THE HONORABLE _____

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PLAINTIFF PACITO; PLAINTIFF ESTHER;
PLAINTIFF JOSEPHINE; PLAINTIFF SARA;
PLAINTIFF ALYAS; PLAINTIFF MARCOS;
PLAINTIFF AHMED; PLAINTIFF RACHEL;
PLAINTIFF ALI; HIAS, INC.; CHURCH
WORLD SERVICE, INC.; and LUTHERAN
COMMUNITY SERVICES NORTHWEST,

        *Plaintiffs*,

       v.

DONALD J. TRUMP, in his official capacity as
President of the United States; MARCO RUBIO,
in his official capacity as Secretary of State;
KRISTI NOEM, in her official capacity as
Secretary of Homeland Security; DOROTHY A.
FINK, in her official capacity as Acting Secretary
of Health and Human Services,

        *Defendants*.

Case No. 2:25-cv-255

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

## INTRODUCTION

1.    This lawsuit challenges the Trump Administration's dismantling of Congress's carefully crafted system for resettling refugees in this country. Through executive orders and actions, the Administration has (a) indefinitely suspended *all* refugee admissions and processing

COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF
(No. _____)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

and (b) stopped federal funding of the organizations that have served refugees for decades, crippling their ability to provide resettlement services.

2.      This is not the first time President Trump has attacked refugees and the system that facilitates their resettlement in the United States—the U.S. Refugee Admissions Program ("USRAP"). These actions echo President Trump's prior attempts during his first term in office to ban refugees and dismantle the USRAP infrastructure. This Court, as well as courts around the country, uniformly rejected those prior attempts.

3.      Rather than learn from past mistakes, the Trump Administration has repeated them and engaged in severely harmful and irrational conduct that flouts the rule of law.

4.      Unlike the October 2017 suspension of refugee admissions that occurred during President Trump's first term—a ninety-day ban that targeted refugees from Muslim-majority countries and those seeking family reunification—the executive order signed by President Trump just hours into his second term bars entry for *all* refugees and suspends decisions on refugee applications, both for an indefinite period of time. Exec. Order No. 14163, Realigning the United States Refugee Admission Program, 90 Fed. Reg. 8,459 (Jan. 20, 2025) (the "Refugee Ban EO" or "Order").

5.      The chaos intensified when the implementing agencies arbitrarily and without explanation failed to follow even the paltry restraints in the Order: Rather than wait until January 27 to implement the suspension as the Order directed, the agencies immediately canceled scheduled travel for refugees. Plaintiff Pacito, for example, was scheduled to travel on January 22 with his wife and baby and had sold all of the family's possessions and given up their rental house in preparation; he then learned that their travel was canceled.

6.      The agencies also immediately suspended all processing, freezing work on pending refugee applications—even though neither required nor authorized by the Order's express terms.

7.      And, in an attempt to sound the final death knell for U.S. refugee resettlement, the Trump Administration suspended, effective immediately, funding to the resettlement partners that

COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 2
(No. _____)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1  assist in processing refugee applications abroad and that provide necessary—and statutorily

2  mandated—benefits to refugees and Afghan and Iraqi allies who have recently arrived in the

3  United States.

4  8.  The Administration claims that this immediate, no-notice funding suspension, and

5  the accompanying directives to resettlement partners to "cancel as many outstanding obligations

6  as possible," are merely temporary actions designed to allow for a government "review of foreign

7  assistance programs," after which the Administration will decide whether to "continue, modify, or

8  terminate" those programs.

9  9.  In the meantime, Plaintiffs HIAS, Inc. ("HIAS") and Church World Service, Inc.

10  ("CWS," and together with HIAS, the "Plaintiff Resettlement Agencies")—national faith-based

11  nonprofit organizations that receive a majority of their funding from the federal government—are

12  already struggling to keep their lights on and their staff employed, let alone continue to serve the

13  vulnerable refugees at the core of their missions. The Resettlement Support Centers administered

14  by HIAS (in Vienna, Zagreb, and Tel Aviv) and CWS (in Nairobi) have been completely defunded

15  and dismantled by the notices of suspension and stop-work orders issued by the State Department,

16  in spite of standing cooperative funding agreements with that department. Thousands of employees

17  at the Plaintiff Resettlement Agencies, at the Resettlement Support Centers that they administer

18  overseas, and in their U.S. networks of local affiliates have been furloughed and laid off already—

19  with more to come.

20  10.  HIAS and CWS partner with affiliates that form the backbone of the domestic

21  infrastructure supporting refugee resettlement in this country. They are the local entities who have

22  built up strong relationships over decades with state and local governments and local service

23  providers, employers, schools, landlords, and others who are crucial to the effective integration of

24  refugees into their new communities. Affiliates across the country are now facing imminent

25  closure. This infrastructure, once lost, cannot be easily rebuilt. Plaintiff Lutheran Community

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Services Northwest ("LCSNW") is among these affiliates and is facing significant staff layoffs and curtailment of vital services.

11.    The Trump Administration's attacks on refugees and the USRAP harm so many lives. Vulnerable refugees remain in danger, like Plaintiff Alyas, whose travel for February 3 was canceled and who lives under threat in Iraq with his wife and three-year-old child because of his association with the U.S. presence in that country and his membership in a persecuted ethno-religious minority. U.S.-based family members of refugees are left devasted, like Plaintiff Marcos, who stares hopelessly at an empty room, freshly painted and prepared to welcome his stepdaughter who was supposed to travel to the United States in early February but instead remains in danger in El Salvador.

12.    Due to the ongoing, serious, and irreparable harms they face, Plaintiffs request that the Court enter a temporary restraining order and an injunction of the suspension of refugee application processing and admissions imposed by the Refugee Ban EO, Defendants' subsequent implementation of the Order, and the State Department's suspension of funding for USRAP application processing and post-arrival services—and, in so doing, restore the important and historic American tradition of protecting and aiding people fleeing persecution.

## PARTIES

13.    Plaintiff Pacito*[1] is a refugee from the Democratic Republic of the Congo who was approved for resettlement to the United States and scheduled to travel with his family on January 22, 2025, before their travel was abruptly canceled. Pacito and his family currently reside in Nairobi, Kenya.

14.    Plaintiff Esther* is a U.S. citizen living in Boise, Idaho, who filed an application to be reunited with her daughter, who remains in South Africa.

---

[1] Plaintiffs seek to proceed anonymously given the serious harms they and their families face should their participation in this lawsuit become public. All Plaintiffs seeking to proceed anonymously are denoted with an asterisk following their pseudonym.

COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 4
(No. _____)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

15.     Plaintiff Josephine* is the beneficiary on her mother, Esther's, application for family reunion. She was born in the Democratic Republic of the Congo and currently lives in Durban, South Africa.

16.     Plaintiff Sara* is a refugee from Iraq who was conditionally approved for resettlement to the United States and awaiting travel confirmation before her case was suspended. She currently lives with her son, who is a derivative beneficiary on her refugee application, in Jordan.

17.     Plaintiff Alyas* is a refugee applicant from Iraq. He, his wife, and his three-year-old son were scheduled to travel to the United States on February 3 until their travel was canceled. The family currently lives in Iraq.

18.     Plaintiff Marcos* filed an application to be reunited with his stepdaughter, who was approved for resettlement, travel ready, and told she would travel the first or second week of February. Marcos currently lives in Los Angeles, California.

19.     Plaintiff Ahmed* is a refugee from Afghanistan who was conditionally approved for resettlement to the United States and was awaiting travel confirmation before his case was suspended. He currently lives in Germany.

20.     Plaintiff Rachel* is a U.S. citizen who, along with four others, filed an application to sponsor an Afghan refugee family before their case was suspended. She lives in Bellevue, Washington.

21.     Plaintiff Ali* was admitted to the United States as a refugee from Iraq in January 2025 and is statutorily entitled to receive benefits as a recently resettled refugee—but has been informed those benefits are now unavailable. He lives in Dallas, Texas.

22.     Plaintiff HIAS, Inc. is a 501(c)(3) faith-based organization and the world's oldest refugee resettlement agency. HIAS, the American Jewish community's global refugee organization, is a national refugee resettlement agency and has agreements with the State Department to assist with overseas processing for the USRAP and the initial placement and

COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 5
(No. _____)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

resettlement of refugees in the United States. HIAS works towards a world in which all refugees find welcome, safety, and freedom. Founded as the Hebrew Immigrants Aid Society in 1903 to assist Jews who had fled the pogroms of Russia and Eastern Europe (and later renamed the Hebrew Immigrant Aid Society), HIAS now serves refugees and persecuted people, regardless of their faith or ethnicity, around the globe. Since its founding, HIAS has helped more than 4.5 million refugees start new lives. HIAS has offices in Africa, Latin America and the Caribbean, Europe, and Israel. It is headquartered in Silver Spring, Maryland, and provides resettlement services in the United States through thirty affiliates in seventeen states.

23.    Plaintiff Church World Service, Inc. is a 501(c)(3) faith-based organization committed to serving the world's most vulnerable people through just and sustainable responses to hunger, poverty, displacement, and disaster. CWS is a national refugee resettlement agency that has agreements with the State Department to assist with overseas processing for the USRAP in Africa and the initial placement and resettlement of refugees in the United States. Since its founding in 1946 in the aftermath of the Second World War, CWS has provided assistance and resettlement services to those displaced by violence and discrimination. Within the United States, CWS works to build welcoming communities that support refugees on a path toward self-sufficiency, full integration, and a bright future for their families. To date, CWS has helped resettle more than 910,000 refugees, parolees, and other entrants across the United States. CWS has offices in sixteen countries worldwide, including its headquarters in New York City and other domestic offices in Elkhart, Indiana, and Washington, D.C. CWS provides resettlement services in the United States at forty-four locations in twenty-four states, either directly or through affiliates.

