THE HONORABLE JAMAL N. WHITEHEAD

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| PLAINTIFF PACITO; PLAINTIFF ESTHER; PLAINTIFF JOSEPHINE; PLAINTIFF SARA; PLAINTIFF ALYAS; PLAINTIFF MARCOS; PLAINTIFF AHMED; PLAINTIFF RACHEL; PLAINTIFF ALI; HIAS, INC.; CHURCH WORLD SERVICE, INC.; and LUTHERAN COMMUNITY SERVICES NORTHWEST, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; MARCO RUBIO, in his official capacity as Secretary of State; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; DOROTHY A. FINK, in her official capacity as Acting Secretary of Health and Human Services, <br><br> *Defendants*. | Case No. C25-255 JNW <br><br> **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> NOTE ON MOTION CALENDAR: FEBRUARY 24, 2025* <br><br> ORAL ARGUMENT REQUESTED |

---

\* This noting date reflects the expedited briefing schedule for this motion agreed to by Plaintiffs and Defendants. A stipulated notice outlining this schedule will be filed concurrently.

PLS.' MOT. FOR PRELIM. INJ. – i
(No. C25-255 JNW)

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND .................................................................................................................. 2

I.  The Trump Administration has issued a systemwide ban of refugees in an attempt to dismantle the USRAP. ........................................................................ 2

II.  USRAP is a congressionally created lifeline for refugees around the world to seek safety in the United States. ...................................................................... 5

III.  The Trump Administration previously and unlawfully attempted to ban refugees, with lingering effects. ..................................................................... 8

ARGUMENT ....................................................................................................................... 8

I.  Plaintiffs are irreparably harmed by the Refugee Ban EO, Agency Suspension, and Refugee Funding Suspension and have standing to challenge them. ................................................................................................. 9

   A.  The individual Plaintiffs are irreparably harmed and have standing. ......... 9

   B.  The organizational Plaintiffs are irreparably harmed and have standing. .................................................................................................. 11

II.  Plaintiffs are likely to succeed on the merits of their claims. ............................. 13

   A.  The Refugee Ban EO is *ultra vires*. ...................................................... 14

      1.  The President lacks authority to override the Refugee Act. ......... 14

      2.  Section 212(f) does not justify the Refugee Ban EO. ................... 17

   B.  The Agency Suspension violates the INA and APA. ............................... 19

      1.  Defendants cannot rewrite the Refugee Act. ............................... 19

      2.  The Agency Suspension and Refugee Funding Suspension should have been subject to notice-and-comment rulemaking. ..... 22

   C.  The Agency Suspension and Refugee Funding Suspension are arbitrary and capricious. ......................................................................... 23

   D.  The Refugee Ban EO, Agency Suspension, and Refugee Funding Suspension violate the due process rights of follow-to-join petitioners. ............................................................................................ 26

III.  The balance of equities and public interest support a preliminary injunction. ..... 26

CONCLUSION .................................................................................................................. 28

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

## **INTRODUCTION**

A Congolese refugee stranded awaiting travel to the United States with his wife and infant child; a mother and daughter awaiting reunification for seven years; a Yazidi refugee persecuted for his religious beliefs in Iraq; resettlement agencies facing catastrophic cuts to services, staffing, and funding overnight: These are among the Plaintiffs facing irreparable and, indeed, immeasurable harm because of the Trump Administration's ongoing actions to end the resettlement of refugees to the United States and dismantle the congressionally created U.S. Refugee Admissions Program ("USRAP") in its entirety. The Administration has suspended—indefinitely—the processing and admission of all refugees, is denying recently resettled refugees the transitional assistance they depend on to begin their lives in the United States, and has stopped funding the organizations that carry out these critical refugee resettlement services. It has done so through an executive order titled "Realigning the United States Refugee Admissions Program" (the "Refugee Ban EO" or "Order"), Defendants' implementation of that order, and the agencies' suspension of funding to USRAP resettlement partners. These actions by the President and the Department of State ("DOS"), Department of Homeland Security ("DHS"), and Department of Health and Human Services ("DHHS") violate the Refugee Act of 1980 ("Refugee Act"), the Administrative Procedure Act ("APA"), and the U.S. Constitution. Plaintiffs are thus likely to succeed on the merits of their claims.

The Trump Administration's refugee ban and related funding suspension are already inflicting—and, absent expedited relief, will continue to inflict—catastrophic and irreparable harm on refugees, their family members, and organizations that are the backbone of the USRAP. Because of the funding cuts, Plaintiffs Church World Service, Inc. ("CWS") and HIAS, Inc. ("HIAS") have already had to furlough hundreds of staff worldwide and must decide whether they can outlast this assault on refugee resettlement long enough to again welcome refugees when, if ever, the program resumes. The individual Plaintiff refugees (and others like them) have seen the doors to this country suddenly slammed shut, dashing their hopes of ever reaching safety and

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

reuniting with family members. The harm of this lost time and infrastructure cannot be remedied and compounds each day that the Administration's policies are permitted to stand.

A preliminary injunction is imperative to protect Plaintiffs and the future of refugee resettlement in the United States from the Trump Administration's executive order, Defendants' suspension of refugee processing and admissions, and the suspension of USRAP-related funding to resettlement partners.

## BACKGROUND

**I.    The Trump Administration has issued a systemwide ban of refugees in an attempt to dismantle the USRAP.**

Declaring that "it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands," Congress passed the Refugee Act as an amendment to the Immigration and Nationality Act ("INA") to provide a "permanent and systematic procedure" for refugee admissions. Pub. L. No. 96-212, § 101, 94 Stat. 102 (1980). The Refugee Act created the modern-day USRAP, through which refugees are interviewed, thoroughly vetted by multiple government agencies, and matched to resettlement agencies or private sponsor groups that help them resettle in the United States. *See* Ex. 1.[1] For decades, the USRAP has served as a lifeline for millions of refugees from around the world, with 100,034 refugees admitted in fiscal year 2024. *See* Ex. 2.

The Administration threw that carefully crafted system into crisis and disarray on January 20, 2025, after President Donald J. Trump vowed on the campaign trail to "suspend refugee resettlement" as part of a broader effort to "immediately end the migrant invasion of America." Ex. 11. President Trump took the first step to fulfill that promise just hours into his second term. The Refugee Ban EO directed that the entry of refugees under the USRAP be suspended indefinitely until President Trump determines that resumption is in the interests of the United States—as he has defined those interests in the Order. *See* Exec. Order No. 14163, 90 Fed. Reg.

---

[1] Exhibits are attached to the Declaration of Jonathan P. Hawley, filed concurrently with this motion.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

8,459 (Jan. 20, 2025). The Refugee Ban EO cites as justifications "record levels of migration," influxes of migrants that have caused major cities to seek federal aid to manage the "burden of new arrivals," and emergency declarations by New York and Massachusetts "because of increased migration." *Id.* § 1.

Section 4 of the Order outlines the process for making the finding of whether USRAP can resume: The Secretaries of State and Homeland Security must submit a report within ninety days to the President—through his Homeland Security Advisor, Stephen Miller—as to whether resumption of refugee admissions "would be in the interests of the United States"; reports will continue every ninety days thereafter until President Trump makes the determination required to resume the USRAP. *Id.* § 4. The Order provides that this determination be made in light of President Trump's stated refugee policies: (1) to "ensure that public safety and national security are paramount considerations in the administration of the USRAP"; (2) "to admit only those refugees who can fully and appropriately assimilate into the United States"; (3) "to ensure that the United States preserves taxpayer resources for its citizens"; and (4) that state and local jurisdictions be granted a role in the process of determining the resettlement of refugees in their jurisdictions. *Id.* § 2.

