# EXHIBIT 3

PROPOSED REFUGEE ADMISSIONS
FOR FISCAL YEAR 2025


REPORT TO THE CONGRESS


SUBMITTED ON BEHALF OF

**THE PRESIDENT OF THE UNITED STATES**

TO THE

**COMMITTEES ON THE JUDICIARY**

**UNITED STATES SENATE**

AND

**UNITED STATES HOUSE OF REPRESENTATIVES**


IN FULFILLMENT OF THE REQUIREMENTS OF

SECTIONS 207(d)(1) AND (e)

OF THE

IMMIGRATION AND NATIONALITY ACT


UNITED STATES DEPARTMENT OF STATE
UNITED STATES DEPARTMENT OF HOMELAND SECURITY
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Table of Contents

INTRODUCTION ................................................................................................................................ 4

FOREWORD .................................................................................................................................... 5

OVERVIEW OF U.S. REFUGEE POLICY ............................................................................................ 13

PROPOSED CEILINGS FOR FY 2025 ................................................................................................ 14

ADMISSIONS PROCEDURES .......................................................................................................... 15

DHS/USCIS REFUGEE ADJUDICATIONS ......................................................................................... 27

PROCESSING ACTIVITIES OF THE DEPARTMENT OF STATE ............................................................ 29

OFFICE OF REFUGEE RESETTLEMENT ........................................................................................... 33

REGIONAL REFUGEE ADMISSIONS ............................................................................................... 40

    **Africa** ................................................................................................................................... 40

    **East Asia** .............................................................................................................................. 42

    **Europe and Central Asia** ....................................................................................................... 43

    **Latin America and the Caribbean** .......................................................................................... 45

    **Near East and South Asia** ...................................................................................................... 47

    **International Religious Freedom Act Reporting** ....................................................................... 48

    **North Korean Human Rights Act Reporting** ............................................................................ 53

REFUGEE ADMISSIONS TO THE UNITED STATES ............................................................................ 53

**LIST OF TABLES**

|       |                                                                                      | Page  |
|-------|--------------------------------------------------------------------------------------|-------|
| I.    | Projected Refugee Admissions for FY 2024 and Proposed Refugee Admissions for FY 2025 by Region | 14    |
| II.   | USRAP Projected Arrivals by Region, FY 2024                                           | 55    |
| III.  | USRAP Admissions, FY 2023                                                             | 56    |
| IV.   | USRAP Admissions by Country of Origin, FY 2023                                        | 57-59 |
| V.    | Sex and Median Age of Refugee Arrivals, FY 2023                                       | 60    |
| VI.   | Select Age Categories of Refugee Arrivals, FY 2023                                    | 61    |
| VII.  | Refugee Arrivals by State of Initial Resettlement, FY 2023                            | 62-63 |
| VIII. | Funding for Refugee Processing and Resettlement, FY 2024 and FY 2025                  | 64-65 |
| IX.   | UNHCR Resettlement Referrals Submitted by Resettlement Country – 2023                 | 66    |

## INTRODUCTION

This Proposed Refugee Admissions for Fiscal Year (FY) 2025 Report to the Congress is submitted in compliance with Sections 207(d)(1) and (e) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1157(d)(1) and (e).  This report provides the information required by those sections, including:

1) *A description of the nature of the refugee situation;*
2) *A description of the number and allocation of the refugees to be admitted, and an analysis of conditions within the countries from which they came;*
3) *A description of the proposed plans for their movement and resettlement and the estimated cost of their movement and resettlement;*
4) *An analysis of the anticipated social, economic, and demographic impact of their admission to the United States;*
5) *A description of the extent to which other countries will admit and assist in the resettlement of such refugees;*
6) *An analysis of the impact of the participation of the United States in the resettlement of such refugees on the foreign policy interests of the United States; and*
7) *Such additional information as may be appropriate or requested by such members.*

This report contains information as required by Section 602(d) of the International Religious Freedom Act of 1998 (P.L. 105-292) (IRFA), as amended, 22 U.S.C. § 6472(d), about religious persecution of refugee populations eligible for consideration for admission to the United States.

This report meets the reporting requirements of Section 305(b) of the North Korean Human Rights Act of 2004 (P.L. 108-333), as amended, 22 U.S.C. § 7845(b), by providing information about specific measures taken to facilitate access to the United States refugee admissions program for individuals who have fled "countries of particular concern" for particularly severe violations

of religious freedom, identified pursuant to Section 402(b) of the IRFA, 22
U.S.C. § 6442(b).

## FOREWORD

The U.S. Refugee Admissions Program (USRAP) is a critical demonstration of
the United States' efforts to extend hope and relieve suffering globally
through refugee resettlement, as record numbers of people around the
world have been forced to flee war, persecution, and instability.  Nearly 118
million people are now forcibly displaced worldwide, more than at any other
time in history.  According to the United Nations High Commissioner for
Refugees (UNHCR), nearly three million refugees are now in need of
protection through third-country resettlement.  Through resettlement, the
United States provides an opportunity for some refugees to pursue a life of
safety and dignity without fear of persecution.  In doing so, the United
States reaffirms its role as a global leader, upholds our nation's core values,
and builds on the long, enduring history of American communities providing
a warm welcome to those fleeing persecution.

Over the past three years, the Biden-Harris Administration has restored,
strengthened, and modernized the USRAP.  This included a whole-of-
government effort to streamline and improve overseas refugee processing,
enhance the security and integrity of the program, digitize case
management for efficiency, work through the backlog of the oldest cases,
increase staffing to support operations, and reestablish and expand the
domestic infrastructure for welcoming refugees.

These efforts have resulted in steady annual increases in refugee
admissions, with admissions doubling in FY 2022 and again in FY 2023.  In FY
2024, the United States expects to reach a historic milestone by resettling
100,000 refugees from around the world – the most in three decades.
USRAP is on its strongest footing in modern history.

The Administration has launched and continues to implement
groundbreaking initiatives.  The Welcome Corps, a program that allows

everyday Americans to privately sponsor refugees and Afghan SIVs to come to the United States, responds to the widespread interest of the American people to play a greater role in welcoming refugees.  Through the Safe Mobility initiative, migrants in Guatemala, Colombia, Costa Rica, and Ecuador can access information and apply for lawful pathways (including refugee resettlement) to the United States, Canada, and Spain and learn more about local integration options in the countries where they are. Screening individuals for lawful pathways closer to home helps encourage them to avoid dangerous irregular journeys to the U.S. border.

The Administration also continues to lead on resettlement and complementary protection pathways across the international community, working to expand the number of countries where refugees can find safety. All these efforts advance the United States' broader foreign policy and humanitarian efforts to expand safe, orderly, and lawful pathways to the United States and other countries around the world, and to invest in improving conditions in countries of origin and asylum so that vulnerable individuals can access the support they need and are not compelled to undertake dangerous journeys in search of safety.

Welcoming refugees helps demonstrate the United States' global human rights and humanitarian commitments, shows solidarity, and shares responsibility with countries that host the majority of the world's refugees. Collaboration with other countries, including through resettlement, helps provide stability in regions around the world experiencing conflict, advancing vital U.S. interests and national security objectives.

In FY 2025, the United States will continue the momentum of the last three years and reaffirm refugee resettlement as a core component of our global leadership.  For FY 2025, the President again proposes to set an ambitious and achievable goal of resettling 125,000 refugees in the United States.

This renewed goal reflects the highest American values.  The USRAP is an essential part of our proud history as a nation that has welcomed and been enriched by refugees since our founding.  As refugees build new lives in the

communities where they are resettled, the United States benefits from their significant economic, social, and cultural contributions.  As the Department of Health and Human Services (HHS) concluded in a recent landmark study, refugees and other newcomer populations contributed almost $124 billion to the growth of the U.S. economy over a 15-year period.[1]

## USRAP in FY 2025:  Strengthening the Program for the Future

Effective refugee resettlement through the USRAP requires close cooperation among U.S. government agencies, U.S. state and local governments, non-profit and private resettlement partners, foreign governments, UNHCR, the International Organization for Migration (IOM), and refugees themselves.  Crucially, the success and sustainability of the USRAP is shaped by the strong partnership and investment of the American public and the U.S. Congress in this life-saving program.

Innovations and efficiencies made over the last three years have provided new hope and opportunities to refugee applicants in the USRAP, including longstanding refugee populations from Ethiopia, the Democratic Republic of the Congo, and Syria, as well as Rohingya refugees who are facing increased threats and dwindling assistance, among many others.  In FY 2025, the United States will remain focused on these populations while continuing to expand the resettlement of other key populations of concern, including vulnerable people from Latin America and the Caribbean; Afghan allies; lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) individuals; and individuals persecuted for their religious beliefs.

This section highlights priority objectives and innovations in FY 2025 to further strengthen the USRAP, building on the progress made over the past three years.

## Strengthening and Continuing Innovations in Domestic Resettlement

---

[1] Refugees in U.S. Have Contributed Nearly $124B to U.S. Government Budget, New HHS Study Reveals | The Administration for Children and Families (last accessed Aug. 21, 2024).

**The Welcome Corps:**  In FY 2025, the Department of State will continue to expand opportunities for private sponsorship.  The Welcome Corps launched in January 2023 to empower everyday Americans to welcome refugees from around the world and directly support their resettlement and integration as they build new lives in the United States.  The Welcome Corps expands our country's ability to provide a warm welcome to refugees and Afghan SIVs by tapping into the generosity, capacity, and interest of American communities.

The Welcome Corps first enabled Americans to sponsor refugees they did not know.  Beginning in December 2023, Americans also can identify specific refugees they wish to support and directly refer them for consideration to the USRAP, a first for USRAP.  The first "sponsor someone you know" refugee arrived in June 2024.  In April 2024, the Department of State launched Welcome Corps at Work, a program to match refugees with U.S. employers for jobs in critical industries such as healthcare, education, and information technology.  In August 2024, 17 participating U.S. colleges and universities and their on-campus sponsor groups welcomed the first cohort of 31 refugee students through Welcome Corps on Campus.  Like all refugees, refugees arriving through the Welcome Corps are fully vetted overseas before arrival.

As of August 2024, Americans in all 50 states, Washington, D.C., and Puerto Rico have applied to sponsor refugees of more than 45 nationalities through the Welcome Corps.  Building on this interest, the Department of State intends to resettle at least 10,000 refugees through the Welcome Corps in FY 2025.

**Domestic Resettlement Capacity:**  In FY 2025, the Department of State and HHS will build on the efforts that restored the traditional domestic resettlement system following significant cuts and expand to welcome greater numbers of refugees.  There are now 355 local refugee resettlement sites operated by the ten national resettlement agencies throughout the United States, and resettlement agencies continue to explore opening additional local offices in consultation with community stakeholders.  In FY 2025, the Department of State will further expand partnerships with new

resettlement partners and grow its innovative new model of virtual reception and placement services for certain eligible refugees.

Recognizing that access to affordable housing remains a challenge, multiple U.S. government initiatives aim to strengthen access to housing for newly arrived refugees.  For example, some landlords and property managers have been reluctant to rent to refugees, due to a lack of understanding of this immigration status.  In response, in April 2024, the Department of State, Department of Housing and Urban Development, Department of Homeland Security (DHS), and HHS jointly released a fact sheet that provides information to landlords and property managers who may have questions on renting to refugees and other newcomer populations.  The Department of State and HHS also fund Refugee Housing Solutions, a project of Church World Service, to provide technical assistance to resettlement agencies to collectively address affordable housing challenges faced by newly arriving refugees.  Refugee Housing Solutions currently partners with the private sector, universities, and faith groups to increase refugees' access to affordable housing.  They also work to identify housing innovations and best practices for host and shared housing.

**Building on Progress on Global Resettlement Priorities**

**Latin America and the Caribbean:**  As forced displacement in the Western Hemisphere reaches historic highs, the United States remains committed to expanding access to resettlement to refugees from Latin America and the Caribbean to discourage dangerous journeys to the United States.  The Biden-Harris Administration has increased operations in the region from four countries to nearly two dozen and UNHCR has referred more than twice as many individuals from the Americas into USRAP since early 2021 as in the previous three decades combined.  FY 2024 refugee arrivals from Latin America and the Caribbean will be a more than fourfold increase over FY 2023 arrivals.  In FY 2025, the United States will continue to increase refugee resettlement from the region, including through the Safe Mobility initiative.  These historic increases are part of a broader effort the United States is leading, alongside regional partners, to provide lawful pathways to the

United States and other countries to those who qualify, a goal set forth in the Los Angeles Declaration on Migration and Protection endorsed by President Biden and 21 other regional leaders.

