## THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

PACITO, *et al.*,

          *Plaintiffs*,

    - against –

DONALD J. TRUMP, *et al.*,

          *Defendants*.

No. 2:25-cv-00255-JNW

Hon. Jamal N. Whitehead

## DECLARATION OF ADAM ZERBINOPOULOS
## SENIOR BUREAU OFFICIAL
## BUREAU OF POPULATION, REFUGEES, AND MIGRATION
## DEPARTMENT OF STATE

I, Adam Zerbinopoulos, for my declaration, hereby state as follows:

1.      I am the Senior Bureau Official of the Bureau of Population, Refugees, and Migration ("PRM") within the United States Department of State (Department of State or State Department).[1] I have held this position since January 21, 2025. Prior to becoming the PRM Senior Bureau Official, I was PRM's Regional Director for East Asia and the Pacific. I have been employed at the Department of State since 2008.

2.      In my current position, I oversee PRM's operations, namely the promotion of U.S. interests by working to reduce illegal migration, to provide humanitarian assistance to those fleeing persecution, crisis, or violence, and to seek durable solutions for forcibly displaced people around the world.

3.      I submit this declaration in support of the U.S. government's Motion in opposition to Plaintiffs' Motion for preliminary injunction. Specifically, I address herein (i) the framework

---

[1] The title "Senior Bureau Official" is used to refer to the senior-level official who oversees a bureau but does not necessarily hold the title of Assistant Secretary of State.

1

of the U.S. Refugee Admissions Program (USRAP) as set forth in the annual Report to Congress

on Proposed Refugee Admissions, (ii) the President's suspension of refugee entry into the United

States through Executive Order 14163, Realigning the United States Refugee Admissions

Program (E.O. 14163), (iii) the cancellation of refugee travel under the USRAP prior to the

effective date of the suspension of refugee admissions in E.O. 14163, (iv) the suspension of

USRAP processing activities following the issuance of E.O. 14163, and (v) the pause of funding

for USRAP functions following the issuance of Executive Order 14169, Reevaluating and

Realigning United States Foreign Aid (E.O. 14169).

4.      The statements made herein are based on my personal knowledge and information

made available to me in the course of carrying out my duties and responsibilities as the PRM

Senior Bureau Official.

## Structure of the U.S. Refugee Admissions Program

5.      The Refugee Act of 1980, as it amended the Immigration and Nationality Act

(INA), provides the general contours for how the Executive Branch admits refugees.  However, it

would be inaccurate to state that the Refugee Act of 1980 created or statutorily mandated the

USRAP.

6.      For example, pursuant to section 207(a)(2) of INA, the President has sole

authority to determine, after appropriate consultation with Congress, the number of refugees who

may be admitted in a given fiscal year that is justified by humanitarian concerns or is otherwise

in the national interest.  And section 207(a)(3) of the INA, requires refugee admissions to be

allocated among refugees of special humanitarian concern to the United States.  The President

specifies such number – commonly referred to as the "refugee ceiling" – and allocations before

the beginning of the fiscal year through a Presidential Determination on Refugee Admissions.

7.     Section 207(e) of the INA specifies that in-person discussions between designated Cabinet-level representatives of the President and members of the House of Representatives and Senate Judiciary Committees (Judiciary Committees) must be held before the President determines the number of refugees to be admitted within the next fiscal year.  The President has designated the Secretary of State and the Attorney General as his Cabinet-level representatives for such consultations.  Officials from the United States Departments of Homeland Security (DHS) and Health and Human Services (HHS) generally attend the consultations with the Secretary of State.

8.     Section 207(e) of the INA also requires the consultations to include discussions of the refugee situation and the reasons for believing that the proposed admission of refugees is justified by humanitarian concerns or is otherwise in the national interest.  Prior to these discussions, the State Department, DHS, and HHS submit a Report to Congress on Proposed Refugee Admissions to the Judiciary Committees.[2]

9.     The Report to Congress on Proposed Refugee Admissions, among other things, defines which individuals are "of special humanitarian concern" to the United States for the purpose of refugee resettlement through one or more processing categories.  These categories have traditionally included (i) individual cases referred by designated entities by virtue of their circumstances and apparent need for resettlement, (ii) groups of special concern designated by the Department of State as having access to the program by virtue of their circumstances and

---

[2] The Reports to Congress on Proposed Refugee Admissions for fiscal years 2004-2024 are publicly available at https://www.wrapsnet.org/resources/.

apparent need for resettlement, and (iii) individual cases from designated nationalities granted access for purposes of reunification with family members already in the United States.[3]

10.     It is the President's policies in this Report to Congress, rather than the Refugee Act of 1980, that sets forth the contours of refugee admissions for the next fiscal year. Congress's only role is one of consultation.

