```
 1                 UNITED STATES DISTRICT COURT

 2                WESTERN DISTRICT OF WASHINGTON

 3   _____

     PLAINTIFF PACITO; PLAINTIFF    )
 4   ESTHER; PLAINTIFF JOSEPHINE;   )
     PLAINTIFF SARA; PLAINTIFF      )
 5   ALYAS; PLAINTIFF MARCOS;       )
     PLAINTIFF AHMED; PLAINTIFF     )
 6   RACHEL; PLAINTIFF ALI; HIAS,   )
     INC.; CHURCH WORLD SERVICE,    )
 7   INC.; and LUTHERAN COMMUNITY   )
     SERVICES NORTHWEST,            )
 8                                  )
             Plaintiffs,            )   No. 2:25-cv-00255-JNW
 9                                  )
         vs.                        )   Seattle, WA
10                                  )
     DONALD J. TRUMP, in his        )
11   official capacity as           )
     President of the United        )
12   States; MARCO RUBIO, in his    )
     official capacity as           )
13   Secretary of State; KRISTI     )
     NOEM, in her official          )
14   capacity as Secretary of       )
     Homeland Security; DOROTHY     )
15   A. FINK, in her official       )
     capacity as Acting Secretary   )
16   of Health and Human            )
     Services,                      )
17                                  )   Preliminary Injunction Hearing
             Defendants.            )   February 25, 2025
18                                  )   10:00 a.m.

19   _____

20              VERBATIM REPORT OF PROCEEDINGS
          BEFORE THE HONORABLE JAMAL N. WHITEHEAD
21              UNITED STATES DISTRICT JUDGE

22   _____

23

24

25
```

```
 1    APPEARANCES:

 2    For the Plaintiffs:   DEEPA ALAGESAN
                            LINDA B. EVARTS
 3                          GHITA SCHWARZ
                            MEGAN MCLAUGHLIN HAUPTMAN
 4                          International Refugee Assistance Project
                            One Battery Park Plaza, 33rd Floor
 5                          New York, NY 10004
                            dalagesan@refugeerights.org
 6                          levarts@refugeerights.org
                            gschwarz@refugeerights.org
 7                          mhauptman@refugeerights.org

 8

                            JONATHAN PATRICK HAWLEY
 9                          HARRY H. SCHNEIDER JR.
                            SHIREEN LANKARANI
10                          ESME ASTON
                            Perkins Coie
11                          1201 3rd Avenue, Suite 4900
                            Seattle, WA 98101-3099
12                          jhawley@perkinscoie.com
                            hschneider@perkinscoie.com
13                          slankarani@perkinscoie.com
                            easton@perkinscoie.com

14

15    For the Defendants:   AUGUST FLENTJE
                            ALEXANDRA LEE YEATTS
16                          U.S. Department of Justice
                            P.O. Box 868
17                          Ben Franklin Station
                            Washington, DC 20044
18                          august.flentje@usdoj.gov
                            alexandra.yeatts@usdoj.gov
19

20

21

22

23

24

25
```

Pacito et al vs. Trump et al, 2/25/25

```
 1                    P R O C E E D I N G S
 2                         *    *    *
 3            THE CLERK:  This is the matter of Pacito et al. vs.
 4   Donald J. Trump et al, Cause Number C25-255 assigned to this
 5   Court.
 6        Will counsel please rise and make their appearances for
 7   the record.
 8            ATTY. HAWLEY:  Good morning, Your Honor.  Jonathan
 9   Hawley from Perkins Coie for plaintiffs.  I'm joined today by
10   my colleagues from Perkins Coie -- Harry Schneider, Shireen
11   Lankarani, and Esme Aston, as well as our co-counsel from the
12   International Refugee Assistance Project.
13        Deepa Alagesan from IRAP will be arguing today, and I'll
14   hand things off to her.
15            ATTY. ALAGESAN:  Good morning, Your Honor.  Deepa
16   Alagesan from the International Refugee Assistance Project on
17   behalf of plaintiffs.  I'm joined by my colleagues Linda
18   Evarts, Ghita Schwarz, and Megan Hauptman.
19            THE COURT:  All right.  Good morning, all.
20            ATTY. FLENTJE:  Hi.  August Flentje with the Justice
21   Department for the defendants.  With me today is Alexandra
22   Yeatts from the -- oh, sorry.
23            ATTY. YEATTS:  That's okay -- for the Justice
24   Department.
25            THE COURT:  All right.  Good morning.
```

Pacito et al vs. Trump et al, 2/25/25

```
 1        We're here today on plaintiffs' motion for a preliminary
 2    injunction.  I've set aside the morning for the hearing.  That
 3    said, I think that time limits will be useful in keeping us all
 4    on track, so I'm going to allow for 20 minutes of argument for
 5    each side.
 6        Okay.  So with that, let's get underway.
 7        Counsel, if you could make your way to the lectern.
 8            ATTY. ALAGESAN:  Thank you, Your Honor.  Good
 9    morning.
10        Plaintiffs are challenging unprecedented actions by the
11    Trump administration that have completely halted the admission
12    of refugees to the United States, stopped all processing of
13    refugee applications, and cut off funding for refugee
14    processing and domestic resettlement services.  Each of these
15    actions on their own has caused immediate and immense harm to
16    the plaintiffs, refugee families relying on the U.S. Refugee
17    Admissions Program -- or the USRAP -- as a pathway to safety
18    and the organizations that form the backbone of this vital
19    program, including Lutheran Community Services Northwest, which
20    is based in this district and resettled close to 1400 refugees
21    here in the last fiscal year.
22        The government doesn't seriously dispute these harms.  And
23    despite their claims that the Court shouldn't intervene here
24    because of other court orders enjoining funding freezes, they
25    cannot tell you that the funding for the USRAP, including to
```

