THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

PACITO, *et al.*,

           *Plaintiffs*,

- against –

DONALD J. TRUMP, *et al.*,

           *Defendants*.

No. 2:25-cv-00255-JNW

Hon. Jamal N. Whitehead

### DECLARATION OF ADAM ZERBINOPOULOS
### SENIOR BUREAU OFFICIAL
### BUREAU OF POPULATION, REFUGEES, AND MIGRATION
### UNITED STATES DEPARTMENT OF STATE

I, Adam Zerbinopoulos, for my declaration, hereby state as follows:

1. I am the Senior Bureau Official of the Bureau of Population, Refugees, and Migration (PRM) within the United States Department of State (Department of State or State Department).[1] I have held this position since January 21, 2025. Prior to becoming the PRM Senior Bureau Official, I was PRM's Regional Director for East Asia and the Pacific. I have been employed at the Department of State since 2008.

2. I submit this declaration in support of the U.S. government's Motion to Stay Preliminary Injunction. Specifically, I address herein (i) how courts setting (or resetting) the United States' refugee policies frustrates the Department of State's ability to conduct effective foreign policy; (ii) how any injunction concerning United States refugee policy interferes with the Department of State's ability to engage in negotiations with other countries regarding global

---

[1] The title "Senior Bureau Official" is used to refer to the senior-level official who oversees a bureau but does not necessarily hold the title of Assistant Secretary of State.

1

refugee policies; and (iii) how taking actions consistent with the injunction will result in irreparable harm to the United States government.

3. The statements made herein are based on my personal knowledge and information made available to me in the course of carrying out my duties and responsibilities as the PRM Senior Bureau Official.

## United States Refugee Policy

4. As I discussed in my declaration in this litigation dated February 19, 2025, section 207 of the Immigration and Nationality Act (INA) gives the President authority to set the number of refugees that is justified by humanitarian concern or is in the national interest (commonly referred to as the "refugee ceiling") and to allocate admissions among refugees of special humanitarian concern, after consultation with the House of Representatives and Senate Judiciary Committees.

5. If the refugee ceiling is reached within a given fiscal year, no additional refugees may be admitted, unless the President determines, consistent with section 207(b) of the INA, that an unforeseen emergency refugee situation exists and that the admission of certain refugees in response to that situation is justified by grave humanitarian concerns or is otherwise in the national interests. Reaching the refugee ceiling could result if the President chooses to lower the ceiling, including by suspending the entry of refugees under section 212(f) of the INA, effectively lowering the ceiling to the number of refugees admitted in that fiscal year up to the date of suspension. In any of the circumstances where the refugee ceiling has been reached, the U.S. government would suspend United States Refugee Admissions Program (USRAP) processing to avoid violating section 207 of the INA.

6. The President has designated the Secretary of State and the Attorney General as his Cabinet-level representatives for Congressional consultations, giving the Department of State the primary policy role for the USRAP. Within the Department of State, PRM coordinates all intra-department and interagency work on the USRAP, including by drafting the Report to Congress on Proposed Refugee Admissions that is submitted to Congress, on behalf of the President, prior to consultations. The USRAP is a cornerstone of PRM's mission to promote U.S. interests by working to reduce illegal migration, to provide humanitarian assistance to those fleeing persecution, crisis, or violence, and to seek durable solutions for forcibly displaced people around the world. PRM coordinates humanitarian policy and diplomacy, providing life-sustaining assistance, working with multilateral organizations to build global partnerships to reduce illegal migration and human smuggling, and promoting best practices in humanitarian responses.

7. The USRAP is an important component of U.S. foreign policy. Courts setting (or resetting) the refugee policies of the President frustrates the Department of State's ability to conduct effective foreign policy. The United States' foreign partners cannot be sure if the President or the Secretary of State (or their designees) speaks with authority concerning refugee policy if a U.S. district court could simply enjoin the authority that the President has been given by Congress.

### Department of State Refugee Negotiations

8. The Department of State, through PRM and U.S. embassies, routinely discusses the global migration situation with foreign countries and negotiates arrangements with other countries concerning migration.

9. Such negotiations rely upon the State Department's ability to engage authoritatively and consistently to represent U.S. policy on refugees. Court injunctions that create inconsistency or uncertainty in the State Department's ability on such matters undermines the effectiveness of the U.S. negotiating position and reduces U.S. leverage, thereby undermining the State Department's ability to advance the President's direction and U.S. national interests.

## Harm Caused by Complying with the Injunction

10. According to data compiled from PRM's refugee case management system, 37,588 refugees were admitted from October 1, 2024, to January 19, 2025 (fiscal year 2025). All of these refugees were determined to be of special humanitarian concern by previous administrations.

11. According to that same data, there are several thousands of refugees who were scheduled for travel prior to January 20, 2025, and several thousands more approved for refugee classification who were ready to have travel booked. Processing and admitting any of these refugees will result in irreparable harm to the U.S. government.

12. As I discussed above, the President has authority to set the refugee ceiling. While this determination occurs before the beginning of the fiscal year and after Congressional consultations, several administrations have increased or decreased the refugee ceiling within the same fiscal year, particularly when the refugee ceiling was set by a previous administration. It is only natural that a President has different policy priorities – including those relating to refugees – than a previous one.

13. As I discussed in my February 19, 2025 declaration, the President has authority to determine which refugees are of special humanitarian concern to the United States. Which individuals or groups qualify for access to the USRAP through one of the processing categories

4

has frequently changed between administrations, even within the same administration, and there is no statutory provision that would prevent PRM from discontinuing certain processing categories, except those expressly created by statute. It is likewise natural that a President determines different categories of refugees are of special humanitarian concern to the United States than a previous one.

14. On February 25, 2025, the court in this litigation enjoined sections 3(a)-(c) and 4 of Executive Order 14163, Realigning the United States Refugee Admissions Program (E.O. 14163). Section 3(a) of E.O. 14163 suspended entry of refugees into the United States under the USRAP, and section 3(b) of E.O. 14163 suspended decisions on applications for refugee status.

15. The Court's injunction was issued from the bench and was effective immediately, nationwide, but did not provide the Department of State with sufficient time to allow for orderly implementation or to seek a stay pending appeal.

16. Furthermore, the Court's injunction of section 4 of E.O. 14163, which provides for the submission of a report regarding whether resumption of entry of refugees into the United States under the USRAP would be in the interests of the United States, precludes the U.S. government from carrying out the planned, careful, and considered review of the USRAP.

17. If the U.S. government is required to process or admit refugees before it can consider how the USRAP is in the national interest, the President will be unable to determine the number of refugees that is justified by humanitarian concerns or is otherwise in the national interest. The President will also be unable to determine the allocations of refugees of special humanitarian concern to the United States.

18. In complying with this injunction, the court – and not the President – will be determining the refugee ceiling as well as which refugees are of special humanitarian concern.

The Court's setting of a nationwide injunction thus undermines the State Department's ability to negotiate with foreign countries, as it creates uncertainty as to the President's and the State Department's ability to set foreign policy.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 3rd day of March 2025, Washington, D.C.

_____
Adam Zerbinopoulos