```
 1                    UNITED STATES DISTRICT COURT

 2              WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3   _____

 4                                  )
     PLAINTIFF PACITO; PLAINTIFF     ) C25-00255-JNW
 5   ESTHER; PLAINTIFF JOSEPHINE;    )
     PLAINTIFF SARA; PLAINTIFF       ) SEATTLE, WASHINGTON
 6   ALYAS; PLAINTIFF MARCOS;        )
     PLAINTIFF AHMED; PLAINTIFF      ) March 4, 2025
 7   RACHEL; PLAINTIFF ALI; HIAS,    ) 1:00 p.m.
     INC.; CHURCH WORLD SERVICE,     )
 8   INC.; and LUTHERAN COMMUNITY    )
     SERVICES NORTHWEST,             ) Motion for
 9                                   ) Emergency
                   Plaintiffs,       ) Conference
10                                   )
     v.                              )
11                                   )
     DONALD J. TRUMP, in his         )
12   official capacity as            )
     President of the United         )
13   States; MARCO RUBIO, in his     )
     official capacity as            )
14   Secretary of State; KRISTI      )
     NOEM, in her official           )
15   capacity as Secretary of        )
     Homeland Security; DOROTHY      )
16   A. FINK, in her official        )
     capacity as Acting Secretary    )
17   of Health and Human             )
     Services,                       )
18                                   )
                   Defendants.       )
19   _____

20
                    VERBATIM REPORT OF PROCEEDINGS
21            BEFORE THE HONORABLE JAMAL N. WHITEHEAD
                    UNITED STATES DISTRICT JUDGE
22   _____

23

24

25


         Stenographically reported - Transcript produced with computer-aided technology

  Debbie Zurn - RMR, CRR - Federal Reporter - 700 Stewart St. - Suite 17205 - Seattle WA 98101 - (206) 370-8504
```

```
 1   APPEARANCES:

 2     For the Plaintiffs:      Melissa Keaney
                                International Refugee Assistance
 3                              Project
                                PO Box 2291
 4                              Fair Oaks, CA 95628

 5                              Jonathan Patrick Hawley
                                Shireen Lankarani
 6                              Esme Aston
                                Perkins Coie
 7                              1201 3rd Avenue
                                Suite 4900
 8                              Seattle, WA 98101-3099

 9
       For the Defendants:      August Flentje
10                              U.S. Department of Justice
                                P.O. Box 868
11                              Ben Franklin Station
                                Washington, D.C. 20044
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    THE CLERK: This is the matter of Pacito, et al.,
2    versus Trump, et al., Cause No. C25-255, assigned to this
3    court. Will counsel please rise and make their appearances
4    for the record.
5    MR. HAWLEY: Good afternoon, Your Honor. Jonathan
6    Hawley from Perkins Coie for plaintiffs. I'll let my Perkins
7    Coie colleagues introduce themselves first.
8    MS. LANKARANI: Shireen Lankarani from Perkins Coie.
9    MS. ASTON: Esme Aston.
10    MR. HAWLEY: We're joined today by Melissa Keaney
11    from the International Refugee Assistance Project. She'll be
12    handling the argument today.
13    MS. KEANEY: Good afternoon, Your Honor.
14    THE COURT: Good afternoon.
15    MR. FLENJE: August Flenje with the Justice
16    Department for the United States.
17    THE COURT: Hello, again, Mr. Flenje.
18    All right. So we are here on plaintiffs' request for an
19    emergency conference, following the government's termination
20    of some or all of the USRAP cooperation agreements.
21    Plaintiffs, you requested the hearing, so I'll hear from
22    you first.
23    MS. KEANEY: Thank you, Your Honor. Again, Melissa
24    Keaney for plaintiffs.
25    Plaintiffs requested this emergency hearing in order to

1    bring to the court's attention defendants' actions, which can
2    be viewed as nothing other than an attempt to circumvent the
3    relief that the court has ordered.
