1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

PLAINTIFF PACITO; PLAINTIFF
ESTHER; PLAINTIFF JOSEPHINE;
PLAINTIFF SARA; PLAINTIFF
ALYAS; PLAINTIFF MARCOS;
PLAINTIFF AHMED; PLAINTIFF
RACHEL; PLAINTIFF ALI; HIAS,
INC.; CHURCH WORLD SERVICE,
INC., and LUTHERAN COMMUNITY
SERVICES NORTHWEST,

Plaintiffs,

v.

DONALD J. TRUMP, in his official
capacity as President of the United
States; MARCO RUBIO, in his official
capacity as Secretary of State; KRISTI
NOEM, in her official capacity as
Secretary of Homeland Security;
ROBERT F. KENNEDY, JR., in his
official capacity as Secretary of Health
and Human Services,

Defendants.

CASE NO. 2:25-cv-255-JNW

FINDINGS OF FACT, CONCLUSIONS
OF LAW, AND ORDER ISSUING
SECOND PRELIMINARY
INJUNCTION

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

1

## 1. INTRODUCTION

This matter comes before the Court on Plaintiffs' Motion for Preliminary Injunction on Supplemental Pleading. Dkt. No. 57. After carefully reviewing the Parties' briefing, the record, and the law, the Court grants Plaintiffs additional preliminary relief as stated below.

Through this lawsuit, Plaintiffs challenge Executive Order 14163, "Realigning the United States Refugee Admissions Program," and various agency actions that have effectively dismantled USRAP's infrastructure. Hours after this Court enjoined implementation of the USRAP Executive Order, Secretary of State Marco Rubio began terminating every resettlement agency cooperative agreement for domestic reception and placement services and all but one agreement for USRAP processing support abroad. The Termination Notices offered a single rationale: the agreements "no longer effectuate agency priorities."

Administrative law rests on the foundational principle that agencies must act within the bounds of their statutory authority and provide reasoned explanations for their actions. Plaintiffs have made a strong showing that the Government's termination of these agreements violates these basic requirements and contravenes Congress's express mandate to establish a "permanent and systematic procedure" for refugee admission and resettlement. While the Government enjoys significant discretion in administering USRAP, that discretion does not extend to abandoning statutory obligations or rendering the program effectively inoperative. The Government's sudden termination of decades-old agreements without reasoned explanation likely constitutes arbitrary and capricious action that must be set

aside. Without immediate relief, refugees remain stranded abroad, families separated, and resettlement agencies shuttered.

The Government contends these terminations are mere contract disputes beyond this Court's jurisdiction, but this argument fundamentally misapprehends the nature of Plaintiffs' claims. Rather than seeking contractual remedies, Plaintiffs ask this Court to enforce statutory obligations through its inherent equitable powers—authority that Congress specifically reinforces in the Administrative Procedure Act by empowering courts to "issue all necessary and appropriate process" to prevent irreparable injury. 5 U.S.C. § 705.

The Court thus enjoins enforcement of the Termination Notices and orders the Government to reinstate the cooperative agreements. The Court recognizes that such relief is extraordinary but concludes it is necessary to prevent permanent damage and preserve the status quo while the parties litigate the merits of this lawsuit.

## 2.  BACKGROUND

The Court discussed the background of this action and statutory framework at length in its prior order, but to summarize: The United States Refugee Admissions Program (USRAP) was established by the Refugee Act of 1980, which amended the Immigration and Nationality Act. USRAP is jointly administered by the Department of State (DOS), the Department of Homeland Security (DHS), and the Department of Health and Human Services (DHHS), with support from the United Nations and nonprofit agencies. Dkt. No. 45 at 3-4.

1    DOS administers aspects of USRAP through "cooperative agreements" with

2    resettlement agencies under the Federal Grant and Cooperative Agreement Act

3    (Grants Act), which distinguishes cooperative agreements from procurement

4    contracts. These agreements are subject to regulations promulgated by the Office of

5    Management and Budget (OMB), including 2 C.F.R. § 200.340, which governs

6    termination of agreements.

7    On January 20, 2025, hours after taking office, President Trump issued

8    Executive Order 14163, "Realigning the United States Refugee Admissions

9    Program." *See* Executive Order No. 14163, 90 Fed. Reg. 8459 (Jan. 20, 2025)

10   ("USRAP EO"). The Agency Defendants—Secretaries Rubio (DOS), Noem (DHS),

11   and Kennedy (DHHS)—immediately halted refugee processing and cut off funding

12   to resettlement agencies like Plaintiffs Church World Services, Inc. (CWS) and

13   HIAS, Inc. For the reasons explained from the bench and in a later written order,

14   the Court enjoined these actions. Dkt. Nos. 42 (Hr'g Tr.) at 37; 45 (Order) at 61.

15   One day after the Court's oral ruling, DOS began terminating its cooperative

16   agreements with the resettlement agencies. Between February 26–27, DOS

17   terminated every resettlement agency cooperative agreement to provide reception

18   and placement ("R&P") services for USRAP. *See* Dkt. No. 49-2 ¶¶ 4–5. Plaintiffs

19   refer to this as the "R&P Termination." Dkt. No. 57 (Mot.) at 4. DOS also

20   terminated all but one of the cooperative agreements to provide USRAP processing

21

22

23

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING SECOND
PRELIMINARY INJUNCTION - 4

support abroad.[1] *See* Dkt. No. 58-2 ¶¶ 5–9 (HIAS Decl.); 58-3 ¶¶ 5–9 (CWS Decl.).

Plaintiffs call this the "Processing Termination." Dkt. No. 57 at 4. The Court refers

to the R&P Termination and Processing Termination collectively as the "Funding

Termination."

To implement the Funding Termination, DOS used the same, one-page letter

("Termination Notice") stating:

> The U.S. Department of State hereby notifies the recipient that this
> award is immediately terminated as of February 26, 2025. This award
> no longer effectuates agency priorities and is terminated in accordance
> with the U.S. Department of State Standard Terms and Conditions,
> 2 CFR 200.340, and/or Award Provisions as applicable.

*See* Dkt. Nos. 44-3; 44-5; 44-6. The Government claims the Funding Termination

resulted from reviews that DOS began on February 21, 2025, at Secretary Rubio's

direction. Dkt. No. 49-2 ¶ 3.

