April 9, 2025

```
                  UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF WASHINGTON AT SEATTLE
```
_____

```
PLAINTIFF PACITO; PLAINTIFF ESTHER; )
PLAINTIFF JOSEPHINE; PLAINTIFF SARA;)
PLAINTIFF ALYAS; PLAINTIFF MARCOS;  )
PLAINTIFF AHMED; PLAINTIFF RACHEL;  )   CASE NO. C25-00255-JNW
PLAINTIFF ALI; HIAS, INC.;          )
CHURCH WORLD SERVICE, INC.; and     )   Seattle, Washington
LUTHERAN COMMUNITY SERVICES         )
NORTHWEST,                          )   April 9, 2025
                                    )
                    Plaintiffs,     )   MOTION HEARING
                                    )
v.                                  )
                                    )
DONALD J. TRUMP, in his official    )
capacity as President of the        )
United States; MARCO RUBIO, in      )
his official capacity as            )
Secretary of State; KRISTI NOEM,    )
in her official capacity            )
as Secretary of Homeland Security;  )
DOROTHY A. FINK, in her official    )
capacity as Acting Secretary of     )
Health and Human Services,          )
                                    )
                    Defendants.     )
                                    )
                                    )
                                    )
                                    )
                                    )
```
_____

```
                VERBATIM REPORT OF PROCEEDINGS
           BEFORE THE HONORABLE JAMAL N. WHITEHEAD
                UNITED STATES DISTRICT JUDGE
```
_____

APPEARANCES:

For the Plaintiffs:      Linda B. Evarts
                         International Refugee Assistance Project
                         One Battery Park Plaza
                         33rd Floor
                         New York, NY 10004

                         Megan Mclaughlin Hauptman
                         International Refugee Assistance Project
                         650 Massachusetts Avenue NE, 6th Floor
                         Washington, DC 20001

                         Jonathan Patrick Hawley
                         Perkins Coie
                         1201 3rd Avenue, Suite 4900
                         Seattle, WA 98101-3099

                         Melissa S. Keaney
                         International Refugee Assistance Project
                         PO Box 2291
                         Fair Oaks, CA 95628


For the Defendants:      Benjamin Mark Moss
                         Joseph McCarter
                         United States Department of Justice
                         PO Box 878
                         Ben Franklin Station
                         Washington, DC 20044


Reported by:             Nancy L. Bauer, CCR, RPR
                         Federal Court Reporter
                         700 Stewart Street, Suite 17205
                         Seattle, WA 98101
                         nancy_bauer@wawd.uscourts.gov

```
 1                        Motion Hearing
                           1:30 p.m.
 2       _____

 3            THE CLERK:  This is the matter of Pacito, et al.,

 4       versus Trump, et al., Cause No. C25-255, assigned to this court.

 5         Counsel, please make your appearances for the record.

 6            MR. HAWLEY:  Good afternoon, Your Honor.  I'm Jonathan

 7       Hawley, from Perkins Coie, for plaintiffs.

 8            MS. KEANEY:  Good afternoon, Your Honor.  Melissa

 9       Keaney, with the International Refugee Assistance Project, for

10       plaintiffs.

11            MS. EVARTS:  Good afternoon, Your Honor.  Linda

12       Evarts, also of the International Refugee Assistance Project,

13       for plaintiffs.

14            MS. HAUPTMAN:  Megan Hauptman, also of the

15       International Refugee Assistance Project, for plaintiffs.

16            THE COURT:  Good afternoon.

17            MR. MOSS:  Good afternoon, Your Honor.  Benjamin Mark

18       Moss for the United States.

19            MR. MCCARTER:  Good afternoon, Your Honor.  Joseph

20       McCarter for the United States.

21            THE COURT:  All right.  Good afternoon, all.  Please

22       be seated.

23         There are several motions pending before the court,

24       including the government's recent motion for reconsideration, as

25       well as the plaintiffs' motion to enforce this court's
```

```
 1   injunctions.

 2       So I think I'd like to begin with the motion for

 3   reconsideration.  I am aware that there was a filing this

 4   morning in the circuit seeking clarification, but there is still

 5   an outstanding motion before this court, so I would like to

 6   start there.

 7       So who will address that motion on behalf of the government?

 8           MR. MOSS:  I will, Your Honor.

 9           THE COURT:  All right.  Please make your way to the

10   lectern.

11           MR. MOSS:  May it please the court, Benjamin Mark Moss

12   for the United States.

13       As to the government's reconsideration motion, I'd like to

14   begin to frame it with the government's compliance with the

15   first.  And then once it became known that there was a dispute

16   about the meaning of the Ninth Circuit's order, the government

17   sought clarification from the Ninth Circuit.  We're hopeful that

18   the Ninth Circuit will soon give guidance and will confirm that

19   the government has been compliant.

20       And as to the motion to reconsider, as to the second

21   preliminary injunction, we believe that the proper

22   interpretation of the Ninth Circuit's ruling, essentially,

23   requires that outcome inasmuch as that court has largely said

24   that the injunction needs to be paused -- the first injunction

25   needs to be paused at this time.
```

1          That's, sort of, the thrust of it.

2          THE COURT:  All right.  Well, as I look at the text of

3   the Ninth Circuit's order, I mean, it's clear that it creates a

4   carve-out for refugees who were conditionally approved prior to

5   the USRAP EO orders issuance.  So I'm trying to understand the

6   purpose of that carve-out and reconciling it with the

7   government's interpretation of the order.

