UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| PLAINTIFF PACITO; PLAINTIFF ESTHER; PLAINTIFF JOSEPHINE; PLAINTIFF SARA; PLAINTIFF ALYAS; PLAINTIFF MARCOS; PLAINTIFF AHMED; PLAINTIFF RACHEL; PLAINTIFF ALI; HIAS, INC.; CHURCH WORLD SERVICE, INC., and LUTHERAN COMMUNITY SERVICES NORTHWEST,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; MARCO RUBIO, in his official capacity as Secretary of State; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services,<br><br>Defendants. | CASE NO. 2:25-cv-255-JNW<br><br>COMPLIANCE FRAMEWORK ORDER |

COMPLIANCE FRAMEWORK ORDER - 1

## 1. INTRODUCTION

The Court issues this order to "clarify what obligations the Government must fulfill to ensure compliance" with the Court's preliminary injunction orders as narrowed by the Ninth Circuit. *See Dep't of State v. AIDS Vaccine Advoc. Coal.*, 145 S. Ct. 753 (2025). Having closely reviewed the parties' proposed compliance frameworks and the evidentiary record, and having heard oral argument from the parties, the Court is satisfied that the binding compliance framework set forth below exhibits "due regard for the feasibility of any compliance timelines." *See id.*

## 2. BACKGROUND

On February 25, 2025, this Court issued a preliminary injunction enjoining the implementation of Executive Order 14163, which had suspended the United States Refugee Admissions Program (USRAP). Dkt. Nos. 39, 45. On March 24, 2025, the Court issued a second preliminary injunction enjoining Defendants from terminating USRAP-related funding provided to resettlement partners. Dkt. No. 79.

On March 25, 2025, the Ninth Circuit partially stayed the first preliminary injunction, ruling that "[t]he [Government's] motion [to stay] is denied to the extent the district court's preliminary injunction order applies to individuals who were conditionally approved for refugee status by the United States Citizenship and Immigration Services before January 20, 2025." *Pacito et al. v. Trump et al.*, No. 25-1313 (9th Cir.), Dkt. No. 28. On April 21, 2025, the Ninth Circuit issued a clarification order that narrowed the category of refugees protected by this Court's

preliminary injunction to those individuals who, on or before January 20, 2025, met three specific conditions:

> (1) the individual had an approved refugee application authorizing Customs and Border Protection to admit the individual "conditionally as a refugee upon arrival at the port within four months of the date the refugee application was approved," 8 C.F.R. § 207.4; (2) the individual was cleared by USCIS for travel to the United States; and (3) the individual had arranged and confirmable travel plans to the United States.

*Pacito et al. v. Trump et al.*, No. 25-1313, Dkt. No. 46.

On April 11, 2025, this Court ordered the parties to meet and confer regarding a compliance schedule, Dkt. No. 108, and on April 18, 2025, the parties filed a joint status report with their respective proposals. Dkt. No. 112. Following the Ninth Circuit's April 21 clarification order, this Court held a hearing on May 1, 2025, to determine the appropriate compliance framework in light of the clarification. Dkt. No. 118.

### 3. SCOPE OF THE NINTH CIRCUIT'S CLARIFICATION ORDER

A threshold question before this Court is the scope of the Ninth Circuit's April 21 clarification order—specifically, which refugees remain protected by this Court's preliminary injunction ("Injunction-Protected Refugees"). It is surprising that there could be any disagreement about the meaning of a judicial order that articulates three specific criteria in plain, straightforward language. The parties agree on the application of the first criterion (approved refugee application) and the

second criterion (clearance by USCIS for travel).[1] But they present different interpretations of the third criterion: "arranged and confirmable travel plans to the United States." *See Pacito et al. v. Trump et al.*, No. 25-1313, Dkt. No. 46.

Plaintiffs advocate a plain-meaning interpretation of this phrase, under which "arranged and confirmable travel plans" refers, simply, to arranged and confirmable travel plans.

