THE HONORABLE JAMAL N. WHITEHEAD

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9   PLAINTIFF PACITO; PLAINTIFF ESTHER;    Case No. 2:25-cv-255-JNW
    PLAINTIFF JOSEPHINE; PLAINTIFF SARA;
10  PLAINTIFF ALYAS; PLAINTIFF MARCOS;      **PLAINTIFFS' OPPOSITION TO
    PLAINTIFF AHMED; PLAINTIFF RACHEL;      DEFENDANTS' MOTION TO
11  PLAINTIFF ALI; HIAS, INC.; CHURCH       DISMISS**
    WORLD SERVICE, INC.; and LUTHERAN
12  COMMUNITY SERVICES NORTHWEST,           NOTE ON MOTION CALENDAR:
                                            MAY 30, 2025
13              *Plaintiffs*,

14          v.

15
    DONALD J. TRUMP, in his official capacity as
16  President of the United States; MARCO RUBIO,
    in his official capacity as Secretary of State;
17  KRISTI NOEM, in her official capacity as
    Secretary of Homeland Security; ROBERT F.
18  KENNEDY, JR., in his official capacity as
    Secretary of Health and Human Services,
19
20              *Defendants*.

21
22
23
24
25
26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1

**TABLE OF CONTENTS**

2    INTRODUCTION ............................................................................................... 1

3    BACKGROUND ................................................................................................ 1

4    I.    The Refugee Act and the USRAP establish a congressionally mandated
            infrastructure for refugee resettlement. ..................................................... 1
5

6    II.   The Refugee Ban EO eviscerated this statutory scheme. ......................... 2

7    III.  The Court has recognized that Plaintiffs are likely to succeed on the merits
            of their ultra vires and APA claims. .......................................................... 3

8    LEGAL STANDARD ......................................................................................... 4

9    ARGUMENT ..................................................................................................... 4

10   I.    The Court has jurisdiction to decide Plaintiffs' claims and issue the relief
            sought. ......................................................................................................... 5
11
             A.    Plaintiffs do not seek to enjoin the President. ................................ 5
12
             B.    The Court has jurisdiction over Plaintiffs' funding-related APA
13                 claims. .............................................................................................. 6

14           C.    The FTJ Petitioner Subclass's due-process claim is not moot. ...... 10

15   II.   Plaintiffs have stated claims upon which relief can be granted. ............... 12

16           A.    Section 1182(f) does not bar Plaintiffs' claims against the Refugee
                   Ban EO and the Agency Suspension. .............................................. 12
17
                   1.    The Refugee Ban EO does not satisfy section 1182(f)'s
18                       requirements. ......................................................................... 13

19                 2.    The Refugee Ban EO overrides the Refugee Act's
                         comprehensive statutory scheme, which the President's
20                       carefully delineated authority to set the refugee-admissions
                         ceiling does not impliedly allow. .......................................... 15
21
             B.    Section 1182(f) has no bearing on Plaintiffs' claim that
22                 Defendants' suspension and termination of USRAP funding violate
                   the separation of powers. ................................................................. 18
23
             C.    *Muñoz* does not bar the FTJ Petitioner Subclass's due-process
24                 claim. ................................................................................................ 19

25           D.    Plaintiffs' APA claims are reviewable. ........................................... 19

26

PLS.' OPP'N TO DEFS' MOT. TO DISMISS – ii
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1

　　　　　　　　　1.　　The agency Defendants' implementation of the Refugee
Ban EO is reviewable under the APA............................................. 19

2

3
　　　　　　　　　2.　　Plaintiffs challenge discrete and final agency actions. ................. 20

　　　　　　　　　3.　　In allocating funding from an appropriation, Defendants do
not have the discretion to abandon statutory mandates. ............... 22

4

5
CONCLUSION............................................................................................................. 23

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**INTRODUCTION**

Defendants' motion to dismiss follows this Court's issuance of two preliminary injunctions to restore the pre-January 20 status quo, denial of two motions to stay those injunctions, and denial of a motion to reconsider the second stay denial and injunction. In issuing those rulings, the Court reviewed extensive briefing, heard oral argument, and found that Plaintiffs are likely to succeed on the merits of their ultra vires, Administrative Procedure Act ("APA"), and due-process claims challenging Executive Order 14163 (the "Refugee Ban EO") and its implementation by the agency Defendants.

Defendants concede that their motion to dismiss trots out many of the tired arguments the Court has already rejected, which are no more persuasive now than they were before. Nor does the Ninth Circuit's recent clarification of its partial stay support dismissal. The Court should reject Defendants' attempt to evade judicial review of their unprecedented and unlawful actions and allow this case to proceed in the ordinary course.

**BACKGROUND**

The factual background of this case has been covered at length in the Court's prior orders, *see* Dkt. Nos. 45, 79, 104, 108; an overview of the relevant allegations follows.

**I.     The Refugee Act and the USRAP establish a congressionally mandated infrastructure for refugee resettlement.**

The Refugee Act of 1980 was enacted to "provide a permanent and [systematic] procedure for the admission" of refugees and provide for their "effective resettlement." Dkt. No. 56 ("Suppl. Compl.") ¶¶ 34–35 (quoting Pub. L. No. 96-212, § 101(a)–(b), 94 Stat. 102, and citing 8 U.S.C. § 1157 et seq.). Through the U.S. Refugee Admissions Program ("USRAP"), the agency Defendants admit refugees of special humanitarian concern to the United States as long as they are not firmly resettled in a third country or otherwise inadmissible. *Id.* ¶ 40 (quoting 8 U.S.C. § 1157(c)(1)). Once resettled in the United States, refugees are statutorily authorized to apply for their spouses and unmarried minor children to join them; the resettled principal refugee is the

petitioner and the spouse or child, as the derivative refugee, is the "follow-to-join" beneficiary. *Id.* ¶¶ 48–51 (citing 8 U.S.C. § 1157(c)(2)(A)). Before the start of each fiscal year, the President, with congressional consultation, determines the number of refugees who may be admitted for that fiscal year, subject to increase to respond to emergency refugee situations. 8 U.S.C. §§ 1157(a)(2), (b).

Much of the work of the USRAP is carried out by nonprofit and intergovernmental resettlement partners. For instance, the State Department funds third parties, like Plaintiffs HIAS, Inc. ("HIAS") and Church World Service, Inc. ("CWS"), to provide refugee case-processing support in specified regions overseas pursuant to cooperative agreements. *See* Suppl. Compl. ¶¶ 53–61. The agency Defendants also fund national resettlement agencies and their local affiliates, like Plaintiffs HIAS, CWS, and Lutheran Community Services Northwest, to provide statutorily required resettlement support services to recently arrived refugees. *See* 8 U.S.C. §§ 1521–1522; *see also id.* ¶¶ 62–67, 70–77.

