```
 1                UNITED STATES DISTRICT COURT

 2               WESTERN DISTRICT OF WASHINGTON

 3   _____

     PLAINTIFF PACITO; PLAINTIFF   )
 4   ESTHER; PLAINTIFF JOSEPHINE;   )
     PLAINTIFF SARA; PLAINTIFF      )
 5   ALYAS; PLAINTIFF MARCOS;       )
     PLAINTIFF AHMED; PLAINTIFF     )
 6   RACHEL; PLAINTIFF ALI; HIAS,   )
     INC.; CHURCH WORLD SERVICE,    )
 7   INC.; and LUTHERAN COMMUNITY   )
     SERVICES NORTHWEST,            )
 8                                  )
               Plaintiffs,          )   No. 2:25-cv-00255-JNW
 9                                  )
          vs.                       )   Seattle, WA (via Zoom)
10                                  )
     DONALD J. TRUMP, in his        )
11   official capacity as           )
     President of the United        )
12   States; MARCO RUBIO, in his    )
     official capacity as           )
13   Secretary of State; KRISTI     )
     NOEM, in her official          )
14   capacity as Secretary of       )
     Homeland Security; ROBERT F.   )
15   KENNEDY, JR., in his           )
     official capacity as           )
16   Secretary of Health and        )
     Human Services,                )
17                                  )   Status Conference
               Defendants.          )   July 7, 2025
18                                  )   11:00 a.m.

19   _____

20            VERBATIM REPORT OF PROCEEDINGS
          BEFORE THE HONORABLE JAMAL N. WHITEHEAD
21              UNITED STATES DISTRICT JUDGE

22   _____

23

24

25
```

```
 1    APPEARANCES:

 2    For the Plaintiffs:   Jonathan Patrick Hawley
                            Perkins Coie
 3                          1301 2nd Avenue, Suite 4200
                            Seattle, WA 98101-3804
 4                          jhawley@perkinscoie.com

 5

 6    For the Defendants:   David Kim
                            Joseph McCarter
 7                          U.S. Department of Justice
                            PO Box 878
 8                          Ben Franklin Station
                            Washington, DC 20044
 9                          david.kim4@usdoj.gov
                            joseph.a.mccarter@usdoj.gov
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Pacito et al v. Trump et al, 7/7/25

```
 1                    P R O C E E D I N G S

 2                        *    *    *

 3          THE CLERK:  The United States District Court for the

 4    Western District of Washington is now in session, the Honorable

 5    Jamal N. Whitehead presiding.

 6          This is the matter of Pacito et al. vs. Trump et al.,

 7    Cause Number C25-255, assigned to this court.

 8          Will counsel please make their appearances for the record.

 9          ATTY. HAWLEY:  Good morning, Your Honor.  Jonathan

10    Hawley from Perkins Coie for plaintiffs.  And I'm joined today

11    by my colleagues from Perkins Coie and the International

12    Refugee Assistance Project.

13          ATTY. KIM:  Good morning, Your Honor.  David Kim for

14    government defendants.  I'm also joined by my colleague Joseph

15    McCarter.

16          THE COURT:  All right.  Well, good afternoon or

17    perhaps -- good afternoon or good morning if you're on the West

18    Coast.

19          I've reviewed the parties' various filings, certainly

20    looked at plaintiffs' motion for an emergency status

21    conference.  I've also looked at the supplemental briefing that

22    the parties have submitted, at the Court's request, in the wake

23    of the Supreme Court's opinion in Trump vs. CASA.

24          Thank you for putting together that briefing on relatively

25    short notice.  I note that the Ninth Circuit had put a similar
```

Pacito et al v. Trump et al, 7/7/25

```
 1    request to the parties but gave you-all 14 days.  So thank you
 2    for the quick turnaround time on that.
 3          So the hearing is being held at plaintiffs' request, but
 4    there are certainly issues that the Court is keen to hear
 5    argument from the parties on.  So I'll tell you, you know, sort
 6    of what's top of mind for me right now.
 7          I'd like to hear you-all out.  I've got, I think, pretty
 8    firm views about the impact of Trump vs. CASA on this case.
 9    But I'll give you-all an opportunity to state your case about
10    the impact of that opinion on the scope of the relief in this
11    case.
12          Next, there's a dispute about the June 4 proclamation,
13    Proclamation 10949, and its effect on the government's
14    obligations under the existing preliminary injunction.  There's
15    also a disagreement about whether the injunction here covers
16    refugees whose travel plans were canceled before January 20 for
17    reasons unrelated to the USRAP executive order.
18          And, then, finally, I'd like to hear from the government
19    about its progress in processing injunction-protected refugees.
20    And that's separate and apart from all of the discussion about
21    rebuttable presumptions and the 160 refugees that are presumed
22    to be within the scope of the injunction.
23          So let's start with the Trump vs. CASA opinion.
24          Mr. Hawley, will you be speaking on behalf of plaintiffs?
25               ATTY. HAWLEY:  Yes, Your Honor.
```

Pacito et al v. Trump et al, 7/7/25

```
1           THE COURT:  All right.  Well, let's hear from you on

2   that subject.

3           ATTY. HAWLEY:  Yes.  Simply put, Your Honor, CASA

4   does not require, and, at this point, the Court cannot order, a

5   substantive change to the scope of relief that was granted in

6   the preliminary injunctions.  CASA expressly laid out three

7   exceptions to its general holding on universal injunctions,

8   each of which independently applies here and confirms the

9   propriety of nationwide relief in this case.

10          The first is that nationwide relief can still be granted

11  when needed to provide complete relief to the parties.  That's

12  old law, and that's exactly the standard that the Court already

13  applied when it concluded that nationwide relief was needed

14  here.  Nothing has changed to alter that conclusion.

15          We had some individual plaintiffs in this case who are

16  assured to nonparty resettlement agencies, and those plaintiffs

17  will suffer harm if they are denied the services and support

18  that those third-party organizations provide.  We also have

19  organizational plaintiffs who, in turn, assist nonparty

20  refugees across the country and around the globe, and they

21  suffer harm for each refugee who is not assured to them.

