1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

PLAINTIFF PACITO; PLAINTIFF
ESTHER; PLAINTIFF JOSEPHINE;
PLAINTIFF SARA; PLAINTIFF
ALYAS; PLAINTIFF MARCOS;
PLAINTIFF AHMED; PLAINTIFF
RACHEL; PLAINTIFF ALI; HIAS,
INC.; CHURCH WORLD SERVICE,
INC., and LUTHERAN COMMUNITY
SERVICES NORTHWEST,

               Plaintiffs,

    v.

DONALD J. TRUMP, in his official
capacity as President of the United
States; MARCO RUBIO, in his official
capacity as Secretary of State; KRISTI
NOEM, in her official capacity as
Secretary of Homeland Security;
ROBERT F. KENNEDY, JR., in his
official capacity as Secretary of Health
and Human Services,

               Defendants.

CASE NO. 2:25-cv-255-JNW

ORDER ESTABLISHING
INJUNCTION IMPLEMENTATION
FRAMEWORK AND APPOINTING
MAGISTRATE JUDGE

21

## 1.  INTRODUCTION

22

    This order concerns refugees who had been approved for resettlement in the

23

United States and were preparing to travel when their cases were suspended on or

about January 20, 2025, when the Government implemented Executive Order 14163, "Realigning the United States Refugee Admissions Program" ("USRAP EO"). Many had already packed their belongings, given up their homes, and said goodbye to their communities in reliance on the Government's assurance that they would soon be safe in the United States of America.

The Court previously issued a preliminary injunction protecting these and other refugees, but the injunction was largely stayed by the Ninth Circuit. The Court of Appeals preserved protection only for refugees who could demonstrate "a strong reliance interest arising prior to January 20, 2025, comparable to Plaintiff Pacito"—the lead plaintiff whose family was left homeless and stranded at a transit center when their travel was cancelled at the last moment. The Ninth Circuit ordered that this reliance interest should be gauged on a "case-by-case basis."

The Court recognizes that both the Government and refugee advocates seek clarity about how this complex process will unfold. After extensive briefing and argument, the Court issues this framework to clarify how these determinations will be made and to establish orderly procedures for the parties going forward. The framework provides clear guidance on the scope of the Government's obligations while creating efficient processes for resolving disputes that may arise, acknowledging the Government's legitimate operational constraints.

The Court initially considered appointing a special master to oversee this process. However, after reviewing the parties' submissions, the Court agrees with the Government that the complexity of these determinations does not require specialized expertise, and that efficiency counsels in favor of using existing judicial

resources. Accordingly, the Court appoints U.S. Magistrate Judge Michelle L. Peterson to assist with case-by-case determinations under established procedures that protect both refugee rights and Government authority.

The Court expects all parties to implement this framework in good faith, recognizing that real families remain in limbo while these legal processes unfold. Delays in implementation mean continued separation from safety for some of the world's most vulnerable people.

## 2. BACKGROUND

The Court issued two preliminary injunctions enjoining the Government from implementing the USRAP EO. Dkt. Nos. 45, 79. The Ninth Circuit largely stayed the first injunction, *Pacito et al. v. Trump et al.*, No. 25-1313 (9th Cir.), Dkt. No. 28, but, in a later clarification, preserved protection for "individuals who met the following conditions on or before January 20, 2025: (1) the individual had an approved refugee application authorizing Customs and Border Protection to admit the individual 'conditionally as a refugee upon arrival at the port within four months of the date the refugee application was approved,' 8 C.F.R. § 207.4; (2) the individual was cleared by USCIS for travel to the United States; and (3) the individual had arranged and confirmable travel plans to the United States." *Pacito et al. v. Trump et al.*, No. 25-1313, Dkt. No. 46.

On May 1, the Court held a hearing to determine the appropriate compliance framework in light of the Ninth Circuit's clarification. Dkt. No. 118. There, the Government told the Court that as of January 20, approximately 12,000 individuals were approved and booked for travel as refugees; but it argued that the Circuit

intended to protect only those with significant reliance interests arising from imminent travel—specifically, 160 refugees with travel scheduled within two weeks of January 20. On May 5, the Court rejected this argument and issued a compliance framework order trying to implement the Ninth Circuit's directive. Dkt. No. 119.

