1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

| | |
|---|---|
| PLAINTIFF PACITO; PLAINTIFF ESTHER; PLAINTIFF JOSEPHINE; PLAINTIFF SARA; PLAINTIFF ALYAS; PLAINTIFF MARCOS; PLAINTIFF AHMED; PLAINTIFF RACHEL; PLAINTIFF ALI; HIAS, INC.; CHURCH WORLD SERVICE, INC., and LUTHERAN COMMUNITY SERVICES NORTHWEST,<br><br>                Plaintiffs,<br><br>        v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; MARCO RUBIO, in his official capacity as Secretary of State; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services,<br><br>                Defendants. | CASE NO. 2:25-cv-255-JNW<br><br>ORDER DENYING MOTION TO DISMISS |

21

22

23

ORDER DENYING MOTION TO DISMISS - 1

1

2

## 1.  INTRODUCTION

This matter comes before the Court on the Government's motion to dismiss Plaintiffs' First Supplemental Complaint for failure to state a claim and for lack of subject-matter jurisdiction. Dkt. No. 115. Having reviewed the briefing, the record, and the law, the Court, being fully informed, finds that Plaintiffs have adequately pled their claims and established the Court's jurisdiction. For the reasons explained fully below, the Government's motion to dismiss is DENIED. Dkt. No. 115.

## 2.  BACKGROUND

Because the Government mounts a facial attack under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) (*see infra* § 3.1.1), the Court accepts as true the allegations set forth in the operative complaint. Dkt. No. 56 (First Supplemental Complaint).

The factual and legal background of this case, including the statutory framework of the Refugee Act of 1980, the United States Refugee Admissions Program (USRAP) Executive Order, and agency implementation of the USRAP EO, is comprehensively set forth in the Court's prior orders. *See* Dkt. No. 45 at 3–17 (describing the Refugee Act, USRAP EO and agency implementation of the EO, and Plaintiffs' experiences); Dkt. No. 79 at 3–6 (additional factual development).

In brief, Congress enacted the Refugee Act in 1980 to provide a "permanent and systemic procedure" for the admission and resettlement of refugees in the United States. Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 § 101(b). The Government fulfills this statutory mandate through USRAP, a multi-agency effort administered by Department of State (DOS) through the Bureau of Population,

Refugees, and Migration (PRM); Department of Homeland Security (DHS) through U.S. Citizenship and Immigration Services (USCIS); Department of Health and Human Services (DHHS) through the Office of Refugee Resettlement (ORR); the United Nations (UN) through the UN High Commissioner for Refugees (UNHCR) and International Organization for Migration (IOM); and through cooperative agreements, as authorized under 31 U.S.C. § 6305, with nonprofit partners, including Resettlement Support Centers (RSCs) abroad and domestic Reception and Placement (R&P) service providers. *See* Dkt. No. 56 at ¶¶ 31–77.

On January 20, 2025, President Trump signed Executive Order No. 14163, "Realigning the United States Refugee Admissions Program," 90 Fed. Reg. 8459 ("USRAP EO"), which under the purported authority of 8 U.S.C. §§ 1182(f) and 1185(a)(1), suspended all "entry into the United States of refugees under the USRAP" effective January 27, 2025. USRAP EO § 3(a)–(b). The USRAP EO requires reports to the President every 90 days on whether resumption would serve U.S. interests until the President determines resumption is warranted and creates a case-by-case exception mechanism. *Id.* § 4; § 3(c). Immediately following the USRAP EO, the Agency Defendants began implementing what this Court terms the "Agency Suspension"—suspending USRAP case processing, travel, and admissions. Dkt. No. 56 ¶¶ 115–120.

On January 24, DOS issued "Suspension Notices" to USRAP resettlement partners, including Plaintiffs Church World Services (CWS) and HIAS, directing them to "stop all work" under cooperative agreements, "cancel as many outstanding obligations as possible," and "not incur any new costs." *Id.* ¶ 126. These notices cited

as authority not the USRAP EO, but Executive Order No. 14169, "Reevaluating and Realigning United States Foreign Aid," 90 Fed. Reg. 8,619 (Jan. 20, 2025) ("Foreign Aid EO"), which announced a "90-day pause" on "foreign development assistance," and says nothing about refugees or domestic resettlement programs. *See id.*

On top of the Suspension Notices, DOS and DHHS also implemented a *sub silentio* suspension of funding for R&P services, withholding reimbursements for work already performed. Dkt. No. 56 ¶¶ 131–132. The Court refers to the noticed suspension of USRAP agreements, together with the *sub silentio* suspension, as the "Funding Suspension."