24.    Plaintiff Lutheran Community Services Northwest is a 501(c)(3) organization that is an affiliate of a national resettlement agency. Headquartered in Tacoma, Washington, LCSNW has more than 40 locations across Washington, Oregon, and Idaho, with more than 700 employees and dozens of programs providing services to more than 40,000 clients each year. It has provided

1    a range of social and family services to low-income communities in the Northwest for decades and

2    provided resettlement services to refugees resettled in LCSNW's communities since the 1940s.

3          25.    Defendant Donald J. Trump is sued in his official capacity as the President of the

4    United States. In that capacity, he issued the executive order challenged in this action.

5          26.    Defendant Marco Rubio is the Secretary of State and is responsible for overseeing

6    the State Department's management of the USRAP. He is also responsible for overseeing the

7    enforcement and implementation of executive orders by all State Department staff. He is sued in

8    his official capacity.

9          27.    Defendant Kristi Noem is the Secretary of Homeland Security and is responsible

10    for overseeing the Department of Homeland Security ("DHS") management of the USRAP. She

11    is also responsible for overseeing enforcement and implementation of relevant executive orders by

12    all DHS staff. She is sued in her official capacity.

13          28.    Defendant Dorothy A. Fink is the Acting Secretary of Health and Human Services

14    and is responsible for overseeing the enforcement and implementation of executive orders by all

15    Department of Health and Human Services ("DHHS") staff. The Office of Refugee Resettlement

16    ("ORR") sits within DHHS as part of the Administration for Children and Families. She is sued in

17    her official capacity.

18                    **JURISDICTION AND VENUE**

19          29.    This Court has subject-matter jurisdiction over Plaintiffs' claims under the U.S.

20    Constitution and federal statutes pursuant to 28 U.S.C. § 1331. The Court has additional remedial

21    authority under 28 U.S.C. §§ 2201–2202.

22          30.    Venue is proper under 28 U.S.C. § 1391(e). Defendants are officers or employees

23    of the United States acting in their official capacities. Plaintiff Rachel resides in this district and

24    Plaintiff Lutheran Community Services Northwest is an Oregon corporation headquartered in

25    Tacoma, Washington, and with offices in Seattle. No real property is involved in this action.

26

COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 7
(No. _____)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

# FACTUAL ALLEGATIONS

**Congress's Comprehensive System for Meeting the United States' Commitments to People Fleeing Persecution**

*The Refugee Act*

31.    Under Article I of the U.S. Constitution, the power to make immigration laws "is entrusted exclusively to Congress." *Galvan v. Press*, 347 U.S. 522, 531 (1954); *see also* U.S. Const. art. I, § 8, cl. 4.

32.    Pursuant to this authority, Congress has enacted a comprehensive statutory scheme to regulate immigration—the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*—which empowers various federal agencies to enforce and administer immigration law.

33.    Congress amended the INA in 1980 by enacting the Refugee Act, which embodies the U.S. commitment to humanitarian assistance for those fleeing persecution. Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102.

34.    In enacting the Refugee Act, Congress sought to "provide a permanent and systemic procedure for the admission . . . of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted." *Id.* § 101(b). It declares that "it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands," including through resettlement of such persons to this country. *Id.* § 101(a).

35.    The Refugee Act sets out detailed policies and procedures that govern the admission and resettlement of refugees in the United States, which together create the USRAP. *See* 8 U.S.C. § 1157 *et seq.*

36.    Under U.S. law, and consistent with U.S. treaty obligations, a "refugee" is a person fleeing his or her country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. *See* 8 U.S.C. § 1101(a)(42).

COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 8
(No. _____)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1  *The U.S. Refugee Admissions Program*

2      37.    The USRAP embodies and effectuates the United States' commitment to offering

3  a safe haven for people around the world fleeing persecution.

4      38.    Individuals outside of the United States seeking admission as refugees are

5  processed through the USRAP, which is managed by the State Department in cooperation with the

6  DHS and DHHS.

7      39.    The State Department, working with resettlement agencies and other cooperating

8  agencies around the world, is responsible for facilitating the overall refugee application process,

9  while DHS has responsibility for determining an applicant's eligibility for refugee status under

10  U.S. law.

11      40.    Under the Refugee Act, the Secretary of DHS is authorized to admit to the United

12  States "any refugee who is not firmly resettled in any foreign country, is determined to be of special

13  humanitarian concern to the United States, and is admissible . . . as an immigrant." 8 U.S.C.

14  § 1157(c)(1).

15      41.    The Refugee Act also provides that the total number of refugees who can be

16  admitted to the United States in a given fiscal year is determined in advance by the President,

17  based on what the President finds is justified by humanitarian concerns or is otherwise in the

18  national interest.

19      42.    In late 2024, President Joe Biden set the refugee admissions goal for fiscal year

20  2025 at 125,000 refugees, *see* Presidential Determination No. 2024-13, 89 Fed. Reg. 83,767 (Sept.

21  30, 2024), as he had done for the prior three fiscal years. Historically, the President has set the

22  refugee admissions goal as high as 240,000 (in 1980, the year Congress passed the Refugee Act)

23  and as low as 15,000 (at the end of the first Trump Administration).

24

25

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

43.     According to data from the State Department, as of December 31, 2024, 27,308 refugees have already been admitted to the United States in Fiscal Year 2025.[2]

***How Refugees Access the USRAP***

44.     The U.N. High Commissioner for Refugees ("UNHCR") estimates that there are more than 120 million people around the world who have been forced to flee their homes, of whom more than 43 million are refugees.

45.     Only a tiny fraction of refugees worldwide will ever be considered for refugee resettlement in the United States.

46.     Refugees trying to reach safety in the United States must be processed through the USRAP, and USRAP access is restricted to refugees considered to be "of special humanitarian concern to the United States," which is determined by the USRAP "priority" system that the State Department sets out annually in joint reports to Congress.

47.     Under this system, a refugee must either be referred to the program by an authorized entity or group (such as UNHCR) or belong to certain designated groups with common characteristics, defined either by statute or by the State Department in its joint reports to Congress.

48.     Some refugees can access the USRAP through a congressionally created family reunification program called follow-to-join ("FTJ").

49.     The FTJ program allows a refugee already admitted to the United States to petition for his or her spouse and unmarried minor children, who remain abroad, to come to the United States. *See* 8 U.S.C. § 1157(c)(2)(A).

50.     Beneficiaries of an FTJ petition are admitted as refugees, and their admission is counted under the number of refugees authorized to enter the United States pursuant to that fiscal

---

[2] *See Admissions & Arrivals*, Refugee Processing Ctr., https://www.wrapsnet.org/admissions-and-arrivals (Dec. 31, 2024) (click "Refugee Admissions Report as of December 31, 2024").

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

year's presidential determination. Under the Refugee Act, they are also entitled to the same services that other refugees receive upon resettlement, described below.

51.    Under the Refugee Act, so long as an FTJ beneficiary is not inadmissible under the INA, the government has no discretion to deny their entry as refugees.

***The Role of Resettlement Partners in USRAP Refugee Processing***

52.    Processing of refugee cases abroad through the USRAP is conducted by the State Department and DHS. The State Department has overall overseas management responsibility of the USRAP. Meanwhile, U.S. Citizenship and Immigration Services ("USCIS"), a component of DHS, has responsibility for adjudicating applications for refugee status and reviewing case decisions.

53.    To fulfill its responsibilities, the State Department funds and manages nine regional Resettlement Support Centers ("RSCs") that are operated by third parties and assist the government with certain aspects of refugee application processing. RSC support includes assisting applicants in preparing their refugee applications, conducting cultural orientations for approved applicants, and collecting information to assist in appropriate refugee placement in the United States. RSCs also directly assist in application processing by, for example, scheduling medical exams and uploading the results to a government system.

54.    Plaintiffs HIAS and CWS are among the third-party agencies that operate the RSCs pursuant to "cooperative agreements" with the State Department. Under these cooperative agreements, the State Department agrees to provide a set amount of funding to recipients, such as HIAS and CWS, during a year-long period in exchange for the recipients providing "regional refugee processing service for U.S. refugee admissions" in specified regions. HIAS also receives State Department funding through a cooperative agreement for its work in collaboration with UNHCR and others to ensure highly vulnerable, hard-to-reach refugees can be processed through the USRAP.

COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 11
(No. _____)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

55.     A refugee pursuing resettlement through the USRAP must complete a multi-step process.

56.     At the threshold, they might be interviewed by a designated referral entity so that their case can be considered for referral to the program.

57.     Once a case is referred to the USRAP, an RSC collects biographic and other information from the applicant to prepare the cases for security screening, interview, and adjudication.

58.     DHS, through its subagency USCIS, reviews the collected information and the results of security screening processes and conducts an in-person interview before deciding whether to conditionally approve the applicant for resettlement.

59.     After DHS conditionally approves a refugee applicant for resettlement to the United States, the RSC guides the applicant through post-adjudication steps, including a health screening. The RSC also obtains a "sponsorship assurance" from one of the ten U.S.-based national resettlement agencies, of which Plaintiffs CWS and HIAS are two.

60.     Once all the required steps are completed, the RSC refers the applicant's case to the International Organization for Migration ("IOM") to schedule the applicant's travel using State Department funds, which the applicant is expected to pay back after their arrival in the United States.

61.     Finally, the RSC provides the refugee with cultural orientation training and materials before the refugee travels to the United States.

***The Role of Resettlement Agencies in Post-Arrival Refugee Services***

62.     When a resettlement agency provides a sponsorship assurance to a conditionally approved refugee abroad, the resettlement agency assumes responsibility for placing the refugee with one of its affiliates, which will provide the refugee with initial services during the refugee's first ninety days in the United States. The local affiliate will provide basic necessities, including housing and food, and core services during the refugee's initial period of resettlement. In

COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 12
(No. _____)

coordination with publicly supported refugee service and assistance programs, the resettlement agency affiliate assists the refugee in achieving economic self-sufficiency as soon as possible after arrival in the United States. Plaintiff LCSNW is one of these affiliates.