The immense impact of the Refugee Ban EO is clear from its face. Unlike the first Trump Administration's refugee ban of October 2017, *see infra* p. 8, it suspends *all* refugee admissions across all nationalities and subprograms. It suspended decisions on applications for refugee status immediately and admissions as of 12:01 a.m. EST on January 27, 2025. *Id.* § 3(a). And it provides no deadline by which the President will make a decision as to whether the program can resume. Although the Order suggests that exceptions to the suspension can be made on a case-by-case basis should the Secretaries of State and Homeland Security find that the "entry of such [refugees] is in the national interest and does not pose a threat to the security or welfare of the United States," *id.* § 3(c), it does not provide any process for seeking or making such exceptions. The Refugee Ban EO also directs the Secretary of Homeland Security, in consultation with the Attorney General, to

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

propose a way for state and local jurisdictions to have greater involvement in the process of determining the placement of refugees in their jurisdictions, consistent with applicable law. *Id.* § 3(d).

The agencies overseen by Defendants immediately moved to implement the Order's suspension on refugee decisions and admissions and, in fact, *expanded* its scope (the "Agency Suspension"). The day after the Order was signed, DOS's Bureau of Population, Refugees, and Migration ("PRM") sent an email to refugee resettlement partners stating that *all* refugee case processing, including referrals of new cases to the program and all processing of existing cases, was suspended. Ex. 23 ¶¶ 29–30; Ex. 24 ¶¶ 35–36. PRM further advised that all previously scheduled travel for refugees was being canceled, including travel scheduled to take place before the effective date set out in the Order, and that no new travel would be booked. Ex. 23 ¶¶ 29–30; Ex. 24 ¶¶ 35–36. Thousands of refugees, including many with imminent travel scheduled, found themselves trapped mid-process. DOS has provided no information to resettlement partners regarding the case-by-case waiver contemplated by the Order. Ex. 23 ¶ 28; Ex. 24 ¶ 40.

The agencies overseen by Defendants then took the unprecedented step of suspending all funding to resettlement partners, including Plaintiff resettlement agencies, for their work processing USRAP applications overseas and their provision of post-arrival services to refugees in the United States. On January 24, 2025, PRM sent notices of suspension to the resettlement agencies, ordering that they immediately "stop all work" under their cooperative agreements to provide Reception and Placement services and refugee case processing through Resettlement Support Centers ("RSCs") and other consortia, and that they not incur any new costs after the date of the letter (the "Suspension Notices"). Ex. 23 ¶ 43; Ex. 24 ¶¶ 44–45. The Suspension Notices further ordered that the resettlement agencies "cancel as many outstanding obligations as possible." Ex. 23 ¶ 43; Ex. 24 ¶¶ 44–45.

DOS claims that the Suspension Notices—issued without notice and effective immediately—are necessary because foreign assistance programs "may no longer effectuate

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

agency priorities" such that the government must review the programs and decide whether to "continue, modify, or terminate" them. Ex. 23 ¶ 43; Ex. 24 ¶¶ 44–45. But the notices threaten to imminently eviscerate the refugee resettlement infrastructure and destabilize recently arrived refugees: They halt all funding for resettlement agencies' work and the provision of statutorily mandated benefits and services to individuals in the United States. Ex. 23 ¶¶ 43–45; Ex. 24 ¶¶ 28, 44–45. And, in any event, these extraordinary, devastating agency actions have no obvious connection to the sole authority cited—President Trump's executive order titled "Reevaluating and Realigning United States Foreign Aid" (the "Foreign Aid EO"), which required a ninety-day pause of all funding for "foreign development assistance" pending a review to ensure alignment with President Trump's foreign policy. Exec. Order No. 14169, 90 Fed. Reg. 8,619 (Jan. 20, 2025). The government has not explained how processing cases for a U.S. immigration program and support for resettled refugees in the United States plausibly relate to "foreign development assistance."

Also beginning on January 20, 2025, DOS and the Office of Refugee Resettlement ("ORR") a subagency of DHHS, began withholding reimbursements to resettlement agencies for work performed pursuant to cooperative agreements to provide support for recently arrived refugees and Special Immigrant Visa ("SIV") recipients, without any announcement or explanation for this action (the "*Sub Silentio* Suspension," and together with the Suspension Notices, the "Refugee Funding Suspension"). Ex. 23 ¶¶ 46–47, 53; Ex. 24 ¶ 59. Since receiving the Suspension Notices, CWS and HIAS have not received reimbursements for millions of dollars they are owed from DOS for work performed in November and December 2024, well before the Suspension Notices and the Foreign Aid EO issued. Ex. 23 ¶¶ 46–47, 53; Ex. 24 ¶ 59.

## II.    USRAP is a congressionally created lifeline for refugees around the world to seek safety in the United States.

As Congress has authorized, only certain refugees "of special humanitarian concern" to the United States are considered for resettlement via the USRAP. 8 U.S.C. § 1157(c)(1). The

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1  categories of refugees determined to be of special humanitarian concern to the United States are

2  set out annually in a report to Congress from DOS, DHS, and DHHS. *See, e.g.*, Ex. 3, at 15–16.

3  Generally, a refugee must either be referred by a designated entity (such as the United Nations

4  High Commissioner for Refugees or a group of private individual sponsors) or be eligible to apply

5  directly to the program because they belong to a group with shared characteristics (designated by

6  statute or DOS in the annual report to Congress). *See id.* at 15–21. Congress also authorizes

7  refugees already resettled to the United States to apply for their spouse and unmarried minor

8  children to join them—the "follow-to-join" program. *See* 8 U.S.C. § 1157(c)(2)(A). Those family

9  members are entitled to admission as refugees so long as they are not inadmissible under specific

10 statutory grounds—that is, the U.S. government lacks discretion to deny their applications for any

11 other reason. *See id.* Refugees and follow-to-join family members are subject to the ceiling on

12 refugee admissions set by the President through the annual "presidential determination" as

13 "justified by humanitarian concerns or . . . otherwise in the national interest." 8 U.S.C.

14 § 1157(a)(3). President Joe Biden provided for 125,000 refugees to be resettled to the United States

15 in fiscal year 2025. *See* Ex. 4. As of December 31, 2024, 27,308 of them had been admitted. Ex. 2.

16     Once a refugee or follow-to-join family member's case is in the USRAP pipeline, the

17 processing of their application is generally the same: They are interviewed; subject to rigorous

18 background, security, and medical checks; and, in the case of refugee applicants, required to attend

19 cultural orientation to prepare for their arrival in the United States. *See* Ex. 5. Some of these

20 processing steps are handled by resettlement partners, such as third-party-operated RSCs located

21 overseas and the International Organization for Migration. Pursuant to cooperative agreements

22 with DOS, the RSCs conduct intake interviews, collect information to facilitate security screening

23 and adjudication by the U.S. government, schedule interviews and medical exams, and offer

24 cultural orientation. Ex. 6.

25     After an applicant has been conditionally approved by the DHS, DOS requests a

26 "sponsorship assurance" from one of ten national resettlement agencies—including Plaintiffs

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    CWS and HIAS. Exs. 1, 5–6; *see also* Ex. 7 (listing refugee resettlement partners, including U.S.

2    resettlement agencies). When a resettlement agency provides an assurance, it assumes

3    responsibility through one of its local affiliates—such as Plaintiff Lutheran Community Services

4    Northwest ("LCSNW")—to provide basic necessities and integration services during the refugee's

5    initial period of resettlement. *See* Exs. 1, 8. These services help refugees and their families

6    integrate and achieve self-sufficiency in coordination with efforts from state and local actors,

7    community groups, and others. For example, resettlement agencies have developed relationships

8    with local landlords such that they are able to secure housing before refugees arrive, even though

9    the refugees have no credit history or bank accounts. *See* Ex. 23 ¶¶ 12–13; Ex. 24 ¶¶ 16, 25; Ex. 25

10   ¶¶ 17–19. Through decades of work, the Plaintiff resettlement agencies, like other resettlement

11   agencies, have built the necessary infrastructure and local relationships to provide these services.