**Afghan Resettlement:**  The United States continues to fulfill its commitment to the brave Afghans who supported the U.S. mission in Afghanistan over two decades, serving alongside American diplomats, development professionals, and military service members.  U.S. communities have welcomed more than 160,000 Afghan newcomers since August 2021, most notably in Texas, California, Virginia, Washington, and Pennsylvania. Through our Enduring Welcome effort, Afghan allies arrive to the United States using durable immigration pathways, such as refugee referrals, Afghan SIVs, and family reunification pathways.  Through the Welcome Corps, Americans may now sponsor and welcome Afghan refugees and SIVs to the United States, including those they know.

**Resettlement Diplomacy:**  As the country that resettles the most refugees in the world, the United States is uniquely positioned to galvanize global action on resettlement and encourage countries across the world to provide well-organized and legal pathways to protection for those in danger.

The United States chairs the Resettlement Diplomacy Network (RDN), a high-level forum launched in partnership with Australia, Canada, Italy, New Zealand, Spain, the United Kingdom, and the European Commission to strengthen the global resettlement system.  Through the RDN, the United States works with other resettlement countries to build on the lessons learned around global efforts to rapidly standup new protection pathways in response to the displacement of Afghans, Russia's war against Ukraine, and other emerging crises.  The RDN allows us to make better use of resettlement as a foreign policy tool and ensures the United States is just one of many safe havens for refugees.  The United States also co-chairs the Priority Situations Core Group alongside the Government of Canada.  In FY 2024, the United States, along with Canada, led a delegation comprising six governments to Rwanda and Ethiopia to demonstrate and expand resettlement countries' commitment to receiving referrals from the

Emergency Transit Mechanism in Rwanda, which hosts vulnerable individuals relocated by UNHCR from Libya.  The United States will continue to support and promote the life-saving protection offered by this mechanism and others like it.

In FY 2025, the United States will continue to advance collective diplomacy to address shared resettlement challenges across multiple regions, collaborate on refugee referral mechanisms, and deepen cooperation on emergency resettlement responses.

**Rohingya in Bangladesh:**  Around one million stateless Rohingya have been forced to seek refuge in Bangladesh and the surrounding region after the Burma military committed genocide and crimes against humanity against them, which further worsened following the February 2021 military *coup d'état*.  In August 2023, the United States co-led with Canada a delegation of resettlement countries to Bangladesh to encourage greater resettlement of Rohingya, leading to additional commitments from resettlement countries. In FY 2025, the United States and our partners will continue to resettle Rohingya refugees from the region so they can start new lives in the United States and elsewhere.  The United States continues to work with other countries and international partners to seek increased resettlement opportunities for Rohingya globally in the coming months and years.

**LGBTQI+ Persons:**  In FY 2025, the Department of State will build on significant progress in expanding resettlement access for vulnerable LGBTQI+ refugees in regions across the world.  The U.S. Special Envoy to Advance the Human Rights of Lesbian, Gay, Bisexual, Transgender, Queer and Intersex (LGBTQI+) Persons has continued their partnership with NGOs to identify LGBTQI+ individuals in need of resettlement.  Through the Equitable Resettlement Access Consortium (ERAC), other NGO partners are also now making direct referrals to the USRAP of historically marginalized refugee populations, including LGBTQI+ refugees.  In FY 2025, these partners will further facilitate access to resettlement.  Communities across the United States may now also sponsor and welcome LGBTQI+ refugees through the Welcome Corps.

**Recognition of the Impacts of Climate Change on Refugee Vulnerability:**  As the world tackles the climate crisis, it is vital to develop smart, humane policies to address the impacts of climate change on migration and displacement within countries and across borders.  The United States will use its global leadership role in refugee resettlement to reflect the crucial role that migration plays in adaptation to the climate crisis.  Many displaced populations, stateless persons, and vulnerable migrants are displaced many times by climate impacts and require expanded protection.  In FY 2025, the United States aims to strengthen this protection, including through consideration of the impact of climate change on refugees' vulnerability in the refugee resettlement process.

**Ensuring Security and Program Integrity**

**Security Vetting:**  The safety and security of the American people remain at the forefront of efforts to strengthen the USRAP.  In FY 2024, the Department of State and DHS, alongside U.S. intelligence, counterterrorism, and law enforcement partners, modernized an older refugee vetting process, the Security Advisory Opinion, through the National Vetting Center. This change enhanced the integrity and thoroughness of refugee vetting while enabling more efficient processes.  Additional improvements to further enhance the refugee vetting process are planned for FY 2025.

**Ensuring National Security, Public Safety, and Fraud Prevention:**  The Department of State and DHS, in cooperation with other U.S. federal government partners, continue to safeguard the integrity of the USRAP by leading efforts to ensure U.S. national security and public safety are prioritized while mitigating fraud, waste, and abuse; identifying potential vulnerabilities; investigating allegations received through public and private reporting mechanisms; and ensuring fraudulent cases do not gain access to the USRAP.  In FY 2024, strong relationships across the U.S. federal government bolstered the program's ability to proactively address fraud risks and learn from best practices.  In FY 2025, these partnerships will

support the implementation of additional integrity measures and robust monitoring to ensure the effectiveness of existing integrity mechanisms.

## OVERVIEW OF U.S. REFUGEE POLICY

### Who is a Refugee?

Under Section 101(a)(42) of the INA, 8 U.S.C. § 1101(a)(42), a refugee is a person who is outside their country of nationality (or, if no nationality, country of last habitual residence) and who has experienced past persecution or has a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.  Individuals who meet the statutory definition may be considered for refugee status under Section 207 of the INA, 8 U.S.C. § 1157, if they are outside the United States.

Additionally, under Section 101(a)(42)(B) of the INA, 8 U.S.C. § 1101(a)(42)(B), the President may specify circumstances under which individuals who are within their countries of nationality (or, if no nationality, within their country of last habitual residence) may be considered a refugee for purposes of admission to the United States.  For FY 2025, the President proposes to specify that the following individuals may be considered refugees for the purpose of admission to the United States within their countries of nationality or habitual residence:  Persons in Cuba; Persons in Eurasia and the Baltics; Persons in Iraq; Persons in El Salvador, Guatemala, and Honduras; and, in certain circumstances, that is, for compelling humanitarian reasons, persons identified by a U.S. embassy or by an authorized State Department referral partner in any location.

Individuals outside the United States seeking admission as a refugee under Section 207 of the INA, 8 U.S.C. § 1157, are processed through the USRAP, which is managed by the Department of State in cooperation with DHS and HHS.  Those admitted as refugees are eligible for U.S. government-funded resettlement assistance, which is discussed below in the Office of Refugee

Resettlement section.

Since the enactment of the Refugee Act in 1980, which incorporated this definition of a refugee into the INA, the United States has welcomed more than 3.3 million refugees through the USRAP.

## PROPOSED CEILINGS FOR FY 2025

**TABLE I**
**Projected Refugee Admissions for FY 2024 and**
**Proposed Refugee Admissions for FY 2025 by Region**

| REGION | FY 2024 CEILING | FY 2024 PROJECTED ARRIVALS | PROPOSED FY 2025 ALLOCATION |
|---|---|---|---|
| Africa | 30,000-50,000 | 32,500-34,500 | 30,000-50,000 |
| East Asia | 10,000-20,000 | 6,500-8,500 | 10,000-20,000 |
| Europe and Central Asia | 2,000-3,000* | 3,000 | 2,000-3,000 |
| Latin America/Caribbean | 35,000-50,000 | 23,500 − 25,500 | 35,000-50,000 |
| Near East/South Asia | 30,000-45,000 | 27,500 − 29,500 | 30,000-45,000 |
| | | | |
| Total | 125,000 | 100,000 | 125,000 |

* In July 2024, the Department of State transferred unused admissions allocated to other regions to the Europe and Central Asia region to increase that regional allocation to 2,000-3,500.

The proposed FY 2025 regional allocation ranges continue to reflect the Administration's ambition to expand refugee processing in priority regions, while providing flexibility as needs arise and as operational capacity grows. The total admissions among all the regions would not exceed 125,000. Furthermore, the President may, as in the past, authorize the Secretary of State, upon notification to the Judiciary Committees of the Congress, to transfer unused allocations from a particular region to one or more other

regions that have a need for greater allocations.  More detail about each region is provided below in the Regional Refugee Admissions section.

## ADMISSIONS PROCEDURES

### Eligibility for Access to the USRAP

The Department of State's Bureau of Population, Refugees, and Migration (PRM) is responsible for coordinating and managing the USRAP.  A critical part of this responsibility is determining which individuals or groups from among the millions of refugees worldwide will have access to the USRAP. PRM coordinates within the Department of State, as well as with DHS, U.S. Citizenship and Immigration Services (USCIS), and other agencies, in carrying out this responsibility.

Section 207(a)(3) of the INA, 8 U.S.C. § 1157(a)(3), provides that "[a]dmissions … shall be allocated among refugees of special humanitarian concern to the United States in accordance with a determination made by the President after appropriate consultation."  Which individuals are "of special humanitarian concern" to the United States for the purpose of refugee resettlement consideration is determined through one of four categories:

*Priority 1:  Individual cases referred by designated entities to the program by virtue of their circumstances and apparent need for resettlement.*

*Priority 2:  Groups of special concern designated by the Department of State as having access to the program by virtue of their circumstances and apparent need for resettlement.*

*Priority 3:  Individual cases granted access for purposes of reunification with family members already in the United States.*

*Priority 4:  Individual cases from all nationalities who have been referred by private sponsors in the United States and who receive post-arrival support and services from those sponsors.*

(Note:  Refugees resettled in the United States may also seek the admission of their spouses and unmarried children younger than the age of 21 who are still abroad or are located domestically but who did not accompany the principal refugee by filing a Form I-730, Refugee/Asylee Relative Petition, known as a "following-to-join" petition, which does not require a separate refugee adjudication for these family members overseas.  This option is described in more detail in the discussion of following-to-join cases below.)

Access to the USRAP under one of the four categories does not necessarily mean an applicant meets the statutory definition of a "refugee" or is admissible to the United States under the INA.  Applicants granted access to the USRAP within the established categories present to USCIS officers for inquiry and adjudication.  The determination as to whether an applicant can be admitted as a refugee into the United States is made by DHS in accordance with criteria set forth in the INA and various security protocols.

Although the four access categories to the USRAP are referred to as "priorities," entering the program under a certain priority does not establish precedence in the order in which cases will be processed or the likelihood of success of being admitted to the United States as a refugee.  Once cases are established as eligible for access under one of the categories, they all undergo the same processing steps.

**Priority 1 (P-1) – Individual Referrals**

Priority 1 (P-1) allows the USRAP to consider refugee claims from persons of any or no nationality, usually with compelling protection needs, for whom resettlement appears to be the appropriate durable solution.  P-1 cases are identified and referred to the program by UNHCR, a U.S. embassy, a senior U.S. government official granted referral authority, or a designated NGO.

UNHCR, which has the international mandate to provide protection to refugees worldwide, has historically referred the vast majority of cases to the United States under this priority.  A U.S. ambassador or designated embassy representative may also make a P-1 referral for vulnerable individuals and are encouraged to do so.

To facilitate protection and access to the USRAP for our Afghan allies, U.S. government federal employees in the Senior Executive Service or Senior Foreign Service may make P-1 referrals for Afghan nationals who are known to U.S. government officials, have imminent and compelling protection concerns, and do not qualify for an SIV or P-2 referral based on their past employment.

Two other senior government officials were designated with authority in 2023 to make P-1 referrals.  The U.S. Special Envoy to Advance the Human Rights of LGBTQI+ Persons may refer both individuals who face persecution because of their work promoting respect for the human rights of LGBTQI+ persons and individuals who face persecution on the basis of their real or perceived sexual orientation, gender identity, gender expression, or sex characteristics.  The Special Envoy's office has also partnered with NGOs with expertise serving LGBTQI+ individuals to submit refugee referrals to the USRAP.  The Assistant Secretary of State for the Bureau of Democracy, Human Rights, and Labor may also make P-1 referrals for vulnerable individuals identified by the bureau.