11.     Following consultations with Congress, the number of refugees determined to be admitted in the fiscal year as justified by humanitarian concerns or is otherwise in the national interest may be changed.  Section 207(b) of the INA provides that the President may increase the refugee ceiling, following consultation with the Judiciary Committees, if he determines that an unforeseen emergency refugee situation exists, the admission of refugees in response to this situation is justified by grave humanitarian concerns or is otherwise in the national interest, and the admission of these refugees cannot be accomplished under the previous determination.  And section 212(f) of the INA gives the President authority to suspend the entry of all aliens or any class of aliens, thereby potentially decreasing the refugee ceiling, including to zero.

12.     Relatedly, which refugees are considered "of special humanitarian concern to the United States" is not permanent.  Which individuals or groups qualify for access to the USRAP through one of the processing categories has frequently changed within the same administration, and processing categories have changed within the same fiscal year after the Report on Proposed Refugee Admissions is submitted to the Judiciary Committees.  For example, PRM created a Priority 1 direct referral process and Priority 2 group designation for Afghans in summer 2021

---

[3] Although these categories are called "priorit[ies]," entering the USRAP under a certain "priority" does not establish precedence in the order in which cases will be processed.  Once cases are established as eligible for access under one of the processing priorities, they all undergo the same processing steps.  Beginning with the report for fiscal year 2022, the Report to Congress on Proposed Refugee Admissions included as a processing category individual cases from all nationalities who have been referred by private sponsors in the United States and who receive post-arrival support and services from those sponsors.

and created Priority 1 processes for direct referrals from the U.S. Special Envoy to Advance the Human Rights of Lesbian, Gay, Bisexual, Transgender, Queer and Intersex (LGBTQI+) Persons and the Bureau of Democracy, Human Rights, and Labor Senior Bureau Official in spring and summer 2023, respectively. And there is no statutory provision that would prevent PRM from discontinuing certain processing categories, except those expressly created by statute.[4]

13.     Just as the USRAP is not congressionally mandated, the provision of initial reception and placement (R&P) benefits is not required by statute. Section 412 of the INA sets forth the contours of the provision of initial R&P benefits to refugees through resettlement agencies. The Department of State has traditionally provided these initial R&P benefits for the first 90 days of a refugee's resettlement in the United States, and HHS has provided benefits to refugees thereafter.

14.     While section 412(b) of the INA authorizes the Secretary of State "to make grants to, and contracts with" resettlement agencies for initial R&P benefits in the United States, nothing requires the Secretary to exercise this authority or to any specific extent.

15.     Relatedly, while Afghan and Iraqi special immigrant visa (SIV) holders are eligible by law for R&P benefits that are "available to refugees," if no R&P benefits are "available to refugees," then there are no benefits for which Afghan and Iraqi SIV holders are eligible.

## Suspension of Refugee Entry under the U.S. Refugee Admissions Program

16.     On January 20, 2025, through E.O. 14163, President Trump directed that the entry of refugees under the USRAP would be detrimental to the interests of the United States. In

---

[4] For example, the Refugee Crisis in Iraq Act of 2007 created the Iraqi direct access program, and through the Lautenberg and Specter Amendments, Congress required the establishment of categories for religious minorities from certain countries.

making such direction, President Trump referenced the record levels of migration, including refugees, over the past four years, which the United States has been unable to absorb in a manner that does not compromise the availability of U.S. resources.

17.    Between January 2021 and January 2025, over 210,000 refugees were admitted into the United States under the USRAP, the most admitted in a four-year period in nearly a decade.[5] In fiscal year 2024 alone, over 100,000 refugees were admitted, the most in a single year in over 30 years. In addition to hundreds of thousands of refugees, numerous other migrants entered the United States over the past four years in parole status or with immigrant visas. And from January 2021 to January 2025, the Department of State obligated nearly $1.5 billion to resettlement agencies to support the refugees' initial R&P benefits. The absorbing of hundreds of thousands of migrants, including hundreds of thousands of refugees, at the expense of more than one billion dollars in U.S. government resources over the past four years supports the President's concern that a record level of migrants and costs to support them compromises the availability of resources for U.S. citizens.

### Cancellation of Travel for Refugees in the U.S. Refugee Admissions Program

18.    Prior to the issuance of E.O. 14163, senior officials in PRM were informed on or about January 18-19, 2025, that President Trump intended to suspend refugee admissions under the USRAP through executive order.

19.    PRM anticipated that the executive order would be similar to the executive order issued during the first week of President Trump's first administration. On January 27, 2017, President Trump issued Executive Order 13769, Protecting the Nation from Foreign Terrorist Entry into the United States, which, among other things, directed the Secretary of State to

---

[5] This data is publicly available at https://www.wrapsnet.org/admissions-and-arrivals/.

suspend the USRAP for 120 days. The 2017 suspension took effect immediately, and following the suspension, some refugees were stranded at U.S. ports of entry, unable to enter the United States.