Pacito et al vs. Trump et al, 2/25/25

```
 1    the organizational plaintiffs here, has been turned back on.
 2    While the impact of defendants' actions is far-reaching and
 3    devastating, the essence of plaintiffs' challenge is simple.
 4    Defendants must act in accordance with U.S. law and cannot undo
 5    the comprehensive and permanent system for refugee admissions
 6    and resettlement that Congress created nearly 50 years ago.
 7         There are a lot of moving pieces here.  With the Court's
 8    indulgence, I'll turn first to plaintiffs' likelihood of
 9    success on the merits, beginning with the agency suspension of
10    all refugee processing, adjudication, and admissions, and the
11    suspension of funding for that processing and resettlement.
12         I should also mention I'd like to reserve some time for
13    rebuttal.
14         Would it be helpful to set an amount of time?
15              THE COURT:  Sure.  How much time would you like,
16    Counsel?
17              ATTY. ALAGESAN:  I'll take five minutes.
18              THE COURT:  Okay.
19              ATTY. ALAGESAN:  As we have outlined in our papers,
20    we think each suspension is lawful for -- is unlawful for a
21    number of reasons, all of which we think plaintiffs have shown
22    a likelihood of success on, but any ground would be enough for
23    the Court to issue the relief that plaintiffs seek.
24         At the threshold, starting with the refugee ban, the
25    suspension of processing, it should have been subject to
```

Pacito et al vs. Trump et al, 2/25/25

1   notice-and-comment rulemaking as a substantive rule that

2   affects changes to the existing law and alters the rights of

3   refugees and organizations involved in the USRAP.  Judge Robart

4   found that the last, much narrower refugee ban was unlawful for

5   this same reason and issued a preliminary injunction against

6   it, which defendants do not address in their papers.  Here, the

7   agencies have suspended indefinitely the whole refugee

8   program -- as to all nationalities and all pathways -- and

9   don't claim that any exception to the APA's rulemaking

10   requirement applies.

11       THE COURT:  Counsel, on that point, you said the

12   suspension.  I mean, defense counsel is going to phrase it as a

13   temporary suspension.

14   Does that matter in the context of your APA claims?  More

15   specifically, can you have a final agency decision when

16   defendants will argue that this is a temporary suspension?

17       ATTY. ALAGESAN:  Your Honor, there is final agency

18   action here.  The final agency action requirement is not tied

19   to the duration of an action.  And certainly, when an agency

20   acts, it is free to act again and change course at any time,

21   subject to the APA's requirements.

22   Instead, the test for final agency action is that the

23   action represented the consummation of the agencies'

24   decision-making, which it did here -- they have suspended all

25   processing for the U.S. Refugee Admissions Program -- and from

Pacito et al vs. Trump et al, 2/25/25

1   which legal consequences flow, which I understand defendants do

2   not dispute.  So there is final agency action here that would

3   permit review under the APA.

4       Turning back to the notice-and-comment claim, if the Court

5   finds that the processing suspension violated this requirement,

6   that is a basis alone to issue the preliminary injunction that

7   plaintiffs seek as to that suspension.  In any event, both the

8   refugee processing suspension and the funding suspension also

9   violate the APA's prescription of arbitrary and capricious

10  decision-making.

11      As to the funding suspension, the agencies' decision to

12  suspend funding for a U.S. immigration program and the

13  provision of benefits to resettled refugees in the United

14  States is justified only by their passing reference to an

15  executive order on foreign aid payments.  There is no rational

16  connection articulated between the agencies' decision to

17  suspend aid to this domestic program, including the provision

18  of benefits in the United States meant for the integration of

19  refugees, that would pass muster under the APA.  Similarly,

20  they have failed to consider relevant factors including the

21  Refugee Act statutory purpose of responding to the urgent needs

22  of people facing persecution in their home countries and of

23  providing for the effective resettlement and absorption of

24  refugees once resettled to the United States.

25      Perhaps most strikingly, they've failed entirely to

Pacito et al vs. Trump et al, 2/25/25

1  consider the reliance interests of the organizational

2  plaintiffs who have described the impact of this funding

3  suspension as catastrophic.  It's forcing them to lay off

4  staff, to lose local partnerships that are vital to their

5  carrying out of their services, and face the prospect of

6  shutting their doors.  And finally, they've also failed to

7  consider reasonable alternatives to an immediate and wholesale

8  suspension of funding that is causing those impacts.

9      Again, defendants do not respond to these arguments.  They

10  rely only on a declaration that they have submitted.  But

11  defendants are not permitted, under the APA, to rely on post

12  hoc rationalizations for their answers, let alone statements by

13  counsel in their papers.

14      The refugee ban suspension is arbitrary and capricious as

15  well for similar reasons.  Again, no rational connection is

16  made to the facts underlying the decision.  It cites only to

17  the executive order, which I suspect we'll talk about in a

18  little bit.  Similarly, they have failed to consider important

19  factors, namely the main humanitarian purpose of the statute,

20  the reliance interests of refugees in reaching safety and

21  avoiding further family separation, and the failure to consider

22  reasonable alternatives.

23      One thing to note, Your Honor, the suspension that the

24  agencies enacted goes far beyond whatever was called for by the

25  executive order.  It involved the cancellation of travel before

Pacito et al vs. Trump et al, 2/25/25

1  the executive order took effect, which has left refugees,

2  including plaintiffs, stranded, totally in limbo.  And the fact

3  that no alternatives to an immediate and wholesale suspension

4  were considered is also grounds to find the suspension

5  unlawful.

6          Finally, as to the APA, should the Court reach these

7  grounds, both suspensions are unlawful for the additional

8  reason that they are ultra vires and conflict with the Refugee

9  Act.  They vastly overstep the agencies' discretion to admit

10  particular refugees pursuant to Congress's enumerated criteria

11  and regulations that the agencies may prescribe, and they

12  conflict with the detailed statutory schemes for refugee

13  admissions and domestic resettlement.

14          If Your Honor has no further questions on the APA claims,

15  I'm happy to turn to the executive order.

16              THE COURT:  Let's go to the EO.

17              ATTY. ALAGESAN:  Having demonstrated that the agency

18  suspensions are unlawful, I'll now zoom out to the refugee ban

19  executive order, which is also unlawful, and its implementation

20  should be enjoined.