4        Your Honor had already held that defendants' attempt to
5    withhold funding that's been duly appropriated for the U.S.
6    refugee admissions program, or USRAP, is unlawful.  And the
7    only thing that has changed is that defendants can no longer
8    claim their actions are temporary.
9        All the facts, including the timing and the nature of what
10   the government has done here, suggests that this is an
11   attempt to make an end run around this court's ruling, in
12   advance of the written order that was issued on Friday.
13       Although defendants attempt to move the goalposts through
14   this action, these termination notices, just like the
15   suspension notices, reflect a policy decision to defund
16   USRAP.  And it would be appropriate for the court to extend
17   relief as to the termination notices, as they are just an
18   extension of this policy which the court has already found to
19   be unlawful.
20            THE COURT:  All right.  Thank you, counsel.
21       Now, the terminations, do they constitute a separate
22   agency decision, apart from the suspension of the contracts
23   that we talked about last week?
24            MS. KEANEY:  We think they're properly viewed as an
25   extension of the prior decision the agency made to defund

1    U.S. Refugee Admissions Program. So maybe just the latest
2    action in the implementation of that policy decision.
3             THE COURT: But as of the last hearing and in the
4    complaint, termination was not at issue. I know that you
5    argued that the suspension effectively was a termination.
6    But as to an actual termination, that just wasn't a factual
7    circumstance at the time, was it?
8             MS. KEANEY: That's correct. I think some of the
9    fundamental facts remain the same, even if the labels the
10   government is applying have changed. They decided to defund
11   the USRAP. That's what has legal consequences for our
12   clients. That's what matters under the *Bennett v. Spear*
13   test, that's what we have challenged from the very beginning.
14   And importantly, it has profound practical consequences for
15   our clients. As Your Honor recognized, the organizational
16   plaintiffs can ill afford to continue to have their funding
17   frozen. Even since the termination notices were issued,
18   there have been additional layoffs. Plaintiff HIAS has had
19   to lay off almost another 200 members of their staff. So
20   there are compounding irreparable harms that continue as a
21   result of defendants' actions.
22            THE COURT: I'm with you that the analysis is going
23   to track closely the same as the court's analysis when it was
24   taking a look at the suspension of the contracts.
25            So tell me this. This later change in circumstance, I

1    mean, does it warrant a separate legal treatment and factual
2    exploration from the court?
3             MS. KEANEY:  If the court were to find it necessary,
4    we're prepared to file supplemental pleadings to make clear
5    that the -- to set out the events that postdate the filing of
6    our complaint and make clear they are part and parcel of the
7    claim that we brought against the funding suspension.
8         We think that the -- we are -- our supplemental pleading
9    doesn't add any additional claims or any new arguments,
10   because the arguments we made already extend just as equally
11   to the termination notices.  And we've brought a copy of the
12   proposed supplemental pleading, if the court would like to
13   see it.
14            THE COURT:  And the government's response that was
15   filed this morning, have you had a chance to review it?
16            MS. KEANEY:  Yes, Your Honor.
17            THE COURT:  Do you have any comment on anything
18   that's raised in the response?
19            MS. KEANEY:  I guess just to address the points
20   around whether or not there's any sort of conflict between
21   anything this court has ordered or could order, and
22   additional cases, we think that the defendants are trying to
23   confuse the issues.  And the declaration that they submitted
24   in connection with their response really focuses on USAID
25   funding.

```
 1        But the bottom line here is that we challenged the
 2   legality of their policy to defund USRAP.  That's not an
 3   issue that's presented in the *AIDS* case, or any other case
 4   except for this case, and no other court has addressed or
 5   examined that issue, other than this court.
 6        And it's clear now, with the termination notices, as
 7   plaintiffs have held all along, that the plan was to defund
 8   all resettlement programs in the United States.  And all ten
 9   resettlement agencies have, in fact, received termination
10   notices.  That's confirmed by the government's filing.