In subsequent status reports, the Government confirms that it has

terminated all its R&P cooperative agreements, *see* Dkt. No. 62 at 5 (Government

Status Report), and all but one of its agreements with nonprofit resettlement

---

[1] While not terminated, CWS's contract remains suspended until its "concurrence"
with Executive Order 14151, "Ending Radical and Wasteful Government DEI
Programs and Preferencing"; Executive Order 14148, "Initial Recissions of Harmful
Executive Orders and Actions"; and Executive Order 14168, "Defending Women
from Gender Ideology Extremism and Restoring Biological Truth to the Federal
Government." Dkt. No. 62 at 3. All three Executive Orders are subject to ongoing
litigation, and courts have enjoined portions of them. *See, e.g.*, *Nat'l Assoc. of
Diversity Officers in Higher Educ. v. Trump*, Case No. 1:25-cv-00333-ABA (D. Md.
Fed. 2, 2025); *Am. Assoc. of Colleges for Tchr. Educ. v. Carter*, Case No. 1:25-cv-
00702-JRR (D. Md. Mar. 3, 2025); *N. Alaska Envtl. Ctr. v. Trump*, Case No. 3:25-cv-
00038 (D. Alaska Feb. 19, 2025); *Jones v. Trump*, Case No. 1:25-cv-00401 (D.D.C.
Feb. 10, 2025); *Kingdom v. Trump*, Case No. 1:25-cv-00691 (D.D.C. Mar. 7, 2025);
*Doctors for Am. V. Office of Pers. Mgmt. et al.*, Case No. 1:25-cv-00322 (D.D.C. Feb.
2, 2025).

1

2

agencies to handle USRAP processing abroad, *see* Dkt. No. 75 at 2 (Joint Status

Report). The Government acknowledges that this has caused a "significant

3

deterioration of functions throughout the USRAP," Dkt. No. 62 at 3.

4

The Court held an emergency status conference to address the Termination

5

Notices, at which the Government confirmed that each termination rests on the

6

same legal authority—2 C.F.R. § 200.340. The Court granted Plaintiffs leave to

7

amend their complaint and to file the pending motion for preliminary relief. *See*

8

Dkt. Nos. 51; 54. Plaintiffs move to enjoin the Government from "enforcing or

9

implementing any portion of Defendants' termination of USRAP-related funding

10

provided to resettlement partners through their cooperative agreements with the

11

U.S. State Department, including as reflected in the Termination Notices the U.S.

12

State Department sent to resettlement partners beginning on February 26, 2025."

13

Dkt. No. 57-1 at 3.

14

15

### 3. THRESHOLD JURISDICTIONAL QUESTIONS

16

**3.1    Defendants' pending appeal does not divest this Court of jurisdiction.**

17

"The filing of a notice of appeal is an event of jurisdictional significance—it

18

confers jurisdiction on the court of appeals and divests the district court of its

19

control over those aspects of the case involved in the appeal." *Griggs v. Provident*

20

*Consumer Disc. Co.*, 459 U.S. 56, 58 (1982). Because Defendants filed a notice of

21

appeal challenging this Court's original preliminary injunction, Dkt. No. 46, the

22

23

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING SECOND
PRELIMINARY INJUNCTION - 6

1    Court must first address its jurisdiction to consider Plaintiffs' motion for a second

2    preliminary injunction.

3         Courts of appeal generally have exclusive jurisdiction over matters directly

4    involved in a pending appeal, *see Griggs*, 459 U.S. at 58, but district courts retain

5    jurisdiction to issue orders that preserve the status quo and ensure compliance with

6    a prior injunction. *See Nat. Res. Def. Council, Inc. v. Sw. Marine, Inc.*, 242 F.3d

7    1163, 1166 (9th Cir. 2001). Rule 62(c) specifically authorizes district courts to

8    "suspend, modify, restore, or grant an injunction during the pendency of an appeal,"

9    provided doing so does not "materially alter the status of the case on appeal."

10   *Mayweathers v. Newland*, 258 F.3d 930, 935 (9th Cir. 2001).

11        Plaintiffs' motion for a second preliminary injunction regarding the Funding

12   Termination concerns Agency Defendants' actions taken *after* this Court's initial

13   injunction. This subsequent action—terminating cooperative agreements rather

14   than merely suspending them—represents a new agency policy or action that also

15   threatens to render the initial injunction ineffective. Accordingly, this Court has

16   jurisdiction to consider Plaintiffs' motion, as it seeks to preserve the Court's ability

17   to grant effective relief and to maintain the force of the Court's prior order. A ruling

18   here will not "'materially alter the status of the case on appeal.'" *Id.* (quoting *Nat.*

19   *Res. Def. Council, Inc.*, 242 F.3d at 1166).

20

21

22

23

**3.2    The Court has jurisdiction under the APA, as Plaintiffs' claims are not contract claims subject to the exclusive jurisdiction of the Court of Federal Claims.**

The APA provides a waiver of sovereign immunity allowing persons "adversely affected" by "final agency action" to obtain "judicial review thereof." 5 U.S.C. §§ 702, 704. That waiver, however, is subject to three limitations that could bar Plaintiffs' claims. *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1022 (9th Cir. 2023). First, "the plaintiff must 'seek[ ] relief other than money damages[.]'" *Id.* (quoting 5 U.S.C. § 702). Second, the relief sought "must not be 'expressly or impliedly forbid[den]' by 'any other statute.'" *Id.* (quoting 5 U.S.C. § 702). Third, "the plaintiff must have 'no other adequate remedy[.]'" *Id.* (quoting 5 U.S.C. § 704)*; see generally Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 645 (9th Cir. 1998).

The Government's jurisdictional challenge implicates all three of these limitations, as the Government suggests that Plaintiffs' claims, though pled under the APA, are essentially breach-of-contract claims that belong, if anywhere, in the Court of Federal Claims under the Tucker Act. Dkt. No. 61 (Opp.) at 1–3. As explained below, none of these limitations applies.

**3.2.1    Plaintiffs do not seek "money damages."**

Plaintiffs do not seek "money damages" under § 702, but rather an injunction vacating unlawful agency actions and compelling the Government to comply with its statutory and constitutional duties. The Supreme Court has carefully distinguished "money damages"—which substitute for a suffered loss—from

"specific remedies" that "attempt to give the plaintiff the very thing to which he was entitled." *Bowen v. Massachusetts*, 487 U.S. 879, 895 (1988). As this Court previously decided, "Plaintiffs here do not bring... claims for money damages." *See* Dkt. No. 45 at 40 (cleaned up). The fact that compliance with the injunction "may actually require a payment of money by the government" does not transform this into an action for "'money damages' under APA § 702." *Tucson Airport Auth.*, 136 F.3d at 645; *Bowen*, 487 U.S. at 891–901; *see also AIDS Vaccine Advoc. Coal. v. United States Dep't of State*, No. CV 25-00400 (AHA), 2025 WL 752378, at *8 (D.D.C. Mar. 10, 2025).