8          I mean, if I were to read the order in the way that the

9   government suggests, what is the point of the carve-out?  Is it

10  simply just to preserve a legal status?  That seems hollow to me

11  in the context of the case and the circuit's larger order.

12         MR. MOSS:  Your Honor, the government's reading of the

13  Ninth Circuit's order is that the Ninth Circuit has looked at

14  the question of people who have made their way some of the way

15  through the refugee approval process.  They haven't gotten all

16  the way there yet.  They have received conditional approval, and

17  the Ninth Circuit was concerned that, without clarifying that

18  the government couldn't revoke those conditional approvals, that

19  that could occur, and, therefore, that is the government's

20  understanding of that paragraph.

21         But then as to everything else -- and I believe the precise

22  phrase that we all, I'm sure, will be discussing today, in all

23  other respects -- that, in all other respects, everything else

24  was stayed.

25         THE COURT:  Okay.  And the arguments that the

 1   government advances as it relates to the per curium opinion that

 2   just came from the Supreme Court in the *Department of Education*

 3   *v. California,* what new rule does that case, that order

 4   announce?

 5              MR. MOSS:  Your Honor, the Supreme Court's ruling in

 6   *Department of Education v. California,* from just this past

 7   Friday, if I'm getting it right, I'm not prepared to say whether

 8   it announced a new rule.  It did, however, reaffirm that the

 9   APA's limited waiver of sovereign immunity does not apply to

10   orders seeking to enforce contractual obligations against the

11   government.

12              THE COURT:  And so, in that way, I mean, there's no

13   new rule that's announced.  It's just the application of the

14   existing rules to the facts of that case.  Would you agree?

15              MR. MOSS:  I, respectfully, am not able to take a

16   position on whether it announces a new rule.  I can say that the

17   principles that we've been discussing have been consistent with

18   what the government put forward in the past.

19              THE COURT:  And those principles, I mean, they were

20   addressed -- I'd like to think, thoughtfully -- in the court's

21   second preliminary injunction order.  I mean, those were the

22   same rules that the Supreme Court was grappling with.

23        So really what we're talking about is the application of

24   the existing rules to the facts of this case.  That's what the

25   government takes issue with.

1          MR. MOSS:  I appreciate Your Honor's characterization.

2   I, unfortunately, am still not able to take a position on

3   whether it's a new rule, with respect, Your Honor.

4          THE COURT:  All right.  Is there anything else you'd

5   like to tell me about the government's motion to reconsider?

6          MR. MOSS:  Not unless the court has any other

7   questions.

8          THE COURT:  All right.  Thank you.

9          MR. MOSS:  Thank you, Your Honor.

10          THE COURT:  Who will address the motion on behalf of

11   the plaintiffs?

12          MR. HAWLEY:  Good afternoon, Your Honor.  Jonathan

13   Hawley for plaintiffs.  I will be addressing just this limited

14   argument here.  Ms. Hauptman will be presenting arguments for

15   plaintiffs, primarily, today, with Ms. Evarts answering the

16   court's specific questions.  But I'll begin with the last point

17   that you raised about the Supreme Court's *Department of*

18   *Education* stay order.

19          As you said, that order did not announce a new rule from

20   the Supreme Court.  *Bowen v. Massachusetts* remains good law.

21   The Supreme Court has, time and time again, cautioned courts

22   against divining new rules and new precedent, even in the

23   context of a normal opinion of the court, let alone a stay

24   order.  *Agostini v. Felton*, is the case -- one of them -- for

25   that proposition.

 1          So the court shouldn't read into a limited stay order the

 2     overturning of *Bowen v. Massachusetts.*  And on the facts, as

 3     well, the *Department of Education* case is very different.  In

 4     that case, the TRO the district court granted, quote, required

 5     the government to pay out past-due grant obligations and to

 6     continue paying obligations as they accrue.  The order required

 7     the enforcement of contractual obligations, in other words.

 8          Here, neither the first nor second preliminary injunction

 9     orders issued by this court required the government or ordered

10     the government to fulfill contractual obligations.

11          There might have been a piece of the preliminary injunction

12     orders that centered on the funding of USRAP programs, but that

13     was an incidental and injunctive component of the order that the

14     USRAP resume.

15          It was injunctive relief the plaintiff sought.  It was

16     injunctive relief that the court ordered.  It did not order the

17     enforcement of contractual obligations.  And, indeed, plaintiffs

18     do not bring contract claims that must be heard in the court of

19     federal claims under the Tucker Act.  We seek injunctive relief,

20     and we properly bring APA claims, as *Bowen v. Massachusetts*

21     holds, which is, again, still good law.

22          On the other point for the motion for reconsideration, as

23     you noted, the government has sought clarification from the

24     Ninth Circuit.

25          I will also point out that, under the Ninth Circuit rules,

1   motions for clarification are generally disfavored, generally

2   not granted, and usually used for purposes when there's been

3   some sort of intervening issue of law or a legal point that the

4   panel missed, and that is not the case here.

5        The government moves the Ninth Circuit to endorse its

6   preferred view of the stay order, but that should have no effect

7   on this court's enforcement of the first preliminary injunction,

8   as clarified and as partially stayed by the Ninth Circuit, nor,

9   certainly, enforcement of the second preliminary injunction

10  order.