The Government, however, would have the Court believe that when the Ninth Circuit used this phrase, it secretly embedded a qualifier requiring that travel must have been scheduled to occur within two weeks of January 20, 2025. The Government finds support for this reading in the Ninth Circuit's language suggesting that its partial denial of a stay was not meant to apply to "tens of thousands of individuals." *See Pacito et al. v. Trump et al.*, No. 25-1313, Dkt. No. 46 at 3. According to the Government, the denial must apply only to those refugee cases furthest along, like Plaintiff Pacito's. This reading would reduce the number of Injunction-Protected Refugees from about 12,000 individuals—those who held plane tickets as of January 20—to about 160 individuals—those whose planes were set to depart by February 3.

The Government's interpretation is, to put it mildly, "interpretive jiggery-pokery" of the highest order. *See King v. Burwell*, 576 U.S. 473, 506 (2015) (Scalia, J., dissenting). It requires not just reading between the lines, but hallucinating new

---

[1] The parties agree that the first and second criteria in the Ninth Circuit's order are coextensive: anyone with an "approved refugee application authorizing" admission by CBP under 8 C.F.R. § 207.4 is necessarily "cleared by USCIS for travel to the United States," and vice versa.

COMPLIANCE FRAMEWORK ORDER - 4

text that simply is not there. The third criterion requires that the individual "had arranged and confirmable travel plans to the United States" as of January 20, 2025. Not "had arranged and confirmable travel plans with a departure window within two weeks of January 20, 2025." Not "had imminent travel plans." Not "had travel plans like Plaintiff Pacito's." Just, "had arranged and confirmable travel plans." Had the Ninth Circuit intended to impose a two-week limitation—one that would reduce the protected population from about 12,000 to 160 individuals—it would have done so explicitly. The Ninth Circuit is capable of imposing temporal limitations when it intends to do so. That it did not do so here must be construed as deliberate. And it goes without saying that 12,000 is not the "*tens* of thousands of individuals" the Ninth Circuit implied to be problematic.

Fidelity to the text requires this Court to apply the Ninth Circuit's criteria *as written*. Thus, the Court finds that the third criterion applies to all refugees who, as of January 20, 2025, had received confirmation of travel arrangements to the United States through some USRAP instrumentality, regardless of when that travel was scheduled to occur, and regardless of whether that travel was self-arranged or arranged by the International Organization of Migration (IOM). This straightforward reading respects both the letter and the purpose of the clarification order.

This reading also acknowledges the reliance interests that concerned the Ninth Circuit. The record shows that when refugees receive confirmation of travel plans—whether for the next week or several months later—they typically begin the difficult process of uprooting their lives in preparation for resettlement. These

COMPLIANCE FRAMEWORK ORDER - 5

significant reliance interests do not diminish simply because travel was scheduled for a date more than two weeks after January 20.

This Court will not entertain the Government's result-oriented rewriting of a judicial order that clearly says what it says. The Government is free, of course, to seek further clarification from the Ninth Circuit. But the Government is not free to disobey statutory and constitutional law—and the direct orders of this Court and the Ninth Circuit—while it seeks such clarification. The Government's obligation to process, admit, and provide statutorily mandated resettlement support services to the Injunction-Protected Refugees is *immediate*. Likewise, the Government's obligation to restore funding, information, and operational support to its USRAP partners as necessary to process, admit, and provide resettlement services to these individuals is also *immediate*.

### 4.  COMPLIANCE FRAMEWORK

To ensure the Government's prompt compliance with the Court's preliminary injunction orders *as they apply to Injunction-Protected Refugees*, the Court establishes the following compliance framework. This framework is designed to balance the urgency of the Government's obligations with "due regard for the feasibility of any compliance timelines." *See AIDS Vaccine Advoc. Coal.*, 145 S. Ct. 753 (2025). Failure to comply with this Order may result in sanctions.