**II.    The Refugee Ban EO eviscerated this statutory scheme.**

On Inauguration Day, President Trump signed an executive order titled "Realigning the United States Refugee Admissions Program"—the Refugee Ban EO—which indefinitely suspended all refugee admissions and decisions on applications for refugee status until he determines that resumption is in the "interests of the United States." Suppl. Compl. ¶¶ 94–98; *see also* Exec. Order No. 14163, 90 Fed. Reg. 8,459 (Jan. 20, 2025). The order defines the "interests of the United States" as "public safety and national security"; the so-called ability of admitted refugees to "fully and appropriately assimilate"; "preserv[ation] [of] taxpayer resources"; and participation by "State and local jurisdictions . . . in the process of determining the placement or settlement in their jurisdictions of [noncitizens] eligible to be admitted" as refugees. Suppl. Compl. ¶¶ 99–100 (quoting Refugee Ban EO § 2). And while the order authorizes the Secretaries of State and Homeland Security to "jointly determine . . . in their discretion" to admit refugees on a "case-by-case" basis—only if they determine that "entry of such [refugees] is in the national interest and does not pose a threat to the security or welfare of the United States"—it does not specify any

1   process or timeline for establishing a process for such case-by-case exceptions. *Id.* ¶¶ 105–06

2   (quoting Refugee Ban EO § 3(c)).

3          The day after President Trump signed the Refugee Ban EO, the State Department

4   suspended all refugee case processing and cancelled all previously scheduled travel for refugees,

5   including travel scheduled to take place before the effective date set out in the order (the "Agency

6   Suspension"). *Id.* ¶¶ 116–20. A few days later, the agency Defendants suspended all funding to

7   USRAP resettlement partners, including the organizational Plaintiffs. *Id.* ¶¶ 123–35. The sole

8   authority cited for the suspension was another executive order (the "Foreign Aid EO"), which

9   required a ninety-day pause of all funding for "foreign development assistance" pending a review

10  to ensure alignment with President Trump's foreign policy. *Id.* ¶¶ 127, 129 (quoting Exec. Order

11  No. 14169, 90 Fed. Reg. 8,619 (Jan. 20, 2025)). A month later, and after the Court had granted

12  Plaintiffs' preliminary-injunction motion on the record, the agency Defendants doubled down and

13  terminated most of the cooperative agreements with USRAP resettlement partners to provide

14  refugee case-processing support and domestic resettlement benefits. Suppl. Compl. ¶¶ 208–17.

15  The only explanation given for the termination was that the cooperative agreements no longer

16  "effectuate[] agency priorities" and termination was for "the convenience" of the government. *Id.*

17  ¶¶ 213–14.

18         Together, these actions to halt all refugee resettlement and dismantle the USRAP have

19  caused immense harm to refugees worldwide, *see id.* ¶¶ 136–82, 220, and the organizations that

20  form the backbone of the program, *see id.* ¶¶ 183–204.

21  **III.    The Court has recognized that Plaintiffs are likely to succeed on the merits of their
            ultra vires and APA claims.**

22
23         Plaintiffs filed this case and moved for a preliminary injunction to block enforcement of

    the Refugee Ban EO and its implementation, as well as the suspension of USRAP funding. Dkt.

24  No. 14. On February 25, 2025, the Court issued its first preliminary injunction, followed shortly

25  thereafter by a written order, enjoining Defendants' suspension of refugee processing, decisions,

26

PLS.' OPP'N TO DEFS' MOT. TO DISMISS – 3
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

and admissions and the suspension of USRAP funds. Dkt. No. 45; *see also* Dkt. No. 78 (denying stay of first preliminary injunction). Following the government's termination of USRAP funding, Plaintiffs amended their complaint—the operative complaint at issue on this motion. Dkt. No. 56. Plaintiffs moved for and the Court granted a second preliminary injunction, enjoining the termination of USRAP funding. Dkt. No. 79; *see also* Dkt. No. 92 (denying stay of second preliminary injunction); Dkt. No. 104 (denying motion to reconsider). Defendants appealed both preliminary injunctions, *see* Dkt. Nos. 46, 80, and now seek dismissal of the first supplemental complaint, *see* Dkt. No. 115 ("Mot.").

## LEGAL STANDARD

A court should deny a motion to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) if the allegations, viewed in the light most favorable to the nonmoving party, state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A court should dismiss a complaint under Rule 12(b)(1) only if it determines that it lacks subject-matter jurisdiction and, when resolving a facial attack like Defendants' here, the court "accept[s] the plaintiff's allegations as true" and "draw[s] all reasonable inferences in the plaintiff's favor" to "determine[] whether the allegations are sufficient . . . to invoke the court's jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).

## ARGUMENT

The Court should deny Defendants' motion to dismiss for all the reasons set forth in its previous orders:

- Defendants argue that Plaintiffs' claims should be dismissed because the Court lacks jurisdiction to enjoin the President, Mot. 8–9, but the Court already concluded that these claims are justiciable, *see* Dkt. No. 45 at 18–20, 34–37.

- Defendants seek to dismiss Plaintiffs' funding-related APA claims by asserting that the Tucker Act divests the Court of jurisdiction to review them, Mot. 13–16—an argument this Court has rejected more than once, *see* Dkt. No. 45 at 38–41; Dkt. No. 79 at 8–14; Dkt. No. 104 at 5–7.

- Defendants contend that Plaintiffs' ultra vires claim challenging the Refugee Ban EO and APA claim challenging the Agency Suspension should be dismissed

1    because the Refugee Ban EO is a valid exercise of the President's 8 U.S.C.
2    § 1182(f) authority, Mot. 9–13, but the Court has rejected this argument, *see* Dkt.
     No. 45 at 21–30.

3    •    Defendants rely on *Department of State v. Muñoz*, 602 U.S. 899 (2024), to dispose
          of Plaintiff Esther's and the FTJ Petitioner Subclass's due-process claim, Mot. 17–
4         18, but *Muñoz* has no bearing here, *see* Dkt. No. 45 at 51–53.

5    •    Defendants attempt to evade all APA review by claiming that the agency actions
          here are presidential acts and are neither discrete nor final, and that the agency
6         funding decisions fall within an exception to APA review, Mot. 18–21, but the
          Court dispensed with these arguments before, *see* Dkt. No. 45 at 32–38; Dkt. No. 79
7         at 14–16.

8    In addition, Defendants seek dismissal of the FTJ Petitioner Subclass's due-process claim because

9    the proposed class representative has since arrived in the United States. In doing so, Defendants

10   ignore that an important exception to mootness applies, which allows for adjudication even if a

11   class representative's claim has become moot before the class is certified. Lastly, Defendants argue

12   that Plaintiffs' separation-of-powers claim is barred by the President's power under sections

13   1182(f) and 1185(a), but those provisions have no bearing on the viability of this claim.

14   **I.    The Court has jurisdiction to decide Plaintiffs' claims and issue the relief sought.**

15        **A.    Plaintiffs do not seek to enjoin the President.**

16        Defendants ask the Court to dismiss Plaintiffs' claims challenging the Refugee Ban EO

17   and the Agency Suspension implementing it, as well as Plaintiffs' constitutional claims, "to the

18   extent they apply to the President" because the Court lacks jurisdiction "to enjoin the President in

19   the performance of his official duties." Mot. 8–9.[1] Defendants' request is premised on a

20   fundamental mischaracterization of Plaintiffs' claims and should be rejected.

21        As a threshold matter, Plaintiffs do not seek to enjoin the President. Rather, Plaintiffs seek

22   declaratory relief as to the Refugee Ban EO, *see* Suppl. Compl. 47 (asking Court to "[d]eclare that

23   the Refugee Ban EO is unlawful and invalid"); declaratory relief and vacatur as to the Agency

24   Suspension and suspension and termination of USRAP funding, *see id.* at 47–48 (asking Court to

25

26        [1] Plaintiffs' second claim under the APA is only brought against Secretaries Rubio, Noem,
     and Kennedy—not President Trump. Suppl. Compl. ¶¶ 234–38.