22          Basically, nothing short of nationwide relief would

23  completely prevent the injuries to the plaintiffs that the

24  Court has recognized and that defendants never meaningfully

25  disputed.  That is the tailored relief that is needed to
```

Pacito et al v. Trump et al, 7/7/25

1    prevent the injuries that have been identified.

2          And I'll also flag that the *CASA* opinion included a

3    footnote about practicality.  This Court recognized that the

4    U.S. Refugee Admissions Program is interconnected and requires

5    cross-border cooperation.  It's an inherent part of the

6    process.  And so even from a practical standpoint, nationwide

7    relief is necessary to provide meaningful relief in this case.

8          The second is that another footnote in the *CASA* opinion

9    expressly exempts APA actions from its holding, and this is, in

10   part, an APA case.

11         Now, defendants have suggested in a footnote that there's

12   some daylight between preliminary relief that the Court can

13   issue with its equitable powers and final relief of vacatur in

14   an APA case.  But preliminary relief very often mirrors final

15   relief as part of the Court's equitable power.  And what's

16   more, there is still controlling Ninth Circuit case law that

17   allows for a nationwide injunction against agency action when

18   it's challenged under the APA.

19         And I'll cite to that the *East Bay Sanctuary Covenant vs.*

20   *Biden* case from 2021.  That's at 993 F.3d 640.  I quote "When a

21   reviewing court determines that agency regulations are

22   unlawful, the ordinary result is that the rules are vacated,

23   not that their application to the individual petitioners is

24   proscribed."  And that conclusion was on an appeal of a TRO and

25   a preliminary injunction in that case.

Pacito et al v. Trump et al, 7/7/25

1          Third, Your Honor, this is a class action, which *CASA*
2    discusses at length.  Nationwide relief is necessary here to
3    provide full relief to our requested subclasses.
4          And I will flag, Your Honor, that it does not matter that
5    the preliminary injunction preceded a ruling on class
6    certification in this case.  That was also the case in two
7    Ninth Circuit opinions from 2020, *Doe Number 1 vs. Trump*, 957
8    F.3d 1050, and *Al Otro Lado vs. Wolf*, 952 F.3d 999.
9          We will add, though, that *CASA* puts renewed emphasis and
10   urgency on our pending motion for class certification, and we
11   respectfully encourage the Court to rule on that.  But, again,
12   that is in a third independent basis for affirming the
13   propriety of nationwide relief here.
14         And I want to address one other thing -- yes, please.
15              THE COURT:  Yeah, on the point of the pending class
16   certification motion, there's also a pending motion to dismiss.
17   The parties spent time talking about the Court's jurisdiction
18   as it relates to expanding or narrowing the scope of the
19   existing injunction.
20         Are there any jurisdictional issues with the Court ruling
21   on the pending motions --
22              ATTY. HAWLEY:  There is -- apologies, Your Honor.
23         No.  When a preliminary injunction is appealed, it does
24   not divest the district court of the jurisdiction to do normal
25   things it would ordinarily do in a proceeding, including ruling

Pacito et al v. Trump et al, 7/7/25

1   on class certification.

2        There's a -- *Doe vs. University of Washington*, 2018 WL

3   453451, is a Western District of Washington case from 2018 that

4   addresses this issue in the context of class certification

5   specifically.  And *G&M, Inc. vs Newbern*, which is 488 F.2d 742,

6   is a Ninth Circuit opinion from the 1970s that gets at the

7   general proposition, that just because a preliminary injunction

8   is appealed, it doesn't divest a district court of jurisdiction

9   to, again, do the ordinary things it would normally do, like,

10  in this case, rule on class certification or rule on a motion

11  to dismiss.

12        And on this jurisdictional point, Your Honor, you might

13  have noticed that both plaintiffs and defendants, in our latest

14  briefing, cite the same cases and the same principles to

15  discuss what the Court can and cannot do at this time.  And I

16  thought I might address that briefly.

17        What is not allowed or what the Court does not have

18  jurisdiction to do, at this point, is what defendants request

19  in light of *CASA*, which is to dramatically limit the scope of

20  an appeal preliminary injunction, especially on the facts here,

21  where it's an intervening change in law.  And this issue,

22  whether or not the scope of nationwide relief is appropriate in

23  this case, has been directly put before the Ninth Circuit.  It

24  has been ceded to them.  And as you noted, the Ninth Circuit

25  has requested briefing on the impact of *CASA*.

Pacito et al v. Trump et al, 7/7/25

 1          Defendants chose to appeal the preliminary injunction, and
 2     they chose to appeal this issue in particular.  They put the
 3     ball into the Ninth Circuit's court, and they can't take it
 4     back now without meaningfully altering the case on appeal,
 5     which the Court does not have jurisdiction to do at this point.
 6          But what the Court does have jurisdiction to do is enforce
 7     the preliminary injunction as it is currently in effect.  And
 8     that is what plaintiffs are seeking here.  The Court plainly
 9     retains jurisdiction to, for example, adopt plaintiffs'
10     proposed compliance framework, appoint a special neutral, and
11     order defendants to continue to comply with the preliminary
12     injunction and take remedial steps if they refuse to do so.
13          And I'll just flag that the appointment of a special
14     neutral is especially important right now given that the Ninth
15     Circuit prescribed a case-by-case analysis to determine whether
16     or not a given refugee is protected by the injunction, and
17     facilitating that inquiry is well within the Court's powers.
18     And we believe that it's especially important to do so now
19     given that the August 1 medical clearance deadline for the
20     injunction-protected refugees is rapidly approaching, and there
21     are other deadlines and timing considerations that, more than
22     ever, require a special neutral to be appointed and to move
23     quickly to adjudicate these cases.
24          THE COURT:  All right.  Thank you.
25          Mr. Kim, will you be responding to these points on behalf

Pacito et al v. Trump et al, 7/7/25

```
1   of the government?

2           ATTY. KIM:  No.  My colleague Joseph McCarter will be

3   addressing this issue, Your Honor.

4           THE COURT:  Mr. McCarter?

5           ATTY. McCARTER:  Thank you, Your Honor.  I'll be

6   addressing the *CASA* issue, and Mr. Kim will be addressing the

7   rest of the issues today.

8       Your Honor, the *CASA* decision, it makes clear that the

9   Court's injunctions, when issued, were overbroad in scope.

10  Unlike what plaintiffs have suggested, the defendants actually

11  agree that the Court may not modify its injunctions while

12  they're on appeal.  Defendants, in their briefing, did discuss

13  why they believe the Court's injunctions were improper when

14  issued.  But, currently, the ball is in the Ninth Circuit's

15  court, so this Court may not modify those injunctions.

16          THE COURT:  I'm glad we have common ground on that

17  point.

18      On the jurisdictional issue, I put the question to

19  Mr. Hawley.  I'll ask you as well.

20      Any problem with the Court ruling on the pending motion to

21  dismiss and the motion for class certification, setting aside,

22  of course, you know, any arguments you might have about the

23  merits of those motions?