But on May 9, the Ninth Circuit issued a second clarification order, adding a fourth requirement: that its "limited carveout from the stay … should be interpreted narrowly, on a case-by-case basis, to apply to individuals with a strong reliance interest arising prior to January 20, 2025, comparable to Plaintiff Pacito." *Pacito et al. v. Trump et al.*, No. 25-1313, Dkt. 64. This clarification transformed the process from a largely categorical determination to individualized, case-by-case assessments.

On May 15, the Court rescinded its previous compliance framework given this clarification and stated it would appoint a special neutral to assist with case-by-case determinations of reliance interests. Dkt. No. 126. Given the Government's earlier representations about the 160 refugees having significant reliance interests, the Court established a rebuttable presumption that these individuals were entitled to protection and directed briefing on the role and identity of a special neutral. *Id.*

On June 25, Plaintiffs requested an emergency conference, raising two issues that required immediate resolution. Dkt. No. 135. First, they challenged the Government's application of Presidential Proclamation No. 10949 (issued June 4, 2025) to deny admission to approximately 80 of the 160 presumptively protected refugees from designated countries. Second, they contested the Government's

exclusion of refugees whose travel was cancelled before January 20 for reasons the Government claims were unrelated to the USRAP EO.

As for compliance to date, the Government's most recent reporting acknowledges that, as of June 9, of the 160 refugees entitled to a rebuttable presumption of protection, only 37 had been admitted; 80 were being denied relief under Proclamation 10949 based on their nationality; 3 had voluntarily repatriated to Afghanistan; and 33 were ready for departure and awaiting travel arrangements. Dkt. No. 138. There has been no indication that the Government has begun individualized reliance assessments for other potentially eligible refugees.

All parties agree that refugee processing should proceed by "cases" (family units) rather than individuals. For purposes of this order, "Review-Eligible Cases" refers to refugee cases that satisfy the three-part test established by the Ninth Circuit and are thus eligible for individualized reliance-interest evaluation to determine the ultimate question of injunctive protection. "Injunction-Protected Refugees" are Review-Eligible Cases that also satisfy the Ninth Circuit's fourth criterion—a strong reliance interest comparable to Plaintiff Pacito—and are thus fully entitled to processing, admission, and resettlement in the United States.

### 3.   CLARIFYING THE PARTIES' OBLIGATIONS

Before establishing procedures moving forward, the Court must first resolve the parties' disputes about the scope and application of the Government's obligations under the Ninth Circuit's directives.

**3.1    Plaintiff Pacito's experience defines the "reliance interest" standard.**

The Ninth Circuit's May 9 clarification requiring refugees to demonstrate "a strong reliance interest arising prior to January 20, 2025, comparable to Plaintiff Pacito" necessitates a definition for this standard. The "reliance interest" concept originates in contract doctrine and refers to a promisee's remedial "interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as [they] would have been in had the contract not been made." Restatement (Second) of Contracts § 344 (1981). In recent decades, the concept has become central to Administrative Procedure Act jurisprudence, with the Supreme Court establishing that agency policy changes are arbitrary and capricious when the agency fails, before the policy change, to consider serious reliance interests rooted in the status quo. *See, e.g.*, *Smiley v. Citibank (South Dakota), N. A.*, 517 U.S. 735, 742 (1996); *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016); *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30–33 (2020) (J. Roberts) (holding that rescission of DACA was arbitrary and capricious because DHS "was not writing on a blank slate" and thus "was required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns"); *see generally* Gary M. Bridgens, *Demystifying Reliance Interests in Judicial Review of Regulatory Change*, 29 GEO. MASON L. REV. 411 (2021).

Here, "reliance interest" refers to *a refugee's interest in relief from harms caused by the refugee's reliance on the U.S. Government's assurance that their*

*refugee case had been processed and conditionally approved, and travel was arranged*. Plaintiff Pacito provides the exemplar. *See* Dkt. No. 15-14 (Pacito Decl.). After his family's case (including him, his wife, and their infant son) was approved for resettlement under USRAP—and after multiple rounds of medical exams, interviews, and biometrics—their travel was booked for January 22. *Id.* ¶¶ 16, 17. In reliance on this assurance, Pacito's family packed their belongings, gave up the lease to their home, and gave away or sold their possessions, including equipment essential to Pacito's livelihood. *Id.* ¶¶ 17, 18. On January 21, as they were set to depart from Kenya to the United States, Pacito was informed, with virtually no explanation, that their travel was canceled. *Id.* ¶ 23. His family slept that night in the transit center parking lot, homeless, with eight or nine other families likewise stranded in transit. *Id.* ¶¶ 29, 30.