Plaintiffs filed this lawsuit on February 10, challenging the USRAP EO, Agency Suspension, and Funding Suspension, and moved for preliminary injunctive relief. *See* Dkt. Nos. 1, 14. On February 25, the Court ruled from the bench, preliminarily enjoining implementation of key sections of the USRAP EO. Dkt. No. 39. But the very next day—before the issuance of the written order—DOS issued communications terminating all ten cooperative agreements for R&P services ("R&P Termination") and all but one cooperative agreement for USRAP processing abroad ("Processing Termination"). Dkt. No. 56 ¶ 209. These "Termination Notices" directed the recipients, "effective immediately," to "stop all work on the program," "not incur any new costs," and "cancel as many outstanding obligations as possible." *Id.* ¶ 216. The only explanation given was that the agreements "no longer effectuate agency priorities," and the only legal authority cited was "the U.S. Department of State Standard Terms and Conditions, 2 CFR 200.340, and/or Award Provisions as applicable." *Id.* ¶¶ 214, 218. The Court refers to the R&P Termination and

Processing Termination, together, as the "Funding Termination." The only RSC not subject to the Funding Termination was RSC Africa, run by Plaintiff CWS, which nonetheless remained suspended under the Funding Suspension. *Id.* ¶ 210.

On March 4, the Court held an emergency status conference to address the Funding Termination, after which it granted Plaintiffs leave to amend their complaint to allege these newly developed facts. *See* Dkt. Nos. 51, 54. On March 5, Plaintiffs filed the First Supplemental Complaint, which remains the operative pleading. Dkt. No. 56.

The First Supplemental Complaint asserts seven causes of action: (1) Violation of the Refugee Act (on behalf of all Plaintiffs, including the Class, against all Defendants), alleging that "Defendants' suspension of the USRAP violates the Refugee Act, including 8 U.S.C. §§ 1182 and 1157(c)(2)(A)," Dkt. No. 56 ¶¶ 229–233; (2) Violation of the Administrative Procedure Act (APA) (on behalf of all Plaintiffs, including the Class, against the Agency Defendants), alleging that "Defendants' actions taken to implement the [USRAP EO]" violate the APA, *id.* ¶¶ 234–238; (3) Violation of the *Accardi* Doctrine and APA (on behalf of Plaintiffs HIAS, CWS, LCSNW, Esther, Josephine, and the Class, against the Agency Defendants), alleging that "Defendants' suspension of the FTJ process violates agency procedures, including those at 8 C.F.R. § 207.7," and that this "failure to comply with applicable regulations" violates the APA, *id.* ¶¶ 239–241; (4) Violation of the Fifth Amendment Due Process Clause (on behalf of Plaintiffs Esther and the FTJ Petitioner Subclass, against all Defendants), alleging that "Defendants' suspension of the USRAP violates Plaintiff Esther and the FTJ Petitioner Subclass's due

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

process rights" by depriving their "statutorily created entitlement to benefits," *id.* ¶¶ 242–244; (5) Violation of the APA and INA (on behalf of all Plaintiffs, including the Class, against the Agency Defendants), alleging that the Funding Suspension and Funding Termination violate the APA, *id.* ¶¶ 245–250; (6) Violation of the *Accardi* Doctrine and Administrative Procedure Act (on behalf of all Plaintiffs, including the Class, against the Agency Defendants), alleging that the Funding Suspension and Funding Termination violate "agency policy and regulation, including those at 45 C.F.R. § 400.1 *et seq.*," and that this "failure to comply with applicable regulations" violates the APA, *id.* ¶¶ 251–253; and (7) Violation of the Separation of Powers (on behalf of all Plaintiffs, including the Class, against all Defendants), alleging that "President Trump's Foreign Aid Executive Order and Defendants' implementation of that Order, including the State Department's Termination Notices and Suspension Notices and the *Sub Silentio* Suspension, violate the constitutional principle of the separation of powers," *id.* ¶¶ 254–257.