63.     Resettlement agencies, including Plaintiffs HIAS and CWS, receive funding under cooperative agreements with the State Department to provide these services to the refugees assured to their agency. The agreements set out funding amounts based on the number of refugees the resettlement agency is anticipated to assure during the one-year agreement term, as described in more detail below.

64.     Resettlement agencies, directly and through affiliates, develop close relationships with the refugees and refugee families they resettle, as they provide critical support during this vulnerable and challenging time.

65.     For example, local resettlement offices provide many services that a refugee family is likely to require immediately upon their arrival, including finding and furnishing housing, stocking the pantry, and making the family a welcome meal for their first night. When the refugees arrive, affiliate staff often greet them at the airport, along with needed interpreters and caseworkers.

66.     After the refugees arrive, staff help them with transportation, socialization, and other steps necessary to transition to life in the United States, like taking an English placement test and getting social security cards.

67.     Resettlement agencies and their affiliates have invested decades in building up this resettlement infrastructure, including staff with relevant language skills, and the private partnerships—such as relationships with local employers, service providers, and landlords—required to ensure that the refugees they help resettle are afforded the best possible chance at success in building their new lives in the United States.

COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 13
(No. _____)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

*Federal Funding for Refugee Assistance*

68.    Federal funding for the USRAP and for refugee resettlement and assistance falls into a few different categories.

69.    At the threshold, and as described above, the State Department provides funding to designated referral entities and to RSCs to support refugee application processing. The State Department also provides funding to IOM to book refugee travel to the United States.

70.    After refugees arrive in the United States, the State Department provides funding to support their integration and self-sufficiency through the Reception and Placement Program, which covers up to the first ninety days a refugee is in the United States.[3]

71.    The Reception and Placement Program is administered through the cooperative agreements between the State Department and resettlement agencies.

72.    Resettlement agencies use this funding to provide housing, essential furnishings, food, clothing, orientation, and assistance with access to other social, medical, educational, and employment services. Under the cooperative agreements, resettlement agencies are reimbursed per refugee they sponsor, some of which must be used in direct assistance to the refugee and some of which may offset the costs of the affiliate's services and overhead supporting the refugee. This support is intended as a supplement to private resources the resettlement agencies and their affiliates mobilize for the benefit of their refugee clients, relying on the relationships they have built up over decades.

73.    In addition to refugees, Afghan and Iraqi Special Immigrant Visa ("SIV") holders are entitled to Reception and Placement benefits provided by one of the resettlement agencies. *See*

---

[3] The Refugee Act permits the President to reassign the statutory authority of the Director of the ORR to administer the Reception and Placement Program to another office. *See* 8 U.S.C. § 1522(b)(1)(B). President Jimmy Carter determined that the State Department should exercise that authority; ever since, the State Department's Bureau of Populations, Refugees, and Migration has administered the Reception and Placement Program. Accordingly, this Complaint refers to the State Department's responsibility to make grants or contracts with resettlement agencies "consistent with the objectives of [8 U.S.C. § 1522]." 8 U.S.C. § 1522(b)(1)(A).

COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 14
(No. _____)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1   Afghan Allies Protection Act, Pub. L. No. 111-8, § 602(b)(8), 123 Stat. 809 (2009); Refugee Crisis

2   in Iraq Act, Pub. L. No. 110-181, § 1244(g), 122 Stat. 398 (2008).

3       74.     Next, the ORR, which sits within the DHHS, provides longer-term assistance to

4   refugees through both the resettlement agencies and state governments. *See* 8 U.S.C. §§ 1521(a),

5   1522(b).

6       75.     ORR is responsible for funding and administering federal cash and medical

7   assistance programs for refugees beyond the initial resettlement period. *See id.* §§ 1521(b),

8   1522(e)(1).

9       76.     Some of the money administered by ORR flows through the resettlement agencies

10  for the provision of critical services to refugees and to Afghan and Iraqi SIV recipients assured to

11  their agencies.

12      77.     Some of the money administered by ORR flows through the states pursuant to a

13  detailed statutory scheme under which each participating state must submit a plan describing how

14  the state will coordinate cash and medical assistance and otherwise meet the requirements imposed

15  by the Refugee Act. *See id*. § 1522(a)(6); 45 C.F.R. §§ 400.4(a), 400.5(b).

16                  **History of President Trump's Attempts to Ban Refugees**

17      78.     After demonizing refugees on the campaign trail—and pledging that, if elected,

18  "they're going back"—President Trump attempted to deliver on that promise during his first term

19  through an executive order issued on January 27, 2017, which suspended all refugee admissions

20  for a period of 120 days and indefinitely blocked Syrian refugees from entering the United States.

21  *See* Exec. Order No. 13769, Protecting the Nation from Foreign Terrorist Entry into the United

22  States, 82 Fed. Reg. 8,977 (Jan. 27, 2017). The order also slashed, by more than half, the annual

23  refugee admission allotment that was set prior to fiscal year 2017. *Id.*

24      79.     On February 3, 2017—less than a week after the executive order was issued—a

25  court in this district issued a nationwide temporary restraining order enjoining it. *Washington v.*

26  *Trump*, No. C17-0141JLR, 2017 WL 462040, at *2 (W.D. Wash. Feb. 3) (construing temporary

COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 15
(No. _____)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    restraining order as preliminary injunction and denying government's motion for stay pending

2    appeal), *stay pending appeal denied*, 847 F. 3d 1151 (9th Cir. 2017) (per curiam).

3          80.    Rather than pursuing an appeal of that decision, President Trump signed a new

4    executive order, which again suspended the USRAP for 120 days and included a discretionary

5    case-by-case exception only if the Secretaries of State and Homeland Security determined that

6    "the entry of such individuals as refugees is in the national interest and does not pose a threat to

7    the security or welfare of the United States." Exec. Order No. 13780, Protecting the Nation from

8    Foreign Terrorist Entry into the United States, 82 Fed. Reg. 13,209 (Mar. 6, 2017). Like the first

9    executive order, this second order also attempted to lower the ceiling on admissions of refugees

10   for fiscal year 2017 by more than half. *Id.*

11         81.    Before this executive order could take effect, the U.S. District Court for the District

12   of Hawai'i issued a nationwide temporary restraining order, concluding that the second order likely

13   violated the Establishment Clause. *See Hawai'i v. Trump*, 241 F. Supp. 3d 1119, 1140 (D. Haw.

14   2017). About a week later, the district court converted the temporary restraining order into a

15   preliminary injunction. *See Hawai'i v. Trump*, 245 F. Supp. 3d 1227, 1239 (D. Haw.), *aff'd in part*

16   *and vacated in part*, 859 F.3d 741 (9th Cir. 2017) (per curiam).

17         82.    On appeal, the Ninth Circuit affirmed the district court's preliminary injunction,

18   holding that the second executive order violated the INA and that the President exceeded his

19   statutory authority in suspending refugee admissions. *See Hawai'i v. Trump*, 859 F.3d 741, 755–

20   56 (9th Cir. 2017) (per curiam).[4]

21

22   ───────────────

23         [4] After consolidating the *Hawai'i* case with a challenge to the executive order in the Fourth
     Circuit, on June 26, 2017, the U.S. Supreme Court granted certiorari and partially stayed the
24   injunction against the refugee ban pending appeal to the extent it applied to "foreign nationals
     abroad who have no connection to the United States at all." *Trump v. Int'l Refugee Assistance*
25   *Project*, 582 U.S. 571, 581 (2017) (per curiam). With Supreme Court review pending, President
     Trump replaced the executive order with a presidential proclamation that limited entry for visa
26   applicants from certain countries; meanwhile, the refugee ban was later replaced by an agency
     memorandum further suspending refugee admissions as described below. Accordingly, the

COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 16
(No. _____)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

83.     At the conclusion of the 120-day suspension, President Trump issued a new executive order, which purported to allow the USRAP to resume subject to determinations by the Secretary of DHS in consultation with the Secretary of State of "whether any actions should be taken to address the risks to the security and welfare of the United States presented by permitting any category of refugees to enter this country, and, if so, what those actions should be." Exec. Order No. 13815, Resuming the United States Refugee Admissions Program with Enhanced Vetting Capabilities, 82 Fed. Reg. 50,055 (Oct. 24, 2017).

84.     That same day, the Secretaries of State and Homeland Security issued a memorandum to the President, which continued the prior executive order suspensions of the USRAP in two ways: (a) it continued to suspend the USRAP for refugees from eleven countries and (2) it indefinitely suspended the FTJ process for refugees.

85.     A court in this district, examining a challenge brought by several refugee resettlement agencies as well as individuals directly affected by the memorandum's ban, quickly enjoined the Trump Administration from enforcing it. *See Doe v. Trump*, 288 F. Supp. 3d 1045, 1087 (W.D. Wash. 2017).

86.     Eventually, in February 2020, the parties in *Doe v. Trump* reached a settlement whereby the government agreed to prioritize processing of certain cases of individuals who were close to traveling to the United States before the ban went into effect. But nearly five years later, some of those cases still have not completed processing, and now their processing is once again suspended by President Trump's new Refugee Ban EO.

**History of President Trump's Attacks on Refugee Resettlement Infrastructure**

87.     Alongside the first Trump Administration's attempts to prevent refugees from reaching the United States, it also tried to decimate the domestic infrastructure necessary for refugee resettlement.

---

Supreme Court's subsequent decision in *Trump v. Hawai'i*, 583 U.S. 941 (2017), did not address the Ninth Circuit's ruling on the executive order's refugee ban, which remains controlling law.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

88.     In 2019, President Trump issued an executive order upending Congress's carefully calibrated scheme for resettling refugees in states and communities across the country. *See* Exec. Order No. 13888, Enhancing State and Local Involvement in Refugee Resettlement, 84 Fed. Reg. 52,355 (Sept. 26, 2019). He directed that refugees were presumptively not allowed to be resettled in any state or community until both had affirmatively provided their consent to refugee resettlement—but failed to outline any process for implementing this new requirement.