12   Ex. 23 ¶¶ 11–14; Ex. 24 ¶¶ 10–12, 35; Ex. 25 ¶¶ 17–20.

13           Part of the funding for the resettlement agencies' provision of life-changing post-arrival

14   support comes from cooperative agreements with DOS. Ex. 9. This funding covers up to the first

15   ninety days a refugee is in the United States and is used to provide housing, furnishings, food,

16   clothing, orientation, and assistance with access to social, medical, educational, and employment

17   services. *Id.*[2] Under their cooperative agreements, resettlement agencies are reimbursed a set

18   amount per refugee or SIV recipient they sponsor, which is split between direct assistance to the

19   family and the local affiliate's services and overhead supporting the family. Ex. 23 ¶ 49; Ex. 24

20   ¶ 54; Ex. 25 ¶¶ 14, 38–39.

21           Resettlement agencies also receive funding through ORR for longer-term assistance to

22   refugees and SIV recipients. *See* 8 U.S.C. §§ 1521, 1522(b). ORR enters into cooperative

23   agreements with the resettlement agencies to reimburse them for their work supporting the

24

25           [2] These benefits are also authorized for Afghan and Iraqi SIV holders. *See* Refugee Crisis
     in Iraq Act of 2008, Pub. L. 110-181, § 1244(g), 122 Stat. 3; Afghan Allies Protection Act of 2009,
26   Pub. L. 111-8, § 602(b)(8), 123 Stat. 807.

PLS.' MOT. FOR PRELIM. INJ. – 7
(No. C25-255 JNW)

integration of recently arrived refugees and SIV recipients after their first ninety days in the United States. Ex. 8; Ex. 24 ¶ 17; Ex. 25 ¶¶ 15, 21–25.

### III.    The Trump Administration previously and unlawfully attempted to ban refugees, with lingering effects.

In 2017, after campaigning on a promise to ban Muslims, refugees, and especially Muslim refugees from the United States, President Trump repeatedly attempted to suspend the USRAP and block refugees from the United States; each attempt was enjoined. *See* Dkt. # 1 ¶¶ 78–86 (outlining executive orders and court challenges); *HIAS, Inc. v. Trump*, 415 F.Supp.3d 669, 686 (D. Md. 2020) (preliminarily enjoining executive order giving state and local governments power to veto where refugees are resettled), *aff'd*, 985 F.3d 309 (4th Cir. 2021). The first Trump Administration's third attempt was challenged in this district by several directly affected resettlement agencies and individuals, and the court quickly blocked the administration from enforcing it. *See Doe v. Trump*, 288 F.Supp.3d 1045, 1086 (W.D. Wash. 2017). That case ultimately settled, with the government prioritizing the processing of refugee cases that were close to complete at the time the ban went into effect. *See* Stipulated Dismissal, *Doe v. Trump*, C17-0178JLR (W.D. Wash. Feb. 20, 2020), Dkt. # 205. Five years later, many of the cases covered by that settlement are still pending. *See* Ex. 10. After having had their cases delayed for over eight years due to the refugee bans of the first Trump Administration, these refugees are now stuck once again due to President Trump's latest refugee ban—which seeks to impose even more widescale damage by dismantling refugee resettlement to the United States *in its entirety*.

### ARGUMENT

Together, the Refugee Ban EO, Agency Suspension, and Refugee Funding Suspension have placed the lives of hundreds of thousands of refugees on hold, left families separated without hope of reuniting, threatened the survival of those who recently arrived in the United States, created an existential crisis for the nonprofit organizations that serve them, and left the future of the USRAP hanging in the balance. Plaintiffs respectfully request that the Court preliminarily

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

enjoin these challenged actions to stop the irreparable harm currently being imposed on Plaintiffs and countless other individuals and organizations.

A preliminary injunction is warranted where plaintiffs establish that (1) they are likely to succeed on the merits, (2) irreparable harm is likely in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Under the Ninth Circuit's sliding-scale approach to preliminary relief, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (cleaned up).

## I.    Plaintiffs are irreparably harmed by the Refugee Ban EO, Agency Suspension, and Refugee Funding Suspension and have standing to challenge them.

### A.    The individual Plaintiffs are irreparably harmed and have standing.

Each individual Plaintiff in this case has standing to challenge the Refugee Ban EO, the Agency Suspension, and/or the Refugee Funding Suspension, and each is irreparably harmed by one or more of the challenged actions. These Plaintiffs[3] are:

- **Pacito**, a refugee from the Democratic Republic of the Congo, who, after learning his travel scheduled for January 22, 2025, had been abruptly canceled, slept in a parking lot outside the travel office with his wife and infant child, hoping that it was just a mistake. Ex. 14 ¶¶ 9, 29–30.

- **Esther**, a U.S. citizen and former refugee living in Idaho, and **Josephine**, her daughter stranded in South Africa, who have been waiting for seven years to reunite. Ex. 15 ¶¶ 4–5, 10, 17; Ex. 16 ¶¶ 2, 30–31.

- **Sara**, an Iraqi refugee stranded in dangerous conditions in Jordan, who longs to reunite with her eldest son in the United States and fears she might miss the birth of her first grandchild. Ex. 17 ¶¶ 2–7, 19, 21.

---

[3] The individual Plaintiffs are each proceeding under pseudonym out of fear that, if their names are publicized in connection with this lawsuit, they or their family members will be vulnerable to harassment in the United States or to reprisals from the government or other actors abroad. *See* Ex. 14 ¶ 47; Ex. 16 ¶ 34; Ex. 17 ¶ 23; Ex. 18 ¶ 34; Ex. 20 ¶ 29; Ex. 21 ¶ 18.

PLS.' MOT. FOR PRELIM. INJ. – 9
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

- **Alyas**, a Yazidi refugee from Iraq, who is desperate to find a safe home where his family can practice their religion freely and without fear. Ex. 18 ¶¶ 10–11, 25.

- **Marcos**, whose stepdaughter in El Salvador was on the verge of travel after her case had stalled due to program suspensions during the first Trump Administration, only to have the hope of reuniting dashed again. Ex. 19 ¶¶ 2–3, 11–13, 18–21.

- **Ali**, a newly arrived refugee living on his own, who worries that he will be unable to gain work and security without the critical support he received through the Refugee Cash Assistance program. Ex. 20 ¶¶ 2, 19, 22–25.

- **Ahmed**, an Afghan refugee and peace activist who longs to pursue his studies and begin his life anew instead of being stuck in limbo in Germany. Ex. 21 ¶¶ 4, 7, 13–15.

- **Rachel**, a Washington-based sponsor whose Jewish faith motivated her to spend many hours preparing and fundraising over $15,000 to welcome an Afghan refugee family through the Welcome Corps program. Ex. 22 ¶¶ 3, 5, 8–18.

The individual Plaintiffs have standing because their injuries described above are traceable to the Refugee Ban EO, Agency Suspension, and Refugee Funding Suspension and will be redressed by vacating or enjoining those unlawful actions. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). As a result of the challenged actions, the Plaintiffs stranded abroad are injured by their inability to pursue their cases and travel to the safety of the United States. And, as demonstrated by the ongoing effects of President Trump's first refugee ban, even a short delay results in "cascading effects that prolong a refugee's processing and ultimate admission." *Doe*, 288 F.Supp.3d at 1070 (explaining how refugees' security and medical checks expire and must be reinitiated in order to travel (citing *Hawai'i v. Trump*, 871 F.3d 646, 664 (9th Cir. 2017))). Many of the individual Plaintiffs are injured by prolonged separation from their family members, Ex. 14 ¶ 42; Ex. 15 ¶¶ 22–23; Ex. 16 ¶¶ 27–28; Ex. 17 ¶¶ 18, 20–21; Ex. 18 ¶¶ 26–30; Ex. 19 ¶¶ 15, 19–21, 23–24; Ex. 21 ¶ 15, and are at risk of physical harm because they are unable to travel to the United States, Ex. 14 ¶ 37; Ex. 16 ¶ 31; Ex. 17 ¶ 19; Ex. 18 ¶¶ 10, 20. The petitioner and sponsor Plaintiffs are harmed by loss of funds spent on planning to welcome family members and the family they prepared to sponsor. Ex. 15 ¶ 22; Ex. 19 ¶¶ 16–17; Ex. 22 ¶¶ 14–15, 25. And the Plaintiffs who sold belongings and gave up jobs in anticipation of their imminent travel to the

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

United States are harmed by loss of funds and threats to their livelihood. Ex. 14 ¶¶ 17–20, 34–36, 39; Ex. 16 ¶¶ 21, 30; Ex. 17 ¶¶ 14, 21; Ex. 18 ¶ 22. Plaintiff Ali, who recently arrived in the United States, is injured by the loss of benefits and case management support he relies on to help him achieve self-sufficiency, including through finding a job and securing financial assistance. Ex. 20 ¶¶ 17–24.