The Department of State has also designated certain NGOs that assist refugees to make P-1 referrals through the ERAC led by HIAS, RefugePoint, and the International Refugee Assistance Project.  This effort seeks to reach highly vulnerable refugees in need of resettlement who lack access to the USRAP through traditional referral mechanisms and for whom resettlement may be the only durable solution.  ERAC is designed to grow the network of NGOs that refer individuals to the USRAP and to address the coordination gap among resettlement stakeholders to ensure a coherent and streamlined approach to NGO referrals.  This model for refugee referrals expands equitable access to resettlement while establishing global partnerships with

UNHCR, refugee-led organizations, organizations serving LGBTQI+ refugees, and other stakeholders in the field of refugee protection.

**Priority 2 (P-2) – Group Referrals**

P-2 includes specific groups whose members warrant resettlement as identified by the Department of State in consultation with USCIS, NGOs, UNHCR, and other experts.  P-2 designations reflect the determination that a group is of special humanitarian concern to the United States and that individual members of the group will likely qualify for admission as refugees under U.S. law.

There are two distinct models of P-2 access to the program:  predefined group access and direct access.  Under both models, P-2 designations are made based on shared characteristics that define the group.  In general, these characteristics are the reason that members of the group have been persecuted or have a well-founded fear of persecution in the future.

A predefined group designation is usually based on a UNHCR recommendation that lays out eligibility criteria for individuals in a specific location.

Once PRM, in consultation with USCIS, establishes the access eligibility criteria for the group, the referring entity provides the biographical data of eligible refugee applicants for processing.  This type of referral enables efficient processing because it identifies large groups of people with very similar persecution claims, avoids labor-intensive individual referrals, and prevents delays to applicants.

In special circumstances, the direct access model for P-2 group referrals enables individuals to apply for access to the program based on meeting designated criteria.  The direct access model has operated largely for in-country programs, historically including refugees from Bosnia and Herzegovina, Cuba, Eurasia and the Baltics, and Vietnam.  To establish a direct access P-2 group, PRM, in consultation with USCIS, defines the specific

criteria and procedures for access.  Applicants may then apply according to that process.  Applicants who clearly do not meet the access requirements do not proceed to USCIS interviews.

Once an individual gains access to processing via a P-2 designation, all other processing steps are the same as for those referred by P-1, including individual pre-screening and USCIS interviews, and all security and medical checks.

*Pre-defined Group Access P-2s:*

**Ethnic Minorities from Burma in Malaysia:**  Members of ethnic minorities from Burma who were recognized by UNHCR as refugees in Malaysia, registered by August 17, 2010, and identified as needing resettlement, are eligible for resettlement processing.

**Rohingya Refugees in Bangladesh:**  Rohingya who are (1) registered with UNHCR in Bangladesh, (2) defined by the Government of Bangladesh and UNHCR as part of the registered caseload of 1992 refugees, and (3) participated in the 2023 re-verification exercise are eligible for resettlement consideration.

**Registered Refugees Residing in the Nine Temporary Shelters in Thailand:** Refugees from Burma who (1) currently reside in one of the nine temporary shelters in Thailand and (2) were verified by UNHCR in its 2015 verification exercise or by the Thailand Ministry of the Interior in its 2019-2020 verification exercise are eligible for resettlement consideration.

**Congolese in the Great Lakes:**  Congolese refugees in Rwanda, Tanzania, and Burundi who arrived in the countries of asylum within certain designated years are eligible for resettlement processing in these countries.

**Refugees "Twice Displaced" in Ethiopia:**  Eritrean, Sudanese, and South Sudanese refugees in Ethiopia who were displaced from refugee camps in

Ethiopia as a result of the violence in Tigray, Afar, and Benishangul-Gumuz regions are eligible for resettlement processing.

**Certain Afghan Nationals:**  Certain Afghans who do not meet the minimum time-in-service for an SIV but who work/worked as employees of contractors*, locally employed staff, interpreters or translators for the U.S. government, including United States Forces Afghanistan, International Security Assistance Force, or Resolute Support; certain Afghans who work/worked for a U.S. government-funded program or project in Afghanistan supported through a U.S. government grant or cooperative agreement*; and certain Afghans who are/were employed in Afghanistan by a U.S.-based media organization or NGO are eligible for resettlement processing.  U.S.-based media organizations may also refer Afghan nationals who worked for them under stringer, freelance, and comparable arrangements.**  Afghan nationals eligible for a P-2 referral must be referred by an American citizen who works for a U.S. government agency or by the senior-most U.S. citizen employee of a U.S.-based NGO or media organization.  Afghan nationals may not submit self-referrals.

*Afghans who work/worked for sub-contractors and sub-grantees do not qualify for the P-2 designation, though they may qualify for P-1 referrals.*

**Under exceptional circumstances, PRM may accept P-2 referrals for third-party contractors, particularly from U.S.-based media organizations, and for staff of U.S. NGO wholly- or majority-owned subsidiaries in Afghanistan.*

*Direct Access Model P-2s:*

**Lautenberg Program for Certain Members of Religious Minority Groups in Eurasia, the Baltics, and Iran:**  Jews, Evangelical Christians, and Ukrainian Catholic and Orthodox religious adherents who are or were nationals and residents of the Soviet Union, as identified in the Lautenberg Amendment, Section 599D of Title V, of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1990 (P.L. 101-167), as amended (the Lautenberg Amendment), with close family in the United States are

considered for refugee resettlement in their countries of origin under a reduced standard for establishing a well-founded fear of persecution.

Members of religious minorities in Iran who are or were nationals and residents of Iran with close family in the United States are also eligible for processing under the Lautenberg Amendment pursuant to the Specter Amendment, Section 213 of Title II, Division E, of the Consolidated Appropriations Act of 2004 (P.L. 108-199).

**Certain Iraqis Associated with the United States:**  Set forth in Section 1243(a) of the Refugee Crisis in Iraq Act of 2007 (Title XII, Div. A, P.L. 110-181), as amended, employees of the U.S. government, a U.S. government-funded contractor or grantee, U.S. media, or U.S. NGOs working in Iraq, and certain family members of such employees, as well as beneficiaries of approved Forms I-130, Petition for Alien Relative, are eligible for in-country refugee processing in Iraq as well as in several countries in the region, including Jordan, Egypt, and Lebanon.

**Syrian Beneficiaries of Approved Form I-130 petitions:**  Syrian beneficiaries of approved Form I-130 petitions for whom immigrant visas have not yet been issued are eligible for consideration for refugee processing.

**Certain Persons in El Salvador, Guatemala, and Honduras:**  Under the Central American Minors (CAM) P-2 designation, certain qualifying parents and legal guardians in the United States may request access to the USRAP for their unmarried child(ren) younger than the age of 21.  In some instances, other in-country relatives may be eligible when accompanying the qualifying child.

**Certain Persons in Cuba:**  Human rights activists, members of persecuted religious minorities, former political prisoners, and persons deprived of their professional credentials or subjected to other disproportionately harsh or discriminatory treatment resulting from their perceived or actual political or religious beliefs were eligible for resettlement processing.  As of September 2024, this program remains suspended.

**Priority 3 (P-3) – Family Reunification**

P-3 provides USRAP access to individuals of special humanitarian concern who have eligible family members in the United States (i.e., parents, spouses, or children younger than the age of 21 who were admitted in certain humanitarian immigrant statuses). The eligible family members in the United States can initiate an application for their relatives even if they subsequently gained lawful permanent resident status or naturalized as U.S. citizens.

To qualify for access under the P-3 category, an applicant must generally be outside their country of origin, be registered or have legal status in the country of asylum, have had an Affidavit of Relationship (AOR) filed on their behalf by an eligible family member in the United States, and have been cleared for onward processing by USCIS.

PRM designates which U.S.-based relatives can initiate P-3 processing based on their admission status. For FY 2025, AOR filers can include those admitted as asylees, refugees, or Afghan and Iraqi special immigrants (admitted under Section 1059 of the National Defense Authorization Act for Fiscal Year 2006 (Title X, Div. A, P.L. 109-163), Section 1244 of the Refugee Crisis in Iraq Act of 2007 (Title XII, Div. A, P.L. 110-181), as amended, and Section 602 of the Afghan Allies Protection Act of 2009 (Div. F, Title VI, P.L. 111-8), as amended). This includes persons who are lawful permanent residents of the United States or U.S. citizens who initially were admitted to the United States in the designated status. The U.S.-based filer must be at least 18 years of age at the time the AOR is filed. The filer must file the AOR within five years of the date they were admitted as an asylee, refugee, or special immigrant, and the USRAP may reject any AOR for a relationship that is contrary to law or policy of the United States, such as underage or plural marriages.

The USRAP recognizes that many refugee families face legal and practical obstacles to legal marriage or marriage registration. The United States will

allow a qualifying individual to file for P-3 access for a partner of any gender if the filer considers that person to be their spouse or life partner and can provide evidence of an ongoing relationship with the partner for at least one year overseas prior to the submission of the AOR and evidence that legal marriage could not be obtained due to social and/or legal prohibitions.

Because of the importance of reuniting immediate refugee families who have been separated while fleeing from persecution, the USRAP will continue to make P-3 processing available to individuals of all nationalities, including stateless individuals.

In FY 2024, the United States made progress in streamlining P-3 processing and will continue to do so in FY 2025.

**Priority 4 (P-4) – Privately sponsored refugees**

The Welcome Corps private sponsorship program creates opportunities for Americans to directly sponsor refugees from around the world arriving through the USRAP.  The program is designed to strengthen and expand the country's capacity to resettle refugees by harnessing the energy of private sponsors across American society, including members of faith and civic groups, veterans, diaspora communities, businesses, colleges and universities, and other community organizations.  The program complements the reception and placement (R&P) program provided pursuant to Section 412(b) of the INA, 8 USC 1552(b), by creating new, additional opportunities for Americans and organizations nationwide to directly support refugee resettlement.

Like traditional resettlement agency partners, groups of private sponsors help refugees find housing and employment, enroll children in school, connect with other essential services, and raise funds to support refugees during the initial resettlement period.  These services are provided according to standards of care within a framework of outcomes and indicators developed jointly by the NGO community, state refugee coordinators, and U.S. government agencies.

Americans may sponsor refugees through the Welcome Corps in one of three ways: (1) they can be matched with approved refugees or Afghan SIVs they do not know yet, (2) they can sponsor someone they know who is already in USRAP or Afghan SIV processing, or (3) they can apply to sponsor refugees they know and refer them to the USRAP. The United States welcomed the first arrival through this "sponsor someone you know" P-4 referral process in June 2024.

The P-4 category provides access to the USRAP globally for refugees of any nationality who have U.S.-based private sponsors. However, the ability of the United States to accept and effectively process P-4 referrals is subject to the specific requirements imposed by host governments and the operational constraints of conducting refugee processing in certain country contexts. To qualify for access to the USRAP through the P-4 category, an applicant must generally be outside of their country of origin, be registered as a refugee as of an established cut-off date, and have a P-4 referral filed on their behalf by an eligible private sponsor group in the United States that is approved through the Welcome Corps. Additional eligibility criteria may apply for applicants in certain locations to comply with the specific requirements of host governments. Refugees must still be found eligible for refugee status, undergo security vetting, and be approved by USCIS, consistent with all other refugee cases.

**Family Members and Other Individuals Accompanying the Refugee Applicant**

In accordance with Section 207(c)(2)(A) of the INA, 8 U.S.C. § 1157(c)(2)(A), a refugee applicant's spouse or a child, as defined by Section 101(b)(1) of the INA, 8 U.S.C. § 1101(b)(1), accompanying that applicant is entitled to the same admission status as the refugee applicant.

On a case-by-case basis, an individual may be added to a qualifying refugee applicant's case if that individual:

- Lived in the same household as the qualifying family member in the country of nationality or, if stateless, last habitual residence;

- Was part of the same economic unit as the qualifying family member in the country of nationality or, if stateless, last habitual residence; and

- Demonstrates exceptional and compelling humanitarian circumstances that justify inclusion on the qualifying family member's case.

These individuals are not "spouse[s]" or "child[ren]," under Section 207(c)(2)(A) of the INA, 8 U.S.C. § 1157(c)(2)(A), and thus cannot derive their refugee status from the principal applicant.  They must, therefore, independently establish that they qualify as a refugee.