20.     To avoid a similar situation, PRM officials canceled all refugee travel scheduled for after 12:00 p.m. on January 20, 2025. Most refugees travel to the United States from around the world. Their travel accordingly includes several layovers and often spans more than one day. Even one flight delay or cancellation at any layover could result in a multi-day delay to a refugee's travel to the United States. There was, accordingly, a not insignificant risk that refugees scheduled for travel between January 20-27, 2025, could experience such a delay or cancellation and, thus, not arrive in the United States before the entry suspension went into effect at 12:01 a.m. on January 27, 2025. In such circumstances, refugees would be stranded at a U.S. port of entry, or worse, at a layover location in a third country mid transit. And for many refugees, once they leave their country of first refuge, they cannot return, effectively leaving them indefinitely stranded at an airport in a foreign country.

**Suspension of U.S. Refugee Admissions Program Processing Activities**

21.     Following the issuance of E.O. 14163, PRM suspended all USRAP processing activities. This suspension was consistent with the text of the executive order, in particular its purpose in section 1, which states: "This order *suspends the USRAP* until such time as the further entry into the United States of refugees aligns with the interests of the United States." (emphasis added). And section 4 of E.O. 14163 requires the Secretary of Homeland Security, in consultation with the Secretary of State, to submit reports every 90 days "until [the President] determine[s] that *resumption of the USRAP* is in the interest of the United States." (emphasis

added).  The most reasonable reading of these sections is that the USRAP generally, and not just admissions specifically, was suspended by E.O. 14163.

22.    The suspension of USRAP processing activities was also logical.  It would be an inefficient use of U.S. government – and resettlement partner – resources to move refugees to transit centers or to conduct pre-departure activities when refugees will not be admitted until the President resumes the USRAP.[6]  And the results of some processing activities expire after a certain amount of time, for example, six months for medical examinations and certain security checks.  Lastly, it is uncertain to what extent the President will resume USRAP admissions.  It is possible that some applicants in the USRAP pipeline will not be admitted after the President determines how, and to what extent, the resumption of the USRAP is in the U.S. interest.  It would therefore be inefficient to continue processing applications for individuals who might not be admitted to the United States even after entry under the USRAP resumes.

### Pause of Funding for U.S. Refugee Admissions Program Functions

23.    Section 412(b)(1)(A) of the INA authorizes the use of "grants to, and contracts with, public or private nonprofit agencies for initial resettlement (including initial reception and placement with sponsors) of refugees in the United States."  On January 13, 1981, President Carter determined, in accordance with section 412(b)(1)(B) of the INA, that "the administration of the Reception and Placement Grants, awarded to resettlement agencies for the performance of certain initial services for refugees coming to the United States, should be retained by the Department of State."

---

[6] Section 3(c) of E.O. 14163 provides a process for case-by-case exceptions to the refugee admissions suspension if the Secretary of State and the Secretary of Homeland Security jointly determine that the entry of such aliens as refugees is in the national interest and does not pose a threat to the security or welfare of the United States.  It is possible for some refugees to be admitted before the President resumes the USRAP, but it is not clear – and was not clear on January 21, when USRAP processing was suspended – which refugees those might be.

24.     Funds for activities to meet refugee and migration needs, to include funds for R&P assistance, are appropriated under the "Migration and Refugee Assistance" (MRA) heading of title III of the Department of State, Foreign Operations, and Related Programs Appropriations Act (SFOAA).

25.     On January 20, 2025, President Trump issued E.O. 14169, section 3(a) of which directed that "[a]ll department and agency heads with responsibility for United States foreign development assistance programs shall immediately pause new obligations and disbursements of development assistance funds to foreign countries and implementing non-government organizations, international organizations, and contractors pending reviews of such programs for programmatic efficiency and consistency with United States foreign policy, to be conducted within 90 days of this order."

26.     Consistent with E.O. 14169, on January 24, 2025, Secretary Rubio issued 25 STATE 6828, an "All Diplomatic and Consular Posts" ("ALDAC") cable (25 STATE 6828), included as Attachment A, "paus[ing] all new obligations of funding, pending a review, for foreign assistance programs funded by or through the Department and USAID." For existing foreign assistance awards, the Secretary directed contracting officers and grant officers to "immediately issue stop work orders, consistent with the terms of the relevant award, until such time as the Secretary shall determine, following a review." This pause applied to assistance funded from, among others, accounts in title III of the SFOAA, to include MRA funds from which R&P assistance is funded.

27.     Following issuance of E.O. 14169 and 25 STATE 6828, PRM issued a "Notice of Suspension," included as Attachment B, on January 24, 2025, to its implementing partners, to include HIAS Inc. and Church World Service. This Notice advised recipients that awards were

"immediately suspended pending a Department-wide review of foreign assistance programs" and that "[d]ecisions whether to continue, modify, or terminate" awards would be made following that review. Recipients were directed to stop all work under the awards and not incur any new costs after January 24, 2025. Additionally, recipients were advised they could submit payment for legitimate expenses incurred prior to the date of the Notice or for legitimate expenses associated with the Notice.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 19th day of February 2025, Washington, D.C.

Adam Zerbinopoulos