21          The President's authority under 212(f), which is the main

22  citation to the authority for the suspension, has been

23  delegated by Congress, and the executive order's exercise of

24  that authority can be reviewed for whether it is properly

25  within the scope or is, instead, ultra vires.  On this point,

Pacito et al vs. Trump et al, 2/25/25

1    the Supreme Court in *Hawai'i* specifically states that it can be

2    assumed that, quote, "1182(f) does not allow the President to

3    expressly override particular provisions of the INA," end

4    quote.  By suspending indefinitely the entire statutorily

5    created refugee program, the executive order purports to do

6    just that.

7        This invocation is unprecedented and fundamentally unlike

8    the visa entry ban considered and upheld by the Supreme Court

9    in *Hawai'i vs. Trump*.  There, the Supreme Court found that the

10   proclamation suspension of entry for several nationalities,

11   based on specifically identified governmental

12   information-sharing deficiencies, did not conflict with the

13   statutory scheme.  And, in fact, the proclamation at issue

14   promoted Congress's purposes in determining, on a case-by-case

15   basis, whether a particular noncitizen was admissible.  The

16   Court specifically observed that that was, quote, "not a

17   situation where Congress has stepped into the space and solved

18   the exact problem," but that is exactly what Congress has done

19   here with the Refugee Act.

20       Congress has already said that it is in the national

21   interest to provide a permanent system for the resettlement of

22   people who face persecution in their home countries, pursuant

23   to the systematic procedures the Act outlines.  Although the EO

24   claims that refugee resettlement is per se detrimental based on

25   the conclusory assertion that the country lacks the ability to

Pacito et al vs. Trump et al, 2/25/25

1  absorb migrants writ large, including some refugees, the

2  process for absorbing refugees has also been passed upon by

3  Congress.

4          THE COURT:  Isn't it the President's call to say what

5  is detrimental?  I mean, in talking about *Trump vs. Hawai'i*,

6  they talk about the deference owed to the President's

7  determination about what is detrimental -- about the statute,

8  1182(f), exuding deference to the President.

9      So how do you reconcile your arguments now with the

10  admittedly broad -- or recognized to be broad authority of the

11  President to invoke 1182(f) in the suspension of the refugee

12  admissions?

13          ATTY. ALAGESAN:  Your Honor, while the *Hawai'i* court

14  recognized the broad deference that this provision provides, in

15  noting that it cannot be used to override statute, it

16  recognized that that broad power must be read alongside other

17  U.S. laws.  And there, the Court found that there was no

18  statutory conflict.  Here, there is.

19      Similarly, as to the President's finding of a detriment,

20  there, the Court pointed to, quote, "extensive findings."  It

21  pointed to the fact that the agencies had been ordered to

22  conduct a comprehensive evaluation of every single country's

23  compliance with the baseline for information sharing, then

24  issued this proclamation with extensive findings about the

25  deficient practices of particular governments and the impact on

Pacito et al vs. Trump et al, 2/25/25

1    our country's ability to assess national security risks, and
2    ultimately crafted individualized restrictions that pertain to
3    each country's distinct circumstances.
4        Here, we have only a reference -- passing -- to the
5    country's inability to absorb, quote, "migrants" without
6    compromising resources, protecting safety and security, and
7    ensuring assimilation.  Each of these topics are topics covered
8    specifically by the Refugee Act.
9        The Refugee Act has provisions that provide for the
10   grounds on which refugees will be found inadmissible.  It
11   exempts refugees from specific grounds of inadmissibility,
12   including that they might be a public charge to the U.S., and
13   it, both in its stated purpose and its statutory provisions,
14   provides for a detailed system for their distribution around
15   the U.S. and their integration into U.S. society.  All of these
16   are covered by statutes, including the question of whether a
17   refugee might be placed in a, quote, "highly impacted area."
18   Congress has specifically provided for consideration of these
19   topics, and the executive order attempts an end run around
20   Congress's plan.  And that is something that the *Hawai'i* court
21   does not condone.
22       Lastly, on the executive order, in terms of the textual
23   requirements, the *Hawai'i* court also pointed to the
24   proclamation statement at issue there that its conditional
25   restrictions would be enforced only as necessary to address the

Pacito et al vs. Trump et al, 2/25/25

1    identified inadequacies and risks.  Similarly, unlike here,

2    there is no triggering condition that may be resolved in the

3    future because the order ties the presumption of the USRAP to

4    the determination of whether refugee resettlement is in the

5    interest of the United States, and Congress has already

6    determined that it is.

7        I'll turn now briefly to our due process claim, unless

8    Your Honor has further questions on the executive order.

9             THE COURT:  I don't.

10            ATTY. ALAGESAN:  Okay.  Plaintiffs also bring a due

11   process claim on behalf of plaintiff Esther who submitted a

12   follow-to-join petition for her daughter based on the statutory

13   entitlement for admission for follow-to-join family members.

14       To zoom out a little bit, there are millions of refugees

15   in the world.  Most of them do not get to participate in the

16   USRAP program, let alone come to the United States, but for

17   those who do, in order to prevent families from being

18   separated, Congress has decided that refugees get to bring very

19   particular relatives to join them as long as those family

20   members aren't inadmissible under specific statutory criteria,

21   and it's this statutory entitlement which is the basis for

22   Esther's due process claim, and plaintiffs are likely to

23   succeed on that as well because that statutory entitlement has

24   been violated without due process.

25       I can now turn briefly to -- one minute -- okay -- the

Pacito et al vs. Trump et al, 2/25/25

```
 1    other factors here.  I think that irreparable harm really
 2    speaks for itself in the terms of the plaintiffs and their
 3    declarations.  The organizational plaintiffs are facing
 4    catastrophic consequences.  And this is a situation where, like
 5    Humpty Dumpty falling off the brick wall, pieces are being
 6    broken that will not be put together without immediate relief.
 7    So, too, the harm being suffered by individual refugees around
 8    the world is striking and irreparable.  They are being
 9    separated from their families.  They are faced with being in
10    limbo, stuck with their applications frozen, not knowing when,
11    if ever, they will move forward again.  And that harm is
12    irreparable and supports a preliminary injunction here.
13         Finally, Congress has stated that the refugee program is
14    in the public interest, and the balance of hardships, given the
15    concrete harms, tips sharply in the plaintiffs' favor and would
16    support a preliminary injunction here.
17         I think that's my 15 minutes.
18              THE COURT:  I'd like to ask you a question --
19              ATTY. ALAGESAN:  Sure.
20              THE COURT:  -- about the foreign aid EO and the
21    effect of litigation involving the foreign aid EO.
22         I mean, I understand plaintiffs' position to be that the
23    foreign aid EO in no way limits the operation of the USRAP, the
24    funding, and everything else that is detailed at length in the
25    brief.
```