11             THE COURT:  All right.  Thank you, Ms. Keaney.
12             MS. KEANEY:  Thank you.
13             THE COURT:  Mr. Flenje.
14             MR. FLENJE:  May it please the court, as we noted in
15   our short filing this morning, we think the proper avenue to
16   challenge the terminations would be an amended complaint and
17   supplemental PI motion.  We're prepared to work with
18   plaintiffs on a schedule for that.
19        As the court knows, we've also filed a notice of appeal
20   and a stay motion with Your Honor.  So this will be moving on
21   a couple of tracks.
22        I'll note that the amended complaint -- a supplemental PI
23   motion is what a court in the District of Columbia in a case
24   called U.S. Catholic Bishops, that actually involves one of
25   the resettlement coordinators in DDC.  I will also flag that
```

1  plaintiffs are right, the ten domestic resettlement contracts
2  were terminated.  But the grants that work overseas to
3  facilitate refugee entry, have not all been terminated.  So
4  those are -- a couple of those are in place to facilitate
5  refugee entries and admissions to the U.S. at this point.
6           THE COURT:  So tell me this:  Why did the State
7  Department issue termination notices to these resettlement
8  agencies, the very day after the court issued its preliminary
9  injunction dealing with a suspension of these --
10          MR. FLENJE:  I think the timing primarily is related
11 to the case in the District of Columbia.  As I think we've
12 explained in some of our pleadings, I don't know which ones,
13 the Secretary issued the suspension and said:  For 90 days --
14 I'm going to take 90 days and look at all these and find out
15 if they further agency priorities.  The court in DDC enjoined
16 that suspension.  And then the choice was to -- funding would
17 resume.
18    That sped up the Secretary's process, such that as the
19 declaration that we both attached to our pleadings noted, was
20 carried out in a matter of a couple weeks.  And basically
21 concluded on February 26th, which I think was right after the
22 hearing here, and resulted in termination of most but not all
23 of the refugee-related cooperative agreements.
24          THE COURT:  I mean, that's a remarkable coincidence
25 to me that the termination notices would be sent within

1   24 hours of the court's preliminary injunction.  I mean, was
2   the timing completely unrelated to the court's preliminary
3   injunction?
4           MR. FLENJE:  Well, the timing was related to speeding
5   up review because of the other litigation.  So I would say it
6   was related to the other litigation.
7           THE COURT:  Counsel, you made a very big showing,
8   both at the hearing and in the briefing, that this funding
9   suspension was only temporary.  And the very next day, the
10  funding suspension becomes a termination.  What am I to make
11  of that?
12          MR. FLENJE:  The Secretary's "ALDAC," it was called,
13  that was the subject of this litigation, was a temporary
14  suspension, a 90-day suspension.  That's correct.  That's
15  what plaintiffs challenged in their PI motion.  That was the
16  facts as they were a week ago.  And that was what we were
17  talking about.
18          THE COURT:  I guess what I'm driving at, if there is
19  a process that was already in the works of an actual
20  termination of the contracts as opposed to merely suspension,
21  why didn't you tell me that last week?
22          MR. FLENJE:  I may be wrong, but I believe we
23  submitted information on the AIDS vaccine.  I mean, we
24  pressed this court to hold its hand because of the ongoing
25  litigation in that case, which involved multiple court

1  orders.  One of which has now gone to the U.S. Supreme Court,
2  where the U.S. Supreme Court issued a stay of an order to pay
3  a large amount of money, which would include money that
4  overlaps with the case here.
5     So we were very cognizant of that litigation, and I don't
6  think we withheld any information about that.
7         THE COURT:  All right.  The USRAP statutory scheme,
8  it's a complicated one and an interconnected one.  And the
9  resettlement agencies play an important role in the process
10 by congressional design.
11    Can the government carry out the rest of the preliminary
12 injunction order, without the resettlement agencies?
13        MR. FLENJE:  The order -- yes.  We have advised the
14 State Department of the order.  They have maintained, for
15 example, their funding contract with the UN's International
16 Office of Migration, which is the entity that actually funds
17 sort of the travel to the United States.