### 3.2.2    The Tucker Act does not "impliedly forbid" the relief sought by Plaintiffs.

The Government argues that the Tucker Act—which gives the Court of Federal Claims jurisdiction over contract claims against the United States— impliedly forbids the relief sought here. *See* 28 U.S.C. § 1491(a)(1). This argument hinges on characterizing Plaintiffs' claims as disguised contract claims rather than legitimate APA challenges. Courts use the *Megapulse* test to determine whether "an APA action seeking injunctive and declaratory relief" is essentially "a 'disguised' breach-of-contract claim" by looking to "(1) 'the source of the rights upon which the plaintiff bases its claims' and (2) 'the type of relief sought (or appropriate).'" *United Aeronautical Corp.*, 80 F. 4th at 1026 (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). "If rights and remedies are *statutorily* or *constitutionally* based, then districts courts have jurisdiction; if rights and remedies are *contractually* based then only the Court of Federal Claims does, even if the plaintiff

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

formally seeks injunctive relief." *Id.* This analysis turns on substance, not form. *Kidwell v. Dep't of Army, Bd. for Correction of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995).

        a.        <u>The USRAP cooperative agreements probably aren't enforceable "contracts" under the Tucker Act.</u>

As an initial matter, the Government fails to establish that its cooperative agreements under USRAP—the source of Plaintiffs' rights, according to the Government—are even "contracts" enforceable under the Tucker Act. To support Tucker Act jurisdiction, a contract must meet certain criteria that the Government does not address here and that cooperative agreements typically fail to meet. For instance, cooperative agreements generally do not confer a "direct" and "tangible" benefit on the United States—a requirement for Tucker Act jurisdiction. *See St. Bernard Par. Gov't v. United States*, 134 Fed. Cl. 730, 735–36 (2017), *aff'd*, 916 F.3d 987 (Fed. Cir. 2019) (finding that cooperative agreement to provide hurricane relief in New Orleans provided no direct or tangible benefit to the Government); *Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*, 703 F. Supp. 3d 126, 132–34 (D.D.C. 2023) (same with respect to cooperative agreement to build a water system in the Occupied West Bank); *compare* 31 U.S.C. § 6305 (principle purpose of cooperative agreements is to form a relationship that does not provide a direct, tangible benefit to the Government) *with* 31 U.S.C. § 6303 (principle purpose of procurement contracts is to provide a direct, tangible benefit to the government). Similarly, for a government contract to give rise to Tucker Act jurisdiction, it must be "money-mandating"—meaning it must give the contracting parties a substantive right to

1    recover damages in the event of breach—and the Court of Federal Claims has

2    frequently found that cooperative agreements are not. *See Rick's Mushroom Serv.,*

3    *Inc. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008) ("[Plaintiff's] breach of

4    contract claim arises from its cost-share agreement with the government; however,

5    the cost-share agreement does not provide a substantive right to recover money-

6    damages and [plaintiff] does not point to a money-mandating source of law[.]"); *St.*

7    *Bernard Par. Gov't*, 134 Fed. Cl. at 735 ("Since the Court construes the agreement

8    between the [agency] and the [plaintiff] as a cooperative agreement, damages

9    cannot be implied; therefore, the agreement is not money-mandating, unless the

10   [plaintiff] can point to a specific provision mandating a monetary recovery.").

11           That said, the Court need not resolve whether the USRAP cooperative

12   agreements constitute "contracts" enforceable under the Tucker Act because even

13   assuming they do, the *Megapulse* test makes plain that they are not the source of

14   the rights on which Plaintiffs base their claims.

15                   b.    <u>Plaintiffs assert rights derived from statutory mandates, not contractual promises.</u>

16           Even assuming the USRAP cooperative agreements are money-mandating

17   contracts enforceable under the Tucker Act, "the source of the rights upon which the

18   plaintiff[s] base[ ] [their] claims" is not contractual. *See Megapulse*, 672 F.2d at 968.

19   The Government contends that "the sole basis for Plaintiffs' claim is grounded in

20   the cooperative agreements." Dkt. No. 61 at 3. Not so. This assertion ignores that

21   most of the plaintiffs here, including individual refugees, are not parties to any

22   cooperative agreement. Their rights stem from the APA, which expressly "entitle[s]"

23

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING SECOND
PRELIMINARY INJUNCTION - 11

them to "judicial review" of "agency action[s]" that "adversely affect" them. 5 U.S.C. § 702. And when such actions are arbitrary, capricious, and contrary to statutory and constitutional law, the Court "shall… hold [them] unlawful and set [them] aside[.]" *See* 5 U.S.C. § 706.

The Government tries to analogize to cases like *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985), which held that the Tucker Act barred a government contractor's APA suit for money owed under a procurement contract. But the court in *Spectrum Leasing* distinguished cases in which the plaintiffs—even though contractors—"were not asserting a private right in their capacity as government contractors, but were instead… enforcing the requirements of [statutory law]." *Id.* at 894 n.4 (discussing *Nat'l Helium Corp. v. Morton*, 455 F.2d 650 (10th Cir.1971)); *see also Megapulse*, 672 F.2d at 971 (rejecting argument "that an agency action may not be enjoined, even if in clear violation of a specific statute, simply because that same action might also amount to a breach of contract"). This is plainly such a case—Plaintiffs seek to enforce statutory, not contractual, obligations.

        c.   <ins>*The relief sought is equitable enforcement of statutory obligations, not contractual remedies.*</ins>

The "relief sought" here is also non-contractual. *See Megapulse*, 672 F.2d at 968. The Government argues that the Funding Termination renders Plaintiffs' claims analogous to those in *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 298–99 (2020) (holding that action for "specific sums already calculated, past due, and designed to compensate for completed labors" belonged in Federal Court of

1
2
3
4
5
6

Claims). But unlike the plaintiffs in *Maine Community Health*—or those in *Ingersoll-Rand Co. v. United States*, 780 F.2d 74 (D.C. Cir. 1985), also cited by the Government, which concerned a procurement contract terminated "for convenience of the government" under a federal regulation—Plaintiffs here seek "prospective, nonmonetary relief to clarify future obligations." *Maine Cmty. Health*, 590 U.S. at 298.

7
8
9
10
11
12
13
14
15

Plaintiffs "are not seeking compensation for their losses due to the failure to pay them, which, as in any contract case, could be far greater than the amount withheld pursuant to the agency policy[.]" *See AIDS Vaccine*, 2025 WL 752378, at *8. Nor do they seek "a monetary judgment that would allow [them] to use the funds appropriated . . . for any purpose, without restriction." *See Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 201 (Fed. Cir. 1997). Rather, they seek vacatur of the Funding Termination and an injunction compelling the Government to meet its statutory obligations moving forward. The Tucker Act does not impliedly forbid such forward-looking equitable relief.

16
17

### 3.2.3    No "adequate remedy" is available in the Court of Federal Claims.

18
19
20
21
22
23

Even if Tucker Act jurisdiction were theoretically available, the Court of Federal Claims could not provide the equitable relief Plaintiffs seek. *See* 5 U.S.C. § 704. It lacks the power to set aside the Funding Termination and compel the Government to meet its statutory and constitutional obligations, for "the Court of Claims has no power to grant equitable relief." *Richardson v. Morris*, 409 U.S. 464, 465 (1973); *see also, e.g.*, *Nat'l Ctr. for Mfg. Scis*, 114 F.3d at 200

1
2
3
4

(reversing transfer to Court of Federal Claims of manufacturing consortium's APA claim against Air Force seeking to compel payment of millions of dollars due under cooperative agreement, in part because the relief sought extended beyond contractual damages).