11            THE COURT:  All right.  Thank you, Mr. Hawley.

12       I certainly have my read of the Ninth Circuit's order.  I

13  think I made that clear in the court's ruling denying the

14  request for a stay of the preliminary injunction -- the second

15  injunction last week.  So I certainly staked out my position,

16  but I'm surprised to hear that there is disagreement.  But be

17  that as it may, that's where we are right now.

18       What's your take as to how this court should proceed, given

19  that we've got the motion for clarification that is now pending

20  before the Ninth Circuit?

21       Wouldn't it be advisable to -- I don't know -- at least,

22  slow down or pause as to the enforcement route that we are

23  headed down otherwise while we wait for clarification from the

24  circuit?

25            MR. HAWLEY:  No, Your Honor.  As you pointed out,

1    there is a stay order that was issued by the Ninth Circuit.  It

2    has been interpreted by this court, and I will let Ms. Hauptman

3    press the particulars of this, but I will just stress that all

4    due haste from this court is not only appropriate but required,

5    given that the government, in the weeks since this court issued

6    its first preliminary injunction, has done next to nothing to

7    comply with that injunction, and even those minimal steps that

8    it had taken originally is now ceased because of its erroneous

9    interpretation of the Ninth Circuit order.

10        So given the urgency of these issues and the fact that

11   there are active rulings by both this court and the Ninth

12   Circuit requiring the processing of conditionally approved

13   refugees from before January 20th, 2025, plaintiffs would submit

14   that slowing down is not only inappropriate, but it would

15   undermine the order of Ninth Circuit that we are asking this

16   court to enforce, as well as its own preliminary injunction

17   orders.

18        THE COURT:  Okay.  Thank you.

19   All right.  Typically, the moving party has the last word

20   on the motion.  Mr. Moss, is there anything else that you'd like

21   to add?

22        MR. MOSS:  Thank you, Your Honor.  I didn't address

23   this before because I wasn't quite sure the scope of the court's

24   questioning at the moment, but since my colleague on the other

25   side has brought up and Your Honor has raised the question, if I

1    may address the question of what to do about the pace, in light

2    of the government's pending motion for clarification before the

3    Ninth Circuit?

4              THE COURT:  Yes, certainly.  I'll hear you out.

5              MR. MOSS:  Thank you.

6         As soon as the government realized that there was this

7    dispute and, certainly, that Your Honor had taken the

8    plaintiffs' view of the question of what the Ninth Circuit's

9    order meant, and I believe that Your Honor issued a ruling on

10   this past Friday.  I believe it was either one or slightly over

11   one business day later that the government swiftly sought the

12   Ninth Circuit's clarification.

13        Because we believe that the Ninth Circuit is the court in

14   the best position to interpret its own order, we are hopeful

15   that the court will soon give clarity on this question, which

16   will, I'm sure, inform, also, the responses to the court's

17   questions about the pending motion to enforce.

18        Given that the Ninth Circuit stands poised to resolve a

19   question fundamental to that pending motion, we think, for

20   judicial economy, as well as to avoid possibly conflicting

21   orders from different courts where there's questions about what

22   obligations attach, we do think that it would be prudent to wait

23   for that process to unfold.

24        Thank you.

25             THE COURT:  All right.  Thank you.

1      All right.  I'm going to take the argument of the parties

2  into consideration, but I'll tell you that I will have a ruling

3  out by the end of the day on the motion to reconsider.  So I'll

4  leave it at that on that point.

5      So with that, let's turn to the motion to enforce.

6  Ms. Hauptman, I understand you'll be arguing for plaintiffs.

7      MS. HAUPTMAN:  Your Honor, with the court's

8  indulgence, I'll be presenting opening remarks on the motion to

9  enforce, and my colleague, Ms. Evarts, will be taking any

10  questions, if that's all right with the court.

11      THE COURT:  Yes, I'll allow that.  Typically, in this

12  district, we don't split argument in that way, but I'll

13  certainly provide for it here, given the scope and vastness of

14  the record.

15      MS. HAUPTMAN:  Thank you very much, Your Honor.

16  Good afternoon.

17      It has now been a month and a half since the court issued

18  its first preliminary injunction, and now defendants say that

19  they do not have to comply not only with the first conjunction,

20  but also with the second injunction.

21      Defendants don't grapple with the specific relief that

22  plaintiffs have requested in their motion to enforce in order to

23  restore the status quo and daily reporting.  But defendants'

24  actions make crystal clear that relief of this nature is

25  warranted.

1    Defendants now acknowledge that they're doing nothing to

2    process and admit conditionally approved refugees, and they're

3    reneging even on processing and travel for follow-to-join

4    beneficiaries, one of the only meaningful steps that they had

5    taken towards compliance.

6    At the same time, defendants have reinstated all of the

7    terminated cooperative agreements, and then turned around and

8    immediately resuspended the same agreements.

9    They rely on a tortured reading of the Ninth Circuit's

10    partial stay to justify their blatant refusal to follow either

11    order.

12    But defendants have stalled on implementing the first

13    injunction from the beginning.  Instead of restoring funding to

14    USRAP, they immediately terminated all but one of the

15    cooperative agreements, and they've prevented the one RSC, whose

16    cooperative agreement they did not terminate, from being able to

17    resume operations.

18    They do not dispute that, for the month following the

19    injunction, they never restarted processing and admissions for

20    the vast majority of refugees.  Their strategy seems, instead,

21    to have been to ride out the clock until the Ninth Circuit ruled

22    on their motion to stay, rather than follow the clear orders of

23    this court.