(1) The Government must take the following measures within SEVEN (7) days of this Order:

    a. Provide an update to Plaintiffs regarding the status of each individual plaintiff's case; and for each individual plaintiff who qualifies as an Injunction-Protected Refugee, identify any remaining processing steps that must be taken before they can travel to the United States.

    b. Instruct agency offices and staff, including U.S. embassies, to resume processing the cases of Injunction-Protected Refugees. Defendants must advise all government offices and officials involved in processing refugee applications abroad that Defendants and their agents are enjoined from implementing any suspension of processing, travel, admissions, and domestic resettlement support for Injunction-Protected Refugees.

    c. Confirm to the Court that the suspension on admission of Injunction-Protected Refugees has been lifted such that there is no impediment to Injunction-Protected Follow-to-Join Refugees with travel documents traveling to the United States and seeking admission.

    d. To the extent necessary to process, admit, and provide resettlement support to Injunction-Protected Refugees, issue notices lifting the suspension of USRAP cooperative agreements for operating Resettlement Support Centers ("RSCs"), including, but not limited to, Plaintiffs CWS and HIAS.

    e. Reinstate resettlement partner access, including for CWS and HIAS, to the START, FileCloud, RPC Help Desk (ITSM), and any other databases

or technologies necessary to facilitate refugee application processing and travel. This includes ensuring that funding is restored for any necessary databases and technology maintained by resettlement partners, such as the IRIS beneficiary data repository.

f. Take immediate steps to facilitate travel and admissions for Injunction-Protected Refugees whose clearances, including medical and security authorizations, have not yet lapsed. Provide reporting to the Court (in accordance with the reporting timeline outlined below—i.e., three days after the deadline for compliance) regarding the total number of these individuals and the timeline for their admission. Given that the Government has already begun to admit some Injunction-Protected Refugees, such admissions should proceed immediately and with haste.

g. Develop a comprehensive plan, including a detailed timeline, to renew the travel clearances, including security and medical authorizations, of all Injunction-Protected Refugees whose clearances have lapsed since January 20. This comprehensive plan may include a combination of measures, including: extending existing clearances where possible; arranging new screening appointments where formal extensions are not possible; authorizing applicants to arrange their own medical screenings; and facilitating expedited treatment from security vetting agencies. The Government must submit this plan to the Court in accordance with the reporting timeline outlined below (i.e., three days after the deadline for compliance).

(2) The Government must take the following measures within FOURTEEN (14) days of this Order:

    a. Notify all Injunction-Protected Refugees of this Order and that the Government will resume processing their cases in accordance with this Order.

    b. Restore funding to RSCs as needed to ensure that the cases of all Injunction-Protected Refugees can be processed.

    c. Provide guidance as necessary to RSCs to resume processing the cases of Injunction-Protected Refugees. This includes guidance from the Bureau of Population, Refugees, and Migration (PRM) about the scope of services the RSCs are to restore and which cases to prioritize. Moving forward, Defendants must maintain regular communications with RSCs about the progress and status of the Injunction-Protected Refugees' cases.

    d. Notify all Follow-To-Join Refugees who arranged their own independent travel on or before January 20, 2025, that an independent travel option remains available, and restart production of travel documents for those individuals who qualify as Injunction-Protected Refugees.

    e. To the extent necessary to provide statutorily mandated Reception and Placement (R&P) services to Injunction-Protected Refugees, issue notices lifting the suspension of USRAP-related cooperative agreements for R&P service providers, including, but not limited to, Plaintiffs CWS and HIAS.

    f. As necessary, permit Injunction-Protected Refugees to facilitate their own medical exams and advise them and panel physicians of this option.

COMPLIANCE FRAMEWORK ORDER - 9

g. Resume option of IOM-facilitated and -funded travel for Injunction-Protected Refugees. This includes renewing travel plans that lapsed.

h. As necessary, resume option of IOM-facilitated and -funded medical exams for Injunction-Protected Refugees.

i. To the extent that IOM-facilitated travel is not sufficient to timely process and admit all Injunction-Protected Refugees, coordinate with RSCs to permit the option of independent travel for Injunction-Protected Refugees who do not require financial assistance to facilitate their travel, including ensuring that necessary coordination takes place with domestic R&P agencies to provide resettlement support to these refugees upon arrival.