     PLS.' OPP'N TO DEFS' MOT. TO DISMISS – 5
     (No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

"[d]eclare unlawful and set aside the Defendants' suspension of refugee processing, decisions, and admissions" and "[d]eclare unlawful and set aside the Defunding of the USRAP"); and injunctive relief against the agency Defendants, *see id.* at 47 (asking Court to "[i]ssue a[n] . . . injunction [e]njoining Defendants . . . from implementing or enforcing any portion of the Refugee Ban EO," Agency Suspension, and USRAP funding suspensions and terminations). This Court has the authority to review these claims and issue the requested relief. *See* Dkt. No. 45 at 18–20, 34–37. The Court can determine whether the President "acted within the law" in issuing the Refugee Ban EO. *See Clinton v. Jones*, 520 U.S. 681, 703 (1997) ("[W]hen the President takes official action, the Court has the authority to determine whether he has acted within the law."); *Sierra Club v. Trump*, 929 F.3d 670, 696–97 (9th Cir. 2019) (finding challenge to presidential action justiciable where President lacked "statutory authority" and "background constitutional authority"). And the Court can review agency actions taken pursuant to an ultra vires presidential action. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–89 (1952) (affirming decision enjoining Secretary of Commerce from carrying out presidential order because President exceeded his constitutional power); *see also infra* pp. 19–20 (agency actions implementing executive orders or other presidential acts are reviewable under APA). Consequently, the Court has jurisdiction over Plaintiffs' claims challenging the Refugee Ban EO and the Agency Suspension and related constitutional claims, and has the authority to grant the requested relief.

## B.    The Court has jurisdiction over Plaintiffs' funding-related APA claims.

Defendants again argue that the Tucker Act divests the Court of jurisdiction to review Plaintiffs' APA claims related to the USRAP funding suspensions and terminations, an assertion that the Court has already rejected—twice. *See* Dkt. No. 45 at 38–41; Dkt. No. 79 at 8–14. And there has been no change in controlling law undermining these earlier determinations. *See* Dkt. No. 104 at 5–7 (denying Defendants' motion to reconsider).

Contrary to Defendants' contention, *see* Mot. 13, Plaintiffs' funding-related claims do not fall outside the APA's waiver of sovereign immunity, *see* 5 U.S.C. § 702 (sovereign immunity is

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    not waived where relief sought is "expressly or impliedly forbid[den]" by another statute). In

2    considering whether an APA action seeking injunctive and declaratory relief is a disguised breach-

3    of-contract claim impliedly forbidden by the Tucker Act, courts evaluate: "(1) 'the source of the

4    rights upon which the plaintiff bases its claims' and (2) 'the type of relief sought (or appropriate).'"

5    *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (quoting

6    *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). "If rights and remedies are

7    *statutorily* or *constitutionally* based, then district courts have jurisdiction; if rights and remedies

8    are *contractually* based then only the Court of Federal Claims does." *Id.*

9         At the outset, the USRAP cooperative agreements are likely not contracts enforceable

10   under the Tucker Act because they neither confer a direct and tangible benefit on the United States

11   nor are "money-mandating" such that contracting parties have a substantive right to recover

12   damages. *See* Dkt. No. 79 at 10–11. Regardless, the *Megapulse* test readily makes clear that

13   Plaintiffs' claims belong in this Court and are not disguised breach-of-contract claims. The rights

14   Plaintiffs seek to vindicate arise from the APA, the Refugee Act, agency regulations, and the U.S.

15   Constitution, *see* Suppl. Compl. ¶¶ 245–53, and the relief Plaintiffs seek is equitable and forward

16   looking, *see id.* at 47–48 (seeking injunction and vacatur of unlawful agency actions as well as

17   declaratory relief)—which the Court of Federal Claims cannot grant, *see, e.g.*, *Richardson v.

18   Morris*, 409 U.S. 464, 465 (1973); *see also* Dkt. No. 79 at 9–13 (Tucker Act does not impliedly

19   forbid the relief sought by Plaintiffs). The terms of the relevant cooperative agreements are not

20   relevant to adjudication of Plaintiffs' claims.

21        Defendants' heavy reliance on *Department of Education v. California*, 145 S.Ct. 966

22   (2025) (per curiam), is unavailing, *see* Mot. 14–15. As the Court has observed, *see* Dkt. No. 104

23   at 5–6, that case did not announce a new rule of law and instead reaffirmed the longstanding rule

24   from *Bowen v. Massachusetts*, 487 U.S. 879 (1988), that "a district court's jurisdiction 'is not

25   barred by the possibility' that an order setting aside an agency's action may result in the

26   disbursement of funds," *Dep't of Educ.*, 145 S.Ct. at 968 (quoting *Bowen*, 487 U.S. at 910); *see*

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

*also* Apr. 9, 2025 Hr'g Tr. 6:8–25 (Defendants' concession that *Department of Education* "reaffirm[s] that the APA's limited waiver of sovereign immunity does not apply to orders seeking to enforce contractual obligations against the government"). And, in any event, this case differs from *Department of Education* in critical ways. The Supreme Court's decision to stay a temporary restraining order, which required the government to "pay out past-due grant obligations," rested on the *relief*: enforcement of a contractual obligation. *Dep't of Educ.*, 145 S.Ct. at 968; *see also California v. Dep't of Educ.*, 132 F.4th 92, 96–97 (1st Cir. 2025) ("[T]he terms and conditions of each individual grant award are at issue[.]"). Here, by contrast, Plaintiffs seek to enforce Defendants' statutory and constitutional obligations—and the terms and conditions of the individual cooperative agreements are not at issue. Moreover, the plaintiffs in *Department of Education* were parties to the grantor/grantee relationship, whereas the individual Plaintiffs here are not parties to the USRAP cooperative agreements and thus have no claim to enforce them. They can assert only violation of the statutory and constitutional laws underlying their claims, and the APA provides a mechanism for individual plaintiffs to challenge agency actions that "adversely affect[]" them. 5 U.S.C. § 702.

Defendants' reliance on *U.S. Conference of Catholic Bishops v. Department of State*, No. 1:25-CV-00465 (TNM), 2025 WL 763738 (D.D.C. Mar. 11, 2025), is no more availing, *see* Mot. 14–15. Unlike here, the relief sought in *Catholic Bishops* was characterized as "money due" under cooperative agreements, and the plaintiffs' claims relied on the terms and conditions of the agreements. 2025 WL 763738, at *5; *compare* Suppl. Compl. 47–48 (prayer for relief making no mention of past-due award obligations), *with* Complaint at 34, *U.S. Conf. of Cath. Bishops v. Dep't of State*, No. 1:25-CV-00465 (TNM) (D.D.C. Feb. 18, 2025), Dkt. No. 1 (requesting court to "[e]njoin . . . [d]efendants to reimburse USCCB for all expenses it has incurred"). The *Catholic Bishops* court also relied on the *dissenting* opinion in *Bowen* rather than controlling precedent. *See* 2025 WL 763738, at *5, *6 n.6.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    Notably, Defendants' disagreement about what 8 U.S.C. § 1522 obligates only highlights

2    the fundamentally statutory nature of Plaintiffs' claims. *See* Mot. 15–16. And, as the Court has

3    concluded, that statute mandates that the agency Defendants administer the domestic refugee

4    resettlement program. *See* Dkt. No. 45 at 42–43; *see also* 8 U.S.C. §§ 1521–1524. For instance,

5    after Congress appropriates funds, Defendants must ensure the provision of support services for

6    resettled refugees, including employment training and placement, English-language training, and

7    cash assistance. 8 U.S.C. § 1522(a)(1)(A). The agency Defendants' failure to satisfy these and

8    other statutory requirements is the basis of Plaintiffs' claim.