24          ATTY. McCARTER:  Well, Your Honor, the government

25  doesn't -- the Court has jurisdiction -- has authority to rule
```

Pacito et al v. Trump et al, 7/7/25

1   on those motions.  But the government contends that it would be
2   impractical for the Court to do so because the Ninth Circuit is
3   currently deciding the legal issues that are at issue in the
4   motion to dismiss.  And the result of the Ninth Circuit's
5   decision will directly impact the proposed classes and whether
6   they're viable.
7       So this Court should wait for the Ninth Circuit to make a
8   decision on those legal issues before it weighs in on the
9   motion to dismiss or on the class certification motion.
10      THE COURT:  All right.  On the *Trump vs. CASA* case,
11  doesn't it have a specific carve-out for class actions and in
12  APA claims?  This case has both.
13      Isn't that enough for the Court to maintain its injunction
14  in light of the APA and the putative class that's brought in
15  this case?
16      ATTY. McCARTER:  Your Honor, while -- *CASA* doesn't
17  preclude the ability for a court to set aside actions under the
18  APA or to proceed with class action lawsuits.  But, again, it
19  would be impractical for the Court to rule on the class
20  certification.
21      As far as the APA issue goes, while plaintiffs have
22  separately pled APA claims, the core of their suit is about the
23  constitutionality of the President issuing the USRAP order
24  pursuant to 1182(f).  And if the Ninth Circuit decides that the
25  President validly exercised his 1182(f) authority, then the APA

Pacito et al v. Trump et al, 7/7/25

1    claims will fall by the wayside as well.

2        And as far as the class -- sorry -- the fact that this is

3    a putative class action, well, at the time this Court issued

4    its preliminary injunction, plaintiffs had not yet moved for

5    class certification, and this Court certainly hadn't granted

6    class certification.  So this case is not -- was not a class

7    action at the time that the injunctions were issued.  So that

8    issue doesn't really have any bearing on the propriety of the

9    Court's injunction.

10        THE COURT:  Do you contend that an injunction cannot

11   be issued in the case of a putative class?  Are you saying that

12   I need class certification in order to maintain an injunction?

13        ATTY. McCARTER:  An injunction can be issued.  But in

14   this case, with the very issue -- with the issues before the

15   Ninth Circuit, there's no need for this Court to certify class

16   at this time because, again, whether this Court certifies the

17   broad classes that plaintiffs have proposed, the Ninth Circuit

18   has narrowed the Court's injunction to a very small group of

19   individuals that have reliance interests comparable to

20   Plaintiff Pacito's.

21        So even if a class were certified, the injunction would

22   only be effective as to that very small group, which only would

23   comprise a very small portion of the proposed classes.  So

24   those classes wouldn't really have any practical effect on the

25   case as it stands until the Ninth Circuit decides otherwise,

Pacito et al v. Trump et al, 7/7/25

1    which is more reason why the Court should hold off on

2    certifying a class and ruling on the motion to dismiss until

3    the Ninth Circuit has ruled.

4            THE COURT:  All right.  Well, the Ninth Circuit has

5    stayed the injunction in part.  So, I mean, it's an admission

6    that I got at least something right in the analysis.  And, of

7    course, the APA analysis wasn't discussed at all in any of the

8    orders that have been issued by the Ninth Circuit.

9        So when you talk about if the Ninth Circuit rules

10   essentially in your favor, that word "if" is doing a lot of

11   work there for me.  So I appreciate your argument on the

12   subject.

13       Is there anything else that you want to tell me as it

14   relates to the *Trump vs. CASA* case and its impact on this

15   litigation that isn't already said in your brief?

16           ATTY. McCARTER:  One moment, Your Honor.

17       Your Honor, I will just point out that while the

18   plaintiffs did argue that the Court got things right when it

19   was -- when it decided the initial injunction, that the Ninth

20   Circuit does need a moment to weigh in as well on those issues.

21   And that's all.

22           THE COURT:  All right.  Thank you.

23           ATTY. HAWLEY:  I'm sorry, Your Honor.  May I briefly

24   respond to a couple of the points that opposing counsel just

25   made?

Pacito et al v. Trump et al, 7/7/25

```
 1              THE COURT:  Yes, briefly.
 2              ATTY. HAWLEY:  There's no reason to delay on class
 3    certification here because the class certification issues are
 4    not on appeal.  The underlying legal issues are, and those
 5    might determine whether the classes are entitled to relief.
 6              But contrary to what defendants argued opposing class
 7    certification, those legal issues will decide classwide relief
 8    in one swift scope.  It's the -- it's exactly why class
 9    certification is appropriate here, because those legal issues
10    will determine the potential for liability classwide.
11              And so there's no reason to delay.  The Ninth Circuit
12    isn't addressing class certification on appeal.  And whether
13    the legal issues rise or fall have nothing to do with that.
14              And as Your Honor just pointed out, there are APA claims
15    here that are unrelated to the President's Section 1182
16    authority, namely the defunding of the USRAP, which was not
17    contemplated or ordered by the executive order.  That was
18    agency implementation of the order.  And whether or not the
19    President had authority under 1182 to issue the executive
20    order, the agencies did not have any discretion to defund the
21    USRAP when that wasn't ordered.
22              THE COURT:  Or to implement the order early, for that
23    matter.
24              ATTY. HAWLEY:  Exactly, Your Honor.  Thank you.
25              THE COURT:  All right.  Mr. Hawley, let's stay with
```

Pacito et al v. Trump et al, 7/7/25

1    you -- or I should ask.

2        Will you be prepared to address the June 4 proclamation

3    and the issue of travel plans that were canceled prior to

4    June 20 for unrelated reasons?

5            ATTY. HAWLEY:  Yes, Your Honor.

6        Would you like me to address both of those right now?

7            THE COURT:  Yes, please.

8            ATTY. HAWLEY:  Yes.  So the June 4 travel ban is the

9    latest obstacle that defendants have manufactured to avoid

10   compliance with the preliminary injunction.  And it has

11   specific force because of the 120 injunction-protected refugees

12   who are still outside of the United States.  Two thirds of

13   them, defendants have told us, are ineligible for admission now

14   because of the travel ban.

15       Now, setting aside that had defendants shown the diligence

16   that the Court expected when it issued the order, those 80

17   individuals would have been admitted before June 4.  But

18   setting that aside for the moment, that position is plainly at

19   odds with the purpose and text of this new executive order.

20       Now, these issues haven't been fully briefed, but I will

21   briefly touch on three of the reasons why the travel ban should

22   not interfere with this Court's -- with defendants' compliance

23   with the preliminary injunction and this Court's enforcement of

24   it.

25       First, in design and language, the new travel ban is a

Pacito et al v. Trump et al, 7/7/25

1  recreation of the first administration's travel ban from 2017,

2  2018.  And that was understood at that time not to apply to

3  refugee admissions.

4      And the fact that this is a resuscitation of that earlier

5  travel ban is not just my word for it.  The White House issued

6  a fact sheet accompanying the new travel ban which said, quote,

7  "It builds on President Trump's first term travel ban."

8      That first travel ban did not apply to refugee admissions.

9  And by extension, this second travel ban does not either, by

10  the White House's own suggestion.

11      Second, the stated rationale for the travel ban in the

12  proclamation just cannot be squared with refugee admissions.

13  The new travel ban is purportedly justified by the sufficiency

14  of vetting and screening information available to U.S.

15  officials, and it urges, quote, "vigilance during the visa

16  issuance process."

17      None of these rationales can possibly apply to the refugee

18  admissions because refugees are not issued visas.  They are not

19  admitted under visas.  And they are admitted under a separate

20  section of the INA unrelated to visas.  And what's more,

21  refugees, as we have discussed previously and the Court has

22  noted, are among the most carefully screened and vetted

23  individuals in the U.S. immigration infrastructure.

24      So refugees are not visa holders, and none of the

25  rationales stated in the travel ban could possibly apply to

Pacito et al v. Trump et al, 7/7/25

1    refugees.

2         In fact, the travel ban mentions visas 60 times.  It only

3    mentions refugees twice.  And both times, it's to exclude

4    refugees from the scope of the ban.  And that is point

5    Number 3.

6         The ban states, and I quote, "Nothing in this proclamation

7    shall be construed to limit the ability of an individual to

8    seek refugee status consistent with the laws of the United

9    States."  So on its face, the travel ban should have no effect

10   on the USRAP or this Court's order resuming it.

11        Now, as you saw in our briefing, defendants have taken the

12   position that seeking refugee status is meaningfully different

13   from admission and processing as a refugee.  But that's a

14   particularly Kafkaesque way of reading this fairly common and

15   ordinary language.

16        When one seeks to do something, they seek to complete a

17   process, not to become trapped in an endless administrative

18   limbo.  Seeking to become a refugee or seeking refugee status

19   both semantically and logically includes application,

20   processing, and admission as a refugee.  And the travel ban

21   does not state anything different.

22        In short, Your Honor, the June 4 travel ban should not

23   interfere with the Court's enforcement of the preliminary

24   injunction.  Defendants are still required to resume the USRAP

25   under the narrow terms of the Ninth Circuit regardless of the

Pacito et al v. Trump et al, 7/7/25

1   travel ban.

2          And if defendants are of the position that the travel ban

3   is some intervening circumstance that inhibits their ability to

4   comply with the preliminary injunction, then it's on them to

5   seek relief from the order.  Neither the Court nor plaintiffs

6   are required to do that for them.  And if they don't and if

7   defendants continue to refuse to process injunction-protected

8   refugees, then plaintiff will take action, including to move to

9   enforce the PI.

10         But at the end of the day, Your Honor, it is defendants'

11  burden to seek relief as to the travel ban, not plaintiffs' or

12  anyone else.

13         THE COURT:  Well, that sounds like a slight pivot,

14  then, from the footnote that's in the -- your submission here.

15  I understood it to say -- there's a footnote that plaintiffs

16  were considering an amended pleading.

17         So are plaintiffs challenging the June 4 proclamation?

18  And if so, how?  Is it a new lawsuit?  Is it a contempt motion?

19  Is it an amendment to the complaint in this case?  Or is it, as

20  you just said, incumbent upon defendants, the government, to

21  seek relief?

22         ATTY. HAWLEY:  Yes, Your Honor.

23         So we -- plaintiffs' position is that -- so plaintiffs are

24  not currently challenging the travel ban.  We would need to

25  supplement or amend the complaint and move accordingly.

Pacito et al v. Trump et al, 7/7/25