According to the Ninth Circuit's clarification, Pacito's story represents the benchmark against which other cases must be compared on a case-by-case basis to assess entitlement to relief. The Court agrees with the Government that "no one reliance interest [should receive] conclusive weight" and that "a totality of the circumstances approach" is appropriate to assess whether a given refugee demonstrates reliance interests comparable to Pacito. *See* Dkt. No. 128 at 6. Except for cases entitled to a rebuttable presumption of protection, the framework below assigns this determination *first* to the Government, *then* to the Court if the Government denies relief.

1

2

**3.2    Proclamation 10949 does not excuse denial of relief to Injunction-Protected Refugees.**

Under the stated authority of 8 U.S.C. 1182(f), Proclamation 10949 suspends the entry into the United States of nationals from a list of designated countries that, according to the Government, lack adequate vetting and security systems. *See* Presidential Proclamation No. 10949, "Restricting the Entry of Foreign Nationals to Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats," 90 Fed. Reg. 24,497 (June 4, 2025), §§ 1, 2, 3, 5. Defendants argue the Court cannot compel admission of Injunction-Protected Refugees from these countries because the Court's injunctions cannot override a separate, presumptively lawful executive order.

The Court need not resolve whether its injunctions can override a separate executive order—a question whose answer is likely no—because that question is not actually presented. Proclamation 10949 expressly states that "[n]othing in this proclamation shall be construed to limit the ability of an individual to seek… refugee status… consistent with the laws of the United States." *See* Proclamation 10949, § 6(d). In other words, by its plain terms, the Proclamation excludes refugees from its scope. That includes, of course, Injunction-Protected Refugees.

Defendants advance a creative reading of the Proclamation's refugee carveout, according to which the Proclamation fully bars refugee entry while preserving only their ability to seek refugee status. The Court rejects this reading for several reasons. First, it runs counter to the plain text of the Proclamation, which states that "nothing in this proclamation shall be construed to limit the

ability of an individual to seek… refugee status." §6(d). Barring refugee entry, of course, limits an individual's ability to seek refugee status.

Second, it is unclear how refugees from designated countries are supposed to obtain "refugee status" upon admission if they are barred from admission in the first place. Defendants' interpretation renders the carveout a functional nullity, violating the canon against surplusage. *Cf.* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012) (no provision "should needlessly be given an interpretation that causes it to… have no consequence").

Third, the Proclamation's policy rationale—addressing inadequate visa vetting—does not apply to refugees because refugees do not receive visas and because refugees are, in the words of the Departments of State, Homeland Security, and Health and Human Services, "the most thoroughly screened and vetted group to enter the United States." Dkt. No. 15-3 at 29 (FY 2025 Joint Report to Congress) (describing inter-agency vetting scheme including "rigorous background security checks," "biographic checks" including biometrics, and "vett[ing] against a broad array of law enforcement, intelligence community, and other relevant databases").

Finally—and perhaps most decisively—the Government's representations confirm this reading. At oral argument, the Government indicated that Proclamation 10949 closely mirrors, and builds upon, a proclamation from President Trump's first term: Presidential Proclamation No. 9645, "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats," 82 Fed. Reg. 45161 (September, 24, 2017); *see also* White House Fact Sheet: President Donald J. Trump

Restricts the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats (June 4, 2025), accessible at https://www.whitehouse.gov/fact-sheets/ ("This Proclamation builds on President Trump's first-term travel ban[.]"). The Government admitted that Proclamation 9645, unlike, in the Government's view, Proclamation 10949, did not bar the admission of refugees into the United States—in particular, because it contained an express carveout for refugees. Yet the carveout language in both proclamations is identical. *See* Proclamation 9645, § 6(e) ("Nothing in this proclamation shall be construed to limit the ability of an individual to seek... refugee status[.]"). If the President had intended the carveout in Proclamation 10949 to operate differently from the one in its direct predecessor, he would have worded it differently.