Finally, one fact not pled in the complaint merits mention. When the complaint was filed, Plaintiff Josephine was in South Africa, awaiting travel to the United States as the follow-to-join (FTJ) beneficiary of her mother, Plaintiff Esther, the sole representative of the proposed FTJ Petitioner Subclass. *See id.* ¶¶ 143–150, 239–244. Since then, Esther's petition has been processed, and Josephine has been admitted into the United States. *See* Dkt. No. 93 at 6. This fact is not disputed. *See* Dkt. Nos. 115 at 24; 130 at 13. This development bears on the Government's mootness challenge to the due process claim but does not render the broader claims

1    moot for the reasons addressed in the Court's Class Certification Order issued

2    concurrently with this order.

## 3.   DISCUSSION

### 3.1    Legal standard.

#### 3.1.1      Fed. R. Civ. P. 12(b)(1).

The Court must dismiss a complaint under Rule 12(b)(1) if it lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A Rule 12(b)(1) jurisdictional attack may be facial, in which case the defendant asserts the allegations in the complaint, accepted as true, fail to invoke federal jurisdiction, or factual, in which case the defendant disputes the truth of the complaint. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). The court "resolves a facial attack" by "[a]ccepting the plaintiff's allegations as true," "drawing all reasonable inferences in the plaintiff's favor," and "determin[ing] whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). In a factual attack, "[t]he Court need not presume the truthfulness of the plaintiff's allegations" and may "review evidence beyond the complaint." *Safe Air*, 373 F.3d at 1039.

The Government argues that the complaint fails to establish jurisdiction even with all the allegations accepted as true. This makes their challenge "facial" rather than "factual." This conclusion is not affected by the Government's mootness challenge (*infra* § 3.5) based on a factual assertion not contained in the complaint: that Plaintiff Esther's FTJ petition has been processed during the pendency of this

case. This is because the parties do not dispute that Esther's FTJ petition was processed, *see* Dkt. Nos. 115 at 24, 130 at 13, and where the allegations in a complaint are "controverted by *undisputed* facts in the record," a court can assume the truth of the undisputed facts without converting a facial analysis into a factual one. *See Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987) (emphasis added).

### 3.1.2    Fed. R. Civ. P. 12(b)(6).

The Court will grant a Rule 12(b)(6) motion if the complaint fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plausibility standard is less than probability, "but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* When considering a motion to dismiss, the Court accepts factual allegations pled in the complaint as true and construes them in the light most favorable to the plaintiff. *Lund v. Cowan*, 5 F.4th 964, 968 (9th Cir. 2021). But courts "do not 'assume the truth of legal conclusions merely because they are cast in the form of factual allegations.'" *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (quoting *W. Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981)). Thus, "'conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss.'" *Id.* (quoting *Adams v. Johnson,* 355 F.3d 1179, 1183 (9th Cir.2004)).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**3.2    Plaintiffs do not seek impermissible injunctive relief against the President.**

To begin, the Government argues that Plaintiffs' claims against President Trump must be dismissed because the Court lacks authority to enjoin the President. Dkt. No. 115 at 15–16. On this basis, they move to "dismiss Plaintiffs' First, Second,[1] Fourth, and Seventh Claims to the extent they apply to the President." *Id.*

It is true that courts generally lack authority to enjoin the President in the performance of official duties.[2] But Plaintiffs do not seek such relief. The only relief that Plaintiffs seek against the President himself is a *declaratory* judgment that the USRAP EO is ultra vires. As the Court explained when issuing its First Injunction, district courts have jurisdiction to declare executive orders unlawful and to enjoin sub-Presidential Executive Branch officials from carrying out unlawful orders. *See* Dkt. No. 45 at 18–20 (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–89 (1952); *Clinton v. Jones*, 520 U.S. 681, 703 (1997); *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017); *Sierra Club v. Trump*, 929 F.3d 670, 696–97 (9th Cir. 2019); *Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023)).

---

[1] Plaintiffs assert their second claim only against the Agency Defendants, not the President. The Court assumes its inclusion here is an error.