89.     The implementing agencies—DHS and the State Department—in turn shifted the burden to the resettlement agencies to make sense of President Trump's edict. Unless and until they obtained written consents from states and localities around the country, the resettlement agencies would be unable to propose refugee resettlement in those jurisdictions (a process that is usually worked out through the resettlement agencies' cooperative agreements with the State Department).

90.     As with the refugee ban executive orders, this order and its implementation by the agencies was enjoined. *See HIAS, Inc. v. Trump,* 415 F. Supp. 3d 669, 686–87 (D. Md. 2020), *aff'd*, 985 F.3d 309 (4th Cir. 2021).

**President Trump's Current Executive Order Banning Refugees**

91.     It took years to rebuild the resettlement infrastructure and significantly expand the number of refugees who could be resettled to the United States after the Trump Administration's repeated attacks on the USRAP. By fiscal year 2024, however, the resettlement infrastructure was able to support the resettlement of more than 100,000 refugees to the United States.

92.     Meanwhile, the effects of the attacks on the USRAP and resettlement infrastructure continue to linger. For example, some refugees who were on the verge of travel in 2017 and whose cases were suspended by the prior refugee bans had to to wait for their cases to finally proceed to travel. They are waiting still.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    93.    And, as President Trump campaigned for a second term, he promised to implement

2  "brand new crackdowns" on refugees.[5]

3    94.    Just hours into his second term, on January 20, 2025, President Trump signed a

4  bevy of executive orders, including one titled "Realigning the United States Refugee Admissions

5  Program"—the Refugee Ban EO.

6    95.    Under the purported authority of INA sections 212(f) and 215(a), the Refugee Ban

7  EO imposes an indefinite suspension of "entry into the United States of refugees under the

8  USRAP" as well as a suspension on "decisions on applications for refugee status" until President

9  Trump finds that decisions on refugee applications and admissions can resume. *See* Order § 3(a)–

10  (b).

11    96.    The process for making a finding to resume action on refugee applications and

12  admissions is outlined in Section 4 of the Order, which requires the Secretaries of Homeland

13  Security and State to submit a report to the President within ninety days detailing "whether

14  resumption of entry of refugees into the United States under the USRAP would be in the interests

15  of the United States, in light of the policies outlined in section 2." *Id.* § 4.

16    97.    Section 4 requires further reports every ninety days after the first report "until

17  [President Trump] determine[s] that resumption of the USRAP is in the interests of the United

18  States." *Id.*

19    98.    The Refugee Ban EO does not provide any deadline by which the President will

20  determine whether the USRAP can resume, if ever.

21    99.    Section 2 details President Trump's stated policies for refugee admissions, which

22  the Order explains will be the basis of his finding of whether "resumption of USRAP is in the

23  interest of the United States." It states that "[i]t is the policy of the United States to ensure that

24

25    [5] Kristina Cooke & Ted Hesson, *In a Small Wisconsin Church, Trump's Threat of Refugee
26  Crackdown Looms*, Reuters (Oct. 29, 2024), https://www.reuters.com/world/us/small-wisconsin-church-trumps-threat-refugee-crackdown-looms-2024-10-29.

COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 19
(No. _____)

1    public safety and national security are paramount considerations in the administration of the

2    USRAP, and to admit only those refugees who can fully and appropriately assimilate into the

3    United States and to ensure that the United States preserves taxpayer resources for its citizens."

4    Order § 2.

5        100.    It further states that "[i]t is the policy of the United States that, to the extent

6    permitted by law and as practicable, State and local jurisdictions be granted a role in the process

7    of determining the placement or settlement in their jurisdictions of [individuals] eligible to be

8    admitted to the United States as refugees." *Id.*

9        101.    In short, the Order suspends all refugee admissions for an indefinite period until

10   such time as President Trump determines that resuming the USRAP is in the "interests of the

11   United States"—as President Trump, through the Order, has defined those interests.

12       102.    The Refugee Ban EO suspends *all* refugee admissions regardless of the basis for a

13   refugee's access to the USRAP. This includes statutorily created programs for USRAP access such

14   as the FTJ and the Iraqi P2 Direct Access programs.

15       103.    By its terms, the Order's suspension of refugee admissions was to take effect at

16   12:01 a.m. EST on January 27, 2025. The Order's suspension on decisions on applications for

17   refugee status, however, was effective immediately.

18       104.    Aside from the suspension of decisions on refugee applications, the Order does not

19   specify any actions to be taken related to other stages of refugee processing.

20       105.    The Order suggests that exceptions to the suspensions may be made on a "case-by-

21   case basis" pursuant to a joint determination by the Secretaries of State and Homeland Security

22   after a finding that the "entry of such refugees is in the national interest and does not pose a threat

23   to the security or welfare of the United States." Order § 3(c).

24       106.    The Order does not specify any process or require any timeline for establishing a

25   process for such case-by-case exceptions.

26

COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 20
(No. _____)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

107.    The Order also requires the Secretary of Homeland Security, in consultation with the Attorney General, to "examine existing law to determine the extent to which, consistent with applicable law, State and local jurisdictions may have greater involvement in the process of determining the placement or resettlement of refugees in their jurisdictions" and requires them to "devise a proposal to lawfully promote such involvement." Order § 3(d).

108.    The Order does not make any findings that public safety and national security are not currently "paramount considerations in the administration of USRAP."

109.    The Order does not make any findings that refugees who have been admitted through the USRAP are not "fully and appropriately assimilat[ing]".

110.    The Order does not make any findings that State and local jurisdictions do not currently have a role in the placement or settlement of refugees or that the consultation requirements in 8 U.S.C. § 1522(a)(2) are not currently being carried out. Nor does it find that refugee resettlement has been conducted outside of the process outlined by statute, which disperses refugees across the country in accordance with local capacity to receive them and, as explained above, provides for federal funding to support arriving refugees.

111.    The Order seeks to justify its sweeping suspension of the USRAP by reference to "record levels of migration" and influxes of migrants causing New York and Massachusetts to declare states of emergency "because of increased migration." Order § 1.

112.    But the Order does not connect any of these supposed "migration influxes" to the admission of refugees under the USRAP. Indeed, New York's state of emergency declaration related to Texas Governor Greg Abbott's bussing of 17,000 asylum seekers to New York City without warning.[6]

---

[6] *See Addressing the Asylum Seeker Crisis*, Governor Kathy Hochul, https://www.governor.ny.gov/programs/taking-action-address-asylum-seeker-crisis-new-york (last visited Feb. 10, 2025).

COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 21
(No. _____)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

113.    Equally irrelevant is the Massachusetts declaration, which emphasized the need for the federal government to quickly grant work authorization to arriving asylum seekers.[7] In contrast, individuals admitted as refugees automatically receive work authorization upon admission.

**The Agencies' Implementation of the Refugee Ban and Related Orders**

114.    The agencies overseen by Defendants immediately began to implement the Refugee Ban EO.

115.    The evening after President Trump signed the Order, on January 21, 2025, the State Department's Bureau of Population, Refugees, and Migration ("PRM") sent an email to refugee resettlement partners, including Plaintiffs CWS and HIAS, regarding the agency's implementation of the Order (the "Agency Suspension," and together with the Refugee Ban EO, the "Refugee Ban").

116.    PRM's communication explained that all previously scheduled travel of refugees to the United States was canceled and that no new travel bookings will be made.

117.    When questioned about whether the travel cancelations applied to cases where a refugee was scheduled to travel before the Refugee Ban EO's effective date for the refugee admissions suspension—which is to say, January 27 at 12:01 a.m. EST—PRM confirmed that it did.

118.    In other words, the State Department opted to implement the suspension on refugee admissions almost one week earlier than required by the Order by canceling travel for refugees who were scheduled to travel to the United States *before* the effective date set out therein.

119.    The agency's immediate implementation of the suspension of refugee admissions resulted in the canceled flights of Plaintiff Pacito and his family and prevented Plaintiff Josephine from booking her own flight to the United States.

---

[7] *See Governor Healey Declares State of Emergency, Calls for Support for Newly Arriving Migrant Families*, Commonwealth of Mass. (Aug. 8, 2023), https://www.mass.gov/news/governor-healey-declares-state-of-emergency-calls-for-support-for-newly-arriving-migrant-families.

120.    PRM's communication also stated that all refugee case processing, including new referrals to the USRAP and processing of all active and previously submitted applications, is currently suspended.

121.    PRM's communication did not include any information about the process for requesting the case-by-case waiver provided under the Order.

122.    To date, the Plaintiff Resettlement Agencies have not received any information regarding the case-by-case waiver allegedly available under the Order.

**The Trump Administration's Unprecedented Attack on the Refugee Resettlement Infrastructure**

123.    Just days after President Trump issued his executive orders, the State Department and DHHS attacked refugee resettlement again—this time by targeting the refugee resettlement infrastructure.

124.    On the evening on Friday, January 24, the State Department immediately and without notice suspended the funding the agency had already committed to its resettlement partners for their refugee resettlement work—specifically, funding to support refugee application processing overseas and funding for reception, placement, and other integrative services for newly arrived refugees and SIV holders.

125.    Defendants advised resettlement partners, including Plaintiffs HIAS and CWS, of this unprecedented action by sending notices of suspension (the "Suspension Notices").

126.    The Suspension Notices informed the partners that their existing cooperative agreements—referenced in a list at the top of each Notice—are "immediately suspended as of January 24, 2025." The Suspension Notices ordered the partners to "stop all work" under their cooperative agreements and "not incur any new costs" after January 24, 2025. The Suspension Notices also directed that the partners "must cancel as many outstanding obligations as possible."