These harms represent paradigmatic irreparable injury. Prolonged separation from one's family is irreparable harm. *See Hawai'i v. Trump*, 859 F.3d 741, 782–83 (9th Cir.) (per curiam), *vacated on mootness grounds*, 583 U.S. 941 (2017); *Leiva-Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011) (per curiam) (recognizing that "important [irreparable harm] factors include separation from family members" (cleaned up)). So too is the risk of physical harm to those abroad resulting from their inability to seek safety in the United States. *Cf. Leiva-Perez*, 640 F.3d at 969 (likelihood of physical danger if asylum-seeker is returned to his or her home country is part of irreparable harm inquiry). Likewise irreparable is the economic harm suffered by individual plaintiffs who sold belongings and gave up jobs in reliance on anticipated travel. *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) (economic harm is irreparable "where parties cannot typically recover monetary damages flowing from their injury—as is often the case in APA cases"). The need for preliminary relief here is apparent and acute.

**B.    The organizational Plaintiffs are irreparably harmed and have standing.**

The challenged actions also inflict devastating and irreparable harm on Plaintiffs CWS, HIAS, and LCSNW, which gives them standing to seek preliminary relief. The organizational Plaintiffs resettle, reunite, and serve refugees to fulfill their longstanding political, moral, and, in some cases, religious commitments to welcome the stranger. Ex. 23 ¶¶ 4–6, 14; Ex. 24 ¶¶ 5–6; Ex. 25 ¶¶ 4–5. Plaintiffs CWS and HIAS, both national resettlement agencies, have resettled over *5 million* refugees since their founding and have offices across the nation and the world. Ex. 23 ¶¶ 7, 9–10 (CWS has offices in sixteen countries and provides services across twenty-four states, either directly or through affiliates); Ex. 24 ¶¶ 10–12 (HIAS has offices in twenty-one countries

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    and thirty affiliate locations throughout seventeen states). In addition, CWS and HIAS operate

2    RSCs pursuant to cooperative agreements with DOS, through which they provide regional refugee

3    processing services for USRAP. Ex. 23 ¶¶ 17, 23–24; Ex. 24 ¶¶ 19, 21. Over one hundred million

4    dollars in anticipated revenue under those agreements has now been suspended indefinitely due to

5    the Refugee Funding Suspension. Ex. 23 ¶¶ 19, 43–45, 49–52; Ex. 24 ¶¶ 28, 44–45; Ex. 25 ¶¶ 11–

6    12, 21, 26. The Refugee Ban EO, Agency Suspension, and Refugee Funding Suspension thus

7    directly threaten and interfere with the organizational Plaintiffs' "core business activities." Ex. 23

8    ¶¶ 6, 8, 28, 40–41, 47, 49–56; Ex. 24 ¶¶ 10, 30–31, 38, 42, 55–56; Ex. 25 ¶¶ 3, 26–30, 34, 37–41;

9    *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (organization has standing

10   where it can show that its core business activities are directly affected by defendant's conduct).

11   The Refugee Funding Suspension has left the organizational Plaintiffs in cash-flow crises with no

12   option but to furlough or lay off hundreds of staff—which has already started, Ex. 23 ¶¶ 3, 41, 54,

13   56; Ex. 24 ¶¶ 3, 42, 61–62, and the accompanying directive to "cancel as many outstanding

14   obligations as possible" has led them to indefinitely stop core work, including provision of

15   essential services for refugees and their families, Ex. 23 ¶¶ 43, 52–56; Ex. 24 ¶¶ 55–56, 64.

16          These losses pose an existential threat to the organizational Plaintiffs, Ex. 23 ¶¶ 2, 54–56;

17   Ex. 24 ¶¶ 2, 65; Ex. 25 ¶¶ 44–45, and constitute irreparable business harms, *see HiQ Labs, Inc. v.*

18   *LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) ("[T]he threat of being driven out of business

19   is sufficient to establish irreparable harm[.]" (cleaned up)); *Doran v. Salem Inn, Inc.*, 422 U.S. 922,

20   932 (1975) ("a substantial loss of business" and prospect of "bankruptcy" constitute irreparable

21   harm). Similarly, the organizational Plaintiffs face reductions in their staffs, the loss of institutional

22   knowledge and goodwill with community partners, and a corresponding decline in the quality of

23   services provided. Ex. 23 ¶¶ 3, 40–41, 54–56; Ex. 24 ¶¶ 61–62, 65; Ex. 25 ¶¶ 44–45; *see also*

24   *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence

25   of threatened loss of . . . goodwill certainly supports a finding of the possibility of irreparable

26   harm.").

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

The organizational Plaintiffs have standing not only because of the direct harms they face, but also to vindicate the rights of their clients—people with whom they have close relationships who are unable to protect their interests on their own. *See Powers v. Ohio*, 499 U.S. 400, 410–11 (1991). The Refugee Ban EO, Agency Suspension, and Refugee Funding Suspension impose a significant, if not insurmountable, barrier to the reunification of their clients with family members who are seeking resettlement through the USRAP. Ex. 23 ¶¶ 3, 31, 33–34, 36–38; Ex. 24 ¶¶ 47–58, 65; Ex. 25 ¶¶ 3, 30, 35–41. This too is a cognizable injury. *See Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 45 F.3d 469, 471 (D.C. Cir. 1995) (U.S. residents petitioning for family members abroad to enter country demonstrated irreparable harm based on prolonged separation), *vacated on other grounds*, 519 U.S. 1 (1996). Accordingly, the organizational Plaintiffs have standing to assert their clients' rights in this case and, in balancing the equities, the Court may consider the irreparable injury that would befall them. *See, e.g.*, *Exodus Refugee Immigr., Inc. v. Pence*, 165 F.Supp.3d 718, 738–39 (S.D. Ind.) (considering irreparable harm to refugee clients for whom resettlement organization had third-party standing), *aff'd*, 838 F.3d 902 (7th Cir. 2016).

## II.    Plaintiffs are likely to succeed on the merits of their claims.

Plaintiffs are likely to succeed on the merits of their claims because the challenged actions—the Refugee Ban EO, Agency Suspension, and Refugee Funding Suspension—unlawfully disrupt Congress's carefully crafted statutory framework for refugee resettlement in the United States, defy the guardrails for agency decision-making set out in the APA, and violate the U.S. Constitution.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

A.      **The Refugee Ban EO is *ultra vires*.**

1.      **The President lacks authority to override the Refugee Act.**

The Refugee Ban EO must be enjoined because the President does not have the power to totally suspend the USRAP under section 212(f) of the INA, *see* 8 U.S.C. § 1182(f), or any other power provided for by Congress.[4]

As the U.S. Supreme Court acknowledged when considering a narrower entry suspension imposed by President Trump in his first term, the President cannot invoke his power under section 212(f) to "override particular provisions of the INA." *Trump v. Hawai'i*, 585 U.S. 667, 689 (2018); *see also E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 774 (9th Cir. 2018) (President "may not rewrite clear statutory terms" (citing *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014))). This is especially true where, as here, an executive order purports to eviscerate a statutorily created immigration program. *See, e.g.*, *Nat'l Ass'n of Mfrs. v. U.S. DHS*, 491 F.Supp.3d 549, 564–65 (N.D. Cal. 2020) ("*NAM*") (President Trump's attempt in his first term to indefinitely ban entire work visa categories "indefinitely nullif[ied] Congress' considered judgments").

The Refugee Ban EO conflicts with specific provisions of the INA in several ways.