**Following-to-Join Family Reunification Petitions**

Under Section 207(c)(2) of the INA, 8 U.S.C. § 1157(c)(2), a principal refugee admitted to the United States may request following-to-join benefits for their spouse and/or unmarried children younger than the age of 21 who were not previously granted refugee status.  Once in the United States, and within two years of admission, the principal refugee may file a Form I-730 Refugee/Asylee Relative Petition[2] with USCIS for each eligible family member.[3]  Following-to-join refugee petitions are initially processed domestically by USCIS' Refugee, Asylum, and International Operations Directorate (RAIO).

Once USCIS has completed initial processing of the Form I-730 petition, if the beneficiary appears eligible, the case is sent to the appropriate office depending on the beneficiary's location to interview the qualifying spouse

---

[2] This petition is used to file for the relatives of both refugees and asylees, also known as Visa 93 and Visa 92 cases, respectively.  The USRAP handles only Visa 93 cases, which are counted within the annual refugee admissions ceiling. Visa 92 cases are not considered to be refugee admissions cases and are not counted in the number of refugees admitted annually.

[3] USCIS may grant a waiver of the two-year filing deadline for humanitarian reasons.

and/or child(ren) and to complete processing.  If the beneficiary is located within the United States, the petition is forwarded to the USCIS domestic field office with jurisdiction over the beneficiary's residence.  If the beneficiary is located outside of the United States, the petition is forwarded through the Department of State's National Visa Center to either the USCIS international field office or one of the Department of State's consular posts with jurisdiction over the beneficiary's location.  By regulation, all Form I-730 petitions must be filed with and adjudicated by USCIS.  However, in locations where USCIS does not have a presence, USCIS partners with the Department of State to have consular officers conduct interviews and determine the beneficiary's eligibility to travel to the United States.

The U.S. government continues to streamline and improve following-to-join refugee processing, including by centralizing processing within the USCIS International and Refugee Affairs Division, increasing staffing to support that workload, and making significant technological improvements.

USCIS or consular officers interview individuals who gain access to the USRAP through the Form I-730 petition to verify the relationship claimed in the petition, as well as to examine any applicable bars to asylee or refugee status and/or admissibility to the United States.  Beneficiaries are not required to establish past persecution or a well-founded fear of persecution, as they derive their status from the refugee relative in the United States who filed the petition.  Beneficiaries of Form I-730 petitions may be processed within their country of origin or in other locations.

Certain eligible principal refugees in the United States may file a Form I-730 petition and separately seek P-3 access for their qualifying family members simultaneously.  In some cases, the Form I-730 petition will be the only option, as the family members are still in their country of origin.  It is also important to note that unlike the P-3 process, the Form I-730 following-to-join process does not allow the relative in the United States to petition for parents.

## DHS/USCIS REFUGEE ADJUDICATIONS

Pursuant to Section 207(c)(1) of the INA, 8 U.S.C. § 1157(c)(1), as amended, the Secretary of Homeland Security may admit, at the Secretary's discretion, any refugee who is not firmly resettled in a third country, who is determined to be of special humanitarian concern, and who is admissible to the United States as an immigrant. USCIS has authority to adjudicate refugee applications. (*See* 6 U.S.C. § 271(b)(3)). USCIS also devotes substantial resources to security vetting, fraud prevention and detection, and training related to refugee processing, and it has strong partnerships with the law enforcement, national security, and intelligence communities to maintain and promote the integrity of the USRAP.

**Eligibility for Classification as a Refugee**

To be approved for classification as a refugee, an applicant must meet the refugee definition in Section 101(a)(42) of the INA, 8 U.S.C. § 1101(a)(42). That section provides that a refugee is a person who is outside his or her country of nationality or, if stateless, last habitual residence, and is unable or unwilling to return to that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. As mentioned above, the President may specify special circumstances under which a person can meet the refugee definition when still within their country of origin or, if stateless, within their country of habitual residence.

The refugee definition excludes a person who has ordered, incited, assisted, or otherwise participated in persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. Further, an applicant who has been "firmly resettled" in a third country may not be admitted as a refugee under Section 207 of the INA, 8 U.S.C. § 1157. Applicants are also subject to various statutory grounds of inadmissibility, including criminal, security, and public health grounds, some of which may be waived or from which applicants may be exempted. Finally, an applicant must establish that a positive exercise of discretion is merited.

A USCIS officer conducts an inquiry of each principal refugee applicant designed to elicit information about the applicant's claim for refugee status, any grounds of inadmissibility, and factors related to the exercise of discretion.  The officer asks questions about the applicant's experiences in the country of origin, including problems and fears about returning (or remaining), as well as questions concerning the applicant's activities, background, and criminal history.  The officer also considers evidence about conditions in the country of origin and assesses the applicant's credibility and claim.  For derivative applicants, the officer also asks questions to inform the decision of eligibility based on family relationships.

**Background Security Checks**

The safety and security of the American people remains the first and foremost consideration in refugee admissions processing.  Refugees are the most thoroughly screened and vetted group to enter the United States.  Refugee applicants of all nationalities are required to undergo rigorous background security checks.  Security checks include biographic checks for all refugee applicants and biometric (fingerprint) checks for refugee applicants within certain age limits.  Biographic and biometric information is vetted against a broad array of law enforcement, intelligence community, and other relevant databases to help confirm identity, to check for any national security, criminal, or other derogatory information (including watchlist information), and to identify information that could inform lines of questioning during the inquiry.  Refugee applicants must have all required security checks completed and fully addressed prior to an applicant's admission to the United States as a refugee.

In addition, PRM and USCIS work continually with interagency partners to identify opportunities to enhance and refine security screening for refugee applicants.  This includes increasing the efficacy, efficiency, and fairness of security screening to further enhance the rigorous security measures that ensure the safety and security of the American people.

## PROCESSING ACTIVITIES OF THE DEPARTMENT OF STATE

**Overseas Processing Services**

In most processing locations, PRM funds an NGO or an international organization to manage a Resettlement Support Center (RSC) that assists in the processing of refugee applicants for admission to the United States.  RSC staff pre-screen applicants for eligibility for one of the applicable processing priorities and prepare cases for USCIS.  The RSCs assist applicants in completing documentary requirements and schedule USCIS refugee eligibility interviews.  USCIS then conducts security vetting checks on applicants.  If an applicant is conditionally approved for resettlement by USCIS, RSC staff guide the refugee through post-adjudication steps, including completing medical screening exams and attending cultural orientation programs.  The RSC obtains domestic sponsorship assurances, and once all required steps are completed, the RSC refers the case to IOM for transportation to the United States.

In FY 2024, four NGOs worked under cooperative agreements with PRM to operate RSCs based in Austria covering Austria and Israel (HIAS), Kenya covering sub-Saharan Africa (Church World Service), Türkiye covering Türkiye and Lebanon (International Catholic Migration Commission), and Thailand covering Asia (International Rescue Committee).  The Department of State also funded IOM to operate RSCs based in El Salvador covering Latin America and the Caribbean, Jordan covering the Near East and North Africa, and Ukraine (temporarily in Poland) covering Europe and Central Asia.

**Cultural Orientation**

PRM strives to ensure refugees who are approved for admission to the United States are prepared for the profound life changes they will experience as part of the resettlement process.  Pre-departure and post-arrival cultural orientation aim to provide refugees with the vital knowledge, skills, and insights they need to adapt to their new lives and be well-positioned to achieve self-sufficiency.

PRM supports a robust technical assistance program, the Cultural Orientation Resource Exchange (CORE), which works to ensure refugees receive consistent messages in pre-departure and post-arrival cultural orientation and trains resettlement staff to deliver effective cultural orientation.  In addition, CORE helps providers respond to unforeseen events that impact resettlement and require rapid adaptation and critical communication to resettling refugees, such as during the COVID-19 pandemic.  CORE also develops and manages refugee-facing resources and digital channels to augment instructor-led classes, support refugee self-learning, and build the digital skills that will help them achieve self-sufficiency.

RSCs offer pre-departure cultural orientation, usually one week to three months before departure.  The orientation is generally one to five days and is provided by trained educators using appropriate teaching methodologies.

Cultural orientation programming is guided by objectives and indicators that cover 14 topics.  Each RSC over many years has established its own curriculum that is customized as needed to the populations receiving it, based on these objectives and indicators.  RSCs regularly review and update their curriculum and incorporate new materials and activities from CORE as needed.  The RSCs have specific cultural orientation trainers who deliver the sessions.  Resettlement agencies have access to a comprehensive curriculum via the CORE website. "The Road Ahead" supports local providers in delivering effective cultural orientation.  The curriculum serves as a foundation and can be adapted to align with local needs.

Staff at local resettlement agencies provide the post-arrival cultural orientation, beginning right after arrival in the United States.  As part of the resettlement cultural orientation continuum, post-arrival cultural orientation reviews and builds upon pre-departure cultural orientation by grounding lessons in the local context.  For example, state health care coverage is explained as refugees learn how to access and pay for health services; refugees are introduced to the local public school system and learn

about customary student behavior and expectations of parental involvement; and refugees learn about the amenities and services available in their new communities.

Cultural adjustment is also addressed including gender dynamics, child rearing, and changing family roles. Laws and responsibilities are also a focus. In many locations, local partners, such as representatives from health care facilities, banks, and local police stations, are invited to attend cultural orientation to break down barriers and build trust. Volunteers in many communities also help with cultural orientation by, for example, accompanying refugees to neighborhood grocery stores or the library or by showing them how public transportation works in their cities.

**Transportation**

The cost of transportation to the United States is provided to refugees in the form of an interest-free loan from IOM. Refugees are responsible for repaying these loans over time, beginning six months after their arrival, although it is possible to request a deferral based on inability to begin paying at that time. The underlying principle of the IOM travel loan program is that refugees' financial participation in making repayments against their debt will not only defray U.S. resettlement costs but also strengthen the refugees' determination to make a success of their migration and help establish their credit rating in the United States. IOM billing and credit reporting policies are designed to encourage repayment of these interest-free loans without placing undue hardship on refugees as they adjust to their new lives in the United States.

**Reception and Placement (R&P)**

In FY 2024, PRM funded cooperative agreements with ten non-profit resettlement agencies to provide initial resettlement services to refugees and Afghan SIVs arriving in the United States pursuant to the authority in Section 412(b) of the INA, 8 U.S.C. § 1522(b), as amended. The resettlement agencies are responsible for providing initial reception and core services to

arriving refugees. These services are provided according to standards of care within a framework of outcomes and indicators developed jointly by the NGO community, state refugee coordinators, and U.S. government agencies. These national resettlement organizations maintain a nationwide network of approximately 355 affiliated offices in 226 communities to provide services. Two of the organizations also maintain a network of 28 affiliated offices through which they place unaccompanied refugee minors into foster care, a program administered and funded by HHS.

Using R&P funds from PRM, supplemented by funds and in-kind contributions from private and other sources, the participating resettlement agencies provide the following services, consistent with the terms of the R&P cooperative agreements:

- Agreement to accept cases for management by local resettlement affiliates (a process known as "assurance");
- Pre-arrival resettlement planning, including placement;
- Reception on arrival;
- Basic needs support (including housing, furnishings, food, and clothing) for at least 30 days;
- Cultural orientation;
- Assistance with access to health, employment, education, and other services, as needed; and
- Development and implementation of an initial service plan for each refugee.

In FY 2024, PRM approved six of the national resettlement organizations to offer virtual R&P services (VR&P) to select beneficiaries, including Afghan SIV holders, Afghan refugees, and refugees from Latin America. VR&P services are provided through remote case managers instead of relying on local affiliate offices. Modeled after the successful Virtual Afghan Placement and Assistance program, VR&P empowers refugees who have opted into this R&P model (and after an assessment) to make their own decisions on housing, material needs, and other items by receiving per capita direct assistance once assured to VR&P.

## OFFICE OF REFUGEE RESETTLEMENT

Through the Refugee Act, Congress directed the Office of Refugee Resettlement (ORR) in HHS to provide refugees with resettlement assistance that includes employment training, English language training, cash assistance (in a manner that promotes early self-sufficiency), and job placement – including providing women with equal opportunities to employment as men.  ORR's mission is to promote the health, well-being, and stability of refugees and other eligible individuals and families, through culturally responsive, trauma-informed, and strengths-based services.  ORR can only provide these benefits to the extent possible based on the availability of Congressional appropriations.