Pacito et al vs. Trump et al, 2/25/25

1      But I've got the government telling me that the relief

2    that you're seeking is also an injunction of the foreign aid

3    EO.

4      So can you speak to that point?

5        ATTY. ALAGESAN:  We are not seeking -- we haven't

6    challenged the lawfulness of the foreign aid EO and are not

7    seeking an injunction of it.  What we are seeking is an

8    injunction against the agencies from enforcing their suspension

9    of funding to the resettlement partners for discharging their

10   responsibilities under the USRAP, both as to the processing of

11   refugee applications and the provision of services once

12   refugees are in the United States.

13       THE COURT:  All right.  Thank you.

14       ATTY. ALAGESAN:  Thank you, Your Honor.

15       THE COURT:  Mr. Flentje, I understand that you'll be

16   arguing for the government?

17       ATTY. FLENTJE:  Yes, Your Honor.

18      May it please the Court, August Flentje with the Justice

19   Department.  I'm here on behalf of the United States.

20       THE COURT:  I think I'd like to start with something

21   that plaintiffs' counsel just said about irreparable harms

22   speaking for themself and being self-evident in this case,

23   given the evidence.

24      Do you agree with that?

25       ATTY. FLENTJE:  No.  No, we don't.  And I think if

Pacito et al vs. Trump et al, 2/25/25

1  we're looking at the types of irreparable harm asserted, we

2  have to be very -- separate out the various plaintiffs and each

3  person's harm alleged and each organization's harm alleged.

4      I'll start with the organizational plaintiffs.

5          THE COURT:  I've read the declarations.  And, I mean,

6  I guess my question is, have you?  I mean, in reading the

7  declarations in the record that's been put before the Court, I

8  have refugees stranded in dangerous places.  I have families

9  who sold everything they owned in advance of travel that was

10  abruptly canceled.  I've got spouses and children separated

11  indefinitely from their refugee family members in the U.S.  I

12  see resettlement agencies that have already laid off hundreds

13  of staff and face potential insolvency.

14      So I guess my question to you is, aren't these textbook

15  examples of harms that can't be undone with money damages?

16          ATTY. FLENTJE:  We don't think that there's

17  irreparable harm made out on the facts in this case.  I have

18  read the declarations.

19      I'll stress that these are claims of harm by nine

20  individual plaintiffs and three organizations.  And if the

21  Court believes relief is warranted to remedy what is stated to

22  be irreparable harm, any order should be limited to the

23  plaintiffs before the Court.  The Ninth Circuit said, in

24  *California vs. Azar*, that a district court's relief had to be

25  narrow to address only the injuries shown to the particular

Pacito et al vs. Trump et al, 2/25/25

1    plaintiffs in court.

2          So I think that's an important thing to look at, and

3    that's why I stress that you have to look at kind of the level

4    of alleged harm for each specific plaintiff.  And I would like

5    to address that briefly, especially with regard to the large

6    organizational plaintiffs.  Those two plaintiffs are

7    contractors with the United States.  They enter into something

8    called a cooperative agreement to help process refugees abroad

9    and in the United -- and to provide services in the United

10   States.

11         It's very well established that a contract dispute does

12   not make out irreparable harm and should be resolved based on

13   the terms of the contract.  Plaintiffs have filed this suit,

14   but they haven't provided the terms of the contracts with the

15   United States.  So it's very hard to evaluate their claims.

16   They cite contracting provisions, 2 CFR Part 200 and 600, which

17   has very detailed requirements on terminating contracts.  And

18   I'll note that one of those provisions says that the United

19   States can terminate a contract, in whole or in part, anytime

20   an award no longer effectuates agency priorities.

21         We don't have those contracts in the Court, so we can't

22   evaluate them on this PI motion.  It's their responsibility to

23   show the kind of entitlement to relief for an extraordinary

24   preliminary injunction.  They haven't done that without giving

25   us the contracts and explaining how that's violated.  In fact,

Pacito et al vs. Trump et al, 2/25/25

1  if you study the contracts, it may very well be that this Court

2  doesn't have jurisdiction to resolve that dispute.  It might be

3  a court of federal claims-type issue.

4        THE COURT:  Do you contest or dispute that money owed

5  for services already rendered have been withheld?

6        ATTY. FLENTJE:  I don't know the latest facts on

7  that.  I am not contesting their allegation that as of the time

8  they filed their PI motion -- I think which was about

9  February 10th or 11th -- that there were pending requests for

10  reimbursement for periods prior to January 24th.

11     I will note that they -- you know, they say they submitted

12  paperwork -- that's only been two weeks ago -- kind of

13  addressing that problem.  So I think we should probably give

14  the agency a little more time on that aspect of the case.

15     But I think the bigger aspect of the case is the

16  going-forward temporary pause in funding.  And I think there is

17  where you -- we quickly get into a contract dispute where you

18  won't have irreparable harm, and you need to look at things

19  that are not before the Court to decide if there was a

20  violation of law or the contract.

21     As far as the individuals, they have pled irreparable

22  harm, and they have declarations in support.  I think it's --

23  again, if there's relief based on that individual harm, it has

24  to go to only those individuals who have made out a case for

25  irreparable harm.