18    One of the plaintiffs in this case has a contract that has
19 not been terminated, that covers Africa area.  So there are
20 -- some of the overseas-facing agreements are in place, which
21 would allow that entry to be possible.
22        THE COURT:  And the domestic services?
23        MR. FLENJE:  The domestic services, as plaintiffs
24 noted, they have all been terminated.  Our view is that the
25 refugee statute, Section 1522, doesn't require those

1  services, it's an option.  And the Secretary has reviewed
2  those agreements and determined that they do not serve agency
3  priorities.
4     We believe that they would -- that is a decision, it's
5  obviously an agency decision that could be challenged.  But
6  as we said, we'd need an amended complaint.
7          THE COURT:  Which contracts were terminated?  Was it
8  all ten resettlement agencies that had their contracts
9  terminated?
10         MR. FLENJE:  Ten that operate the services in the
11 United States.
12         THE COURT:  Was there any prior notice given of the
13 terminations?
14         MR. FLENJE:  Well, each of them received a notice of
15 the termination.  That was the notice.
16         THE COURT:  Prior notice.
17         MR. FLENJE:  No, they didn't get prior notice.  They
18 got notice that their agreement was being terminated, under
19 very clear law, 2 CFR 200.340, which in our view sort of
20 underscores that this is not a mandatory program, this is a
21 discretionary program that the Secretary controls.
22 Obviously, our view that you rejected last week, was the
23 refugee entries is subject to the President's control.
24         THE COURT:  That's a good segue to the question I
25 had.  I mean, what authority are you operating under in

1     canceling the cooperative agreements in immediate fashion,
2     without notice?
3            MR. FLENJE:  Well, if you look at 2 CFR 200.340,
4     which is a standard contract term, it goes -- again, the
5     cooperative agreements are not in the record, and this
6     court's ruling is global.  So it applies to a lot of
7     plaintiffs that are not here and cooperative agreements that
8     really couldn't easily be in the record.
9        But 2 CFR 200.340 says:  Every agreement -- the agreements
10    that included, and it's all of them -- it can be terminated
11    by the department, to the greatest extent authorized by law,
12    if the award no longer effectuates the program goals or
13    agency priorities.
14           THE COURT:  Okay.  And this same CFR, it's both
15    overseas and domestic?
16           MR. FLENJE:  That would apply to all the cooperative
17    agreements.  I haven't studied each and every one of them,
18    I'll be frank.  But the ones that we've seen related to the
19    plaintiffs in this case, all include that provision.  And I
20    don't think plaintiffs dispute that.
21           THE COURT:  All right.
22       Now, the termination notices mention agency priorities.
23    That's what's referenced in at least the ones before the
24    court.  How do those differ from the priorities mentioned in
25    the suspension notices?  Are they one and the same?

1    MR. FLENJE:  Well, if I recall, the suspension was
2    designed so that Secretary Rubio could evaluate, you know,
3    all this money going out the door, and determine if it did
4    serve agency priorities.  That was designed to be a process
5    that would last 90 days.  Obviously, it happened much quicker
6    than that, given various court orders.
7    THE COURT:  All right.  Has the State Department or
8    the Department of Homeland Security resumed processing any
9    refugee applications or entries at this point?
10   MR. FLENJE:  There's been directions to resume that,
11   that went out as soon as this court's order issued.  I don't
12   have any further information on the details there.  It's a
13   complex operation, as you're familiar with and as plaintiffs
14   know.  But it has been resumed.
15   THE COURT:  Travel arrangements for plaintiffs like
16   plaintiff Pacito?
17   MR. FLENJE:  Again, I don't know.  Well, plaintiffs
18   can speak to Mr. Pacito.  I don't know what kind of travel
19   arrangements have been resumed.
20   THE COURT:  And on the issue of reimbursements for
21   work already performed by the resettlement agencies, can you
22   give me an update on that?