5
6
7
8
9
10
11
12

The Government's argument that "[t]he termination of organizational Plaintiffs' cooperative agreements leaves those Plaintiffs with one remedy: to submit invoices for work performed and allow the State Department to assess the invoices under the terms of the agreements . . ." misses the mark. Dkt. No. 61 at 1. Plaintiffs seek prospective relief compelling the Government to meet its statutory obligations. The mere fact that such relief might require reinstating the cooperative agreements or paying out sums owed does not transform their claims into contract claims.

13
14
15
16
17

In summary, none of the APA limitations applicable to breach-of-contract claims applies here. Plaintiffs do not seek money damages, the Tucker Act does not impliedly forbid the requested relief, and no adequate remedy is available elsewhere. The Court therefore has jurisdiction to review Plaintiffs' APA claims challenging the Funding Termination.

18

**3.3    The Funding Termination cannot escape APA review.**

19
20
21

According to the Government, "the decision whether to terminate the contracts at issue here are decisions that are committed to agency discretion by law." Dkt. No. 61 at 7. And because the APA does not apply to actions that are

22
23

1    "committed to agency discretion by law," *see* 5 U.S.C. § 701(a), the Government

2    argues that the Funding Termination is not APA-reviewable.

3        This argument is easily dismissed, as it miscasts the narrow scope of the

4    committed-to-agency-discretion-by-law exception. The exception applies only when

5    "there is no law to apply"—that is, when the statutes at issue are "drawn so that a

6    court would have no meaningful standard against which to judge the agency's

7    exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985); *Citizens to Pres.*

8    *Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410-14 (1977) (*Overton Park*). Courts have

9    consistently distinguished between an agency's discretion in how it *implements*

10   statutory mandates (which may, in some instances, be unreviewable) and an

11   agency's attempt to *abandon* those mandates entirely (which is always reviewable).

12       The Government relies on *Lincoln v. Vigil* to argue otherwise. In *Vigil,* the

13   Supreme Court held that "allocation of funds from a lump-sum appropriation is [an]

14   administrative decision traditionally regarded as committed to agency discretion."

15   508 U.S. 182, 192–93 (1993). But the Court expressly limited its holding, clarifying

16   that "an agency is not free simply to disregard statutory responsibilities: Congress

17   may always circumscribe agency discretion to allocate resources by putting

18   restrictions in the operative statutes." *Id.* at 193; *see also Beno v. Shalala*, 30 F.3d

19   1057, 1067 (9th Cir. 1994) (finding *Vigil* distinguishable where "program contains

20   complex and detailed regulations and does not reveal a congressional commitment

21   to . . . unfettered discretion").

22       The Government's statutory obligation to carry out USRAP is mandatory.

23   When Congress established the program, it did not merely authorize but directed

the executive agency to create a "permanent and systematic procedure for the admission to this country of refugees." The relevant statutes contain specific directives, not mere suggestions that the agency may choose to ignore. Yet the Government admits that its suspension, followed by termination, of USRAP funding has caused "significant deterioration of functions throughout the USRAP," effectively kneecapping the program. Dkt. No 62 at 3.

To be sure, the Agency Defendants have significant discretion over how to administer USRAP, including which partners to work with, how much funding to allocate to specific initiatives, and what procedures to adopt. But they lack the discretion to effectively dismantle the program Congress established.

In sum, the Court finds that Plaintiffs' challenge to the Funding Termination presents a cognizable APA claim.

## 4. INJUNCTIVE RELIEF IS WARRANTED

### 4.1 Legal standard.

A preliminary injunction preserves the status quo pending a final decision on the merits of the case. *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1191 (9th Cir. 2024). As the Court recently explained in its February 28 Order, this extraordinary remedy requires Plaintiffs to establish four elements: (1) likelihood of success on the merits, (2) irreparable harm, (3) a favorable balance of equities, and (4) alignment with the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Under the Ninth Circuit's "sliding scale" approach, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiffs can support issuance of a preliminary injunction, so long as the plaintiffs also show that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021) (cleaned up).

**4.2    Plaintiffs have established that they will likely succeed on their APA claims.**

Plaintiffs have shown that they will likely succeed on their APA claims. "The [APA] was adopted to provide, inter alia, that administrative policies affecting individual rights and obligations be promulgated pursuant to certain stated procedures so as to avoid the inherently arbitrary nature of unpublished ad hoc determinations." *Morton v. Ruiz*, 415 U.S. 199, 232 (1974). To that end, "[t]he APA sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). It authorizes judicial review for those "suffering legal wrong" or "adversely affected" by a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. §§ 702, 704.

Courts must "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)–(D). In

reviewing agency action under the APA, the district court sits in equity and has the authority to fashion even "mandatory affirmative relief" if "necessary to accomplish justice." *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 680 (9th Cir. 2007) (quoting *Adams v. Witmer*, 271 F.2d 29, 38 (9th Cir. 1958)).

The Court now turns to its analysis of why the Funding Termination likely violates the APA.

### 4.2.1   The Funding Termination likely violates the statutory framework for refugee admission and resettlement.

The Funding Termination contravenes the comprehensive statutory scheme Congress established through the Refugee Act of 1980. Through this Act, Congress created a permanent and systematic framework for both the processing and admission of refugees abroad and their resettlement once in the United States. The Agency Defendants' actions have effectively dismantled this framework overnight, leaving no viable alternative for fulfilling the statutory mandates. *See* Dkt. No. 62 (Government Status Report) at 6.

The Refugee Act of 1980 demonstrates Congress's clear intent "to provide a permanent and systematic procedure for the admission to this country of refugees," as well as "comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted." Refugee Act of 1980, Pub. L. No. 96-212, § 101(b), 94 Stat. 102. To fulfill these purposes, Congress created the Office of Refugee Resettlement (ORR) within DHHS to fund and administer refugee assistance programs, "in consultation with the Secretary of State." *See* 8 U.S.C. § 1521(b). Congress also detailed the specific types of assistance that the executive

1    agency must provide, including "employment training and placement," "cash

2    assistance," and "English language training." 8 U.S.C. § 1522(a)(1)(A). Congress

3    mandated that this assistance be provided "to the extent of available

4    appropriations." *Id.*

5          The R&P Termination directly prevents refugees from obtaining the

6    "assurances" that they need under current agency policy to enter the country

7    through USRAP. Currently, refugees must receive an "assurance" from a domestic

8    resettlement agency with a qualifying R&P cooperative agreement before moving to

9    the United States. *See* Dkt. No. 15-3 at 30 (explaining that resettlement agencies

10   abroad obtain "domestic sponsorship assurances" for refugees as part of the

11   admissions process); *see also* Dkt. No. 68-1 ¶ 13 (explaining that resettlement

12   agencies handling USRAP processing abroad "[are] not permitted to finalize

13   processing" for a refugee who lacks an assurance). Through this "assurance"

14   process, resettlement agencies with R&P cooperative agreements (and their

15   affiliates) "agree[] to accept [USRAP] cases for management" in the United States.