24    And now that the Ninth Circuit has ruled on the stay,

25    defendants cherry-pick and repeat preferred words from the

1    order, and ignore the clear takeaway.

2        This court's order remains in effect for refugees

3    conditionally approved as of January 19th.

4        Defendants have made clear that they have not and do not

5    plan to comply with the court's orders.  This has turned into a

6    game of Whack-a-Mole.  At each turn, they invent a new strategy

7    to avoid their legal obligations.

8        And the effect of this delay on refugees and the

9    organizations that serve them has been devastating.  Plaintiff

10   Pacito, for example, was booked for travel on January 22nd,

11   almost a week before the refugee ban went into effect.  Now,

12   because defendants first rushed to implement the ban, and then

13   stalled in implementing the injunction, Pacito still has not

14   been rebooked for travel or seen any movement in his case.  And

15   in the interim, his medical clearance and his exit visa to leave

16   Kenya have both expired, leaving him stranded abroad in an

17   indefinite limbo.  And because defendants never restored funding

18   nor restarted USRAP operations abroad, there is no RSC that can

19   help him.

20       Defendants could have easily provided relief for

21   travel-ready plaintiffs like Pacito.  But, instead, they've

22   shown that they will find or invent every excuse not to comply

23   with the court's orders.

24       For this reason, we ask that the court issue an order with

25   no room for workarounds.  Defendants must, by date certain,

1    restore the status quo as of January 19th for conditionally

2    approved refugees.

3         But it's not just the defendants haven't complied; it's

4    also that they've repeatedly hidden the ball from plaintiffs and

5    the court.  Take, for example, the Ninth Circuit's stay.

6         Defendants just said, as soon as the government realized

7    that there was a dispute about the meaning of the Ninth

8    Circuit's stay, they moved for a clarification.  This is not

9    correct.

10        Two days after the partial stay order issued, March 27th,

11   plaintiffs asked defendants about their compliance efforts, and

12   specifically asked about their plans to process conditionally

13   approved refugees who were approved as of January 19th, in line

14   with the Ninth Circuit order.  Defendants did not tell

15   plaintiffs that they interpreted the stay differently or that

16   they planned to halt all follow-to-join processing.  Instead,

17   plaintiffs learned about defendants' interpretation for the

18   first time in their Monday filing.

19        This has also happened with organizational plaintiffs.

20   Taking, for example, RSC Africa, the only cooperative agreement

21   that wasn't terminated on February 26th.  The same day the

22   defendants notified CWS of their intention to lift the

23   suspension of that agreement, CWS provided the requested

24   concurrence, but defendants provided no guidance to restart, nor

25   did they respond when CWS asked for instructions or

 1    clarification.

 2         It is now a month later, and CWS just learned, in a

 3    footnote in one of defendants' filings from Friday, that CWS's

 4    concurrence was not sufficient.

 5         Given the defendants have not been forthcoming in their

 6    communication, daily reporting is also needed to make sure that

 7    they actually take steps to restore the status quo.  Without

 8    additional measures, it is clear the defendants do not plan to

 9    comply with either preliminary injunction, and conditionally

10    approved refugees will suffer the consequences.

11         Given this, we ask the court to order the compliance

12    measures requested in our motion, or to order other relief as it

13    sees appropriate.

14         Thank you, very much, Your Honor.

15              THE COURT:  All right.  Thank you.

16    And I understand I'm to direct my questions to Ms. Evarts.

17              MS. HAUPTMAN:  Thank you very much.

18              MS. EVARTS:  Good afternoon, Your Honor.

19              THE COURT:  All right.  So no warm-up; just straight

20    to questions here, I guess.

21         So I will tell you that I am mindful of the Supreme Court's

22    recent order in the *AIDS Vaccine* case, in which they instructed

23    the district court to clarify what obligations the government

24    must fulfill to ensure compliance with the court's orders, with

25    due regard for the feasibility of any compliance timelines.

1          MS. EVARTS:  Yes, Your Honor.

2          THE COURT:  So, obviously, the court has issued

3    preliminary injunctions.  I expect the court orders to be

4    followed, unless and until the Ninth Circuit says differently.

5    But I am trying to reconcile what I've heard from the Supreme

6    Court.  And, frankly, the practical realities of the situation,

7    that, perhaps, this is not as easy as just snapping our fingers

8    and reinstituting the prior system.

9          So my question to you would be, what sort of framework or

10   timeline for compliance could the court impose, short of just

11   setting a date certain, as Ms. Hauptman and your briefing

12   suggests, for the restoration of everything?

13         MS. EVARTS:  Of course, Your Honor.

14         I think, just to clarify first, the date certain is -- the

15   importance of the date certain is to make clear to defendants

16   what does not appear to be clear to them right now, which is

17   that they are under court order, right now, to restore the

18   status quo ante litem; that that is what Your Honor had in mind

19   when you issued these two preliminary injunction orders and made

20   very clear that plaintiffs are suffering ongoing and compounding

21   irreparable harms.  And so I think that alone would be a very

22   helpful order from the court.

23         THE COURT:  I certainly agree with you there.  I

24   understand from the status reports, not to be glib, but the

25   government to say that the system has been broken so badly, at

1    this point, that perhaps it will be difficult to put it back

2    together quickly.

3        So what is the response to that?

4        MS. EVARTS:  Of course.  Well, I mean, I think there

5    are concrete things that defendants could have but have not yet

6    done.