(3) The Government must take the following measures within TWENTY-ONE (21) days of this Order:

a. Fully resume provision of post-arrival services for admitted Injunction-Protected Refugees as envisioned in 8 U.S.C. § 1522. This includes initial housing, transportation, employment training and placement, English language training, cash and medical assistance, and case management support. This also includes ensuring that resettlement partners can seek and obtain timely reimbursements for the post-arrival services they provide or facilitate.

b. Ensure that resettled refugees whose benefits were prematurely cut following the Refugee Funding Suspension, *see* Dkt. No. 45, have those benefits restored and extended by an amount of time commensurate with any interruption.

  c. Ensure that any refugees who independently traveled to and were admitted to the United States in the time following the Court's first preliminary injunction are matched with, or assigned to, a domestic R&P agency for resettlement support.

(4) Within TWENTY-EIGHT (28) days of this Order, if not all RSCs operative before January 20 have reopened, the Government must ensure that all Injunction-Protected Refugees outside the geographic scope of the reopened RSCs can complete the post-conditional-approval processing steps necessary for travel and admission.

## 5. REPORTING REQUIREMENTS

On top of the requirements set forth in the compliance timeline above, the Court ORDERS the Government to comply with the following reporting requirements:

(1) Within THREE (3) days of each deadline above, Defendants must report to the Court on their completion of each compliance measure.

(2) In addition to describing compliance with the seven-day requirements set forth in the timeline above, the Government's *first* compliance report to the Court (due ten days from the date of this Order—i.e., three days after the soonest compliance deadlines) should address the following questions:

  a. Identify the total number of Injunction-Protected Refugees.

  b. Provide a high-level overview of the countries or regions in which the Injunction-Protected Refugees are located, as well as the RSCs

   with which they worked to receive conditional approval status and travel documents.

   c. Identify the number of refugees admitted monthly to the United States through USRAP in August 2024, September 2024, October 2024, November 2024, December 2024, and January 2025. This data set will serve as a reference regarding feasible admission rates under the status quo ante litem.

(3) After completing the 28-day compliance schedule outlined above and submitting the final report (on Day 31), Defendants must submit weekly reports to the Court detailing actions taken since the last report to comply with the Court's injunctions. These reports must identify the number of Injunction-Protected Refugees (broken down by I-590 and I-730 refugees) who, in that week:

   a. Received independent travel documents, and of those refugees, the number admitted to the United States;

   b. Had travel facilitated by IOM, and of those refugees, the number admitted to the United States;

   c. Were scheduled for medical exams;

   d. For whom medical exam results were received; and

   e. Received renewed security authorizations.

   f. Additionally, the report must provide an overview of the cities and states in which Injunction-Protected Refugees have been resettled

upon admission, as well as the R&P service agencies responsible for providing their resettlement support services.

## 6. PROCEDURE FOR ADDRESSING FEASIBILITY CONCERNS

If, at any point, the Government believes that compliance with any of these measures is not feasible, the Government must follow this procedure:

(1) The Government must promptly meet and confer with Plaintiffs to discuss the feasibility concern(s) and attempt to reach agreement on modified compliance measures.

(2) Following this meet and confer, and assuming they agree on a proposed course of action, the parties must file a joint submission with the Court before the deadline for completion of the compliance measure(s) from which the Government seeks relief that:

  a. Identifies with particularity the specific compliance measure(s) at issue;

  b. Explains the precise operational constraint(s) preventing compliance;

  c. Proposes alternative compliance measures and timelines.

(3) If the parties cannot reach agreement, they must clearly identify their respective positions in a joint submission, with each side limited to 1,500 words. Any such joint submission must be filed no later than THREE (3) calendar days before the deadline for completion of the compliance measure at issue.

The Court will promptly review any joint submission and issue an order either amending or declining to amend the compliance framework as necessary. Absent express relief from the Court before the deadline, the Government remains obligated to comply with the measures set forth above.

Dated this 5th day of May, 2025.

> Jamal N. Whitehead
> United States District Judge