9    In short, as the Court has repeatedly concluded, it has jurisdiction over Plaintiffs' APA

10    claims challenging the USRAP funding suspensions and terminations. *See* Dkt. No. 45 at 38–41;

11    Dkt. No. 79 at 8–14; *see also, e.g.*, *New York v. Trump*, No. 1:25-cv-39-JJM-PAS, 2025 WL

12    1098966, at *1–3 (D.R.I. Apr. 14) (applying *Bowen* as controlling law and concluding that

13    *Department of Education* is inapplicable and does not divest court of jurisdiction over APA claims

14    challenging federal funding freeze), *appeal docketed*, No. 25-1413 (1st Cir. Apr. 28, 2025);

15    *Climate United Fund v. Citibank, N.A.*, No. 25-cv-698 (TSC), 2025 WL 1131412, at *9–12

16    (D.D.C. Apr. 16, 2025) (same as to APA claims challenging funding suspension and termination);

17    *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 1:25-cv-00097-MSM-

18    PAS, 2025 WL 1116157, at *13–15 (D.R.I. Apr. 15) (same as to APA claims challenging funding

19    freeze), *appeal docketed*, No. 25-1428 (1st Cir. May 1, 2025).

20    Finally, even if Plaintiffs' APA claims were impliedly barred by the Tucker Act—and they

21    are not—Defendants do not and cannot dispute that the Court has jurisdiction over Plaintiffs' ultra

22    vires and constitutional claims, including Plaintiffs' claim that the agency Defendants violated the

23    separation of powers when they sought to override Congress's power of the purse. No waiver of

24    sovereign immunity is required for such claims because Defendants enjoy no protection for actions

25    outside their delegated authority. *See, e.g.*, *Murphy Co. v. Biden*, 65 F.4th 1122, 1128–31 (9th Cir.

26    2023) (constitutional claims and ultra vires claims that "implicate [] separation of powers

PLS.' OPP'N TO DEFS' MOT. TO DISMISS – 9
(No. 2:25-cv-255-JNW)

1  concerns" are reviewable); *Schilling v. U.S. House of Representatives*, 102 F.4th 503, 506 (D.C.

2  Cir. 2024) (rejecting assertion of sovereign immunity if plaintiff brings suit challenging federal

3  officer's ultra vires act).

4        **C.**      **The FTJ Petitioner Subclass's due-process claim is not moot.**

5        Defendants contend that Plaintiff Esther's due-process claim must be dismissed because her

6  daughter arrived in the United States since the filing of Plaintiffs' supplemental complaint. *See*

7  Mot. 17.  But Esther brought her claim both on an individual basis and on behalf of the FTJ

8  Petitioner Subclass; thus, regardless of whether her individual claim is moot, the due-process claim

9  brought by the FTJ Petitioner Subclass is not. *See Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975)

10 ("[T]he termination of a class representative's claim does not moot the claims of the unnamed

11 members of the class.").

12       Defendants nevertheless argue that the claim must be dismissed because Esther's claim

13 became moot before the class has been certified. But the Court has jurisdiction to review the

14 subclass's claim under the well-established "capable of repetition yet evading review" exception

15 to the mootness doctrine, which applies here because the claim is inherently transient. *See County*

16 *of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991) (court had jurisdiction even though "the class

17 was not certified until after the named plaintiffs' claims had become moot" because claim fell

18 within transitory exception); Dkt. No. 109 at 5–7 (arguing that Esther still adequately represents

19 subclass such that the Court may certify her under this exception). A claim is inherently transient,

20 and thus subject to this exception, if "(1) the duration of the challenged action is too short to allow

21 full litigation before it ceases; and (2) it is certain that other persons similarly situated will have

22 the same complaint." *Mansor v. U.S. Citizenship & Immigr. Servs.*, 345 F.R.D. 193, 202 (W.D.

23 Wash. 2023) (cleaned up) (finding transitory exception applied where named plaintiffs' claims

24 were mooted by defendants before class was certified). When a proposed class's claims are

25 inherently transitory, "the court may invoke the 'relation back' doctrine upon class certification

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    and review the facts as they were at the time the complaint was filed, 'to preserve the merits of the

2    case for judicial resolution.'" *Id.* (quoting *McLaughlin*, 500 U.S. at 52).

3         Both prongs of the transitory exception are satisfied here. The first prong, assessing whether

4    the duration of the challenged action is too short to allow full litigation before it ceases, is satisfied

5    where "the duration of the controversy is solely within the control of the defendant." *Anderson v.*

6    *Evans*, 371 F.3d 475, 479 (9th Cir. 2004) (cleaned up). Here, the duration of the follow-to-join

7    application process is entirely within Defendants' control because they determine when and how

8    quickly follow-to-join petitions are processed. (Indeed, Plaintiff Esther had been waiting more

9    than seven years to reunify with her daughter when Defendants sought to moot out her claim by

10   allowing her daughter to travel and seek admission.) As to the second prong, it is certain that other

11   follow-to-join petitioners will have the same complaint. Numerous members of the FTJ Petitioner

12   Subclass are impacted by the USRAP suspension: Several thousand refugees already settled in the

13   United States have applied for family reunification through the follow-to-join program and their

14   cases are still frozen as a result of the Refugee Ban EO. *See* Suppl. Compl. ¶ 222; *see also Mansor*,

15   345 F.R.D. at 202 ("[O]ther TPS applicants will certainly have the same complaint" as plaintiffs

16   where defendants will continue challenged practice); *Casa Libre/Freedom House v. Mayorkas*,

17   No. 2:22-cv-01510-ODW, 2023 WL 3649589, at *7 (C.D. Cal. May 25, 2023) (same for SIJ

18   petitioners).

19        The only case Defendants cite to support their assertion that the due-process claim is moot

20   actually supports Plaintiffs' argument. *Kuahulu v. Employers Insurance of Wausau* stressed that

21   its holding—that a case is moot where the class is not certified before the named plaintiff's case

22   becomes moot—was "very narrow" and suggested that the case would not have been moot if (as

23   here) the named plaintiff's claim fell within the capable-of-repetition exception. 557 F.2d 1334,

24   1337 n.3 (9th Cir. 1977) (quoting *Gerstein*, 420 U.S. at 111 n.11). Defendants do not and cannot

25   argue otherwise.

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    **II.    Plaintiffs have stated claims upon which relief can be granted.**

2         **A.    Section 1182(f) does not bar Plaintiffs' claims against the Refugee Ban EO
               and the Agency Suspension.**

3         Defendants' arguments for dismissal of the Refugee Ban EO ultra vires claim and the APA

4    claim challenging the Agency Suspension rely on the presumption that the Refugee Ban EO is a

5    valid exercise of the President's section 1182(f) power, thus barring those claims. *See* Mot. 9–10.