```
 1        But plaintiffs do not -- to ensure the -- to ensure the
 2   continued enforcement of the preliminary injunction, plaintiffs
 3   do not need to seek relief because the Court's order is still
 4   in effect.  And until something changes, defendants are
 5   required to comply with that order.
 6        Now, if the Court takes the position that the refugee ban
 7   is a new legal development that requires a new challenge, then
 8   plaintiffs stand prepared to supplement their complaint.  When
 9   I mentioned that plaintiffs would take action if defendants
10   refuse to do something, that is one of the options that
11   plaintiffs have before them, is to directly challenge the
12   travel ban.
13        But we maintain that it's, right now, defendants'
14   obligation to comply with the Court's orders.  The travel ban
15   has not changed that.  And if they believe that it has, then
16   they can do something about it.  And if they don't, plaintiffs
17   will.
18        THE COURT:  All right.  Well, the June 4
19   proclamation, it does strike me as an intervening circumstance.
20   And I guess what I'm looking at is, you know, whether or not
21   the proclamation is a valid invocation of the President's
22   authority under 1182(f).  I mean, the phrase about the statute
23   exuding deference to the President -- I mean, that, you know,
24   abounds on all the pleading and the case law since the case was
25   issued.
```

Pacito et al v. Trump et al, 7/7/25

1          So, you know, what am I to make of that?  I mean, if the
2     June 4 proclamation is a valid invocation of the President's
3     authority, does the Court have the power to order the
4     government to continue processing and admitting
5     injunction-protected refugees who fall, you know, on the list
6     of countries that are covered by the proclamation?
7          ATTY. HAWLEY:  It does, Your Honor, because
8     regardless of the President's 1182 authority to issue the
9     travel ban, it does not apply to refugee admissions.  That is
10    plain from the text of the order, from its provenance and its
11    history.  And so whether or not the travel ban is a proper
12    exercise of presidential authority is something of a red
13    herring for purposes of this case because it does not apply to
14    refugee admissions, and it can't be used to halt the processing
15    of refugees as otherwise ordered by this Court, statute, or any
16    other authority.
17         THE COURT:  All right.  You know, let's hear from --
18    I believe it's Mr. Kim, then, on this point before we go any
19    further.
20         Mr. Kim, please respond to Mr. Hawley's arguments.  Talk
21    to me about the June 4 proclamation.
22         ATTY. KIM:  Thank you, Your Honor.
23         So the June 4 proclamation is, in many ways, very similar
24    to Proclamation 9645, the prior travel ban order from the first
25    Trump administration.  And so I think there's agreement between

Pacito et al v. Trump et al, 7/7/25

1   the parties on that point.

2        What Mr. Hawley didn't mention is that with

3   Proclamation 9645, refugees weren't sort of covered because

4   there was an express carve-out.  That language is very

5   explicit.  I have it here.  It says that -- you know, so this

6   is Proclamation 9645.  "This proclamation shall not apply to an

7   individual who has been granted asylum by the United States" --

8        THE COURT:  Mr. Kim, I'm going to ask you to slow

9   down.  We're on Zoom.  So if you could slow down, I'm sure our

10  court reporter would appreciate it as well.

11       ATTY. KIM:  Yes, Your Honor.

12       And so Proclamation 9645 expressly states that, you know,

13  this proclamation shall not apply, in relevant part, to a

14  refugee or -- who has already been admitted to the United

15  States.  And nothing in this proclamation shall be construed to

16  limit the ability of an individual to seek asylum, refugee

17  status.

18       And so the point is that -- the one key difference between

19  the two proclamations is that express carve-out.  But that

20  carve-out doesn't exist in Proclamation 10949.  And so it

21  absolutely can cover refugees.  The administration has

22  determined that it does cover refugees.

23       Mr. Hawley pointed out, you know, language in the new

24  proclamation about visas.  And it's true that refugees under

25  the USRAP wouldn't be issued visas.  But there's also language

Pacito et al v. Trump et al, 7/7/25

1  in the new proclamation, Your Honor, that talks about -- so

2  foreign nationals from these designated countries with serious

3  security sort of vetting, protocol issues.

4      And so, yes, we do concede that there is visa-specific

5  language, but there's also more general language that could

6  easily cover refugees.  And the administration has held that it

7  does cover refugees.

8      And, you know, as to whether, you know, 10949 could be

9  challenged through an amended complaint or a new lawsuit, yes,

10  it absolutely can.  But, you know, I think it's telling that

11  it's been over a month since the new proclamation has been

12  issued, and as far as I'm aware, I don't believe there's been

13  sort of, like, programmatic challenge to the new proclamation.

14      And so Mr. Hawley said that, you know, they may find that

15  they have to go and do that.  That's true.  But at the very

16  least, it's not on the government to try to seek relief from a

17  presidential order.  Like, that's sort of a remarkable claim --

18          THE COURT:  To be fair to Mr. Hawley's argument, I

19  don't think he's talking about seeking relief from the

20  executive order.  I think he's talking about seeking relief

21  from this Court's injunction that butts up against -- as I

22  understand your position, that butts up against the June 4

23  proclamation.

24          ATTY. KIM:  Well, the new proclamation, as an

25  intervening sort of development, can have a practical effect on

Pacito et al v. Trump et al, 7/7/25

1   the government's ability to apply this Court's modified
2   injunction to every one of these, let's say, you know,
3   injunction-protected refugees.  But that's not to say that, you
4   know, the government has brought its implementation of this
5   Court's order to a screeching halt.  It absolutely has not done
6   that.  It is complying with the new proclamation, but it's also
7   carrying forward this Court's injunction, as it always has.

8        And so, you know, the government's brief mentioned that
9   last week, there were seven people slated to travel to the
10  United States.  And we checked with Safe Harbor this morning,
11  and, in fact, all seven have been admitted.  There are a few
12  more people on deck this week.

13       And so, essentially, it's -- yes, there is a practical
14  effect of the new proclamation on the government's ability to
15  carry out the injunction, but that's not to say that the
16  government is flouting this Court's order at all.  We've been
17  very clear that we are, to the best of our ability, trying to
18  maintain our consistent application of the Court's order
19  without, at the same time, flouting this new proclamation,
20  which we're also bound by.

21       And so while there may be people who do come up against
22  the new proclamation, that's something that -- that doesn't
23  render the government's efforts to carry out this Court's order
24  completely void or nugatory.  I mean, we do continue to carry
25  it out, and I think the numbers support that, Your Honor.

Pacito et al v. Trump et al, 7/7/25