To be clear, Plaintiffs do not challenge the legality of Proclamation 10949. But given its clear refugee carveout, the Court rejects any suggestion that the Proclamation excuses the Government's obligation to process and admit Injunction-Protected Refugees. The Government must immediately resume processing the 80 presumptively protected refugees it has denied based on the Proclamation (that is, unless the Government intends, in accordance with the dispute-resolution procedures below, to try to rebut the presumption), and must assess reliance interests for all Review-Eligible Cases from designated countries.

1

2

### 3.3    Refugee cases whose travel was canceled before January 20 are not necessarily excluded from injunctive relief.

3

4

5

6

7

8

Plaintiffs assert that the Government is improperly denying protection to Injunction-Protected Refugees whose travel to the United States was canceled before January 20. According to Plaintiffs, this includes two groups: individuals whose travel was canceled *because* the Government began implementing the USRAP suspension before President Trump took office; and individuals whose travel was canceled for unrelated reasons, but who, save for the USRAP suspension, would have otherwise been re-booked for travel after January 20.

9

10

11

12

13

14

15

16

17

18

19

Excluding individuals from injunctive protection merely because their travel was canceled before January 20—especially if (i) travel was canceled as a direct result of early implementation of the USRAP EO, or (ii) travel would have been re-booked but for the USRAP EO—is impermissible. The Ninth Circuit's four-part test intends relief for individuals who had "arranged and confirmable travel plans" "on or before January 20, 2025." It contains no limitation based on the date of, or reason for, travel cancellation. And as the parties agree, the Government's appeal of the Court's first injunction divested the Court of jurisdiction to modify the injunction, requiring strict adherence to the Circuit's directives. *See Nat. Res. Def. Council, Inc. v. Sw. Marine, Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001). The Court will not read unsupported restrictions into the Circuit's clear language.

20

21

22

23

Plaintiffs' counsel's statements at oral argument support the need for a broader temporal scope, as he represented that the refugee suspension took effect *before* January 20, pointing to an Afghan refugee whose January 16 travel was

cancelled without explanation and never re-booked. If the allegations are true, this individual may still have a reliance interest akin to Plaintiff Pacito's even though travel was canceled before January 20.

But the Court must establish manageable temporal boundaries while staying true to the Circuit's individual-assessment directive. When pressed about a date cutoff, Plaintiffs' counsel suggested December 1, 2024, as a reasonable starting point for identifying potentially affected refugees. Thus, the Court adopts December 1, 2024, as the temporal cutoff.

Accordingly, Review-Eligible Cases include refugees who, on or before January 20, 2025, had arranged and confirmable travel plans, and whose travel, at some point after December 1, 2024, was canceled and never re-booked. Refugees whose travel was cancelled before January 20, 2025, may face an uphill battle in proving reliance interests comparable to Pacito, but those with cancellations at some point after December 1, 2024, deserve individualized assessment rather than categorical exclusion.

## 4. INJUNCTION IMPLEMENTATION FRAMEWORK

### 4.1 Government to identify universe of Review-Eligible Cases.

Defendants must identify the universe of "Review-Eligible Cases"—cases satisfying the first three Ninth Circuit criteria: (1) "the individual had an approved refugee application authorizing Customs and Border Protection to admit the individual 'conditionally as a refugee upon arrival at the port within four months of the date the refugee application was approved,' 8 C.F.R. § 207.4"; (2) "the individual

was cleared by USCIS for travel to the United States"; (3) "the individual had arranged and confirmable travel plans to the United States." As discussed above (*supra* § 3.3), this includes individuals whose travel to the United States was canceled after December 1, 2024, and never rebooked because of the USRAP EO.

All parties agree the START database can be used to identify such cases.

Within seven (7) days of this order, the Government must provide Plaintiffs with a list of the case numbers for all Review-Eligible Cases and their corresponding Resettlement Support Centers. If Plaintiffs identify cases they believe are Review-Eligible but were omitted by the Government, the parties must meet and confer before seeking judicial intervention.

## 4.2    Rebuttable-Presumption Cases.

As announced in the Court's previous order, Dkt. No. 126, a small subset of Review-Eligible Cases is entitled to a rebuttable presumption of protection ("Rebuttable-Presumption Cases"), placing the burden on the Government to prove, by clear evidence, that the case lacks a reliance interest comparable to Pacito. Cases in which the Government fails to meet this burden must be processed and admitted immediately.