[2] Defendants slightly overstate this rule, omitting the phrase "in general" from their citation to governing authority. *See Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) ("[I]n general, 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'"). The Supreme Court and Ninth Circuit have referred to injunctive relief against the President as "extraordinary," but not necessarily forbidden. *See id.*; *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017), *vacated on other grounds*, 583 U.S. 941 (2017) ("[I]njunctive relief against the President . . . is extraordinary, and should . . . raise[ ] judicial eyebrows."). Because Plaintiffs do not in fact seek such relief, this case does not require the Court to define the outer bounds of its equitable powers.

1    Because Plaintiffs seek only declaratory relief against the President, the

2    Court declines to dismiss their claims against him.

### 3.3    Plaintiffs have adequately pled that Defendants violated the INA.

4    The Government argues that "Plaintiffs' First, Third, and Seventh Claims are

5    not plausible because, as the Ninth Circuit recently clarified, the President's

6    suspension of the USRAP was valid under 8 U.S.C. § 1182(f)." Dkt. No. 115 at 16

7    (citing *Pacito v. Trump*, No. 25-1313 (9th Cir. Apr. 21, 2025)).

8    At the start, the Court notes that the Ninth Circuit's partial stay does not, as

9    the Government represents, "clarif[y] . . . the President's suspension of the USRAP

10   was valid." *Id.* The Ninth Circuit's order discussed neither the Government's duties

11   under the Refugee Act nor the outer limits of the President's authority under

12   Section 1182(f). And in any case, the Circuit's "predictive analysis" of Plaintiffs'

13   likelihood of success on the merits—issued in an emergency interlocutory posture—

14   does not "forever decide the merits of the parties' claims." *See E. Bay Sanctuary*

15   *Covenant v. Biden*, 993 F.3d 640, 661 (9th Cir. 2021).

16   On a substantive level, the Government offers two arguments why the

17   USRAP EO, Agency Suspension, Funding Suspension, and Funding Termination do

18   not violate the INA as amended by the Refugee Act: first, that the Refugee Act

19   confers neither rights upon refugees nor obligations upon the Government; and

20   second, to the extent the Refugee Act does create rights and obligations, they are

21   statutorily circumscribed by the President's authority under Section 1182(f). The

22   Court addresses these arguments in turn.

23

1

2

### 3.3.1    The Refugee Act imposes duties upon the Government, and Plaintiffs plausibly allege the Government breached them.

The Government argues that "[t]he Refugee Act . . . does not mandate *any* refugee admissions[.]" Dkt. No. 115 at 17 (emphasis in original). The Court disagrees.

The Constitution vests Congress with the power to set immigration policy. *See* U.S. Const. art I, §§ 1, 8, cl. 4. "[O]ver no conceivable subject is the legislative power of Congress more complete[.]" *Fiallo v. Bell*, 430 U.S. 787, 792 (1977). In passing the Refugee Act of 1980, Congress expressed a clear intent "to provide a *permanent and systematic* procedure for the admission to this country of refugees . . . and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted." Pub. L. No. 96-212, § 101(b), 94 Stat. 102 (emphasis added). This language is unequivocal.

Equally unequivocal are the statutory requirements created by the Refugee Act that mandate both refugee admissions and the provision of resettlement support. *See* 8 U.S.C. § 1157(a)(3) (requiring that admissions into the United States "shall be allocated among refugees of special humanitarian concern"); *id.* § 1157(a), (b), (d), (e) (obligating the President, annually, to determine the number of refugees to admit in the upcoming fiscal year); *id.* § 1157(c) (stating that FTJ beneficiaries— i.e., spouses or unmarried minor children of resettled refugees—are "entitled to the same admission status" as their family members, who can petition on their behalf); *id.* § 1522 (requiring that resettlement support "shall" be provided "to the extent of

1    available appropriations" and setting forth private-public scheme to deliver such

2    support); *see generally* Dkt. Nos. 45 at 7–8; 78 at 18–24.

3        The Court has already addressed, and rejected, the statutory arguments

4    advanced by the Government to minimize or negate its duties under the Refugee

5    Act. *See id.* at 21–30. The Government repeats its argument that

6    Section 1157(c)(2)(A) does not entitle FTJ beneficiaries to admission but rather only

7    to status "*if and when* [they] are admitted." Dkt. No. 115. This Court—and others—

8    have rejected this position, which implausibly renders the statute a functional

9    nullity. *See* Dkt. No. 45 at 52; *see also Doe v. Trump*, 288 F. Supp. 3d 1045, 1078–79

10   (W.D. Wash. 2017).