127.    Defendants' lone explanation for their extreme and unprecedented action is that the cooperating agreements "*may* no longer effectuate agency priorities" as expressed in President

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Trump's "Reevaluating and Realigning United States Foreign Aid" executive order (the "Foreign Aid Executive Order"). According to the Suspension Notices, the State Department will be undertaking "a Department-wide review of foreign assistance programs" to determine "*whether* to continue, modify, or terminate" the cooperative agreements. Exec. Order No. 14169, 90 Fed. Reg. 8,619 (Jan. 20, 2025) (emphasis added).

128.    But the Foreign Aid Executive Order—the stated basis for the funding suspension—has nothing to do with refugee resettlement. It makes no mention of refugees, the USRAP, or anything related to processing of individuals for admission into the United States and support for individuals after their arrival in the United States.

129.    Rather, the Foreign Aid Executive Order requires a "90-day pause" of U.S. "foreign development assistance" pending a review by "all department and agency heads with responsibility for United States foreign development assistance programs" to ensure that U.S. foreign assistance is not "disbursed in a manner that is not fully aligned with the foreign policy" of President Trump.

130.    The State Department has provided no explanation as to why USRAP processing and support for refugees and Afghan and Iraqi allies in the United States constitute "foreign development assistance."

131.    The State Department and DHHS have also implemented a *sub silentio* suspension of funding for support for recently arrived refugees and SIV holders, as detailed below (the "*Sub Silentio* Suspension," and together with the Suspension Notices, the "Refugee Funding Suspension").

132.    Since receiving the Suspension Notices, the Plaintiff Resettlement Agencies have not received reimbursements for millions of dollars they are owed from the State Department for work performed in November and December 2024, well before the Suspension Notices and the Foreign Aid Executive Order issued.

133.    Upon information and belief, DHHS also took aim at the refugee resettlement infrastructure by, without notice or explanation, withholding reimbursements it had committed,

COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 24
(No. _____)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1   pursuant to cooperative agreements, to resettlement agency work supporting the integration of

2   recently arrived refugees and SIV holders.

3         134.    The Plaintiff Resettlement Agencies do not have significant cash reserves and are

4   dependent on expeditious processing of reimbursements in order to maintain the funds necessary

5   to provide services to recently arrived refugees and SIVs.

6         135.    Upon information and belief, ORR might have also suspended payments that it

7   makes to states to provide supportive services to recently arrived refugees and SIV holders. On

8   February 5, 2025, Plaintiff Ali received notification from the Texas Office for Refugees that there

9   was an "indefinite delay in Refugee Cash Assistance (RCA) benefit payments" due to "technical

10   issues at the federal level."

11       **The Refugee Ban and Refugee Funding Suspension Irreparably Harm Plaintiffs**

12         136.    All of these actions—the suspension of refugee admissions and processing and the

13   refugee funding suspension—have not just harmed refugees waiting to come to the United States.

14   They have also devastated refugees already here and the organizations that seek to help them.

15   *Individual Plaintiffs*

16   *Plaintiff Pacito*

17         137.    Plaintiff Pacito is a refugee from the Democratic Republic of the Congo who, along

18   with his wife and baby son, was scheduled to travel to the Unites States on January 22, 2025, days

19   before the suspension of refugee admissions was to take effect per the Order.

20         138.    As they were expecting to imminently travel, Pacito's family sold all of their

21   belongings but for the items that could fit in their checked luggage—including the music

22   production equipment that he had used to earn a living—and they gave up the lease on their home.

23         139.    But just days before they were scheduled to travel, Pacito received a phone call

24   from IOM informing him that his family's travel had been canceled. Initially he thought there must

25   be some mistake, so the family traveled to the IOM transit center (where they were supposed to go

26   on the day of travel for transport to the airport) and asked for clarification. There, he learned that

COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 25
(No. _____)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

their travel had been canceled because of the Order. IOM staff referred him to the White House website for more information.

140.    When Pacito read that the admissions suspension was not to take effect until January 27, he asked IOM staff why the Order was affecting his family. IOM staff could not explain and simply said that a representative from Washington, D.C., instructed them to cancel the family's flights.

141.    That night, the family slept in the parking lot of the IOM transit center, vainly hoping and praying that there was some mistake and that they would be taken to the airport to board their flight the next day as planned.

142.    Pacito and his family are devastated by the travel cancelation. They are struggling to find stable housing and employment, particularly since he no longer has the equipment required to continue his work as a music producer.

*Plaintiff Esther*

143.    Plaintiff Esther and her family fled their home in the Democratic Republic of the Congo because of the war. At the time, her daughter Josephine was very young. The family arrived at a refugee camp in Tanzania, where life was unsafe for Josephine because young Christian women like her were in danger of being kidnapped and assaulted and were prevented from attending school. The family made the difficult decision to send Josephine to South Africa so she could be safe and have more options.

144.    When Esther came as a refugee to the United States in 2016 with other members of her family, she learned that she could apply for family reunification with Josephine through the FTJ process. The case moved forward very slowly during the first Trump Administration's suspension of FTJ processing. Finally, with the assistance of attorneys, Esther filed a mandamus lawsuit in federal court asking the court to order the agencies to make a decision on the years-long pending application.

COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 26
(No. _____)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

145. The case began to move more quickly, and in January 2025, Josephine was on the verge of travel. Her boarding foil—the documentary proof she would need to board a flight and enter the United States—was issued. She was awaiting travel booking confirmation when the Refugee Ban went into effect.

146. When Esther learned that Josephine's case is now indefinitely on pause, she was heartbroken. It is especially hard for Esther because one of her children died unexpectedly and she wishes Josephine was with her to provide support. Esther longs to be reunited with her daughter.

*Plaintiff Josephine*

147. Josephine became separated from her mother and the rest of her family after they fled the war in the Democratic Republic of the Congo and found their way to a refugee camp in Tanzania. Josephine's family decided she could not stay in the camp because it was too dangerous for a young Christian, unmarried woman. Josephine fled to South Africa, where she currently lives.

148. Processing began to move more quickly after Josephine's mother, Plaintiff Esther, filed the mandamus lawsuit in federal court to speed up her years-long delayed family reunification case. While Josephine waited for IOM to book her flight, Josephine's lawyer helped her organize her own travel so that she could try to travel before the Refugee Ban took effect on January 27, 2025. Before her flight, Josephine went to the U.S. embassy in Johannesburg to pick up her boarding foil. Because she believed she would not be returning to her living quarters, Josephine packed her bags, gave away many of her belongings, and terminated her rental agreement with her landlord.

149. Unfortunately, the embassy refused to release Josephine's boarding foil. Josephine stayed overnight in Johannesburg and tried again the following day to obtain the boarding foil that would have allowed her to self-travel to the United States before January 27, 2025. But she was not able to obtain the document.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

150.    Josephine is brokenhearted that she is unable to support her mother as she grieves the loss of her son, Josephine's brother, and she longs to be reunited with her siblings, whom she has not seen in so many years.

*Plaintiff Sara*

151.    Plaintiff Sara and her youngest son are Iraqi nationals who currently live in Amman, Jordan. Sara fled Iraq with her eldest son in or around 2003 after their lives were threatened by militias. They were subsequently referred to the USRAP for resettlement to the United States as refugees. Sara's eldest son was admitted to the United States as a refugee in or around 2012 while her own application remained pending. While in Jordan, Sara became remarried, gave birth to her second son, and then divorced. Her youngest son is a derivative beneficiary on her pending refugee application.

152.    Sara's refugee application was conditionally approved in January 2024 and she completed her medical exam and cultural orientation—two of the last steps in refugee processing before travel arrangements are made—in January 2025. IOM told her to be prepared to leave quickly because once travel was scheduled, she would have very little time.

153.    Sara made preparations to leave and eagerly awaited a phone call saying that she and her son were booked to travel to the United States, where they would finally be reunited with her eldest son, who lives in Idaho. Instead, on January 25, 2025, IOM informed her that the refugee program was suspended—and, along with it, her application for resettlement. Sara could hardly bear the news that, after so many years of waiting to reunite with her eldest son and restart their lives in safety, her dreams were now put on indefinite hold.

154.    When Sara closes her eyes, she still imagines herself at the airport and the joy she would feel in seeing her oldest son waiting for her. He is now a U.S. citizen and is expecting his first child. Sara is crushed that she might miss the birth of her first grandchild and that her separation from her oldest son is now indefinitely prolonged. She also feels afraid for her and her

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

youngest son's safety in Jordan, where they face discrimination as Iraqis; her son has been targeted by a local gang and beaten and robbed.

155.    Her youngest son also suffers from a neurological birth defect that affects his nerves and vision. She herself suffers from several medical conditions, including diabetes and uterine fibroids. Sara and her son struggle to access appropriate medical care in Jordan.

*Plaintiff Alyas*

156.    Plaintiff Alyas is an Iraqi national who currently lives in Sinjar City, Iraq, with his wife and three-year-old son. Alyas applied for refugee resettlement to the United States through the Iraqi P-2 DAP program, which is a statutorily-created program that allows Iraqi nationals who worked for or on behalf of the U.S. government in Iraq, as well as certain family members of such individuals, to directly apply to the USRAP. *See* 8 U.S.C. § 1242(a).

157.    In December 2024, Alyas was conditionally approved for refugee resettlement to the United States, and he and his family were booked to travel on February 3, 2025. On January 21, 2025, IOM informed Alyas that his travel was canceled and his case was suspended because of the Refugee Ban.

158.    Alyas and his wife suffer from anxiety and hopelessness, wondering if they will ever complete the process and be resettled in the United States where they long to live free from fear. He and his family are in danger in Iraq because they are Yazidi, an ethno-religious minority that is the target of violence and discrimination. Alyas's heart breaks at the thought that his long-awaited reunion with his parents and two brothers, who live in Nebraska, is now on indefinite hold.

*Plaintiff Marcos*

159.    Plaintiff Marcos lives in Los Angeles, California, with his wife. In or around November 2016, he sponsored his stepdaughter, who lives in El Salvador, to be reunited with her mother and him in the United States through the Central American Minors ("CAM") program.