*First*, the Order bars entry and suspends decisions on applications for follow-to-join refugees, directly conflicting with Congress's considered judgment to prioritize family reunification and its resulting mandate that follow-to-join refugees "shall" be entitled to the same refugee status as the principal applicant as long as they are not barred by specific inadmissibility grounds. *Doe*, 288 F.Supp.3d at 1078–79; *see also* 8 U.S.C. § 1157(c)(2)(A); *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 691 (9th Cir. 2003) (Congress's use of word "shall" imposes mandatory duty). Another court in this district has already held that indefinite suspension of

---

[4] He certainly does not under 8 U.S.C. § 1185(a)(1), also cited by the Refugee Ban EO, which makes it unlawful for a noncitizen to enter the United States except under such "reasonable rules, regulations and orders" as the President prescribes. At minimum, the Order would need to align with the President's authority under section 212(f), *see Hawai'i*, 859 F.3d at 770 n.10, which, as explained below, it does not.

PLS.' MOT. FOR PRELIM. INJ. – 14
(No. C25-255 JNW)

follow-to-join refugee processing violates the INA. *See Doe*, 288 F.Supp.3d at 1077–78. By ordering agencies to indefinitely stop performing their mandatory duty to admit spouses and children of refugees whom Congress singled out for entitlement to admission, the Order unlawfully overrides 8 U.S.C. § 1157(c)(2)(A).

*Second*, the Order's suspension of the USRAP (and underlying policy objectives) conflicts with Congress's purpose in establishing the program, and where an executive order conflicts with the purpose of a statute, it is *ultra vires. See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 318 F.Supp.3d 370, 417 (D.D.C. 2018) (citing *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1339 (D.C. Cir. 1996)), *rev'd and vacated on other grounds*, 929 F.3d 748 (D.C. Cir. 2019); *Murphy Co. v. Biden*, 65 F.4th 1122, 1133 (9th Cir. 2023) (considering whether executive action was consistent with statute's purpose when conducting *ultra vires* review). The Order indefinitely suspends the USRAP in pursuit of a series of stated policy interests, some of which unlawfully supplant the congressional plan underlying the Refugee Act (replacing them with President Trump's own policy interests) and others of which are interests that "the pre-existing law already guarantees." *NAM*, 491 F.Supp.3d at 565 (executive order unlawful where pre-existing law guaranteed order's policy objectives).

Specifically, the Order's four identified policy goals related to the USRAP (upon which resumption is dependent), *see supra* pp. 2–5, each would supplant Congress's own policy judgments or are already provided for by the relevant law—or both. By seeking to end refugee admissions in order to prioritize resources for Americans and impose "assimilation" requirements on refugees, the Order subverts the Refugee Act's historic purpose to respond to "the urgent needs of [refugees]" as a matter of "humanitarian concern." Pub. L. 96-212, § 101, 94 Stat. 102. With respect to public resources, Congress has specifically opted to provide public benefits, including cash assistance, to refugees and has outlined detailed procedures for doing so. *See* 8 U.S.C. § 1522(a)(1)(A), (e). And it has created a detailed statutory structure to support recently arrived refugees' "effective[] resettle[ment]," which Congress has defined as promoting their economic

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

self-sufficiency and English language learning—*not* full assimilation. *See id.* § 1522(a)(1)(A); *see also infra* pp. 19–22 (discussing conflict between Refugee Funding Suspension and section 1522). Congress has provided a detailed scheme for the involvement and input of states and localities, as the Order acknowledges. *See* Refugee Ban EO § 3(d) (citing 8 U.S.C. § 1522(a)(2)); *see also HIAS*, 415 F.Supp.3d at 680–81 (observing that executive order granting state and local governments ability to veto refugee resettlement in their jurisdictions would "undermine [section 1522(a)(2)'s] arrangement" and "flies in the face of clear Congressional intent"). And, as described above, Congress already requires refugees to undergo rigorous security vetting and provides for exclusion of refugees on the basis of national security and public safety. *See* 8 U.S.C. § 1182(a) (listing inadmissibility categories). In short, Congress already carefully weighed the policy interests that President Trump claims necessitate shutting down the USRAP when it enacted the Refugee Act and created "comprehensive and uniform provisions" for refugee admission and authorizing programs for domestic resettlement and assistance to refugees. The President lacks the authority to ignore Congress's considered judgments.

In any event, the Refugee Ban EO conflicts with Congress's detailed statutory scheme for refugee admissions. It provides that a case-by-case exception to its ban will be made only upon a separate determination that an individual's entry is "in the national interest and does not pose a threat to the security or welfare of the United States." Refugee Ban EO § 3(c). But Congress has already defined the circumstances under which a refugee may be admitted, *see* 8 U.S.C. § 1157(c)(1), including the detailed, specific inadmissibility bars for refugees, which are narrower than those that apply generally to noncitizens seeking admission, *see id.* § 1157(c)(3).[5] Under these standards, Congress granted the Secretary of Homeland Security discretionary authority to "admit any particular refugee who is not firmly resettled in any foreign country and is determined to be

---

[5] In particular, the public charge, labor certification, and travel document grounds of inadmissibility do not apply to refugees, and other grounds of inadmissibility (other than controlled substance trafficking and certain security-related grounds) may be waived for humanitarian purposes, to assure family unity, or when in the public interest. 8 U.S.C. § 1157(c)(3).

PLS.' MOT. FOR PRELIM. INJ. – 16
(No. C25-255 JNW)

of special humanitarian concern to the United States," as long as they are admissible.[6] And the definition of "refugee" itself was carefully defined by Congress to achieve its purposes and tailored to ensure compliance with the United States' international treaty obligations. *See* Pub. L. No. 96-212, § 201, 94 Stat. 102 (enacting universal, nondiscriminatory definition of "refugee" closely paralleling that of 1951 United Nations Convention Relating to Status of Refugees).

Because the Order conflicts with Congress's comprehensive plan for refugee resettlement, Plaintiffs are likely to succeed on their claim that the executive order is *ultra vires*. *See Doe v. Trump*, 957 F.3d 1050, 1064 (9th Cir. 2020) (proclamation issued during President Trump's first term mandating acquisition of healthcare to establish eligibility for family visa eviscerated public charge statutory scheme).

### 2.    Section 212(f) does not justify the Refugee Ban EO.

Even if the ban could somehow be read as consonant with the Refugee Act—which it cannot—the Refugee Ban EO fails to meet the requirements to invoke the President's section 212(f) power. That statute requires that any suspension thereunder be supported by a finding that entry of the suspended class "would be detrimental to the interest of the United States," 8 U.S.C. § 1182(f), but the Refugee Ban EO's only "findings" are irrelevant to the entry ban ordered, *see Hawai'i*, 859 F.3d at 788 (requiring justification beyond statement that detriment existed). For example, the Order cites the example of certain states and localities that sought federal aid and work authorization to assist migrants, but those migrants were *not* refugees for whom Congress has systematically provided federal funding for integration and who are authorized to work upon arrival.[7] These unrelated and misleading citations bear no relation to the Refugee Ban EO's

---

[6] All applicants in the USRAP pipeline have already been determined to be of special humanitarian concern to the United States. *See supra* pp. 5–8.

[7] In particular, section 1 of the Refugee Ban EO states that U.S. cities have experienced "influxes of migrants" and sought federal aid or declared states of emergency in response to "increased migration" to conclude, in a deceptive non-sequitur, that the United States lacks the ability to absorb "in particular, refugees" into its communities. Refugee Ban EO § 1. On the contrary, the New York state of emergency referenced related to Texas Governor Greg Abbott's bussing of approximately 17,000 asylum seekers to New York City without warning, *see* Ex. 13,

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    suspension of refugee admissions and thus cannot satisfy the preconditions of section 212(f). *See*

2    *NAM*, 491 F.Supp.3d at 569 (finding that did "not comport with actual facts" was insufficient to

3    satisfy section 212(f)).