ORR refugee benefits are also authorized by Congress for asylees, Cuban and Haitian entrants, certain Amerasians from Vietnam, victims of a severe form of trafficking, Iraqi and Afghan SIV holders, and certain Afghan and Ukrainian humanitarian parolees.  In addition to refugee arrivals through the USRAP, ORR is projecting to serve 531,500 other arrivals in FY 2025, the majority of whom are expected to arrive as Cuban and Haitian Entrants through lawful pathways.  ORR funds and administers several critical programs for eligible populations, some of which are highlighted below.

### Refugee Cash and Medical Assistance

Refugees who are not eligible for Temporary Assistance for Needy Families (TANF) or Supplemental Security Income are eligible to receive Refugee Cash Assistance (RCA) upon arrival.  Refugees who are not eligible for Medicaid are eligible to receive Refugee Medical Assistance (RMA) upon arrival. While refugees are statutorily authorized to receive RCA and RMA for up to 36 months from arrival, funding limitations have historically limited RCA and RMA availability.  In FY 2022, ORR expanded RCA and RMA from eight months to up to 12 months of assistance.  RCA and RMA are administered by states and replacement designees, which are private entities designated by ORR to administer the domestic resettlement program in a state that has

withdrawn from administration of the program.  In state-administered programs that operate a publicly administered RCA program, RCA benefits are based on cash-benefit levels established by state TANF programs.  In states that operate their RCA program through a public-private program, the RCA benefit is based on the higher of the RCA rates developed by ORR or the state TANF rates.  RMA benefits are generally designed to mirror those provided through the state's Medicaid program.

**Refugee Support Services**

ORR provides states and replacement designees with Refugee Support Services program (RSS) funds.  ORR distributes this funding by a formula based on the arrived and served ORR-eligible populations for up to the previous three years.  Funding is time limited, and refugees can only access RSS services up to five years after arrival.  These services include employment services, on-the-job training, English language instruction, vocational training, case management, translation/interpreter services, social adjustment services, health-related services, home management, childcare, and transportation.

Additionally, to assist specific groups of refugees or to target specific needs, ORR administers specialized RSS "set-aside" programs, which includes the following:  Services to Older Refugees (SOR) to support integration and wellness for refugees aged 60 and older; Refugee School Impact (RSI), which also includes "Early RSI," to support effective integration and education for children from birth to age 18 and their families; Youth Mentoring to foster mentorships in support of positive civic and social engagement and educational and vocational advancement; and Refugee Health Promotion, including the Refugee Mental Health Initiative, to support physical and emotional wellness and to build capacity within communities to address the mental health needs of refugee populations, including helping to overcome stigmas associated with mental health care and creating opportunities for social engagement to reduce isolation.

**ORR Matching Grant Program**

The ORR Matching Grant program (MG) is an alternative to traditional cash assistance provided through the ten national resettlement agencies.  The objective of MG is to guide newly arrived refugee households toward economic self-sufficiency through employment within eight months of program eligibility (which usually begins on the date of arrival in the United States).  In MG, self-sufficiency is defined as total household income from employment that (1) would exceed the established state income threshold for TANF eligibility and (2) enables a family unit to support itself without relying on cash assistance.  For each MG participant, ORR awards a per-capita grant to participating national resettlement agencies, which then allocate funds to their networks of local affiliates for direct services and administrative expenses.  Resettlement agencies provide a 50 percent match to every federal dollar awarded.  While enrolled in MG, refugees may not access ORR-funded RCA but can still access RMA.

Through MG, local service providers ensure core support services for a minimum of 240 days, which include housing, transportation, food, and a cash allowance.  Refugees also receive intensive case management and employment services throughout the 240-day service period, with more than 78 percent of refugees attaining self-sufficiency during that time.  Refugees who are unable to attain self-sufficiency by day 240 may access RCA for the remainder of the eligibility period, up to 12 months.

**Preferred Communities Program**

ORR's Preferred Communities program (PC) provides intensive case management to particularly vulnerable refugees.  PC supports a network of sites nationwide specializing in a variety of programs supporting particularly vulnerable populations.  The program builds resettlement agencies' capacity for placement of the most vulnerable refugees and provides long-term intensive case management to those with acute vulnerabilities, such as health or mental health needs, family strengthening needs, and single-

headed households.  It also helps meet the unmet needs of unexpected arrivals.

**Specialty Programs**

ORR administers several specialty programs that promote economic mobility and pathways to self-sufficiency.  Funded through grants to community-based organizations, these programs help refugees advance their careers and obtain certifications, open small businesses, build community gardens, engage with employers in career development, and save to purchase homes or cars or to pay for tuition.  ORR also funds ethnic community organizations to help build the capacity of local providers to offer ongoing support and services in a culturally competent manner.

**ORR Refugee Health and Behavioral Health**

ORR services focus on providing technical assistance on domestic medical screening guidelines and refugee medical assistance, assessment, and follow-up for contagious or communicable diseases, mental health awareness and linkages, suicide prevention, emergency preparedness, and other health and mental health initiatives.  Specifically, ORR funds RMA, medical screening, and refugee health promotion to support refugee populations.  Additionally, in FY 2025, ORR plans to increase behavioral health services through a new grant program, Support for Trauma-Affected Refugees (STAR).  The goals of the STAR program are the integration and successful achievement of sustained physical, social, emotional, and economic well-being of refugees whose experience of trauma is impeding their ability to function effectively at home, school, work, or in social settings.  STAR will provide access to appropriate and effective trauma assistance services at both the individual and family level and include a network of culturally responsive providers who can deliver holistic services to address the psychosocial needs of trauma-affected newcomers.

ORR also funds the Survivors of Torture program to provide culturally competent and strengths-based services, as well as individual-centered

treatment plans to restore dignity, enhance resilience, and rebuild the lives of all survivors of torture, regardless of immigration status.  ORR also conducts mental-health first aid trainings to refugee-serving program staff and refugee community leaders to help them identify and assist refugees in emotional distress.  Additionally, ORR provides direct services to those identified as survivors of torture, including physical and psychological treatment and rehabilitation, social and legal services to enable survivors to rebuild their lives.

**ORR Unaccompanied Refugee Minors Program**

ORR provides funding to 15 states and the District of Columbia and replacement designees to administer 26 Unaccompanied Refugee Minors programs (URM).  The URM program is separate and distinct from ORR's Unaccompanied Children program, although children who become eligible for the URM program while in the care and custody of ORR may be referred for placement into the URM program.  States and replacement designees contract with local licensed foster care agencies that provide specialized placements and services to unaccompanied refugee minors.

Unaccompanied minors with refugee status identified overseas are eligible for the URM program, and over time, Congress has expanded eligibility to other unaccompanied minor populations.  Unaccompanied refugee minors live in various placements including traditional and therapeutic foster homes, group homes, semi-independent and independent living, and residential treatment centers.  The youth receive various services including English language training, educational and vocational training, cultural preservation, social integration, family tracing, permanency planning, independent living, medical care, and mental health care.  ORR requires states to provide services to unaccompanied refugee minors in parity with the state's Title IV-B and Title IV-E foster care plans.

**ORR Refugee Technical Assistance**

ORR's Refugee Technical Assistance program provides technical assistance to resettlement stakeholders to enhance services, strengthen organizational capacity, and increase community engagement.  Switchboard, a project of the International Rescue Committee, is funded by ORR and makes its resources, trainings, and expertise available to all ORR grantees and sub-grantees.

ORR also funds a technical assistance provider to support grantees in its Survivors of Torture program.  The Center for Victims of Torture's National Capacity Building project supports ORR Survivor of Torture grantees by building capacity to provide holistic, sustainable, and integrated services and evaluating and strengthening the quality and sustainability of these programs and organizations.  Refugees are determined to be eligible for the Services for Survivors of Torture program based on the definition of torture in 18 U.S.C. § 2340(1).

In FY 2025, ORR will launch the new National Refugee Children and Youth Resilience program, which aims to expand the child welfare and protection capacity of refugee-serving agencies through training and technical assistance, partnership and outreach, crisis intervention and case consultation, and assessment and evaluation activities.

**Lived Experience**

In recognition of the value of lived experience, ORR has prioritized creating opportunities to listen and respond to the voices of new arrivals and former refugees to adapt policy and program services to best support their unique needs.

The ORR Youth Leadership Council for Refugees and Newcomers, a component of the Youth Mentoring program, allows refugees and newcomer youths to build their leadership skills and share their experiences directly with ORR.  As part of this council, ORR has hosted guided listening

sessions and roundtable discussions on topics such as community support and resilience, civic engagement, leadership, professional development, mental health, addressing systemic racism, prejudice, and discrimination.

ORR is working to more proactively engage Ethnic Community Self-Help grantees on the topic of integration.  These are community-based grantees that comprise leadership from refugee and immigrant groups and are closely connected to their communities' challenges and strengths.

Ethnic community-based organizations play an important role in refugee resettlement, including improving linguistic and cultural understanding and filling the gaps in service provision.  Through expanded engagement and regular listening sessions, ORR hopes to build additional capacity to support more refugees.

**Research Initiatives**

ORR also works to support enhanced research initiatives to demonstrate the positive impact refugees have on communities.  The HHS Office of the Assistant Secretary for Planning and Evaluation (ASPE), in collaboration with ORR, conducted a study, which estimated the net fiscal impact of refugees and asylees on government budgets.  The net fiscal impact of refugees and asylees over a 15-year period equaled $123.8 billion.  The net fiscal benefit to the federal government was estimated at $31.5 billion, and the net fiscal benefit to state and local governments was estimated at $92.3 billion.

ORR's Annual Survey of Refugees (ASR) is the only national survey on refugee self-sufficiency and integration.  ASR findings are included in ORR's Annual Report to Congress, as required by Section 413 of the INA, 8 U.S.C. § 1523, as amended.  The 2022 ASR results provide insight into arrival demographics, resettlement trends, and refugee employment and integration.  As a longer-term gauge of employment and integration. ORR's recent 2022 Annual Survey of Refugees reflected:

- Among refugees in the labor force, more than 85 percent are employed, earning an average of $16.50 per hour.
- More than 25 percent own homes within 5 years of arrival.
- 70 percent took English as a second language classes since arriving in the United States, with more than 50 percent improving their English language proficiency.

## REGIONAL REFUGEE ADMISSIONS

### Africa

The proposed FY 2025 allocation for African refugees is 30,000-50,000 individuals.

There are currently more than 8.1 million refugees on the African continent, approximately 25 percent of refugees under UNHCR's mandate globally.  New or escalating conflicts across the continent have forced unprecedented numbers of people to cross borders in search of safety, intensifying the pressure on the humanitarian infrastructure.  New refugees are increasingly susceptible to food insecurity, conflicts, gender-based violence, asylum restrictions, and overcrowded camps – all compounded by climate shocks.

In 2024, UNHCR estimates that more than 735,000 refugees in Africa need resettlement.  While voluntary repatriation and local integration may be possible in small numbers, resettlement remains an important durable solution for refugees across the continent.  To address these needs, the United States plans to maintain robust resettlement activities in Africa.  The United States will continue processing Congolese, Eritrean, Sudanese, South Sudanese, and Somali refugees, as well as reaching populations the USRAP has historically only processed in small numbers in countries such as Cameroon, Ivory Coast, South Sudan, Mauritania, and Djibouti.  Remote interviews are also planned in locations that are difficult to access due to security or operational constraints.

According to UNHCR, Uganda hosts the largest number of refugees and asylum-seekers on the African continent (more than 1.6 million) and continues to receive new arrivals from eastern Democratic Republic of the Congo (DRC), Sudan, and South Sudan, as well as from other countries in the region.  The East, Horn of Africa, and Great Lakes Region have the highest concentration of refugees with populations from Sudan, the DRC, South Sudan, and Somalia.  In Ethiopia, immense humanitarian needs persist, including for refugees who experienced secondary displacement within Ethiopia during the 2020-2022 northern conflict.

Since the outbreak of the conflict in Sudan in April 2023, nearly 1.9 million individuals have fled to neighboring countries, placing an additional strain on already limited resources and assistance.  Chad alone has taken more than 604,000 refugees and asylum-seekers and is struggling to manage the humanitarian crisis.  An average of 1,000 people leave Sudan for South Sudan on a daily basis, with more than 700,000 arrivals since 2023.  Among the recent influx from Sudan, 86 percent are women and children, many of whom report experiencing gender-based violence during the conflict and while fleeing to safety.  Resettlement will remain an important protection and responsibility-sharing tool to support the efforts of refugee-hosting nations in the face of the Sudan crisis.