Pacito et al vs. Trump et al, 2/25/25

1    There is -- you said people were in dangerous locations.
2  There's one plaintiff in Iraq.  The refugee program works --
3  almost always, people are moved to a third safe location well
4  before there's any refugee determination.  So other than the
5  plaintiff in Iraq, the other plaintiffs have moved out of the
6  areas where they face persecution.
7    The plaintiff in Iraq has lived there for about 16 years
8  since the allegations of persecution against -- that he
9  identified in the declaration.  And State Department reports of
10  current conditions in Iraq don't support the notion that there
11  is the kind of irreparable harm alleged in that declaration.
12  But, again, I think the focus, if we're concerned about those
13  plaintiffs, would be relief for individual plaintiffs.
14    Now, there's some problems with that because they also
15  need to make out a strong case on the merits.  And for the
16  individual plaintiffs who are hoping to get into the United
17  States, it's impossible to get past the *Hawai'i* decision in the
18  Supreme Court.  And that's really the entry suspension.
19    There are two aspects to this case -- the funding and then
20  the entry suspension.  And the entry suspension is a relatively
21  straightforward issue, we think, in light of *Hawai'i*.  That
22  court -- the court in *Hawai'i* definitively resolved the issues.
23  The President has ample authority to suspend entry, as has been
24  done here.  That authority derives from both the Constitution,
25  as underscored by Section 212(f) where Congress recognized that

Pacito et al vs. Trump et al, 2/25/25

1   the President is authorized to make decisions about entry into

2   the United States.

3          The Supreme Court --

4          THE COURT:  You're right.  I mean, *Trump vs. Hawai'i*

5   is unmistakable in its holding that the President has

6   considerable discretion under 1182(f) or 212(f), whatever you'd

7   like to call it.

8          But in reading your brief, it posits that the President's

9   authority in this realm is virtually unlimited.

10         Is that the case?  Is that the argument from the

11  government, that the President's authority to suspend refugee

12  admissions under 1182(f) is unlimited?

13         ATTY. FLENTJE:  Well, it is limited.  This only

14  concerns entry into the United States, so that is a significant

15  limitation.  That is the authority that Congress entrusted the

16  President with, to make determinations about whether entry

17  would be detrimental to the interests of the United States.

18  And as the Supreme Court said, that statutory language, quote,

19  "exudes deference to the President in every clause."  And the

20  Court also said the President can impose additional limitations

21  beyond the grounds for exclusion set forth in the INA.

22         And, now, one important thing to note about *Trump vs.*

23  *Hawai'i* -- it was a challenging, controversial case, but there

24  were no dissents on the statutory justification based on the

25  scope of authority in Section 1182(f).  And there's a reason

Pacito et al vs. Trump et al, 2/25/25

```
 1    for that.  Because the Supreme Court has said -- back to the
 2    passage of that Act -- in the 1940s and 1950s, that this is a
 3    broad authority that is essentially like a lawmaking authority
 4    conferred on the President to decide when entry is harmful to
 5    the interests of the United States.
 6              THE COURT:  The scope of the order that we're dealing
 7    with now is much broader than the order that was dealt with in
 8    Trump vs. Hawai'i.  Plaintiffs tell me that it's so broad that
 9    the suspension here defeats the very purpose of the USRAP and
10    portions of the INA.
11       What's your response to that?
12              ATTY. FLENTJE:  I don't think that's a fair
13    assessment.  It involves one -- one route into the United
14    States.  Hawai'i vs. Trump involved every route, based on
15    nationality.  So I think that it is a more straightforward --
16    and I'll note that, you know, there were three executive orders
17    during 2017.  The first two suspended the refugee program, and
18    the Supreme Court stepped in and stayed injunctions barring
19    implementation of those orders.  So the Supreme Court at least
20    had a -- kind of an eye on the scope here when it was deciding
21    Hawai'i.
22       I want to note, especially like -- plaintiffs in their
23    brief rely heavily on the refugee suspension in late 2017 and
24    the Doe case before Judge Robart.  There's a critical
25    distinction between these two cases.  That suspension was
```

Pacito et al vs. Trump et al, 2/25/25

1    issued by the Secretary of State, so it was not based on 212(f)

2    presidential authority.  And that decision was therefore

3    subject to the APA.  The plaintiffs talked about APA review.

4    There's no APA review of the President's determination.

5        The *Doe* case before Judge Robart was also prior to the

6    Supreme Court's decision in *Hawai'i*, so the law shifted

7    dramatically since that ruling.

8            THE COURT:  Well, I mean, I guess I want to push

9    further on this line of thinking.

10       I mean, imagine a scenario in which a future president

11   says that I'm going to suspend all refugee admissions because I

12   find that they are detrimental to the interests of the United

13   States because refugees compete with American citizens for

14   housing and jobs.

15       Now, assuming that's the scenario, could the President

16   suspend entry under 1182(f) indefinitely?

17           ATTY. FLENTJE:  Well, two points.  The indefinite

18   point, *Hawai'i* dealt with that.  It said an indefinite

19   suspension is fine when you have, kind of, reporting.  And we

20   have exactly that here.  In 90 days, there's going to be a

21   report on whether we can take in -- take in refugees consistent

22   with the goals set out by the President.

23           THE COURT:  There's no criteria set forth in the

24   executive order about what would be the trigger for the

25   resumption of the --

Pacito et al vs. Trump et al, 2/25/25

 1          ATTY. FLENTJE:  Well, there is, an assessment of the
 2   cost to the American taxpayer, whether it's -- whether we have
 3   sufficient resource to protect safety and security, and whether
 4   we have the tools to help with assimilation, given the very
 5   large number of irregular migrants over the past four years.
 6          So the President did identify some factors in Section 2,
 7   and I think those will be very relevant to the report that --
 8   that the agencies put together in 90 days.
 9          THE COURT:  But back to the scenario --
10          ATTY. FLENTJE:  And I want to go back -- oh, sorry.
11   I want to go back.  You said could they -- could the whole
12   refugee program be -- I mean, this suspension is for all
13   refugee applicants, so it's similar in scope.  And, again,
14   that's -- there were some orders in 2017 that did something
15   similar, so this is not something brand new or unprecedented.
16          But I will note -- like, if you look at the Refugee Act --
17   and this is outside of 1182 -- but 1157, the Refugee Act, gives
18   the President the authority to set the number of refugees every
19   year.  There's no limit on that authority.  The President could
20   set the number at zero and have no -- there's no requirement
21   for an explanation of that.
22          So I think these two provisions are entirely consistent.
23   If the President has the authority to say no refugees in the
24   Refugee Act, the President can certainly suspend entries of
25   refugees temporarily to make an assessment of the type that

Pacito et al vs. Trump et al, 2/25/25

1   will come in -- in the end of the fiscal year.