23   MR. FLENJE:  Some of that money has been paid.  None
24   of the policies challenged presume to halt that.  And the
25   intent of the government is to -- they're going to review

1  those, but the plan is, there's no reason they wouldn't be
2  paid at this time; unless something comes up in the review.
3           THE COURT:  Do you have a sense of a timeline for
4  this review and repayment?
5           MR. FLENJE:  I'm sorry, Your Honor, I don't.
6     Again, that brings us back to the D.C. litigation, where a
7  court ordered a very quick repayment of billions of dollars.
8  The Supreme Court had to step in.  It will move forward, but
9  I don't know the timeline.  And obviously it's tied with a
10 lot of different requests for repayment for past services.
11          THE COURT:  All right.  Thank you, counsel.  Is there
12 anything else that you'd like to tell me that wasn't in the
13 brief response that was filed this morning?
14          MR. FLENJE:  No, I don't think there's anything else.
15 But thank you.  Happy to answer your questions.
16          THE COURT:  Ms. Keaney, please.
17          MS. KEANEY:  A couple of points, Your Honor.
18    I first just want to note that the regulation that
19 defendants rely upon for the termination notices says, "They
20 may be terminated to the extent authorized by law."  But as
21 Your Honor has already found, defunding USRAP is contrary to
22 law so it cannot be authorized.
23    I also wanted to point out that while defendants maintain
24 that they have not terminated the RSC Africa's cooperating
25 agreement, it is still subject to a suspension notice which

1    Your Honor has found unlawful.
2         No money has been flowing to keep operations in that
3    center.  In fact, plaintiff CWS has not received any money,
4    not one penny since this court issued its order.
5         I also wanted to address defendants' point that their
6    position is that resettlement services are not required under
7    the statute.
8         Your Honor already found that the agencies are required to
9    administer those benefits, so long as appropriations are
10   made, and they have been.
11        And there is no indication that defendants have made any
12   sort of way forward to provide those benefits, that it's been
13   almost 50 years' history of the resettlement agencies
14   providing those benefits.
15        I also wanted to note that it's -- the government's
16   declaration that was filed last night with their motion to
17   stay, strongly suggests that they haven't taken any steps to
18   implement this court's injunction.  And I think defense
19   counsel wasn't able to specify any steps that have been
20   taken.  In paragraph 2 of that declaration that was
21   submitted, the declarant explains that he submits it in order
22   to, "Explain why taking actions consistent with the
23   injunction will result in irreparable harm," suggesting that
24   they haven't taken any such actions so far.
25        And the agency, of course, very quickly implemented the

1    suspension in less than 24 hours, and set out the steps that
2    they took and the correspondence the State Department sent to
3    the resettlement agencies, explaining the steps that they
4    took to implement the suspension.  And we think that those
5    steps must be undone and the government should be required to
6    show that they have taken steps to undo those actions.
7         That would, as Your Honor noted, I think include resuming
8    refugee processing and all the predeparture activities that
9    were suspended, rebooking travel for those who had their
10   travel canceled.  And that's a time-sensitive issue, Your
11   Honor, because plaintiffs, like plaintiff Pacito, his medical
12   exam is set to expire on March 25th.  If he's unable to
13   travel before that date, then that step will have to be
14   redone and he'll face additional delays.
15        None of the plaintiffs in the case have received any sort
16   of communications that suggest that their applications have
17   resumed processing, or that there's any sort of effort to,
18   for example, rebook travel for the many thousands of refugees
19   who had their travel canceled.
20        So we would ask that the court require defendants to
21   report on the specific steps that they've taken to implement
22   the injunction, maybe by early next week.  And also request
23   that the parties be ordered to submit a joint status report
24   sometime shortly thereafter, so that it would provide another
25   opportunity for defendants to explain what steps they've

1    taken, and also for plaintiffs to report on what we're seeing
2    in terms of implementation.
3             THE COURT:  All right.  Thank you, counsel.
4             MS. KEANEY:  Thank you, Your Honor.
5             THE COURT:  All right.  The timing of the
6    government's decision to terminate the contracts of the
7    resettlement agencies, just one day after the court issued
8    its preliminary injunction, raises serious concerns about
9    whether these actions are designed to circumvent the court's
10   ruling.