16   *See* Dkt. No. 15-3 at 33. They then provide the R&P services required by

17   8 U.S.C. § 1522. *See id.* (listing services like "reception on arrival," "cultural

18   orientation," and "basic needs support . . . for at least 30 days). By terminating all

19   R&P cooperative agreements with every domestic resettlement agency within a 48-

20   hour window, DOS has made it so refugees cannot follow the Agency Defendants'

21   own resettlement policies.

22         Similarly, the Processing Termination has shuttered refugee processing for

23   whole regions of the world, thereby conflicting with the regional allocations of

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING SECOND
PRELIMINARY INJUNCTION - 19

refugees of special humanitarian concern explicitly provided for in the INA. *See* 8 U.S.C. § 1157(a)(3). These regional allocations were set forth by DOS, DHS, and DHHS just months ago in their report to Congress in support of the FY 2025 Presidential Determination. *See* Dkt. No. 15-3 at 40–53; *see also* Mar. 4 Tr. 8:3–5, 10:18–21 (confirming that termination of funding for some RSCs will prevent refugee processing in corresponding regions). The Government's elimination of refugee processing in these regions effectively nullifies the statutory scheme for determining refugee admissions.

Plaintiffs also assert that the Agency Funding Termination is contrary to law because it violates the Impoundment Control Act (ICA). With limited exceptions, the ICA precludes the Executive Branch from refusing to spend congressionally appropriated funds. *See generally*, 2 U.S.C. §§ 682(1)(A); 684(a)–(b). The ICA is a way to enforce, by statute, our Constitution's mandated separation of powers. *See City and Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231, 1234 (9th Cir. 2018) (any argument that "the President has a constitutional power to decline to spend appropriated funds, . . . is supported neither by reason nor precedent" (citation omitted)). But because the briefing on this issue is sparse, and because the Court need not reach the issue to decide this motion, the Court declines to rule on Plaintiffs' ICA argument for now.

### 4.2.2    The Agency Defendants' interpretation of § 1522(b) is contrary to law.

The Government argues it can terminate the cooperative agreements because 8 U.S.C. § 1522(b)(1)(A) merely authorizes, rather than mandates, DOS to make

grants and contracts with resettlement agencies. Dkt. No. 6–7. But this reading renders significant portions of the statute superfluous, violating a fundamental canon of statutory construction—courts must read statutes "wholistically, … giv[ing] effect to each word," and avoid "interpret[ing] a [statutory] provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." *R.J. Reynolds Tobacco Co. v. Cnty. of L.A.*, 29 F.4th 542, 553 (9th Cir. 2022) (quoting *Shelby v. Bartlett*, 391 F.3d 1061, 1064 (9th Cir. 2004)).

First, although § 1522(b)(1)(A) uses "authorized" rather than "required," the agency's obligation to provide services is clearly established in § 1522(a)(1)(A), which directs that assistance "*shall*" be made "for employment training and placement" and "English language training." 8 U.S.C. § 1522(a)(1)(A) (emphasis added). This language creates a statutory mandate that the agency must fulfill. The Government's position that it can terminate all resettlement cooperative agreements without providing an alternative mechanism for delivering these services would effectively nullify this statutory obligation.

Second, § 1522(b)(7) requires that any grant or contract "shall" obligate the agency receiving the grant or contract to fulfill specific responsibilities, including providing for basic needs of each refugee resettled and implementing a resettlement plan. This provision presupposes the existence of such grants or contracts for delivering these services, which reinforces the conclusion that Congress intended these mechanisms to be used to fulfill the statutory mandate.

Third, § 1522(b)(8) states that the administering agency "shall establish criteria" for awarding or renewing grants and contracts, and these criteria "shall

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

include" specific factors enumerated in subsections (A) through (F). The use of "shall" in this provision indicates a congressional directive that is not discretionary. Moreover, by requiring the agency to establish such criteria, Congress contemplated an orderly process for managing these agreements, not sudden termination of the entire system.

This section also instructs that the agency "shall use the criteria in the process of awarding or renewing grants and contracts under this paragraph." 8 U.S.C. § 1522(b)(8). This language limits agency discretion by specifying how the agency must decide on grants and contracts. The Government's abrupt termination of all cooperative agreements without reference to these statutorily mandated criteria runs contrary to this provision.

Thus, the Court finds that while the Government may have great leeway in how it administers USRAP, it cannot exercise that discretion in a manner that renders it unable to fulfill statutory obligations. The record shows that the Government has terminated all R&P cooperative agreements with resettlement agencies without providing any alternative mechanism for delivering the required services. *See* Dkt. No. 62 at 5. (Government Status Report). This action has effectively dismantled the infrastructure necessary to fulfill the Government's statutory obligations and is therefore contrary to law.

### 4.2.3    The Court rejects the Government's contrary arguments.

The Government advances several arguments to justify its actions, but none of them are likely to withstand judicial scrutiny.

1    First, the Government asserts that Secretary Rubio acted lawfully because

2   2 C.F.R. § 200.340 allows an executive agency to unilaterally terminate cooperative

3   agreements if they "no longer effectuate[ ] agency priorities." *See* Dkt. No. 61 at 8;

4   *see also* Dkt. Nos. 44-3; 44-5; 44-6 (Termination Notices). But this regulation only

5   allows agencies to terminate cooperative agreements "to the extent authorized by

6   law." *See* 2 C.F.R. § 200.340(a)(4). Thus, this regulation cannot authorize actions

7   that contravene statutory requirements, nor does it relieve DOS of its duty to follow

8   the law.

9    Second, the Government argues that the provisions of Section 1522(b) apply

10  only to R&P cooperative agreements (i.e., the R&P Termination) and *not* to

11  cooperative agreements covering USRAP-processing services abroad (i.e., the

12  Processing Termination). *See* Dkt. No. 61 at 5. Even if this interpretation were

13  correct,[2] it would not justify the Processing Termination, which contravenes the

14  Refugee Act by frustrating the system that Congress established for determining

15  which refugees are of special humanitarian concern. *See* 8 U.S.C. § 1157; *see also*

16  Dkt. No. 15-3 at 40–53.

17   Third, the Government asserts that Secretary Rubio may manage cooperative

18  agreements for USRAP-related work abroad "in whatever way he thinks is

19  appropriate" because "the Executive's authority is at its apex when spending money

20  abroad." Dkt. No. 61 at 5. This sweeping claim would effectively immunize any

21

22  [2] The Court is not so sure. *See* 8 U.S.C. § 1522(b)(2) (authorizing the Secretary of
23  State to implement programs that facilitate domestic resettlement in the United
    States "with respect to refugees awaiting entry into the United States").