7        THE COURT:  Such as?

8        MS. EVARTS:  So, for example, what my colleague,

9    Ms. Hauptman, was just referring to with CWS.  CWS, the day that

10   it was told that it needed to provide a concurrence in order to

11   reopen and make operative RSC Africa, it did so.  It had no

12   understanding that there was anything wrong with the concurrence

13   it provided.  It asked, thereafter, if the government had any

14   instructions for it as to what it needed to do to become

15   operative again, and it never got a response.

16       And so, for example, the government could be ordered to

17   provide the information necessary to enable the still operative,

18   quote/unquote, resettlement support centers, to make them

19   functioning, as long as they had -- either to provide them with

20   the instructions; for example, they need to be provided access

21   to the START system, because that is required to engage in any

22   kind of refugee processing.  They need to be provided guidance

23   as to what is expected of them in order to actually engage in

24   the work they've done.  They need to be provided information

25   about when they would be given the funding that is necessary to

1    their work.  And this is all laid out, I should say, in the

2    declaration that we provided from CWS that outlines exactly what

3    they need in order to do their work.

4         And it's notable that the government contends that there is

5    nothing wrong with that cooperative agreement.  It has not been

6    terminated, it has not been resuspended, and they say that the

7    ball is in CWS's court, but, clearly, that has not proven to be

8    the case.

9              THE COURT:  All right.  I'm also trying to wrap my

10   head around where we're at right now just, sort of, factually.

11        I read the briefing, obviously, but do you have any idea

12   how many people we are talking about who have been conditionally

13   approved as of the date before January 19th, 2025, the day

14   before the USRAP appeal was issued?

15             MS. EVARTS:  We don't have that number, Your Honor,

16   but, of course, we would assume that it is in the control of the

17   government.

18        Of course, and we have brought to the court's attention, in

19   the past, the number of people who actually had travel booked

20   and the number of people who were travel-ready but did not have

21   travel booked as of January 19th.  And, of course, the number of

22   people who were conditionally approved is larger than those

23   numbers, and those are tens of thousands of people.

24             THE COURT:  All right.  And the typical time frame for

25   processing refugee entry domestically -- let's take it from the

```
 1   time of conditional approval by USCIS to when there's domestic
 2   resettlement -- can you give me a timeline for, typically, how
 3   long that takes?
 4             MS. EVARTS:  I'm sorry, Your Honor.  From the time
 5   that -- if you could repeat the question.
 6             THE COURT:  Sure.  I guess what I'm thinking of, also,
 7   is this lovely flowchart that's in the record here.  I think
 8   this is Exhibit 5 to plaintiffs' preliminary injunction motion,
 9   but, you know, I've got the flowchart.  I see, as we're here
10   dealing with approval -- conditional approval, and there are
11   steps between conditional approval and domestic resettlement.
12   So I'm just trying to get some sense of, typically -- if there
13   is a typical case -- but, typically, how long it takes to wind
14   from conditional approval to domestic resettlement.
15             MS. EVARTS:  Just one moment, Your Honor.
16             THE COURT:  Sure.
17        And to be transparent, I'm going to ask similar questions
18   of the government.
19             MS. EVARTS:  Your Honor, obviously, there's some
20   variation from case to case.  Our understanding is it can take
21   anywhere from weeks to months, depending on the case.
22        But we would note, as we put into the record, that, in the
23   case of the Afrikaners, it's a new refugee resettlement program
24   that the government has been able to start up in
25   record time, and they appear to have managed to bring people
```

1    from point zero in the process to quite far along in processing

2    very quickly.

3        So it is clear that, at least in this moment in time, the

4    government appears to be able to process cases very quickly.

5              THE COURT:  All right.  And this may be in the record,

6    the declaration that you just referenced, but if you could

7    identify for me the most critical components that need to be

8    restored.  The pre-January 20th system, what needs to be

9    immediately restored, from your perspective, to get this going?

10             MS. EVARTS:  Well, Your Honor, first and foremost, you

11   would need to have resettlement partners who are able to assist

12   the government in actually processing cases of refugees who are

13   abroad who are conditionally approved.

14       And I know that Your Honor is very well aware, in the

15   various orders, of the work that -- the post-approval work that

16   settlement partners engage in, and the government has made clear

17   that it does not do that or is not able to do that without those

18   partners, so that is imperative.

19       Second, it would need to have the travel organizing piece

20   that has historically been accomplished by IOM.  Also, at least

21   our understanding of current policy, is that a refugee needs to

22   have an assurance with a resettlement or a reception and

23   placement partner who's in the United States -- historically,

24   those have been resettlement agencies -- before they are

25   permitted to travel.  And so we would be eager to hear from the

1    government if that policy has changed.  But, at least, our

2    understanding is there must be a reception and placement partner

3    wherever a refugee would be going in the United States, who

4    would be able to provide that assurance that they would be

5    providing for their domestic resettlement, as anticipated and

6    directed by Congress and the Refugee Act.

7         And we would note that, of course, the government has

8    referenced the concept of self-travel, specifically with respect

9    to follow-to-join refugees.  They did inform us that that was

10   not possible for other categories of refugees, but I'm not sure

11   that I understood what the reason was, and so, of course, we

12   would be eager to hear if there is some reason why refugees,

13   other than follow-to-join refugees, are unable to self-travel,

14   simply to avoid delay, especially for individuals such as

15   Plaintiff Pacito and other refugees who are travel-ready and who

16   are in dire circumstances.