6    But such is not the case, as this Court found in issuing the first preliminary injunction order. *See*

7    Dkt. No. 45 at 21–30. And to the extent Defendants attempt to immunize from APA review agency

8    actions taken to implement the Refugee Ban EO, their efforts fail. *See supra* pp. 5–6 (agency

9    actions taken pursuant to ultra vires presidential action are reviewable); *infra* pp. 19–20 (agency

10   actions implementing executive orders are reviewable under APA). Defendants also suggest that

11   the Ninth Circuit's recent clarification order demands dismissal because, in reviewing the stay

12   factors, it observed that "the government is likely to succeed on the merits." Dkt. No. 113-1 at 3

13   (citing *Trump v. Hawai'i*, 585 U.S. 667 (2018)). But the Ninth Circuit's partial stay order was not

14   a binding ruling on the merits and thus does not support dismissal. *See E. Bay Sanctuary Covenant*

15   *v. Biden*, 993 F.3d 640, 661 (9th Cir. 2021) (stay order's "predictive analysis should not, and does

16   not, forever decide the merits of the parties' claims"); *Nken v. Holder*, 556 U.S. 418, 432 (2009)

17   ("The whole idea [of a stay] is to hold the matter under review in abeyance because the appellate

18   court lacks sufficient time to decide the merits.").[2]

19        The present question for the Court to resolve is whether the facts, viewed in the light most

20   favorable to Plaintiffs, state a claim that the Refugee Ban EO is ultra vires. The answer is "yes"

21   where the suspension fails to comply with section 1182(f)'s textual requirements and where it

22   overrides the Refugee Act and Congress's considered policy judgments in creating the statutory

23   scheme.

24

25   ───────────────

26        [2] To the extent the Ninth Circuit motions panel believed the USRAP suspension to be
     unquestionably a valid exercise of section 1182(f), it would not have denied the stay in part.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1     **1.  The Refugee Ban EO does not satisfy section 1182(f)'s requirements.**

2    In defending their position that the Refugee Ban EO is a valid suspension under section

3 1182(f), which allows the President to "suspend the entry of all [noncitizens] or any class of

4 [noncitizens]" when "the President finds that the[ir] entry . . . would be detrimental to the interests

5 of the United States," Defendants attack a straw man and argue that the President was not required

6 to prescribe a fixed end date for entry restrictions. Mot. 10. While no one disputes that the President

7 was not required to specify a date certain, the proper exercise of section 1182(f) does require some

8 temporal limitation, *see* Dkt. No. 45 at 26–28, such as "link[ing] the duration of the suspension . . .

9 to the resolution of [a] triggering condition," *Hawai'i*, 585 U.S. at 687. Defendants do not appear

10 to dispute that an indefinite ban on refugee entry would exceed the President's authority under

11 section 1182(f). Nor could they. *See id.* (agreeing with plaintiffs that "the word 'suspend' often

12 connotes a deferral till later" (cleaned up)).

13    As the Court has concluded, the Refugee Ban EO goes beyond merely suspending entry and

14 "effectively displaces the refugee program entirely and indefinitely" because it is not tied to any

15 resolvable triggering condition. *See* Dkt. No. 45 at 26–28. It bans entry of refugees to the United

16 States unless and until President Trump determines that admitting refugees "is in the interests of

17 the United States." *Id.* at 24 (citing Refugee Ban EO §§ 1, 4); *see also* Suppl. Compl. ¶¶ 95–101.

18 The order, in turn, defines the national interest to categorically exclude refugees on the ground that

19 they "compromise the availability of resources for Americans" and threaten "taxpayer resources"

20 for citizens. Refugee Ban EO §§ 1–2. Never mind that federal law—namely the Refugee Act and

21 its implementing regulations—specifically requires that refugees be provided federally funded

22 resettlement support, *see* 8 U.S.C. § 1522; 45 C.F.R. § 400 et seq., such that any refugee admitted

23 to the United States necessarily receives (and is entitled to) "taxpayer resources." Indeed, the

24 Refugee Ban EO's "zero-sum view that admitting refugees necessarily depletes resources for

25 Americans creates an unresolvable justification" such that "President Trump could effectively

26

PLS.' OPP'N TO DEFS' MOT. TO DISMISS – 13
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1  suspend USRAP permanently based solely on his judgment about American interests." Dkt. No. 45

2  at 24, 27.

3      Defendants suggest that the triggering condition is the strain on American communities

4  caused by record levels of migration over the past four years. Mot. 10. But there is no "finding"

5  within the ordinary sense of that word in the Refugee Ban EO, Dkt. No. 45 at 22 n.4, and no

6  connection between refugees arriving through USRAP with federal support for resettlement and

7  work authorization and the distinct circumstances involving asylum seekers and other migrants

8  described in the order, which "highlights the disconnect between the Government's stated

9  justifications and its sweeping actions," *id.* at 58. Nor has the President identified any concerns

10  about USRAP that the Refugee Ban EO is designed to address. *Id.* at 27.

11      The Secretaries of State and Homeland Security's submission of reports every ninety days,

12  *see id.* (citing Refugee Ban EO § 4), does little to cure the lack of a resolvable triggering condition

13  because it misses the mark: refugee entry can *never* be in "the interests of the United States" as

14  those interests are defined in the order. To the extent Defendants dispute that the Refugee Ban EO

15  is an indefinite suspension, that is a factual question, not a legal one, that is inappropriate to resolve

16  on a motion to dismiss where Plaintiffs have alleged sufficient facts to state a claim. *See Navarro*

17  *v. Block*, 250 F.3d 729, 732 (9th Cir. 2001) ("A Rule 12(b)(6) motion tests the legal sufficiency of

18  a claim.").

19      In a single conclusory statement, Defendants further argue that section 1182(f)'s requisite

20  finding that entry of the identified noncitizens would be "detrimental to the interests of the United

21  States" was satisfied here. Mot. 10. But Defendants do not provide any explanation, nor do they

22  meaningfully engage with any of Plaintiffs' allegations that this precondition was not met. *See*

23  Dkt. No. 45 at 22–23 n.4 (noting that "[t]he textual divergence between Section 1182(f)'s

24  requirements and the USRAP EO's language raises questions about its conformity with

25  congressional authorization"). The only "findings" of detriment underlying the Refugee Ban EO

26  are irrelevant to the entry ban ordered. *See* Suppl. Compl. ¶¶ 108–13 (explaining general lack of

PLS.' OPP'N TO DEFS' MOT. TO DISMISS – 14
(No. 2:25-cv-255-JNW)

1    findings and clarifying that cited examples of "influxes of migrants" were unrelated to refugee

2    admissions); *see also Hawai'i v. Trump*, 859 F.3d 741, 770–76 (9th Cir.) (per curiam) (requiring

3    justification beyond statement that detriment existed), *vacated on other grounds*, 583 U.S. 941

4    (2017); *Nat'l Ass'n of Mfrs. v. Dept. of Homeland Sec.*, 491 F.Supp.3d 549, 569 (N.D. Cal. 2020)

5    (finding set out in text of Proclamation did "not comport with actual facts" and was insufficient to

6    satisfy section 1182(f) prerequisite).

7         To the extent Defendants cite 8 U.S.C. § 1185(a)(1) to support their argument that the

8    President acted pursuant to his congressionally conferred powers in enacting the Refugee Ban EO,

9    *see* Mot. 9, that provision does not change the analysis that Plaintiffs' claim survives. Section

10   1185(a)(1) similarly does not give the President the power to completely suspend the USRAP.

11   Section 1185(a)(1) makes it unlawful for a noncitizen to enter the United States except under such

12   "reasonable rules, regulations, and orders" as the President prescribes. Thus, at minimum, the

13   Refugee Ban EO would need to align with the President's authority under section 1182(f), *see*

14   *Hawai'i*, 859 F.3d at 770 n.10—and, as Plaintiffs have explained, it does not. Where the Refugee

15   Ban EO is temporally indefinite and is not based on any findings of detriment, it is not a valid

16   exercise of the President's section 1182(f) power.