```
 1          THE COURT:  All right.  Thank you for that.  But I
 2   just want to drill down a little bit further on the point.
 3          In recognition of the June 4 proclamation, is the
 4   government reading that as a categorical exclusion of refugees
 5   from the countries that are listed in the proclamation?
 6          ATTY. KIM:  If they are from those designated
 7   countries, yes, they would be excluded.  At the same time,
 8   they're not exempt from being considered for these case-by-case
 9   national interest exceptions.  And so at the very least, you
10   know, their cases can go forward.  It's just that they do have
11   to show that they meet the requirements for that national
12   interest exception.
13          So we can't say that every individual who's from one of
14   these designated countries would absolutely not be able to get
15   into the country.  Like, the process would have to play out in
16   each case, and there would have to be an individualized
17   determination in each case as to whether or not they'd qualify
18   for that exemption.
19          THE COURT:  So if there's an injunction-eligible
20   refugee, maybe someone that falls within the -- the previous
21   number was 12,000.  I understand that it may be a little bit
22   broader than that now.  But if there's someone that is on that
23   list, let's say, from Afghanistan, plaintiffs say that this
24   person has a reliance interest, a strong reliance interest,
25   similar to that of Plaintiff Pacito, are you telling me, then,
```

Pacito et al v. Trump et al, 7/7/25

```
 1    the government would conduct both a review of that person's
 2    reliance interest as well as the national security
 3    implications, meaning they'd go through both screenings?
 4            ATTY. KIM:  They wouldn't collapse into one inquiry.
 5    And it's not --
 6            THE COURT:  Then sequential.
 7            ATTY. KIM:  Yes, it could be sequential.  And I
 8    believe, you know, the agencies are still working out the
 9    details of what this would look like.
10        But all I'm saying, Your Honor, is that we are not
11    disregarding this Court's order, nor are we disregarding the
12    proclamation, you know, 10949.  We are trying our best to
13    comply with both.
14        To the extent that there are sort of frictions that
15    develop as to individual cases, I'm just trying to provide the
16    reassurance that even in those individual cases where we find
17    that the proclamation would clearly apply, it's not as if
18    they're categorically barred in all circumstances from entering
19    the country.  They could still qualify for the national
20    interest exception.  Now, that is a showing that they would
21    have to make.  But at the very least, they are able to make it,
22    and they would be considered for the exception.
23            THE COURT:  All right.  I just -- I want to be clear,
24    also, just in terms of the previous proclamation.  We talked
25    about Proclamation 9645.
```

Pacito et al v. Trump et al, 7/7/25

1    I mean, that proclamation, it did not -- emphasis on
2    "not" -- cover refugees; is that right?
3         ATTY. KIM:  It did not because of that express
4    carve-out, Your Honor.  Yes.  And that's the significant
5    difference between the two proclamations, although they're
6    otherwise very similar.
7         THE COURT:  All right.  Mr. Hawley, go ahead.
8         ATTY. HAWLEY:  Unless I'm misunderstanding Mr. Kim, I
9    have the text of these two carve-outs side by side, the old
10   travel ban and the new travel ban.  And I confess, I struggle
11   to find any meaningful difference from them other than the new
12   travel ban introduced an abbreviation for the Convention
13   against Torture.  But otherwise, the language of these
14   carve-outs is exactly the same.
15        So if the government's position is that the first travel
16   ban did not apply to refugees, I don't see how they could
17   reasonably assert that the new one does when the language is
18   virtually identical.
19        THE COURT:  All right.  Thank you for that,
20   Mr. Hawley.
21        My read of the two proclamations, there is an uncanny
22   resemblance there.  So thank you both for your arguments on
23   this point.
24        Let's turn to the other issue, and that's of canceled
25   travel plans that were unrelated to the USRAP order.

Pacito et al v. Trump et al, 7/7/25