Plaintiffs propose extending rebuttable presumptions to several categories. *See* Dkt. No. 127 at 4–6. The Court adopts some proposals while rejecting others based on the Ninth Circuit's directives.

First the rejection. The Court declines to extend a presumption to "[c]ases authorized for expedited processing for medical or protection concerns." *See id.* at 6.

The Court acknowledges that this population likely bears an *acute interest* in admission. But it is not clear that this acute interest amounts to a *reliance interest*—an interest arising directly from reliance on the assurance of travel. The Government is obligated to assess Review-Eligible Cases in this category for reliance interest, but the Court finds no factual basis on which to categorically extend a rebuttable presumption to this group. Doing so would controvert the Circuit's direction for case-by-case review.

The Court, however, will adopt a presumption of sufficient reliance interests in the following cases:

(1)     *160 refugees with imminent travel.*

In its previous order, the Court stated that refugees who were cleared for admission and booked for travel within two weeks of January 20—a group of 160—are entitled to this rebuttable presumption. Dkt. No. 126 at 3. That entitlement persists, and it applies fully to the 80 individuals to whom the Government has denied relief based on Proclamation 10949.

(2)     *Unaccompanied minor children.*

Plaintiffs argue that minor children traveling without an accompanying adult—whether because they are traveling to reunite with family, or to be placed in foster care—necessarily have a serious reliance interest because "steps to transition the child's situation in anticipation of travel would need to have been taken given the nature of a child living without a parent or legal guardian." Dkt. No. 127 at 6. Plaintiffs also argue that "it would not be feasible to require children to explain their reliance interests[.]" *Id.* On this latter point, the Court fully agrees. To place

the burden of proving individualized reliance on a population of unaccompanied refugee children—a population of diminished legal capacity, and likely impacted by severe trauma—would be inequitable, impractical, procedurally unsound, and unlikely to produce accurate results. The Court agrees with Plaintiffs that unaccompanied minor children who satisfy the first three criteria are entitled to a rebuttable presumption that they possess reliance interests comparable to Plaintiff Pacito. Thus, the Government must admit all review-eligible cases of unaccompanied minor children unless it timely rebuts their presumption of injunctive protection.

(3)    *Afghan refugees at Camp As Sayliyah.*

Plaintiffs ask the Court to extend a rebuttable presumption of protection to Afghan refugees who were required by the U.S. Government to relocate to a third location for processing of their application. As explained by Plaintiffs, "[u]nder a State Department initiative, certain Afghan refugees were required to relocate from Afghanistan to Camp As Sayliyah (CAS) in Qatar to pursue their refugee applications, where they lack authorization to stay long-term." *Id.* at 6. While "the government represents that many of these individuals fall within the 160 cases that the Court has ordered to be processed according to a rebuttable presumption of reliance interests," Plaintiffs assert on information and belief that "there may be a small number of additional cases with travel booked prior to January 20 who remain stranded at Camp As Sayliyah." *Id.* To the extent this is true, the Court agrees that these individuals—given their relocation to CAS in reliance on the

assurance of processing, travel, and admission—are entitled to a rebuttable presumption of protection.

The Government must resume processing all unchallenged Rebuttable-Presumption Cases within fourteen (14) days of this order. In other words, Rebuttable-Presumption Cases automatically become Injunction-Protected Cases if the Government does not identify them for challenge within fourteen (14) days of this order under Section 4.6.2 of this order.

## 4.3    Government to provide notification to all Review-Eligible Cases.

The Government must notify all Review-Eligible Cases of their standing under this framework:

(1)    *Review-Eligible Cases:* Within seven (7) days of identifying Review-Eligible Cases (*see supra* § 4.1), notify all Review-Eligible Cases of the four-part protection criteria and procedures for seeking individualized reliance assessments (*see infra* § 4.4).

(2)    *Rebuttable-Presumption Cases*: Notify that processing will proceed unless the Government objects within fourteen (14) days of this order.

The Government must keep all Review-Eligible Cases reasonably informed about their application status and eligibility determinations throughout this process.