11       The Government cites one out-of-circuit district court opinion for the

12   proposition that "[Section] 1157 confers discretionary authority to admit refugees,

13   including 'discretion over whether to implement this provision at all.'" Dkt. No. 115

14   at 18 (quoting *Doe 1 v. Jaddou*, __ F. Supp. 3d __, 2025 WL 327368, at *3–4 (D. Md.

15   Jan. 29, 2025)). But that case is readily distinguishable—there, individual plaintiffs

16   sought mandamus to force the Government to process their refugee applications.

17   Here, by contrast, Plaintiffs challenge Government actions that entirely dismantle

18   USRAP and abandon the duties established by the Refugee Act. The distinction

19   matters. This Court need not decide whether individual refugees have enforceable

20   rights under the Refugee Act. What is clear is that the Government has duties

21   under the Act, and enforcing those duties is what Plaintiffs seek.

22       In sum, the Court rejects any contention that the INA does not obligate the

23   Government to process, admit, and resettle refugees. And Plaintiffs' complaint

adequately alleges that the USRAP EO, Agency Suspension, Funding Suspension, and Funding Termination—individually and together—breached that obligation.

### 3.3.2 The President's delegated authority under Section 1182(f), while broad, does not authorize the total abandonment of the Government's duties under the Refugee Act.

The Government characterizes Section 1182(f), effectively, as a kill-switch, capable, when activated, of nullifying the Government's statutory obligations under the Refugee Act. The Court disagrees.

Section 1182(f) provides, in relevant part:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f). In *Trump v. Hawaii*, the Supreme Court addressed the scope of Presidential authority under Section 1182(f). 585 U.S. 667 (2018). It held that the text of Section 1182(f) "exudes deference" to the President, "vests [him] with ample power to impose entry restrictions in addition to those elsewhere enumerated in the INA," and fully "entrusts to the President the decisions whether and when to suspend entry," "for how long," and "on what conditions." *Trump v. Hawaii*, 585 U.S. 667, 684 (2018) (citation modified). This delegation of authority is, no doubt, substantial.

And yet, it is not without limits. In *Trump v. Hawaii*, the Supreme Court accepted plaintiffs' "structural argument" that Section 1182(f) "does not give the President authority to countermand Congress's considered policy judgments." *Id.* at

1   688. More to the point, *Trump v. Hawaii* was decided on the explicit assumption—
2   which this Court likewise adopts—"that § 1182(f) does not allow the President to
3   expressly override particular provisions of the INA." *Id.* at 689 (upholding
4   Presidential Proclamation because plaintiffs did not identify a conflict between the
5   Proclamation and the INA). This case is distinguishable on precisely this issue.

6         This Court has already found that the complete, indefinite suspension of
7   USRAP—the program by which the Government fulfills its statutory duties under
8   the Refugee Act—countermands not only the INA statutory provisions discussed
9   above (*supra* § 3.3.1), but also the considered policy judgments of Congress. *See* Dkt.
10  No. 45 a 24–26. In passing the Refugee Act, Congress "declare[d] that it is the
11  historic policy of the United States to respond to the urgent needs of persons subject
12  to persecution in their homelands"—and to fulfill this policy, Congress sought to
13  "provide a permanent and systematic procedure" for refugee resettlement.
14  Pub. L. No. 96-212, § 101(a)–(b), 94 Stat. 102. When the President, through the
15  USRAP EO, effectively subordinated this Congressional policy interest in refugee
16  resettlement to countervailing Executive policy interests in, among other things,
17  "appropriate assimilation" (*see* USRAP EO § 2), he impermissibly "countermand[ed]
18  Congress's considered policy judgment." *See Trump v. Hawaii*, 585 U.S. at 688.