160.    The CAM program allows parents who are nationals of some Central American countries and have certain legal statuses in the United States to request access to the USRAP for

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    their minor, unmarried children who are living in those countries. If ultimately approved, the child

2    enters the United States as a refugee.[8]

3         161.    Marcos's stepdaughter received conditional approval for refugee resettlement in or

4    around August 2024, and IOM told Marcos in early January 2025 that his stepdaughter would be

5    traveling to the United States in the first or second week of February.

6         162.    When Marcos learned about the suspension of refugee admissions, he was

7    devastated and heartbroken to share the news with his stepdaughter, who cried on the phone with

8    him when she learned that her long-awaited reunion with her mother—whom she has not seen

9    since she was a small child—was no longer on the horizon. Marcos fears that his stepdaughter will

10   never be able to travel to the United States to live with her mother and him.

11   *Plaintiff Ahmed*

12        163.    Plaintiff Ahmed is a refugee from Afghanistan who was actively involved in peace

13   and human rights activism and participated in political activities sponsored by or affiliated with

14   the U.S. government. In the Fall of 2021, when the United States withdrew and the Taliban took

15   over Afghanistan, the U.S. government evacuated Ahmed from Afghanistan to Germany due to

16   the serious threats to his life.

17        164.    After being evacuated, Ahmed was referred for resettlement to the United States as

18   a refugee. His case was conditionally approved in January 2025, and he was scheduled to complete

19   his medical exam when the Refugee Ban was announced.

20        165.    Having learned that his refugee application is on indefinite hold as a result of the

21   suspension, Ahmed is disconsolate that his dream to pursue his graduate studies in the United

22   States and reunite with his sister, who lives in Maryland, is now delayed for an uncertain period.

23        166.    Ahmed cannot safely return to Afghanistan, nor can he live in Germany long-term.

24   He does not know the German language, which prevents him from working in Germany to support

25   himself and his family members who remain in Afghanistan.

26   ⎯⎯⎯⎯⎯⎯⎯⎯
     [8] CAM has an additional humanitarian parole track that is not at issue in this case.

COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 30
(No. _____)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

*Plaintiff Rachel*

167.    Plaintiff Rachel is U.S. citizen living in Bellevue, Washington. Driven by her Jewish faith, she organized her friends, synagogue community members, and book club members in support of sponsoring an Afghan family. She, along with four others and her synagogue, filed an application to sponsor a family through Welcome Corps.

168.    Welcome Corps is a program started by the State Department in January 2023 that permits a group of eligible private individuals to sponsor refugees in the USRAP. In submitting an application to sponsor, Welcome Corps group agrees to provide the individual or family with all of the post-resettlement support that would normally be provided by a resettlement agency. As of August 2024, Americans in all fifty states, Washington D.C., and Puerto Rico have applied to sponsor refugees of more than forty-five nationalities through Welcome Corps.[9]

169.    The family that Rachel's group agreed to sponsor was already known to her because her daughter befriended a young Afghan woman who was granted asylum in the United States but whose family remains in danger abroad.

170.    Rachel spent more than forty hours actively working on the process to sponsor the family. She found four other people to sponsor with her; they fundraised about $16,000, completed background checks, and signed guarantees that they would be responsible for the family for the first three to six months. Rachel prepared a detailed application for the family, explaining why each member feared return to Afghanistan, and began preparing for their possible arrival. She spent countless hours thinking about the family and her hopes for them to come to the United States.

171.    The family completed their medical exams and interviews in the summer of 2024.

172.    When Rachel learned about the refugee suspension, she felt immense pain for herself and the family she hoped to welcome. Rachel's heart broke when she told the young Afghan

---

[9] *See Proposed Refugee Admissions for Fiscal Year 2025*, U.S. Dep't of State, https://www.state.gov/wp-content/uploads/2024/10/Report-Proposed-Refugee-Admissions-for-FY25.pdf (last visited Feb. 10, 2025).

COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 31
(No. _____)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

woman about the suspension. Two days later, the Afghan woman's father, who would have been one of the sponsored refugees, died.

*Plaintiff Ali*

173.    Plaintiff Ali is a refugee from Iraq who was admitted to the United States through the USRAP in early January 2025. He now lives in Dallas, Texas, alone, with no familial support.

174.    As a gay man in Iraq, he faced extreme persecution and discrimination: Same-sex relationships are criminalized in Iraq, and the Iraqi government and society are hostile towards members of the LGBTQ+ community.

175.    Over the years, Ali was subjected to repeated sexual assault by several men and physical and emotional abuse at the hands of his family members, teachers, peers, and coworkers. Ali was unable to seek protection from the police, who instead arrested him, beat him, and tried to coerce him into a sexual act. Ali was referred for resettlement in the United States on the basis of this persecution.

176.    With only $120 in his pocket, Ali entered the United States as a refugee in January 2025. He was assured to a local resettlement agency, which helped arrange an apartment and some initial cash for basic necessities—critical support for Ali, who has no family or support in the United States. They also referred him to apply for the Refugee Cash Assistance Program, which he understood would provide about $726 every month for six months and, after six months, a reduced amount based on income.

177.    Ali was already worried about making the $726 per month stretch enough to cover rent, groceries, furniture, clothing, and all his necessities. Then, on February 5, 2025, he received an email from the Texas Office for Refugees that indicated "there is an indefinite delay in Refugee Cash Assistance benefit payments." Ali learned from his case manager at the resettlement agency that this is the result of the federal government's suspension of funding for programs that assist recently arrived refugees like him.

COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 32
(No. _____)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

178.     Ali has trouble sleeping and worries he will have to decide between living on the street or moving back to Iraq, where his life will be in constant danger. While Ali loves his new community in Dallas and cherishes the freedom to wear what he wants and be who he is, he suffers from the lack of full benefits to assist him in establishing a new life in the United States.

***Impact of the Refugee Funding Suspension on Individual Plaintiffs***

179.     In addition to Plaintiff Ali, who is directly impacted by the Refugee Funding Suspension because it is preventing him from obtaining cash assistance and other benefits to which he is entitled under the Refugee Act and its implementing regulations, each of the individual Plaintiffs is also impacted by the funding suspension.

180.     Without State Department funding committed to refugee processing abroad, including to maintain the overseas RSCs, refugees will be frozen in the USRAP and unable to continue processing—even if the suspension of refugee admissions and processing is lifted. That is so because the resettlement partners, including Plaintiffs HIAS and CWS, are critical players in refugee processing. Forced to lay off staff or even close (see below), RSCs cannot move the individual Plaintiffs' refugee applications along in the process.

181.     Furthermore, because the Refugee Funding Suspension suspends funding for refugee travel (arranged by IOM, on information and belief, pursuant to an agreement with PRM), even if the individual Plaintiffs managed to complete refugee processing and the admissions ban were lifted, they would still have no ability to travel to the United States and seek admission.

182.     And, if any of the other individual Plaintiffs who are currently overseas manage to surpass all of these hurdles and travel to the United States, the Refugee Funding Suspension will prevent them from accessing critical support and services during their first days in the United States—just like Plaintiff Ali. Refugees arrive in the United States with, at most, two pieces of carry-on luggage—hardly sufficient to start their lives over in a new and foreign country.

COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 33
(No. _____)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

*Organizational Plaintiffs*

183.    Plaintiffs HIAS, CWS, and LCSNW (the "Plaintiff Organizations") are 501(c)(3) nonprofit organizations dedicated to serving refugees by assisting with refugee processing abroad and providing essential services to refugees recently resettled in the United States. Two of the Plaintiff Organizations—HIAS and CWS—are among the ten national resettlement agencies with current cooperative agreements with the State Department to assist in refugee processing abroad and the resettlement of refugees through the Reception and Placement Program. The third, LCSNW, is a local affiliate of a national resettlement agency that provides services to refugees and others in three Northwestern states, with headquarters in Tacoma and offices in Seattle.

184.    Refugee resettlement lies at the heart of the Plaintiff Organizations' work in the United States. The Plaintiff Organizations share a mission to support and advocate on behalf of refugees and other persecuted people and engage their respective faith communities in welcoming refugees and newcomers. Their missions and work are the product of sincerely held beliefs, both religious and moral.

185.    The Plaintiff Organizations collectively have resettled millions of refugees over decades of work.

186.    HIAS currently provides refugee resettlement support through its thirty affiliate offices in seventeen states: California, Colorado, Connecticut, Florida, Illinois, Maine, Massachusetts, Michigan, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Rhode Island, Texas, Washington, and Wisconsin.

187.    Through one of the cooperative agreements with PRM, HIAS has also operated the Resettlement Support Center in Austria, with suboffices in Croatia and Israel, for over twenty-five years. These offices coordinate refugee applications and processing for the USRAP in these countries. The offices in Austria and Croatia rely on special arrangements between the governments of those countries and the State Department. Under those arrangements, Austria and Croatia issue a limited number of visas at the request of HIAS, vetted by the U.S. government, for

Iranian followers of the Jewish, Christian, Baha'i, Zoroastrian and Mandaean faiths. There are currently over 14,000 religious minority members who registered with HIAS for the program and are waiting for visas in Iran. The program allows them to escape from living as persecuted religious minorities in the Islamic Republic of Iran and travel to Europe for adjudication of their claims by DHS officials. In Tel Aviv, the RSC operated by HIAS prepares resettlement applications and coordinates refugee processing for refugees from Eritrea, Sudan, and South Sudan who are vulnerable in Israel.