4           The Refugee Ban EO also completely disregards the existing statutory framework for

5    refugee admissions, which already addresses the policy concerns that the Order raises. *See supra*

6    pp. 14–17; *NAM*, 491 F.Supp.3d at 568 (where findings "completely disregard[] . . . the preexisting

7    statutory framework," they are insufficient to justify invocation of section 212(f) powers). And, in

8    any event, the Order does not attempt to explain why its inapposite findings would require

9    indefinite suspension of all refugee admissions, contrary to congressional intent and the statutory

10   scheme. Notably, the Order makes no findings that public safety and national security are not

11   already paramount concerns or that current processes are inadequate. As courts have cautioned,

12   national security is not a "talismanic incantation" that can be invoked to support unbridled

13   presidential powers under section 212(f). *Hawai'i*, 859 F.3d at 788. Similarly, the self-evident

14   need for compliance with the state and local consultation requirements under section 1522(a)(2),

15   *see* Refugee Ban EO § 3(d), without any finding of *non*-compliance, cannot support the Refugee

16   Ban EO's suspension. And "domestic" concerns, such as the availability of resources for

17   Americans, are outside "the traditional spheres" of section 212(f) and do not support the broad

18   invocation of the President's power attempted here. *See Doe*, 957 F.3d at 1065, 1067

19   (unsubstantiated findings of perceived problem of burdened healthcare system related to long-term

20   economic concern and was insufficient to show detriment); *NAM*, 491 F.Supp.3d at 566

21   (underlying purpose of "eliminat[ing] the threat of taking jobs from American citizens" not basis

22   for finding detriment).

23

24

---

25   and the Massachusetts state of emergency emphasized the need for work authorization for asylum
26   seekers, *see* Ex. 12, whereas individuals admitted as refugees automatically receive work
     authorization upon admission.

PLS.' MOT. FOR PRELIM. INJ. – 18
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1                                          \*    \*    \*

2      In short, Plaintiffs are likely to succeed on the merits of their claim that the Refugee Ban

3 EO is unlawful because it conflicts with the INA and fails to make any finding necessary to justify

4 a wholesale suspension of the USRAP.

5           **B.**      **The Agency Suspension violates the INA and APA.**

6      Defendants' and their agencies' implementation of the Refugee Ban EO to immediately

7 halt the processing, adjudication, and admission of refugee cases is unlawful for many of the same

8 reasons as the Refugee Ban EO itself. This action too should be enjoined.

9           **1.**      **Defendants cannot rewrite the Refugee Act.**

10      The Court should block enforcement of the Agency Suspension and the Refugee Funding

11 Suspension because they violate the well-established principle that agencies can exercise their

12 statutorily delegated authority only pursuant to the scheme that Congress enacted. *See La. Pub.*

13 *Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) (administrative agencies "literally ha[ve] no

14 power to act . . . unless and until Congress confers power[s]" to do so); 5 U.S.C. § 706(2)(C)

15 (reviewing court shall "hold unlawful and set aside agency action . . . in excess of statutory

16 jurisdiction, authority, or limitations, or short of statutory right"). Together or independently, the

17 Agency Suspension and Refugee Funding Suspension suspend the USRAP in its entirety by

18 prohibiting processing of refugees' applications (the Agency Suspension) and by cutting off

19 funding for that processing (the Refugee Funding Suspension).

20      Defendants' agencies have not identified any statutory authority to suspend the USRAP in

21 its entirety; their communications announcing the Agency Suspension and Refugee Funding

22 Suspension cite only the Refugee Ban EO and the Foreign Aid EO, respectively. To the extent the

23 agencies implicitly rely on 8 U.S.C. §§ 1182(f) and 1185(a), they cannot: These laws expressly

24 delegate authority to the President alone. And, although the Refugee Act authorizes DHS to admit

25 refugees "pursuant to such regulations as [the Department] may prescribe," 8 U.S.C. § 1157(c), as

26 explained further below, Defendants' agencies have failed to issue any such regulations here.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Finally, whatever authority Defendants enjoy under the Refugee Act is limited by its stated purpose: to design a "systematic procedure" for refugee admissions embodying the American commitment to refugee admissions as a matter of humanitarian (as opposed to ideological, political, or other) concern. Defendants' complete suspension of all refugee processing is wholly at odds with this purpose.

Even if the Agency Suspension and Refugee Funding Suspension were somehow considered to fall within the agencies' authority to act, they must still be set aside as contrary to law and violative of the APA because they fundamentally conflict with the Refugee Act. *See Nebraska v. Su*, 121 F.4th 1, 16 (9th Cir. 2024) (agency rule that contradicted statute violated both statute and APA (citing *E. Bay Sanctuary Covenant*, 932 F.3d at 773)); *see also supra* pp. 14–17. First, similar to the Order, these suspensions each and collectively take a wrecking ball to Congress's carefully crafted statutory scheme—elevating an applicant's refugee status to an inadmissibility bar of its own. Under the Refugee Act, any individual refugee may enter the United States only if they are not subject to one of the inadmissibility bars set out in 8 U.S.C. § 1182(a). Agencies cannot "nullif[y]" the contours of existing inadmissibility grounds or "evade the limitations [of] Congress," *Abourezk v. Reagan*, 785 F.2d 1043, 1057 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987), by creating a new and separate inadmissibility grounds that do not exist in the INA. But this is exactly what the Agency Suspension and Refugee Funding Suspension purport to do by banning the entry of all refugees.

The Refugee Funding Suspension is in excess of the agencies' statutory authority for the additional reason that it is contrary to Congress's detailed statutory scheme for providing federal support to recently arrived refugees. *See* 8 U.S.C. § 1522 *et seq.* In section 1522, Congress expressly sought to ensure the economic self-sufficiency and effective resettlement of refugees as quickly as possible and to foster close collaboration between resettlement agencies and state and local governments receiving refugees. *See id.* § 1522(a)(1). In furtherance of those purposes, Congress directed that the resettlement agencies contracted to provide initial resettlement services

1    to refugees "*shall . . .* fulfill [their] responsibility to provide for the basic needs (including food,

2    clothing, shelter, and transportation for job interviews and training) of each refugee resettled" as

3    well as develop, implement, and monitor "a resettlement plan" for each resettled refugee. *Id.*

4    § 1522(b)(7) (emphasis added). By withholding funds Congress appropriated to support refugee

5    self-sufficiency and integration under the statute, Defendants are acting directly contrary to

6    Congress's stated intent and statutory scheme—and thereby making it impossible for CWS, HIAS,

7    and LCSNW to comply with Congress's mandatory directives that they provide for the basic needs

8    of each resettled refugee.[8]

9        Similarly, Congress created a statutory scheme and appropriated funds to ensure that

10   Afghan and Iraqi nationals in danger because of their work on behalf of the U.S. missions in their

11   countries be provided with resettlement benefits to the same extent as refugees. *See* Refugee Crisis

12   in Iraq Act of 2008, Pub. L. 110-181, § 1244(g), 122 Stat. 3; Afghan Allies Protection Act of 2009,

13   Pub. L. 111-8, § 602(b)(8), 123 Stat. 807. By withholding funds appropriated to assist resettled

14   Afghan and Iraqi SIV holders, Defendants once again directly contravene a congressional

15   mandate.

16       Finally, the Agency Suspension and Refugee Funding Suspension violate the Refugee

17   Act's guarantee of admission to a refugee's spouse and minor children who have met the eligibility

18   requirements and who are not subject to any applicable inadmissibility grounds. *See* 8 U.S.C.

19   § 1157(c)(2)(A) ("A spouse or child . . . of any refugee who qualifies for admission . . . *shall . . .*

20   be entitled to the same admission status as such refugee if . . . following to join[] such refugee and

21   if the spouse or child is admissible[.]" (emphasis added)). As another court in this district

22   previously observed, "[n]othing in the statute authorizes the Secretary to stop, terminate, or

23

24

25       [8] To the extent President Trump's Foreign Assistance EO directed this result, an executive
order that conflicts with the purpose of a federal statute is *ultra vires*, and the President cannot

26   supplant Congress's carefully crafted purpose with his own policy interests. *See supra* pp. 14–17.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

suspend the ability of otherwise qualified [follow-to-join] applicants from seeking and obtaining that entitlement." *Doe*, 288 F.Supp.3d at 1079.