The complex emergency in the DRC has contributed to the continent's ever expanding refugee population.  Longstanding conflict in eastern DRC that has recently intensified, along with political instability and armed clashes in the Sahel region, is expected to drive up the number of forcibly displaced and stateless persons.

Given the protracted conflict in the DRC, a sizable number of Congolese refugees remain pending USRAP processing.  Congolese refugees will continue to constitute one of the largest populations arriving in the United States.  In addition, the United States will accept a high volume of referrals from Ethiopia through the 2023 P-2 designation for certain refugees "twice displaced" by violence in the Tigray, Afar, and Benishangul-Gumuz regions.

In addition, resettlement processing out of Chad will continue to increase in response to the influx from the Sudan conflict.

The United States is a key partner in the resettlement of unaccompanied refugee minors from Africa.  As one of the few countries with a specialized foster care system for unaccompanied minors, the United States plans to increase the number of emergency unaccompanied refugee minor cases processed throughout the continent.  PRM will continue to focus on unaccompanied refugee minors who have been evacuated from Libya by UNHCR through the Emergency Transit Mechanisms in Rwanda and Niger.

PRM has made steady progress safely identifying, referring, processing, and departing LGBTQI+ individuals from Africa for resettlement in the United States.  These individuals face specific legal and protection risks in Africa, where same-sex relationships are often criminalized and integration prospects are limited or non-existent.  LGBTQI+ refugees often face significant insecurity, discrimination, and difficulty accessing asylum systems in the country of asylum.

The United States has also made a concerted effort to advance stalled backlog cases that were referred to the USRAP prior to FY 2018.  Cases processed in Africa represent the largest number of backlog cases within the program that are now resolved, including more than 12,000 backlogged individuals across the African continent that have arrived stateside since FY 2023.  Processing efficiencies, remote interviews, and close partner coordination will help resolve more longstanding cases.

### East Asia

The proposed FY 2025 allocation for refugees from East Asia is 10,000-20,000 individuals.

According to UNHCR, there are 14.3 million people of concern across Asia and the Pacific, including 7.2 million refugees, 245,000 asylum-seekers, 5.3

million internally displaced persons, and 2.5 million stateless persons.  Thailand, Bangladesh, and Malaysia continue to host large numbers of refugees and asylum-seekers from Burma, as well as Afghan, Iraqi, Pakistani, Somali, Sri Lankan, Sudanese, and Syrian refugees.  Tens of thousands of refugees from more than fifty nationalities are residing in and around the capital cities of Bangkok, Kuala Lumpur, and Jakarta.  Malaysia and Bangladesh currently host 90 percent of all Rohingya refugees in the region.

The United States considers Rohingya a priority refugee population whose resettlement is an essential component of an international, comprehensive humanitarian response.  More than 16,000 Rohingya have resettled to the United States since 2009, primarily from Malaysia.  The United States will continue to focus on Rohingya resettlement in USRAP as well as in resettlement diplomacy efforts.

The four primary countries for UNHCR referrals from East Asia are Bangladesh, Indonesia, Malaysia, and Thailand, with a smaller number of referrals from other countries in the region.  Three P-2 designations for certain ethnic Burmese, including Rohingya, residing in Bangladesh, Malaysia, and Thailand support large-scale resettlement of refugees from Burma.  While refugees from Burma comprise the majority of individuals departing from the East Asia region, refugees from other countries including from Afghanistan, Cambodia, Iran, Pakistan, Sri Lanka, Sudan, and Vietnam depart from some 14 other countries in the region.

## Europe and Central Asia

The proposed FY 2025 allocation for refugees from Europe and Central Asia is 2,000-3,000 individuals.  By July 2024, almost 3,500 refugees, of which 75 percent qualified as persecuted religious minorities from the former Soviet Union under the Lautenberg program, arrived from this region to the United States.

Europe hosts large refugee populations, particularly as a result of Russia's war of aggression against Ukraine, as well as significant numbers of asylum-seekers, internally displaced persons, and stateless persons. According to UNHCR, European countries are hosting approximately six million refugees from Ukraine as of June 2024. Many other refugees have sought refuge in Europe by fleeing conflicts outside the region, particularly in Syria, Afghanistan, and Iraq. The estimate also includes persons claiming persecution within Eurasia, including hundreds of thousands of refugees and internally displaced persons in the Balkans and South Caucasus. There are also Belarusians and Russians seeking protection who have been fleeing the increased crackdown on dissent inside Belarus and Russia since February 2022.

Much of the refugee caseload within Eurasia falls under the direct access P-2 Lautenberg program, a family reunification program dating from 1990 whereby individuals who were nationals and residents of the former Soviet Union are eligible for the USRAP if they belong to certain religious minorities and can show a qualifying relationship with individuals legally residing in the United States. P-2 applicants may include Ukrainians who fled Russia's full-scale invasion.

In 2004, Congress expanded the Lautenberg program with the Specter Amendment to include persecuted religious minorities from Iran. Refugees resettled through the Iranian Lautenberg program have included Jews, Christians, Baha'is, Sabaean-Mandaeans, and Zoroastrians. These refugees are counted against the Near East/South Asia regional allocation. The demand for this refugee program in Iran continues to grow and the Department of State reached arrangements with new partners in Europe that aim to increase annual refugee processing of Iranian minorities to more than 1,250 in FY 2025.

The United States' commitment to helping refugees, including Ukrainians, from the former Soviet Union is unwavering. While some Ukrainians have been resettled through the USRAP, the majority of Ukrainians that arrived in the United States since the start of the war have come on temporary status

because most do not want to resettle permanently.  Martial law restricts most male Ukrainian applicants from leaving Ukraine, and many Ukrainian refugees families choose to remain in Europe.  Russian and Belarusian applicants often need to travel to the South Caucasus or Central Asia to be processed and interviewed.

Türkiye continues to host the largest refugee population in the world.  According to UNHCR, there are more than 3.3 million refugees in Türkiye since the start of 2024, the vast majority of whom are Syrians (3.1 million), with smaller numbers of Afghans, Iraqis, Iranians, and other nationalities.  Refugees in Türkiye from a wide array of nationalities are resettled through USRAP Türkiye and are counted against the corresponding regional allocation of their country of origin.

## Latin America and the Caribbean

The proposed FY 2025 allocation for refugees from Latin America and the Caribbean is 35,000-50,000 individuals.  This allocation reflects the unprecedented levels of displacement in the region.  It further helps advance foreign policy priorities with partners in the region to also provide for a safe refuge for those individuals fleeing persecution in their homeland, and reaffirms the U.S. commitment to working with regional partners to advance the principles of safe, orderly, humane, and regular migration under the Los Angeles Declaration on Migration and Protection.

According to UNHCR, countries in Latin America and the Caribbean host more than 21 million asylum-seekers, refugees, stateless persons, and internally displaced persons.  The crisis in Venezuela has displaced more than 7.7 million Venezuelans, with 85 percent of them residing within other countries in Latin America and the Caribbean.  Government repression in Nicaragua and Cuba have also forced hundreds of thousands to flee those countries.  Protracted violence by organized criminal gangs in Guatemala, Honduras, and El Salvador has uprooted more than a million people from those three countries since 2015.  Additionally, a combination of economic insecurity, political instability, and gang violence in Haiti has forced the

internal displacement of 578,000 people in 2024 and has prompted increased outmigration.

In FY 2023, UNHCR submitted an all-time high number of referrals from the region to the USRAP and will more than quadruple that number by the end of FY 2024. Refugee resettlement from Latin America between 2016 and 2021 focused primarily on Colombians in Ecuador and Salvadorans, Guatemalans, and Hondurans within northern Central America; since then, efforts have expanded to more than 20 countries. Venezuelans, which accounted for relatively few cases two years ago, have become the most-referred nationality to USRAP operations in the region, surpassing Guatemalans, Salvadorans, and Hondurans.

The United States has surpassed its commitment made in connection with the Los Angeles Declaration on Migration and Protection to resettle 20,000 refugees from the Americas during FY 2023 to FY 2024. This reflects the Biden-Harris Administration's strong commitment to welcoming refugees through established lawful pathways. Haitian and Nicaraguan refugee arrivals to the United States have steadily trended upward in FY 2024, as referrals to the USRAP from these nationalities increased, enabling the United States to interview and screen people with legitimate protection concerns in the regions where they are.

The Safe Mobility initiative (known by the Spanish name *Movilidad Segura)* facilitates access to protection and other lawful pathways to the United States and other countries via the MovilidadSegura.org website and Safe Mobility Offices (SMOs). The Safe Mobility initiative is one of the ways the United States is facilitating access to integration and lawful migration pathways. SMOs in Colombia, Costa Rica, Ecuador, and Guatemala provide information about the wide range of existing services and support available for refugees and migrants to integrate in host countries and, when needed, facilitate expedited refugee processing via the USRAP as well as provide information and referrals to other humanitarian and labor pathways. SMOs also provide information and referrals to lawful pathways to third countries, including Canada and Spain.

Since the launch of the SMO initiative in June 2023, more than 230,000 individuals have registered via MovilidadSegura.org.  More than 50,000 individuals have been referred to the USRAP across the four SMO countries, and more than 24,000 individuals have been referred for other lawful pathways.

### Near East and South Asia

The proposed FY 2025 allocation for refugees from the Near East and South Asia is 30,000-45,000 individuals.

The Near East and South Asia region continues to host more than 8 million refugees, primarily Afghans, Iranians, Iraqis, Palestinians, Sri Lankans, Syrians, and Tibetans.  The humanitarian situation in Syria remains dire.  Over the past 13 years, nearly 14 million Syrians have been displaced from their homes, including more than 6.7 million who are now refugees hosted in Türkiye, Lebanon, Jordan, and Egypt.  Within Syria, human rights violations and abuses and armed conflict – as well as economic decline, food and water scarcity, and the degradation of social services – are expected to continue contributing to vulnerabilities in 2025.  Humanitarian needs in the country, as measured by the UN, are at their highest level since the conflict began.  Across the region, Syrian refugees remain highly vulnerable.  UNHCR reports that Syrian nationals have the highest resettlement needs globally and estimates that more than 753,000 Syrians will need resettlement as part of an ongoing multi-year targeted program.  In Iraq, the political and security environment is likely to remain challenging, while the Sudan crisis and the resulting displacement of millions of Sudanese across North Africa will continue to have a wider impact, particularly on Libya and Egypt.  More than four million people have been displaced by the civil conflict in Yemen, and the humanitarian situation continues to deteriorate as the conflict endures.  In Iran, people continue to seek to escape repression as the Government of Iran continues its long history of human rights violations against its citizens, including using transnational repression to intimidate,

silence, and exact reprisal against dissidents, journalists, and former insiders.

More than 774,400 Afghan nationals have been displaced since 2021.  Inside Afghanistan, more than 3 million Afghans are internally displaced by conflict, and 1 million internally displaced persons have returned to their places of origin.  Following the announcement of the Government of Pakistan's Illegal Foreigners Repatriation Plan in October 2023, more than 595,000 Afghans have returned to Afghanistan from Pakistan – including deportations, assisted voluntary repatriations, and other returns of Afghans of varying statuses (including UNHCR proof of registration cardholders, Afghan citizen cardholders, and undocumented Afghans).  As of March 2024, there are more than seven million Afghans in neighboring countries, including 5.5 million Afghan refugees and Afghans in refugee-like situations in Iran and Pakistan alone.

Since August 2021, the U.S. government and its partners have resettled more than 160,000 Afghan newcomers.  As of early July 2024, PRM has accepted 28,000 P-1 and P-2 referrals for Afghan principal applicants and continues to process refugee cases for Afghan nationals in third countries around the globe.  The United States remains committed to providing refuge, through a range of legal pathways, for those Afghans who supported the U.S. mission in Afghanistan.  In July 2023, PRM and USCIS began processing applications of Afghan refugees in Pakistan, and since January 2024 have significantly increased processing capacity.

## International Religious Freedom Act Reporting

The USRAP continues to be available through P-1 referrals to persons of any or no nationality who have been persecuted or fear persecution on account of religion.  The Lautenberg P-2 program provides direct access for members of religious minority groups in Eurasia, the Baltics, and Iran.  In addition, P-3 provides USRAP access to individuals of special humanitarian concern, including those persecuted on account of religion, who have immediate family members in the United States who were admitted in certain

humanitarian immigrant statuses.  Lastly, P-4 allows groups of Americans to refer and sponsor refugees, including those persecuted on account of religion, in the United States.