2           THE COURT:  I want to come back to my scenario,

3   though, about an indefinite suspension for perhaps a nebulous

4   or ill-defined reason of a domestic priority -- right? --

5   making sure that Americans have priority in matters of housing

6   and jobs, and therefore, it is detrimental to the United

7   States' interest to admit refugees.

8       In that scenario, I mean, isn't what we're talking about a

9   nullification of the USRAP and portions of the INA, if there's

10  an indefinite suspension?

11          ATTY. FLENTJE:  Well, again, two points.  *Hawai'i*

12  said an indefinite suspension was okay with reporting.  And on

13  the justifications, again, the Supreme Court was quite clear

14  that it is questionable whether you can even look at the

15  justifications.

16      And I'll note the Supreme Court cited favorably a

17  suspension by President Clinton that was one sentence long.  It

18  cited favorably a Reagan era suspension of irregular migrants

19  entering the U.S. that was five sentences long.  This is more

20  detailed than that.  It's not as detailed as the order in

21  *Hawai'i*, but it's also less complicated than the order in

22  *Hawai'i*.  So I think it's perfectly reasonable.

23      Again, the statute -- the statute says whenever entry of

24  any class of aliens -- any class.  That would include refugees.

25  It's hard to say refugees are not, quote, "any class" -- would

Pacito et al vs. Trump et al, 2/25/25

1  be, quote, "detrimental to the interests of the United States."

2      Again, impacts in the United States are exactly the sort

3  of detriments that the President's charged with looking at.

4  That's why you are talking about entry.  Is there going to be

5  harm to the United States interior if that entry is allowed?

6      And I do want to point out the plaintiffs have relied on

7  another *Doe* case, *Doe #1*, involving something called a health

8  care proclamation where the Ninth Circuit had a stay ruling.

9  And, again, that was a preliminary ruling, and they talked

10  about impacts in the United States.

11      The difference between *Doe* and this case is *Doe* used an

12  entry suspension to impose kind of ongoing requirements on

13  people who are entering.  So the question was can that

14  suspension of entry reach beyond entry, and now you have to

15  have health insurance for, like, a period of time.

16      I don't think we'd agree with the *Doe #1* ruling of the

17  Ninth Circuit, but obviously, it's law in this circuit.  But

18  it's very different from the issue here where the suspension is

19  not based on ongoing obligations once the person has entered

20  the United States.  Instead, it's based on the finding of

21  detriment based on the very large number of migrants over the

22  last four years and the pressure on the system in the United

23  States that was caused for that period --

24          THE COURT:  Let's --

25          ATTY. FLENTJE:  -- and on the taxpayers of the United

Pacito et al vs. Trump et al, 2/25/25

1   States.

2          THE COURT:  Let's move to the APA arguments.

3          ATTY. FLENTJE:  By move to the APA argument -- I want

4   to make one point.

5       One, the APA argument is irrelevant to the legality of the

6   refugee suspension.  That's an order of the President that --

7   whether it's reviewable is a hard question.  And the Supreme

8   Court said that was a hard question.  No justices dissented on

9   that point.  But the APA points, I think, deal with a few other

10  aspects of the case.  And I feel like plaintiffs have tried to

11  mush it all together, but everything has to be looked at

12  separately.  There are a lot of decisions that could be looked

13  at on the APA side of the case.  So I can turn to it.

14      There are the funding decisions.  I talked about that a

15  little earlier.  But, again, an APA review of a funding

16  decision -- you would need the basis for the decision.  You

17  have the suspension notices.  Plaintiffs submitted a couple of

18  those.  And then you would sort of need whatever governs that.

19  Was it lawful?

20      And I've stressed earlier, and I'm going to stress

21  again -- you need the contract terms to understand that.

22  Plaintiffs did not provide the contract terms, so it's very

23  hard to issue equitable relief on that funding suspension for

24  the two plaintiffs -- two organizational plaintiffs that get

25  funds from the United States to implement the refugee program.

Pacito et al vs. Trump et al, 2/25/25

```
 1   And that's my answer to that aspect of the APA case.
 2            THE COURT:  What about this notion raised in the
 3   brief about the actions taken of the agency defendants being
 4   purely ministerial in nature, that they're simply implementing
 5   the executive order?  It seems to me that there's discretion in
 6   many of the actions there that move this beyond just purely
 7   ministerial actions.
 8            ATTY. FLENTJE:  Well, again, I think we've got to
 9   look at -- the refugee suspension, the presidential 212(f)
10   suspension, yes.  Implementing that is ministerial.  The
11   President provided a determination.  There could be no entry.
12   And the agencies are not going to allow entry given that order.
13   So I think that's pretty straightforward.
14        If you look beyond that to the --
15            THE COURT:  Well, what about -- I mean, if we're
16   looking at the letter of the law on the executive order -- I
17   mean, it gave an effective date, but the agencies implemented
18   portions of it early.
19        Isn't that a discretionary call?
20            ATTY. FLENTJE:  Yes.  I will not dispute that in the
21   right case, I think there could be review of that kind of a
22   determination.
23        I think the agencies' explanation -- they say it's post
24   hoc rationalization, but I think it's a legitimate effort, at
25   this expedited time frame where we don't have records submitted
```

Pacito et al vs. Trump et al, 2/25/25

1  yet and they're challenging a lot of different agency decisions
2  at the same time, to provide an explanation for that
3  determination.  That explanation was that the refugee
4  suspension was coming into force in seven days, and travel
5  should be halted to avoid stranding refugees in the midst of
6  their travels.  I think that's a reasonable decision by the
7  Secretary.
8          If the Court wants to look at that, that issue applies to
9  one single plaintiff in the case who was slated to travel on
10 January 22.  This sort of review would focus on that
11 individual, on the decision for that individual and whether it
12 was reasonable.  And we think we have shown it was reasonable
13 to avoid the risk of that person being stranded.  And I think
14 that is Plaintiff Pacito, who is living in Kenya.
15         So that's what I would say about that brief period of
16 time.
17         As far as implementing the refugee suspension going
18 forward, yes, the agency does take some steps to implement it.
19 The agency has suspended refugee processing, so it's not taking
20 steps like doing medical exams or background checks while the
21 suspension is in place.  Again, we explained the rationale of
22 the agency there.  These are time-sensitive operations by the
23 agency.  It would be wasteful to do so, particularly when the
24 concerns identified are the resources of American taxpayers.
25         Again, I stress.  There are some 600,000 people in refugee

Pacito et al vs. Trump et al, 2/25/25

1    processing around the world.  That is a huge number and a very

2    expensive operation, so the agency made a reasonable decision

3    to hold off on that during the period of the suspension.