11      Now, nevertheless, the court's preliminary injunction did
12   not discuss actual termination of the resettlement agency
13   contracts.  That just was not the factual circumstance before
14   the court, at the time of the preliminary injunction motion,
15   or contained within the pleadings.  So it was not part of the
16   record before the court.
17      So the court does not read its injunction so broadly as to
18   state that it expressly prohibited defendants from canceling
19   the contracts.  Now, it seems to me that the termination
20   notices constitute a new agency action requiring separate
21   legal analysis and updated pleadings.
22      That said, the court's careful APA analysis regarding
23   contract suspensions will likely operate with equal force,
24   when examining these terminations.  And based on what I've
25   heard in court today, the same legal deficiencies, failure to

1    provide a reasoned explanation, a disregard for statutory
2    mandates, perhaps arbitrary decisionmaking that rendered the
3    suspensions unlawful, likely unlawful, are likely present in
4    what looks to be hasty terminations.
5         So here's how we'll proceed:  I'm going to grant
6    plaintiffs leave to amend their pleadings.  Counsel, I think
7    I heard you mention that you've already got the amended
8    pleading ready to go.  We'll need updated briefing as to the
9    injunctive relief being sought and the scope of the
10   injunction, to what extent it should be modified, if any.
11        I can certainly set a schedule.  I read the government's
12   brief this morning saying that they would work cooperatively
13   and in good spirits to come up with a mutually agreeable
14   briefing schedule.  So I will give the parties an opportunity
15   to hash out the schedule.  But I'd like for you to e-mail my
16   courtroom deputy, before you leave the courthouse, as to what
17   that schedule will be.  If you can't agree, I will set the
18   schedule.  I've already got it in mind.  But I want to at
19   least give you the opportunity to say your piece as to what
20   it might look like.
21         Ms. Keaney, your point about status reports is a good one.
22   I'm going to order the government to issue a status report as
23   of next Monday.  There will be an order, a minute order that
24   will follow that will put some details as to what that status
25   report will entail.  I also like the idea of a joint status

1  report to get the plaintiffs' take as to compliance.
2       So a schedule for that will be outlined in the order to
3  follow.  We've got the motion to stay, that's currently
4  pending.  I'm inclined to follow our district's standard
5  cadence for the briefing schedule on this one.  So the motion
6  is not ripe yet.  So I'm not going to express any opinion or
7  render any sort of decision today on the motion to stay.
8       All right.  Is there anything else to discuss?
9            MS. KEANEY:  Just a clarification, Your Honor.  On
10 the preliminary injunction briefing, this is supplemental
11 briefing, I just want to ensure that this isn't an
12 opportunity for defendants to relitigate issues that have
13 been decided.  This is just specifically about the
14 termination notices; is that correct?
15           THE COURT:  That's correct.  I mean, you're going to
16 be the moving party, you're updating your brief.  I'm not
17 going to cabin the scope of the opposition brief that they
18 are going to submit.  If they want to talk about issues that
19 are settled, I think that's folly on their part, but I'm not
20 going to issue any sort of ruling, so to speak, limiting what
21 they can discuss in their opposition.
22           MS. KEANEY:  Thank you.
23           THE COURT:  All right.
24    Mr. Flenje, anything?
25           MR. FLENJE:  No, thank you.  But thanks.

1    THE COURT:  All right.
2    With that, we're adjourned.
3                        (Adjourned.)

5                     C E R T I F I C A T E

8    I certify that the foregoing is a correct transcript from
9    the record of proceedings in the above-entitled matter.

13   */s/ Debbie Zurn*

14   DEBBIE ZURN
     COURT REPORTER

Debbie Zurn - RMR, CRR - Federal Reporter - 700 Stewart St. - Suite 17205 - Seattle WA  98101 - (206) 370-8504