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING SECOND
PRELIMINARY INJUNCTION - 23

agency action involving foreign spending from APA review. The Government cites no legal authority for this proposition, and the Court rejects it.

Fourth, the Government maintains that DOS was authorized to unilaterally terminate its R&P cooperative agreements because no law requires it to enter such agreements in the first place. *See id.* at 5–6. But this argument fails to recognize that while DOS may have flexibility in how it fulfills its statutory obligations, it cannot exercise that flexibility in a way that prevents it from meeting those obligations altogether. As explained above, the Government's interpretation would render superfluous the detailed statutory provisions in § 1522(b) specifying how grants and contracts must be managed.

Finally, the Government asserts that the relevant statutes—specifically the ICA—do not provide Plaintiffs with a cause of action. *See id.* at 7. This argument, however, miscomprehends the relevant legal framework. The APA itself provides the cause of action here, allowing judicial review of final agency action when there is no other adequate remedy available. *See* 5 U.S.C. § 702; *see also Sierra Club v. Trump*, 929 F.3d 670, 694 (9th Cir. 2019). Courts routinely analyze statutes during APA review to understand Congress's overall purpose, not to determine whether those statutes independently create causes of action. *See* 5 U.S.C. §§ 702, 704 (plaintiffs may seek APA review of final agency when there is *not* another adequate remedy available); *see also e.g.*, *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 669–70 (9th Cir. 2021) (finding that courts analyze statutes during APA review to understand Congress's overall purpose in enacting the statute—"not [to] determine whether Congress *intended* a cause of action to arise for the plaintiff in question").

1    For the reasons above, Plaintiffs have made a strong showing that the

2    Agency Defendants exceeded their statutory authority and acted contrary to law.

3    ### 4.2.4    The Agency Funding Termination is likely arbitrary and
4    capricious.

5    Plaintiffs also argue that the Funding Termination is unlawful because it is

6    arbitrary and capricious. Dkt. No. 57 at 8. The Court agrees that it likely is.

7    Under the Administrative Procedure Act (APA), courts must invalidate

8    agency actions found to be arbitrary or capricious. *See Ariz. Cattle Growers' Ass'n v.*

9    *U.S. Fish & Wildlife*, 273 F.3d 1229, 1236 (9th Cir.2001) (citing 5 U.S.C. §

10   706(2)(A)). This standard creates "a narrow scope of review of agency factfinding"

11   and agency reasoning. *Id*. To survive review, the "the agency [must] articulate[ ] a

12   rational connection between the facts [it] found and the choice [it] made." *Id*.; *see*

13   *also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009); *Arrington v.*

14   *Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008); *Sierra Club v. EPA*, 346 F.3d 955, 961

15   (9th Cir. 2003). The agency's decision must have been based "on a consideration of

16   the relevant factors." *Sierra Club*, 346 F.3d at 961 (quoting *Motor Vehicle Mfrs.*

17   *Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (*State Farm*)

18   (internal quotation marks omitted)).

19   Courts may only consider the facts that the agency reviewed during its

20   decision-making process. *See Overton Park*, 401 U.S. at 419. Post-hoc

21   rationalizations cannot justify an agency's actions, *id*., and the court may not "infer

22   an agency's reasoning from mere silence," *Arrington*, 516 F.3d at 1112 (citation

23   omitted). When no formal or informal record of agency factfinding can be found, "it

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING SECOND
PRELIMINARY INJUNCTION - 25

1   may be that the only way there can be effective judicial review is by examining the

2   decisionmakers themselves." *Overton Park*, 401 U.S. at 420.

3       Agencies must follow specific procedures when changing course from

4   established policies—agencies must acknowledge a changed position rather than

5   merely departing from prior policy *sub silentio* or disregarding existing rules. *Fox*

6   *Television Stations,* 556 U.S. at 515. And when an agency effectively rescinds its

7   existing, "longstanding" policies, it must consider any "serious reliance interests" it

8   may have engendered, "determine whether they [are] significant, and weigh [them]

9   against competing policy concerns." *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30,

10  33 (2020) (cleaned up). Also, the agency must consider alternatives to its policy

11  change that are "within the ambit of existing [policy]." *Id.* at 30 (alteration in

12  original) (quoting *State Farm*, 463 U.S. at 42)). Failure to take any of these steps

13  renders a decision arbitrary and capricious. *Id.*

14      The Court finds strong evidence that the Funding Termination is arbitrary

15  and capricious. Most fundamentally, DOS provided no factual findings or bases for

16  its termination decisions, making it impossible to "articulate[] a rational connection

17  between the facts [it] found and the choice [it] made." *Ariz. Cattle Growers' Ass'n*,

18  273 F.3d at 1236; *see also State Farm*, 463 U.S. at 43. This marks the Funding

19  Termination as arbitrary and capricious because it constitutes a shift in agency

20  policy without any reasoned explanation. *See generally* Dkt. No. 15-3 (official report

21  to Congress by Agency Defendants outlining USRAP policy and plan for FY 2025).

22      The Government has failed to show that the Agency Defendants ever

23  assessed the reliance interests they engendered through their longstanding USRAP

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING SECOND
PRELIMINARY INJUNCTION - 26

infrastructure and standard USRAP practices. Nor has the Government shown that the Agency Defendants "weigh[ed] any such interests against competing policy concerns," *see Regents of Univ. of Cal.*, 591 U.S. at 33, or that they considered alternatives to the Funding Termination that fell "within the ambit of existing [policy]," *see id.* at 30 (quoting *State Farm*, 463 U.S. at 51). To be sure, the Agency Defendants' may change their "view of what is in the public interest," but they "must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored[.]" *Nw. Envtl. Def. Ctr.*, 477 F.3d at 687 (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.1970)). And "if an agency glosses over or swerves from prior precedents without discussion," as the Agency Defendants have done here," they likely "cross the line from the tolerably terse to the intolerably mute." *Id.* at 687–88.

Plaintiffs also argue that they will succeed on their APA claims under the *Accardi* doctrine, which is "the legal proposition that agencies may be required to abide by certain internal policies." *Alcaraz v. INS*, 384 F.3d 1150, 1162 (9th Cir. 2004); *see also Emami v. Nielsen*, 365 F. Supp. 3d 1009, 1020 (N.D. Cal. 2019). But the Court finds it unnecessary to reach this issue having already determined the Funding Termination is likely arbitrary and capricious.

### 4.3    Plaintiffs will suffer irreparable harm absent a preliminary injunction.

In its first Preliminary Injunction Order, the Court concluded that Plaintiffs were likely to suffer irreparable harm due to the Agency Funding Suspension

absent an injunction. *See* Dkt. No. 45 § 3.6. The Court adopts the same reasoning here, finding that it applies with even greater force to the Funding Termination.