17        And then, of course, with respect to reception and

18   placement, as Your Honor has discussed at some length in your

19   orders, reception and placement partners are providing a

20   critical service to refugees who have just arrived in the United

21   States.  For example, they ensure, even before a refugee gets on

22   a plane, that there's a place for that person to live once they

23   arrive, there's food in the cupboard, there's information about

24   how the children are going to go to school and how people are

25   going to take buses to English language classes.  Right?  So

1    that set of services that is imperative for people to be able to

2    resettle quickly is also essential to the success of the refugee

3    resettlement program as envisioned by Congress.

4              THE COURT:  All right.  Thank you.

5         Is there anything else that you'd like to tell me that

6    isn't in the brief?

7              MS. EVARTS:  The one thing I'd like to mention is just

8    next steps in this case, Your Honor.

9         So we would anticipate that this case would be progressing

10   in the normal course.  I think defendants made some reference to

11   an abeyance in the case.  It wasn't entirely clear if they meant

12   the entire case or if that was limited to some portion of it,

13   but we would vigorously oppose such abeyance.  We've heard no

14   reason why it would be necessary here.

15        So we understand the next step would be the government's

16   production of the administrative record, as it is an APA case,

17   at least in part.

18        The government's answer to the plaintiffs' pleading is, of

19   course, due next week, on April 15th.

20        We would also anticipate that a scheduling order would be

21   appropriate here.  And under Rule 16 -- under Rule 16, a

22   scheduling order is appropriate, I think it's in the shorter of

23   two different timeframes, whether it's when the defendants

24   appeared or the complaint was served.  Here, the defendants

25   appeared just short of 60 days ago.  I think the 60th day will

 1    be this Saturday.  And so it would be appropriate and prudent to

 2    set a scheduling order here, and then we would anticipate a

 3    Rule 26(f) conference.

 4           THE COURT:  Certainly, and there's the matter -- the

 5    pending class certification motion as well.

 6           MS. EVARTS:  Also that, Your Honor.

 7           THE COURT:  Thank you.

 8           MS. EVARTS:  Thank you.

 9           THE COURT:  All right.  Mr. Moss, are you up again?

10           MR. MOSS:  It would appear so, Your Honor.

11           THE COURT:  All right.  Please.

12           MR. MOSS:  Your Honor, I think I'd like to begin,

13    first, by addressing the government's legal arguments responding

14    to the motion to enforce, and then respond to some of the

15    court's questions that the court had posed to my opponents, if

16    that is agreeable.

17           THE COURT:  Yes, please.

18           MR. MOSS:  I do not wish to belabor the point, just to

19    mention that the government believes that, as this question,

20    which turns on a proper interpretation of the Ninth Circuit's

21    order, is now pending with the Ninth Circuit, it would be

22    prudent to wait for that court's ruling, which would provide the

23    needed clarity on the issue of whether it is -- if there's even

24    something to enforce.

25        That said, assuming the court were, nevertheless, inclined

1   to reach, sort of, the merits of that issue, I am prepared to

2   address why we believe the government's interpretation of the

3   Ninth Circuit's order is correct.

4        I understand that there's been some discussion of that

5   already, and I'll await the court's questions, if that would be

6   helpful.

7             THE COURT:  Mr. Moss, I will say we can skip further

8   discussion about interpreting the Ninth Circuit's order.  Like I

9   said, I'll have an order ruling on the government's motion for

10  reconsideration to you by the end of the day, but I, at this

11  point, don't think there's any reason to rehash the arguments

12  that you made earlier.  So let's jump straight to the merits of

13  plaintiffs' motion.

14            MR. MOSS:  Understood.  Thank you.

15       The government strongly disagrees with any suggestion that

16  the government has been out of compliance.  The government

17  complies with injunctions, and if it believe that they're not

18  appropriate, it seeks further review either from the issuing

19  court or from the Court of Appeals, as may be appropriate, and,

20  here, the government has, indeed, complied with all operative

21  injunctions.

22       I would like to address the timing of the government's

23  efforts to obtain clarification from the Ninth Circuit.

24       I believe my prior remarks, if I didn't say this, I think I

25  did, but what I was getting at is that, as soon as the

1    government became aware that Your Honor agreed with plaintiffs'

2    interpretation, the government, very promptly, sought the Ninth

3    Circuit's clarification, which is, of course, pending.

4         THE COURT:  Counsel, I'd also like to clarify, I'm not

5    agreeing with anyone's interpretation of the order.  What I'm

6    doing is reading the order as written.  I understand that you

7    have an argument as to what is there.  Frankly, I think it's

8    more an argument based on what isn't there.

9         I'm going to focus on the text of the order, and I think

10   that I've previewed, frankly, where the order that I'm going to

11   issue this afternoon -- the forthcoming order -- stands on the

12   issue.

13        So unless the Ninth Circuit tells me that the court's

14   interpretation of the stay or partial stay order is incorrect,

15   we're going to proceed and press forward with litigation in this

16   court.

17        MR. MOSS:  I understand, Your Honor.

18        Turning to the operational aspect, I'd like to address the

19   scope of the plaintiffs' requested relief for daily reporting.

20        That would be enormously burdensome on the government and,

21   frankly, it could be counterproductive in some ways.  We did not

22   address that at length in our papers because we believe that the

23   Ninth Circuit's order speaks for itself.

24        But I think a theme I would like to suggest, with respect

25   to a number of the points that the plaintiffs have raised, is

1    there are some factual questions about what the government is

2    able to do and on what time frame.  Rather than respond to those

3    specifics today, which I'm not prepared to do, I would suggest

4    that the court require further briefing on that topic, whether

5    by way of a status report or otherwise, so that we can address

6    important factual questions that will help the court decide what

7    needs to happen going forward.  And that might include questions

8    that Your Honor was posing earlier about timing from conditional

9    approval to ultimate entry, and things like that.