17             **2.    The Refugee Ban EO overrides the Refugee Act's comprehensive
                        statutory scheme, which the President's carefully delineated authority
18                      to set the refugee-admissions ceiling does not impliedly allow.**

19        Defendants further argue that the Refugee Ban EO cannot be ultra vires, and Plaintiffs'

20   claims must fail, because the Refugee Act merely reinforces the President's section 1182(f) power.

21   Mot. 10–11. As an initial matter, the Court has already concluded to the contrary: the Refugee Ban

22   EO is likely ultra vires because it eviscerates Congress's carefully crafted statutory scheme

23   governing refugee admissions by suspending the USRAP entirely (and indefinitely) and

24   unlawfully countermands Congress's considered policy judgments underlying the USRAP. *See*

25   Dkt. No. 45 at 24–26. Specifically, the Refugee Ban EO identifies four "America First" policy

26   goals, each of which either supplants the congressional purpose underlying the Refugee Act or

PLS.' OPP'N TO DEFS' MOT. TO DISMISS – 15
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    implicates interests that "the pre-existing law already guarantees." *Nat'l Ass'n of Mfrs.*, 491

2    F.Supp.3d at 564–65 (executive order unlawful where pre-existing law guaranteed order's policy

3    objectives).

4              To support their argument that the Refugee Act only fortifies the President's section

5    1182(f) powers, Defendants point to the President's authority to set a maximum number of refugee

6    admissions to the United States each fiscal year. Mot. 10–11. But the Refugee Act does not grant

7    the President unfettered discretion; rather, it aims to "*balance*[] presidential authority *with*

8    congressional oversight." Dkt. No. 45 at 4 (emphasis added). For instance, the President, before

9    the start of each fiscal year, must consult with members of Congress "regarding the foreseeable

10   number of refugees who will be in need of resettlement . . . and the anticipated allocation of refugee

11   admissions." 8 U.S.C. § 1157(a)(2), (d)(1); *see also* § 1157(e) (defining "appropriate

12   consultation"). And while the President may increase refugee admissions mid-year in response to

13   an "unforeseen emergency refugee situation," subject to congressional consultation requirements,

14   *id.* § 1157(b), (d)(3)(B), the statute provides no mechanism to abruptly curtail refugee admissions

15   mid-year after the President's plan has been confirmed following "appropriate consultation." *See*

16   *Hawai'i*, 859 F.3d at 780–81 (reviewing Refugee Act's "very specific" consultation requirements

17   and concluding it "does not provide a mechanism for the President to *decrease* the number of

18   refugees to be admitted mid-year"). Contrary to what Defendants claim, *see* Mot. 10, the President

19   could not set the refugee ceiling to zero for the same reasons he cannot indefinitely suspend the

20   USRAP: it would override Congress's carefully crafted statutory scheme, supplant Congress's

21   policy considerations in enacting the Refugee Act, and conflict with 8 U.S.C. § 1157(c)(2)(A).

22             In addition to overriding the USRAP, the Refugee Ban EO is ultra vires because it conflicts

23   with Congress's guarantee of admission to qualifying family members of resettled refugees. *See*

24   *Hawai'i*, 585 U.S. at 689 ("[Section] 1182(f) does not allow the President to expressly override

25   particular provisions of the INA [Immigration and Nationality Act]."). Defendants argue that

26   nothing in section 1157(c)(2)(A) limits the President's authority or entitles an admissible follow-

PLS.' OPP'N TO DEFS' MOT. TO DISMISS – 16
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    to-join beneficiary to admission. Mot. 11–12. But section 1157(c)(2)(A) mandates that follow-to-

2    join beneficiaries "shall" be entitled to the same refugee status as the principal applicant so long

3    as they are not barred by specific inadmissibility grounds. *See Doe v. Trump*, 288 F.Supp.3d 1045,

4    1077–79 (W.D. Wash. 2017) (indefinite suspension of follow-to-join processing and admissions

5    violates section 1157(c)(2)(A)).

6          In arguing that follow-to-join beneficiaries have no statutory entitlement to admission,

7    Defendants attempt to rewrite the statutory text to distort the plain meaning of section

8    1157(c)(2)(A) and impose additional requirements on follow-to-join admissions. Specifically,

9    Defendants argue that section 1157(c)(2)(A) only provides that a follow-to-join beneficiary is

10   entitled to the same admission status as the principal refugee "if they are *admitted*." Mot. 11

11   (emphasis added). The plain text of section 1157(c)(2)(A) contains no such limitation; it does,

12   however, link the entitlement to whether the beneficiary is "*admissible*," which has a very

13   particular meaning under the INA. *Compare* 8 U.S.C. § 1101(a)(13)(A) ("admission" and

14   "admitted" mean "the lawful entry of [a noncitizen] into the United States after inspection and

15   authorization"), *with id.* § 1182 ("inadmissibility" refers to specific statutory grounds that make

16   noncitizens "ineligible to be admitted to the United States"). Further, Defendants claim that a

17   derivative refugee's admission is constrained by the refugee ceiling set by the President for the

18   fiscal year. Mot. 12. But section 1157 provides that "*[u]pon* the [derivative's] admission to the

19   United States, such admission shall be charged against" the refugee ceiling. 8 U.S.C.

20   § 1157(c)(2)(A) (emphasis added). In contrast, the immediately preceding subsection provides that

21   principal refugees "may" be admitted, but their admission is "[s]ubject to the numerical

22   limitations" of the refugee ceiling, among other limitations. *Id.* § 1157(c)(1). It is well established

23   that where Congress writes subsections of a statute differently, it intends a different meaning. *See,*

24   *e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983).

25         Lastly, Defendants' reliance on section 1201(h) to support their assertion that follow-to-join

26   beneficiaries have no statutory entitlement to admission, Mot. 10–12, is misplaced, as it relates to

PLS.' OPP'N TO DEFS' MOT. TO DISMISS – 17
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    "[i]ssuance of visas," *see* 8 U.S.C. § 1201, and refugees are not visa holders, *see* Dkt. No. 15-5.

2    And in any event, section 1157 already requires an inadmissibility determination, as Plaintiffs

3    acknowledge. The Refugee Ban EO overrides the USRAP and other INA provisions, and

4    Defendants' arguments to the contrary are unavailing.

5                                               *       *       *

6         Because the Refugee Ban EO and the Agency Suspension are not valid exercises of the

7    President's section 1182(f) powers—and, indeed, exceed those powers—Defendants' motion to

8    dismiss those claims should be denied.

9    **B.    Section 1182(f) has no bearing on Plaintiffs' claim that Defendants'
            suspension and termination of USRAP funding violate the separation of
10           powers.**

11        Defendants argue that Plaintiffs' separation-of-powers claim is barred by the President's

12   "sweeping proclamation power" to suspend the entry of noncitizens and impose additional

13   limitations on entry. Mot. 12 (citing 8 U.S.C. §§ 1182(f), 1185(a)). In so arguing, Defendants

14   fundamentally misconstrue Plaintiffs' separation-of-powers claim as pleaded: the Foreign Aid EO

15   and the agency Defendants' implementation of it violate Congress's exclusive power of the purse

16   and power to legislate because Defendants, without congressional authorization, suspended and

17   terminated USRAP funding that had already been appropriated. *See* Suppl. Compl. ¶¶ 123–35,

18   205–19, 254–57; *see, e.g.*, *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1231–35

19   (9th Cir. 2018) (executive order violated constitutional principle of separation of powers where it

20   directed withholding of properly appropriated funds to effectuate President's policy goals).