```
1          Mr. Hawley, I'll hear you out on this point.
2               ATTY. HAWLEY:   Thank you, Your Honor.
3          So as you have noted, defendants have taken the position
4     that refugees who, based on defendants' own determination, had
5     travel canceled for reasons other than the refugee ban should
6     not be included in the pool of potentially injunction-protected
7     refugees, which we understand could mean hundreds or even
8     thousands of impacted individuals.
9          The problem is that there is no basis for this limitation.
10    It's yet another attempt for the -- for defendants to create a
11    limitation where neither the Court nor the Ninth Circuit has
12    prescribed one.  And there is good reason to question
13    defendants' good-faith assessment of why travel was canceled in
14    the lead-up to the refugee ban.
15         As the Court noted earlier in this hearing, we have
16    evidence that the travel ban was imposed even before its
17    effective date and, indeed, even before January 20, 2025.  We
18    know of at least one Afghan refugee who had travel scheduled
19    for January 16, 2025.  That travel was canceled without reason,
20    and the refugee was never rebooked for additional travel.
21         The fact that there might have been pretextual
22    cancellations in the run-up to the executive order might
23    explain why there are only 160 injunction-protected refugees in
24    the two-week period after January 20.  Given that there are 52
25    weeks in a year and that 100,000-plus refugees are admitted
```

Pacito et al v. Trump et al, 7/7/25

1   annually, you would expect, in a given two-week period, to see

2   thousands of refugees with booked travel and admissions for any

3   given two-week period.  Here, we have only 160.  And so the

4   idea that the government might have proactively canceled some

5   travel because of the refugee ban is not only probable but

6   likely, just given the numbers and given what we know about the

7   government's premature implementation of the refugee ban.

8           THE COURT:  So, Mr. Hawley, how far back do I go?  I

9   mean, if -- 2024?  2023?  Where's the line?  Is there a line?

10          ATTY. HAWLEY:  We have not proposed a line.  But we

11  are not -- what plaintiffs are not suggesting, as defendants

12  have put forward, is that any individual over the last 50

13  years, whoever was in the refugee pipeline that had travel

14  canceled, should be eligible for protection under this

15  injunction.  We only want to make sure that this universe of

16  injunction-protected refugees captures everyone who had travel

17  canceled because of the refugee ban.

18      And as is true of many of the issues in this case,

19  defendants will know, ultimately, better than plaintiffs what

20  that universe should look like and where those numbers might

21  fall.  But just to throw out a starting point, December 1,

22  2024, might be a reasonable basis because at that point, the

23  executive order was starting to be implemented.  And that would

24  probably be an outside window for providing this inquiry.

25          THE COURT:  All right.  And on the subject of

Pacito et al v. Trump et al, 7/7/25

1    rebuttable presumption, I mean, there's a proposal by

2    plaintiffs, both in this latest submission and also in response

3    to the Court's order rescinding the previous compliance order,

4    about including minors traveling alone, applying a rebuttable

5    presumption to them.

6         What's the basis for your argument there?  How is it that

7    you're showing a reliance interest, from a categorical

8    perspective, similar to what we saw for the 160?  And, of

9    course, the 160 -- I mean, the number that the Court came to on

10   that is derived exclusively from the representation made by the

11   government at the May 1 status conference.

12        But talk to me about this idea of including minors

13   traveling alone as a group that would receive a rebuttable

14   presumption of meeting the test as laid out by the Ninth

15   Circuit.

16             ATTY. HAWLEY:  Yes, Your Honor.

17        So we propose three narrow categories for the rebuttable

18   presumption, unaccompanied minor children being one of them.

19        Those refugees, Your Honor, are processed through

20   procedures that are distinct.  They're different, minor

21   counseling and processing.  So there is the fact that they're

22   separated out for special treatment because of the obvious

23   reliance interest that comes from family reunification and just

24   minors traveling alone.

25        What's more, it just -- the -- would not be necessarily

Pacito et al v. Trump et al, 7/7/25

```
 1   feasible to require children to explain their reasoning and
 2   their substantial reliant interests in the wake of obvious
 3   reasons.  We believe that minor children, just on their face,
 4   would necessarily have substantial reliance interests.  And we
 5   haven't heard anything from defendants suggesting why at least
 6   that category should not be allowed the rebuttable presumption.
 7            THE COURT:  All right.  Thank you, Mr. Hawley.
 8       Mr. Kim, let's, I guess, pick up where we left off with
 9   Mr. Hawley about rebuttable presumption applied to minors
10   traveling alone.
11            ATTY. KIM:  Well, Your Honor, I mean, the only place
12   that we've talked about the rebuttable presumption is in our
13   brief and response to the Court's order on a special neutral.
14       And correct me if I'm wrong, Your Honor, but I believe in
15   the order, it only talked about rebuttable presumption with
16   respect to the group of 160.  Now, if we're talking about --
17   and if we're talking about expanding that presumption, I think
18   the government would stand by sort of the structured plan that
19   they laid out.
20       In the alternative, in responding to the Court's order on
21   the special neutral, we talked about basically starting with
22   the group of 160.  And we are doing that.  I mean, we're being
23   very deliberate about that and being very careful in how we
24   sort of consider each on a case-by-case basis.  But we're going
25   through the 160.
```

Pacito et al v. Trump et al, 7/7/25

1     And then from there, you know, we haven't taken a position

2  on whether the Court's rebuttable presumption would also -- or

3  should also apply to unaccompanied refugee children.  I believe

4  that might require further deliberations with our clients as to

5  the feasibility of extending that presumption to what could be

6  a potentially very large group, certainly larger than the group

7  of 160.

8     But all I can say at this moment, Your Honor, is that we

9  would propose, if this Court were to sort of amplify the

10  rebuttable presumption, that at the very least, you'd go in the

11  order that we laid out in our response to the Court's special

12  neutral order.

13     THE COURT:  One of the other categories as proposed

14  by plaintiffs were people with special medical needs or a

15  medical reliance interest.

16     Does the government have a position as to applying a

17  rebuttable presumption to those that have a strong reliance

18  interest that is rooted in a medical condition or medical

19  needs?

20     ATTY. KIM:  I haven't discussed that personally, Your

21  Honor, with my clients.  But, again, you know, in the brief

22  that we filed, we talked about basically the group of 160, then

23  unaccompanied refugee children, and then proceeding on a

24  week-by-week basis.

25     In terms of special medical needs, like, I think that term

Pacito et al v. Trump et al, 7/7/25

```
 1   is somewhat nebulous.  And so there may be a necessity to sort
 2   of drill down on what plaintiffs might mean by, you know, a
 3   special medical need.
 4       And so perhaps, like, a more sort of structured and viable
 5   way of proceeding would be along sort of the timeline that the
 6   government has laid out in its special neutral brief, so that
 7   week-by-week development, essentially.
 8            THE COURT:  All right.  So let's, I guess, move
 9   beyond that issue of the rebuttable presumption.
10       I asked Mr. Hawley about a cutoff, and he talked about
11   December 1, 2024, if I were to press him for a deadline.
12       What's the difference between December versus January for
13   administrative reasons, in terms of assessing that reliance
14   interest?  I mean, couldn't someone that was cut off or
15   canceled their travel in December make a showing, potentially,
16   under the clarification orders as put out by the Circuit?
17            ATTY. KIM:  I mean, I think as a matter of concept,
18   there really wouldn't be any kind of meaningful difference
19   between December and January.
20       I mean, Mr. Hawley talked about sort of, like, the
21   government using, you know, the order as a pretext of sorts to
22   cancel travel before the date.  And, you know, we would push
23   back on that vigorously.  I mean, I think there is a
24   presumption of regularity that applies to government actions.
25       And so if we represent that a particular case was canceled
```

Pacito et al v. Trump et al, 7/7/25