## 4.4    Resettlement Support Centers to facilitate documentation of reliance interests by administering surveys to Review-Eligible Cases.

For Review-Eligible Cases not subject to rebuttable presumptions, Resettlement Support Center (RSCs) must provide case members with an

opportunity to complete a standardized survey, to be administered by the RSC, to document reliance interests on a case-by-case basis.

(1) *Survey contents.* The Court adopts Plaintiffs' proposed survey questions, Dkt. No. 127-1, which address the relevant reliance indicators in appropriate detail. Both parties had the opportunity to propose survey procedures, and while their approaches are substantially similar, Plaintiffs' questions provide the necessary specificity for documenting reliance interests. The survey will address key indicators including housing changes, employment termination, school withdrawal, sale of belongings, and medical decisions based on scheduled travel. All survey responses must be made under penalty of perjury to ensure the accuracy and reliability of the information provided.

(2) *Timing.* Survey administration begins immediately for all Review-Eligible Cases to ensure timely processing.

(3) *Administration method.* RSCs must accommodate language barriers, literacy levels, and technology limitations—including by translating the survey questions to different languages as needed, and by administering the surveys in a reasonably accessible manner. While email may suffice for some cases, others will require phone or in-person administration. RSCs may conduct follow-up to obtain complete responses.

(4) *Survey disposition.* Upon completion of surveys, RSCs must transmit all completed survey responses to Plaintiffs' counsel. Plaintiffs retain discretion to determine which completed surveys to submit to the Government for reliance-interest assessment under Section 4.5. Cases for which Plaintiffs do not submit

surveys to the Government will not be reviewed for injunctive protection under this framework.

### 4.5    Plaintiffs to review completed survey responses and select cases for Government determination.

Upon receiving completed surveys from the RSCs, Plaintiffs must review each response to determine which cases to submit to the Government for an initial reliance-interest assessment. Plaintiffs may submit survey responses to the Government on a rolling basis.

Upon receiving survey responses from Plaintiffs, the Government must review each response within seven (7) days to make an initial determination of whether sufficient reliance interests have been demonstrated.

*If a sufficient reliance interest is found*, the case becomes Injunction-Protected, and the Government must immediately process, admit, and resettle the case members. The Government must notify Plaintiffs that a sufficient reliance interest has been found, but no notification to the Court is required.

*If a sufficient reliance interest is not found*, the Government must immediately inform Plaintiffs of the denial.

### 4.6    Dispute-resolution procedures.

The Court sets forth dispute-resolution procedures for two scenarios: (1) Government denials of reliance-interest claims; and (2) Government challenges to individual Rebuttable-Presumption Cases.

### 4.6.1    Disputed initial determinations.

*If the Government finds an insufficient reliance in a case submitted by Plaintiffs,* Plaintiffs may file the survey response along with an optional brief of no more than six (6) pages arguing the case demonstrates sufficient reliance interests. Such filings may be anonymized or filed under seal per LCR 5(g) if anonymization is inadequate. Plaintiffs should title these submissions as "Motion Challenging Initial Reliance-Interest Determination." The Court will immediately refer any motion thus titled to Judge Peterson.

After Plaintiffs' filing, the Government may file an optional response brief within four (4) days, not exceeding six (6) pages, explaining its reasoning for denial.

Once a filing becomes ripe for Judge Peterson's consideration (i.e., following the four-day Government response period), Judge Peterson will issue a Report and Recommendation (R&R) within twenty-one (21) days, summarizing key reliance facts and recommending whether the case satisfies the four-part criteria. If Judge Peterson finds survey responses inadequate, she may order Plaintiffs to obtain additional information through the RSCs.

Objections to any R&R should be filed no later than fourteen (14) days from the date of the R&R. Objections should be noted for consideration on this Court's motions calendar fourteen (14) days from the date they are filed. Responses, if any, to objections must be filed no later than the day before the noting date.

To conserve resources and streamline review, the Court encourages the parties to implement the above procedure in a regularized fashion. For example, each Monday, Plaintiffs might file a single docket entry containing the survey

responses for cases that, in the week before, the Government deemed, through its initial determination, to be ineligible for injunctive protection, along with any briefing arguing that the case shows sufficient reliance interests. Then, by Friday, the Government may file its responsive brief in opposition, if any. Sometime in the next three weeks, Judge Peterson would then issue her R&Rs as to each case identified in Plaintiffs' submission. The parties would then have fourteen days to object to the R&R. If either party objects, the opposing party would then have thirteen days to respond to the objection, after which the matter will become ripe for the Court's final resolution.