19        To be sure, Section 1182(f) authorizes the President—upon satisfying its
20  statutory conditions—to suspend the entry of "any aliens or of *any class* of aliens"
21  into the United States. Whether the term "class" can be reasonably construed to
22  include *all* "refugees" as defined at 8 U.S.C. § 1101(a)(42)—a statutory construction
23  that sets up a troubling contradiction with the "permanent and systematic"

1    language of the Refugee Act—is an open question. But this Court need not resolve

2    that question because, as the Court previously found, the USRAP EO does not

3    actually announce a "suspension" of the kind plausibly authorized by Section

4    1182(f). *See* Dkt. No. 45 at 26–28 (analyzing and applying the definition of

5    "suspension").

6        When invoking Section 1182(f), while the President need not "prescribe in

7    advance a fixed end date" for entry restrictions—which would be impractical or

8    impossible in some cases—there must be some temporal limitation. *Trump v.*

9    *Hawaii*, 585 U.S. at 687 (reasoning that a President "may link the duration of

10   th[e]restrictions [on entry], implicitly or explicitly, to the resolution of the triggering

11   condition"). Indeed, that is law of the Circuit: any valid invocation of Section 1182(f)

12   must "have an endpoint." *Doe #1 v. Trump*, 957 F.3d 1050, 1065 (9th Cir. 2020)

13   (holding that Presidential Proclamation suspending entry on immigrant visas

14   pending the "diminishment of uncompensated healthcare costs" was invalid under

15   Section 1182(f) because "the Proclamation's perfunctory time limitations do not

16   comport with the textual limits of § 1182(f)"). And while it is true that the Ninth

17   Circuit later "re-examin[ed] the merits" of *Doe #1 v. Trump* in a subsequent

18   decision, that decision was vacated. *See Doe #1 v. Trump*, 984 F.3d 848 (9th Cir.

19   2020), *vacated, Doe #1 v. Biden*, 2 F.4th 1284, 1285 (9th Cir. 2021). The parties do

20   not dispute that *Doe #1 v. Trump*, 957 F.3d 1050 (9th Cir. 2020), is binding

21   precedent. *See* Dkt. No. 45 at 24 n.5.

22       In short, the Court finds that the USRAP EO lacks the express or implied

23   temporal limitation required to qualify as a valid "suspension" under Section

1182(f). Apart from executive fiat, it identifies no triggering condition to "render the limitation feasibly temporary." *Doe #1 v. Trump*, 957 F.3d at 1065–66. Like the unlawful proclamation in *Doe #1 v. Trump*, it cites broad, long-term policy concerns without suggesting how they might be resolved or how the suspension relates to addressing them. And it is entirely unclear how a vague notion such as "appropriate assimilation"—a concern arguably at odds with core constitutional principles of democratic pluralism and equal protection—could ever lend itself to a clear, objective resolution.

Thus, the Court finds that the USRAP EO does not "suspend" entry "for [a] period" as authorized by Section 1182(f). Instead, it functionally nullifies the policy judgments and statutory mandates set forth in the Refugee Act. Nor does the Government's invocation of 8 U.S.C. § 1185(a)(1), *see* Dkt. No. 115 at 16, fare any better, as Section 1185(a)(1) likewise does not empower the President to abandon his statutory and constitutional obligations and nullify the will of Congress as set forth in the Refugee Act.

### 3.4    Plaintiffs have adequately pled their separation-of-powers claim.

The Government argues that Plaintiffs' separation-of-powers claim should be dismissed because "the Supreme Court has 'long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" Dkt. No. 115 at 19 (quoting *Fiallo*, 430 U.S. at 792).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

This argument fails for two reasons. First, neither the President's statutory authority under the INA nor his inherent authority under the Constitution permits him to subvert the express will of Congress. *See In re Aiken Cnty.*, 725 F.3d 255, 267 (D.C. Cir. 2013) (J. Kavanaugh) ("It is no overstatement to say that our constitutional system of separation of powers would be significantly altered if we were to allow executive . . . agencies to disregard federal law. . . . Our decision today rests on the constitutional authority of Congress, and the respect that the Executive and the Judiciary properly owe to Congress in the circumstances here.").

Second, and more importantly, the Government mischaracterizes the claim. The gravamen of Plaintiffs' separation-of-powers claim is that the Funding Suspension and Funding Termination are unlawful because the "Constitution grants the power of the purse and the power to legislate exclusively to Congress" and "[a]bsent congressional authorization, the Executive Branch may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *Id.* ¶¶ 255, 257; *see also City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) ("Because Congress did not authorize withholding of funds, the Executive Order violates the constitutional principle of the Separation of Powers."). The Government's appeal to the President's "power to expel or exclude aliens" is inapposite because it fails to address the agency actions at the heart of this claim: the Funding Suspension and Funding Termination.