188.    Through another cooperative agreement with the State Department, HIAS administers and leads the Equitable Resettlement Access Consortium ("ERAC") as a means to facilitate referrals from nongovernmental service providers who identify highly vulnerable refugees in need of resettlement due to protection concerns in their country of first asylum. Since ERAC's launch in 2023, thirteen NGOs have been approved by PRM as ERAC partners, and hundreds of NGO staff globally have been trained in refugee protection and resettlement. The ERAC network has set up operations in Lebanon, Jordan, Egypt, Nigeria, Kenya, Greece, Romania, Poland, Aruba, Guyana, Peru, Panama, and Colombia, which in turn identify individuals with resettlement needs and submit applications to the USRAP for individuals from countries including Syria, Iraq, Afghanistan, the Democratic Republic of the Congo, Somalia, Ethiopia, Central African Republic, Venezuela, and Ecuador.

189.    Either directly or through its affiliates, CWS currently supports refugees resettled in forty-four locations in twenty-four states: California, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kentucky, Massachusetts, Michigan, Nebraska, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Texas, Virginia, and Utah.

190.    CWS also operates an overseas refugee resettlement support center (RSC Africa) in Nairobi, Kenya, covering sub-Saharan Africa. Through a cooperative agreement with PRM, CWS assists in the processing of refugee applicants for admission to the United States. RSC staff

COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 35
(No. _____)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

pre-screen applicants for eligibility for one of the applicable processing priorities and prepare cases for adjudication by USCIS staff. Through the RSC, CWS assists applicants in completing documentary requirements and schedules USCIS refugee eligibility interviews. USCIS then conducts security vetting checks on applicants. If an applicant is conditionally approved for resettlement by USCIS, RSC staff guide the refugee through post-adjudication steps, including completing medical screening exams and attending cultural orientation programs. The RSC obtains domestic sponsorship assurances and, once all required steps are completed, the RSC refers the case to IOM for transportation to the United States.

191.    LCSNW is a multiservice social welfare agency with forty locations in Washington, Oregon, and Idaho. As an affiliate of a national resettlement agency, LCSNW provides refugee resettlement services as part of its core work, assisting resettled refugees to secure housing, enroll in school, learn English, and adjust to their new communities.

192.    The success of HIAS and CWS depends on their broad network of affiliates and offices around the country, such as the partnership LCSNW has with its national resettlement agency. In order to carry out their work effectively, HIAS, CWS, and their affiliates invest considerably in a network of individuals and entities whose cooperation is both useful and necessary to successfully resettle refugees, including landlords, medical providers, employees, government agencies, congregations, civil organizations, and foster care providers.

193.    The Plaintiff Organizations also rely heavily on the work of their volunteers, often drawing upon faith communities that believe that refugee resettlement is a fulfillment of the religious calling to welcome the stranger. In turn, the Plaintiff Organizations serve as a conduit, providing these faith communities with an opportunity to express this sense of calling.

194.    The impact of the Refugee Ban on the Plaintiff Organizations has been immediate and severe. Tens of thousands of refugees that the Plaintiff Organizations have as clients have had their plans to resettle or reunify with family blocked indefinitely. Among hundreds of vetted individuals and families who were considered "travel-ready," many saw travel scheduled for

January and February abruptly canceled. Funds available for essential services for thousands of recently resettled refugees in their first ninety days in the United States were suddenly canceled, leaving the Plaintiff Organizations scrambling for ways to provide financial and emotional support. The Order barring entry and decision-making for refugee applications has thwarted the Plaintiff Organizations' missions and shut down core components of their work.

195.    Financially, the impact of the Order and its implementation has been catastrophic, directly impeding the Plaintiff Organizations' ability to carry out their mission-driven work.

196.    With no advance warning, on January 24, 2025, the Plaintiff Organizations were instructed to stop all work on current and active funding agreements they had with federal agencies. They are now unable to access the funding portals on the State Department website even to access reimbursement for work performed in the months of calendar year 2024, prior to the Suspension Notices.

197.    The orders to stop work took effect immediately, and officials at PRM and other offices of the State Department have not responded to urgent questions posed by HIAS about suspended funding, leaving them and other resettlement agencies to navigate the sudden loss of millions of dollars of funding with no period of transition.

198.    In addition to formal funding suspensions, some of the Plaintiff Organizations are finding that other federal grants and reimbursements have been made unavailable even when federal agencies have not communicated a funding suspension.

199.    The Suspension Notices, *Sub Silentio* Suspension, and other obstacles to obtaining funding to conduct refugee resettlement work have already resulted in thousands of layoffs and furloughs at HIAS and CWS and pose the threat of layoffs and other financial contraction at LCSNW.

200.    HIAS began laying off employees at its national offices on January 31, 2025. Overseas, HIAS has laid off forty-two of fifty employees at the RSCs that it administers in Austria, Croatia, and Israel. HIAS has had to end all subawards under the ERAC project to vetted,

approved, and trained resettlement referral partners, preventing partners from maintaining resettlement staff and continuing operations. Resettlement case workers who have undergone extensive training have been laid off with no notice, resulting in challenges to communication with clients in various stages of the resettlement process.

201. CWS has furloughed 860 individuals in its offices in the United States and issued notices under the Worker Adjustment and Retraining Notification Act to some furloughed employees that they may be laid off after 60 days. CWS has further initiated layoffs of over 600 staff in Africa, with CWS paying severance and benefits for each employee.

202. After LCSNW was informed of the Suspension Notice on its refugee resettlement work, it found itself without the grants to provide rent, food, and other assistance for the recently resettled refugees who are entitled to such payments in the ninety days after arrival. Unwilling to leave these refugees at risk of housing loss or hunger, LCSNW has continued to serve these clients without a guarantee of funding by drawing on other available funding, a short-term solution that will not allow these services to continue for the long-term.

203. If the Plaintiff Organizations or their affiliates are not permitted to continue resettling refugees, they might be unable to sustain their operations and could be forced to close local resettlement offices or even face insolvency in the medium- or long-term.

204. Each day that the Refugee Ban and the Refugee Funding Suspension remain in effect causes lasting damage that cannot be repaired. Once staff with expertise, extensive networks and relationships, and goodwill are separated from employment, full rehiring and rebuilding the goodwill they cultivated is nearly impossible.

## CLASS ALLEGATIONS

205. Plaintiffs Pacito, Esther, Josephine, Sara, Alyas, Marcos, Ahmed, and Ali bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1) and (b)(2) on behalf of themselves and all other similarly situated persons for whom the Refugee Ban and Refugee Funding Suspension interfere with their (a) ability to be resettled, (b) reunification with family

COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 38
(No. _____)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

members in the United States, and/or (c) ability to receive post-resettlement services to which they are entitled by law (the "Class"). The Class includes:

    a.    All persons being processed for admission to the United States as a refugee (the "Refugee Subclass");

    b.    All persons in the United States who are petitioning for family members under the FTJ program (the "FTJ Petitioner Subclass"); and

    c.    All refugees and Afghan and Iraqi SIV holders resettled to the United States and still within their first ninety days post-resettlement (the "Reception & Placement Subclass," and together with the Refugee Subclass and the FTJ Petitioner Subclass, the "Subclasses").

206.    Separate subclasses might be appropriate for the Class defined in the preceding paragraph.

207.    The Class, including the Subclasses, is so numerous that joinder is impracticable. Approximately 20,287 refugees and SIVs were approved for resettlement and ready for travel as of January 2025. Many thousands more are in the USRAP pipeline in earlier stages of refugee processing. Several thousand refugees already resettled in the United States have applied for family reunification through the FTJ program and are awaiting a final decision on their applications. Approximately 42,000 individuals (comprising of approximately 32,000 refugees and 10,000 SIVs) resettled in jurisdictions throughout the United States and within their first 90 days post-resettlement are currently entitled to Reception and Placement services.

208.    The claims of the Class and Subclass members share common issues of law, including but not limited to whether the Refugee Ban and Refugee Funding Suspension violate the INA, the Administrative Procedure Act, and the Fifth Amendment.

209.    The claims of the Class and Subclass members share common issues of fact, including but not limited to whether the Refugee Ban is being or will be enforced so as to prevent them or their family members from entering the United States from abroad. In addition, whether

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1   the Refugee Funding Suspension is or will be enforced to prevent the provision of essential post-
2   resettlement services to which the Reception & Placement Subclass members are entitled as a
3   matter of law.

4        210.    The claims and defenses of the named Plaintiffs are typical of the claims or defenses
5   of the Class and Subclasses.

6        211.    The named Plaintiffs will fairly and adequately protect the interests of the Class
7   and Subclasses. The named Plaintiffs have no interest that is now or might be potentially
8   antagonistic to the interests of the Class and Subclasses. The attorneys representing the named
9   Plaintiffs include experienced attorneys who are considered able practitioners in federal civil
10  litigation, including civil rights litigation. These attorneys should be appointed as class counsel.

11       212.    Defendants have acted, have threatened to act, and will act on grounds generally
12  applicable to the Class and Subclasses, thereby making final injunctive and declaratory relief
13  appropriate to the Class as a whole. The Class and potential Subclasses may therefore be properly
14  certified under Federal Rule of Civil Procedure 23(b)(2).

15       213.    Prosecution of separate actions by individual members of the Class and Subclasses
16  would create the risk of inconsistent or varying adjudications and would establish incompatible
17  standards of conduct for individual members of the Class. The Class and Subclasses may therefore
18  be properly certified under Federal Rule of Civil Procedure 23(b)(1).

19                              **CLAIMS FOR RELIEF**

20                              **FIRST CLAIM FOR RELIEF**
21                           **Violation of the Refugee Act**
         **(On Behalf of All Plaintiffs, including the Class, Against All Defendants)**

22       214.    The foregoing allegations are repeated and incorporated as though fully set forth
23  herein.

24       215.    Through the Refugee Act, Congress established a comprehensive statutory
25  framework for the admission, reception, and placement of refugees determined to be of "special
26  humanitarian" concern to the United States.

COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 40
(No. _____)

216.    Through these statutory provisions, Congress defined "refugee" and detailed the considerations, including the applicable inadmissibility criteria, according to which the executive agencies are to make decisions regarding refugee admissions and according to which refugees admitted are to be placed in states and localities throughout the country and provided with essential services.