> **2.**     **The Agency Suspension and Refugee Funding Suspension should have been subject to notice-and-comment rulemaking.**

The Agency Suspension and Refugee Funding Suspension should be enjoined for the separate reason that they fail to satisfy the procedural standards for agency action set by the APA. Each amounts to a "legislative rule" for which notice and comment rulemaking under the APA is required. *See Doe*, 288 F.Supp.3d at 1075 (plaintiffs were likely to succeed on their claim that refugee ban violated APA's rulemaking requirements). There can be no question that the two suspensions substantively alter the rights of hundreds of thousands of refugees worldwide, their U.S.-based family members and sponsors, and the resettlement partners that serve them. *See Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087–88 (9th Cir. 2003) (legislative rules "create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress"). The Refugee Funding Suspension also substantively alters the rights of thousands of recently arrived refugees and SIV holders in the United States. Without these policies, there is no basis in law or regulation for the agencies to suspend refugee processing and admissions. *See id.* at 1087. And, without the Refugee Funding Suspension, there is no basis in law or regulation for the agencies to suspend statutorily mandated benefits to recently arrived refugees and SIV holders. The Agency Suspension and Refugee Funding Suspension thus should have been promulgated through notice-and-comment rulemaking.[9]

---

[9] Of note, 8 C.F.R. part 207, the regulations implementing the Refugee Act, and subsequent amendments outlining procedures for the follow-to-join program, were subject to notice and comment before they were codified. Aliens and Nationality; Refugee and Asylum Procedures, 46 Fed. Reg. 45,116 (Sept. 10, 1981) (to be codified at 8 C.F.R. pt. 207); Procedures for Filing a Derivative Petition (Form I-730) for a Spouse and Unmarried Children of a Refugee/Asylee, 63 Fed. Reg. 3,792 (Jan. 27, 1998) (to be codified at 8 C.F.R. § 207.7).

PLS.' MOT. FOR PRELIM. INJ. – 22
(No. C25-255 JNW)

1

2

**C.    The Agency Suspension and Refugee Funding Suspension are arbitrary and capricious.**

The Agency Suspension and Refugee Funding Suspension must also be set aside under the APA for the separate reason that they are "arbitrary, capricious, [or] an abuse of discretion." *Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (quoting 5 U.S.C. § 706(2)(A)). When taking final agency action, agencies are required to "consider[] the relevant factors and articulate[] a rational connection between the facts found and the choices made." *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011) (cleaned up). An agency "must show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Where the agency rescinds prior policy, it must consider important aspects of the problem, including serious reliance interests, *id.*, and the agency "must consider" reasonable "alternatives that are within the ambit of the existing policy," *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020) (cleaned up).

Here, the agencies offer no rational connection between the suspension of the refugee program in its entirety—which harms hundreds of thousands of vulnerable refugees and the organizations who serve them—and the facts and justifications that could conceivably underlie it. In fact, they offer no explanation at all. This is fatal under the APA. *See Crickon v. Thomas*, 579 F.3d 978, 982 (9th Cir. 2009) (courts should not "infer an agency's reasoning from mere silence" (cleaned up)). With respect to the Agency Suspension, the only rationale that the agencies appear to provide is a reference to the Refugee Ban EO. But where an agency rule incorporates a presidential action, the combined operative rule must comply with the APA. *E. Bay Sanctuary Covenant*, 932 F.3d at 770 (reviewing validity of DHS rule incorporating proclamation under APA). Here, of course, it does not, because the Refugee Ban EO itself is contrary to law and *ultra vires*. *See supra* pp. 14–19.

The Agency Suspension would violate the APA in any event because it goes beyond what the Refugee Ban EO requires without explanation and in violation of the Refugee Act. *See e.g.*,

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

*Zafarmand v. Pompeo*, No. 20-CV-00803-MMC, 2020 WL 4702322, at *3–4 (N.D. Cal. Aug. 13, 2020) (reviewing whether agency implementation exceeded presidential proclamation). The suspension stopped refugee travel *immediately*—a week *before* the Refugee Ban EO's express deadline. And the Agency Suspension stopped all refugee case processing, whereas the Refugee Ban EO directed suspensions of admissions and decisions only. Again, no justification was offered, nor any indication that the agencies had considered any justifications in light of the reliance interests of the refugees, U.S.-based family members, and resettlement agencies in the continuation of processing and travel, or even the purpose of the Refugee Act pursuant to which they operate the program. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 57 (1983).

As for the Refugee Funding Suspension, the agencies do not come close to satisfying the APA's minimum standards for reasoned decision-making. DOS failed to provide any reason why it must immediately suspend all USRAP funding while it merely *considers* whether such work is consistent with President Trump's Foreign Aid EO—thereby threatening the ability of refugees and SIV holders to obtain food, shelter, and medical care during their first days in the United States and threatening the survival of the resettlement agencies that are the backbone of refugee resettlement (and thereby ensuring that the USRAP would be suspended, even without the Agency Suspension). The Notices of Suspension do not even attempt to explain why the Foreign Aid EO is relevant: That order does not bear on *domestic* funding for refugees and SIVs or on support provided by resettlement partners for processing of refugees for admission to the United States. This is fatal under the APA.

With respect to both the Agency Suspension and the Refugee Funding Suspension, the agencies failed to consider important aspects of the problem, including Congress's purpose in adopting the Refugee Act and in creating a detailed statutory scheme providing resettlement benefits for recently arrived refugees and SIV holders. DOS also failed to consider its own regulations governing the limited circumstances in which its contracts can be suspended or

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

terminated and accompanying procedural requirements, *see* 2 C.F.R. § 200 *et seq.*; 2 C.F.R. § 600 *et seq.*—which DOS explicitly incorporated into the cooperative agreements, *see* Ex. 23 ¶ 25; Ex. 24 ¶ 27.

Most importantly, the agencies entirely failed to consider the serious reliance interests created by the decades-long federal policy of resettling refugees to safety through the USRAP and by the congressionally appropriated funding of the resettlement agencies' work, which in turn is relied upon by recently arrived refugees and SIV holders to meet their basic needs. *See* Ex. 20 ¶¶ 19, 24; Ex. 23 ¶ 51. As described above, the resettlement agencies are highly dependent on government funding to do their core work and cannot exist without it. *See* Ex. 23 ¶¶ 3, 19–24, 41, 54–56; Ex. 24 ¶¶ 2–3, 55–56, 61–65. Inexcusably, even as DOS claims to be merely *considering* whether to change its policy going forward, it failed to contemplate any alternative to the drastic, far-reaching suspension of all funding to the resettlement agencies that will inevitably cause such harm as to prevent a return to the status quo in the future. *See* Ex. 23 ¶¶ 52–56; Ex. 24 ¶¶ 2–3, 38, 42, 61–64; Ex. 25 ¶¶ 29–32, 44–45. Either DOS is ignorant of the fundamental facts or it seeks to eliminate refugee resettlement infrastructure under the guise of a "temporary" suspension—regardless, its action is arbitrary and capricious and must be set aside. *See FCC*, 556 U.S. at 515 (agency must display awareness of relevant facts). Moreover, by silently withholding reimbursements from resettlement agencies for millions of dollars incurred to provide services to refugees and SIV holders, Defendants' agencies have engaged in the *Sub Silentio* Suspension—which is, by definition, arbitrary and capricious. *Id.* Finally, DOS failed to consider any alternative to stopping *all* refugee application processing immediately, including travel scheduled before the Refugee Ban EO's travel suspension went into effect—thereby preventing even those refugees like Plaintiffs Pacito and Josephine, who were on the cusp of travel, from coming to safety and reuniting with their families.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

**D. The Refugee Ban EO, Agency Suspension, and Refugee Funding Suspension violate the due process rights of follow-to-join petitioners.**

Finally, Plaintiff Esther is likely to succeed on her procedural due process claim that the Refugee Ban EO, Agency Suspension, and Refugee Funding Suspension deprive her of her statutorily created entitlement to the admission of her daughter. To have a property interest in a statutorily created benefit, an individual must "have a legitimate claim of entitlement to it." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). The mandatory language in the statute provides Esther with a "legitimate claim of entitlement" to her daughter's admission that Defendants cannot take away without due process. *See id.*

**III. The balance of equities and public interest support a preliminary injunction.**

The Court should preliminarily enjoin the Refugee Ban EO, Agency Suspension, and Refugee Funding Suspension in their entirety, as other courts did with the prior refugee bans, to stem the devastation they cause to refugees and resettlement agencies and prevent even further irreparable harm. *See, e.g.*, *Doe*, 288 F.Supp.3d at 1086 (preliminarily enjoining first Trump Administration refugee ban); *HIAS*, 415 F.Supp.3d at 686 (preliminarily enjoining executive order giving state and local governments power to veto refugee resettlement). Plaintiffs are entitled to preliminary relief because both the balance of equities and the public interest "tip[] sharply" in their favor such that they satisfy the standard for preliminary relief. *Cottrell*, 632 F.3d at 1134–35; *see also Nken v. Holder*, 556 U.S. 418, 435 (2009) (balance of harms and public interest factors "merge when the Government is the opposing party").