## Countries of Particular Concern

As of December 29, 2023, the Secretary of State designated the following countries as Countries of Particular Concern pursuant to Section 402(b) of the IRFA, 22 U.S.C. § 6442(b), as amended.

### Africa:  Eritrea

In Eritrea, the government is engaging in or tolerating systematic and ongoing violations of religious freedom.  The Eritrean government only recognizes four officially registered religious groups:  the Eritrean Orthodox Tewahedo Church, Sunni Islam, the Catholic Church, and the Evangelical Lutheran Church of Eritrea.  The Eritrean government continues to imprison individuals on the basis of their religion.  NGOs estimate between 130 to 1,000 people are detained for their faith.  At least 20 Jehovah's Witnesses continue to be imprisoned for their refusal to participate in military service or renounce their faith.  The Government of Eritrea also continues to deny citizenship to Jehovah's Witnesses after stripping them of citizenship in 1994 for refusing to participate in the referendum that created the independent state of Eritrea.

### East Asia:  Democratic People's Republic of Korea (DPRK), People's Republic of China (PRC), and Burma

The Democratic People's Republic of Korea (DPRK) severely restricts religious freedom, including all government-organized religious activity, and reportedly continues to execute, torture, arrest, and physically abuse individuals for religious activities.  While the constitutions of the DPRK, the People's Republic of China (PRC), and Burma provide for freedom of religion or religious belief, in practice and in law, these governments heavily restrict or repress religious activities and freedom.  Furthermore, a military coup in Burma in February 2021 has further undermined those human rights

enshrined in Burma's constitution and laws and resulted in further repression of religious freedom and related human rights.  In March 2022, the Secretary of State determined the military of Burma committed genocide and crimes against humanity against Muslim Rohingya.  In January 2021, the Secretary of State determined that, since at least March 2017, the PRC has committed genocide and crimes against humanity against predominantly Muslim Uyghurs and members of other ethnic and religious minority groups in Xinjiang.

**Europe and Central Asia:  Russia, Tajikistan, and Turkmenistan**

The Russian government misuses the law on extremism to restrict the peaceful activities of members of religious minority groups, including Muslim and Christian groups.  In both Russia and Russia-occupied areas of Ukraine, the Russian government has harassed, tortured, or imprisoned hundreds for their faith.

Tajikistan law prohibits persons younger than the age of 18 from participating in public religious activities, and the government-supported highest Islamic religious body bans Hanafi Sunni women from attending mosques.  The Government of Turkmenistan has imprisoned an unknown number of Muslims for their religious beliefs.  Turkmenistan law prohibits all activity by unregistered religious groups, and the grounds for approval of registration remains arbitrary.

**Near East and South Asia:  Iran, Pakistan, and Saudi Arabia**

In Iran and Pakistan, the governments use blasphemy and defamation of religion laws to restrict religious freedom, constrain the rights of religious minorities, limit freedom of expression, and imprison those accused.  The Government of Iran convicts and executes dissidents, political reformers, and peaceful protesters on charges of "enmity against God" and spreading anti-Islamic propaganda.  In Saudi Arabia, freedom of religion is not provided for under the law.  The Saudi government constrains the rights of religious

minorities, and incarcerates individuals accused of apostasy and blasphemy against Islam.

**Western Hemisphere:  Cuba and Nicaragua**

In Cuba and Nicaragua, the governments used forced exile, unjust arrests, violence and intimidation, and prolonged detention without charges of religious actors, who were expressing their religious beliefs, to stamp out any perceived dissent.  The Government of Nicaragua also denationalized hundreds of individuals in conjunction with forced exile and other forms of persecution, including Catholic clergy and affiliates of the Catholic Church.

## Special Watch List

As of December 29, 2023, the Secretary of State also designated the following countries to the Special Watch List pursuant to Section 402(b) of the IRFA, 22 U.S.C. § 6442(b), as amended.

**Africa:  Central African Republic and Comoros**

In Central African Republic, security actors, including the Forces Armées Centrafricaines (FACA), police, and gendarmes, used violence, discrimination, and threats to target individuals and communities based on their actual or perceived religious affiliation.

In Comoros, the constitution defines national identity based on one official state religion, Sunni Islam, but proclaims equality of rights and obligations for all, regardless of religious belief.  However, this is understood to be freedom of belief for foreigners.  The constitution also specifies that Shafi'i Sunni Islam regulates worship and social life.  Proselytizing any religion other than Sunni Islam is illegal, and the law prohibits performance of non-Sunni rituals based on the principle of "affronting society's cohesion and endangering national unity."  Individuals who convert from Sunni Islam to Christianity or Shia Islam are often shunned.

## Europe:  Azerbaijan

In Azerbaijan, the government maintains control over religious practices and arrests, imprisons, and harasses religious actors.  The Azerbaijani government granted the State Committee for Work with Religious Associations (SCRWA) sole responsibility for the hiring and firing of all imams and the authority to approve the appointment of religious leaders in non-Islamic religious communities.  The SCRWA required religious groups to cease religious activity in the absence of an appointed cleric, approves the content of religious literature read during meetings and sermons at mosques, establishes registration requirements for all religious groups, and bans activities by unregistered religious groups.  Any offense committed against the SCRWA regulations is punishable by fines or imprisonment.  The government arrests religious activists and Shia Muslims whom they consider "nonconforming," specifically, the unregistered Shia group Muslim Unity Movement (MUM), which the government considers an illegal organization. MUM members report authorities physically abused them and sexually assaulted them while in custody.

## Near East:  Algeria

The Algerian government has increasingly restricted religious freedom, often punitively or violently, for religious minority communities through numerous government agencies.  The government most often uses the 2006 and 2012 laws governing practices of religion and association to target the Protestant Church of Algeria, other Protestant churches, and the Ahmadi Muslim community.  Because these churches and religious communities are not allowed to register as religious groups, their gatherings, worship services, and other religious and administrative activities are deemed illegal by the government.

## East Asia:  Vietnam

In Vietnam, the government maintains significant control over religious practices in the stated interest of national security, including mandating

registration of groups under government-sponsored religious organizations. Authorities in certain provinces frequently force individuals not registered under state-sponsored organizations to renounce their faith, and the authorities harass, intimidate, threaten, arrest, and detain those who peacefully advocate for freedom of religion or belief.

### North Korean Human Rights Act Reporting

As reflected in the North Korean Human Rights Act, 22 U.S.C. § 7845(b), as amended, the United States remains deeply concerned about the human rights situation of North Koreans, both inside the DPRK and in other countries around the world. The United States began resettling interested, eligible North Korean refugees and their family members in 2006 and remains committed to continuing this program.

### REFUGEE ADMISSIONS TO THE UNITED STATES

In FY 2023, the USRAP admitted 60,014 refugees from 75 countries. The Democratic Republic of the Congo, Syria, Afghanistan, and Burma collectively comprised more than two-thirds of total admissions. (See Table IV.)

The demographic characteristics of refugee arrivals from the 20 largest source countries (representing 96 percent of total arrivals) in FY 2023 illustrate the variation among refugee groups. The median age of all FY 2023 arrivals was 20 years, ranging from a median age of 16 years for arrivals from Syria to 37 years of age for arrivals from Iran. In FY 2023, 49.95 percent of all arriving refugees were female, and 50.38 percent of all arriving refugees were male. (See Table V.)

Of the total arrivals in FY 2023, roughly 11.24 percent were younger than the age of five, 34.08 percent were of school age (5-17 years old), 52.90 percent were of working age (18-64 years old), and 1.78 percent were of retirement age (65 years and older). (See Table VI.) Considerable variation among refugee groups can be seen among specific age categories.

During FY 2023, 50.77 percent of all arriving refugees resettled in 10 states: Texas (8.42 percent), New York (6.42 percent), California (6.11 percent), Pennsylvania (4.59 percent), North Carolina (4.37 percent), Arizona (4.34 percent), Ohio (4.21 percent), Kentucky (4.19 percent), Michigan (4.08 percent), and Washington (4.04 percent).  (See Table VII.)

# ADMISSIONS TABLES AND STATISTICS

### TABLE II
### USRAP Projected Arrivals by Region, FY 2024

| REGION | FY 2024 CEILING | FY 2024 PROJECTED ARRIVALS |
|---|---|---|
| Africa | 30,000 - 50,000 | 32,5000-34,500 |
| East Asia | 10,000 - 20,000 | 6,500-8,500 |
| Europe and Central Asia | 2,000 - 3,000* | 3,000 |
| Latin America/Caribbean | 35,000 - 50,000 | 23,500-25,500 |
| Near East/South Asia | 30,000 - 45,000 | 27,500-29,500 |
|  |  |  |
| Total | 125,000 | 100,000 |

\* In July 2024, the Department of State transferred unused admissions allocated to other regions to the Europe and Central Asia region to increase that regional allocation to 2,000-3,500.

**TABLE III**
**USRAP Admissions, FY 2023**

| REGION | FY 2023 CEILING | FY 2023 ACTUAL ARRIVALS |
|---|---|---|
| Africa | 40,000 | 24,481 |
| East Asia | 15,000 | 6,262 |
| Europe and Central Asia | 15,000 | 2,765 |
| Latin America/Caribbean | 15,000 | 6,312 |
| Near East/South Asia | 35,000 | 20,194 |
| Regional Subtotal | 120,000 | 60,014 |
| Unallocated Reserve | 5,000 | |
| Total | 125,000 | 60,014 |

TABLE IV

**USRAP Admissions by Country of Origin, FY 2023**

| Country of Origin | Individual Arrivals | Percentage of Total Arrivals |
|---|---:|---:|
| **Grand Total** | **60,014** | 100% |
| Dem. Rep. Congo | 18,145 | 30.24% |
| Syria | 10,781 | 17.96% |
| Afghanistan | 6,594 | 10.99% |
| Burma | 6,185 | 10.31% |
| Guatemala | 1,748 | 2.91% |
| Sudan | 1,635 | 2.72% |
| Venezuela | 1,442 | 2.40% |
| Somalia | 1,385 | 2.31% |
| Ukraine | 1,337 | 2.23% |
| Iraq | 1,235 | 2.06% |
| Colombia | 1,165 | 1.94% |
| El Salvador | 1,056 | 1.76% |
| Eritrea | 973 | 1.62% |
| Iran | 743 | 1.24% |
| Central African Republic | 634 | 1.06% |
| Honduras | 598 | 1.00% |
| Republic of South Sudan | 592 | 0.99% |
| Pakistan | 492 | 0.82% |
| Moldova | 489 | 0.82% |
| Ethiopia | 441 | 0.74% |
| Burundi | 335 | 0.56% |
| Russia | 297 | 0.50% |
| Nicaragua | 217 | 0.36% |
| Yemen | 204 | 0.34% |
| Armenia | 190 | 0.32% |
| Kyrgyzstan | 146 | 0.24% |
| Belarus | 126 | 0.21% |
| Uzbekistan | 90 | 0.15% |
| Senegal | 86 | 0.14% |
| Rwanda | 85 | 0.14% |
| Kazakhstan | 70 | 0.12% |
| Palestinian Territories | 56 | 0.09% |
| Cuba | 45 | 0.08% |

| | | |
|---|---|---|
| Vietnam | 45 | 0.08% |
| Uganda | 39 | 0.07% |
| Haiti | 34 | 0.06% |
| Cameroon | 29 | 0.048% |
| Mali | 26 | 0.043% |
| Guinea | 25 | 0.042% |
| Sri Lanka | 22 | 0.037% |
| Ivory Coast | 22 | 0.037% |
| Nepal | 18 | 0.030% |
| Bhutan | 17 | 0.028% |
| China | 15 | 0.025% |
| Tajikistan | 11 | 0.018% |
| Cambodia | 10 | 0.017% |
| Liberia | 9 | 0.015% |
| Türkiye | 8 | 0.013% |
| Indonesia | 7 | 0.012% |
| Libya | 6 | 0.010% |
| Kenya | 6 | 0.010% |
| Turkmenistan | 5 | 0.008% |
| Egypt | 5 | 0.008% |
| Lithuania | 4 | 0.007% |
| Jordan | 4 | 0.007% |
| Namibia | 3 | 0.005% |
| Jamaica | 3 | 0.005% |
| Algeria | 3 | 0.005% |
| Zimbabwe | 2 | 0.003% |
| Tunisia | 2 | 0.003% |
| Peru | 2 | 0.003% |
| Chad | 2 | 0.003% |
| Zambia | 1 | 0.002% |
| Togo | 1 | 0.002% |
| Tanzania | 1 | 0.002% |
| Nigeria | 1 | 0.002% |
| Niger | 1 | 0.002% |
| Morocco | 1 | 0.002% |
| Lebanon | 1 | 0.002% |
| India | 1 | 0.002% |
| Guyana | 1 | 0.002% |
| Costa Rica | 1 | 0.002% |
| Burkina Faso | 1 | 0.002% |

| Benin | 1 | 0.002% |
| Bangladesh | 1 | 0.002% |

*Source:  Department of State, Bureau of Population, Refugees, and Migration, Refugee Processing Center*