4    Obviously, if there's no suspension, those are processes that

5    would start again.

6         So those, I think, are the two sort of APA pieces of the

7    refugee suspension order.

8         As far as the payment pause, again, we have the two

9    institutional plaintiffs.  And I feel like I've addressed that,

10   but I'm happy to answer more questions.

11        There is one individual in the United States who alleges

12   that payment stopped.  Again, I don't know that we have a lot

13   of facts on what happened there and what the situation is.

14   What we have is a screenshot of an announcement, so we might

15   need to make more -- do more to figure -- to figure out what

16   happened in that individual case.  But I'm stressing, like --

17   this is a case brought by an individual, and the Court relief

18   would be -- have to be limited to that individual.

19        And I guess connected to that is the litigation going on

20   in the District of Columbia and the scope of relief.

21   Plaintiffs say now they're actually more limited in their scope

22   of relief, although it's not -- on the -- on the funding pause,

23   it's not clear to me.  Their PI motion asks that all three

24   orders be enjoined, quote, "in their entirety."  That's a

25   significant ruling that they're asking for.

Pacito et al vs. Trump et al, 2/25/25

```
 1        Again, I stress.  The funding orders, 90 percent of
 2   them --
 3             THE COURT:  I don't understand their request to be to
 4   enjoin three orders.  I understand it to be purely as it
 5   relates to the USRAP executive order.
 6             ATTY. FLENTJE:  Well, the executive orders regard
 7   foreign affairs funding.  So the orders deal with a lot more
 8   than USRAP, and they deal with a lot more than the two
 9   plaintiffs before this case.  So if -- and their PI brief asks
10   for them to be enjoined in their entirety.
11        So what they're asking for is for you to enjoin orders
12   that apply to people who are not before the Court, who are
13   working in foreign affairs, like USAID -- all the funding that
14   was suspended by those orders.  So I think plaintiffs probably
15   would need to narrow their request for relief, but the motion
16   before this Court asks for an order that broad from this Court.
17   And that is why we raised the issue of the DC DDC case where
18   there is a similar challenge to the same orders and
19   implementation of the funding orders.  This is all about
20   funding.  The DC case is not about refugee suspension.
21        But the Court there did issue a universal, nationwide
22   injunction.  And part of the reason we are worried about a
23   similar order or process in this Court is the risk of
24   overlapping or inconsistent obligations.  The judge over in DDC
25   is very actively involved in sorting out exactly how that
```

Pacito et al vs. Trump et al, 2/25/25

```
 1   court's orders impact given that a lot of these funding
 2   mechanisms operate through contracts, which I've made that
 3   point here as far as the two plaintiffs here, and is engaging
 4   in ongoing proceedings.  There's filings due this weekend on
 5   how all that works.
 6        Now, you know, this is one problem with universal
 7   injunctions.  Like, it creates -- and I think it's a unique
 8   problem here because it is so complicated, how these funding
 9   streams work, that there is a higher risk here that a second
10   universal injunction would start to have inconsistent
11   obligations than in something like the -- some of the other
12   cases where it's a more simple policy that's being looked at.
13             THE COURT:  Thank you.
14        Is there anything else that you'd like to tell me that
15   isn't in the government's briefing?
16             ATTY. FLENTJE:  I think I covered most of the issues
17   I hoped to cover.  Thank you for the questions.
18             THE COURT:  Thank you.
19        Rebuttal?
20             ATTY. ALAGESAN:  Thank you, Your Honor.
21        I'll start at the top by maybe clarifying a couple of
22   things about plaintiffs' claims and the relief that they're
23   seeking.
24        Plaintiffs' have challenged specifically the refugee ban
25   executive order that purports to suspend admissions and
```

Pacito et al vs. Trump et al, 2/25/25

1   decisions for refugees; they have challenged the agencies'

2   suspension of refugee processing admission -- processing and

3   admissions; and then the suspension -- the agencies' suspension

4   of funding to the U.S. Refugee Admissions Program.  We have not

5   challenged the foreign aid EO.  We have not sought an

6   injunction of the foreign aid EO.  We have sought an injunction

7   as to the enforcement of the refugee ban executive order and

8   the two agency suspensions, both as to processing and funding.

9        As to defendants' counsel's argument that there are, you

10   know, many, many individualized decisions here, on plaintiffs'

11   APA claims, plaintiffs have challenged two policy decisions

12   which are cognizable agency actions that can be challenged

13   under the APA.  And the remedy for those actions is to set

14   aside those actions at final judgment.  And plaintiffs are

15   entitled to preliminary injunctive relief that would enjoin the

16   enforcement of those policy decisions.

17        The funding suspension -- I think I covered this -- is

18   purely an APA claim.  It's as to the agencies and not as to

19   what the President did.

20        On the executive order, I think that -- you know, again,

21   we would state that the issue here that distinguishes this case

22   from *Hawai'i* is the scope of the exercise of authority and its

23   direct conflict with the INA.