In sum, the Court found concrete evidence of devastating harm to both individual and organizational plaintiffs. *See id*. These included an inability to access USRAP, the prolonged separation of refugee families, the inability of the resettlement agencies to perform their core functions, and the cash-flow crises that the resettlement agencies experienced due to their sudden lack of funding. *See id*. Indeed, the Court found that suddenly refusing to fund the resettlement agencies under their grant and cooperative agreements "has forced them to furlough or lay off hundreds of staff members, cancel obligations, and halt essential refugee services." *See* Dkt. No. 45 at 54. These harms pose "an existential threat to their survival, as the combination of staff reductions, loss of institutional knowledge, damaged community partnerships, and declining service quality threatens to permanently shut down their operations." *See* Dkt. No. 45 at 54. Unsurprisingly, the organizational Plaintiffs argue that the situation will only become more dire if the Termination Notices are not enjoined. *See* Dkt. No. 58-2 ¶ 12 (Decl. of President of HIAS); *see also* Dkt. No. 58-3 ¶ 13 (Decl. of Richard L. Santos).

The Government's arguments to the contrary are unconvincing. First, the Government contends that the "Organizational Plaintiffs can claim no irreparable harm . . . because the government has terminated the cooperative agreements," such that "the only relief now available to [them] is *money damages*." Dkt. No. 61 at 7. This argument relies on the unjustified presumption that the Agency Funding

1    Termination was lawful, even though Plaintiffs have made a strong showing that it

2    was not. *See supra* § 4.2.1.

3        The Government also asserts that the individual Plaintiffs face no

4    irreparable harm because they can still access USRAP—just not through

5    resettlement organizations. Dkt. No. 61 at 7. But this argument ignores the

6    evidence that the individual Plaintiffs submitted showing that they cannot access

7    R&P benefits. *See* Dkt. Nos. 68-2 (Decl. of Plaintiff Ali); 68-3 (Decl. of former ORR

8    Deputy Director) (distinguishing R&P services from ORR funds); *see also* Dkt. No.

9    62 at 6 (Government Status Report). It also ignores the fact that the R&P

10   Termination prevents refugees awaiting entry into the United States from

11   obtaining the requisite R&P agency "assurance." *See supra* § 4.2.1. Additionally, the

12   Government's March 10 status report confirms that the Agency Defendants have

13   not offered an alternative to the USRAP services previously provided by

14   resettlement agencies under cooperative agreements. *See* Dkt. No. 62 at 6

15   (conceding that domestic refugee resettlement infrastructure is functionally

16   inoperative while the Government considers new alternatives to the established

17   system).

18       Accordingly, the Court finds that Plaintiffs will suffer irreparable harm

19   absent an injunction of the Agency Funding Termination.

20   **4.4    The balance of the equities and public interest support a preliminary
         injunction.**

21

22       When it granted Plaintiffs' first motion for a preliminary injunction, the

23   Court concluded that the third and fourth *Winter* factors supported enjoining the

1    Agency Funding Suspension. *See* Dkt. No. 45 § 3.7. The Court's reasoning is the

2    same here. *See id.* To summarize, the harms Plaintiffs face are "mostly irreversible

3    and warrant immediate intervention to stop more harm from befalling [them]." *Id.*

4    And "[t]he public interest is not served by maintaining executive actions that

5    conflict with federal law." *Id.* (citing *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006,

6    1029 (9th Cir. 2013)). The Government's arguments on these *Winter* factors pertain

7    primarily to the scope of the relief, which the Court addresses below. Ultimately,

8    the Court concludes that the third and fourth *Winter* factors support preliminary

9    injunctive relief here.

10                              **5.  SCOPE OF RELIEF**

11          In its previous preliminary injunction Order, the Court addressed the Agency

12    Defendants' unlawful suspension of USRAP operations and funding, explaining why

13    nationwide relief was appropriate to preserve the status quo. The instant request

14    for relief raises a different question: whether this Court may compel the Executive

15    to reinstate and resume cooperative agreements that it has formally terminated.

16          The Government contends the Court lacks the power to order "specific

17    performance" by the United States of an alleged contractual obligation, citing

18    several cases in support. Dkt. No. 61 at 4. But these cases only reiterate the well-

19    established principle that claims seeking contractual remedies against the federal

20    government do not belong in district court. *See Ingersoll-Rand*, 780 F.2d at 80;

21    *Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir. 1989); *B.K. Instrument,*

22    *Inc. v. United States*, 715 F.2d 713, 727-28 (2d Cir. 1983). As discussed above,

23    Plaintiffs seek statutory, not contractual, remedies. *See infra* § 3.2.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING SECOND
PRELIMINARY INJUNCTION - 30

1

2

3

To be clear, the mere fact that the government's statutory obligations sometimes overlap with its contractual obligations does not prevent district courts from compelling statutory compliance. As the D.C. Circuit reasoned in *Megapulse*:

> It is one thing to rely on the generally recognized rule that a plaintiff cannot maintain a contract action in either the district court or the Court of Claims seeking specific performance of a contract. It is quite another to claim, as the Government does in this case, that an agency action may not be enjoined, even if in clear violation of a specific statute, simply because that same action might also amount to a breach of contract. Government's counsel admitted at oral argument that by the logical inference of its position the government could avoid injunctions against activities violative of a statutory duty simply by contracting not to engage in those activities. Because government involvement in any such activities would thereby also constitute a breach of a contract term, any injunction would be equivalent to an award of specific performance, which, as a matter of public policy, is not available against the government. We cannot accept such an interpretation of the law for many of the same reasons we refuse automatically to classify claims raising contract issues as "contract actions."

> It is clear to us that so long as an action brought against the United States or an agency thereof is not one that should be classified from the outset as a "contract action" for Tucker Act purposes, its remedies are also not contract-related, and the mere fact that an injunction would require the same governmental restraint that specific (non)performance might require in a contract setting is an insufficient basis to deny a district court the jurisdiction otherwise available and the remedial powers otherwise appropriate.

*Megapulse*, 672 F.2d at 971.

In other words, district courts can issue contract-related remedies in cases against the government—such as ordering the government to honor its contractual obligations or to reinstate wrongfully terminated agreements—if such remedies are warranted by *extracontractual* law. *See, e.g.*, *Rowe v. United States*, 633 F.2d 799, 800–802 (9th Cir. 1980) (affirming district court jurisdiction over APA claim challenging government leasing decision even where plaintiffs raised contract claim

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING SECOND
PRELIMINARY INJUNCTION - 31

alongside APA claim); *Laguna Hermosa Corp. v. Martin*, 643 F.2d 1376, 1379 (9th Cir. 1981) (holding that "Tucker Act [did] not impliedly forbid the issuance of a declaratory judgment stating that [plaintiff] possesse[d] contract rights against the United States" where plaintiffs' right to declaratory judgment stemmed from statutory law); *N. Side Lumber Co. v. Block*, 753 F.2d 1482, 1486 (9th Cir. 1985) ("Like the claims in *Laguna Hermosa* and *Rowe*, the statutory claim does not seek a declaration of contract rights against the government. Rather, it asks for a declaration that, whatever the content of those rights, federal statutes preclude the government from enforcing them."); *Nat'l Ctr. for Mfg. Scis.*, 114 F.3d 196 (affirming district court jurisdiction over manufacturing consortium's APA claim seeking to compel Air Force to release funds appropriated by Congress and promised to consortium under cooperative agreement, despite presence of contract claim seeking specific performance); *National Helium*, 455 F.2d 650 (affirming injunction compelling Secretary of Interior to reinstate helium-conservation contract that was terminated in violation of statutory law).