10         Although we would note, just in -- I do think it is

11   important to note that the Ninth Circuit -- I think everybody

12   acknowledges -- I hope I'm not overstating -- but everybody

13   acknowledges the reference to the *Hawaii* case, and Section

14   1182(f), ultimately does -- at least that order does allow the

15   government to apply that part of the executive order.

16         But there are more fact questions, some of which have been

17   addressed in the government's status reports, but to the extent

18   the court feels that more updates would be helpful; for example,

19   the timing that security checks, medical screening, travel

20   arrangements, things like that, all of which go into the process

21   of what happens once somebody is conditionally approved to when

22   can they, potentially, seek entry, those are fact questions that

23   I'm not prepared to answer right now but may be helpful in some

24   sort of a filing.

25              THE COURT:  Well, I appreciate your argument and

1    position on the matter.  I would think, though, that the

2    information that you would need to formulate a position would be

3    readily available to the government.

4        The court's order doesn't require the government to create

5    a new system from whole cloth.  I mean, we're talking about a

6    system that was functional as of January 19th, 2025.  So I would

7    think that getting the information necessary to give the court

8    some sort of timeline for when the system, frankly, is going to

9    be turned back on, would be something that would be easy for the

10   government to put together.

11       I guess the part that I'm struggling with here is that

12   there are two injunctions that have been issued by this court.

13   The first was partially stayed.  You've got some qualms about

14   the extent to which that order was stayed.  But it seems clear

15   to me that there was a carve-out for refugees that were

16   conditionally approved prior to the USRAP EO.

17       So I've made findings that irreparable harm will befall

18   these people short of immediate relief, so there is an urgency

19   to the matter.

20       So to say that you'll get back to me, which is, basically,

21   what I'm hearing, is not a satisfactory answer.

22       So what I'll do is I'll come back to where I began with

23   plaintiffs' counsel, and that's the *Aids Vaccine* case and the

24   Supreme Court's instruction to the district court to clarify the

25   obligations the government must fulfill to ensure compliance

1    with the court's order with due regard for feasibility of any

2    compliance timelines.

3        Is there any chance that the parties could meet and confer

4    and come up with some sort of timeline for compliance and check

5    marks?  I understand plaintiffs' position about giving a date

6    certain for when the lights must be turned back on, but I'm

7    worried that I won't be in a position to gauge the government's

8    compliance if I just say "turn the lights on."

9        And there are aspects, perhaps, that the court did not

10   appreciate or, perhaps, the parties did not anticipate.  So I

11   want to approach this in a reasoned manner but with urgency,

12   with haste.

13       So what would you say to that, in terms of working together

14   to come up with a compliance timeline that would both provide

15   assurances to the court and a mechanism for accountability for

16   the government, to the extent that timeline, those benchmarks

17   are not met?

18       MR. MOSS:  There are an enormous number of moving

19   pieces here, and without conceding that any compliance time

20   frame is needed, for the reasons I've highlighted, the

21   government is open to having a conversation with plaintiffs to

22   see if, should the court so order, some sort of arrangement

23   could be addressed, to see if that timeline would be something

24   that the parties could agree to.  We're happy to have the

25   conversation.

1          THE COURT:  All right.

2      And I referenced the flowchart, Exhibit 5 from -- Exhibit

3   5, I don't know to whom's declaration, but it was part of the

4   record in the first preliminary injunction.

5          So I don't hear any disagreement about what the system

6   looked like prior to the USRAP order, but the part that I'm

7   missing is how long it takes for these steps to unfold.

8          So I would expect -- I believe that the government would

9   have historical data about how long it took, let's say, late

10  2024 or 2023, for someone to wind from conditional approval to

11  domestic resettlement, and how long the steps in between take.

12         Is that data that the government would be able to produce

13  to the court?

14         MR. MOSS:  Your Honor, as I stand here today, I do not

15  know, specifically, what data has been kept or how quickly it

16  could be accessed, but that is an example of the, sort of,

17  factual inquiry, that, if the court requires, we could look into

18  to see what is available.

19         THE COURT:  All right.  And to the question of how

20  many we're talking about who had conditional approval status as

21  of January 19th, 2025, do you know the answer to that?

22         MR. MOSS:  Your Honor, that, unfortunately, is another

23  example of facts that I'm not prepared to say what it is, as I

24  stand here today, but if the court requires, the government

25  could look into that.

 1          THE COURT:  All right.  Now, of course, you understand

 2    that plaintiffs have asked me to haul government witnesses into

 3    court and put questions to them under oath.  I mean, you're

 4    talking about a factual inquiry.  Is that what you're

 5    suggesting, that the court take evidence in that way, testimony?

 6          MR. MOSS:  Your Honor, I have not raised that

 7    suggestion.

 8          THE COURT:  The facts that you're saying that you need

 9    and that the court would need to resolve and pass judgment on,

10    how do you suppose those would get into the record?

11          MR. MOSS:  Your Honor, again, respectfully, not

12    conceding that it would be legally necessary, given the Ninth

13    Circuit's ruling.  Should the court conclude otherwise, I would

14    suggest that that might be a topic for the court to invite the

15    parties to opine on.