21        Defendants' arguments and cited authorities do not bear *at all* on Congress's exclusive power

22   of the purse and power to legislate. Indeed, section 1182(f) was not cited as a legal authority in the

23   Foreign Aid EO, which Defendants claimed was the basis for the suspension of USRAP funding.

24   This is unsurprising, since section 1182(f) concerns noncitizen entry, not federal funding. And

25   even if section 1182(f) does have some connection to the Foreign Aid EO—and it does not—that

26   provision provides no authority to unelected agency officials.

PLS.' OPP'N TO DEFS' MOT. TO DISMISS – 18
(No. 2:25-cv-255-JNW)

1        In a conclusory statement, Defendants attempt to turn Plaintiffs' separation-of-powers claim

2    on its head with the proposition that granting the requested relief would "override the President's

3    judgment in the arena of foreign affairs." Mot. 13. But Plaintiffs do not ask the Court to declare

4    unlawful and invalid the Foreign Aid EO. Plaintiffs ask only that the Court (1) enjoin Defendants

5    from implementing or enforcing the USRAP funding suspensions and terminations and (2) declare

6    unlawful and set aside the agency Defendants' actions to defund the USRAP. *See* Suppl.

7    Compl. 47–48. Plaintiffs' separation-of-powers claim should not be dismissed.[3]

8        **C.**    ***Muñoz* does not bar the FTJ Petitioner Subclass's due-process claim.**

9        Defendants contend that the FTJ Petitioner Subclass's claim that the Refugee Ban EO and

10   Agency Suspension violate their due-process rights is foreclosed by *Muñoz*, Mot. 17–18, but that

11   case is inapposite, *see* Dkt. No. 45 at 51–52. The *Muñoz* Court held that a U.S. citizen plaintiff did

12   not possess a constitutional liberty interest in her noncitizen spouse's admission, but that holding

13   was in the context of analyzing whether there is an unenumerated constitutional right to secure a

14   noncitizen spouse's entry into the United States. *See* 602 U.S. at 903; Dkt. No. 45 at 51. Here, in

15   contrast, a specific *statutory entitlement* to admission where otherwise admissible, not a

16   discretionary privilege, creates the constitutionally protected interest. *See supra* pp. 16–17. That

17   distinction proves fatal to Defendants' argument for dismissal of the due-process claim.

18       **D.**    **Plaintiffs' APA claims are reviewable.**

19       **1.**    **The agency Defendants' implementation of the Refugee Ban EO is reviewable under the APA.**

20

21       Defendants take the position that all of Plaintiffs' APA claims must be dismissed because

22   the suspension of the USRAP and the Foreign Aid EO are presidential actions and thus not

23   reviewable under the APA. Mot. 19. But, as this Court and other courts in this circuit have held,

24   agency actions implementing executive orders or other presidential acts are reviewable under the

25

26   ───────────────

    [3] Defendants have waived challenging Plaintiffs' separation-of-powers claim, *see* Suppl.
Compl. ¶¶ 254–57, as to the USRAP funding suspensions and terminations, *see* Mot. 12–13.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

APA. *See* Dkt. No. 45 at 34–37; *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 754–55 (9th Cir. 2018) (reviewing plaintiffs' APA challenge where challenged agency rule implemented presidential proclamation); *Doe #1 v. Trump*, 423 F.Supp.3d 1040, 1042–45 (D. Or. 2019) (reviewing agencies' implementation of presidential proclamation that was issued pursuant to section 1182(f)). Indeed, when agencies exercise judgment and discretion in implementing executive orders, their actions are not ministerial and cannot be shielded from APA review. *See, e.g.*, *Tate v. Pompeo*, 513 F.Supp.3d 132, 143 (D.D.C. 2021) (State Department implementation of presidential proclamation forbidding admission to certain noncitizens was not ministerial and was reviewable); *Milligan v. Pompeo*, 502 F.Supp.3d 302, 314 (D.D.C. 2020) (same).

Here, the Agency Suspension went beyond merely implementing the Refugee Ban EO and substantively expanded the order's ban on refugee entry in "at least three ways"—by (1) imposing the ban one week before its effective date; (2) terminating all USRAP case processing and operations, not just case decisions and admissions; and (3) "discretionarily opt[ing]" not to create the system for case-by-case exceptions to the entry ban as called for by the order. Dkt. No. 45 at 34–37, 48; *see also* Suppl. Compl. ¶¶ 114–22. Moreover, the agency Defendants went far beyond the text of the Foreign Aid EO that they purported to implement when they suspended funds for a *domestic* refugee-resettlement program that the order did not even reference, *see* Dkt. No. 45 at 49, and when the agency decided, in its discretion, to terminate all USRAP funds (and thereby terminated resettlement support services to which refugees are entitled upon arrival to the United States); refugees' ability to obtain assurances necessary to travel to the United States; and refugee case processing in whole regions of the world. Dkt. No. 79 at 5, 19–20 *see also* Suppl. Compl. ¶¶ 127–30. The agency Defendants' unlawful exercise of agency discretion in taking these actions cannot evade APA review.

### 2. Plaintiffs challenge discrete and final agency actions.

Next, Defendants argue that the actions taken by the agency Defendants are still not reviewable under the APA because they are neither discrete nor final. Mot. 18–20. The Court

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    correctly rejected these same arguments in holding that the Agency Suspension and funding

2    suspensions are reviewable under the APA. *See* Dkt. No. 45 at 32–38.

3    According to Defendants, Plaintiffs fail to identify discrete agency action but instead seek

4    the "wholesale improvement of [a] program by court decree." Mot. 18 (quoting *Lujan v. Nat'l*

5    *Wildlife Fed'n*, 497 U.S. 871, 891 (1990)). Not so. *See* Dkt. No. 45 at 32–34. In seeking a return

6    to the status quo, Plaintiffs challenge two sets of time-limited, specific agency actions: the

7    suspension of USRAP-related refugee case processing, decisions, and admissions; and the

8    suspension and termination of federal funding to administer the USRAP. These are discrete, final

9    agency actions properly subject to APA review, and the same holds true now. *See* Dkt. No. 45 at

10   32–34.

11   Indeed, *Lujan v. Nat'l Wildlife Fed'n*, on which Defendants rely, supports Plaintiffs'

12   position. There, the plaintiffs did not challenge one or even multiple specific agency actions.