```
 1   for some other reason, then that's something that we would have
 2   to stand by.  We have no other choice.  Like, that is a regular
 3   government action that's taken.  And it would be on plaintiffs
 4   to show as to that individual case why that's not true or why
 5   the government might be dissembling in that case.
 6          And so because we do stand by that sort of general
 7   position, there -- the Court would have to, in that instance,
 8   sort of engage in, I think, arbitrary line drawing.  And we
 9   would strongly, you know, suggest to the Court that it should
10   not be doing that at plaintiffs' behest, based on their theory
11   or conjecture of some sort of kind of misguided or underhanded
12   or, you know, duplicitous effort to cancel travel before
13   January 20 based on, you know, some other nefarious reason.
14   Like, those don't exist, Your Honor.
15              THE COURT:  Well, I certainly understand your
16   position.
17          I mean, this is an adversarial lawsuit.  I understand what
18   Mr. Hawley said in discovery, and, you know, the factual
19   development in the case will bear out what the truth is.
20          But, I mean, you talked about an arbitrary line.  I mean,
21   I think that's the part that I'm struggling with with the
22   government's position.  The Ninth Circuit has said people with
23   arranged and confirmable travel plans on or before January 20.
24   And that was period.  It doesn't say anything about the reason
25   for the cancellation or the timing of the cancellation.
```

Pacito et al v. Trump et al, 7/7/25

1      So, certainly, you know, plaintiffs may face an uphill
2   battle in trying to establish a reliance interest for someone
3   who had, you know, plans that were canceled for reasons other
4   than the USRAP order before December 1, 2024.
5      But aren't they entitled to try and make that case?  I
6   mean, the Circuit instructed us to engage in a case-by-case
7   analysis for that reliance interest.
8          ATTY. KIM:  I mean, Your Honor, if you isolate that
9   phrase -- you know, I would give you the fact that, yeah,
10  perhaps it could be read kind of as broadly as plaintiff
11  suggests.
12     But then, you know, we also pointed out, like, other
13  phrases like "in transit" on the day.  And in transit means
14  that essentially hasn't been canceled as of that time.
15     And so -- but I think more importantly than that, Your
16  Honor, on a fundamental level, like, this case is about people,
17  you know, whose travel would have been disrupted by the USRAP
18  order; right?  And so to sweep in people, like, whose injuries,
19  initial injury, didn't result from the USRAP order, I mean,
20  that's just simply not a viable claim that they can make.  It
21  just simply doesn't stand, and --
22          THE COURT:  And I think that's the point right there.
23  I mean, you're making a determination about whether or not
24  there's a viable claim.
25     I mean, aren't they entitled to know the universe of

Pacito et al v. Trump et al, 7/7/25

1    people that might fall within the ambit of the injunction?  And

2    then there's a discussion, at least as I am contemplating it,

3    between the parties about whether or not there's reliance

4    interest.  And if there's no agreement between the parties,

5    then that's when the special neutral or the Court would get

6    involved.

7         But isn't plaintiffs -- aren't plaintiffs entitled to

8    discover and learn the identity of the 12,000-, it sounds like,

9    plus people, regardless of, you know, when or the reason behind

10   their travel plans?  Don't they have a right to know?

11          ATTY. KIM:  No, Your Honor.  Because if you do take

12   their theory to its logical conclusion -- again, I mean, the

13   Court would be forced to draw an arbitrary line.  Because, you

14   know, let's say there's someone whose travel had been canceled

15   for what the government says is some other reason, maybe about,

16   like, a year ago, so not that far back; right?  And perhaps

17   this person might have wanted to travel to the United States

18   shortly after the order came out; right?  That person could

19   easily say, "Well, why is my case any different?  Why do I fall

20   on the wrong side of this line that the Court has drawn?"

21        And so it's simply not workable, Your Honor.  Like, it's

22   not workable for -- unless -- unless, of course, prepared to

23   basically sweep in everyone, like the Court has suggested

24   plaintiffs might be trying to do, whose travel might have been

25   canceled for any reason prior to that cutoff.  It would have to

Pacito et al v. Trump et al, 7/7/25

1    draw some sort of line to make this a manageable sort of plan.

2    And that would be arbitrary, Your Honor. We stand by that.

3           THE COURT: All right. Mr. Hawley, please respond to

4    that.

5           ATTY. HAWLEY: Yes. I think, Your Honor, you hit on

6    something that is very critical here. The Ninth Circuit did

7    not -- it said on or before January 20. It did not provide any

8    sort of limitation. And we are merely trying to enforce what

9    the Ninth Circuit has allowed us to enforce, which is travel

10    canceled on or before January 20.

11       And it's not only the pretext issue that is of concern.

12    There are likely individuals who are in the refugee system who

13    did have travel canceled, but then it was not rescheduled

14    because of the refugee ban. Their refugee admission would have

15    been interrupted by an unlawful executive order just as much as

16    any plaintiff whose travel was directly canceled by it.

17       And to Mr. Kim's point, would it be difficult to prove it

18    up in some of these cases? Perhaps. But as you noted, the key

19    here is that there has to be a subjective case-by-case

20    assessment for each individual. And if we leave individuals

21    out who would otherwise qualify for protection under the

22    injunction, then we are not following either this Court's order

23    or the Ninth Circuit's command that we undertake that

24    assessment for those who had travel canceled before January 20.

25       It's going to be a subjective inquiry each time. But it's

Pacito et al v. Trump et al, 7/7/25

1    an inquiry that we should have because at the end of the day,
2    we are seeking relief from an unlawful executive order.  And we
3    need to know the contours of how that executive order was
4    applied.  And it might have been applied, and we have reason to
5    believe it was applied, before January 20 to cancel travel,
6    travel that was not rebooked for individuals.
7         And regardless of why that travel was canceled in the
8    first place, the impact is going to be that it could not be
9    rescheduled in the ordinary course because of the ban.  The
10   USRAP was interfered with and disrupted.  That includes
11   rebooking and other things.  And for any given individual, they
12   ought to have the opportunity to examine that and see, on a
13   case-by-case basis, if they had reliance interests and would
14   qualify under the injunction.
15             ATTY. KIM:  If I could make one quick point, Your
16   Honor?
17        I mean, to continue along the line of that -- that one
18   individual who might have had his travel canceled about a year
19   ago, I think that person could also easily say, you know, my
20   intent was to travel to the United States, let's say, in
21   February of this year.  Now, that person, because the order was
22   in effect, would not have been able to travel to the United
23   States because of this order; right?  But then, you know, if we
24   do draw some sort of a line, that person would, again, fall on
25   the wrong side of that line and not be eligible for this

Pacito et al v. Trump et al, 7/7/25

1   relief.

2       And so it just creates a lot of problems with

3   practicality, which is why we think we should hew to this date

4   cutoff.

5           THE COURT:  Well, I understand your argument.  But, I

6   mean, I want to hew to the clarification as expressed by the

7   Circuit.  We've got a tripartite test that came out in the

8   first clarification order, followed by this directive to

9   narrowly construe for reliance interests similar to that of

10  Plaintiff Pacito on a case-by-case basis.

11      So, you know, I understand what you're saying about a date

12  cutoff.  And as a practical matter, I mean, it may be that

13  there is some sort of de facto date cutoff.  But in terms of

14  plaintiffs' ability to discover the identity and to put forward

15  their case, I'm not seeing anything in the orders from the

16  Ninth Circuit that say that they cannot do that.  In fact, it

17  seems to me to be quite the opposite under the operation of the

18  civil rules, that they are entitled to know this information.

19          ATTY. KIM:  I mean, we would simply point out that,

20  you know, the Ninth Circuit did, in its last clarification

21  order, talk about people with strong reliance interests like

22  Plaintiff Pacito's.  And Plaintiff Pacito, like, his travel had

23  not been canceled for some other reason long before.  I mean,

24  on the date of, he was scheduled to depart shortly after.

25      And so if you sort of use that as a key illustrative

Pacito et al v. Trump et al, 7/7/25

1   example, then you should limit consideration to this pool of

2   people who had their travel canceled on the date of because of

3   the order and not people whose travel was canceled long before

4   for any other reason.

5           THE COURT:  All right.  Mr. Kim, sticking with you,

6   we've talked about rebuttable presumptions.

7       But can you tell me what, if anything, the government is

8   doing right now to gauge the reliance interest of individuals

9   such as, let's say, Plaintiff Alyas, whose travel to the United

10  States was set to take place, you know, after the rebuttable

11  presumption period.

12      Is there any kind of process for those folks?

13          ATTY. KIM:  I can't speak to that particular

14  plaintiff, Your Honor.  But as we mentioned in our brief, I

15  believe Plaintiff Pacito is slated to travel on July 10, so

16  just a few days from now.  And we can definitely provide the

17  Court with an update on that.  As for this week, I think -- I

18  believe there are ten more people set to travel.

19      And so, again, we are starting with the 160.  And the

20  Court hasn't given any indication that we should not be

21  starting with the 160.  And we think it's very much reasonable

22  and consistent with the Ninth Circuit's orders to start with

23  that smaller group of people who fall within the first two

24  weeks after the order was issued.

25      And so we continue to sort of implement that plan.  And

Pacito et al v. Trump et al, 7/7/25