The Government must ensure that all refugee applicants are promptly informed of the Court's final determination, and that any refugees determined by the Court to be injunction-protected are granted relief.

### 4.6.2    Dispute resolution as to Rebuttable-Presumption Cases.

Within fourteen (14) days of this order, the Government must identify all Rebuttable-Presumption Cases it intends to challenge. Cases not timely challenged automatically become Injunction-Protected Refugees.

For challenged cases, the Government has ten (10) days to file briefs not exceeding six (6) pages per case, providing argument why the case lacks Pacito-comparable reliance interests. All filings must be anonymized or sealed per LCR 5(g). The Government should title these submissions as "Motion Challenging Rebuttable Presumption of Injunctive Protection." The Court will immediately refer any motion thus titled to Judge Peterson.

Plaintiffs must respond within five (5) days with briefs not exceeding six (6) pages per case.

After this five-day response window has passed, Judge Peterson should issue R&Rs within twenty-one (21) days making factual findings about the applicant's reliance interests and issuing a final recommendation to the Court as to whether the Government has met its burden to overcome the applicant's presumptive reliance interests by clear evidence. If Judge Peterson determines that additional information is needed to assess reliance interests, she may order the parties to obtain additional information from the applicant, through the RSCs, as necessary.

Objections to any R&R should be filed no later than fourteen (14) days from the date of the R&R. Objections should be noted for consideration on this Court's motions calendar fourteen (14) days from the date they are filed. Responses, if any, to objections must be filed no later than the day before the noting date.

The Court will make a final determination about whether the case is eligible for injunctive protection. If the Government prevails in rebutting the presumption of protection, the case does not lose its Review-Eligible status; in any such case, Plaintiffs may still attempt, in accordance with the procedures set forth in Section 4.6.1, to try to prove that the case has a sufficient reliance interest to merit injunctive protection.

## 5. APPOINTMENT ORDER

Pursuant to 28 U.S.C. § 636, the Court appoints the Honorable Michelle L. Peterson, U.S. Magistrate Judge, to fulfill the adjudicative role described above. *See supra* § 4.6 (explaining that the Court will assign any "Motion Challenging Initial

Reliance-Interest Determination" or "Motion Challenging Rebuttable Presumption of Injunctive Protection" to Judge Peterson for an R&R). The Court directs Judge Peterson to closely review the parties' filings, carefully assess the factual evidence before her to assess whether each individual applicant demonstrates a reliance interest comparable to Pacito, and timely issue R&Rs regarding each case before her. This appointment will persist as long as the above-described dispute-resolution framework remains in effect. This appointment is in lieu of appointing a special neutral as contemplated in the Court's previous order.

## 6.   REQUIREMENTS FOR REPORTING AND SEEKING RELIEF

If, at any point, due to feasibility concerns, the Government seeks judicial relief from the requirements set forth above, the Court directs the Government to follow this procedure:

(1) The Government must promptly meet and confer with Plaintiffs to discuss the feasibility concern(s) and attempt to reach agreement on modified injunction-implementation measures.

(2) Following this meet and confer, and assuming they agree on a proposed course of action, the parties must file a joint submission with the Court before the deadline for completion of the injunction-implementation measure(s) from which the Government seeks relief that:

    a.   Identifies with particularity the specific measure(s) at issue;

    b.   Explains the precise operational constraint(s) preventing performance; and

c. Proposes alternative measures and timelines.

(3) If the parties cannot reach agreement, they must clearly identify their respective positions in a joint submission, with each side limited to 1,500 words. Any such joint submission must be filed no later than three (3) calendar days before the deadline for completion of the measure at issue.

The Court will promptly review any joint submission and issue an order either amending or declining to amend the injunction-implementation and dispute-resolution framework as necessary. Absent express relief from the Court before the deadline, the Government remains obligated to comply with the measures set forth above.

It is so ORDERED.

Dated this 14th day of July, 2025.

Jamal N. Whitehead
United States District Judge

ORDER - 23