The Government addresses the substance of Plaintiffs' actual claim only in its reply brief, arguing that Section 1182(f) and the President's foreign-affairs powers authorize him to "manage and restrict foreign aid." Dkt. No. 132 at 12. This

late-levied argument is unpersuasive. The Foreign Aid EO calls for a pause in "foreign development assistance." It says nothing about refugees or USRAP. And the Government gives no explanation why the Foreign Aid EO, or the President's foreign-affairs powers, is relevant to statutory resettlement programs that Congress has expressly characterized as "domestic"—in other words, not a form of "foreign aid." *See* 8 U.S.C. § 1522(a)(3) ("domestic assistance" to refugees). The Court thus rejects the Government's request to dismiss this claim.

### 3.5    Plaintiffs have adequately pled their due process claim, and the claim remains justiciable.

The Government offers three arguments why the Court should dismiss Plaintiffs' due process claim. Dkt. No. 115 at 24.

First, the Government argues that "this claim is moot because the Plaintiffs pressing it—Plaintiffs Esther and Josephine—received the relief they sought." *Id.* The Court addresses this argument in its Class-Certification Order (issued concurrently), concluding that because Esther's claim is inherently transitory, the processing of her FTJ petition does not render the claim moot. And under the law of the Ninth Circuit, this Court is bound to consider the application of the inherently transitory exception to mootness before dismissing a putative class action as moot. *See Wade v. Kirkland*, 118 F.3d 667 (9th Cir. 1997).

Second, the Government argues that "there is no entitlement to admission for following-to-join beneficiaries." Dkt. No. 115 at 24. The Court has already rejected this argument.  Dkt. No. 45 at 52.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Third, the Government argues that "principal refugees already present inside the United States do not have a liberty interest in the admission of family members." Dkt. No. 115 at 24. The Government cites *Muñoz* for the proposition that a "citizen does not have a fundamental liberty interest in her noncitizen spouse being admitted to the country." *Id.*; *see Dep't of State v. Muñoz*, 602 U.S. 899, 909 (2024). But as the Court already explained, *Muñoz* is inapposite. *See* Dkt. No. 45 at 51–52. Whereas *Muñoz* dealt with a *substantive* due process claim asserting a fundamental liberty interest in the admission of one's foreign-national spouse into the country, Esther and the FTJ Petitioner Subclass assert a *procedural* due process claim alleging deprivation of a statutorily created benefit without due process. *See Khachatryan v. Blinken*, 4 F.4th 841, 855 (9th Cir. 2021) (procedural due process rights attach to interests arising from "nonconstitutional law, such as a statute"). This argument thus misses the mark.

The Court concludes that Plaintiffs have adequately pled their due process claim.

**3.6     Plaintiffs have established the Court's jurisdiction over their APA claims, which are not breach-of-contract claims subject to the exclusive jurisdiction of the Court of Federal Claims.**

The Government rehashes its thrice rejected argument that Plaintiffs' APA claims amount to no more than "disguised breach-of-contract claims" subject to the exclusive jurisdiction of the Court of Federal Claims. Dkt. No. 115 at 20. Having explained the fault in this position three times, the Court addresses it here only briefly. *See* Dkt. Nos. 45 at 38–41; 79 at 8–14, 30–33; 104 at 5–6.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

The organizational Plaintiffs do not seek damages for breach of their cooperative agreements. *See generally* Dkt. No. 56 at 47–48 (relief requested). Rather, they seek to set aside the Agency Suspension, Funding Suspension, and Funding Termination and, in so doing, to compel the Agency Defendants to fulfill their statutory obligations, including to fund resettlement programs "to the extent of available appropriations." *See* 8 U.S.C. § 1522(a)(1)(A); *see* Dkt. No. 56 at 48 (seeking, as relief, to "Declare unlawful and set aside the Defunding of the USRAP"). The organizational Plaintiffs have no adequate remedy in the U.S. Court of Federal Claims—not only because the Claims Court lacks the power to order the relief sought, *see Richardson v. Morris*, 409 U.S. 464, 465 (1973), but also because the USRAP cooperative agreements are not the sort of "money-mandating" contracts that are enforceable under the Tucker Act. *See Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008); *St. Bernard Par. Gov't v. United States*, 134 Fed. Cl. 730, 735–36 (2017), *aff'd*, 916 F.3d 987 (Fed. Cir. 2019).