217.    Under the Refugee Act, FTJ benefits are nondiscretionary and there is no authority for the executive to indefinitely suspend a nondiscretionary statutory duty.

218.    Defendants' suspension of the USRAP violates the Refugee Act, including 8 U.S.C. §§ 1182 and 1157(c)(2)(A).

**SECOND CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act**
**(On Behalf of All Plaintiffs, including the Class, Against Defendants Rubio, Noem, and Fink)**

219.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

220.    Defendants' actions taken to implement the Refugee Ban EO are arbitrary and capricious; an abuse of discretion or otherwise not in accordance with law; contrary to a constitutional right, power, privilege, or immunity; and in excess of a statutory jurisdiction, authority, or limitation or short of statutory right.

221.    Defendants' actions taken to implement the Refugee Ban EO were arbitrary and capricious because they failed to follow their own policies, procedures, and regulations.

222.    Defendants' actions taken to implement the Refugee Ban EO constitute a legislative rule issued without observance of the notice and comment procedure required by 5 U.S.C. § 553.

223.    Defendants' implementation of the Refugee Ban EO must therefore be set aside pursuant to the Administrative Procedure Act. *See* 5 U.S.C. § 706(a)(2)(A)–(D).

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1

2

**THIRD CLAIM FOR RELIEF**
*Accardi* **Doctrine & Administrative Procedure Act**
**(On Behalf of Plaintiffs HIAS, CWS, LCSNW, Esther, and Josephine and the Class Against**
**Defendants Rubio, Noem, and Fink)**

3

4

224.    The foregoing allegations are repeated and incorporated as though fully set forth

herein.

5

6

225.    Defendants' suspension of the FTJ process violates agency procedures, including

7

those at 8 C.F.R. § 207.7. The Agencies' suspension of the FTJ process should therefore be set

8

aside under the principles articulated in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S.

260 (1954).

9

10

226.    The suspension's failure to comply with applicable regulations renders it arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C.

11

12

§ 706(2)(a).

13

**FOURTH CLAIM FOR RELIEF**
**Violation of the Fifth Amendment Due Process Clause**
**(On Behalf of Plaintiff Esther and the FTJ Petitioner Subclass Against All Defendants)**

14

15

227.    The foregoing allegations are repeated and incorporated as though fully set forth

herein.

16

17

228.    Plaintiff Esther and the FTJ Petitioner Subclass have a statutorily created

18

entitlement to benefits under the FTJ process, including admission of eligible and admissible

family members to the United States as refugees.

19

20

229.    Defendants' suspension of the USRAP violates Plaintiff Esther and the FTJ

21

Petitioner Subclass's due process rights protected by the Fifth Amendment to the U.S.

Constitution.

22

23

**FIFTH CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act and Immigration and Nationality Act**
**(On Behalf of All Plaintiffs, including the Class, Against Defendants Rubio, Noem, and**
**Fink)**

24

25

230.    The foregoing allegations are repeated and incorporated as though fully set forth

26

herein.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

231. Defendants' suspension of funding for the USRAP, including overseas case processing and provision of post-arrival resettlement benefits, is arbitrary and capricious; an abuse of discretion or otherwise not in accordance with law; contrary to a constitutional right, power, privilege, or immunity; and in excess of a statutory jurisdiction, authority, or limitation or short of statutory right.

232. The Refugee Funding Suspension, including the Suspension Notices and the *Sub Silentio* Suspension, is arbitrary and capricious because Defendants failed to consider the relevant factors, articulate a rational connection between the facts found and the choices made, show there are good reasons for the change in policy, consider important aspects of the problem, including serious reliance interests, and consider reasonable alternatives within the ambit of the existing policy. The *Sub Silentio* Suspension is arbitrary and capricious for the additional reason that it is a *sub silentio* policy change.

233. The Refugee Funding Suspension is also contrary to law because it is contrary to Congress's statutory scheme governing refugee processing and admissions, refugee resettlement, and SIV resettlement, and Defendants have also failed to follow its own policies, procedures, and regulations.

234. The Refugee Funding Suspension constitutes a legislative rule issued without observance of the notice and comment procedure required by 5 U.S.C. § 553.

235. The Refugee Funding Suspension must therefore be set aside pursuant to the Administrative Procedure Act. *See* 5 U.S.C. § 706(a)(2)(A)–(D).

### SIXTH CLAIM FOR RELIEF
*Accardi* **Doctrine and Administrative Procedure Act**
**(On Behalf of All Plaintiffs, including the Class, Against Defendants Rubio, Noem, and Fink)**

236. The foregoing allegations are repeated and incorporated as though fully set forth herein.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

237.    Defendants' implementation of the Refugee Funding Suspension violates agency policy and regulation, including those at 45 C.F.R. § 400.1 *et seq.* The Refugee Funding Suspension should therefore be set aside under the principles articulated in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

238.    The failure to comply with applicable regulations renders the Refugee Funding Suspension arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(a).

**SEVENTH CLAIM FOR RELIEF**
**Violation of the Separation of Powers**
**(On Behalf of all Plaintiffs, including the Class, Against All Defendants)**

239.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

240.    Under the U.S. Constitution, our government is predicated on the separation of powers. The Constitution grants the power of the purse and the power to legislate exclusively to Congress. There is no provision in the Constitution that authorizes the President to enact, amend, or repeal statutes. Absent congressional authorization, the Executive Branch may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals.

241.    The President may not confer powers upon other federal officers or departments within the Executive Branch that he does not himself possess.

242.    President Trump's Foreign Aid Executive Order and Defendants' implementation of that Order, including the State Department's Suspension Notices and ORR's *Sub Silentio* Suspension, violate the constitutional principle of the separation of powers.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs pray that the Court:

A.    Issue a temporary restraining order, preliminary injunction, and permanent injunction enjoining Defendants, including their officials, agents, employees,

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    assigns, and all persons acting in concert or participating with them, from

2    implementing or enforcing any portion of the Refugee Ban EO;

3    B.    Declare that the Refugee Ban EO is unlawful and invalid;

4    C.    Issue a temporary restraining order, preliminary injunction, and permanent

5    injunction enjoining Defendants, including their officials, agents, employees,

6    assigns, and all persons acting in concert or participating with them, from enforcing

7    any portion of Defendants' suspension of refugee processing, decisions, and

8    admissions;

9    D.    Declare unlawful and set aside the Defendants' suspension of refugee processing,

10    decisions, and admissions;

11    E.    Issue a temporary restraining order, preliminary injunction, and permanent

12    injunction enjoining Defendants, including their officials, agents, employees,

13    assigns, and all persons acting in concert or participating with them, from

14    implementing or enforcing the Refugee Funding Suspension, which includes the

15    Notices of Suspension the State Department sent to all refugee and resettlement

16    partners on January 24 and ORR's *Sub Silentio* Suspension, and directing them to

17    restore funding pursuant to the terms of all cooperative agreements, consistent with

18    the terms of such agreements and any relevant statutes and regulations;

19    F.    Declare unlawful and set aside the Refugee Funding Suspension, including the

20    Notices of Suspension the State Department sent to all refugee and resettlement

21    partners on January 24 and the *Sub Silentio* Suspension;

22    G.    Order Defendants to file a status report with the Court within twenty-four hours of

23    entry of a temporary restraining order or preliminary injunction, and at regular

24    intervals thereafter, confirming compliance with these orders;

25    H.    Determine that Plaintiffs' claims may properly be maintained as a class action

26    pursuant to Federal Rule of Civil Procedure 23(b)(1) and (b)(2);

COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 45
(No. _____)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1 I. Award Plaintiffs costs of suit and reasonable attorneys' fees and expenses pursuant

2  to any applicable law; and

3 J. Issue such other and further relief as the Court deems equitable, just, and proper.

4

Dated: February 10, 2025  By: s/ *Harry H. Schneider, Jr.*

5       Harry H. Schneider, Jr., WSBA No. 9404

 Deepa Alagesan*   By: s/ *Jonathan P. Hawley*

6 Mevlüde Akay Alp*   Jonathan P. Hawley, WSBA No. 56297

 Linda Evarts*    By: s/ *Shireen Lankarani*

7 Ghita Schwarz*   Shireen Lankarani, WSBA No. 61792

8 **INTERNATIONAL REFUGEE** By: s/ *Esmé L. Aston*

 **ASSISTANCE PROJECT**  Esmé L. Aston, WSBA No. 62545

9 One Battery Park Plaza, 33rd Floor **PERKINS COIE LLP**

 New York, New York 10004  1201 Third Avenue, Suite 4900

10 Telephone: (646) 939-9169  Seattle, Washington 98101

 Facsimile: (516) 324-2267  Telephone: (206) 359-8000

11 dalagesan@refugeerights.org  Facsimile: (206) 359-9000

 makayalp@refugeerights.org  HSchneider@perkinscoie.com

12 levarts@refugeerights.org  JHawley@perkinscoie.com

 gschwarz@refugeerights.org  SLankarani@perkinscoie.com

13       EAston@perkinscoie.com

14 Melissa Keaney*

 **INTERNATIONAL REFUGEE** John M. Devaney*

15 **ASSISTANCE PROJECT**  **PERKINS COIE LLP**

 P.O. Box 2291    700 Thirteenth Street NW, Suite 800

16 Fair Oaks, California 95628  Washington, D.C. 20005

 Telephone: (646) 939-9169  Telephone: (202) 654-6200

17 mkeaney@refugeerights.org  Facsimile: (202) 654-6211

18       JDevaney@perkinscoie.com

19       Joel W. Nomkin*

20       **PERKINS COIE LLP**

       2525 East Camelback Road, Suite 500

21       Phoenix, Arizona 85016

       Telephone: (602) 351-8000

22       Facsimile: (602) 648-7000

       JNomkin@perkinscoie.com

23

       *Counsel for Plaintiffs*

24

       *Pro hac vice forthcoming*

25

26

COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 46
(No. _____)