The individual Plaintiffs suffer irreparable harm every day they are deprived of the ability to seek safety, reunite with family members, and receive critical benefits to which they are entitled. *See supra* pp. 9–11. The organizational Plaintiffs suffer irreparable harm every day they are unable to perform the core work at the heart of their missions, and each passing day of Defendants' unlawful actions threatens their very ability to survive. *See supra* pp. 11–13. Finally, the relief Plaintiffs seek is consistent with the public interest and indeed is necessary to enforce Congress's

detailed statutory scheme for resettling refugees through the USRAP and supporting their effective resettlement after they arrive in the United States. There can be no legitimate government interest in violating federal law, *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013), or the U.S. Constitution, *see United States v. U.S. Coin & Currency*, 401 U.S. 715, 726 (1971).

Defendants' unlawful conduct results in overlapping and irreparable injuries to Plaintiffs that cannot be otherwise remedied. Individual Plaintiffs abroad are harmed every day that the USRAP does not process their refugee applications—whether because the Refugee Ban EO or Agency Suspension prohibits such processing or because the Refugee Funding Suspension prevents resettlement partners, including the organizational Plaintiffs, from doing this work. Individual Plaintiffs in the United States are harmed every day they are unable to receive their statutorily mandated resettlement benefits because the Refugee Funding Suspension prevents resettlement agencies from providing them. And Individual Plaintiffs who are family members and sponsors in the United States are harmed every day the Refugee Ban EO, Agency Suspension, and Refugee Funding Suspension prolong their separation from their family and friends abroad.[10]

As for the organizational Plaintiffs, every fewer refugee assured to them as a result of the Refugee Ban EO, Agency Suspension, or Refugee Funding Suspension results in reduced federal funding pursuant to their cooperative agreements and thereby threatens their ability to maintain the local resettlement support infrastructure and relationships they have built up over years. Their missions suffer as a result. Meanwhile, the Refugee Funding Suspension strikes at their ability to survive in the immediate term, as evidenced by their layoffs and furloughs of hundreds of employees to date.

---

[10] Restriction of any remedy based on connection to the United States is unnecessary here; because refugees must be assured by a resettlement agency or sponsored by a welcome group to be admitted, they necessarily have a relationship to the United States by virtue of their pending applications for resettlement. *See Hawai'i*, 871 F.3d at 661. In addition, many refugees resettled to the United States are reuniting with family. *See, e.g.*, Ex. 24 ¶ 15 (75% of refugees HIAS assures are placed based on U.S. tie).

PLS.' MOT. FOR PRELIM. INJ. – 27
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

The only way to prevent continuing irreparable harms to Plaintiffs is to enjoin in their entirety the Refugee Ban EO, Agency Suspension, and Refugee Funding Suspension; a broad preliminary injunction is therefore necessary and appropriate. *See E. Bay Sanctuary Covenant*, 993 F.3d at 658 (affirming nationwide preliminary injunction of rule limiting asylum eligibility where broad relief was necessary to prevent harm to plaintiffs). Vacatur of agency action is the standard remedy for violations of the APA, *Regents of Univ. of Cal. v. U.S. DHS*, 908 F.3d 476, 511 (9th Cir. 2018), *rev'd in part and vacated in part*, 591 U.S. 1 (2020), and it is appropriate here where uniform application of immigration laws is particularly important, *E. Bay Sanctuary Covenant*, 993 F.3d at 681.

## **CONCLUSION**

Preliminary relief is necessary to stop irreparable harm to Plaintiffs and safeguard the American commitment to providing refuge for those facing persecution—before it is too late. Plaintiffs respectfully request that this Court issue a preliminary injunction blocking the enforcement of the Refugee Ban EO, the Agency Suspension, and the Refugee Funding Suspension in their entirety.

*        *        *

The undersigned certifies that this motion contains 10,000 words, in compliance with the Local Civil Rules and pursuant to Plaintiffs' concurrently filed unopposed motion to file an over-length motion.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    Dated: February 11, 2025                    By: s/ *Harry H. Schneider, Jr.*

2       Deepa Alagesan*                          Harry H. Schneider, Jr., WSBA No. 9404
                                                 Jonathan P. Hawley, WSBA No. 56297
3       Mevlüde Akay Alp*                        Shireen Lankarani, WSBA No. 61792
        Linda Evarts*                            Esmé L. Aston, WSBA No. 62545
4       Ghita Schwarz*                           **PERKINS COIE LLP**
        **INTERNATIONAL REFUGEE**                1201 Third Avenue, Suite 4900
5       **ASSISTANCE PROJECT**                   Seattle, Washington 98101
        One Battery Park Plaza, 33rd Floor       Telephone: (206) 359-8000
6       New York, New York 10004                 Facsimile: (206) 359-9000
7       Telephone: (646) 939-9169                HSchneider@perkinscoie.com
        Facsimile: (516) 324-2267                JHawley@perkinscoie.com
8       dalagesan@refugeerights.org              SLankarani@perkinscoie.com
        makayalp@refugeerights.org               EAston@perkinscoie.com
9       levarts@refugeerights.org
        gschwarz@refugeerights.org               John M. Devaney†
10                                               **PERKINS COIE LLP**
        Melissa Keaney*                          700 Thirteenth Street NW, Suite 800
11      **INTERNATIONAL REFUGEE**                Washington, D.C. 20005
        **ASSISTANCE PROJECT**                   Telephone: (202) 654-6200
12      P.O. Box 2291                            Facsimile: (202) 654-6211
13      Fair Oaks, California 95628              JDevaney@perkinscoie.com
        Telephone: (646) 939-9169
14      mkeaney@refugeerights.org                Joel W. Nomkin*
                                                 **PERKINS COIE LLP**
15                                               2525 East Camelback Road, Suite 500
                                                 Phoenix, Arizona 85016
16                                               Telephone: (602) 351-8000
                                                 Facsimile: (602) 648-7000
17                                               JNomkin@perkinscoie.com

18                                               Nicholas J. Surprise†
                                                 **PERKINS COIE LLP**
19                                               33 East Main Street, Suite 201
20                                               Madison, Wisconsin 53703
                                                 Telephone: (608) 663-7460
21                                               Facsimile: (608) 663-7499
                                                 NSurprise@perkinscoie.com
22
                                                 *Counsel for Plaintiffs*
23
                                                 * *Admitted pro hac vice*
24                                               † *Pro hac vice forthcoming*

25

26

PLS.' MOT. FOR PRELIM. INJ. – 29
(No. C25-255 JNW)

1

## CERTIFICATE OF SERVICE

I certify under penalty of perjury that on February 11, 2025, I caused to be electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notification of the filing to the email addresses indicated on the Court's Electronic Mail Notice List.

Dated: February 11, 2025

*s/ Harry H. Schneider, Jr.*
Harry H. Schneider, Jr.

CERTIFICATE OF SERVICE
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000