**TABLE V**
**Sex and Median Age of Refugee Arrivals, FY 2023**

| Rank | Country of Origin | Refugees Admitted | Median Age | % Female | % Male |
|---|---|---|---|---|---|
| 1 | Dem. Rep. Congo | 18,145 | 18 | 49.95% | 50.05% |
| 2 | Syria | 10,781 | 16 | 47.92% | 52.08% |
| 3 | Afghanistan | 6,594 | 22 | 50.77% | 49.23% |
| 4 | Burma | 6,185 | 21 | 48.78% | 51.22% |
| 5 | Guatemala | 1,748 | 21 | 54.69% | 45.31% |
| 6 | Sudan | 1,635 | 21 | 45.87% | 54.13% |
| 7 | Venezuela | 1,442 | 27 | 51.11% | 48.89% |
| 8 | Somalia | 1,385 | 23 | 50.40% | 49.60% |
| 9 | Ukraine | 1,337 | 23 | 50.49% | 49.51% |
| 10 | Iraq | 1,235 | 28 | 47.45% | 52.55% |
| 11 | Colombia | 1,165 | 22 | 51.16% | 48.84% |
| 12 | El Salvador | 1,056 | 23 | 58.43% | 41.57% |
| 13 | Eritrea | 973 | 21 | 47.79% | 52.21% |
| 14 | Iran | 743 | 37 | 44.68% | 55.32% |
| 15 | Central African Republic | 634 | 18 | 49.53% | 50.47% |
| 16 | Honduras | 598 | 23 | 52.84% | 47.16% |
| 17 | Republic of South Sudan | 592 | 18 | 50.00% | 50.00% |
| 18 | Pakistan | 492 | 23 | 47.76% | 52.24% |
| 18 | Moldova | 489 | 26 | 54.19% | 45.81% |
| 20 | Ethiopia | 441 | 22 | 50.79% | 49.21% |
| 21 | All other countries | 2,344 | 27 | 47.74% | 52.26% |
| **TOTAL** | | 60,014 | 20 | 49.62% | 50.38% |

*Source:  Department of State, Bureau of Population, Refugees, and Migration, Refugee Processing Center*

TABLE VI
SELECT AGE CATEGORIES OF REFUGEE ARRIVALS, FY 2023

| RANK | COUNTRY OF ORIGIN | YOUNGER THAN 5 YEARS | SCHOOL AGE (5-17) | WORKING AGE (18-64) | RETIREMENT AGE (65 AND OVER) |
|---|---|---|---|---|---|
| 1 | Dem. Rep. Congo | 14.89% | 34.24% | 49.05% | 1.82% |
| 2 | Syria | 9.38% | 44.49% | 45.37% | 0.77% |
| 3 | Afghanistan | 9.63% | 30.83% | 57.39% | 2.15% |
| 4 | Burma | 13.40% | 32.64% | 52.77% | 1.18% |
| 5 | Guatemala | 9.38% | 31.98% | 57.21% | 1.43% |
| 6 | Sudan | 11.80% | 31.07% | 55.90% | 1.22% |
| 7 | Venezuela | 6.45% | 28.92% | 63.04% | 1.60% |
| 8 | Somalia | 5.92% | 28.88% | 63.03% | 2.17% |
| 9 | Ukraine | 13.09% | 31.41% | 49.21% | 6.28% |
| 10 | Iraq | 4.94% | 24.70% | 66.15% | 4.21% |
| 11 | Colombia | 10.64% | 31.59% | 57.17% | 0.60% |
| 12 | El Salvador | 8.14% | 31.16% | 58.81% | 1.89% |
| 13 | Eritrea | 7.71% | 32.89% | 59.10% | 0.31% |
| 14 | Iran | 2.42% | 9.96% | 81.70% | 5.92% |
| 15 | Central African Republic | 8.83% | 40.85% | 49.37% | 0.95% |
| 16 | Honduras | 9.87% | 28.93% | 59.87% | 1.34% |
| 17 | Republic of South Sudan | 7.77% | 39.53% | 52.03% | 0.68% |
| 18 | Pakistan | 5.28% | 32.93% | 60.57% | 1.22% |
| 19 | Moldova | 12.47% | 25.15% | 55.21% | 7.16% |
| 20 | Ethiopia | 12.24% | 32.43% | 53.97% | 1.36% |
| 21 | All other countries | 8.32% | 25.51% | 63.27% | 2.90% |
| Total | | 11.24% | 34.08% | 52.90% | 1.78% |

*Source:  Department of State, Bureau of Population Refugee and Migration, Refugee Processing Center*

TABLE VII
REFUGEE ARRIVALS BY STATE OF INITIAL RESETTLEMENT FY 2023

| STATE | TOTAL REFUGEE ARRIVALS | PERCENTAGE OF TOTAL ARRIVALS |
|---|---|---|
| Texas | 5,053 | 8.42% |
| New York | 3,851 | 6.42% |
| California | 3,667 | 6.11% |
| Pennsylvania | 2,756 | 4.59% |
| North Carolina | 2,621 | 4.37% |
| Arizona | 2,605 | 4.34% |
| Ohio | 2,524 | 4.21% |
| Kentucky | 2,514 | 4.19% |
| Michigan | 2,447 | 4.08% |
| Washington | 2,423 | 4.04% |
| Illinois | 2,331 | 3.88% |
| Georgia | 2,228 | 3.71% |
| Florida | 1,899 | 3.16% |
| Minnesota | 1,531 | 2.55% |
| Iowa | 1,515 | 2.52% |
| Indiana | 1,444 | 2.41% |
| Colorado | 1,424 | 2.37% |
| Wisconsin | 1,408 | 2.35% |
| Missouri | 1,402 | 2.34% |
| Virginia | 1,381 | 2.30% |
| Maryland | 1,331 | 2.22% |
| Massachusetts | 1,247 | 2.08% |
| Tennessee | 1,132 | 1.89% |
| Utah | 893 | 1.49% |
| Nebraska | 849 | 1.41% |
| Oregon | 844 | 1.41% |
| Idaho | 796 | 1.33% |
| Kansas | 784 | 1.31% |
| South Carolina | 683 | 1.14% |
| Connecticut | 672 | 1.12% |
| New Jersey | 550 | 0.92% |
| Nevada | 415 | 0.69% |
| Maine | 402 | 0.67% |
| Oklahoma | 330 | 0.55% |
| Vermont | 318 | 0.53% |
| New Mexico | 286 | 0.48% |

| | | |
|---|---|---|
| South Dakota | 202 | 0.34% |
| Rhode Island | 191 | 0.32% |
| North Dakota | 184 | 0.31% |
| New Hampshire | 171 | 0.28% |
| Arkansas | 148 | 0.25% |
| Delaware | 130 | 0.22% |
| Montana | 130 | 0.22% |
| Alabama | 106 | 0.18% |
| Louisiana | 105 | 0.17% |
| Alaska | 79 | 0.13% |
| Mississippi | 9 | 0.15% |
| District of Columbia | 3 | 0.005% |
| **TOTAL** | **60,014** | **100%** |

TABLE VIII
**Funding for Refugee Processing and Resettlement**
**FY 2024 and FY 2025**

| AGENCY | FY 2024 AVAILABILITY (IN MILLIONS) | ESTIMATED FY 2025 AVAILABILITY (IN MILLIONS) |
|---|---|---|
| DEPARTMENT OF HOMELAND SECURITY *U.S. Citizenship and Immigration Services* | | |
| **Refugee Processing [1]** | $126.5 | $139.6 |
| DEPARTMENT OF STATE *Bureau of Population, Refugees, and Migration* | | |
| **Refugee Admissions [2] [3] [4]** | $1,321.8 | $1,215.2 |
| DEPARTMENT OF HEALTH AND HUMAN SERVICES *Administration for Children and Families, Office of Refugee Resettlement* | | |
| **Refugee Resettlement [5]** | $1,352.2 | $3,785.5 |
| **TOTALS** | $2,800.5 | $5,140.3 |

[1] FY 2024 projected costs are based on payroll and general expenses that support USCIS refugee processing activities, reimbursement for following-to-join refugee processing conducted by Department of State on behalf of USCIS, and certain International Cooperative Administrative Support Services (ICASS) and Capital Security Cost Sharing (CSCS) costs and other international operations costs related to USCIS international offices that support refugee processing.   FY 2025 projections assume that funding levels match the President's FY 2025 budget request submitted to Congress, which is subject to Congressional budget action.  All figures are estimates.

[2] FY 2024:  Equals the sum of FY 2024 Migration and Refugee Assistance (MRA) allocation of $1,243.3 million, $68.5 million in MRA carryover from FY 2023, and an estimate of $10 million in prior year MRA recoveries.  Some FY 2024 funds will be carried forward into FY 2025.

[3] FY 2025:  Equals the FY 2025 MRA budget request of $1,215.2 million.

[4] Funding in FY 2024 and FY 20254 does not include funding from the ERMA or Enduring Welcome Administrative Expenses accounts, which covers costs associated with Enduring Welcome.

[5] FY 2024 and FY 2025:  In addition to refugees, ORR refugee program benefits and services are also provided to asylees, Cuban and Haitian entrants, certain Amerasians from Vietnam, victims of a severe form of trafficking who have received certification or eligibility letters from ORR,

Iraqi and Afghan SIV holders, and certain Afghan and Ukrainian parolees.  However, only refugees are included in the refugee admissions ceiling; there is no admissions ceiling or target for the other ORR-eligible populations.  The estimated funding to provide cash and medical assistance, domestic medical screenings, and refugee social services for all ORR eligible populations, are included here.  ORR received $871 million in regular FY 2024 appropriations, as well as $481 million in emergency appropriations.  These amounts are reflected in the above funding chart.  ORR estimates do not include any prior year carryover funding or reprogramming.  Funding estimates to support all ORR-eligible populations in mainstream services such as TANF, Medicaid, and Supplemental Security Income are also not included, as they are not appropriated to ORR.  In addition to base funding requested to support the Transitional and Medical Services and Refugee Support Services line items, the President's FY 2025 Budget request includes a $2.9 billion emergency supplemental appropriation.

**TABLE IX**
**UNHCR Resettlement Referrals Submitted by Resettlement Country – 2023[1]**
(January-December 2023)

| Resettlement Country | Number of UNHCR Refugees Referred to Each Country | Percent of Total Number of UNHCR Refugees Referred Globally |
|---|---|---|
| United States | 105,490 | 67.86% |
| Australia | 14,377 | 9.25% |
| Canada | 13,194 | 8.49% |
| Germany | 6,931 | 4.46% |
| France | 3,804 | 2.45% |
| New Zealand | 2,386 | 1.53% |
| Norway | 2,358 | 1.52% |
| Finland | 1,263 | 0.81% |
| Spain | 1,198 | 0.77% |
| Sweden | 803 | 0.52% |
| Italy | 770 | 0.50% |
| The Netherlands | 635 | 0.41% |
| The United Kingdom | 559 | 0.36% |
| Switzerland | 427 | 0.27% |
| Portugal | 424 | 0.27% |
| Romania | 246 | 0.16% |
| Denmark | 201 | 0.13% |
| Belgium | 184 | 0.12% |
| Slovenia | 131 | 0.08% |
| Japan | 64 | 0.04% |
| **TOTAL** | **155,445** | |

*Source:  UNHCR, actual data current as of June 2024*

[1] The figures provided are primarily limited to UNHCR country operations with allocated quotas and specific commitments to meet; additional submissions may have been made by other operations.  The table reflects only the number of refugee referrals UNHCR submitted to resettlement countries and does not reflect actual number of refugees resettled in each country.