24        And I'll just point out that in terms of the history of

25   the executive orders under the prior Trump administration, the

Pacito et al vs. Trump et al, 2/25/25

1   reason that the refugee ban itself was not up at the Supreme
2   Court was because of a decision by that administration to
3   bifurcate the two bans.  And so the ban that was split off
4   after the second EO to suspend refugee admissions ended up in
5   this courthouse before Judge Robart while the visa ban went up
6   to the Supreme Court.
7       And, then, I would like to focus on the issue of the scope
8   of relief and the challenges to the harm shown by plaintiffs
9   that my friends on the other side raised.
10      First, an injunction is required as to the entirety of
11  both suspensions here to provide relief to the plaintiffs
12  before the Court here.  That is the limitation that has been
13  raised.  But for a few reasons, to give effective relief to the
14  plaintiffs here, a broad injunction of those suspensions is
15  necessary.
16      First, the resettlement agencies in this case operate in
17  at least 30 states and in every single circuit, making a
18  geographically limited injunction unworkable.  Separately, the
19  individual plaintiffs in this case, some are assured to other
20  resettlement agencies beyond the plaintiffs in this case, based
21  on where their families live or where they were assigned during
22  the refugee admissions process.
23      So if those -- if funding is not restored broadly to the
24  program, those individual plaintiffs will not receive the
25  support that they are entitled to upon admission, if they are

Pacito et al vs. Trump et al, 2/25/25

1   even permitted to enter, because they are assured to a

2   different agency.  Every fewer refugee who is assured to the

3   organizational plaintiffs in this case injures them.  It means

4   a loss of funding under their cooperative agreements.  And

5   those refugees that they receive here might be processed by

6   other agencies other than the plaintiffs in this case.

7       So, again, the funding to the whole program -- the lack of

8   funding to the whole program is injuring both the

9   organizational and the individual plaintiffs here.  And without

10  funding the USRAP processing of other resettlement partners,

11  whole regions of the world will remain closed to refugee

12  processing.  The plaintiffs here operate resettlement support

13  centers in Europe and in Africa, but there are other

14  resettlement support centers that are responsible for

15  processing refugees around the world.  And those refugees would

16  not be able to be processed without an injunction that enjoins

17  the suspension in its entirety.

18      I'll point out -- that I think was clear in the statement

19  of our claims -- this is not a contract dispute.  The contracts

20  have not been terminated.  Plaintiffs are not seeking money

21  damages.  They are seeking an injunction of the funding

22  suspension to the U.S. Refugee Admissions Program.

23      And then, lastly, a couple points on irreparable harm.

24  Again, I think the declarations speak for themselves.  The

25  organizations have been very clear about the impact on them.

Pacito et al vs. Trump et al, 2/25/25

1  They also have third-party standing, and the harm -- the
2  irreparable harm that is accruing to their clients can also be
3  considered in the Court's analysis.
4       And then, finally, you know, on the idea that counsel is
5  saying that individual refugees in this case are not facing
6  danger in the countries that they are fleeing or living in, the
7  refugee program was created to provide a pathway to safety for
8  these groups.  They are refugees of special humanitarian
9  concern to the United States.  That is spelled out in statute.
10 In-country processing for refugees in Iraq is spelled out in
11 statute.  So the argument that these refugees are somehow not
12 being harmed by defendants' decision to stop processing their
13 applications and cut off their lifeline to safety is really
14 belied by law and logic.
15      And I think that's all I have.
16           THE COURT:  Very good.
17           ATTY. ALAGESAN:  Thank you, Your Honor.
18      We'd just ask, given the gravity of the situation and time
19 being of the essence, for the Court's prompt consideration.
20      Thanks again.
21           THE COURT:  Thank you.
22      All right.  Thank you, Counsel.  I think that's a good
23 segue.
24      You talk about the Court's prompt attention on this
25 matter.  I can assure you that this has received our utmost and

Pacito et al vs. Trump et al, 2/25/25

```
 1    highest attention.  I am well-steeped in the parties' briefing.
 2    We have looked at the case law.  We have looked at the factual
 3    record thoroughly.  So in that way, we are very far along, very
 4    advanced in our thinking on this matter.  And I wanted to hear
 5    from the parties this morning at argument to confirm some of
 6    the things that I suspected to be true here as it relates to
 7    this case.
 8         To be sure, the President has substantial discretion under
 9    Section 1182(f) to suspend refugee admissions.  But that
10    authority is not limitless.  I cannot ignore Congress's
11    detailed framework for refugee admissions and the limits it
12    places on the President's ability to suspend the same.  The
13    evidence before me shows that plaintiffs face concrete
14    irreparable harms, including refugees stranded after selling
15    their possessions, agencies laying off hundreds of staff, and
16    family reunifications suspended indefinitely.
17         Preliminary relief is warranted here because the
18    plaintiffs are likely to show that the President's suspension
19    of the USRAP has crossed the line from permissible
20    discretionary action to effective nullification of
21    congressional will.  And this is to say nothing of the
22    defendants' agencies' implementation of the order, which likely
23    violates bedrock principles of administrative law by vastly
24    expanding the scope of the order with no reasoned explanation,
25    no advance notice, and no APA-compliant procedure.
```

Pacito et al vs. Trump et al, 2/25/25

1          An injunction is needed to preserve the status quo while

2     the merits of the case are sorted out in a court of law.  Our

3     system of separated powers demands no less.

4          So for these reasons and those that will be explained in a

5     detailed order to follow in the next couple of days,

6     plaintiffs' motion is granted.  The Court enjoins the

7     implementation of Section 3, Subparts A, B, and C, and

8     Section 4 of the USRAP executive order.  The order to follow

9     will define the precise scope of the preliminary injunction as

10    it relates to agency -- the agency suspension and agency

11    funding suspension issues.

12         Is there anything else further from the parties?

13             ATTY. FLENTJE:  The United States would ask that you

14    briefly stay whatever PI you issue to allow us to consider

15    emergency appellate relief.

16             THE COURT:  Once the Court issues the order, if that

17    is the decision of the United States, the government, to move

18    for a stay, I will certainly entertain that motion.  But at

19    this point, it's premature.

20             ATTY. FLENTJE:  Thank you.

21             THE COURT:  Anything else?

22             ATTY. ALAGESAN:  Nothing further from plaintiffs,

23    Your Honor.

24             THE COURT:  Anything else from the government?

25             ATTY. FLENTJE:  No.  Thank you.

Pacito et al vs. Trump et al, 2/25/25

1              THE COURT:  All right.  We are adjourned.

2                          (Adjourned.)

3

4

5                    C E R T I F I C A T E

6

7       I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.

8

9   /s/ *Andrea Ramirez*

10  ANDREA RAMIREZ
    OFFICIAL COURT REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25