More specifically, when federal agencies terminate grants or cooperative agreements in violation of the APA, district courts can set aside the termination and effectively compel the government to reinstate the agreements. *See, e.g.*, *Pol'y & Rsch., LLC v. United States Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62 (D.D.C. 2018) (J. Jackson) (vacating termination of grant funding under Teen Pregnancy Prevention Program); *Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 328 F. Supp. 3d 1133 (E.D. Wash. 2018) (same; ordering government to "continue Plaintiffs' cooperative agreements under

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING SECOND PRELIMINARY INJUNCTION - 32

the TPP Program"); *Purpose Built Fams. Found., Inc. v. United States*, 95 F.4th 1346 (11th Cir. 2024) (discussing approvingly imposition of TRO vacating arbitrary and capricious termination of grant funding under cooperative agreement, even where termination was triggered by audit identifying fiscal mismanagement); *American Ass'n of Colleges for Teacher Educ., et al., v. Linda McMahon, et al.*, No. 1:25-CV-00702-JRR, 2025 WL 833917 (D. Md. Mar. 17, 2025) ("Defendants are ordered to reinstate the Grant Awards for Plaintiffs' members who are Grant Recipients… [and] Defendants shall not… terminate[ ] any… awards in a manner this court has determined is likely unlawful as violative of the APA[.]").

Importantly, vacating the unlawful Funding Termination—and thereby compelling reinstatement of the cooperative agreements—differs from an order of specific performance. Plaintiffs request only an injunction prohibiting the Government "from enforcing or implementing any portion of Defendants' termination of USRAP-related funding." *See* Dkt. No. 57-1. Such an injunction does not encroach upon the Government's unquestioned discretionary authority, moving forward, to enter and terminate cooperative agreements *in compliance with the law*. The Government is only bound to retain the USRAP cooperative agreements if, as Plaintiffs argue, it "cannot… meet its statutory obligations… without maintaining the cooperative agreements[.]" Dkt. No. 67 at 7. At present, the Court makes no finding about the Government's capacity to meet its statutory obligations without its long-standing USRAP partners.

Because the *Winter* factors are met, this Court has "the ability and indeed the juristic duty to remedy [the] violation." *See Nw. Envtl. Def. Ctr.*, 477 F.3d at 681

(setting aside agency action transferring government contract from one entity to another) ("[W]e are confident that we retain the power to require [the agency] to fund the [original contractor], at least for a period of time in which [the agency] can reconsider its action in accordance with our opinion."). This Court's decision to compel nationwide reinstatement of the USRAP cooperative agreements "rests on the constitutional authority of Congress, and the respect that the Executive and the Judiciary properly owe to Congress in the circumstances here." *In re Aiken Cnty.*, 725 F.3d 255, 267 (D.C. Cir. 2013) (J. Kavanaugh) (granting mandamus compelling Executive to spend congressionally allocated funds despite its "policy objections" against doing so). Such relief, the Court concludes, is "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

## 6. INJUNCTION BOND

The Government moves to require Plaintiffs to post an injunction bond as security. Dkt. No. 63. Although this request was calendared for April 1, 2025, and concerns the previously issued injunction rather than the current one, judicial economy favors addressing it now.

Federal Rule of Civil Procedure 65(c) establishes the general framework for injunction bonds, stating that courts "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Despite the seemingly mandatory language, Rule 65(c) invests the district court with discretion

as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (citations and internal quotation marks omitted). "In particular, the district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id.* (cleaned up) (citation and internal quotation marks omitted).

The Government argues that a bond is warranted because "Congress has appropriated nearly $4 billion dollars to refugee funding." Dkt. No. 63 at 3. The Court is not persuaded. The requested relief merely compels the Government to spend funds that have already been appropriated by Congress, and whose expenditure is mandatory. Thus, any "cost to the government, in the event it is found to have been wrongfully enjoined, would be minimal." *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999). Further, the Court's order does not deprive the Government of discretion to *lawfully* terminate the cooperative agreements. It merely restores the status quo before the improper termination.

Given the balance of equities and the public-interest motivation behind this litigation, the Court finds that no security bond is necessary to cover the costs to the Government if it is found to have been wrongfully enjoined. The Court waives the bond requirement on the injunction already in place, Dkt. Nos. 39, 45, and the present one.

The motion at Dkt. No. 63 is DENIED.

## 7. CONCLUSION

The Court GRANTS Plaintiffs' motion for a preliminary injunction, Dkt. No. 57, and ORDERS as follows:

1

2

(a) The terms of the preliminary injunction issued by the Court on
February 25, 2025, Dkt. Nos. 39, 45, remain in effect;

3

4

5

6

7

8

9

10

11

(b) Defendants, except for President Trump individually, and all their
respective officers, agents, servants, employees and attorneys, and any
person in active concert or participation with them who receive actual
notice of this order, are hereby fully enjoined from enforcing or
implementing any portion of Defendants' termination of USRAP-
related funding provided to resettlement partners through their
cooperative agreements with the U.S. State Department, including as
reflected in the Termination Notices the U.S. State Department sent to
resettlement partners beginning on February 26, 2025.

12

13

14

15

16

(c) Defendants are ordered to reinstate all cooperative agreements
terminated pursuant to the Termination Notices to their status as they
existed immediately before February 26, 2025, including but not
limited to agreements to provide reception and placement services and
to provide USRAP processing support abroad.

17

18

19

20

(d) Defendants are prohibited from terminating any USRAP cooperative
agreements without complying with applicable statutory requirements
and administrative procedures mandated by the Administrative
Procedure Act, as described herein.

21

22

23

(e) Defendants' attorneys shall provide written notice of this Order to all
Defendants and agencies and their employees, contractors, and
grantees by March 31, 2025, at 5:00 p.m. (Pacific Standard Time).

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING SECOND
PRELIMINARY INJUNCTION - 36

Defendants shall file a copy of the notice on the docket at the same time.

(f) Defendants' attorneys shall submit a status report detailing their efforts to comply with this Court's preliminary injunction on the supplemental pleadings by March 31, 2025, and the Parties shall submit a joint status report on the steps taken to comply with the Court's preliminary injunction on the supplemental pleadings by April 7, 2025.

(g) No security bond is required under Federal Rule of Civil Procedure 65(c).

(h) This preliminary injunction remains in effect pending further orders from this Court.

It is so ORDERED.

Dated this 24th day of March, 2025.

Jamal N. Whitehead
United States District Judge