16       There may be data out there that is readily available.  I

17    don't know.  I want to be clear, I am speculating right now.

18    And if there is data that is readily available, that probably

19    would not -- would be the most efficient way of sharing with the

20    court, rather than having live witnesses.

21       Since I don't know what we don't know at the moment, here

22    in court, in terms of the many facts in this very complicated

23    regulatory system, I think that may be something that the

24    parties could address in a proposal to the court, should the

25    court order the parties to meet and confer, as the court seems

1    to be inclined to do.

2              THE COURT:  All right.  Thank you, Mr. Moss.  Is there

3    anything else that you'd like to tell me that's not in the

4    briefing?

5              MR. MOSS:  If I may have just one moment, Your Honor?

6              THE COURT:  Certainly.

7              MR. MOSS:  Nothing further from the government on this

8    point, Your Honor.  Thank you.

9              THE COURT:  All right.  Thank you, Mr. Moss.

10             MR. MOSS:  Thank you, Your Honor.

11             THE COURT:  Ms. Evarts, I think you're up.

12             MS. EVARTS:  Your Honor, I would simply say that,

13   given how long plaintiffs and other refugees have been waiting,

14   as well as the resettlement agencies and other resettlement

15   partners, that it is imperative to ensure that this process that

16   Your Honor is anticipating proceeds as expeditiously as

17   possible, and so we would say that we are prepared to meet and

18   confer forthwith and to submit information to the court as soon

19   as practicable.  Perhaps Friday, given that today is Wednesday,

20   would be an adequate amount of time.

21             THE COURT:  All right.  I'm contemplating.  I haven't

22   made any decisions yet, but I will tell you that, as I've said,

23   I think, at least twice now, about the instruction from the

24   Supreme Court to the district court in D.C., about coming up

25   with some sort of framework and clarifying the obligations.  As

1   I said, that's front and center in my mind, is making sure there

2   is a framework by which the court can engage compliance and to

3   hold the government accountable, if necessary, for

4   noncompliance.

5         So it is certainly the court's expectation that its orders

6   are complied with, and done so immediately.  So I understand

7   your position that there should be no delay, that it should all

8   be back, but, the practical matter, in presiding over this

9   dispute, I need to come up with something, like I said, to gauge

10  compliance and a mechanism for accountability.  So that's where

11  I'm at right now.

12        Is there anything else you'd like to tell me that isn't in

13  the briefing?

14              MS. EVARTS:  No, Your Honor.  Thank you.

15              THE COURT:  All right.  You've all given me plenty to

16  think about.  There's certainly this threshold issue of the

17  meaning of the Ninth Circuit's partial stay order.  I can't say

18  that was an issue I anticipated, but it looks like it's

19  something that's before the Ninth Circuit now.

20        I will have an order to the parties here by the end of the

21  day on the defendants' pending motion to reconsider.

22        But I will say that unless and until the circuit provides

23  further guidance or tells me otherwise, this court's

24  interpretation of the partial stay is what controls, and its

25  mandate as to the carve-out for folks who were conditionally

1    approved -- ordinance prior to the USRAP EO -- seems pretty

2    clear to me.

3         All right.  Unless there's -- yes, I see you're standing to

4    address the court, Mr. Moss.

5              MR. MOSS:  Yes, Your Honor.  Only that, Your Honor, if

6    the court does plan to issue an order relating to its

7    injunctions, if you wouldn't mind giving us a little time to

8    assess what steps, if any, related to any appeal, to enable the

9    government to just make that assessment before, in terms of any

10   deadlines the court may set, even a brief window of time to

11   allow us to assess, we would be grateful for.

12             THE COURT:  The request or the relief that you're

13   seeking, it is not clear to me, frankly, what exactly it is that

14   you're asking for, specifically, but what I will say is that I

15   will issue an order today on the pending motion to reconsider.

16        As to plaintiffs' motion to enforce, I'm not quite certain

17   yet, so I'm not going to give you any sort of timeline there.

18        Does that address the issue that you're raising?

19             MR. MOSS:  I believe so, Your Honor, with, perhaps,

20   one point.

21        If the court were inclined to grant plaintiffs' motion to

22   enforce, that would impose a duty on the government to do a

23   thing.

24        What I was respectfully requesting was some time before the

25   obligation attaches, between when the court issues the order and

April 9, 2025                    35

1    when the obligation attaches, to enable the government to

2    undertake an inquiry as to whether any further review may be

3    needed.

4              THE COURT:  All right.  Understood.

5         Ms. Evarts, anything to say in response?

6              MS. EVARTS:  Just one moment.

7         No.  Thank you, Your Honor.

8              THE COURT:  All right.  Thank you, all.  With that,

9    court is adjourned.

10                   (Proceedings concluded at 2:20 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

C E R T I F I C A T E

2

3

4          I, Nancy L. Bauer, CCR, RPR, Court Reporter for

5    the United States District Court in the Western District of

6    Washington at Seattle, do hereby certify that I was present in

7    court during the foregoing matter and reported said proceedings

8    stenographically.

9          I further certify that thereafter, I have caused

10   said stenographic notes to be transcribed under my direction and

11   that the foregoing pages are a true and accurate transcription

12   to the best of my ability.

13

14

15          Dated this 11th day of April 2025.

16

17                              /S/  Nancy L. Bauer

18                              Nancy L. Bauer, CCR, RPR
                                Federal Official Court Reporter
19                              WSL#22003010

20

21

22

23

24

25