13   Instead, the plaintiffs challenged "the continuing (and thus constantly changing) operations of the

14   [agency] in reviewing" a certain category of applications. *Lujan*, 497 U.S. at 890. The Supreme

15   Court found that there was no identifiable agency action under such circumstances but noted that

16   if there was "some specific order or regulation, applying some particular measure across the

17   board," then it could be challenged under the APA. *Id.* at 890 n.2. Here, the challenge is against a

18   discrete universe of agency actions taken to implement the Refugee Ban EO and Foreign Aid EO,

19   which were applied across the board to refugee applicants, newly resettled refugees, and

20   resettlement partners. Indeed, other courts in this circuit have found challenges to agency action

21   implicating a broader immigration program or policy to be reviewable under the APA. *See, e.g.*,

22   *Al Otro Lado, Inc. v. McAleenan*, 394 F.Supp.3d 1168, 1206–07 (S.D. Cal. 2019) (Department of

23   Homeland Security policy limiting asylum access at border was reviewable under APA).

24   Defendants also argue that the Agency Suspension and USRAP funding suspensions are

25   not "final" agency action, and thus not reviewable under the APA, *see* 5 U.S.C. § 704, because

26   they consist of "temporary steps" and only "pause" refugee program processes and funding,

PLS.' OPP'N TO DEFS' MOT. TO DISMISS – 21
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    Mot. 19–20. But "*all* agency actions are subject to future change." Dkt. No. 45 at 38. Rather, an

2    agency action is final if it (1) "mark[s] the consummation of the agency's decisionmaking process"

3    and (2) is an "action . . . from which legal consequences will flow." *Bennett v. Spear*, 520 U.S.

4    154, 177–78 (1997) (cleaned up). Both prongs of the *Bennett* test are satisfied here. *See* Dkt. No. 45

5    at 37–38. The agencies' decision-making process here had a direct and immediate effect on the

6    day-to-day operations of the refugee resettlement partners, case processing for refugee applicants,

7    and benefits provisions for recently resettled refugees in the United States. *See* Suppl. Compl.

8    ¶¶ 114–35, 205–19. Whether the action leads to a permanent state of affairs is immaterial.

9    Moreover, there are clear practical and legal effects that flowed from the agency decisions. *See,*

10   *e.g.*, *id.* ¶¶ 136–72, 220–28 (explaining devastating impact of agency action on individual

11   Plaintiffs and similarly situated class members); *id.* ¶¶ 183–204 (describing existential threat to

12   organizational Plaintiffs). Plaintiffs' APA claims challenge discrete, final agency actions, and the

13   authorities on which Defendants rely actually support Plaintiffs' arguments.

**3.     In allocating funding from an appropriation, Defendants do not have the discretion to abandon statutory mandates.**

14

15

16   Lastly, Defendants argue that APA review of Plaintiffs' funding-related claims is

     unavailable because the State Department's decisions to suspend and terminate the organizational

17   Plaintiffs' cooperative agreements were "agency action [] committed to agency discretion by law."

18   5 U.S.C. § 701(a)(2) (excepting from APA review "agency action [that] is committed to agency

19   discretion by law"); *see also* Mot. 20–21. This narrow exception to the APA's presumption of

20   reviewability does not apply here because there is clear law to apply; thus, Plaintiffs' claims

21   challenging the USRAP funding suspensions and terminations are reviewable under the APA. *See*

22   Dkt. No. 79 at 14–16.

23   The "committed to agency discretion by law" exception to APA reviewability applies

24   "where the substantive statute left the courts with 'no law to apply.'" *Heckler v. Chaney*, 470 U.S.

25   821, 826 (1985) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    (1971)). In other words, it applies only if the statute at issue "is drawn so that a court would have

2    no meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 830.

3    But here, the Refugee Act contains "specific directives" the agencies cannot ignore. Dkt. No. 79

4    at 15–16. "Courts have consistently distinguished between an agency's discretion in how it

5    *implements* statutory mandates . . . and an agency's attempt to *abandon* those mandates entirely,"

6    the latter of which is "always reviewable." *Id.* at 15.

7        The government's reliance on *Lincoln v. Vigil*, 508 U.S. 182 (1993), merely reiterates the

8    law in the context of lump-sum appropriations. But *Lincoln* makes clear that the allocation of funds

9    from a lump-sum appropriation is judicially reviewable to determine whether the agency

10   "disregard[ed] statutory responsibilities." *Id.* at 192–93; *see also King County v. Azar*, 320

11   F.Supp.3d 1167, 1175–76 (W.D. Wash. 2018) (decision to shorten grant period reviewable where

12   statute and regulates provided applicable law). That is exactly the situation here: Plaintiffs allege

13   that Defendants' funding decisions violate their responsibilities under the Refugee Act and related

14   regulations, *see* 8 U.S.C. § 1522(a)(1)(A); 45 C.F.R. § 400 et seq. Even if Defendants have

15   discretion in how to satisfy their statutory obligations, they do not have the discretion to opt out of

16   them. Yet, that is exactly what Defendants have done.

17       In sum, Plaintiffs' APA claims do not fall within any exceptions to APA review, and

18   Defendants have not shown otherwise.

19                                   **<u>CONCLUSION</u>**

20       For the foregoing reasons, this Court should deny Defendants' motion.

21                              *    *    *

22       The undersigned certifies that this opposition contains 8,147 words, in compliance with the

23   Local Civil Rules.

24

25

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    Dated: May 23, 2025

2        Deepa Alagesan*
3        Mevlüde Akay Alp*
         Linda Evarts*
4        Ghita Schwarz*
         Pedro Sepulveda, Jr.†
5        **INTERNATIONAL REFUGEE**
         **ASSISTANCE PROJECT**
6        One Battery Park Plaza, 33rd Floor
         New York, New York 10004
7        Telephone: (646) 939-9169
         Facsimile: (516) 324-2267
8        dalagesan@refugeerights.org
         makayalp@refugeerights.org
9        levarts@refugeerights.org
         gschwarz@refugeerights.org
10
         Melissa Keaney*
11       **INTERNATIONAL REFUGEE**
         **ASSISTANCE PROJECT**
12       P.O. Box 2291
         Fair Oaks, California 95628
13       Telephone: (646) 939-9169
         mkeaney@refugeerights.org
14
         Laurie Ball Cooper*
15       Megan Hauptman*
         **INTERNATIONAL REFUGEE**
16       **ASSISTANCE PROJECT**
         650 Massachusetts Ave. NW
17       Washington, D.C. 20001
         Telephone: (646) 939-9169
18       lballcooper@refugeerights.org
         mhauptman@refugeerights.org
19

By: s/ *Harry H. Schneider, Jr.*
    Harry H. Schneider, Jr., WSBA No. 9404
    Jonathan P. Hawley, WSBA No. 56297
    Shireen Lankarani, WSBA No. 61792
    Esmé L. Aston, WSBA No. 62545
    **PERKINS COIE LLP**
    1201 Third Avenue, Suite 4900
    Seattle, Washington 98101
    Telephone: (206) 359-8000
    Facsimile: (206) 359-9000
    HSchneider@perkinscoie.com
    JHawley@perkinscoie.com
    SLankarani@perkinscoie.com
    EAston@perkinscoie.com

    John M. Devaney*
    **PERKINS COIE LLP**
    700 Thirteenth Street NW, Suite 800
    Washington, D.C. 20005
    Telephone: (202) 654-6200
    Facsimile: (202) 654-6211
    JDevaney@perkinscoie.com

    Joel W. Nomkin*
    **PERKINS COIE LLP**
    2525 East Camelback Road, Suite 500
    Phoenix, Arizona 85016
    Telephone: (602) 351-8000
    Facsimile: (602) 648-7000
    JNomkin@perkinscoie.com

    Nicholas J. Surprise*
    **PERKINS COIE LLP**
    33 East Main Street, Suite 201
    Madison, Wisconsin 53703
    Telephone: (608) 663-7460
    Facsimile: (608) 663-7499
    NSurprise@perkinscoie.com

    *Counsel for Plaintiffs*

    * *Admitted pro hac vice*
    † *Pro hac vice pending*

20

21

22

23

24

25

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000