```
 1   unless the Court tells us otherwise, that's what we plan to do.
 2          THE COURT:  All right.  And there is some urgency, as
 3   Mr. Hawley pointed out, and the Court is aware about medical
 4   certification.  Can you give me a time frame for the people
 5   that you flagged that are in the 160 and then the subset --
 6   I've got the math written down -- but, you know, the close to
 7   40 people that, I believe, the government has represented that
 8   it was currently processing.
 9       What's the timeline?
10          ATTY. KIM:  So we did mention this in the brief, Your
11   Honor, but we said by May 9.  So we were on top of this, like,
12   months before.  You know, we made requests for the validity of
13   medical checks to be extended.  For those that couldn't be
14   extended, we would have renewed those requests.  And so those,
15   by and large, have been taken care of well before, like,
16   just -- today.
17       And so as for, like, security checks, you know, those are
18   also being re-upped.  And there's nothing to indicate that,
19   like, we wouldn't be able to continue on on this path that
20   we're on.
21          THE COURT:  All right.  And the idea of re-upping
22   medical certification, can you talk to me -- I mean, if the
23   government wanted to, could it re-up, in large swaths, medical
24   certification, or would there be pushback to that if, let's
25   say, the timeline, as identified by the government, isn't
```

Pacito et al v. Trump et al, 7/7/25

1    congruous with the current cutoffs?

2              ATTY. KIM:  I mean, if we're talking about the 160,

3    Your Honor, I can represent that, like, you know, we're not

4    seeing any particular difficulties with re-upping those medical

5    and security checks.

6         Now, if we talk about, like, all at once, vastly expanding

7    the pool of people that we have to consider, instead of sort of

8    progressing along this, like, structured basis, then I would

9    certainly have to check with the clients.

10        But in terms of the smaller pool, yes.  I mean, it's very

11   much manageable, and we are carrying it out, Your Honor.

12             THE COURT:  All right.  I'm going to throw it open

13   for just any final points here.

14        Mr. Kim, is there anything else that you want to leave me

15   with here that is not already in the government's briefing?

16             ATTY. KIM:  No, Your Honor, just provide some

17   reassurance that, you know, despite the presence of this new

18   proclamation, which we do have to comply with, and even if,

19   like, the government were sued over the legality of 10949 --

20   and I think at this point, there's some doubt as to whether

21   that would even occur -- we would still make sure that we're

22   complying with every step of the process in terms of

23   implementing the Court's modified preliminary injunction.  And

24   we don't think this is an emergency, Your Honor, because we are

25   carrying out the injunction.

Pacito et al v. Trump et al, 7/7/25

1    And on top of that, you know, the Ninth Circuit does want

2    to hear from both parties on *CASA*, and the oral argument has

3    been scheduled for early fall.  And so, you know, a lot of

4    these questions that are bound up in the PI appeal, Your Honor,

5    will be settled by the Ninth Circuit.  At that point, it will

6    give the Court and the parties a lot of clarity to sort of

7    proceed on these other outstanding issues.

8         THE COURT:  All right.  Thank you.

9    Mr. Hawley, I'll give you the last word.

10        ATTY. HAWLEY:  Thank you, Your Honor.

11    I just want to underscore, again, the urgency.  We feel

12    this is an emergency, and the expiration of medical clearances

13    is just one salient example of this.

14    If a medical clearance is not extended but if it's instead

15    redone, that's a process that could take weeks, more likely

16    months, during which time a refugee's security clearance might

17    have expired because under the new policy, those clearances

18    only go for 30 days.  So there are cascading injuries that will

19    occur here if expeditious action is not taken by defendants.

20    And while, indeed, the Ninth Circuit might provide some

21    clarity beginning on September 19 at oral argument, that is two

22    months from now.  And for an individual like Plaintiff Pacito,

23    who the Ninth Circuit has said the preliminary injunction is

24    still in effect for individuals like that who had significant

25    reliance interests, those reliance interests will not dissipate

Pacito et al v. Trump et al, 7/7/25

1   in the next two months.  They will only increase, as will the

2   attendant harm to them, to the individual plaintiffs in this

3   case, and the organizational plaintiffs.

4       And so we urge the Court to adopt plaintiffs' proposed

5   compliance framework, appoint a special neutral, and begin this

6   process as soon as possible.

7       So, again, we urge the Court to act quickly, and we

8   appreciate the Court's time and consideration.

9           THE COURT:  All right.  Thank you both.  Thank you to

10  the parties here for your briefing on these subjects.  Thank

11  you for your argument here today.  This has been helpful in

12  understanding the compliance issues and other issues that are

13  before the Court right now.

14      I'm not going to make any sort of rulings from the bench

15  on any of the substantive legal questions that we've discussed.

16  But as Mr. Hawley has pointed out repeatedly and as the Court

17  is acutely aware, it seems to me more clear than ever that a

18  compliance framework or dispute resolution process or whatever

19  you want to call it for evaluating the case-by-case reliance

20  interests of the injunction-eligible refugees is needed.

21      So on that point, you can expect an order from the Court

22  by the end of the week.  We've got other orders that we are

23  working on in this case, and I do expect those in short order

24  as well.

25      But on this issue of the -- like I said, the compliance

Pacito et al v. Trump et al, 7/7/25

1    framework, dispute resolution, whatever you'd like to call it,

2    effectuating the Ninth Circuit's clarification orders, there

3    will be an order this week on that.

4              ATTY. KIM:  Thank you, Your Honor.

5              THE COURT:  All right.  Well, with that, court is

6    adjourned.

7         Thank you, all.

8              ATTY. HAWLEY:  Thank you, Your Honor.

9                        (Adjourned.)

10

11                   C E R T I F I C A T E

12

13        I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

14

15   /s/ *Andrea Ramirez*

16   ANDREA RAMIREZ
     OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25