Moreover, it is not the organizational Plaintiffs alone who sue the Agency Defendants under the APA. The individual Plaintiffs—most of them refugees—also bring APA Claims. It goes without saying that these individuals are not suing for breach of any contract. There is no conceivable reason why the Tucker Act should bar their claims. Thus, for the fourth time, the Court rejects the Government's Tucker Act-based jurisdictional attack on Plaintiffs' APA claims.

1

2

**3.7    Plaintiffs' APA claims identify discrete, final, agency actions contrary to statutory and regulatory law.**

The Government argues that Plaintiffs' APA claims "suffer from three distinct and independently fatal problems: (1) they fail to identify a discrete agency action; (2) they fail to identify a final agency action; and (3) agency funding decisions are committed to agency discretion by law." Dkt. No. 115 at 25. But the Court has previously considered and rejected these arguments. *See* Dkt. No. 45 at 32–38.

First, discreteness. The Government is correct that APA claims must challenge discrete agency actions, not seek "*wholesale* improvement" and, by extension, problematic judicial oversight of agency programs. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). The Government is incorrect, however, that Plaintiffs seek such impermissible relief. As Plaintiffs explain: "In seeking a return to the status quo, Plaintiffs challenge two sets of time-limited, specific agency actions: the suspension of USRAP-related refugee case processing, decisions, and admissions; and the suspension and termination of federal funding to administer the USRAP." Dkt. No. 130 at 24. The Court finds that the Funding Suspension, Funding Termination, and Agency Suspension amount to sufficiently discrete agency actions to support APA review.

Second, finality. Agency action is considered "final"—and thus reviewable— only if it (1) marks "the consummation of the agency's decisionmaking process" and (2) is "one by which rights or obligations have been determined, or from which legal consequences flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation

modified). The Government asserts that the agency actions at issue—the Agency Suspension, Funding Suspension, and Funding Termination—were not "final" because they were temporary measures subject to future change. But virtually *all* agency actions can be characterized as temporary measures subject to future change. As the Court has already explained, what's decisive is that "Defendants do not dispute that the [agency actions at issue] produce 'legal consequences' for USRAP nonprofit partners, refugees, and others." *See* Dkt. No. 45 at 38. "Nor do they dispute that the Agency Suspension and Refugee Funding Suspension each represent the consummation of an internal administrative decision-making process, even if opaque." *See id.* This challenge to the reviewability of Plaintiffs' APA claims thus fails.

Third, discretion. The Government argues that APA review of Plaintiffs' funding-related claims is unavailable because the State Department's decisions to suspend and terminate the organizational Plaintiffs' agreements were "committed to agency discretion by law" within the meaning of 5 U.S.C. § 701(a)(2). Dkt. No. 115 at 27–28. But this exception to APA-reviewability applies only "where the substantive statute left the courts with 'no law to apply,'" meaning that "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 826–30 (1985) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) for its "no law to apply" standard). While this carveout generally precludes review of discretionary spending decisions as to lump-sum appropriations, it does not preclude APA review of spending decisions that "disregard statutory

responsibilities." *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993). As Plaintiffs rightly argue, "[t]hat is exactly the situation here: Plaintiffs allege that Defendants' funding decisions violate their responsibilities under the Refugee Act and related regulations." Dkt. No. 130 at 26 (citing 8 U.S.C. § 1522(a)(1)(A); 45 C.F.R. § 400 et seq.). This challenge thus fails.

In sum, the Court rejects the Government's challenge to the reviewability of Plaintiffs' APA claims.

## 4.  CONCLUSION

For the reasons explained above, the Court FINDS that Plaintiffs plausibly plead their claims and adequately establish the Court's jurisdiction. The Motion to Dismiss is DENIED. Dkt. No. 115.

Dated this 30th day of July, 2025.

Jamal N. Whitehead
United States District Judge