District Judge Jamal N. Whitehead

UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

PLAINTIFF PACITO; PLAINTIFF ESTHER; PLAINTIFF JOSEPHINE; PLAINTIFF SARA; PLAINTIFF ALYAS; PLAINTIFF MARCOS; PLAINTIFF AHMED; PLAINTIFF RACHEL; PLAINTIFF ALI; HIAS, INC.; CHURCH WORLD SERVICE, INC.; and LUTHERAN COMMUNITY SERVICES NORTHWEST,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, MARCO RUBIO, in his official capacity as Secretary of Homeland Security; ROBERT J. KENNEDY JR, in hIS official capacity as Secretary of Health and Human Services,

*Defendants*.

CASE NO. 2:25-cv-00255-JNW

DEFENDANTS' SUPPLEMENT TO CERTIFIED ADMINISTRATIVE RECORD

## <u>CERTIFICATION OF ADMINISTRATIVE RECORD</u>

I, Andrew Gradison, Principal Deputy Assistant Secretary, Administration for Children and Families (ACF), United States Department of Health and Human Services, certify that, to the best of my knowledge, based on the information presented to me, the attached supplement to the administrative record is a true, correct, and complete copy of the non-privileged documents that were considered in pausing and lifting the pause on ORR refugee resettlement funding.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 23th day of December 2025 in Washington, D.C.

Andrew Gradison
Principal Deputy Assistant Secretary for Children and Families
Administration for Children and Families
U.S. Department of Health and Human Services

**INDEX**

| | DOCUMENT | STARTING BATES NUMBERS |
|---|---|---|
| 1 | December 7, 2022, Florida Supreme Court Grand Jury Report, publicly available at https://www.myflfamilies.com/sites/default/files/2024-05/Grand%20Jury%20Presentments_0.pdf. | 008 |

# IN THE SUPREME COURT OF FLORIDA

CASE NO.: SC22-796

## FIRST PRESENTMENT OF THE TWENTY-FIRST STATEWIDE GRAND JURY
### (FLORIDA STATUTE 787.07)

We, the members of the Twenty-First Statewide Grand Jury, have been asked to investigate the impact of illegal immigration on the State of Florida. A critical component of this issue is the smuggling of both unaccompanied illegal alien minors and adults into and within the State of Florida by those conspiring with transnational criminal organizations (TCOs).

During our first session, we heard testimony from witnesses such as Bill Gladson, State Attorney for the Fifth Judicial Circuit of Florida, Polk County Sheriff Grady Judd, and Brevard County Sheriff Wayne Ivey. We also received exhibits about the nature of human smuggling in Florida and how illegal aliens are transported into and within the state. Additionally, we heard testimony about specific instances of human smuggling and the efforts law enforcement agencies have taken to stem the rising tide of human smuggling in our state.

As a result, we have concluded that the smuggling of illegal aliens not only endangers Floridians, but also generates huge sums of money for TCOs which are used to further a host of criminal activities, notably drug trafficking and human trafficking. Additionally, the illegal aliens being smuggled into and within the state are put into a vulnerable position and are often exploited by criminals. This is particularly troubling when dealing with unaccompanied alien minors.

While state and local law enforcement agencies have done their best to combat this escalating threat, it is clear that more needs to be done. Since the smuggling of illegal aliens into and within Florida involves multiple individuals, TCOs, and other criminals, the human smuggling statute must be revised.

RECEIVED    12/07/2022 3:14 pm    FLORIDA SUPREME COURT

**CAR 008**

To that end, we have deliberated and drafted a new version for the Legislature's consideration and approval. We believe this issue must be remedied.  It is critical to give the statute the force it needs to deter human smuggling in our state and hold accountable those who are engaged in its commission.

Respectfully submitted to the Honorable Ellen S. Masters, Presiding Judge of the Twenty-First Statewide Grand Jury, this 6th day of December, 2022.

Foreperson Juror #    018
Twenty-First Statewide Grand Jury

THE FOREGOING Presentment Report was returned to me in open court this 6th day of December, 2022.

HON. ELLEN S. MASTERS, Presiding Judge
Twenty-First Statewide Grand Jury

**CAR 009**

I, Nicholas B. Cox, Statewide Prosecutor and Legal Advisor, Twenty-First Statewide Grand Jury of Florida, hereby certify that I, as authorized and required by law, have advised the Grand Jury which returned this Report on this 6th day of December, 2022.

NICHOLAS B. COX
Statewide Prosecutor
Twenty-First Statewide Grand Jury

I, Richard Mantei, Assistant Statewide Prosecutor and Assistant Legal Advisor, Twenty-First Statewide Grand Jury of Florida, hereby certify that I, as authorized and required by law, have advised the Grand Jury which returned this Report on this 6th day of December, 2022.

RICHARD MANTEI
Assistant Statewide Prosecutor
Twenty-First Statewide Grand Jury

I, Guillermo Vallejo, Assistant Statewide Prosecutor and Assistant Legal Advisor, Twenty-First Statewide Grand Jury of Florida, hereby certify that I, as authorized and required by law, have advised the Grand Jury which returned this Report on this 6th day of December, 2022.

GUILLERMO VALLEJO
Assistant Statewide Prosecutor
Twenty-First Statewide Grand Jury

**FILED**
JOHN A. TOMASINO

DEC 06 2022

CLERK, SUPREME COURT
BY

**CAR 010**

## § 787.07  Smuggling And Harboring of Persons

A person who:

(1) transports within or into this state an individual whom the person:
   a. knows, or should know, or is in reckless disregard of the fact that the individual has
   b. illegally entered the United States from another country, or remains in the United States in violation of law;

   Or

(2) Conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection in any place within the State of Florida, including any temporary or permanent structure or any means of transportation, an individual whom the person:
   a. knows, or should know, or is in reckless disregard of the fact that the individual has
   b. illegally entered the United States from another country, or remains in the United States in violation of law,

commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(3) A person who violates subsection (1) or (2) by transporting, concealing, harboring, shielding from detection, or attempting to transport, conceal, harbor, or shield from detection within the State of Florida any child younger than 18 years of age commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(4) A person commits a separate offense for each individual he or she transports or harbors in violation of this section.

(5) A person who commits this offense against five or more individuals during a single episode commits a felony of the second degree.

(6) A prior conviction under this chapter shall result in any subsequent conviction constituting a felony of the second degree for any violation of section (1) or (2) and a felony of the first degree for any violation of section (3) or (5).

**CAR 011**

(7) Proof that a person presented false identification, or knowingly and willfully gave false information to a law enforcement officer who is conducting an investigation of this offense, gives rise to an inference that such person was aware that the transported individual had illegally entered or remained in the United States.

Florida law also recognizes a concept known as willful blindness, which is sometimes referred to as "deliberate avoidance of positive knowledge." Willful blindness occurs when a person has his or her suspicion aroused about a particular fact, realized its probability, but deliberately refrained from obtaining confirmation because he or she wanted to remain in ignorance. A person who engages in willful blindness is deemed to have knowledge of that fact (Florida Standard Jury Instruction 3.3(h)).

(8) No person arrested or charged with this offense shall be permitted to be released prior to first appearance, notwithstanding Chapter 907.041 or any other law.

---

Chapter 921, Florida Statutes, is hereby amended so that § 787.07, Fla. Stat. is moved from 921.0022(d) to 921.0022(e), increasing the severity level from Level Four to Level Five for purposes of the Criminal Punishment Code.

FILED
JOHN A. TOMASINO
DEC 0 6 2022
CLERK, SUPREME COURT
BY

**CAR 012**

#62

# IN THE SUPREME COURT OF FLORIDA

CASE NO.: SC22-796

## SECOND PRESENTMENT OF THE TWENTY-FIRST STATEWIDE GRAND JURY REGARDING ABUSE OF FLORIDA STATUTES 908.104

We, the members of the Twenty-First Statewide Grand Jury, have been asked to investigate the impact of illegal immigration on the State of Florida. As part of this mission, we have looked at county compliance with Florida Statutes 908.104 requiring local cooperation with federal immigration authorities, specifically, a process by which inmates in some county jails seek the lifting of detainers issued by U.S Immigration and Customs Enforcement (ICE).

Florida Statutes 908.104(5) allows the lifting of ICE holds for noncitizens who have been cooperating victims or witnesses of a crime, while Florida Statutes 908.104(8) allows for the lifting of ICE holds for unlawfully present aliens who are a witness or victim of certain enumerated crimes without requiring any proof of cooperation with law enforcement.

During our third session, we heard testimony from witnesses and received exhibits detailing a process used by county jail inmates to request relief under these two statutory exemptions. We have come to the conclusion that Florida Statutes 908.104(8) is being intentionally and flagrantly abused, leading to the lifting of ICE holds contrary to the plain meaning of the statute and the intent of its authors, the Florida Legislature.

Without sufficient oversight, this process allows the submission of an unsworn notice indicating that a statement exists where the jail inmate claims that they were a "victim" of a qualifying offense under Florida Statutes 908.104(8). These "statements" are often not challenged by anyone, nor are they corroborated or actually shared with the county jail. In effect, unproven claims are being submitted and approved allowing county officials to disregard and lift ICE holds.

RECEIVED 01/2/2023 02:45 PM FLORIDA SUPREME COURT

**CAR 013**

Making matters worse, these unsworn exemption notices are being submitted for defendants who have not only failed to report being the victim of any alleged crime, but also these notices are being submitted for alleged crimes that occurred either decades ago or outside of the United States. For example, in one instance a defendant had an ICE detainer lifted by claiming to be the "victim" of an alleged "battery" that occurred over thirty years ago. It is also telling that all the notices we have reviewed claim relief under Florida Statutes 908.104(8) rather than Florida Statutes 908.104(5) which requires evidence of cooperation.

No sensible reader would believe that, for example, a "crime" supposedly committed against a defendant years ago, which was not reported to authorities and did not occur within the United States, would be sufficient to exempt such a defendant from ICE detention. And yet, that is precisely the state of affairs in one county. Moreover, the majority of the notices submitted claimed that the defendant was a victim of a battery—a crime that in Florida can consist of an unwanted touch as unserious as a poke of a finger. A bedrock principle of statutory construction is that any interpretation of a statute should avoid "unreasonable, harsh, or absurd consequences." *Young v. State*, 141 So. 3d 161, 174 (Fla. 2013). The result of the process described herein epitomizes such absurdity.

The consequence has been that illegal aliens arrested for serious felony offenses, such as sexual battery on a minor, armed carjacking, and aggravated battery have been able to secure release from custody, notwithstanding ICE requesting a hold for deportation proceedings. In one instance, a county jail lifted the ICE hold for a defendant who claimed to be the victim of the very crime for which he had been arrested.

As a result, we have concluded that Florida Statutes 908.104 requires revision to combat further abuse. Florida Statutes 908.104(8) must be deleted in its entirety and Florida Statutes

**CAR 014**

908.104(5) must be limited to crimes occurring in the United States and time barred to five years prior to an alien's claim of relief under the statute. Additionally, the Florida Legislature must bar an alien with pending criminal charges for any crime or attempt to commit any crime of violence, felony drug offense involving the sale, manufacturing, distribution, or trafficking in a controlled substance, or felony sexual offense from being eligible for relief under the statute. In the interim, county jails must revise their procedures to ensure that sufficient corroborating evidence is presented before a county jail processes any detainer exemption notice. It is critical that this issue be remedied and that aliens seeking relief under any statutory exemption to Florida Statutes 908.104 do so in good-faith and provide credible sworn supporting evidence. The issues discussed with Florida Statutes 908.104 are urgent and in need of immediate action to ensure public safety.

Respectfully submitted to the Honorable Ellen S. Masters, Presiding Judge of the Twenty-First Statewide Grand Jury, this 27th day of January, 2023.

Foreperson Juror # 018
Twenty-First Statewide Grand Jury

THE FOREGOING Presentment Report was returned to me in open court this 27th day of January, 2023.

HON. ELLEN S. MASTERS, Presiding Judge
Twenty-First Statewide Grand Jury

**CAR 015**

I, Nicholas B. Cox, Statewide Prosecutor and Legal Advisor, Twenty-First Statewide Grand Jury of Florida, hereby certify that I, as authorized and required by law, have advised the Grand Jury which returned this Report on this 27th day of January, 2023.

NICHOLAS B. COX
Statewide Prosecutor
Twenty-First Statewide Grand Jury

I, Guillermo Vallejo, Assistant Statewide Prosecutor and Assistant Legal Advisor, Twenty-First Statewide Grand Jury of Florida, hereby certify that I, as authorized and required by law, have advised the Grand Jury which returned this Report on this 27th day of January, 2023.

GUILLERMO VALLEJO
Assistant Statewide Prosecutor
Twenty-First Statewide Grand Jury

I, Richard Mantei, Assistant Statewide Prosecutor and Assistant Legal Advisor, Twenty-First Statewide Grand Jury of Florida, hereby certify that I, as authorized and required by law, have advised the Grand Jury which returned this Report on this 27th day of January, 2023.

RICHARD MANTEI
Assistant Statewide Prosecutor
Twenty-First Statewide Grand Jury

I, Robert Finkbeiner, Assistant Statewide Prosecutor and Assistant Legal Advisor, Twenty-First Statewide Grand Jury of Florida, hereby certify that I, as authorized and required by law, have advised the Grand Jury which returned this Report on this 27th day of January, 2023.

**FILED**
JOHN A. TOMASINO

JAN 27 2023

CLERK, SUPREME COURT
BY _____

ROBERT FINKBEINER
Assistant Statewide Prosecutor
Twenty-First Statewide Grand Jury

**CAR 016**

#93

## IN THE SUPREME COURT OF FLORIDA

CASE NO.: SC22-796

## THIRD PRESENTMENT OF THE TWENTY-FIRST STATEWIDE GRAND JURY REGARDING UNACCOMPANIED ALIEN CHILDREN (UAC)

FLORIDA SUPREME COURT

03/29/2023

RECEIVED

We, the members of the Twenty-First Statewide Grand Jury, are a group of Florida residents who come from varied backgrounds; we are educators, retirees, veterans, businesspeople, and homemakers. Some of us were born or have lived extensively overseas. We have children of our own and care for children of others. We have been investigating the questions presented by the Florida Supreme Court's Order establishing this Statewide Grand Jury, have issued two reports already and anticipate more to come. This Presentment touches on an issue of singular importance to us all: the process whereby Unaccompanied Alien Children (UAC) are brought into our State and, in too many cases, left to an uncertain fate.[1]

If one reads no further, we hope this will make our findings clear:

If any resident of Florida exposed U.S.-born children to this process, they would be justifiably arrested for child neglect or worse. We do not think children should be less-protected simply because they were born outside our borders and brought here by a government agency.

UAC[2] are defined under federal law as individuals under the age of 18 with no lawful U.S. status and no parents able to provide care and take physical custody

---

[1] We focus herein on the treatment of UAC only; though similarly situated, Unaccompanied **Refugee** minors undergo a different process and have a different legal situation; accordingly, they are not the subject of our discussions herein. We further commend organizations such as Lantern Rescue for their important work in identifying and assisting actual refugee populations. Finally, like the federal courts, we "use the term "alien" because that is the term used by Congress in the immigration laws. See 8 U.S.C. §1101(a)(3)." State of Florida v. United States of America, et.al, Case No. 3:21-cv-1066-TKW-ZCB (N.D. FL, March 8, 2023).

[2] We have received a great deal of evidence regarding the importation and behavior of **adult** aliens as well, and have followed with interest the proceedings in State of Florida v. United States of America, et.al, Case No. 3:21-cv-1066-TKW-ZCB (N.D. FL, March 8, 2023). We would be remiss in failing to note that, unfortunately, the population of those seeking entry into this country contains both "good and bad apples" just as our native population does. We received gut-

1

**CAR 017**

when they are encountered. They are required to be initially screened by the U.S. Border Patrol and within 72 hours referred to the custody of the Department of Health and Human Services' Office of Refugee Resettlement (HHS/ORR).

Recent years have seen a massive increase in referrals from Border Patrol and the Department of Homeland Security. According to the data published by ORR (which is, if anything, an undercount), it had approximately 3,700 children in its care at the end of calendar year 2020. By the end of March 31, 2021, that number had tripled to approximately 10,500. By April and May 2021, it had nearly doubled again to over 20,000. Since March 2021, HHS has consistently had, on average, 11,000 children in its care *each month*. For FY 2015, a total of 27,340 UAC were released into the custody of sponsors in this country. *In FY 2022, that number was 127,447, nearly a five-fold increase—and 13,195 of them were released in Florida.* Since November 2022, more than 30,000 additional children have been released. Seventy-two percent (72%) of these minors are ages 15-17. Only 16% were under the age of 13.

Like many of our fellow Floridians, we had no pre-existing knowledge about how UAC are processed, how their sponsors are selected, how they arrive in Florida, and how they are cared for upon arrival. The public is led to believe that the process described by our federal government in documents and popular media accounts at least resembled the truth. ORR asserts that children fleeing from danger are adequately identified, properly cared for, and reunited with their family here in this country.

In reality, ORR is facilitating the forced migration, sale, and abuse of foreign children, and some of our fellow Florida residents are (in some cases unwittingly) funding and incentivizing it for primarily economic reasons. These entities encourage UAC to undertake and/or be subjected to a harrowing trek to our border, ultimately abandoning significant numbers of those who survive the journey to an uncertain fate with persons who are largely unvetted. This process exposes children to horrifying health conditions, constant criminal threat, labor and sex trafficking, robbery, rape, and other experiences not done justice by mere words. We will never be able to forget or un-see some of the heart-wrenching testimony, disturbing videos,

---

wrenching testimony, for example regarding brutal and horrific murders committed against civilian tourists, law enforcement officers, and even sponsors of immigrants, by those who had no legal right to be in the country in the first place, and about the significant cost to our State due to the unlawful presence of such individuals and the resources which must be diverted to deal with them.

CAR 018

and infuriating abuse we have observed in the course of our five-month investigation.

In 2014, then-Vice President Biden warned that between 75 and 80 percent of unaccompanied alien children are brought into the United States by smugglers, many of whom "routinely engage in physical and sexual abuse, and extortion . . . ." Those here in Florida who are sending money and other aid to facilitate this process should know what it is they are funding. At nearly every juncture, travelers forging the Darien Gap and other notorious routes must pay handlers, armed militia groups, native tribes, local warlords, gangs, or drug cartels hoping to obtain safe passage. In many cases the toll is exacted in lives, labor, or sexual abuse. They face disease, famine, drought, a perilous jungle trek, insects, and predators both human and animal. As recently as March 5th of this year, Mexican police rescued 343 migrants along the Cosamaloapan-LaTinaja highway-- 343 people crammed into the back of a semitruck which was found abandoned with no driver. Some of those (28) were families, 212 single travelers, and **103 were unaccompanied children**, most from Guatemala, wearing colored bracelets as a means of identification so their smugglers could sort them by who had paid and where they were going. These rescued UAC were the lucky ones. In June 2022, more than 50 persons died trapped in sweltering conditions in an abandoned tractor-trailer in San Antonio, Texas; in December 2021, 55 more died when the truck in which they were traveling crashed in Chiapas, Mexico.

The Florida Department of Children and Families (DCF) published a survey in July, 2022, in which they interviewed 49 UAC (of the more than 13,000 brought in that year) in just two Florida placements. They stated:

> The children interviewed knew very little about the individuals that transported them during their journey to the border . . . [and] disclosed that the individuals who transported them were "Coyotes." One child disclosed that during her journey several members of her group were robbed, attacked by gang members, decapitated, and raped. The child disclosed that she was one of the victims of rape.

Those who provide financial incentives or support by sending money to a coyote or some anonymous handler in a foreign locale thus incentivize putting children through this hellish experience and are contributors to the abuse that occurs as a result. We are working with our partners in the financial world and FDLE to identify them and expose any complicity in criminal human trafficking activity.

3

**CAR 019**

As was pointed out in 2017 Congressional testimony by Kevin McAleenan, then-Acting Commissioner of U.S. Customs and Border Protection:

> [W]e have an obligation to ensure that those who conspire to violate our immigration laws do not do so with impunity—particularly in light of the unique vulnerabilities of alien children who are smuggled and trafficked into the United States. The parents and family members of these children, who are often illegally present in the United States, often pay smugglers several thousand dollars to bring their children into this country. Tragically, many of these children fall victim to robbery, extortion, kidnapping, sexual assault, and other crimes of violence by the smugglers and other criminal elements along the dangerous journey through Mexico to the United States. ***Regardless of the desires for family reunification, or conditions in other countries, the smuggling or trafficking of alien children is intolerable***. (Emphasis supplied).

Regrettably, the problem has gotten worse, not better, in the years since that testimony was given. In addition, the process of identifying UAC and their sponsors creates multiple perverse incentives and tragic outcomes. Some "children" are not children at all, but full-grown predatory adults; some are already gang members or criminal actors; others are coerced into prostitution or sexual slavery; some are recycled to be used as human visas by criminal organizations; some are consigned to relatives who funnel them into sweatshops to pay off the debt accumulated by their trek to this country; some flee their sponsors and return to their country of origin; some are abandoned by their so-called families and become wards of the dependency system, the criminal justice system, or disappear altogether. Meanwhile, ORR's efforts and resources are less-directed at preventing or remedying any of these maladies, and instead appear fully focused on maximizing the number of children they can process, heedless of the downstream consequences to either the children or the communities into which they are jettisoned.

ORR—armed with a budget of billions of taxpayer dollars and working with activists and nonprofit organizations[3] which receive hundreds of millions of dollars in grant monies, hold millions in assets, and pay cadres of executives salaries in the hundreds of thousands of dollars-- is handling thousands of foreign children in a dangerous manner.

---

[3] We intentionally do not identify these organizations in this Presentment; we fully intend to do so at a later time.

4

**CAR 020**

We spent more than five months questioning, learning, listening, reviewing, reading, and discussing dozens of witnesses, streams of video, gigabytes of data, and reams of paper. We have received first-hand testimony and supporting documents in ample quantities justifying these conclusions. Many of the facts we have learned are depressing to contemplate and provoke a great deal of outrage. Yet "in the long run, the most unpleasant truth is a safer companion than a pleasant falsehood."[4]

We understand that one of the typical defenses of this process is that only a small number of children fall prey to any of these misfortunes. To that we say two things: (1) this is a false trope, presented either by those who are utterly ignorant of reality or those who would see the current conditions continue- the number and percentage of UAC experiencing problematic scenarios is *__not__* small by any stretch; and (2) *__even one__* such easily preventable case *__is unacceptable__*.

## I.    The Process

UAC who arrive at a border (as more than 250,000 have since January, 2021) are initially met by a Border Patrol agent and screened to determine their identity, origin, and physical well-being. All of this information is self-reported; some are carrying documents, but most are not, and even those documents are not always authentic. UAC are *__not__* rapid-DNA or biometric tested to see if, in fact, they might be an adult with a criminal history or if they are truly biologically related to either their putative parent or a proposed sponsor. DHS does not cross reference the UC portal—HHS's case management system and official system of record for unaccompanied alien children (to determine, for example, if the UAC has been here before).

Federal law requires that within 72 hours custody of UAC must be turned over to ORR, which then houses the UAC for a period of twenty days or less. They do so in shelters in 22 states; some are designed for this purpose, some are "Emergency shelters" built or converted for this purpose and staffed on a contract basis, and some are shelters run by organizations we have previously referenced (in Florida, these facilities have historically been required to be licensed as "Child Placement Facilities" by the Florida Department of Children and Families). Some such shelters run three shifts of hundreds of "case managers" each, 24 hours a day.

ORR divides the country into three regions and uses "Federal Field Specialists" to oversee and manage the care provider facilities and releases of

---

[4] Theodore Roosevelt.

CAR 021

children to sponsors. An Intake Team reviews available bed space at ORR care providers or temporary facilities through the UC Portal. According to an employee of one care provider, the Intake Team provides "very minimal demographic information" when attempting to identify initial placement, in one instance only asking the care provider if it had "space for a 12-year-old boy from Guatemala."

The UAC is then shipped off to a facility to await placement pending a decision on their claim to remain in the country.[5] Questions are asked about the child's journey, family and significant relationships, and a child's medical, legal, and educational background.

Case managers theoretically determine whether the child requires services such as medical or psychological treatment, and whether they have a sponsor awaiting them in this country. Case managers are not required to have more than a bachelor's degree, and none we spoke with either had themselves or knew of any others with any law enforcement experience. Indeed, several we met with were hired over the phone, sight unseen, after a brief conversation and at most a cursory background check. Unless the case manager comes to the job with prior experience, they receive little to no training in such things as:

-interviewing individuals, especially these children, in a trauma-informed manner;

-examining, evaluating, or recognizing documents as authentic or fake;

-investigating the safety or legitimacy of addresses to which the UAC might be sent;

-conducting checks for criminal history;

-conducting fingerprint checks or interpreting results;

-recognizing gang affiliation.

They are actively discouraged from independently investigating any of these things, and in some cases directly ordered not to do so. Many case managers learn how to do their jobs largely by trial and error or discussions among one another. They ascertain whether ORR's UAC portal database shows that anyone has applied

---

[5]Fortunate UAC arrive at a smaller-scale facility where their cases receive more thorough assessment with a manager-UAC ratio perhaps as low as 8-1. Others end up in overcrowded, hastily-erected converted shelters with ratios approaching 30-1.

**CAR 022**

to sponsor the UAC, and if so where that person might be and whether they claim to be a parent, a relative, or unrelated to the UAC (Categories of sponsors). Case manager supervisors are sometimes just those who have managed to stay around the longest—some were promoted after as little as a few weeks.

Often, inconsistencies emerge in the UAC's story, or in comparing the UAC's version to that of a potential sponsor. We received testimony that at some facilities, even when case managers discovered and attempted to pursue this, they are chastised by their superiors at ORR and reminded that they are **not** to investigate suspicions, or question documents or addresses. They are told they are "not experts" and that their job is to approve placement with a sponsor.

We learned of the incessant pressure on case managers to process UAC speedily with minimal, if any, scrutiny of sponsors or questionable documents, addresses, or stories told to them. Thirty-day timeframes for processing a UAC are often reduced to twenty, and to as few as fourteen.

## II.    What Are They Hiding?

We issued subpoenas and requests for documents and information to several Florida organizations doing business with ORR. We took care **not** to request any information about UAC themselves (including their identities or points of origin). We received, instead, a response from the organizations that they would be purposely ignoring some of those requests under orders from ORR,[6] with whom they have a contractual relationship. The organizations and their officers likewise refused in-person demands for information.

In testimony before us, one CEO admitted only visiting the UAC facility run by that organization one day per month. Officers professed to be unable to discuss the details of their acknowledged transfer of minor children, on the theory that subpoenas and direct questions from the Supreme Court of Florida and this grand

---

[6] ORR and the organizations cited three authorities:
  a) 44 U.S.C. Sec. 3301 (part of the Federal Records Act). This statute defines and governs "Disposal" of records. It says nothing whatsoever about disclosing them or complying with subpoenas;
  b) 5 U.S.C. 552a / SORN #09-80-0321. This is the Privacy Act, which again makes no reference to compliance with subpoenas and specifically applies only to records of "a citizen of the United States or an alien lawfully admitted for permanent residence"—we asked for records of neither);
  c) 81 Fed.Reg. 46682-46683, which is not a statute but instead an ORR bureaucratic rule.

CAR 023

jury were subservient to the language of the contract they chose to sign with ORR in exchange for massive amounts of federal taxpayer dollars. Indeed, part of one response asserted that it was "*beyond the authority of the Statewide Grand Jury*" to even so much as ask for "the total number of sponsors who have received more than one UAC for placement."

Some executives were cooperative to an extent, but nonetheless displayed an alarming lack of awareness that there were any serious problems in the current process. Extreme naivete can be as dangerous as malice in this situation.

Others behaved far more suspiciously. On *ninety-three* separate occasions during examination of one group, the answer was some variant of "I don't know"; they don't know who makes placement decisions, they don't know who redacted entire emails including signature lines, they don't know what a follow-up to placement is, they don't know anything about ORR's success or lack thereof in safe placement, they don't know why they don't report crimes they observe, they don't know what happens to children after leaving their facility, the CEO doesn't know the answer but says another officer does but that officer has no idea why the CEO would say that, and on and on *ad nauseum*.

Uniformly, these individuals professed allegiance to ORR. They were unable to name *any* condition which ORR might put upon a grant which would lead them not to accept the money. We confronted them with a number of the findings about ORR referenced in this report; we pointed out that they could easily choose to provide *care* to UAC without becoming involved in ORR's *placement* business; yet the answers did not change. These organizations would (as one CEO brazenly stated) rather operate an unlicensed placement facility and display contempt of Florida's laws, than risk losing ORR's funding.[7]

We requested (but *intentionally* did not try to compel) the presence of ORR's nominal leader at one of our sessions; that request was refused by an Assistant Secretary for the Administration for Children and Families:

> Your request also fails to state "the reasons why the testimony would be in the interest of the DHHS or the federal government...."*an agency's choice of whether or not to comply with a third-party subpoena is essentially a policy*

---

[7] Last December, four Members of Congress wrote a letter to one such organization, complaining that "*NGOs continue to profit off of exploiting our immigration laws.*" The organization proceeded to publicly call the Congress members "fallacious and factually inaccurate." We believe this Presentment and their IRS Form 990 filings show the contrary.

8

**CAR 024**

*decision* about the best use of the agency's resources."… Compliance with your request *[to send a single person to discuss matters for a few hours— probably less time than it took to write the"response"]* would **disrupt ORR's mission** to provide people in need with critical resources to assist their integration into American society **and would interfere with ORR's carrying out statutorily mandated responsibilities** under the DHHS program authorities. As you know, the subpoena does not arise out of any litigation to which ORR is a party, and *you have not articulated why [the witness]'s testimony would be in the interest of DHHS or the federal government (Emphasis supplied).*

Indeed, it appears that exposure of these activities is not in *their* interest whatsoever, but that returns us to our original question: *What is this agency hiding from the American people* that it would make a "policy decision" that a simple request for the relatively brief testimony of one individual is so dangerous that it would "disrupt its mission"? The Order directing our empanelment contains a mandate to investigate; to do that, we ask for information—information ORR refuses to supply.

This culture of aversion to transparency appears to be endemic. In an October 28, 2021, report prophetically titled *Exposing the Risks of Deliberate Ignorance: Years of Mismanagement and Lack of Oversight by the Office of Refugee Resettlement, Leading to Abuses and Substandard Care of Unaccompanied Alien Children* the United States Senate Committee on Finance noted:

At the beginning of this investigation, the Committee submitted what it considered to be straightforward requests for easily accessible information. Instead of providing this information, HHS slow-walked productions and eventually provided the information in unusable or difficult-to-use formats, causing unacceptable and obstructive delays. HHS first refused to provide any documents in a digital format and then provided several boxes of printed and unorganized, mostly irrelevant, documents. The documents found to be potentially relevant were, without exception, incomplete. HHS also redacted vital tracking numbers from the hard copy documents, meaning that staff were unable to link related SIRs [Significant Incident Reports] together, or to link SIRs to any other ORR response. The document production also inexplicably included, without context, several hundred printed pages of the Code of Federal Regulations— publicly available information that is already

9

**CAR 025**

accessible online in an electronic format. It is standard practice that recipients of congressional information requests, including federal agencies, provide documents to Congress in the most usable format for review available or, at the very least, in the format used by the agency. *It is the position of both offices [Democrat and Republican] that these obstruction tactics … fundamentally interfered with Congress's Constitutional duty to conduct oversight and caused undue delays (Emphasis supplied)*.

We stand in company with the United States Senate and House members in being actively obstructed by this agency.

This obfuscation extends beyond just ORR in the immigration context. Last March, NBC News reported that Border Patrol agents and officials, who had previously been responding to public record and media inquiries about the number of border apprehensions and conditions (including releasing videos), were subjected to a gag order prohibiting any media requests or sharing data on their own. We also learned that ORR actively discouraged its employees, including case managers and those tasked with conducting sponsor verifications, UAC interviews and post-release followup, and fingerprint and background checks, from questioning the process even internally; some were transferred, some terminated, some threatened, and some smeared simply for not processing the UAC as quickly as possible. One was fired for reporting a case of suspected human trafficking (of over 100 UAC shipped off to a single house in Texas) to a government hotline because her ORR superiors refused to investigate the matter. One facility went so far as to set up a "reporting station" for employees to bring their concerns to; it was purported to be staffed with FBI agents, but was later learned to have simply other ORR employees—the agency was reporting itself, to itself. In one memorable instance, a federal employee was told by an ORR attorney to stop asking questions about potentially unsafe sponsors because doing so caused delay, and

> *"[W]e only get sued for keeping them too long.*
>
> *We don't get sued by traffickers. Are we clear?"*

We learned that the very clandestine nature of ORR's process was what first attracted the attention of some in our state; during a six-month period in 2021, more than 70 airplanes (large commercial passenger jets) landed at the international airport in Jacksonville, Florida. These flights arrived in the night time often after midnight, and landed not at the passenger terminal, but instead at an out-of-the-way commercial terminal used normally for shipping freight, away from police facilities

10

**CAR 026**

and miles from the passenger terminal. The companies charged with fueling and offloading the cargo received last-minute notice of the flights, necessitating scrambling for workers to be available. Airport police received very little notice that the flights were arriving, where they were from, or who was aboard (and as our investigation progressed, this information dwindled to zero). The airliners were met by private buses or other coach services, who also received only last-minute notice of the number of passengers they would be serving and the destinations to which they were going. If an operation were ferrying terrorists or large quantities of narcotics, this is what it would look like.

Two Senators and thirteen U.S. Representatives from Florida wrote letters to DHS demanding to know what was going on when airplanes full of children were landing in Jacksonville in the middle of the night; they got no cooperation. As it turned out, the flights were full of UAC. The children would exit the aircraft in this extremely unsecure environment, collect various color-coded luggage, and eventually board the buses/SUVs. Many of them carried envelopes containing paper and a cell phone; most were older teenagers. The buses would then proceed to various points; some drove north out of Florida, while others made several stops at which some of the children would exit. These stops turned out to be facilities managed by the organizations described above. Sometimes, individual children would get off the bus in a parking lot and get into a private vehicle. One of these individuals was a 24-year-old male (erroneously vetted as a child by ORR and placed onto a plane full of other children) who was delivered to his sponsor (a man who claimed falsely to be this person's uncle in another vetting failure) in Jacksonville. The fake UAC proceeded to violently murder the sponsor, who was a businessman living here in Florida for years, by stabbing him more than 50 times and bludgeoning him with a chair. We wish this were the only such case which we have learned about; it is not, but it does serve as a perfect illustration of the completely foreseeable tragic outcomes which occur as a result of this type of activity.

When investigators attempted to learn more about these goings-on, they were met with locked gates and letters from lawyers. As our investigation intensified, and we started issuing subpoenas and making inquiries, the flights stopped. We have since learned, though, that ORR now simply conceals small groups of UAC on regular commercial flights and conducts their operations in piecemeal fashion; instead of large planes populated solely with hundreds of UAC, now groups of five or so ride along with everyday travelers on commercial flights and then get picked up in smaller vehicles. It is disheartening that the response to legitimate inquiry has

11

been to double down on efforts at concealment, but that has proven to be a theme in this investigation.

Nonetheless, with the help of diligent work by FDLE, FHP, the Florida Sheriff's Association and other investigators and courageous cooperation and testimony from dozens of witnesses and whistleblowers to whom our investigation owes much gratitude (including current and former federal and state government employees and law enforcement agents, current and former employees of federal contractors, current and former employees of these nonprofit organizations, immigrants, and subject-matter experts from both public and private sectors), we have more than enough information to understand what is actually going on and will continue nonetheless.

### III.  Follow the Money

The smuggling of human beings including children into this country through our southern border has been characterized as "a multi-billion-dollar international business controlled by organized crime" since at least 2015, when the New York Times gave this description in a report about the 5,064 federal arrests for human smuggling in a single year.  We received testimony and evidence that much of the instigation and funding of these international treks emanates from within our borders, both state and national.  Examination of financial transactions[8] from just a few institutions shows transactions that can only be described as mysterious: for example, Florida residents with no known or apparent connection to obscure cities in Guatemala or Mexico make regular wire transfers to that city, or to multiple points nearby, for a period of one month, then stop; individuals in a border town collect payments from multiple Florida residents who share a nationality with each other, but not the receiver, and other similar discrepancies.

The testimony we have received corroborates this clear pattern; people here send funds to facilitate the migration of others to the border, and in so doing some of them are (wittingly or otherwise) funding trafficking operations, gangs, cartels, and other unsavory characters.  Some of the people sending these funds are not citizens, but themselves are recent arrivals or even UAC who have aged out of ORR custody.  Many are awaiting disposition (with an average delay approaching five years amid a backlog of hundreds of thousands of cases) of an asylum claim they have a 90% chance of losing (because so few have merit, according to several of our

---

[8] We took pains to examine only a small portion of transactions which occur, intentionally excluding those which might fairly fit commercial transactions or simple "remittance" payments.

**CAR 028**

witnesses, including an immigration defense attorney and a former Director of ICE). However, while here, these individuals are eligible for work visas and various government benefits, with some of the proceeds being used to facilitate the next group of travelers in the cycle.[9]

Equally disturbing, nonprofit organizations here in this country are granted hundreds of millions of dollars directly from ORR.[10]  We received testimony that at least one grant, involving approximately one hundred million dollars, was awarded in "single-source" fashion to address the emergency of the crushing increase of UAC reporting to our southern border.  The irony of this is not lost on us; rather than these agencies adopting policies to decrease the number of children making this dangerous journey, the process is turbocharged to squeeze more children through this pipeline. More locally, organizations in Florida have over the past decade collectively received more than 300 million dollars in federal grant monies related to the UAC activities.

The United States Senate likewise observed this phenomenon; in an October 28, 2021 Senate Committee on Finance Investigative Report, it noted that (in addition to many other failings on the part of ORR to adequately safeguard the children in its care) "investigative reports show that the owners and operators of large networks of grantee facilities may have engaged in questionable financial practices, such as self-dealing and excessive salaries for personal gain."  The United States Senate's Committee on Homeland Security and Governmental Affairs Permanent Subcommittee on Investigations also examined HHS's processes for funding and opening children shelter facilities. HHS gave two companies $32 million in grants to operate shelter facilities that never opened.  Those observations are consistent with our own.

### IV. Who are the Children?

In far too many instances, no one seems to really know.  When a UAC presents at the border without parents, Border Patrol is required to refer the UAC to the

---

[9] This represents an optimistic view; what also happens, we have learned, is that cartels and other criminal organizations take advantage of these circumstances to coerce immigrants to bring drugs (most popular recently, fentanyl), other items of contraband, or even terrorists and gang members disguised as family members across the border with them in exchange for permitting the immigrants to traverse their territory and receive funds being sent to them for that purpose. As one witness put it, "if you can get a human across, you can get anything across."

[10] In fiscal year 2021, **$2.14 billion** was transferred to the unaccompanied minor program within HHS, according to the agency's website.

**CAR 029**

custody of ORR. However, at that juncture, Border Patrol has no ability to verify that (a) the child is who they claim to be, or (b) that they are in fact a "child" (in some cases, this is obvious; however, around 40% of UAC are age 17 or above, making it difficult in many cases to visually verify any claims about age). We received testimony and visually inspected many forms of identification discarded on the Mexico side of our southern border; those who present themselves abandon these documents by the truckload. According to what we have learned, this is often so that the individual is not exposed by having his or her real ID on their person and can instead claim to be whomever they wish.

In any event, with *more than a quarter million* purported UAC presenting themselves in just the past two fiscal years, Border Patrol agents have little recourse; they turn the individuals over to ORR. Unfortunately, in many cases this is the last point in the process where at least the agency in charge has real knowledge of who is taking custody of many of these children.

Not all UAC are fit for placement with other children. We note first that, even if Border Patrol agents were permitted to fingerprint or otherwise firmly identify the UAC, they have no way of accessing any criminal history which occurred outside of the United States.

We have already referenced the case of a 24-year-old murderer who finagled his way through the UAC system (where *he spent weeks in the company of other UAC*) to kill his Florida sponsor. The killer's Honduran mother was interviewed by a Spanish-language television reporter; she reported that he called to tell her that he had entered the U.S. fraudulently because "right there at the shelter they helped me." The killer was referring to financial and other assistance rendered by some of the same charitable organizations while he was still in Mexico, and then again once he crossed the border. He presented clearly fraudulent documents to his case manager, which went either ignored or undetected.

We received testimony and saw photographs and other evidence regarding other adults masquerading as UACs, including men and women ranging in age from 27 to 37. HHS discovered 105 children the agency later determined were actually adults during fiscal year 2021 alone, according to its own website. Often, the adults will have fake documents showing their age as a minor. In just the month of August, 2022, El Paso Border Patrol agents arrested seven adults aged from 19 to 26 who tried to pass as children; agents in that region have discovered more than 665 adult

14

**CAR 030**

illegal aliens who tried to pose as unaccompanied minors to gain expedited entry into the United States in the past 12 months.

We reviewed evidence about UAC who, while they were in fact minors, presented phony documentation and fraudulent claims in an effort to enter the country. Yet none of these cases resulted in a report to ICE or any other law enforcement authority, even to investigate the source of the documents. Each incident is a separate federal criminal offense. Instead, the people who discovered them were ordered to report the matter to their cohorts in ORR (sometimes they were effectively misled that they were reporting to the FBI, when in fact they were not). More incredibly, the adults posing as children were simply taken out of the facility and released, as one manager put it, "into the wild"; the minors were permitted to submit other documents, supposedly more legitimate than the first set.

According to the testimony of the Border Patrol's acting chief, even as far back as 2017 it was known that at least 59 UAC had been identified as members of the MS-13 gang. That number has increased significantly; we received testimony that other gangs likewise send members and even have UAC members graduate to adulthood and apply to sponsor other UAC members. Entire separate facilities were required at some ORR shelters to house those UAC who were flashing gang signs, engaging in fights, and making threats due to gang affiliation.

Further, ORR has repeatedly failed to keep UAC safe from one another or even facility staff members. ORR monitors its facilities' abilities to ensure the safety and well-being of children in ORR's care in multiple ways, including reviewing significant incident reports (SIRs). When incidents of a serious or severe nature occur at ORR-funded facilities, facility staff are required to submit SIRs. Incidents that require staff to submit SIRs can range from verbal threats to allegations of sexual assault between children in care or between staff and children.

In February 2019, Axios reported on internal documents received by Congress that showed HHS and the Department of Justice (DOJ) received thousands of allegations of sexual abuse, including almost two hundred staff-on-child allegations. A 2018 Report by the HHS Office of Inspector General:

> reviewed incident reports that 45 care provider facilities submitted to ORR between January 1, 2018, and July 31, 2018. Among these reports, 761 unique incidents described conduct of a sexual nature. Reports for most (704) of these incidents involved conduct between minors, fewer (48) involved conduct by an adult against a minor, and the remaining (9) incidents had an unknown

15

**CAR 031**

perpetrator. … incident reporting system lacks designated fields to capture information that ORR can use to oversee facilities and to protect the minors in ORR care. Important information about facilities' actions are not systematically collected to help ORR determine whether facilities responded appropriately to incidents. In addition, the system does not effectively capture information in a way that allows for efficient identification of issues that require immediate attention and analysis to detect concerning trends. Further, facilities described challenges with staffing youth care workers— who are essential to preventing, detecting, and reporting incidents—and difficulties determining which incidents should be reported to ORR.

Case managers reported to us that not only was this accurate then, the situation has worsened. Significant Incident Reports continue to be underutilized, poorly tracked, and short on information. We also note that many of the charitable organizations we mentioned previously submitted formal complaints, captured in a report published by the Office of Management and Budget, essentially arguing that the mere existence of Significant Incident Reports was so detrimental to the possible immigration or legal status *of the perpetrators*, that the reports should be either dramatically revised to include almost no relevant information, or ***done away with altogether***.

We set forth these unpleasant details, not to suggest that UAC are mostly undesirables; indeed, the majority certainly are not. Rather, we use these incidents to illustrate the utter failure of any of these custodians to truly know, or even make any genuine effort to know, with whom they are dealing. As long as UAC—and, more concerningly as explained below, their sponsors— are not subjected to even minimally competent identification procedures, but instead rushed through the placement process and effectively abandoned thirty days later, completely preventable tragedies will continue.

## V. Where are They Going and With Whom?

Again, we have learned that the answer in many cases is, "nobody really knows." As we previously noted, many of the sponsors are recent arrivals themselves and, as found by the Florida v. United States court (*supra*):

Although DHS says it is screening arriving aliens released on Parole+ATD to determine if they are a public safety threat, the more persuasive evidence establishes that DHS cannot reliably make that determination. Indeed, according to Defendants own witnesses, DHS has no way to determine if an

16

**CAR 032**

alien has a criminal history in his home country unless that country reports the information to the U.S. government or the alien self-reports. Therefore, DHS is mainly only screening aliens at the border to determine if they have previously committed a crime in the United States, and because many of these aliens are coming to the United States for the first time, DHS has no idea whether they have criminal histories or not.

After arrival at a care facility, ORR aims to release each unaccompanied alien child to a sponsor—a parent, guardian, relative, or other individual. ORR developed five categories of potential sponsors; more than 95% of cases fall into the first three categories. ORR prioritizes the release of unaccompanied alien children to a parent or legal guardian ("Category 1" Sponsors) but places some 50 percent of unaccompanied alien children with other relatives ("Category 2" Sponsors)-- extended family, some of whom have never met the child before placement.

According to the Department of Health and Human Services, ORR placed **262,159** unaccompanied alien children with sponsors from January 1, 2020 to December 7, 2022. ***Nearly two-thirds of UAC were placed with someone other than a parent.***

According to ORR, approximately 36% of UAC are placed with Category 1 and 50% are placed with Category 2 sponsors. However, ORR appears to use the term "immediate relative" exceedingly loosely, including extended family members outside of the nuclear family. The description of categories 2A and 2B in the ORR Policy Guide states "A brother; sister; grandparent or other immediate relatives (e.g., aunt, uncle, first cousin) . . ." But as the Senate subcommittee noted, "the Immigration and Nationality Act itself defines 'immediate relative' of a U.S. citizen as 'the children, spouses, and parents of a citizen of the United States.' Sec. 201(b), 8 U.S.C. § 1151(b)(2)(A)(i). 'The common understanding of '***immediate*** relatives' is the nuclear family and would not include aunts, uncles, first cousins, or grandparents, who are members of the ***extended*** family.'"

Since January 2021, approximately 165,000 UAC nationwide have been given to someone who is not their parent or legal guardian, approximately 90,000 have been turned over to someone claimed to be a family member without DNA testing and without adequate document verification, and about 30,000 have been surrendered to someone to whom they have no known relation. In Florida, using those rates, that means in the past two years at least 1,583 children went to live with such "Category 3" persons, nearly 6,600 went to relatives of unknown familial

17

**CAR 033**

proximity, and only 4,750 went to an actual parent—at best. We have learned that a 2022 survey conducted by the Florida Department of Children and Families covering approximately 50 UAC at multiple group shelters revealed only four (*less than ten percent*) of them were being placed with a parent.

A potential sponsor must complete a formal family reunification application and document the identity, address, and relationship to the child they seek to sponsor. According to our witnesses, verification of these materials is suspect:

--most documents are submitted online (sometimes via What'sApp and similar software);

--fingerprint checks are not conducted by federal or state law enforcement, but are contracted to a private vendor (with no ability to determine for example if a sponsor has an active warrant). Only Category 2B and 3 sponsors have their prints sent for an FBI check, and this does not extend to individual state databases. To identify themselves to the examiner (who does not speak to a case manager), sponsors simply show up to one of more than 1,750 machines at various points around the country, where they place their fingers on a glass pad and the prints get sent to yet another remote collection site to be compared to the vendor's records. Sponsors submitting prints can use documents such as a foreign drivers license, a Mexican border crossing card, a "school ID with photo," a "Transportation Worker ID Credential," and other documents whose provenance is rarely ascertainable—meaning that the collector has no true idea who they are actually checking.

--background checks are likewise confined to public records and "backgroundchecks.com," a problematic method of checking. Further, we received ample evidence that such checks are often waived (as far back as 2016, Senator Grassley was criticizing ORR for having waived more than 700 Child Abuse Registry checks for Category 3 Sponsors, and ORR's 2021 Field Guidance #10 and #11 waived checks for others living in the home as well). Criminal history (except for some major offenses), lack of citizen status (ORR prohibits asking, and **does not consider it disqualifying even if a sponsor has been ordered to be deported**), and *even total refusal to submit to a background check,* do not disqualify sponsors.

These requirements have also more recently been weakened by ORR in the name of efficiency. In FY 2021, more than 146,000 unaccompanied alien children entered the United States, of whom HHS released 108,246 to sponsors. However,

18

**CAR 034**

following changes to ORR's background check policies in March 2021, HHS's completion of background checks decreased significantly. In FY 2021, HHS completed 25,413 digital sites fingerprint checks (23 percent of cases) and 9,885 child abuse and neglect registries (9 percent of cases). In other words, HHS conducted 55 percent fewer digital fingerprint checks and almost 20 percent *fewer child abuse and neglect registry checks* on behalf of UAC than in FY 2019.

On March 22, 2021, ORR issued "Field Guidance #10," which diluted these standards further. Now, Category 1 sponsors complete a shortened application to establish proof of relationship and identity and ORR also *eliminated the proof of address requirement for the potential sponsors, and explicitly exempted other household members from being required to submit identification documents or undergo a background check*. Translation: Under Field Guidance #10, case managers no longer have any idea who else is living in the residence the UAC shares with the sponsor or what the background of those individuals may be.

On March 31, 2021, ORR continued eviscerating its own "safety protocols" and issued "Field Guidance #11." Under this edict, *background check requirements (as well as requirements for obtaining identification) for adult household members and alternate adult caregivers identified in a sponsor care plan are not required* in Category 2 cases unless exceptional warning signs surface. Waiving background check requirements on household members of Category 1 parents is bad enough; Field Guidance 11's background check waivers for adult household members and alternate adult caregivers of Category 2 sponsors (including public records and sex offender registry checks) is nothing short of playing roulette with the security of children. One case manager reported to us having to release a teenage female UAC to a male sponsor who had multiple other unknown males living in the same residence— all of whom were unidentified. This was not an isolated incident. A transportation contractor told us he observed a sponsor groping the teenage UAC he had just dropped off.

Often overlooked is the fact that *both background and fingerprint checks only account for activity within the United States*. Unless a sponsor volunteers it, there is no way for case managers to reliably ascertain whether the sponsor (very often themselves a recently-arrived alien) has a criminal or sex offense record or other concerning behavior (drug addiction, child trafficking, gang affiliation) in their country of origin. Case managers reported being discouraged from even trying. One did learn that a sponsor had an Interpol "Red Notice" which thankfully was detected.

19

**CAR 035**

Another found out that a female sponsor applicant was not only a gang member, but also wanted in El Salvador for a RICO-style set of charges involving her boyfriend, a gang kingpin who was in prison there. Despite actually getting the charging documents and other information *from the sponsor herself,* the manager was ordered to allow the placement; when she resisted, the case was reassigned and the sponsor received not only the child in question, but the child's sibling as well. As a further reminder, the persons assessing the significance of any records that do turn up have almost uniformly zero law enforcement or legal training or experience.

*__Even outright refusal to submit to these minimal checks__* is not fatal to a sponsor's attempt to take the child. ORR's Policy Guide states that it "may deny release," but ORR will "consider the totality of the circumstances, including the adult household member's refusal and all other relevant and available information to determine whether the release process may continue." There is no requirement to deny placement with a sponsor if a sponsor or household member refuses to provide information to enable a background check. If a sponsor is found to have *__submitted fraudulent documents__* (a felony), they will be reported to the ORR Inspector General (not to federal or state law enforcement). In some instances, we were told, they were allowed to try again using different documents, over the objections of case managers.

Case managers will check GoogleEarth or SmartyStreets.com to verify that the sponsor's address is classified as residential and that the address identified on GoogleMaps. As a rule, they do NOT actually go see the inside of the location they are sending a child to live. Close checking is also discouraged; witnesses related to us how some sponsors used the "address" of a Jacksonville, FL strip club, empty lots surrounded by stacked shipping containers, or open fields, yet their concerns were brushed aside and placements ordered. As one witness reported, they were told after voicing concerns that "we can't judge where people are forced to live"—while being ordered to force a child to live in such circumstances.

Case managers are able to conduct home studies of sponsor residences if they feel the need—in theory. However, this is another safety rail often discouraged and ignored. In its 2018 report, the Senate Subcommittee found that HHS conducted home studies in *__fewer than 4.3 percent__* of cases between 2013 and 2015, and even though home studies are required by law in certain circumstances, the Subcommittee found several examples where HHS failed to conduct them. The numbers have not improved. For Fiscal Year 2021, ORR took custody of over 122,700 children but

20

**CAR 036**

conducted only 5,468 home studies—or 4.5 percent of cases, less than half of the average number between fiscal years 2017 and 2020. ORR does not universally require home studies for all children 12 or older, despite these children being at higher risk for labor trafficking.  Of the 245,515 children placed with sponsors between August 2018 and January 2022, only 1,835 received discretionary home studies—or *less than one percent of cases*.

Moreover, a disturbing pattern has emerged whereby the same sponsor applies to receive multiple UAC—sometimes at the same address, sometimes at a different one.  Some individual sponsors apply to receive more than one child, at more than one address, *simultaneously*.  One address in Texas had 44 children sent to it; another had 25. One sponsor in Bonita Springs, Florida, had multiple children sent to multiple addresses, and he applied using different versions of his hyphenated surname.  One address in Austin, Texas, had more than one hundred UAC released to a single-family dwelling.

We have seen and heard UAC relating details of being "pimped out" by their "aunt" (whom they did not know prior to arriving in the United States); some who had run away from their sponsor because they were being sold for sex; being teenaged females living in a house full of unknown adult males with no private bedroom;  being children aged seven left with an unknown male while their sponsor was working; UAC relating that they had to drop out of school and work to pay debts for their passage, as well as pay their family's debt to coyotes in their home country; UAC disclosing how they call friends of their sponsor to obtain fraudulent documents to enable them to work; UAC displaying the fake documents; UAC disclosing that they and their families overseas actually paid their "sponsor" to apply for their custody, and that they never actually went to live with that sponsor; UAC relating that they and other UAC rode together to work sites arranged by their sponsors "wherever they take me"; and UAC relating that their **sponsor had been sent to prison in Florida, for Felony Battery upon a child**.

Case managers related events they observed where UAC reported that the sponsor would hold up an 'Order of Deportation' and threaten that "If you do not do what I say, when I say, I'm going to call ICE on you myself." Another Case Manager related the saga of one gang-affiliated female sponsor who was initially denied placement; she threatened to bring her "angels" to see the case manager outside of work.  The case manager was assigned a personal security detail due to the sponsor's

21

**CAR 037**

asserted gang connections. Yet the case was given to a different manager, and the UAC was released to the sponsor.

One of the Florida organizations partially responded to our records request by disclosing that it had received 665 UAC in 2021-2022 but only had 132 sponsors during the time frame, and placed a total of 598 UAC, with 188 of them having unsuccessful post-placement contact during the same time frame. It appears that 67 UAC remain unaccounted for. If 598 UAC were placed with only 132 sponsors, each received an average of 4.5 UAC. Another organization disclosed that it recently received 538 UAC but placed only 374; it received 487 UAC in FY 2022 but placed only 319. A third received 950 and placed 794. A fourth received 503 and placed 429. They could not specify the status of the rest.

According to ORR, "potential sponsors must submit at least one identification document that contains a photograph." However, expired identifications may be used and permissible photo IDs include easily-forged items such as foreign drivers licenses and benefit cards. As for proof of a relationship between Sponsor and Child: DNA testing is not required. Failure to submit proof of relationship is not a disqualifying factor; rather, ORR's Policy Manual states that it is taken into account "along with the totality of the evidence." For Category 2 sponsors, a simple "affidavit attesting that they were the child's primary caregiver" will suffice. We also found it odd that a "baptismal record" from the UAC's church in their home country would be an acceptable piece of identification for this purpose.

Documents by which a sponsor is to establish their identity and relationship to the UAC are almost never provided in person; indeed, many case managers never meet the sponsor in person at all. ***Interviews are conducted almost entirely by phone, and documents are provided via email or What's App.*** In no small part this is because many facilities housing UAC are geographically remote from their ultimate sponsor destination.

We also heard testimony from a former employee of the primary company used by ORR to transport minors across the nation (and a current federal employee). According to him:

> -he transported minors that look like adults and he's told by other children that they lied about their age. In many cases, "they got more facial hair than I do. They got tattoos."

22

**CAR 038**

-UAC told him and his colleagues that they threw their papers away before crossing the border because they stand a better chance of coming into the country without papers—confirming other evidence we received.

-UAC admit that their parents are already living illegally in the United States and they've paid a smuggler to bring their child across the border. The children claim they were promised money if they spent two or three months with the sponsor, and can't wait till they get to spend it.

-Sponsors will admit 'Oh, I'm not a family member, I'm not the kid's father, I'm not the kid's mother, I'm not blood-related, I'm just a 'friend'. UAC admit they met their sponsor through Facebook or a social media app.

-Transporters can often tell legitimate family from bogus "sponsors." "They would cry, they would hug them. But now it's no more crying, no more hugging, it's just 'Hey, I'm here to pick you up.' And that's it. They won't look at the kid. They will be upset that they have to show up to the airport," sometimes inebriated.

-One co-worker had to take a teenage girl to a male sponsor in his 40s that she had never met before, only chatted with on FaceTime from a shelter. One UAC related that a sponsor had to pay double so their niece would not be molested.

-Other employees have also been handing over children to adults who aren't the designated sponsor on the paperwork provided by HHS. One woman in her 30s came to pick up two *unrelated* boys in San Antonio. "These kids are being sent off with neighbors, with people who are nowhere near related to these kids."

-The company discourages complaints about sponsors. "Our job is to escort and that's it. But we're not allowed to bring strange sponsors up. As long as it's a person who shows up and gives you documentation, we leave the child." Failure to do so is a fireable offense; employees who retained custody of minors in the face of suspicious "sponsors" were accused of actually kidnapping the UAC.

-Employees often don't have a background check until months after hiring (his own took more than six months), yet are permitted to work alone in the company of minors.

23

**CAR 039**

We have also reviewed nearly a dozen reports prepared by other agencies of the federal government and Congressional committees regarding ORR and how it goes about its business. Simply put, ORR has a rather spotty record when it comes to vetting sponsors, and has intentionally gutted many of the protections for minors that were in place regarding the identities and backgrounds of the adults to whom they were given. We believe this is why the agency does all it can to keep the public from knowing what is going on.

All this has been a documented problem for some time, though it has not gotten the public attention it deserves. According to other evidence and testimony we received, including a Senate subcommittee report and a 2016 press release from the Department of Justice:

> *ORR placed eight children with members of a human trafficking ring*. The traffickers enticed the children to come into the United States, promising they could attend school. When CBP apprehended the children at the border and placed them in custody, the traffickers applied as sponsors, pretending to be family friends. Once HHS released the children to the traffickers, the traffickers forced them to work on an egg farm in Marion, Ohio for 12 hours a day, six or seven days a week. The children lived in poor conditions, and the traffickers threatened them and their families with physical harm and even death if they did not work and surrender their paychecks. According to the indictment, the traffickers "used a combination of threats, humiliation, deprivation, financial coercion, debt manipulation, and monitoring . . . to create a climate of fear and helplessness that would compel [the victims'] compliance." Seven people pled guilty to Federal charges for their roles.

> The leader of a human trafficking organization and a co-defendant were sentenced to prison. Castillo-Serrano pleaded guilty on Aug. 24, 2015, to conspiracy to commit forced labor, forced labor, witness tampering and alien harboring charges. Pedro-Juan pleaded guilty on Dec. 14, 2015, to conspiracy to commit forced labor. According to documents filed in the case and admissions made in court in connection with the guilty pleas, the defendants and their associates recruited workers from Guatemala, some as young as 14 or 15 years old, by falsely promising them good jobs and a chance to attend school in the United States. The defendants then smuggled and transported the workers to a trailer park in Marion, Ohio, where they ordered them to live in dilapidated trailers and to work at physically demanding jobs at Trillium

24

**CAR 040**

Farms for up to 12 hours a day for minimal amounts of money. The work included cleaning chicken coops, loading and unloading crates of chickens, debeaking chickens and vaccinating chickens. Eight minors and two adults were identified in the indictment as victims of the forced labor scheme.

Castillo-Serrano recruited the victims, smuggled them into the United States, oversaw money transfers and issued threats to ensure compliance. Pedro-Juan falsely represented herself to government officials as a family friend of the minor victims in order to have them released to her custody. She also oversaw the trailers where the victims were housed and arranged for their wages to be transferred to co-conspirators in Guatemala and elsewhere.

After a sponsor is located and approved, the UAC are transported to meet and go home with them (or the sponsor may pick the UAC up at a predetermined location). ORR mandates that for a period of 30 days post-unification, case managers attempt to contact (by phone or otherwise) the sponsor and/or the UAC to determine if things are well; they are required to make at least three attempts to do so. Only if the UAC reports a problem does ORR mandate further action; if the attempts are merely unsuccessful or whoever answers the phone reports no problem, then, *30 days after placement*, ORR considers that is has transferred custody of the UAC, has no further responsibility as a matter of law, and closes its case. *At that point, the UAC is, as far as the federal government is concerned, no longer in their custody*. Case managers (and mental-health or medical treatment providers) are categorically prohibited from further follow-up, *even if the UAC contacts them*.

## VI. What Happens to Them?

In too many cases, no one knows.

A 2001 report by the Department of Justice Office of Inspector General found a number of problems, including issues with transporting children, oversight of child shelters, the length of time children spent in custody before release, and kidnapping of children post-release. Twenty years on, the issues remain.

*In one three-month period* in 2017, ORR discovered it had lost nearly 1500 children. According to the testimony of Steven Wagner, Acting Assistant Secretary of ACF/HHS before the Permanent Subcommittee on Investigations on Homeland Security and Governmental Affairs (April 26, 2018):

25

**CAR 041**

**From October to December 2017,** ORR attempted to reach 7,635 UAC and their sponsors. Of this number, ORR reached and received agreement to participate in the safety and well-being call from approximately 86 percent of sponsors. From these calls, ORR learned that 6,075 UAC remained with their sponsors. *Twenty-eight UAC had run away, five had been removed from the United States, and 52 had relocated to live with a non-sponsor. ORR was unable to determine with certainty the whereabouts of 1,475 UAC.*

In January 2016, that Subcommittee released a report entitled "Protecting Unaccompanied Alien Children from Trafficking and Other Abuses: the Role of the Office of Refugee Resettlement." That report found that HHS placed several children with sponsors without taking sufficient steps to ensure that the placements would be safe. The report also highlighted instances where the agency *failed to*:

-investigate the relationship between the sponsor and child;

-run background checks on the adults in the sponsors' households and secondary caregivers;

-visit sponsors' homes prior to placement;

-determine whether sponsors were accumulating multiple unrelated children; and

-conduct post-placement follow-up to ensure the child was safe.[11]

The Subcommittee found many issues documented in its 2016 report remain unaddressed, but also additional problems including that HHS "could not ascertain with certainty" the location of nearly 1,500 children placed with sponsors. HHS argued it had no legal responsibility to track children after placement with a sponsor. The 2018 report also addressed concerns about the treatment of unaccompanied alien children in HHS custody at shelter facilities.

This is not the first time in recent years that such issues have been exposed—despite ORR's best efforts to keep them from the sunlight. In 2022, Reuters reported "Dozens of migrant children reported missing in Houston, raising alarms." In

---

[11] Both ORR and its care providers love to tout their "post-release services," where they supposedly give UAC contact information to see doctors, therapists, call hotlines, and the like. We note that, as previously mentioned, attempts at arranging this extend no more than thirty days from placement; the sponsor is ultimately the only individual who can decide whether the services are provided at all and, more problematic, we received testimony from case manager supervisors that "75% of the kids are supposed to have it, but nobody is actually assigned to do it."

**CAR 042**

September 2021, Axios reported that ORR "has lost contact with thousands of migrant children released from its custody," with nearly a third of calls to these minors or their sponsors going unanswered. In October 2021, Arizona Rep. Andy Biggs wrote a letter to the Department of Health and Human Services, demanding to know how ***HHS was "unable to contact 19,726 sponsors of unaccompanied alien children since January 2021***." ORR lost contact with nearly 20,000 UAC in less than a year.

We learned from some former employees of charitable organizations that some UAC have encountered serious trauma in the course of their journey and require mental health treatment, sometimes long-term. Yet UAC are retained only for a matter of a few weeks at most before they are placed, making it exceedingly difficult to diagnose or especially treat some of the significant conditions they suffer from. One former therapist tearfully reported that such rapid placement effectively undermines her best attempts at counseling and certainly makes it difficult for the UAC to trust another therapist even if they see one, since they often express that the first one has "abandoned" them.

Pro Publica reported in November 2020 on the "Lives of Immigrant Teens Working Dangerous Night Shifts in Suburban Factories," where "at night while their classmates sleep, they work to pay debts to smugglers and sponsors," and "use fake ID's to get the jobs through temporary staffing agencies that, knowingly or not, accept the papers." The New York Times reported in February 2023 that they "spoke with more than 100 migrant child workers in 20 states who described jobs that were grinding them into exhaustion[.] In town after town, children scrub dishes late at night; they run milking machines in Vermont and deliver meals in New York City. Girls as young as 13 wash hotel sheets in Virginia." We also heard from a Florida teacher whose former middle school English Learning immigrant students routinely report working long hours at adult jobs. And last month, DHS launched an investigation into a meat-packing plant in Nebraska where 50 UAC, some as young as 13, were illegally employed and forced to endure dangerous working conditions.

The failure of ORR to place UAC with responsible sponsors places a substantial financial burden on the State of Florida. Annually, more than four hundred UAC end up in the dependency and foster care system here in Florida. The UAC then become wards of the foster care system, which does a thorough job of vetting their next placement. Each must be provided education, food, shelter, and

**CAR 043**

medical care by our State, and for the duration of their childhood someone will be legally responsible for their welfare.

As the Florida v. United States court found,

> In the 2020-21 school year there were just over 95,000 immigrant children and youth in Florida's public schools. That number increased by more than 17,000 in the 2021-22 school year[.] … Florida spends roughly $8,000 per public school student per year, and an increase in the number of students in Florida's schools requires the state to spend more money over time. *Supra.*

## VII. No Help Is Coming, It's Up to Us

ORR and its contractors claim to employ a thorough process to ensure safety. However, as one witness put it,

> "I was there. I saw what was going on. These people (ORR and its contractors) are aware of what's happening. ***They aren't naïve—they're complicit.***"

We share this conclusion, and use the following (taken from a federal court opinion) for illustration of the point:

> Ms. Nava–Martinez, an admitted human trafficker, was caught at the Brownsville & Matamoros Bridge checkpoint. She was trying to smuggle Y.P.S. into the United States using a birth certificate that belonged to one of her daughters. …This conspiracy was started when Patricia Elizabeth Salmeron Santos solicited human traffickers to smuggle Y.P.S. from El Salvador to Virginia. Salmeron Santos currently lives illegally in the United States. She applied for a tourist visa in 2000, but was turned down. Despite being denied legal entry into the United States, she entered the United States illegally and is living in Virginia.
>
> Salmeron Santos admitted that she started this conspiracy by hiring alien smugglers to transfer her child from El Salvador to Virginia. She agreed to pay $8,500 (and actually paid $6,000 in

28

**CAR 044**

advance) for these human traffickers to smuggle her daughter... Nava-Martinez was arrested, and the child was taken into custody. The DHS officials were notified that Salmeron Santos instigated this illegal conduct. Yet, instead of arresting Salmeron Santos for instigating the conspiracy to violate our border security laws, the DHS delivered the child to her—thus successfully completing the mission of the criminal conspiracy. It did not arrest her. It did not prosecute her. It did not even initiate deportation proceedings for her... A private citizen would, and should, be prosecuted for this conduct.

This is the fourth case with the same factual situation... in as many weeks. In all of the cases, human traffickers who smuggled minor children were apprehended short of delivering the children to their ultimate destination. In all cases, a parent, if not both parents, of the children was in this country illegally. That parent initiated the conspiracy to smuggle the minors into the country illegally. He or she also funded the conspiracy. In each case, the DHS completed the criminal conspiracy, instead of enforcing the laws of the United States, by delivering the minors to the custody of the parent illegally living in the United States. ...

In each of the four cases, the Government also incurred significant expense to help complete the conspiracy. In all cases when the Government apprehended some of the traffickers, the Government transported the children across the country to unite them with a parent (or parents) who was in the country illegally. In one situation, the Government flew a child to multiple locations in different parts of the United States. The taxpayers of the United States suffer the expense of delivering these minors. This expense includes not only the cost of paying travel, room and board for the children, but ... include[s] the salary and travel expenses of a guardian to accompany them. This is an absurd and illogical result. The DHS could reunite the parent and child by apprehending the parent who has committed not one, but at least two different crimes. It would be more efficient for the Government to arrest the individuals who are not only in the country illegally, but while in the country illegally are also fostering illegal conspiracies. It would also be much cheaper to apprehend those co-conspirators and reunite them

29

**CAR 045**

at the children's location. Yet, it neither prosecutes nor deports the wrongdoer.

The DHS is rewarding criminal conduct instead of enforcing the current laws. More troubling, the DHS is encouraging parents to seriously jeopardize the safety of their children. While Y.P.S. was transported in a car, others are made to swim the Rio Grande River or other bodies of water in remote areas. This concern for the safety of these individuals is not fanciful or theoretical; it is a real and immediate concern. …

First, and most importantly, these illegal activities help fund the illegal drug cartels which are a very real danger for both citizens of this country and Mexico. Mexican cartels control most of the human smuggling and human trafficking routes and networks in Texas. The nature of the cartels' command and control of human smuggling and human trafficking networks along the border is varied, including cartel members having direct organizational involvement and responsibility over human smuggling and human trafficking operations, as well as cartel members sanctioning and facilitating the operation of human smuggling and human trafficking organizations. In other circumstances, human smuggling organizations are required to pay the cartels for operating their networks and routes in their territory [A]liens being smuggled were assaulted, raped, kidnapped and/or killed. …

Mexican cartels, transnational gangs, human trafficking groups, and other criminal organizations engage in a wide range of criminal activity in Texas, including murder, kidnapping, assault, drug trafficking, weapon smuggling, and money laundering. However, by far the most vile crime in which these organizations and other criminals are engaged is the exploitation and trafficking of children. These crimes are also carried out and enabled by prostitution rings, manufacturers and viewers of child pornography, sexual predators, and other criminals. Regardless of who perpetrates these crimes or their motives, this category of criminal activity is especially heinous, as it takes advantage of children and subjects them to violence, extortion, forced labor, sexual assault, or prostitution.

30

**CAR 046**

The methods and means used by smugglers to transport and hold aliens subject them to high degrees of risk. Unsafe vehicles and drivers, squalid conditions in stash houses, rugged terrain, and harsh elements create dangerous circumstances. Hundreds of illegal aliens have died in Texas and elsewhere along the border…

In addition to these dangerous methods and means, smugglers also regularly use violence, extortion, and unlawful restraint against illegal aliens. In some cases, they are forced to perform labor, and females—including minors—may be sexually assaulted. Some are subjected to physical assaults if payments are not received, and several have died while being held in stash houses in Texas. And just as drug traffickers may attempt to steal drug loads from rival traffickers, criminals sometimes attempt to steal or hijack groups of aliens from smugglers…

These entities are not known for their concern for human life. They do not hire bonded childcare providers to smuggle children. By fostering an atmosphere whereby illegal aliens are encouraged to pay human smugglers for further services, the Government is not only allowing them to fund the illegal and evil activities of these cartels, but is also inspiring them to do so. The big economic losers in this scenario are the citizens of the United States who, by virtue of this DHS policy, are helping fund these evil ventures with their tax dollars. The overall losers, who endure the consequences of this policy, are the citizens on both sides of the border who suffer from the nefarious activities of the cartels.

Second, the DHS's current policy undermines the deterrent effect the laws may have and inspires others to commit further violations. …Further, this policy is encouraging individuals to turn their children over to complete strangers—strangers about whom only one thing is truly known: they are criminals involved in a criminal conspiracy. Children, such as Y.P.S., are especially at risk.

Some children are more vulnerable to exploitation, such as unaccompanied alien children (UAC). …. If they persist in this policy, more children are going to be harmed, and the DHS will be partly responsible because it encourages this kind of Russian roulette.

31

**CAR 047**

Finally, this policy lowers the morale of those law enforcement agents on the front line here on the border. These men and women, with no small risk to their own safety, do their best to enforce our laws and protect the citizens of the United States. It seems shameful that some policymaker in their agency institutes a course of inaction that negates their efforts. It has to be frustrating to those that are actually doing the work of protecting Americans when those efforts are thwarted by a policy that supports the lawbreakers.

[T]he decision to separate Salmeron Santos from Y.P.S. was made years ago, and it was made by Salmeron Santos. She purposefully chose this course of action. Her decision to smuggle the child across the border, even if motivated by the best of motives, is not an excuse for the United States Government to further a criminal conspiracy, and by doing so, encourage others to break the law and endanger additional children. To put this in another context, the DHS policy is as logical as taking illegal drugs or weapons that it has seized from smugglers and delivering them to the criminals who initially solicited their illegal importation/exportation. Legally, this situation is no different.

We read this with a feeling of *déjà vu,* based upon our investigation. But it was not written recently by a grand jury. It is not the result of current events.

Instead, it is the opinion of a federal Court, written ***ten years ago***. United States v. Nava-Martinez, CRIM. B-13-441-1, 2013 WL 8844097, at *1–5 (S.D. Tex. Dec. 13, 2013). Although the program has been moved to ORR by virtue of a change in federal statutes, the problems followed from one agency to the next. HHS/ORR and their providers were on notice of what these practices mean for UAC at least since then, and it has clearly mattered not a whit—indeed, Y.P.S. was at least given to her actual parent; UAC are now given to many persons ***other*** than parents. As the witness told us, those involved are not ignorant, but complicit.

## Fake Families and Recycled Kids

We learned that children are often found to be exploited as part of a "fake family" or even "recycled" to assist the entry of multiple other individuals.[12] We received evidence from current and former federal law enforcement authorities that

---

[12] Also arrested at the border: 69 individuals whose names appeared on the terror watchlist in the first five months of fiscal year 2023, added to 98 captured in fiscal year 2022, according to CBP.

32

**CAR 048**

children are often used as lottery tickets to get the whole family across the border at a huge discount. Human smugglers or brokers in home countries cut package deals with a parent of two or more children; they pay the parents for the ability to take one of their children over the border, defraying the cost to parents who would keep one child to take over themselves. Parents who agreed to do this could have most or all of the entire family's smuggling fees waived. The international criminal cartel "parents" – a/k/a smugglers, would cover the costs. When fake families are discovered, the children are not deported, but instead become UAC.

Sometimes smugglers included altered, counterfeit, or fraudulently attained birth certificates that would match children to customers in search of a human visa and willing to pay for them; the younger the child the better, since they couldn't answer Border Patrol questions and thus expose the scam. Border Patrol agents often reported encountering single men carrying infants but nothing to indicate actual parenthood (no baby formula, bottles, diapers, or any items suggesting care of infants), or babies and young children alone wandering through cornfields on the U.S. side of the border, where the "parent" had dumped them after they served their purpose.

ICE's "Operation Noble Guardian" identified 35 adults who have entered with a child that has now departed the US and identified a woman personally responsible for recycling **more than 60** children to the Northern Triangle, across multiple trips. We also received evidence regarding Honduran national Valentin Bardales-Antunez, arrested at the Greenville-Spartanburg Airport while attempting to arrange travel for a minor child being sent back to Honduras via commercial airline. Bardales-Antunez entered the U.S. unlawfully and had pending criminal charges in Greenville County following his arrest by the Greenville Sheriff's Office in 2017 for three counts of disseminating obscene images to a minor and one count of soliciting a minor.

We learned about one recent case which is still pending sentencing. Court records indicate that:

In February 2019, Belkin Idania Martinez-Parada, a Honduran mother of four, agreed to a scheme to rent three of her four children, ages six months to twelve years, to three different Honduran men so they could pass through the Texas border as families. Martinez-Parada would thereby earn free passage for herself and all four kids. *The men had all been previously deported more than once* and would be deported back to Honduras if they tried crossing as singles. But they knew if they

33

came in with a child, Border Patrol would let them pass even though they were deportable. Each of the three men received a fraudulently obtained birth certificate indicating the child belonged to them. The whole group traveled together with a smuggler up to the border, then split up for separate crossings.

Martinez-Parada kept the twelve-year-old daughter in Mexico for another month. As for the others, she:

-gave the six-month-old infant to a stranger who flew with the baby to Florida;

-gave the eight-year-old girl to a second stranger, who took her to Houston; and

-gave the six-year-old boy to a third man.

This third man got caught lying at the border and Border Patrol decided to deport him. He confessed everything because he did not want to take the boy back with him.

The Houston-bound man who had the eight-year-old daughter began complaining on Facebook that he eventually had to leave the child alone every day so he could work. One day, a neighbor found her wandering in the parking lot of the apartment complex and took her in but didn't call the police. If she had, the smuggler wrote on Facebook, "I'd be back in Honduras."

The deported fake father left the 6-year-old in detention; the infant in Florida was left with a family of strangers for months.

This particular scourge could be (and previously was) greatly diminished. As Acting Deputy Director Derek Benner of US. I.C.E. testified on November 13, 2019:

> Human smugglers are currently capitalizing on the trend of **fraudulent families** crossing the border to enter the United States. The cartels and human smugglers are well versed in our inability to detain family units for the length of time necessary for their cases to be complete, in large part due to the Flores Settlement Agreement (FSA) and judicial decisions that interpret it. This enabled certain aliens, by falsely claiming to be a legal family unit or UAC, to gain entry into the United States, avoid immigration custody, and then never appear for their immigration proceedings. Family units are often released with little or no consequences for their illegal entry.

34

**CAR 050**

In response to this crisis, ICE dedicated over 400 HSI personnel to assist in combating this issue. HSI deployed teams of special agents, intelligence analysts, forensic interview specialists, and document fraud examiners to the Southwest Border. These teams interviewed groups suspected of fraudulently claiming familial relationships, specifically a parent-child relationship, in order to facilitate human smuggling activity. As a result, _**between mid-April and October 31, 2019, HSI identified 653 fraudulent family units, 1,025 fraudulent documents, and presented 1,168 individuals for criminal prosecution**_, with 1,024 being accepted for prosecution. In a particularly egregious incident investigated by HSI, an adult Guatemalan male presented at the border with a 16 year old minor female who he fraudulently claimed to be his child. Upon being released from custody he took the minor female to the southeastern United States where he raped and beat her on a regular basis until she was rescued.

In addition to the fraudulent family incidents, HSI has also been identifying **adults who are fraudulently presenting themselves as minors**. As of October 31, 2019, HSI has identified 170 adults fraudulently claiming to be minors, of which 143 of those individuals were accepted for prosecution. I would like to take a few moments to discuss two current HSI national operations created to address the fraudulent family issue.

Operation Double Helix: Rapid DNA Testing

From May 6 to 10, 2019, HSI initiated a rapid DNA pilot called Operation Double Helix in El Paso and in McAllen, Texas. Both sites were selected for this initiative because they were considered the sectors with the highest family unit apprehensions along the Southwest Border. Selection of family units for Rapid DNA testing was based on factors such as key observations obtained during interviewing, intelligence gathering, documentary evidence, and any investigative information developed during immigration processing. ... The goal of this operation was to remove children from these dangerous and potentially exploitative situations. During this initial pilot, a total of 84 family units were DNA tested after providing consent and _**16 family units were found to be fraudulent during the testing**_. About half of the

35

**CAR 051**

confirmed fraudulent family units were identified prior to DNA testing when the adult alien recanted their claim of a familial relationship when asked to consent to a DNA test. The teams were also advised by U.S. Border Patrol agents that **other subjects within the processing facilities not selected for testing voluntarily came forward and admitted they were part of a fraudulent family, as they learned that DNA testing was being conducted**. …In September 2019, the pilot expanded to three additional locations bringing the total number of testing locations to 10. *As of October 31, 2019, Operation Double Helix 2.0 has resulted in 1,613 family units being tested with 207 family units (13 percent) testing negative for a familial relationship. Based on those results, 298 individuals have been presented for prosecution* and 168 have been accepted.

Operation Noble Guardian:

In early May 2019, HSI's Human Smuggling Unit (HSU), in coordination with the CBP National Targeting Center's (NTC) Counter Network Division, initiated Operation Noble Guardian. As previously mentioned, some aliens are exploiting our immigration laws, fraudulently claiming to be family units, avoiding detention and/or prosecution, and are subsequently released after being processed in an expedited fashion. The NTC assisted HSI in identifying adult aliens and accompanying alien children that entered the United States as alleged family units, where the children subsequently departed the United States via commercial airlines to Northern Triangle countries. **As of October 31, 2019, 466 migrant children who were processed as part of a family unit have since departed the United States.** … Many of these adults involved in fraudulent family units since their entry into the United States have been identified as absconders from ICE ERO and are now being targeted for arrest and removal from the United States. *As of November 1st, ICE has arrested 232 individuals targeted for their involvement in these activities*.

ICE did significantly curtail fake family abuse in 2019 by deploying rapid *DNA testing* to eleven locations across the southern border. As part of testing the pilot program when it first came out, about *20 percent of those tested failed*. Others, faced with the prospect of undergoing testing, confessed up front.  The DNA

36

**CAR 052**

initiative arose in large part due to the testimony of a whistleblower, who reported that nearly 3,700 sponsors on a list of 20,000 had criminal records, including some who had convictions for child molestation. That was 2015, and it took nearly four years to implement these pilot programs. However, we also received evidence that despite the relative success of these programs, _**DNA testing is no longer conducted as a matter of course**_.

The DNA testing has all but ended, with only a few dozen a month being conducted because, as the *Washington Examiner* quoted a DHS official, "This administration wants these families and kids released quickly. That is their No. 1 goal, so they are not going to do anything to slow that process down." Likewise, on May 8, 2022, the *Wall Street Journal* reported that according to three high-ranking Brazilian federal police investigators, several thousand Brazilian children entered the U.S. with an adult who was falsely claiming to be their parent—multiple children brought over with one of them accompanying a fake parent for the border crossings, and the real parent getting paid $5,000 for allowing it, helping to defray the biological parent's smuggling fee.

We see no reason that, given the demonstrated success of ICE's Rapid DNA testing, it would not be a central part of ORR placement decisions and vetting of sponsors. Perhaps the easiest way to ascertain the biological relationship of two individuals is to let their chromosomes do the talking. Case managers would be spared attempts at interpreting documents easily faked or comparing stories to spot red-flag inconsistencies—as well as the pressure to process as fast as possible. ORR and its companion organizations clearly know the way to reduce hazardous placements and phony family ties. What appears to be lacking is the will, the sense, or both.

## VIII. Impacts on Florida

The Florida Department of Children and Families took the time and trouble to research, revise, and publish multiple Emergency Rules on this subject, the most recent and current of which is Emergency Rule 65CER22-1. The Department found as follows:

> SPECIFIC REASONS FOR FINDING AN IMMEDIATE DANGER TO THE PUBLIC HEALTH, SAFETY OR WELFARE:

37

**CAR 053**

...The surge of foreign nationals attempting to enter illegally at the southwest border has included a large number of Unaccompanied Alien Children (UAC), defined by federal law as a child who has no lawful immigration status; has not attained 18 years of age; and, with respect to whom, there is no parent or legal guardian in the United States, or no parent or legal guardian in the United States available to provide physical custody and care, see 6 U.S.C. § 279(g)(2). ... It is estimated that at least 4,284 UAC were housed in group home facilities or foster homes in Florida over the last year. During federal fiscal year 2021, 11,145 UAC were placed with sponsors in Florida, more than the 10,773 UAC placed in California, a substantially larger state.

Neither DHS nor HHS actively coordinates or consults with the State of Florida, including the Department, on the UAC that are resettled in Florida. The State does not receive meaningful, if any, advance notice when UAC are transported to Florida and is not meaningfully consulted on the number of UAC that the State's child-caring resources and capacity could feasibly support without adversely affecting children already present in Florida and under the State's protection and care.

Moreover, the State receives no information on the background, criminal history, immigration status, status of removal proceedings, or the sponsors of the UAC brought to Florida. ...UAC are regularly placed with sponsors without adequate follow-up by HHS or the placement entities to ensure the safety and welfare of the UAC. According to a recent report, between January and May 2021, federal contractors responsible for placing UAC with sponsors across the United States were unable to reach the minor or the sponsor in roughly one of every three attempts. Nor does the State have any assurance that the UAC are, in fact, minors. ... In short, the Federal Government has failed to provide the State of Florida with sufficient answers to its requests for information on the resettlement of illegal aliens, including UAC, so that their safety and the safety and welfare of Florida's citizens, including children already present in Florida, can be secured... an immediate danger to the safety and welfare of Floridians, including its most vulnerable children, as well as recently arrived UAC. (The Federal Government's conduct with respect to the resettlement of UAC in Florida stands in stark contrast to the Federal Government's conduct

CAR 054

with respect to the resettlement of Unaccompanied Refugee Minors (URM), where the Federal Government has a cooperative agreement in place with the State of Florida.)

Given the ongoing crisis at the border, including the Federal Government's failure to enforce federal immigration law and to secure the border, the resettlement of UAC in Florida, its ongoing refusal to provide meaningful coordination and consultation, its failure to provide adequate protection for and supervision of UAC once they are placed with sponsors in the state, and its failure to adequately screen purported UAC (as evidenced by the recent murder charge brought against an adult foreign national who misrepresented his age to gain entry to the United States), emergency rulemaking is justified and necessary.

DCF's conclusions align with our own. The Department appropriately enacted the Rule which essentially resulted in many UAC shelters not qualifying for Child Placement Facility licensure any longer. The response from ORR was to *waive the longstanding federal requirement that their placement agency be licensed by the State in which they operate, and tell them to continue with business as usual.*

We understand that the Department is finding difficulty enforcing its own rule, due to resistance from placement agencies. Organizations—some of whom signed on to a letter requesting that the Governor order DCF to rescind their rule--continue to operate even without a license. Some have sued the Department. There is no need to rely on an Emergency DCF Rule to vindicate the interests of the people of this State. If ORR and their partners want to continue their dangerous operations despite what has been outlined, our legislature should step in.

The Constitution gives Congress—not Executive Branch officials such as ORR or their contractors— "complete and absolute power" over the subject of immigration and "plenary power" over the admission and exclusion of aliens. See, e.g., Kleindienst v. Mandel, 408 U.S. 753, 766 (1972) (quoting Boutilier v. INS, 387 U.S. 118, 123 (1967)); Oceanic Steam Navigation Co. v. Stranahan, 214 U.S. 320, 343 (1909).

What the Constitution does *not* do, though, is prohibit states from determining the legal requirements for residents taking custody of children other than their own living in the state.

39

**CAR 055**

Legal relationships between parents and children are typically governed by state law, there being "no federal law of domestic relations." Accordingly, subject to possible limitations, we think that the requirement of "legal custody" in section 1432 should be taken presumptively to mean legal custody under the law of the state in question.... [T]his view is consistent with the approach taken in other cases in which a federal statute depends upon relations that are primarily governed by state law.

Bagot v. Ashcroft, 398 F.3d 252, 258 (3d Cir. 2005).

As the Senate Subcommittee Report found,

ORR policy explicitly states, "[o]nce a child is released to a sponsor, ORR's custodial relationship with the child terminates." However, the transfer is of physical custody only. *Unless the sponsor is a parent or legal guardian (Category 1), sponsors do not have legal custody of an unaccompanied alien child without taking further legal steps*.

The Homeland Security Act of 2002 defines an "unaccompanied alien child" as one for whom ". . . (i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody." In accordance with this definition, a non-parental sponsor or non-legal guardian *(Category 2 and 3) are not legal guardians unless they obtain an order from a state court.*[13] (Emphasis supplied).

ORR recognizes this in its Sponsor Care Agreement, which sponsors are required to sign; they are urged that "If you are not the minor's parent or legal guardian, make best efforts to establish legal guardianship with your local court

---

[13] It is worth noting that the Subcommittee took pains to point out that in fact it considered ORR's interpretation to be incorrect, and that the agency was shirking its statutory obligations: "HHS's interpretation of its legal responsibility for unaccompanied alien children, as defined by the Homeland Security Act of 2002, directly contradicts the plain language of the statute. . . HHS's refusal to take responsibility for these children after placement with a sponsor other than a parent or guardian undermines those children's safety, our immigration system, and the rule of law." Nonetheless, ORR continues its practice, and children not placed with a parent are—legally speaking—in complete limbo as far as any adult having a legal duty to them.

40

**CAR 056**

within a reasonable time." Such suggestions are ineffective motivators in this situation.[14]

*At no point in the UAC process is any court involved, or any determination by a judicial officer made as to adoption, permanent or temporary custody, or the best interests of the child. As a result, thousands of children in Florida are surrendered to adults who are not their parents, and therefore have no legal custodial authority—leaving the child in legal limbo.*

These individuals cannot legally authorize medical treatment for the child or exercise any of the myriad other functions of a legal custodian. What is more, UAC are not yet citizens; they are required to appear for immigration court dates, attend school, and are precluded from holding certain types of employment. Without legal status as a citizen, and without legal status as a child or ward of a specific person, UAC exist in a vulnerable situation of ORR's making. When citizen children require medical care, their parent or guardian can obtain it or give permission for them to receive it. When they miss school, their parent or guardian can be held responsible under our truancy laws. If they are required to attend court proceedings, parents or guardians can be held to answer to the court if they fail to appear. If they are discovered laboring in a sweatshop or wandering alone in traffic, authorities have someone to investigate.

On the other hand, UAC (in a new country, often with limited ability to speak the language) are simply given over by a federal contractor to a sponsor, based upon that sponsor asking for them. When that sponsor is a parent, this does not necessarily implicate Florida's custody statutes; when it is not, however—and *in about two-thirds of cases, this is the situation*-- Florida's laws most certainly have something to say.

ORR and its non-profit partners may wish for us to trust their process and ignore the evidence and testimony presented. But what has been observed is the

---

[14] Indeed, the evidence we received was that many of these individuals scrupulously avoid the courts, authorities, and law enforcement altogether, fearing they will be deported as they are themselves awaiting court disposition of their claims. For its part, ORR's policy manual proudly proclaims that it *will not inquire about the citizenship of potential sponsors. ORR can and does place UAC with a sponsor even if said sponsor has lost their asylum appeal and is subject to deportation at any time.* The Senate Homeland Security and Governmental Affairs Committee held a hearing in April, 2019; at that time, it determined that for the *six-month period* between July 2018 and January 2019, **79%** of sponsors had no lawful status, and 21 of them were actually under final removal orders.

CAR 057

complete abdication of responsibility for the welfare of minor children they have transported to our state, then effectively abandoned, often to dangerous and illegal situations.

This could be construed as facilitating the trafficking of those children, or at a minimum, abandoning them to neglect.  To quote **§787.06, Florida Statutes:**

> **(4)(a) Any … person having custody or control of a minor who … transfers custody or control of such minor, or offers to transfer custody of such minor, with knowledge *or in reckless disregard* of the fact that, as a consequence of the sale or transfer, the minor will be subject to human trafficking commits a life felony[.]**

Our findings in this investigation echo what our legislature has previously found as well:

### §787.06. Human trafficking

(1)(a) The Legislature finds that human trafficking is a form of modern-day slavery. Victims of human trafficking are young children, teenagers, and adults. Thousands of victims are trafficked annually across international borders worldwide. Many of these victims are trafficked into this state. Victims of human trafficking also include citizens of the United States and those persons trafficked domestically within the borders of the United States. The Legislature finds that victims of human trafficking are subjected to force, fraud, or coercion for the purpose of sexual exploitation or forced labor.

(b) The Legislature finds that while many victims of human trafficking are forced to work in prostitution or the sexual entertainment industry, trafficking also occurs in forms of labor exploitation, such as domestic servitude, restaurant work, janitorial work, sweatshop factory work, and migrant agricultural work.

(c) The Legislature finds that traffickers use various techniques to instill fear in victims and to keep them enslaved. Some traffickers keep their victims under lock and key. However, the most frequently used practices are less obvious techniques that include isolating victims from the public and family members; confiscating passports, visas, or other identification documents; using or threatening to use violence toward victims or their families; telling victims that they will be imprisoned or deported for immigration violations if

**CAR 058**

they contact authorities; and controlling the victims' funds by holding the money ostensibly for safekeeping.

(d) It is the intent of the Legislature that the perpetrators of human trafficking be penalized for their illegal conduct and that the victims of trafficking be protected and assisted by this state and its agencies[.]

Moreover, according to **§827.03, Florida Statutes**:

(e) "**Neglect of a child**" means:

2. A caregiver's *failure to make a reasonable effort* to protect a child from abuse, neglect, or exploitation by another person.

[N]eglect of a child may be based on repeated conduct or on a single incident or omission that results in, *or could reasonably be expected to result in*, serious physical or mental injury, or a substantial risk of death, to a child.

The intentional avoidance of knowledge regarding the flaws in the process and their foreseeable outcomes does not absolve them of culpability. We find it helpful, in view of the details set forth above, to further remind our readers, including placement agencies, their employees, and donors, of Florida Standard Jury Instruction 3.3(h):

**"Willful Blindness."**

**In some cases, the issue to be determined is whether the defendant had knowledge of a certain fact. Florida law recognizes a concept known as willful blindness, which is sometimes referred to as "deliberate avoidance of positive knowledge." Willful blindness occurs when a person has his or her suspicion aroused about a particular fact, realized its probability, but deliberately refrained from obtaining confirmation because he or she wanted to remain in ignorance. A person who engages in willful blindness is deemed to have knowledge of that fact.**

**CAR 059**

## IX. Recommendations

Florida has a robust system for addressing custody of children, both temporary and permanent. When someone other than a child's natural parent is obtaining custody, they are required to comply with Chapter 63 (adoption) and/or Chapter 751 (Temporary Custody, including by Extended Family members). These statutes involve the courts and other professionals in the process, and *there is no reason to require less legal protection for children born elsewhere.*

Floridians cannot exercise direct control over immigration policy, nor over ORR's treatment of UAC. However, Floridians most certainly can and should regulate those living among us who seek out the responsibility of raising a child not their own. For U.S. citizen children, we already do.

Nelson Mandela said, "The true character of a society is revealed in how it treats its children." Accordingly, we urge our leaders to do the following:

1) Mandate that any person residing (either temporarily or permanently) in this State, who obtains continuing physical custody of a minor child of whom the individual is not the biological parent or court-appointed legal guardian, including where that custody is conferred by an agency of any government, a Child Placement Agency as defined in Chapter 409.175, or any other company or organization, **must within thirty (30) days report that custody to the Department of Children and Families *and* initiate proceedings under Chapter 63 or Chapter 751 of the Florida Statutes to determine legal custody of the minor child.**

   *Failure to do so should be a felony*, at least of the third degree, and could be easily incorporated as an additional section of Chapter 787.06 (Human Trafficking), 827.03 (Child Neglect), or as a standalone statute. DCF should be required to notify the Department of Law Enforcement upon becoming aware of such a situation. Repeat offenses on multiple occasions or involving multiple children should result in increased penalties. This statute should apply retroactively, to protect those children already here. These crimes should also be authorized for investigation by the Department of Law Enforcement and prosecution by the Office of Statewide Prosecution since bringing children into the state affects every circuit.

44

**CAR 060**

2) Any organization or individual licensed as a Child Placement Agency or facilitating the reunification of a child with a purported biological parent must document the relationship with either (a) original documentation of live birth naming the individual as a parent or (b) paternity/maternity testing established via a DNA test, and maintain such records in its possession.

We understand and appreciate that at current rates, this may add to the docket of civil cases statewide requiring a basic determination of UAC custody by Florida courts. We consider this a worthwhile use of resources, as it is everyone's duty to protect children, regardless of where they might be from.

Respectfully submitted to the Honorable Ellen S. Masters, Presiding Judge of the Twenty-First Statewide Grand Jury, this 29th day of March, 2023.

Vice-Foreperson Juror #3
Twenty-First Statewide Grand Jury

THE FOREGOING Third Presentment was returned to me in open court this this 29th day of March, 2023.

HON. ELLEN S. MASTERS,
Presiding Judge
Twenty-First Statewide Grand Jury

45

**CAR 061**

I, Nicholas B. Cox, Statewide Prosecutor and Legal Advisor, Twenty-First Statewide Grand Jury of Florida, hereby certify that I, as authorized and required by law, have advised the Grand Jury which returned this Report on this 29th day of March, 2023.

_____
NICHOLAS B. COX
Statewide Prosecutor
Twenty-First Statewide Grand Jury

I, Guillermo Vallejo, Assistant Statewide Prosecutor and Assistant Legal Advisor, Twenty-First Statewide Grand Jury of Florida, hereby certify that I, as authorized and required by law, have advised the Grand Jury which returned this Report on this 29th day of March, 2023.

_____
GUILLERMO VALLEJO
Assistant Statewide Prosecutor
Twenty-First Statewide Grand Jury

I, Richard Mantei, Assistant Statewide Prosecutor and Assistant Legal Advisor, Twenty-First Statewide Grand Jury of Florida, hereby certify that I, as authorized and required by law, have advised the Grand Jury which returned this Report on this 29th day of March, 2023.

_____
RICHARD MANTEI
Assistant Statewide Prosecutor
Florida Bar #119296
Twenty-First Statewide Grand Jury

I, Robert Finkbeiner, Assistant Statewide Prosecutor and Assistant Legal Advisor, Twenty-First Statewide Grand Jury of Florida, hereby certify that I, as authorized and required by law, have advised the Grand Jury which returned this Report on this 29th day of March, 2023.

_____
ROBERT FINKBEINER
Assistant Statewide Prosecutor
Twenty-First Statewide Grand Jury

FILED
JOHN A. TOMASINO
MAR 29 2023
CLERK, SUPREME COURT
BY_____

46

**CAR 062**



# IN THE SUPREME COURT OF FLORIDA

### CASE NO.: SC22-796

## FOURTH PRESENTMENT OF THE TWENTY-FIRST STATEWIDE GRAND JURY

In the time since we last published our findings, we have continued to investigate the many questions in our Supreme Court mandate. We intend to report those findings in the near future.

We have also been monitoring the issue described in our Third Presentment of the [mal]treatment of Unaccompanied Alien Children (UAC). These children are transported by federal agencies into our state, where many are effectively abandoned. We have received updates regarding investigations undertaken by the Florida Department of Law Enforcement (FDLE) at our direction; we have also summoned back witnesses who made certain representations to us regarding remedial steps they intended to take. We have continued to review government reports and media accounts of the plight of UAC including, sadly, one who died while in the custody of the Office of Refugee Resettlement (ORR) in our state.

Since ORR recently announced a proposed rule to govern itself, and solicited public comment about the rule within a short timeframe, we felt the need to address this particular issue on an interim basis.

### A.

The United States Department of State[1] has announced a position regarding the priority it gives to the best interests of children:

> While the United States strongly supports child protection and takes into account the best interests of the child in certain immigration actions, it is not always a "primary consideration" in the immigration context.

It appears that ORR has taken this position as its own, and far too literally.

---

[1] "Revised National Statement of the United States of America on the Adoption of the Global Compact for Safe, Orderly and Regular Migration," (December 17, 2021). https://www.state.gov/wp-content/uploads/2021/12/GCM.pdf

1

CAR 063

We followed the Congressional testimony of the Director of ORR. Having seen and heard this testimony, we are not surprised that this person declined to appear before us despite invitation to do so. As Congressman LaTurner put it,

> Congress has been attempting to conduct proper oversight of the Office of Refugee Resettlement for years, yet Agency decision-makers have willfully obstructed our constitutional mandate, as detailed by a 2021 Senate Finance Committee report. ORR's behavior has drawn bipartisan condemnation, but it is not just the run-of-the-mill bureaucratic obstruction which I find most concerning. It is that *Agency decision-makers seem determined to undermine ORR's primary directive of safely relocating at-risk children*. Secretary Becerra has urged HHS employees to process UACs out of this program at assembly line speed, resulting in at-risk children being released to sponsors *without proper vetting, exploited for illegal child labor, and put at risk for human trafficking*.

Congressman Garcia summed up the success of the Director's testimony, aptly in our view:

> *I think I speak for probably all Majority Members on the panel, I am very disappointed of all the answers you were unable to give us*. … I am very disappointed that you do not know, percentage-wise, those 128,000 you did DNA testing on. I know the Border Patrol does it occasionally, and it is not unusual for them to find a situation in which they were lying about whether the kid is related or not. You do not know the percent of these kids who you talk to one parent and percent two parents. I would like to know that. I think it is relevant. ... There was a very good question here, the sponsor rejection rate, are any of these sponsors, you know, inadequate. You did not know what the percentage of that rate is. *The fact that we do not know where 85,000 unaccompanied minors are, according to The New York Times, is kind of scary.* …. You were unable to ask the question what is being done to prevent whistleblower retaliation and ensure reports are taken seriously. That is something we should know about, and I think we do not have an adequate response as to what we know about other people in these families. I mean, you imply that we found an uncle for this person. There are people who know their uncles like their brother, and there are people who have never met their uncle before in their life. And, you know, sometimes these sponsors are in a

**CAR 064**

household, maybe the one person we don't have a background check on, or we do a background check on, but other people we do not. So, a lot of people have been asking questions that, presumably, you will get back to us within a week or two with the answers. I am glad we had the hearing. I guess the takeaway on the hearing is, if you go with this open doors policy, part of the open door is going to mean we have a lot of unaccompanied minors detached from their parents coming to the country, and, not surprisingly, *we have no idea where they are winding up or no idea whether they are safe or not.*

Congressman Garcia inquired as to the rate at which DNA testing was being used to validate familial relationships. As we learned, not only have rapid DNA tests been exceedingly rare, they are now being *discontinued altogether*. This seems unwise. Rather than resolve questions about relationship and identity quickly, cheaply and with little intrusion or room for human error, HHS/ORR apparently prefer a longer, more expensive, and less reliable process of attempting to interview and obtain documents from foreign-born children and their potential sponsors to get the same information.

After giving the vetting process short shrift, ORR essentially washes its hands of responsibility for these children. ORR's repeatedly-announced position[2] that it "loses all jurisdiction" over UAC thirty days after placing them with a sponsor *appears to violate both federal law and the Flores Settlement Agreement* to which ORR professes fealty. Paragraph #16, as well as "Exhibit 2, Section e," of the Flores Agreement, states that [ORR] "may terminate the custody arrangements and assume legal custody of any minor whose custodian fails to comply with the [sponsorship] agreement." Yet despite this mandate, if a sponsor violates the agreement by "losing" the child, failing to ensure the child goes to court, failing to abide by federal and state child labor or truancy laws [Section 410.1306], or otherwise putting the child's welfare at risk, ORR's current policy considers this "not our problem."

Since ORR does not and will not "terminate custody arrangements," even in the case of sponsors who have abused and/or trafficked the children given to them, this section of the Flores Agreement appears to be *violated in a large number of*

---

[2] We point out that the United States Senate Committee on Homeland Security and Governmental Affairs explained the error of this position in 2018 and again in 2020: "HHS's interpretation of its legal responsibility for unaccompanied alien children, as defined by the Homeland Security Act of 2002, directly contradicts the plain language of the statute. . . HHS's refusal to take responsibility for these children after placement with a sponsor other than a parent or guardian undermines those children's safety, our immigration system, and the rule of law."

3

CAR 065

*cases handled by ORR for years.* This ORR policy appears more rooted in a desire to absolve ORR of the consequences of its placement policies than it does in faithful adherence to the actual laws supposedly governing that agency.

B.

We reviewed what appears to be an attempt by ORR to respond to the unflattering coverage that office deservedly received from multiple sources, including our Third Presentment and the New York Times' series of articles exposing the fact that ORR placed hundreds of children who ended up being exploited and harmed in labor trafficking scenarios around the country. In summary, ORR audited itself, checking records for a one-month period. Stunningly, ORR found that ORR complied with ORR's own policies, as interpreted by ORR.

ORR *still* had to admit that it had, *in that* **one-month period**, released *344 children to sponsors who each received three or more unrelated children*, yet conducted *home studies in only four* of those instances. Further, when ORR attempted its supposed "30-day follow-up phone calls" after divesting itself of the children, someone claiming to be the child was reached in 66% of cases, someone claiming to be the sponsor was reached in 84% of cases, and, within that month, *calls to 46 of those 344 children failed to reach either a sponsor or a child*. Another disturbing finding of their audit was that:

> of 172 cases[3] reviewed in depth, *12 children ran away from their sponsor and there were 34 reported caretaker changes*. Of those 34 reports, 12 children were referred to child protective services (CPS) of which 6, including four siblings placed with one sponsor and an additional two children placed with another sponsor, were removed from the home by CPS.

These are abysmal statistics. If ORR's one-month "self-audit" accurately reflects their success rate, *then every year they completely lose track of more than 500 children within the first month after placement and nearly 150 others flee their placements altogether.* This should reassure absolutely no one.

---

[3] ORR placed nearly 130,000 UAC in the year selected for its "audit." The fact that the agency reviewed *one-one-thousandth of one percent* (0.0011%) of them "in depth", yet *still* had the problems described herein, says much about the agency and its leaders' actual commitment to protecting these children—none of it good.

4

**CAR 066**

C.

These agencies have also claimed, including in Congressional testimony, that most UAC are "placed with a parent, legal guardian, or close family member." This is misleading on several fronts.

First, ORR places *more than two-thirds of its UAC with persons other than a parent*. Second, the evidence indicates that ORR takes extreme liberties with their definition of "close family member," many of whom are completely unknown to the UAC they are seeking to sponsor. It is not at all uncommon for these sponsors to be *complicit in funding criminal child-trafficking operations* by promising and/or paying coyotes or others to smuggle these children to the border in the first place (as some even admitted to the New York Times and other publications).

For reasons unknown, HHS/ORR **intentionally** do not ask these "vetted sponsors" about such activities, and actually discourage case managers from doing so on their own. As a direct result, we and others (the New York Times, Pro Publica, federal employee whistleblowers, CBS News, Congressional committees, and Department of Justice press releases, to name but a few) have documented a litany of instances wherein ORR and their NGO grantees have placed UAC with total strangers, illegal border crossers, MS-13 members, Transnational Criminal Organization (cartel) members, sexual offenders, and persons seeking to use them as sources of income from labor or government benefits.

HHS and ORR officials continue to publicly insist they "do everything we can" to ascertain the identity of sponsors. However, what happens in reality and practice, according to many witnesses who appeared before us, testimony before Congress, and multiple reports from watchdog agencies, including HHS' own Inspector General, is that case managers or others:

-*may* call a phone number in a foreign country to talk to a supposed parent of the child;

-*may* speak that person's language, or may be forced to use a translator;

-*do not* physically meet, or may not even see, whomever they speak to (parent or sponsor);

-to the extent they receive requested documents, they obtain them almost universally via "WhatsApp," their authenticity unverified;

**CAR 067**

-no longer demand any form of DNA testing, which would resolve any relationship questions very quickly; and

-*do not* subject *other* residents of the proposed home to even the minimal level of scrutiny required of sponsor applicants.

As a result of ORR's obfuscations, we had to learn through other sources of the myriad of children trafficked into sexual bondage and indentured servitude. Whether it was

-the Mexican national in Texas who pled guilty to running a house of prostitution featuring underage foreign children;

-multiple graphic accounts of children suffering crippling injuries working in slaughterhouses;

-MS-13 teens discovered posing as parts of a "family" crossing the border;

-the UAC who sodomized and murdered a girl with autism after being placed in her neighborhood;

-five-year-olds discovered by Texas troopers wandering between ports of entry in the desert; or

-the hundreds of UAC who end up in Florida's foster-care and dependency systems after failed sponsorships (just to name a very few of ORR-sponsored tragedies)—

it is time for the general public to know what is being done with taxpayer funds. Yet ORR and its kindred agencies do everything within their power—including retaliating against whistleblowers and ignoring subpoenas from both Congress and this jury—to keep this knowledge hidden, *not to protect UAC, but to protect themselves from exposure.*

We nonetheless obtained a tranche of information regarding hundreds of UAC placed in Florida approximately 18 months prior to our Third Presentment. The Florida Department of Law Enforcement undertook a massive investigation to ascertain whether, and to what extent, those children were safe and well. We were disheartened, but not surprised, to learn that after less than two years, more than half could not be located at all, and that multiple addresses turned out to be either invalid or not residential locations. These results confirm what witnesses told us, as reflected in our Third Presentment and in multiple reports in other fora:

6

**CAR 068**

ORR may be able to say they "place" UAC, but ***ORR certainly cannot make any credible claim that the UAC they "place" are safe, healthy, or even alive a short time later***.

The results also, unfortunately, mirror those obtained by the Department of Homeland Security's Inspector General, which reported on September 6, 2023, that "DHS Does Not Have Assurance That All Migrants Can be Located Once Released into the United States." Just as we learned was the case with ORR routinely "placing" UAC with phony people at phantom addresses, DHS-OIG learned that for the period between March 2021-August 2022, "addresses for more than 177,000 [migrants] were either missing, invalid for delivery, or not legitimate residential locations" and:

> Based on our analysis, 80 percent (790,090 of 981,671) of addresses were recorded at least twice during an 18- month period, some of which were provided by families upon release. More than 780 of these addresses were used more than 20 times. These families provided addresses that may be unsafe or have overcrowded living conditions based on multiple migrants using the same address. For example, DHS released 7 families, comprising 12 adults and 17 children, to a single-family 3- bedroom New Jersey home in a 70-day period. ... some ERO deportation officers identified addresses of parks and commercial retail stores migrants listed as the location at which they would reside. ... We also identified 7 addresses that were recorded more than 500 times, some of which were other Federal agency locations and charities. USBP agents may input charity addresses. However, charities only serve as temporary residences, not migrants' final destinations. Based on our analysis of USBP release data from March 2021 through August 2022, we identified at least 8,600 migrant release addresses associated with 25 charities.... Using additional analysis, one ICE deportation officer identified more than 100 migrants who used one individual's contact information as their point of contact in the United States.

> [Thus] "DHS may unknowingly release migrants, including children, to potentially unsafe conditions or smuggling operations."

In summary, we have witnessed officials of our own government make facially presentable claims without being required to answer basic follow-up

7

CAR 069

questions. We have asked those questions of witnesses before us who made similar claims. The evidence and answers we received prove those claims to be either half-truths or utterly false.

## II.

HHS/ORR have also published a Notice of Intent (RIN #0970-AC93, https://www.govinfo.gov/content/pkg/FR-2023-10-04/pdf/2023-21168.pdf) that the agencies are seeking to pass an administrative Rule which essentially codifies many of the abominable policies (such as lax vetting and waiver of background checks) we have documented here and elsewhere:

## A.

### *ORR wants to punish contractors / grantees and employees for calling the police.*

Section 420.1304(b) reflects a particularly obtuse philosophy: Keep police away at all costs.

Under proposed § 410.1304(b), involvement of law enforcement would be a last resort and *a call by a care provider facility to law enforcement may trigger an evaluation of staff involved regarding their qualifications and training* in trauma-informed, de-escalation techniques. ORR notes that calls to law enforcement are not considered a behavior management strategy, and care provider facilities are expected to apply other means to de-escalate concerning behavior. But in some cases, such as emergencies or where the safety of unaccompanied children or staff are at issue, care provider facilities may need to call 9-1-1. ORR also notes that proposed § 410.1302(f) describes requirements for care provider facilities regarding the sharing of information about unaccompanied children. Additionally, because ORR would like to ensure law enforcement is called in response to an unaccompanied child's behavior only as a last resort in emergencies or where the safety of unaccompanied children or staff are at issue, *ORR is requesting comment* on the process ORR should require care provider facilities to follow before engaging law enforcement, such as the de-escalation strategies that must first be attempted and the specific sets of behaviors exhibited by unaccompanied children that warrant intervention from law enforcement.

To the extent ORR is sincerely requesting comment, we would say: police should not be called "only as a last resort in emergencies." They should be called to

8

**CAR 070**

*prevent* children from being involved in emergencies in the first place. No caregiver should be disincentivized from summoning police when they feel circumstances warrant such a call. Police are far better equipped for such situations than any ORR employee.

B.

*ORR wants to give itself complete and unfettered discretion as to what constitutes basic vetting procedure for sponsors and children alike, which, as discussed in our Third Presentment, is wholly inadequate.*

According to ORR's Executive Summary, "The proposed provisions of this part would, in many cases, codify existing ORR policies and practices" when it comes to "Sponsor Suitability." To summarize ORR's request: All vetting measures are now *optional*.

Under proposal 410.1202, desire to be a sponsor

> may require a positive result in a suitability assessment of an individual or program prior to releasing an unaccompanied child to that entity, which may include an investigation of the living conditions in which the unaccompanied child would be placed and the standard of care the child would receive, verification of the identity and employment of the individuals offering support, interviews of members of the household, and a home visit.... ORR may consult with the issuing agency (e.g., consulate or embassy) of the sponsor's identity documentation to verify the validity of the sponsor identity document presented and may also conduct a background check on the proposed sponsor.... discretion to evaluate the overall living conditions into which the unaccompanied child would be placed upon release to the potential sponsor. Proposed paragraph (c) therefore provides that ORR may interview members of the potential sponsor's household, conduct a home visit or home study pursuant to proposed § 410.1204, and conduct background and criminal records checks, which may include biometric checks such as fingerprint-based criminal record checks on a potential sponsor and on adult household members, ... permits ORR to verify the employment, income, or other information provided by the individuals offering support....ORR will not automatically deny an otherwise qualified sponsor solely on the basis of low income or employment status (either formal or informal). 410.1204 indicates that "as part of the sponsor suitability assessment, it may require a home study[.]"... "ORR proposes it would consider the potential sponsor's

9

**CAR 071**

strengths and resources in conjunction with any risks or concerns including: (1) the potential sponsor's criminal background; (2) the potential sponsor's current illegal drug use or history of abuse or neglect; (3) the physical environment of the home; and/or (4) other child welfare concerns.

The only mandatory requirement is completion and submission of the sponsorship application. No other vetting measure is mandated. *No finding during the vetting process is automatically disqualifying, a truly disturbing commentary on ORR priorities.*

ORR is similarly lax when it comes to identifying whether UAC are, in fact, children or are actually related to their sponsors. One witness stated: "It is more difficult to adopt a pet from a local animal shelter, than it is to become the sponsor of an unaccompanied alien child." ORR knows this; in fact, ORR encounters the same difficulties when trying to determine whether UAC are in fact children or 24-year-old Hondurans who promptly murder their sponsors [as documented in our Third Presentment]. In sections 410.1702 and 1703, "*ORR acknowledges* the challenges in determining the age of individuals who are in Federal care and custody. These challenges include but are not limited to: *lack of available documentation; contradictory or fraudulent identity documentation and/or statements*; ambiguous physical appearance of the individual; and diminished capacity of the individual."

*Their solution: more of the same,*

including but not limited to: (1) birth certificate, including a certified copy, photocopy, or facsimile copy if there is no acceptable original birth certificate …; (2) authentic government-issued documents issued to the bearer; (3) other documentation, such as baptismal certificates, school records, and medical records, which indicate an individual's date of birth; (4) sworn affidavits from parents or other relatives as to the individual's age or birth date; (5) statements provided by the individual regarding the individual's age or birth date; (6) statements from parents or legal guardians; (7) statements from other persons apprehended with the individual; and (8) medical age assessments, which should not be used as a sole determining factor but only in concert with other factors.

This strikes us as absurd. ORR would credit the "statement of another person apprehended [read: *committing the crime of illegal entry*, 8 U.S.C. 1325] with the individual" but is reluctant to take a DNA sample. ORR would trust a "facsimile copy" or a "baptismal certificate" sent via "WhatsApp" but restrict the use of

10

**CAR 072**

medical age assessments--evidence which is used every day in our nation's courts—to a diminished role, "only in concert with other evidence." There is no legitimate reason for these proposals.

## C.

### *ORR wants to continue concealing information and deliberately ignoring the legal status of sponsors.*

Even when ORR does possess information about UAC and their sponsors, ORR refuses to let other agencies access that information.

ORR restricts sharing certain case-specific information with the Executive Office for Immigration Review (EOIR) and DHS that may dissuade a child from seeking legal relief, or that may bias the court's length of continuances." Further (410.1201(b)), "consistent with existing policy, *ORR would not disqualify potential sponsors based solely on their immigration status*. In addition, ORR proposes that it shall not collect information on immigration status of potential sponsors for law enforcement or immigration enforcement related purposes. *ORR will not share any immigration status information relating to potential sponsors with any law enforcement or immigration related entity at any time.* To the extent ORR does collect information on the immigration status of a potential sponsor, it would be only for the purposes of evaluating the potential sponsor's ability to provide care for the child (e.g., whether there is a plan in place to care for the child if the potential sponsor is undocumented and detained).

ORR would, then, apparently be content placing a child with a person currently under a deportation order from our courts. Yet the agency would not communicate to law enforcement that someone trying to obtain one or more children had been ordered removed due to being convicted of molesting children in their country of origin, or someone who committed multiple federal crimes by illegally re-entering after being deported four previous times.

## D.

### *ORR wants to change its rules to permit NGO "UAC care facilities" to operate in states which refuse to grant them a license, or in which they cannot get one, as well as in facilities which do not meet even current standards of care under the Flores Agreement.*

11

**CAR 073**

Florida is among the states that have declined to grant licenses to operate a placement facility that elects only to follow ORR policies rather than also complying with state laws regarding the care of these children. ORR has refused to permit its contracted facilities to comply with the requirements of Florida law. The agencies do not have valid licenses to operate in Florida if they accept ORR's contractual terms.

ORR has issued policy it now wants to actually codify to allow these places to continue taking ORR contract money to care for and place UAC, regardless of state law, and more concerningly, regardless of consideration for the safety of children which licensing is designed to enhance. ***At least one child has already died in an unlicensed ORR facility in Florida this year***.[4]

According to 410.1302,

The proposed definition of 'standard program' reflects and updates the term 'licensed program' at paragraph 6 of the Flores Settlement Agreement. The FSA does not discuss situations where states discontinue licensing, or exempt from licensing, child care facilities that contract with the Federal Government to care for unaccompanied children, as has happened recently in some states. ***ORR has included this proposed definition of 'standard program' that is broader in scope*** to account for circumstances wherein licensure is unavailable in the state to programs that provide residential, group, or home care services for dependent children when those programs are serving unaccompanied children.

This also meshes with the proposed new definition in section 410.1001:

Standard program means any program, agency, or organization that is licensed by an appropriate State agency, ***or that meets other requirements specified by ORR*** if licensure is unavailable in the State to programs providing services to unaccompanied children, to provide residential, group, or transitional or long-term home care services for dependent children, including a program operating family or group homes, or facilities for special needs unaccompanied children.

---

[4] https://www.tampabay.com/news/pinellas/2023/08/11/migrant-teen-died-after-seizure-safety-harbor-shelter-autopsy-shows/

12

**CAR 074**

*ORR wants to redefine acceptable placement facilities for UAC*, and to enable this seeks to introduce a newly-minted definition of "influx" and "emergency" and new authority these definitions grant to ORR, as well as substitution of "standard programs" for "licensed programs."

> ORR may place an unaccompanied child in a care provider facility as defined at proposed § 410.1001, including but not limited to shelters, group homes, individual family homes, heightened supervision facilities, or secure facilities, including RTCs. ORR proposes that it may also place unaccompanied children in out-of-network (OON) placements under certain, limited circumstances, …. In addition, *ORR proposes that in times of influx or emergency*, as further discussed in proposed subpart I (Emergency and Influx Operations), *ORR may place unaccompanied children in facilities that may not meet the standards of a standard program*[.]

Continuing the theme of wishing to expand the types of places it can send these children, ORR seeks to

> *replace its current long-term and transitional home care placement approach* with a community-based care model that would expand upon the current types of care provider facilities that may care for unaccompanied children in community-based settings …ORR would define 'community-based care' in § 410.1001 as an ORR-funded and administered family or group home placement in a community-based setting, whether for a short-term or a long-term placement. The proposed definition of 'community-based care' encompasses the term 'traditional foster care' that is codified at existing § 411.5. 'Community-based care' would be a continuum of care that would include basic and therapeutic foster family settings as well as supervised independent living group home settings for unaccompanied children, which are funded and administered by ORR.

ORR cannot adequately meet the requirements the agency is currently subject to; it therefore seeks radical redefinition of both the goals it is mandated to achieve and the processes whereby it is mandated to do so. *ORR should not be rewarded for chronic failure by a relaxation of the standards*. These are the lives of children we are discussing, not some depersonalized set of numerical values.

13

**CAR 075**

E.

*ORR wants to redefine words and phrases, including multiple terms from the Flores Settlement Agreement, in a way that gives ORR the ability to waive even more protocols and background checks.*

In section 410.1001, ORR seeks to change the definition of "influx" because

> The FSA defines influx as those circumstances where the INS has, at any given time, more than 130 minors eligible for placement in a licensed program. … The 1997 standard of 130 minors awaiting placement does not reflect the realities of unaccompanied children referrals in the past decade, in which the number of unaccompanied children referrals each day typically exceeds, and sometimes greatly exceeds, 130. To leave this standard as the definition of influx would mean, in effect, that the program was always in influx status.

This becomes evident when examining 410.1800, where ORR seeks leave to use an influx as an "exceptional circumstance" to relieve it of the duty to receive a child from other federal agencies within 72 hours. In other words, ORR wants to keep select parts of the Flores Agreement without setting it entirely aside, while at the same time, claiming that current realities make the strictures of the Flores Agreement impossible to fulfill.

ORR knows its facilities are overwhelmed with UAC and is unable to adequately run placement operations, so ORR proposes a Rule to allow for *less* scrutiny and care because of an influx environment. As ORR admits in Section 410.1801(d), it seeks to add language that

> ORR may grant waivers for an emergency or influx facility operator, either a contractor or grantee, from the standards proposed under § 410.1801(b). Specifically, waivers may be granted for one or all of the services identified under § 410.1801(b) if the facility is activated for a period of six consecutive months or less and ORR determines that such standards are operationally infeasible.

We presume this particular request is directly related to the publishing of a report on May 2, 2023 by the HHS Office of Inspector General entitled *"The Office of Refugee Resettlement Needs to Improve its Practices for Background Checks During Influxes."* This report documented a litany of extremely concerning failures on the part of ORR including (as we describe in a future section) the failure to run

14

**CAR 076**

background, fingerprint, Sex Offender Registry and Child Abuse/Neglect checks on hundreds of its own employees. ORR would rather change their own rules than fix the problems cataloged in that report. This puts children at greater risk, and is unacceptable.

As indicated in the Proposed Rule,

> ORR proposes that it would *consider additional factors that may be relevant to the unaccompanied child's placement*, to the extent such information is available, including but not limited to the following: danger to self and the community/others, runaway risk, trafficking in persons or other safety concerns, age, gender, LGBTQI+ status, disability, any specialized services or treatment required or requested by the unaccompanied child, criminal background, location of potential sponsor and safe and timely release options, behavior, siblings in ORR custody, language access, whether the unaccompanied child is pregnant or parenting, location of the unaccompanied child's apprehension, and length of stay in ORR custody. *ORR believes that this information, to the extent available, is necessary for a comprehensive review of an unaccompanied child's background and needs, and for appropriate and safe placement* of an unaccompanied child.

The current Rules give ORR the authority to consider these factors; to the extent ORR is requesting a new Rule to authorize such consideration, ORR should be directed to explain *why it is not already being done*.

F.

==ORR attempts to perpetuate its overstated claim of provision of services to UAC post-placement and conceal any records that might prove otherwise.==

ORR defines "provision" as follows (88 C.F.R. 68933): "ORR provides PRS by *funding providers to facilitate access* to relevant services"— in other words, by cutting a check to someone and *not by directly providing the services or ensuring their provision.* The HHS Secretary and ORR repeatedly tout their supposed provision of "post-release services" to UAC. We investigated this particular claim thoroughly and found that although many case managers reported they made "recommendations" or "referrals" for such services (medical, psychological, educational, or other) in somewhere around one-half of their cases, *none* of them could name or identify any person or agency *actually providing* such services here in Florida. We even learned that a number of companies advertising the provision

15

**CAR 077**

of services, when asked, admitted to us that they do not actually provide such services here. Nor do the case managers know whether children in fact receive services after placement, or for how long, since only the sponsor can ensure the child is given whatever is recommended. Also on page 68933, ORR admits that it "would not delay the release of a UAC if PRS are not immediately available."

To the extent that HHS/ORR officials claim children are *in fact* receiving the recommended services, we are unwilling to simply take them at their word, since *they also disclaim any authority and responsibility one month after placement*. Further, they are unwilling or unable to provide actual data, names, or any other detail they may have, in the supposed service of privacy.

ORR wants to redefine "Post-Release Services" (410.1001) to include

assistance linking families to educational resources [which] may include but is not limited to, in appropriate circumstances, assisting with school enrollment; requesting an English language proficiency assessment; seeking an evaluation to determine whether the child is eligible for a free appropriate public education[.]

ORR wants to be able to say they have given post-release services merely by having a child's English-speaking capacity tested. Further, ORR is going to make Post-Release Services mandatory **ONLY "during the pendency of removal proceedings for unaccompanied children for whom a home study was conducted."** ORR performs home studies in fewer than one percent of cases; accordingly, ORR could claim to be extraordinarily successful in the provision of PRS when in fact they do so only in a tiny fraction of cases. ORR already has the *authority* to perform more home studies but appears to lack the actual willingness to do so.

In 410.1210

ORR also proposes other circumstances in which it would require a home study. The second circumstance in which a home study is proposed to be required is before releasing any child to a non-relative sponsor who is seeking to sponsor multiple children, or who has previously sponsored or sought to sponsor a child and is seeking to sponsor additional children. The third circumstance in which a home study is proposed to be required is before releasing any child who is 12 years old or younger to a non-relative sponsor.

16

**CAR 078**

Again, we identified in our Third Presentment that ORR was absolutely failing to do this despite currently having authority to do so (*a claim acknowledged in the Proposed Rule*, Subpart C, 410.1200 (88 C.F.R. 191 page 68927)). While we think these home studies should be mandated, ORR should be required to explain this dereliction in failing to do them diligently thus far.

*Even though ORR still insists it has no legal custody over UAC after release to a sponsor, it seeks to prohibit anyone from ever seeing any records a UAC generates following release*, including in the event post-release services are provided. The UAC are supposedly long gone from its control, yet ORR still wants to be exclusively in charge of all their data.

> Under this proposed rule, ORR would consider all unaccompanied children's records, including those produced for PRS, to be included in the individual case file records of unaccompanied children, whether generated while the child is in ORR custody or after release to their sponsor. ORR also proposes in § 410.1303(g)(2) that the records in unaccompanied children's case files are the property of ORR, whether in the possession of ORR a care provider 108 See 8 FR 46682 (July 18, 2016) (stating that "[t]he case file contains information that is pertinent to the care and placement of unaccompanied children, including . . . post-release service records[.]"), facility, or PRS provider, including those entities that receive funding from ORR through cooperative agreements, and care provider facilities and PRS providers may not release unaccompanied children's case file records or information contained in the case files for purposes other than program administration without prior approval from ORR.

Hypothetically, if a UAC dies in a sponsor's care, ORR could prohibit release of any services or treatment records to the investigating agencies. ORR could easily conceal information in cases where it reflected poorly on ORR.

Finally, we note that although ORR is seeking to impose upon providers a slew of requirements for contracted agencies (410.1210), there is absolutely no mention of any penalty whatsoever for failing to do so—especially since ORR will not reassume custody under any circumstances. ORR is consistent in this regard; long on bureaucratic doublespeak, short on accountability.

17

**CAR 079**

G.

**_ORR wants to put the UAC in limited geographic areas—near the Southwest Border—but does not want to consider whether UAC might require greater care._**

In 410.1103, "ORR proposes to codify its existing policy that ORR make reasonable efforts to provide [group facility] placements in those geographical areas where DHS encounters the majority of unaccompanied children." Between 150,000 and 200,000 UAC entered our country this past year. We must ask why ORR would want to confine them to a small number of facilities in one section of the country, forcing ORR to construct new facilities to support them.

Another change to the language of the Flores Settlement Agreement proposed by ORR is the specification of circumstances that would result in a UAC being assigned to more restrictive placement. ORR wants to mandate that

> the existence of a report of a significant incident [an SIR, or a report of sexual abuse, rape, physical attack, etc.] may not be used by ORR as a basis for… restrictive placement" [Section 410.1303 and 1304, 88 CFR 191 page 68940].

Additionally the proposed Rule [88 CFR 191 page 68915, Sections 410.1103] would alter the Flores Agreement definition of "escape risk." The FSA requires that a prior escape from custody lead to a more restrictive placement. The proposed Rule allows ORR to disregard that factor in determining whether a UAC is a runaway risk, even though ORR acknowledges that this factor "overlaps with a concern that a UAC may not appear for immigration proceedings… and may also relate to potential danger to self or others."

H.

**_ORR is seeking significant, and expensive, expansion of a federal bureaucracy which has thus far failed miserably in its mission._**

The requests in 410.1308 and 1309, and 1901 and 1902, seek to create a brand new administrative process (complete with legal advice and "child advocates") for UACs unhappy with their group facility placement and sponsors who are DENIED custody to appeal ORR's decision. These appeals go to ACF (ORR's parent agency); this does not strike us as comforting.

Beginning with 410.2001, ORR states it wants to have created an "Ombuds Office" purportedly for "oversight," but it turns out to be utterly toothless. The Ombudsman would be created "with authority and responsibility to receive,

18

**CAR 080**

investigate and *informally address* complaints about government actions, make findings and recommendations and publicize them when appropriate, and publish reports on its activities… although an ombud's office *would not have authority to compel ORR to take certain actions*" and "will report directly to the ACF Assistant Secretary[,]" (*not* to Congress or anyone else). With this proposal, ORR is intentionally creating a convenient memory-hole for when something else inevitably goes wrong.

**Massive expansion of this bureaucracy**, including funding for more lawyers, "appeals personnel," and "child advocates" on top of already-existing case managers and staff, reveals the true nature of ORR's request: to erect even greater and more expensive bureaucratic walls between citizens and the information about how *public monies* are expended. Though ORR claims to fund 52 separate grantees, it (incredibly) insists the rule will not cost more for any of these new layers (except $1.7M for an Ombudsman). However, examination of the rest of the proposal discloses that ORR would absolutely disburse additional taxpayer funds to support this project: grantees who incur "additional costs associated with the policies discussed in this proposed rule that were not budgeted, and cannot be absorbed within existing budgets, would be allowable for the grant recipient to submit a request for supplemental funds to cover the costs." In addition to being expensive, this bureaucracy is likely to be ineffective, since it would first require a child to be identified as having been "trafficked or especially vulnerable" for a child advocate to be assigned. This is a status ORR historically has gone to great lengths *not* to identify when vetting potential sponsors.

I.

When a nation accepts the presence of unaccompanied children, whether they arrive by legitimate methods or not, it also as a matter of simple justice must accept the responsibility for their care and well-being. The set of rules proposed by ORR seems designed to smooth the path for entry and distribution of vulnerable children while absolving ORR of that responsibility.

If ORR were truly interested in rules to promote its claimed and statutorily-mandated mission—rules by which it might justify its budget— we believe it would instead prioritize the safety of UAC who enter our borders, by enacting the following provisions, at a bare minimum:

1) All sponsors claiming any familial relationship with a child *must*, without exception, submit to a DNA test, as must the UAC seeking sponsorship, to

19

**CAR 081**

determine whether such relationship actually exists. Sponsors who refuse shall not be granted custody under any circumstances; UAC who refuse shall remain in the physical custody of ORR. If the DNA results show the relationship not to exist, the sponsor shall not receive custody of the UAC and shall not be permitted to apply to sponsor any UAC in the future.

2) Any fraudulent representations by the sponsor applicant regarding this relationship shall be recognized as a possible crime and reported as such to both ICE and the state law enforcement agency having jurisdiction over the sponsor's residence.

3) ORR shall require every sponsor who is awarded physical custody of a UAC to notify ORR of any change of address by the sponsor or change in the whereabouts of the UAC within 72 hours. In cases where the UAC is placed with a non-related sponsor, ORR shall maintain at least verbal contact with each sponsor in intervals not exceeding sixty days, and failure to make contact with a sponsor shall require ORR to physically visit the UAC's address and verify the UAC's safety. Inability to contact both sponsor and UAC during such a visit shall require a report to both ICE and the state law enforcement agency having jurisdiction over the sponsor's residence. This shall continue until the UAC reaches the age of 18, is removed from the country, or is found to have fled placement.

4) ORR shall be required to report, biannually and in writing, to the Chair and Ranking Member of the House of Representatives Committee on Homeland Security, the rate of successful UAC contact during the above intervals, as well as the rate of unsuccessful contact.

We acknowledge that such rules would implicitly impose costs upon us and our fellow taxpayers (unlike ORR, we recognize and admit this fact). These are costs that decency requires a society to bear when it permits children to enter its borders who lack a legitimate caregiver. We also will discuss, in a forthcoming report, possible methods of defraying these costs.

III.

ORR has been given more than *two billion* taxpayer dollars every year since 2019 to serve the 150,000 children they have, however briefly, in their custody annually. Of course, ORR keeps children for as short a time as possible, sending

20

**CAR 082**

them through the sponsorship assembly line[5] within 3-4 weeks in most cases. Many of their daily reports indicate around 8,000 UAC in custody on any given day nationwide, a number which increased in the past three months to more than 10,000.

Despite spending an average of *more than $13,000 per child for this brief period*, however, HHS and ORR have demonstrated neither the willingness nor the ability to protect the UAC or our fellow citizens. Indeed, the HHS Office of Inspector General wrote in a May 2023 report that *ORR failed to even properly vet its own employees, let alone sponsors*. The OIG concluded that of a cohort sample of 229 employees, HHS failed to conduct FBI fingerprint checks at all on 191, failed to conduct Child Abuse and Neglect checks on 200 (*and that ORR had actually waived this requirement* for 51 of them), and failed to conduct Sex Offender Registry checks for 42 more.

Despite repeated reports from the HHS Office of Inspector General, Senate and House Committees, and even media—*for over a decade*—this agency has failed to remedy its pathetic performance or justify the billions allocated to it, which at this point appear to be doing little more than a building a pyre upon which the safety of children is sacrificed. This agency should not be given a new Rule that enshrines its ineptitude in official practice. Those who continue to fail these children have much to answer for.

*We ask that this Presentment, and our Third Presentment, be submitted as comments to HHS/ORR's Proposed Rule.*

We renew our recommendation to our state leaders, referenced in our Third Presentment, that all persons taking such custody of children in Florida be required to submit themselves to formal court adjudication to establish legal guardianship:

> Florida has a robust system for addressing custody of children, both temporary and permanent. When someone other than a Florida-born child's natural parent is obtaining custody, they are required to comply with Chapter 63 (adoption) and/or Chapter 751 (Temporary Custody, including by Extended Family members). These statutes involve the courts and other professionals in the process, and *we see no reason to require less legal protection for children born elsewhere.*

---

[5] HHS Secretary Becerra used precisely this language about UAC in a video interview we reviewed, stating that "If Henry Ford had seen this in his plants, he would have never become famous and rich. This is not the way you do an **assembly line[.]**"

CAR 083

Floridians cannot exercise direct control over immigration policy, nor over ORR's treatment of UAC. However, Floridians most certainly can and should exercise control over those living among us who seek out (for whatever reason) the responsibility of raising a child not their own. Indeed, for children born here, we already do. If, as Nelson Mandela said, "the true character of a society is revealed in how it treats its children," we implore our leaders to rescue the character of Floridians from the peril in which the behavior of ORR and its operatives have placed it—along with the children. Hopefully we can encourage safe and lawful transfer of UAC while deterring those who have less savory motives. Accordingly, we urge our legislature to do the following:

1) Mandate that any person residing (either temporarily or permanently) in this State, who obtains continuing physical custody of a minor child of whom the individual is not the biological parent or court-appointed legal guardian, including where that custody is conferred by an agency of any government, a Child Placement Agency as defined in Chapter 409.175, or any other company or organization, **must within thirty (30) days report that custody to the Department of Children and Families _and_ initiate proceedings under Chapter 63 or Chapter 751 of the Florida Statutes to determine legal custody of the minor child.**

2) ***Failure to do so should be a felony***, at least of the third degree, and could be easily incorporated as an additional section of Chapter 787.06 (Human Trafficking), 827.03 (Child Neglect), or as a standalone statute. DCF should be required to notify the Department of Law Enforcement upon becoming aware of such a situation. Repeat offenses on multiple occasions or involving multiple children should result in increased penalties. This statute should apply retroactively, to protect those already here. These crimes should also be authorized for investigation by the Department of Law Enforcement and prosecution by the Office of Statewide Prosecution since bringing children into the state affects every circuit.

We understand and appreciate that at current rates, this may add to the docket of civil cases statewide requiring a basic determination of UAC custody by Florida courts. We consider this a worthwhile use of resources if it can put a dent in the scourge of child-trafficking plaguing our state. We consider it our duty to protect children, regardless of where they might be from.

22

**CAR 084**

We have also been discussing ways and mechanisms to provide funding for such a project.

IV.

We say to those among us, particularly our fellow Floridians who generously donate to organizations (perhaps with names connoting religious affiliation, but in reality, absolutely corporate) which participate in this process, accepting ORR's grants of public funds and the entangling strings attached thereto:[6]

> Your actions come with a price. That price, as we and others have documented exhaustively in this and other reports, is the continued maltreatment and subjugation of foreign-born children to great risk of neglect, harm, labor and sex trafficking, and even death.

> We believe most who work in this industry are well-intentioned. We have met quite a few of them. We began this jury service as naïve as they appear to be. But just as we have come to question and understand the horrifying reality of this assembly-line approach to child custody (which would never withstand legal scrutiny if subjected to the requirements of traditional state-level child custody systems), employees and volunteers who continue to participate in this enterprise can no longer claim they do so without knowing exactly what it is they are facilitating.

> Let the publication of this Presentment serve as notice. There are many ways to assist these and other children which do not require becoming complicit in the current situation. We believe that we have done our part to help illuminate this travesty. What readers do with this information is up to them.

---

[6] ORR's collaborators include the CEO of one "non-government organization" who admitted to us that his corporation could not operate without federal funding; another who promised to consider information we gave him and suggest changes, only to report back to us six months later that he made no proposals and no changes were implemented; one who stated "it is bad policy, but [we] will continue to follow it;" and another who testified that he would follow ORR policies even in the face of contrary Florida laws.

23

**CAR 085**

Respectfully submitted to the Honorable Ellen S. Masters, Presiding Judge of the Twenty-First Statewide Grand Jury, this 20th day of October, 2023.

Foreperson Juror #18
Twenty-First Statewide Grand Jury

THE FOREGOING Third Presentment was returned to me in open court this this 20th day of October, 2023.

HON. ELLEN S. MASTERS,
Presiding Judge
Twenty-First Statewide Grand Jury

I, Nicholas B. Cox, Statewide Prosecutor and Legal Advisor, Twenty-First Statewide Grand Jury of Florida, hereby certify that I, as authorized and required by law, have advised the Grand Jury which returned this Report on this 20th day of October, 2023.

NICHOLAS B. COX
Statewide Prosecutor
Twenty-First Statewide Grand Jury

I, Richard Mantei, Assistant Statewide Prosecutor and Assistant Legal Advisor, Twenty-First Statewide Grand Jury of Florida, hereby certify that I, as authorized and required by law, have advised the Grand Jury which returned this Report on this 20th day of October, 2023.

RICHARD MANTEI
Assistant Statewide Prosecutor
Florida Bar #119296
Twenty-First Statewide Grand Jury

24

**CAR 086**

I, Robert Finkbeiner, Assistant Statewide Prosecutor and Assistant Legal Advisor, Twenty-First Statewide Grand Jury of Florida, hereby certify that I, as authorized and required by law, have advised the Grand Jury which returned this Report on this 20th day of October, 2023.

ROBERT FINKBEINER
Assistant Statewide Prosecutor
Twenty-First Statewide Grand Jury

FILED
JOHN A. TOMASINO
OCT 20 2023
CLERK, SUPREME COURT
BY

25

**CAR 087**

#174

# IN THE SUPREME COURT OF FLORIDA

CASE NO.: SC22-796

# FIFTH PRESENTMENT OF THE TWENTY-FIRST STATEWIDE GRAND JURY

We have now spent approximately 450 hours in session, and interviewed more than one hundred witnesses, some from as near as Polk County and others from as far away as Mexico, California, Argentina, and Panama. We consulted experts in multiple fields, academics, law enforcement officers past and present, defense attorneys, bureaucrats, intelligence officers, whistleblowers, ranchers, teachers, doctors, journalists, caseworkers, financial analysts, NGO employees, executives, treatment professionals, veterans, immigration judges and lawyers, victims, activists, immigrants, and even criminal defendants; we owe each of them a debt of thanks for giving us their time and attention. We watched hours of video, read stacks of materials now several feet thick, directed investigations and gave every effort to understanding, summarizing, and attempting to answer the questions posed to us by our Supreme Court. This is our fifth report.

The Order empaneling our jury instructs us to focus on those who arrive illegally to our country and thence to our state, those individuals or organizations who assist this enterprise, and certain crimes that might be committed *en route* to or following arrival in Florida. Our mandate is NOT to rewrite federal immigration policy; rather, it is to explore whether there is criminal activity affecting our State, how it is made possible, and what, if anything, might be done by our state leaders to address it.[1]

We felt obligated to investigate sufficiently to determine that we had an accurate picture of the conditions at our nation's southern, northern, and coastal borders which might produce these effects. We learned that, if anything, many Floridians are (just as we were before undertaking this inquiry) almost dangerously naïve and unaware of the true magnitude and malevolence of the illegal immigration

---

[1] We will focus on *illegal* immigration, not claims of refugee status, visa admissions, Temporary Protected Status, or other means of entry except to note them in context with the numbers entering or remaining other than lawfully; we also focus on illegal immigration specifically to our country and state, as opposed to generalized worldwide movement.

1

CAR 088

industry. What we discovered has been at varying times sobering, upsetting, depressing, and the cause of significant outrage.

The short answer is that there are most certainly crimes being committed, including by some of our fellow state residents, which abet transnational and local criminal organizations and individuals in their trafficking of people (including and especially children), criminal actors, fraudulent documents, and drugs into our state, extracting money in return. These crimes are sometimes actually enabled by governmental agencies, policies, and activities; and there are things that can be done about them.

We are also convinced that, *because* the driving forces are largely federal policies, and political incentives seem to not prioritize solving the problems, it will be up to Florida and other states to help themselves, at least in the short term. We herein propose several ways that might happen.

CAR 089

## A WORD ABOUT RETALIATION

"I am a firm believer in the people. If given the truth, they can be depended upon to meet any national crisis. The great point is to bring them the real facts."

—Abraham Lincoln

We have met with a number of courageous individuals who provided us with testimony and other evidence despite knowing they would be, and in some cases had already been, targeted for retaliation by their NGO (Non-Government Organization) and/or government agency employer if their cooperation were made public.

While we have kept their identities confidential, they know who they are. We hope they also know they have our gratitude for being willing to meet and share their stories with us, even at personal cost.

We consider it despicable that government agencies such as HHS, ACF, ORR, and DHS, as well as NGOs funded by grants of taxpayer money, would seek to prevent us from gathering information. This is, however, a pattern; last year the HHS Office of Inspector General found that HHS treatment of multiple other whistleblowers "may have risen to the level of whistle-blower chilling."

We are aware that other witnesses were ordered by bureaucrats and their lawyers not to appear, to refuse to provide some documents or answer some questions, or to withhold information and subject themselves to contempt and jail even in the face of subpoenas issued under the auspices of the Supreme Court of Florida. No one in the public is served by such behavior, and those responsible for actively impeding our investigation should be ashamed.

We are heartened that some defied these directives and appeared anyway. We know the price some of these witnesses have paid. While this obfuscation made it more difficult to gather a full perspective of the situation, these rogue agencies should know we nonetheless found it possible. And since our previous reports have exposed profound ineptitude (at best) or malfeasance in several of those agencies, we now understand why they did not want to be questioned. _Government employees theoretically work for the citizens they serve; some have exemplified that, while some clearly need reminding_.

3

**CAR 090**

## I.  INFLUX, IN FLUX

To understand the context in which these things are occurring, we sought to learn what policies appeared to be in place which might be described as "root causes" of fluctuations in migration to this country, and whether those policies appear to be deterring, encouraging, or exacerbating the activity we describe herein. Without overtly commenting[2] on the wisdom of particular choices, we believe we have more than enough information to ascertain (a) which policies are currently in effect and (b) what outcomes those policies produce both in countries outside our borders, and within our own country and state.

These are the policies, and these are their effects.

### WHY

It has long been a matter of common sense and national policy that, in the words of one former President:

"***We simply cannot allow people to pour into the United States undetected, undocumented, unchecked, and circumventing the line of people who are waiting patiently, diligently, and lawfully to become aliens in this country.***"

-Barack Obama (2005)

However, in January, 2023, the current President signed and publicly touted the "Declaration of North America," which referenced several prior announcements and included the following language:

The three countries of North America each made ambitious commitments under the Los Angeles Declaration, including working together to ***advance labor mobility*** in North America, particularly regarding regular pathways, and have been delivering on these commitments. Since June, Mexico, the United States and Canada have collectively ***welcomed record numbers of aliens*** and refugees from the Western Hemisphere under ***new and expanded labor and humanitarian programs***. Today, we affirm our joint commitment to safe, orderly, and humane migration[.]

The "Declaration" reiterates policies set forth previously in a series of four Executive Orders from 2021, EO 10410-10413, the first being titled *Creating a*

---

[2] Certainly, we have opinions about the wisdom of some of these policies, informed by our year-long investigation. We do not need to express them all to answer the questions posed to us.

4

**CAR 091**

*Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border.*

These policies are **explicitly designed to encourage people to leave their countries of origin and come the United States** for economic benefit; in short, as will be explained, these executive-branch policies *affirmatively contravene longstanding statutory and Constitutional laws*, as repeatedly interpreted by federal and state courts of every level.

The policies, via the public pronouncements of the Executive branch, including the Secretary of the Department of Homeland Security, place emphasis on "processing efficiency," with expediency as a goal in itself, in order to:

"Increase processing efficiency" and "streamline processing" to "further facilitate safe and orderly inspection of noncitizens"; and,

"Increase civilian processing personnel" to "perform those functions" and enhance "processing efficiency."

Efficiency is not synonymous with safety, intelligence, or integrity. It appears to be the current policy's desired end, rather than its means. ***Rather than discourage or at least reduce*** the magnitude of the current mass relocation movement, the announced policies only seek to "streamline" it and make it "more efficient."

Others have compounded the effects: for example, the Mayor of New York City addressed the legislature of the Mexican state of Puebla with these words:

We are neighbors. We are familia. *Mi casa es su casa*. Your struggles are my struggles.

We have received ample evidence and testimony, both expert and eyewitness-- including from some who were born outside this country themselves-- that those in foreign lands share sophisticated communications networks and pay heed to policy announcements such as those listed above. We can hardly blame them for interpreting such statements as an invitation to trek to this country specifically to be "efficiently processed" to "advance their labor mobility."

5

**CAR 092**

## HOW

### A. CAPITALIZATION

Our federal government also speaks with its pocketbook. Once here, many of those claiming asylum (of whom as much as 50% fail to even appear for a hearing; once finally held, almost 90% of those who do appear are found to have no credible claim deserving asylum status)[3] qualify for and receive benefits during their period of residence such as Temporary Assistance for Needy Families (TANF), Supplemental Nutrition Assistance (SNAP), Medicaid, Women, Infants, and Children (WIC) benefits, and public school education (including breakfast and lunch programs). These benefits can be claimed for years, even *after* an alien[4] is ordered removed by the courts. Of course, many primarily come looking for jobs, which generally pay far better than those at home.

The availability of so many benefits seems bound to provoke the response we have seen. According to our law enforcement witnesses at both the state and federal levels, more than 2,400 aliens (not including UAC) have been shipped by the federal government *to just two sections of Florida in the first week of November, 2023*; at that rate, more than 100,000 will have joined our population this calendar year. The States of Illinois and Massachusetts and the cities of Chicago, Washington D.C., and New York have all declared a State of Emergency due to a tiny fraction of this population arriving within their borders; New York City has actually begun giving them plane tickets to a destination of their choice in other parts of the world.

### B. MANIPULATION

*Billions* of dollars of grant funds are disbursed every year by federal agencies to Non-Government Organizations (NGOs)[5], many of which also receive financial aid from groups affiliated with the United Nations. These monies are not spent accountably. For example, on March 28, 2023, the DHS Inspector General released a report following its audit of funds awarded to FEMA's Emergency Food and Shelter Program, used by NGOs to assist illegal aliens encountered at the southern

---

[3] We interviewed former immigration judges, immigration attorneys, academics, and advocates, and reviewed multiple reports; the conclusions were remarkably consistent.

[4] 8 U.S.C. 1101(3), the Immigration and Nationality Act, employs this term throughout, as will we: "The term 'alien' means any person not a citizen or national of the United States."

[5] For example, the UAC program administered by HHS alone doled out $2.7 billion to NGOs last year ($15.6 billion since 2008), or more than $20,000 *per child*. HHS also gave two non-UAC no-bid contracts to a single NGO totaling $617 million.

CAR 093

border. Of $12.9 million examined, the NGO awardees were unable to account to the DHSOIG for $7.4 million (58%). Nonetheless, FEMA's Shelter and Services Program (SSP) for NGOs sent another $77 million, bringing the total to around $291 million this year alone. We also heard from witnesses and examined annual reports from some of these NGOs, learning that in some cases more than 70% of their funds were spent on salaries (with many executives making several hundred thousand dollars annually) and "expenses" unrelated to actual alien service.

The DHS Secretary also recently requested ***an additional $1.4 billion to do more of the same***:

> We are taking steps to ***speed work authorizations*** for those who are eligible. The supplemental request includes … An additional $1.4 billion in SSP [Shelter and Services Program] grants to local governments and ***non-profits*** for temporary food, shelter, and other services for recently arrived aliens.

The river of accountability-free money has absolutely polluted the entire process.

Given the breadth of our mandate, we focused on transnational criminal organizations and illegal immigration (detailed further at other sections of this report); we discovered, however, that there are also "legal" organizations who appear to be misusing federal contract monies and their "nonprofit" status ***in order to abet the process, and likely the actors, responsible for the illegal activity we are describing***. In fact, several ***NGOs actively obstructed our investigation***, refusing to provide subpoenaed information and refusing to answer some direct questions (supposedly under orders from the federal government, in the person of the Agency for Children and Families, a subsidiary of the Department of Health and Human Services)[6]. They (or at least the multiple lawyers they hired, whose correspondence we reviewed) know the law regarding our jury's term of service; they know that even if we sought to have them held in contempt, they could delay final court action until

---

[6] We at least have company. The Chair of the House Committee on Homeland Security wrote to DHS on August 21, 2023:

> As outlined in my August 3 letter, over the course of several months, the Committee made numerous attempts to accommodate the Department's production of the documents and information at issue. The requests from the April 27 letter, however, remain unsatisfied and are now 102 days delinquent with no definitive timeline for production. Most recently, when the Committee offered another telephone meeting to secure a production schedule, the Department ignored the Committee's offer and instead has continued to cast doubt on any definitive timeline for future production. This demonstrated approach to indefinitely protract production necessitates the enclosed subpoena.

7

**CAR 094**

our term expires, successfully "running out the clock."[7] *We recommend that our leaders consider the formation of another Statewide Grand Jury solely to investigate their questionable activities* within Florida and their operations outside our borders which result in the use of taxpayer and donor funds to break, and help others to break, both federal and state laws.

These NGOs do not truly or exclusively operate as humanitarians. They do not spend federal grant money to convince alien populations *not* to risk a life-threatening odyssey. Rather, they magnify the magnetic illusion of economic prosperity at the end of a migratory trek. They provide cash cards, cell phones, and transport vehicles and what amount to safari-style guide maps through portions of jungle and across deadly terrain, *increasing* the number of individuals who thus elect to make the journey and enabling Transnational Criminal Organizations to amass fabulous wealth and a bottomless pool of victims in the process. As far back as 2017, DHS and the Rand Corporation found that up to two thirds of aliens from the Northern Triangle hired smugglers to get to our borders, profiting smuggling organizations well over $2 billion just from these countries. Those numbers have jumped astronomically with the advance of time and increased population flow.

## C. DEPRIVATION

We received eyewitness testimony from individuals who live in Panama and others who have made this very journey recently and they recounted the conditions we report herein: the interminable trudge across unforgiving jungle mountains, the tiny boats and crowded buses, the endless caravans of people from all parts of the planet, the Mexican train referred to as "The Beast," and every gory detail of the inhumane conditions; one was even struck by disease and kidnapped by an armed gang in Mexico just prior to reaching the U.S. border. CNN described a portion of the level of unrelenting misery involved in this journey:

> Masked robbers and rapists. Exhaustion, snakebites, broken ankles. Murder and hunger. Having to choose who to help and who to leave behind.

> Almost 250,000 people made the crossing in 2022, fueled by economic and humanitarian disasters – nearly double the figures from the year before, and

---

[7] Likewise, we will not identify these groups here by name. If we were to do so, Florida law gives them the right to ask the courts to conceal this entire report (and the right to appeal any adverse decision), and thereby delay its release—and we have no doubt they would exercise this right. We may instead identify them in a separate report. If the publication of that report is delayed, readers will know how, why, and who is responsible.

CAR 095

20 times the annual average from 2010 to 2020. Early data for 2023 shows six times as many made the trek from January to March, 87,390 compared to 13,791 last year, a record, according to Panamanian authorities.

Along the way, it became evident that the cartel overseeing the route is making millions off a highly organized smuggling business, pushing as many people as possible through what amounts to a hole in the fence for migrants moving north, the distant American dream their only lodestar.

But many are naïve to what lies ahead. They've been told that the days of trekking are few and easy, and they can pack light. But money, not prayer, will decide who will survive the journey. This cash has made an already omnipotent cartel even more powerful. This seems to be a no-go area for the Colombian government.

Migrants at the Acandí Seco camp are given pink wristbands – like those handed out in a nightclub – denoting their right to walk here. … People are the new commodity for cartels, perhaps preferable to drugs. These human packages move themselves. Rivals do not try to steal them. Each migrant pays at least $400 for access to the jungle passage and absorbs all the risks themselves. According to CNN's calculations, the smuggling trade earns the cartel tens of millions of dollars annually….

The volume of children is staggering. Some are carried, others dragged by the hand. The 66-mile route through the Darién Gap is a minefield of lethal snakes, slimy rock, and erratic riverbeds, that challenges most adults, leaving many exhausted, dehydrated, sick, injured, or worse….

Yet the number of children is growing. A record 40,438 crossed last year, Panamanian migration data shows. UNICEF reported late last year that half of them were under five, and around 900 were unaccompanied. In January and February of this year, Panama recorded 9,683 minors crossing, a seven-fold increase compared to the same period in 2022. In March, the number hit 7,200.

The main, older route, via a crossing called Las Tecas, had become littered with discarded clothes, tents, refuse and even corpses….

Wilson, aged about five, he has been separated from his parents. They gave him to a porter to carry, who raced ahead. Wilson shakes his head emphatically when asked if he is going to the US. "To Miami," he says. "Dad is going to build a swimming pool."…

CAR 096

Jose barks chilling advice: "Take care of your children! A friend or anyone could take your child and sell their organs. Don't give them over to a stranger."…

Around 2,200 Chinese citizens made the trek in January and February this year – more than in all of 2022, according to Panamanian government data….

Like many here, Natalia says she was told the walk would be a lot shorter – only two hours' descent ahead, she says. The scale of the deceit has begun to emerge, and the ground is about to literally turn on them. Jean-Pierre was told the whole walk would last 48 hours. "Right now, I don't have enough food," he says. Natalia, who has been reunited with her daughter, Anna, says she was told the descent to the boats from the summit would last only two days. It will be at least three. "'No, your daughter can walk, this is easy,'" she says she was told by a Colombian guide. "But it's not… since then, all I do is pay and pay," she sobs. She and Anna are unable to move forward and are running short on food….

Standing on the riverbank, watching others stumble through the water, Carolina, from Venezuela, weeps. "Had I known, I would not have come or let my son come through here," she says. "This is horrible. You have to live this to realize crossing through this jungle is the worst thing in the world."… "I regret putting my son through this jungle of hell so much that I have had to cry to let it all out because I risked his life and mine," she adds, gazing toward the river…

We soon stumble upon a few of them. A corpse wearing a yellow soccer jersey and wristband, his skull exposed. Further up the path, a foot can be seen sticking out from under a tent – a makeshift cross left nearby in hurried memorial. Elsewhere, the body of a woman, her arm cradling her head. [A]necdotal reports suggest that many who die on the route are never found or reported…

Another mile upstream is what appears to be a crime scene. Three bodies lie on the ground, each about 100 yards from each other. The first is a man, face down on the roots of a tree, rotting on a pathway. The other two are women. One is inside a tent, on her back, her legs spread apart. The third is concealed from the other two behind a fallen tree along the riverbank. She lies face down, found by migrants, according to photographs taken three weeks earlier, with

CAR 097

her bra pushed up around her head. There are injuries around her groin and a rope by her body…

A forensic pathologist who studied photographs of the scene at CNN's request and didn't want to be named discussing a sensitive issue, said there were likely signs of a violent death in the case of the one woman with a rope near her body, and the other two bodies – the man and woman – likely, "did not die of natural causes."…

Jorge, who is on his second bid to cross into the US, where his brother lives in New Jersey. His first attempt ended with deportation back to Venezuela. Both of his journeys have been marred by violence. Just days earlier, further up the old route near the Colombian border, men in ski masks robbed his group…

"When we were coming down Cañas Blancas, three guys came out, hooded, with guns, knives, machetes. They wanted $100 and those that didn't have it had to stay. They hit me and another guy - they jumped on him and kicked him," he said, adding the group had to borrow from other walkers to pay the $100. "That's the story of the Darién. Some of us run with luck. Others with God's will. And those that don't pass, well they stay and that's the way of the jungle…

And when they finally reach the boats, their ordeal is not over, but extended. Lines curve along the riverbank for each canoe – wooden vessels known as "piraguas" crammed full of migrants each paying $20 a head. The boats arrive constantly, perhaps six at a time, to cater to the volume of migrants – each making $300 when full.

"When I got here in the early morning, only four buses left," Manuel says. Next to him, one of his sons vomits onto the plastic mattress they are all trying to rest on. "The oldest, 5-year-old, has diarrhea, fever and [has been] throwing up since yesterday. Our 1-year-old has heat stroke. All that we want is a bus," he says.

A pregnant woman adds: "We've been here for nine days. I'll be close to giving birth here. They don't give us answers. They have us working and don't give us a 'yes, it's [time] for you to leave.' In the end, they lie to us."

Diarrhea, lice, colds – the complaints grow. They point towards the appalling hygiene of the shower blocks, where dirty water just drains onto the ground

11

**CAR 098**

outside. The nearby wash basins are worse: no water and human feces on the floor.

"The whole point of surviving the jungle was for an easier way forwards, and now all we are is stuck," says Manuel. "I was starting to have nightmares. My wife was the strong one. I collapsed."

Their dream of freedom must wait, for now replaced by servitude to a system designed to make them pay, wait, and risk – each in enough measure to drain their cash slowly from them, and keep them moving forward to the next hurdle.

https://www.cnn.com/2023/04/15/americas/darien-gap-migrants-colombia-panama-whole-story-cmd-intl/index.html

We have seen charts and advisory pamphlets showing aliens possible routes of travel (none of which warn, for example, that the territory about to be entered is controlled by violent cartels) handed out by NGOs. We have seen makeshift and expanded "camps" set up as way stations in the middle of places like the Panamanian jungle to help ferry aliens up the Central American peninsula. We have seen the signs on these soft-sided structures advertising the names of these organizations.

We have seen videos showing the squalor of these camps and the treacherous, muddy, disease-infested and flooded conditions through which these people travel. We have seen the virtual destruction of native settlements by erection of NGO way stations which effectively drown the native village in a tsunami of human misery. We have seen the United Nations International Organization for Migration (UN-IOM) branded "rape kits" containing condoms, a whistle, and "morning after pills" funded by the U.S. Department of State, and other items these groups distribute to females, knowing in advance that many of them will be raped along the way; we have been shown the "rape trees" on which cartels and gang members hang their "trophy" lingerie in the deserts of Mexico and Texas. Doctors Without Borders published a recent survey wherein 68% of women, and 17% of men, reported being sexually abused during their trip to this country; testimony before the House Subcommittee on Oversight of DHS in 2021 put that figure at 80%.

We have reviewed videos and photos of fashionably-attired or fully weaponized cartel representatives transacting "business" in these villages, and the massive amounts of trash and debris left behind in what was pristine jungle or choking once-fertile watersheds. We have seen and heard people being robbed,

**CAR 099**

beaten, raped, maimed and murdered (including being beheaded or doused in gasoline and burned alive); we have viewed gun battles between Panamanian defense forces and the cartels and paramilitary gangs that control virtually every section of the route; we have seen these criminals selling children into bondage and burning dismembered torsos of aliens who literally walked into their trap courtesy of these NGOs. We have seen the bodies literally strewn along a trail "parents" force their children to pass and corpses stacked like cordwood in the backs of sun-baked semitrailers. We have seen airplanes packed full of unaccompanied alien children, fleets of boats brimming with passengers to the point of capsizing heading up muddy reptile-infested rivers and swamps, convoys of buses traversing rutted dirt roads and trains overflowing with travelers stacked on rooftops of railcars, hanging off siderails, or getting their legs chopped off under the wheels. And we have seen "parents" physically force wailing children through barbed concertina wire and across predator- and disease-infested bodies of water, with not just the blessing but the active assistance of NGOs spending billions of federal dollars.

One of the most difficult portions of this route from South America is the Darien Gap, a jungle covering the connection of Central and South America. Panama's National Immigration Service documented over 400,000 people attempting to traverse this terrain last year, by far the highest number ever recorded. The United Nations Missing Migrants Project reported that in 2022, 1,457 fatalities were confirmed to have occurred along routes to the Americas, marking not only the deadliest year in recent history but terming "the growing death toll a humanitarian emergency of great dimension[.]"  Even so, the Project was careful to note that its data likely represented a massive undercount ("due to the great challenges for data collection"), perhaps representing only half the true toll (based on surveys of people actually passing along the routes).

Psychological services are offered by NGOs for those previously refused entry at the U.S. border after failing their credible fear interviews in which psychologists help asylum seekers retrieve "repressed memories of trauma," so that they could return to the U.S. border for a second attempt. Pamphlets from the UN-IOM and UN High Commissioner on Refugees contain instructions on how to successfully answer asylum-related questions to thus circumvent U.S. law.

13

**CAR 100**

## D. EXPLOITATION

None of this is "safe," "dignified," "regular," or "humanitarian." It is a massive tragedy, funded with monies from our national treasury, and it is disheartening that much of it could be labeled "Made in U.S.A." *If these actions occurred within our borders, many of these individuals would be arrested for human trafficking, human smuggling, immigration fraud, child abuse, and manslaughter, to name just a few of the atrocities we have witnessed.* Yet our government and its NGO collaborators do not use these billions of contract-granted funds to *reduce* the massive flow of people or dissuade them from undertaking a trip that will cost many their health and personal safety if not their very lives; the reality is quite the opposite.

## E. CORRUPTION AND EXTORTION

Besides enriching cartels and TCOs by funding and encouraging this debacle, current U.S. policies have apparently prompted **foreign governments** to *also* engage in profiteering:

- Government officials in Colombia are selling organized "guided tours" to various points along the most common routes of travel out of their country.
- Nicaragua does not require visas to enter from other countries, and the president of Nicaragua has used 260 charter planes full of aliens from Haiti (approximately 31,000 Haitians and 17,000 Cubans) to charge between $3,000 and $5,000 each to permit the aliens to land in Nicaragua and make their way north to the U.S. border. Nicaragua is seeking a loosening of sanctions imposed by the United States in order to reimpose restrictions on this flow, much as Venezuela did last year. The Haitian government canceled the flights.
- HSI conducted a joint human smuggling interdiction operation in 2022 which resulted in the rescue of 77 migrants and the arrests of six employees of the federal migration service for Panama.
- The New York Times reported that in October, the Costa Rican government declared a national emergency and formed a plan with Panama to shuttle migrants from its southern border to its northern one. ...Similar busing programs have also emerged in parts of Honduras and Mexico. The buses in Costa Rica transport an average of 1,600 people per day or more than 11,000 per week. There are some weeks when the total is closer to 14,000.

14

**CAR 101**

- President Rodrigo Chaves of Costa Rica just visited the White House in August where "The two leaders reaffirmed our commitment to advance the goals outlined in the *Los Angeles Declaration* on Migration and Protection. In support of these efforts and to stabilize flows and offer opportunities to migrants and refugees, *the Department of State is contributing more than $12 million through international organization partners* in Costa Rica." …In Panama, each person must pay $60 to be bused to Costa Rica's main terminal. They then must pay another $30 to board a shuttle that will take them to the Nicaraguan border. The fees are collected by the bus companies, which are licensed by the governments…. A Costa Rican police coordinator told the NY Times, "This migration flow couldn't be stopped, it can't be prohibited, but *it can be administered*." The president of Costa Rica's chamber of tourism affirmed: "*At least this bus system gets the problem elsewhere rather than keeping it here*."
- Multiple countries along this route now count as a significant portion of national Gross Domestic Product (GDP) funds wired to them from places in the United States (discussed further below). Mexico, for example, received more than *57 billion dollars* from United States wire transfers last year alone.

We recognize that some of these countries are faced with a Hobson's choice; they are going to be overrun with travelers who are crashing their borders in a quest to get to the United States. Countries caught in between can either try to resist this flow (none of them have anywhere near the resources and capability to do so by themselves), or make the best of what U.S. policies are forcing upon them.

Thus, foreign governments, with the help of NGOs and the willing participation of agencies of our federal government, are not only turbocharging this process, they are directly profiting from it.

**CAR 102**

These are the policies.





16

**CAR 103**

And these are their effects.

 



 

17

CAR 104

## II. ASYLUM AND PAROLE: THERE'S AN APP FOR THAT

The testimony and evidence we received, from migrant and alien interviews and virtually every single source and witness, was that the overwhelming majority of those arriving at the border to our country who eventually claim to be seeking **_asylum_** say they do so because they are pursuing a "better life," defined as one with economic opportunities not present in their home countries.[8]  This is confirmed by examination of the pattern of remittances returned to assist family and friends in home countries, and the massive portions of Gross Domestic Product (GDP) those remittances constitute in the home countries (described below).

And yet, as this country's highest courts have repeatedly made clear, our laws **_do not_** grant asylum for such purposes, which is why, according to public statistics and the sworn testimony of multiple witnesses (immigration defense lawyers, academics and professors, expert witnesses, and law enforcement officials both state and federal) more than 90% of these individuals rightly lose their claims and become court-ordered for deportation:

> "[N]either economic hardship nor generalized violence can form the basis for a successful asylum claim. See 8 U.S.C. 1158(b)(1)(B)(i); *Melgar de Torres v. Reno*, 191 F.3d 307, 314 (2d Cir. 1999).

Lopez-Cabrera v. Garland, 20-2954-AG, 2021 WL 5105839, at *2 (2d Cir. Nov. 3, 2021).

> "It was clear at the outset ... that [petitioner's] claim for asylum was based solely on economic reasons, and therefore would not merit relief."

Freza v. Attorney Gen. United States, 49 F.4th 293, 300 (3d Cir. 2022).

---

[8] There are more than a few, however, who enter for the explicit purpose of committing crimes including human trafficking, drug trafficking, money laundering, gang activity, and terrorism. Border Patrol arrested **172 denizens of the Terror Watchlist (double last year and more than the past six years combined), 598 gang members (178 from MS-13 alone), 998 persons with active warrants and 15,267 known convicted felons** (35% more than last year) this past fiscal year alone and seized 27,000 pounds of fentanyl **(enough to kill every American 18 times)**.Given the ease with which *legal* entry may be made for the purpose of seeking asylum, the nearly 700,000 *known "gotaways"* (those who are seen live or on camera crossing illegally but elude capture) and untold number of *unknown gotaways* can safely be presumed to contain a significant number of persons who have some reason—likely not a beneficent one—for actively avoiding encounters with those who enforce our laws.

18

**CAR 105**

"For economic deprivation to constitute persecution, "an asylum applicant must offer some ==proof== that he suffered a ==deliberate== imposition of substantial economic disadvantage.""

Maldonado-Luna v. Garland, 20-868, 2022 WL 468511, at *1 (2d Cir. Feb. 16, 2022).

Moreover, as reflected in 8 U.S.C. 1324, which was recently upheld by the United States Supreme Court,[9] anyone who

> (iv) encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law; or …

> (2) Any person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien shall, for each alien in respect to whom a violation of this paragraph occurs—

> (A) be fined in accordance with title 18 or imprisoned not more than one year, or both.

The most recent census data, as well as multiple reports we have reviewed, indicate that close to 1,000,000 individuals currently residing in our state are illegally present in the country, having crossed the international border (via land or sea) at some place other than a designated port of entry.

==_**It is, in fact, a federal crime to enter our country in such a fashion**_==. §8 U.S.C. 1325 unequivocally states that

> Any alien who (1) enters or attempts to enter the United States at any time or place other than as designated by immigration officers, or (2) eludes examination or inspection by immigration officers, or (3) attempts to enter or

---

[9] "A federal ==law prohibits 'encourag[ing] or induc[ing]'== illegal immigration. 8 U.S.C. § 1324(a)(1)(A)(iv). After concluding that this statute criminalizes immigration advocacy and other protected speech, the Ninth Circuit held it unconstitutionally overbroad under the First Amendment. That was error. Properly interpreted, ==this provision forbids only the intentional solicitation or facilitation of certain unlawful acts.== It does not 'prohibi[t] a substantial amount of protected speech'—let alone enough to justify throwing out the law's 'plainly legitimate sweep[.]'" United States v. Hansen, 22-179, 2023 WL 4138994, at *3 (U.S. June 23, 2023).

CAR 106

obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact, shall, for the first commission of any such offense, be fined under title 18 or imprisoned not more than 6 months, or both, and, for a subsequent commission of any such offense, be fined under title 18, or imprisoned not more than 2 years, or both.

Our Congress and our Courts recognize, and have always recognized, that even comparatively wealthy countries still have limits to their resources and cannot support an infinite number of individuals who simply want to take advantage of superior economic situations. Our executive bureaucracy, however, appears to have lost this thread, and continues to make proclamations and fund organizations which persistently advertise to individuals that they are certain, contrary to our actual laws, to obtain economic benefits if they survive the trip to our border. Accordingly, our immigration courts have a backlog of 2.2 million cases for a mere 659 judges,[10] and the average wait to get a hearing on an asylum claim can ***exceed five years***.

During most of this period, many aliens are permitted to remain inside our borders and will either obtain a work permit (after waiting several months) or work illegally. Most aliens know this; the evidence and testimony we reviewed reflected a common theme of people believing they would do as much work as they could for as long as they could and, if actually deported, they often vowed to return to do it again.[11] Then-USBP Chief Raul Ortiz testified that increases in migration result "when there are no consequences" and migrant populations believe they will be released into the country. He is correct. Moreover, once here, even those determined to have no lawful claim are rarely removed;[12] when it occurs, removal is simply experienced as a cost of doing business.

---

[10] We learned recently that DHS has actually adopted a rule to permit asylum decisions to be made by government bureaucratic workers, ***not judges***. In these cases, aliens immediately gain access to work privileges and other benefits and are given an expedited decision in a matter of weeks. If the officer grants asylum, the alien is admitted. If the officer does not, the alien gets back in line to await a judge. This entire process seems questionable, as we explain later.

[11] This includes an enterprising cadre of drug dealers from a small village in Honduras, who have essentially completely taken over the narcotics trade in a section of the city of San Francisco and constantly recycle their membership while building extravagant homes in their Honduran village, as documented in a series of excellent articles by the San Francisco Chronicle.

[12] The United States House of Representatives Subcommittee on Immigration Integrity, Security, and Enforcement found in an October 2023 report that 99.7% who entered without a valid claim still remained due to the lack of priority placed on their removal—a fact which, as we previously noted, those in other countries are well aware of.

CAR 107

As explained by a federal court here in Florida,

> Under §1225(b)(1)(A), certain arriving aliens, including those who lack proper admission documents, are **_subject to expedited removal "without further hearing or review_**." However, if such an alien indicates an intention to apply for asylum or a fear of persecution, the alien "**shall be detained**" pending a final determination of asylum or credible fear of persecution. See 8 U.S.C. §1225(b)(1)(B)(ii), (b)(1)(B)(iii)(IV) (emphasis added). For all other arriving aliens, unless an immigration official determines that the alien is clearly and beyond a doubt entitled to be admitted, the alien "**shall be detained**" for removal proceedings. See 8 U.S.C. §1225(b)(2)(A) (emphasis added). In 2018, in _Jennings v. Rodriguez_, **the Supreme Court held that "§§1225(b)(1) and (b)(2) mandate detention of aliens throughout the completion of applicable proceedings** and not just until the moment those proceedings begin." 138 S. Ct. 830, 845 (2018) (emphasis added).

State of Florida v. United States of America, et al., Case No. 3:21-cv-1066-TKW-ZCB (N.D. FL, March 8, 2023)(emphasis added). The Court also found that:

> The evidence establishes that in late January or early February of 2021, DHS made a discrete change in detention policy from "release only if there is a compelling reason to" to "release unless there is a compelling reason not to."

According to 8 C.F.R. 1225 (the Immigration and Nationality Act),

> In the case of all other arriving aliens, except those detained under § 235.3(b) or (c) of this chapter and paragraph (b) of this section, those officials listed in paragraph (a) of this section **_may, after review of the individual case, parole into the United States temporarily_** in accordance with section 212(d)(5)(A) of the Act, any alien applicant for admission, under such terms and conditions, including those set forth in paragraph (d) of this section, as he or she may deem appropriate. An alien who arrives at a port-of-entry and applies for parole into the United States for the sole purpose of seeking adjustment of status under section 245A of the Act, without benefit of advance authorization as described in paragraph (f) of this section **shall be denied parole and detained for removal** in accordance with the provisions of § 235.3(b) or (c) of this chapter. An alien seeking to enter the United States for the sole purpose of applying for adjustment of status under section 210 of the Act **shall be denied parole and detained for removal** under § 235.3(b) or (c) of this chapter, unless

CAR 108

the alien has been recommended for approval of such application for adjustment by a consular officer at an Overseas Processing Office.

This, however, is not happening. "Parole" is, as discussed above, supposedly permitted only upon "review of [each] individual case." However, current policy applies parole protection to entire classes, nationalities, and groups of aliens *en masse*. As the *Florida v. United States* court found,

> The time estimates in the supplemental administrative record confirm that USBP is not conducting meaningful case-by-case analysis before placing releasing [sic] an individual under the Parole+ATD policy. The supplemental administrative record indicates that the "processing time" for issuing a NTA is between 2 to 2.5 hours, whereas Parole+ATD only takes 15 to 30 minutes. *It is implausible that USBP could meaningfully assess an alien's individual circumstances in 15 to 30 minutes…*Another problem with this argument is that the supplemental administrative record does not explain how…CBP officers can make a meaningful determination as to whether the alien is a security risk (as contemplated by the regulation) if *the alien's home country does not share its criminal history databases with the United States.*

This latter point applies especially to countries generally viewed as hostile or subject to sanctions (such as China and Iran); several witnesses pointed out the alarming and dramatic increase of such individuals being encountered at our borders during the past fiscal year. Last year's inflow included **52,000 Chinese, a 1,300% increase from the prior fiscal year.**

When sued over these policies (as has happened in multiple jurisdictions, including Florida), rather than end programs found to be illegal, DHS simply renames the programs, often with an expansion. When Texas won an injunction in federal court to prevent federal agents from cutting barbed wire fencing erected by the State to stop illegal crossings (trespassings onto Texas land) between ports of entry, the federal government employed heavy tractors to instead lift it out of the way so aliens could crawl beneath it. When Arizona deployed barriers of cargo containers to block illegal entry, or Texas installed a buoy system to block dangerous river crossings, the federal government sued to have them removed.

Some 280,000 aliens have been paroled into the United States at the land border ports after scheduling crossing appointments with the "CPB One" mobile

22

**CAR 109**

phone app[13] as of August, 2023. *95% of them received parole* into our country. Of that total, only 136,000 came from Cuba, Haiti, Venezuela, and Nicaragua, the countries originally designated for use of this program. More than 100,000 came from one of **93 other countries**. More than 57,000 are Mexican nationals. Mexican citizens almost never qualify for U.S. protections and are rejected for asylum at a rate of 96 percent. Also included are 3,852 Kyrgyzstanis, 1,843 Uzbekistanis, 780 Tajikistanis, and 339 Kazakhstanis, and 29 from Turkmenistan; *among the groups operating in those countries are the Islamic Jihad Union, the Islamic Movement of Uzbekistan, and ISIS-Khorasan*.

Also included were nearly 24,000 Russians, 1,086 Armenians, 888 from Belarus, 244 from Azerbaijan, and dozens from mainland China and Mongolia. Other countries of note were South Africa, Togo, Gabon, Namibia, Guinea-Bissau, Argentina, Chile, Ecuador, Bolivia, Suriname, Guyana, France, Spain, Greece, Poland, Hungary, Canada, the United Kingdom, British Indian Ocean Territory, Iran, Lebanon, Jordan, Egypt, Yemen, Indonesia, Senegal, and Mauritania.

These include many "Special Interest Aliens," designated not as terrorists themselves but, because they come from nations where terrorist groups are prevalent, are required to be subjected to enhanced screening. **More than 75,000** SIAs were among those *crossing illegally* between October 2022 and August 2023.

According to data obtained and analyzed by the Transactional Records Access Clearinghouse (TRAC) at Syracuse University,

> These numbers are in addition to a **record number of Notices to Appear** to aliens **who were found inadmissible** under U.S. law. Notices to Appear (NTAs), which put immigrants into removal proceedings within the immigration courts, were rarely used at ports of entry until 2021. Unlike Border Patrol, which is responsible for immigration enforcement between ports of entry, the Office of Field Operations (OFO) is a separate agency responsible for processing people **at ports of entry**. OFO issued **280,000 NTAs in the first 10 months of FY 2023**, a significant increase from 95,000 the previous year and up from about 48,000 five years ago in FY 2018.

These are in addition to some **221,000 aliens *flown directly* into U.S. airports** (through mid-September) under a different parole program. Finally, we learned that

---

[13] Parole under this app carries with it immediate eligibility for work permits—the real draw for many.

**CAR 110**

in many cases, aliens apprehended crossing the border illegally, who upon capture begin to assert a claim for asylum, are being permitted to withdraw that claim (rather than be immediately detained or removed) and apply for a CBP-One appointment, at which their prior illegal entry will not be held against them. The House Committee detailed how:

> DHS has given tens of thousands of aliens the option to leave the United States through "voluntary return," which carries no immigration consequences. In fact, at a May 2023 press conference, Secretary Mayorkas boasted about DHS's soft-on-illegal-entry approach: We are giving the option to individuals, who are in our custody, the option of voluntarily returning to the country from which they came. Because of the consequence of a removal, people have to understand that under Title 8 of the United States Code, *when one is removed, one faces at least a five-year bar to reentry. And so, we will give people an opportunity to avoid that tougher consequence* by voluntarily returning.

> In the first 10 months of fiscal year 2023, there were 75,575 voluntary returns at the southwest border, 23,105 more than the previous eight fiscal years combined. Because aliens do not face immigration consequences through voluntary return, they have myriad opportunities to re-attempt their illegal entries.

As the *Florida v. United States* court found,

> Collectively, these actions were akin to posting a flashing "Come In, We're Open" sign on the southern border…. The Court uses this analogy not only because it is a fair characterization of what Defendants did but also because Defendants elicited testimony and argued at trial that they could not simply hang a "Closed" sign on the border. Moreover, although Defendants' argument that they could not simply "close" the border to arriving aliens may be technically accurate, it is somewhat disingenuous because 8 U.S.C. §1182(f) specifically authorizes the President to "suspend the entry of all aliens" whenever he finds that their entry would be "detrimental to the interests of the United States."

> That statute "exudes deference," *Hawaii*, 138 S. Ct. at 2408, and if it is broad enough to authorize the President to "establish a naval blockade that would … deny illegal Haitian migrants the ability to disembark on our shores," *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187 (1993), it would certainly seem to authorize the President to close the border to arriving aliens once it

24

**CAR 111**

==highlight== became apparent that CBP and ICE facilities were not going to be able to handle the "surge" of aliens coming to the border.

## CONCLUSIONS



*Those who cross illegally, and those who encourage and enable them to do so, make their very first act on U.S. soil the commission of a crime.* Yet federal penalties for these offenses remain rare compared to the frequency of their commission. Even an adverse immigration court determination does not provide consequences; an ERO official acknowledged that with the current rate of removals, ICE would need 20 years to remove the aliens currently on the non-detained docket who have a final order of removal. What results is a system choked with bureaucratic inertia, almost as if by design, and a human tragedy of massive proportions.

Absent the overheated rhetoric from all political angles, the situation truly is not complicated; individuals from other countries are enticed to come to this country, the overwhelming majority with no plausible claim to asylum whatsoever, and serious harm results on both sides of our border as the situation is exploited for crime and profit by cartels, funding by NGOs, and political clout-chasing by others. All the while, we and our fellow taxpayers pick up the tab.

**CAR 112**

These are the policies.



And these are their effects.





26

CAR 113

## III. HOW MANY

Former Secretary of the Department of Homeland Security (under President Obama), Jeh Johnson, famously said:

> I know that one thousand [apprehensions] a day overwhelms the system. I cannot begin to imagine what four thousand looks like, so we are truly in a crisis.

If 1,000 is ***overwhelming***, and 4,000 is a ***crisis***, more than 8,000 a day is nothing short of ***invasive***.

We have been meeting for the entire period of Fiscal Year 2022 (October, 2022 - September, 2023). ***During the time we have been convening, more than 3 million aliens are known to have attempted to cross our borders.*** Approximately one third (around one million) were refused entry; ***more than 900,000 individuals were released into the country*** to await court hearings; some 700,000 crossed illegally but "got away" from law enforcement into the country; 140,000 were Unaccompanied Alien Children (most of whom are age 15 and above) released into the country; and more than 400,000 were either flown in directly or transported across the border ***specifically to avoid having to be tabulated as "border encounters"*** via use of "CBP-One" or other parole programs, some of which have been declared illegal when challenged in federal court by states, including the State of Florida.[14]   Finally, there are the "Unknown Gotaways," those who penetrate one of the many and vast swaths of unprotected borderlands or coastlines without being seen, reported or recorded, or are successfully smuggled in; no figure exists for them, of course, though it seems to us safe to presume the number is at least equal to the "known" cohort (nearly 700,000).[15]

---

[14]Per the federal court in <u>Florida v. United States</u>, "Defendants have effectively turned the Southwest Border into a meaningless line in the sand and little more than a speedbump for aliens flooding into the country by prioritizing 'alternatives to detention' over actual detention and by releasing more than a million aliens into the country—on 'parole' or pursuant to the exercise of 'prosecutorial discretion' under a wholly inapplicable statute—without even initiating removal proceedings. ***The evidence further establishes that Florida is harmed by the challenged policies because well over 100,000 aliens have been released into Florida under the policies[.]***"

[15] According to the U.S. Geological Survey (USGS), the length of the International Boundary line of the U.S.-Canadian border, excluding Alaska (which is 1,538 miles by itself), is approximately 3,987 miles, while the length of the U.S.-Mexican border is estimated at 1,933 miles. Thirteen U.S. states share international boundaries with Canada and four share an international border with

CAR 114

This is a number roughly equivalent to the population of children born in the country; 3.67 million Americans were born during the matching 12-month period, according to the Census Bureau, and that includes at least 400,000 American citizens born to illegal aliens.

Encounters of *illegal* aliens on the southwest border have surpassed 100,000 for 31 straight months (in fact being nearly triple that in the record-setting month of September alone). Indeed, *those entering the country illegally this year substantially outnumbered those crossing according to our laws.* For the month of September 2023, of the 270,000 aliens encountered at the southern border, nearly 220,000 of those were between ports of entry—*i.e., illegal,* and *illegal entries for the year as a whole were double those who properly presented at a port of entry.* This does not include more than a million individuals annually who overstay their visas (again, rendering their presence illegal). If they are added to the inflow, two aliens are illegally present in the country for every newborn American.

The inflow included **52,000 Chinese** and 93,000 Indians, 51,000 Filipinos, 19,000 Turks, and 292,000 people from countries such as Angola, Cameroon, and the Congo; 163,000 Haitians, 196,000 Cubans, 103,000 people from Ecuador, and **386,000 Mexicans**. The population included 1.55 million single men, plus 927,000 women and children in family groups.

More than eight million aliens have crossed the borders of the United States since January 2021, the majority *illegally*. This is a population greater than that of thirty-eight states. We also have seen and heard multiple reports from eyewitnesses and media of the "border litter" so prevalent; various forms of consulate documents, certificates, licenses, and all manner of identification from different countries, along with printed CBP-One appointment slips, are found by the gross along the border regions, between ports of entry. The reasons people crossing would abandon such things do not require much speculation, at least not from the experts and Border Patrol personnel we heard from: *some do not want to wait, and do not want to be discovered for who they actually are*.

Yet at the same time, we heard from witnesses who came to the country legally, followed the prescribed process, and became citizens. One in particular we learned was not given a copy of her naturalization certificate at her swearing-in

---

Mexico. The "general coastline" of our 50 states totals 12,383 miles, while detailed coastal maps including such things as coves and inlets come to 88,612 miles (not including the Great Lakes). There are many gaps from which to choose.

CAR 115

ceremony; the Court pronounced her to be a citizen, yet she did not receive one particular document from agents stationed there. She married, had children, bought a business, and owns a home. When she needed the missing document to return to her home country to visit her sick mother, DHS was unable to provide her with a copy because the backlog of cases created by these policies was so extensive. We commend our law enforcement partners for stepping in to assist her; many months and thousands of dollars later, she reported she was finally given the document. We cannot help but view this incident as a microcosm of the priorities expressed by the current policies-- grossly unfair to those who try to follow our laws, and favoring those who flout them.

## INCOMING BUT NOT OUTGOING

Border Patrol was ordered to release **over 900,000** aliens into the U.S. in fiscal year 2023 *after they were apprehended crossing illegally*, including 155,821 releases in September alone. These numbers do not include ICE or ports of entry releases. The border release numbers also do not include approximately 140,000 Unaccompanied Alien Children, or the 238,870 illegal aliens transferred directly to ICE custody.

For context, 900,000 is a population size larger than several US states, including Wyoming, Vermont, Alaska, North Dakota, and South Dakota. The releases include both Notices to Appear[16] and paroles. Between May and September 2023, just 300,000 aliens were removed or deported—fewer than entered in the month of September alone.

The reason for delay in removal includes some sobering statistics relating to our immigration courts, from TRAC:

- The 659 Judges on the Immigration Courts recorded in FY 2023 receiving **1,488,110** new cases. This compares with **669,011** cases that the court completed during this period.
- At the end of September 2023, there were more than two million active cases pending before the Immigration Courts.

---

[16] Accurately referred to in a Congressional report as a "Notice to [Dis]appear."

**CAR 116**

- **Miami-Dade County, FL**, has the most residents with pending Immigration Court deportation cases (120,271).
- ICE Alternatives to Detention (ATD) programs are currently monitoring **194,632** families and single individuals, 15,000 of them in Miami.

**Fiscal Year 2023**

| State | Pending Cases |
|---|---|
| Entire US | 2,097,244 |
| Florida | 333,723 |
| Texas | 307,756 |
| California | 236,136 |
| New York | 193,836 |
| New Jersey | 119,789 |
| Massachusetts | 113,126 |
| Illinois | 96,840 |
| North Carolina | 74,219 |
| Virginia | 74,129 |
| Georgia | 72,404 |
| Tennessee | 70,504 |
| Maryland | 52,641 |
| Pennsylvania | 49,896 |
| Louisiana | 48,690 |

We are aware that one of the apparent proposed solutions to the court backlog is to *stop letting only judges handle the claims and instead permit* "Asylum Officers"--*bureaucrats-- to do so*. According to NBC News earlier this year:

The administration is issuing a new rule Thursday that will allow asylum officers, rather than just immigration court judges, to adjudicate the claims of immigrants seeking asylum…

Under the new rule, if an asylum officer grants protections to an immigrant, the immigrant can remain in the U.S. and bypass immigration courts…. If an

30

**CAR 117**

asylum officer decides an immigrant is not eligible for asylum, the case will go to an immigration judge.

Particularly in light of the repeated failure of similar bureaucrats to adequately vet sponsors in HHS' UAC program—*some of whom are these very same illegal border crossers*—as documented extensively in our Third and Fourth Presentments, this proposal offers no solace whatsoever. Several states have filed a challenge to the rule in federal court.

This rule allows asylum officers to grant asylum (*a path to citizenship*) with only a "nonadversarial hearing" where the alien may have an attorney but no one will represent the United States, unlike actual Immigration Court. Decisions allowing asylum cannot be appealed by the United States; decisions averse to the alien simply land him back in front of a judge (minimizing any true backlog reduction). And "asylum officers" have *granted asylum in more than 30 percent of the cases, about twice as often as immigration judges*.

What is more, many of those who should not even reach the "asylum hearing" stage at all are likewise not removed. A Congressional report disclosed that:

> Under the Immigration and Nationality Act, certain aliens encountered at the border are subject to expedited removal, in which they are ordered removed from the United States without further review or hearing.

> The prohibition on further review, however, does not apply to any alien who indicates an intention to apply for asylum or otherwise expresses a fear of persecution. In those cases, an asylum officer must conduct a credible fear interview to determine whether "there is a significant possibility" that the alien could establish eligibility for asylum.

> If an alien fails to show a credible fear, the alien should be removed pursuant to the expedited removal process… [yet] of the more than 2.1 million illegal aliens released by DHS from January 20, 2021, through March 31, 2023, only 197,531 illegal aliens *[approximately 10%]* were placed in expedited removal and *claimed a fear of persecution*, with upward of 2 million aliens being released or placed directly in removal proceedings *without* first having established that they even feared persecution.

> Additionally, between January 20, 2021, and March 31, 2023, 25 percent of aliens placed into expedited removal did not claim a fear of persecution. DHS

CAR 118

reported no "confirmed removal or return" for nearly 20,000 of those illegal aliens who did not even claim a fear[.]

The Courts and Border Patrol are not the only agencies removing fewer illegal aliens. Another policy (the "Mayorkas Memo") mandates that the mere fact that aliens are removable "should not alone be the basis of an enforcement action against them." ICE officers also have to divert time they could spend apprehending criminals to processing the (less than 50% of) "parolees" showing up at their offices for "Notice to Appear" appointments. Yet even when denied asylum, these individuals are not removed.

Congress found that DHS released **at least 2.1 million** illegal aliens into the United States but only removed 108,102 of those aliens from the country. Between January 20, 2021, and March 31, 2023, the government has removed from the United States only 5,993 illegal aliens who were encountered at the southwest border and who were placed in removal proceedings before an immigration judge during that time. In other words, of the at least 2.1 million aliens released into the United States during that time, 99.7% of the *illegal* aliens have yet to be removed. Congress also noted that of asylum seekers released into the United States from January 20, 2021, through March 31, 2023, only six percent were screened for a claimed fear of persecution.

ICE agents are now prohibited from relying solely on the fact of an alien's felony conviction to remove him or her, regardless of the seriousness of the underlying crime. Testimony and evidence have shown that ICE *arrests of aliens who are convicted of crimes while in our country have dropped 65%* according to comparisons between ICE arrest figures in 2018 and 2022:

| | | | |
|---|---|---|---|
| Criminal Convictions | 105,140 | to | 36,322 |
| Pending Criminal Charges | 32,977 | to | 10,074 |
| Removals from USA | 95,360 | to | 28,204 |

We learned that *there are over 400,000 convicted criminals* on ICE's "non-detained docket," meaning they are not in custody while awaiting their immigration court hearing. In 2020, the 93,000 criminal aliens arrested by ERO with criminal histories accounted for 374,000 criminal charges and convictions, *about 4 per alien*. In 2022, the 46,000 aliens arrested with criminal histories accounted for nearly 200,000 convictions and charges; as one expert noted, *had this policy not changed,*

CAR 119

*there would have been another 90,000 aliens arrested who collectively have approximately another 300,000 convictions and charges.*

To compound these issues, TRAC found that due to being absolutely overwhelmed,

> as of the end of September 2022, Immigration Court judges dismissed a total of 63,586 cases because Department of Homeland Security officials, chiefly Border Patrol agents, are not filing the actual "Notice to Appear" (NTA) with the Immigration Court. Without a filed NTA, the case cannot proceed. This means that *one out of every six Court cases were thrown out* for this reason this past fiscal year.

> Where NTA's are filed, one congressman learned that New York City's ICE office was giving aliens notices to appear for court in 2033.

### ICE DETAINERS & MIAMI-DADE COUNTY: THROUGH THE LOOKING GLASS

A routine part of federal immigration enforcement is the issuance of detainer notices by U.S Immigration and Customs Enforcement (ICE). These notices are lodged for noncitizens who have been arrested on criminal charges and who ICE has probable cause to believe are illegally present in the United States. The detainer asks state and local law enforcement agencies to notify ICE before a removable alien is released from their custody and to maintain custody of the alien for a brief period of time (usually no longer than 48 hours) so that ICE can take custody of said alien upon release from that agency's custody.

The issuance and compliance with these detainer notices are a critical component of the federal government's obligation to enforce our immigration laws and to ensure public safety. So much so, that ICE's own website acknowledges that "[w]hen law enforcement agencies fail to honor immigration detainers and release serious criminal offenders onto the streets, it undermines ICE's ability to protect public safety and carry out its mission." It is undeniable that the failure to honor ICE detainer notices allows criminal aliens to evade removal proceedings.

As part of our mandate, we investigated county compliance with Florida Statutes § 908.104 requiring local cooperation with federal immigration authorities. The statute also provides a limited avenue by which local state agencies can ignore

33

**CAR 120**

and effectively "lift" an ICE detainer. Specifically, Florida Statutes § 908.104(5) allows the lifting of ICE holds for noncitizens who have been cooperating victims or witnesses of a crime, while Florida Statutes § 908.104(8) allows for the lifting of ICE holds for unlawfully present aliens who are a witness or victim of certain enumerated crimes without requiring any proof of cooperation with law enforcement.

During our third session, we heard testimony and received exhibits detailing a process used by inmates in the Miami-Dade County jail to request relief under these two statutory exemptions. Disturbingly, we discovered that this process was being abused and requests to set aside ICE detainers were being granted contrary to the plain meaning of the statute and the intent of the legislature. This "process" was brokered between Miami-Dade County and the local Public Defender's Office by several immigration activist groups that had sued Miami-Dade County for complying with Florida law and cooperating with federal immigration authorities.

The agreement allowed the submission of unsworn notices indicating that a statement "existed" where the jail inmate claimed that they were a "victim" of a qualifying offense under Florida Statutes § 908.104(8). These "statements" were not challenged by anyone and the county jail did not receive any documentation corroborating these claims. Thus, unproven and dubious claims of victimhood by criminal aliens were submitted and approved allowing Miami-Dade County to disregard and lift ICE holds. Adding insult to injury, every time federal immigration officers reached out to Miami-Dade County and expressed concern over this process, they were met with platitudes and promises of follow-ups that rarely materialized, accomplishing nothing. Our review of subpoenaed records and emails revealed that when federal immigration officials asked the straightforward question of what standard of "evidence" the county used in evaluating these detainer exemption notices, county officials admitted among themselves that they had no way to verify the claims. Yet, this runaway and ill-conceived program soldiered on.

More troubling still was the fact that unsworn exemption notices were being submitted for defendants who not only failed to report being the victim of any crime, but also for crimes that occurred either decades ago or outside of the United States. One defendant claimed to be the victim of a "battery" that allegedly occurred over thirty years ago. These safety valve exemptions were created in the first place to assist local authorities prosecute criminals. Common sense dictates that a "crime" allegedly to have occurred years ago, outside of the United States, and which was

34

**CAR 121**

not reported to authorities would be insufficient to exempt a defendant from ICE detention. Sadly, common sense seemed to be in short-supply in Miami-Dade County as it pertained to these exemption notices.

We would also want to point out the problems with the statute listing battery as an enumerated offense that would qualify a noncitizen for relief under Florida Statutes § 908.104(8). In Florida, battery is any physical touch without a person's consent. Under that analysis, a criminal alien arrested for a serious felony offense can seek relief by claiming to be a victim of a simple slap or unwanted pat on the back. Suppose two jail inmates strike up a conversation and decide that each would poke the other. Each defendant would then be able to claim relief as a "victim" of a battery. It doesn't take much time to see the abuses that can ensue.

Additionally, all the notices we reviewed claimed relief under Florida Statutes § 908.104(8) rather than Florida Statutes § 908.104(5) which requires evidence of cooperation. The consequence has been that criminal illegal aliens arrested for serious felony offenses, such as sexual battery on a minor, armed carjacking, and aggravated battery have been able to secure release from custody despite ICE requesting a hold for deportation proceedings. In one instance, the county jail lifted the detainer notice for a defendant who claimed to be the victim of the very crime for which he had been arrested. Even if the county did not want to implement a rigorous process commiserate with claims from detained criminal aliens seeking relief from ICE holds, a cursory search of pertinent court dockets would have revealed this duplicity. However, it seems that the process employed by Miami-Dade County can be charitably described as willful blindness.

Some of the exemption notices we reviewed asked the county jail to lift ICE holds for lawfully present aliens even though Florida Statutes § 908.104(8) only applies to unlawfully present aliens. For example, one detained criminal alien sought relief claiming to be the victim of domestic battery. The defendant had entered the United States legally before her arrest. Luckily, the county listened to the objections raised by federal immigration agents and denied relief due to her legal status. However, that is not the end of the story. As it turned out, the defendant was arrested for extortion, falsely reporting a crime, and other related charges after admitting to police that she would enter into consensual relationships with men and then extort them by raising the threat of reporting sexual assault. So, in effect, the defendant was claiming to be the victim of the very lies she peddled for financial gain.

35

**CAR 122**

We have learned first-hand that ICE detainers can be the difference between life and death. In 2008, a Cuban national was sentenced to 10 years in prison for Attempted Felony Murder and Armed Robbery with a Deadly Weapon. One would expect that upon the completion of the defendant's prison sentence, he would be prioritized by ICE for immediate deportation. Instead, the defendant was released from prison in 2017 and federal immigration authorities simply "monitored" his whereabouts even when the United States had resumed deportation flights to Cuba. One wonders how federal immigration authorities define "enforcement priorities" if it does not include a violent criminal alien who spent a decade in state prison for attempted murder. Tragically, during the early morning hours of March 24, 2019, the defendant shot in cold blood an unsuspecting acquaintance at the top of a parking garage. Words cannot describe the brutality of what we saw as we watched the video surveillance of this heinous crime. If ICE had requested the state prison to hold this murderer for removal proceedings then his eventual victim would still be alive.

Thankfully and because of our investigation and Second Presentment Report, Miami-Dade County put a halt to this problematic ICE detainer exemption process. Jail inmates seeking relief now have to provide actual evidence to corroborate their claims and certain inmates are ineligible due to their crime of arrest. This is a good start, but more must be done to prevent this kind of abuse from reoccurring. To that end, we strongly urge the legislature to delete Florida Statutes § 908.104(8) in its entirety and Florida Statutes § 908.104(5) must be limited to crimes occurring in the United States and time barred to five years prior to an alien's claim of relief under the statute. Additionally, the Florida Legislature must bar an alien with pending criminal charges for any crime or attempt to commit any crime of violence, felony drug offense involving the sale, manufacturing, distribution, or trafficking in a controlled substance, or felony sexual offense from being eligible for relief under the statute.

36

**CAR 123**

These are the policies.



**Number of NTAs Issued to Inadmissible Immigrants at Ports of Entry**

And these are their effects.

**Immigration Court Cases, FY2020-FY2023 (Aug)**

**CAR 124**

## VISA OVERSTAYS AND LOOPHOLES

According to DHS's "Fiscal Year 2022 Entry/Exit Overstay Report":

An overstay is a nonimmigrant who was lawfully admitted to the United States for an authorized period but stayed in the United States beyond their authorized admission period.

At the end of FY 2022, there were *795,167 Suspected In-Country Overstays*, which represents 3.42 percent of expected departures[.]

Fiscal Year 2022's visa overstay rate was more than double the rate of recent years. Lest any reader think that such illegal acts amount only to "technical" crimes posing no threat, last month CNN reported that:

Sohaib Abuayyash, 20, who is in the United States on an expired nonimmigrant visa, made "statements to others that support the killing of individuals of particular religious faiths," and "referenced an event in Houston for members of a particular religious group," according to a federal court judge who ordered the man be detained pending trial.

The FBI began investigating Abuayyash in August after agents conducting "open-source research" saw video of him firing multiple firearms, including AR-style rifles, on social media, according to a redacted probable cause affidavit filed on October 19 in the US District Court for the Southern District of Texas.

Abuayyash *applied for asylum in the US after his nonimmigrant visa expired in 2019,* according to the affidavit. *He's authorized to work* in the US until August 2025, and is *not allowed to "possess or use firearms or ammunition*," it states. The affidavit also says Abuayyash "has been in direct contact with others who share a radical mindset, has been conducting physical training, and has trained with weapons to possibly commit an attack."

But in an order of detention pending trial document filed on October 24, US Magistrate Judge Christina A. Bryan wrote that Abuayyash "has viewed specific and detailed content posted by radical organizations on the internet including lessons on *how to construct bombs or explosive devices; and that Defendant has made statements to others that support the killing of individuals of particular religious faiths*. In his communications with another individual about martyrdom, the Defendant referenced an

38

**CAR 125**

event in Houston for members of a particular religious group," the judge said. Abuayyash was "plotting to attack a Jewish gathering," a law enforcement source told CNN.

We also learned of what appears to be a more recently-developed scheme to take advantage of a loophole in one of our state statutes: the "Special Immigrant Juvenile Visa." The SIJ visa enables aliens who entered as unaccompanied minors to obtain orders of protection from state family courts based on a claim of abuse, neglect or *abandonment by one parent*. This order of protection **offers a "green card"** path to citizenship for, as one Congressional witness put it, "tens of thousands of UACs now in the pipeline, many of whom would otherwise be ineligible due to a criminal history, gang involvement, immigration fraud, or simple inability to qualify under the legal immigration system created by Congress."

In Florida, a Special Immigrant Juvenile Visa is available to a person who has been declared dependent by a juvenile court, who was deemed eligible for long term foster care, and for whom it has been determined that it would not be in their best interest to return to their parents' previous country of nationality or country of last habitual residence, according to Florida Statutes 39.01.

Ordinarily, petitions for a court to make this finding must be filed by the Department of Children and Families. However, more recently there have been a number of cases wherein UACs have had attorneys file them on behalf of the UAC. These petitions seek no services for the child, and do NOT, under any circumstances, want the Department of Children and Families to become involved in supervision or rendering of services (as would ordinarily happen in family court). This makes the process ripe for abuse by gang members (MS-13 membership of many UAC has been well-documented in our Third and Fourth Presentments), "minors" who are not really minors at all but have fooled ORR (we recounted multiple instances of this as well), or those with a criminal record-- *none of whom would ever otherwise qualify for a permanent resident / green card*--, as well as "sponsors" who coerce UAC into filing the petition so the "sponsor" can further exploit them.

Florida law has a great deal of control over this federal process, unlike many other areas, because SIJ status requires a state-court determination of dependency first. As our Supreme Court wrote in one recent case:

B.R.C.M., an unaccompanied minor from Guatemala, illegally entered the United States at age thirteen and was released by the Office of Refugee Resettlement to his godmother as a sponsor. After his arrival, a private petition

39

**CAR 126**

was filed on behalf of B.R.C.M. alleging three grounds for adjudication of dependency under *section 39.01(15), Florida Statutes* which defines a dependent child as a child who is found by the court: "(a) [t]o have been abandoned, abused, or neglected by the child's parent or parents or legal custodians"; "(e) [t]o have no parent or legal custodians capable of providing supervision and care"; or "(f) [t]o be at substantial risk of imminent abuse, abandonment, or neglect by the parent or parents or legal custodians."

In support of a determination of dependency, *the petition asserted that B.R.C.M.'s father abandoned him at birth and never provided him with food, shelter, clothing, and medical care. The petition asserted that B.R.C.M.'s mother abandoned him [in Guatemala] at age four when she disappeared and never contacted him again or provided him with basic necessities. B.R.C.M. then went to live with his grandmother until she was no longer able to care for him because of old age and illness. At age thirteen, fearing he would be forced to join a local gang and having no family to care for him, B.R.C.M. fled Guatemala, travelled through Mexico, and entered the United States in Hidalgo, Texas.*

The petition asserted that B.R.C.M. was placed with his godmother in Miami, Florida, and met his father for the first time after his arrival in the United States. His father has maintained telephone contact with B.R.C.M., but has not provided for the child's basic needs. [*there was no allegation that the godmother (his ORR sponsor) was abandoning, abusing, or neglecting him.*]. The petition was denied after an eight-minute hearing in the circuit court, during which the court made no factual findings.

On appeal, the Third District repeatedly observed that *the child's sole purpose in filing the dependency petition was to facilitate an application for Special Immigrant Juvenile Status (SIJS) and seek lawful permanent residency.* In re B.R.C.M., 182 So.3d at 751. *The district court determined it was "plain on the face of the petition that B.R.C.M. is not 'truly' abandoned, abused or neglected within the meaning of Chapter 39...:* "The purpose of the dependency laws of this state is to protect and serve children and families in need, not those with a different agenda."

Our Supreme Court then ruled that, because Florida's statute does not actually address this obvious gamesmanship, the courts were without power to deny such petitions:

40

**CAR 127**

[W]hen a Florida court is presented with a dependency petition, the court's concern should be whether the allegations made in support of an adjudication of dependency satisfy Florida's statutory grounds for such an adjudication, not whether the [juvenile] hopes to obtain [SIJS]." … "[I]f a child qualifies for a declaration of dependency under our statutes, the child's motivation to obtain legal residency … is irrelevant."

If a child meets the statutory criteria for dependency, the child must be adjudicated accordingly, regardless of the child's motivations for seeking a dependency adjudication.

B.R.C.M. v. Florida Dep't of Children & Families, 42 Fla. L. Weekly S472 (Fla. Apr. 20, 2017).

We reiterate here our recommendation from our Third and Fourth Presentments: *require any "sponsor" who is not a biological parent or court-ordered legal guardian to submit themselves and the UAC to the family court for such a formal legal determination*; *failure to do so should be a felony*.

Further, we ask our leaders to ***immediately*** *close this visa loophole by requiring petitions under Chapter 39.01 to either (a) be filed by the Department of Children and Families or (b) require that any minor being deemed dependent be formally placed in custody of the Department.*

## WHERE TO

In December of 2022, we reviewed a study which disclosed that following geofencing of NGO facilities on both sides of the Southern border during the month of January 2022, more than 30,000 unique mobile devices were detected at these NGO facilities. **The devices were later traced to 431 separate U.S. congressional districts out of a total 435 congressional districts, including a great number in Florida.**

On September 6, 2023, the DHS Office of the Inspector General (OIG) published a report, "DHS Does Not Have Assurance That All Migrants Can be Located Once Released into the United States." According to that report, "U.S. Border Patrol cannot always obtain and does not always record migrant addresses, and [ICE] does not always validate migrant addresses prior to migrant release into the United States." We have quoted it before:

**CAR 128**

80 percent (790,090 of 981,671) of addresses were recorded at least twice during an 18-month period, some of which were provided by families upon release. More than 780 of these addresses were used more than 20 times…. ICE FACILTITIES DHS released 7 families, comprising 12 adults and 17 children, to a single-family 3-bedroom New Jersey home in a 70-day period. Additionally, the OIG found seven addresses that were used more than 500 times each… ICE must be able to locate migrants to enforce immigration laws, including to arrest or remove individuals who are considered potential threats to national security. ***The notable percentage of missing, invalid for delivery, or duplicate addresses on file means DHS may not be able to locate migrants following their release into the United States… [w]hen migrants do not check in, ICE . . . cannot easily locate migrants who may be threats to public safety or are scheduled for removal***.

The addresses used included restaurants in New York, bus stations in New Jersey, Illinois, and Georgia, ***and a DHS Office in Illinois***.

Moreover, as the *Florida v. United States* court found, as of April 26, 2022, there had been over 226,000 aliens released under "prosecutorial discretion" under the "Notice to Report" and "Parole+ATD policies." More than 110,000 of those aliens had not been issued NTAs and more than 66,000 were outside the period that they were supposed to have reported to ICE to be issued an NTA. We cannot help but wonder where they might be now; to our knowledge, no agency has followed up to investigate their whereabouts.

According to one ICE ERO officer,

[o]fficers spend their days reviewing migrant cases at their desks and do not feel they are exercising law enforcement authority, for which they were hired and, without a valid address to locate migrants, ICE may only locate migrants after they have been arrested by state or local police for unrelated offenses post-release. Only after the migrant's arrest would ICE be aware of the migrant's whereabouts.

By all accounts, more than one million ***illegally present*** aliens reside in our State. Florida ranks fourth among the states in most nationwide estimates of number of such individuals; Miami is fifth among metropolitan areas.

Those numbers are not decreasing. As previously referenced, more than 2,400 aliens (not including UAC) have been shipped by the federal government ***to just two***

42

**CAR 129**

*sections of Florida in the past week*; at that rate, more than 120,000 will have joined our population this calendar year. The <u>Florida v. United States</u> court likewise reported that:

> DHS provided information in discovery estimating that about 160,000 of the aliens released into the country between January 2021 and July 2022 provided a Florida address or are on the Miami ERO docket, which covers Florida, Puerto Rico, and the Virgin Islands. That number does not account for aliens released after July 2022.

43

**CAR 130**

## FORESEEABLE EFFECTS

Some lessons, however traumatic when initially taught, for some reason apparently need to be re-learned:

> *It is elemental to border security to know who is coming into the country.* Today more than 9 million people are in the United States outside the legal immigration system. We must also be able to monitor and respond to entrances between our ports of entry, working with Canada and Mexico as much as possible. There is a growing role for state and local law enforcement agencies. They need more training and work with federal agencies so that they can cooperate more effectively with those federal authorities in identifying terrorist suspects. *All but one of the 9/11 hijackers acquired some form of U.S. identification document, some by fraud.* Acquisition of these forms of identification would have assisted them in boarding commercial flights, renting cars, and other necessary activities.
>
> Fraud in identification documents is no longer just a problem of theft. *At many entry points to vulnerable facilities, including gates for boarding aircraft, sources of identification are the last opportunity to ensure that people are who they say they are and to check whether they are terrorists.*

*The 9/11 commission report*[17], National Commission on Terrorist Attacks, page 361 (2004). https://govinfo.library.unt.edu/911/report/911Report_Ch12.pdf

We have seen the repeated assurances that all these incoming aliens are "vetted" and screened prior to being released for possible court proceedings. Some simple figures associated with this total render us exceedingly skeptical of these claims. One year consists of **31,536,000 seconds**. Assuming for the moment that Customs and Border Patrol officers are working around-the-clock every day, *each of the 3.2 million aspiring entrants averages less than 10 seconds to have their entire history checked*, background explored, biometrics examined and interview accomplished (let alone enhanced SIA vetting requirements).

---

[17] It is no small irony that the Department of Homeland Security owes its very existence to the recommendations of the 9/11 Commission Report, yet now enacts policies which ignore and directly contravene the actual recommendations the Report contains.

**CAR 131**

At that rate, even if 500 officers were working at the same time doing nothing but processing these aliens,[18] barely an hour could be devoted to each. The House Committee on Homeland Security heard testimony that:

---

[18] They most certainly do *not* have such a luxury of focus. According to its own publication, "**On a Typical Day** in Fiscal Year 2022," CBP...

- Processed:
  - 868,867 passengers and pedestrians:
    - 263,000 incoming international air passengers and crew
    - 58,549 passengers and crew on arriving ship/boat
    - 547,318 incoming land travelers
  - 91,605 truck, rail, and sea containers
  - 226,589 incoming privately owned vehicles
  - $9.2 billion worth of imported products
  - 107,000 entries of merchandise at our air, land, and seaports of entry
  - $306 million in duties, taxes, and other fees, including more than $287 million in duties
- Conducted:
  - 6,068 enforcement encounters nationwide between the ports of entry (including apprehensions and expulsions)
  - 41 arrests of wanted criminals at U.S. ports of entry
  - 1,152 enforcement encounters nationwide at ports of entry (including inadmissible migrants and expulsions)
- Discovered:
  - 240 pests at U.S. ports of entry and 2,677 materials for quarantine: plant, meat, animal byproduct, and soil
- Seized:
  - 2,895 pounds of drugs
  - $217,700 illicit currency
  - $8 million worth of products with Intellectual Property Rights violations
- Intercepted:
  - 8 fraudulent documents
- Employed:
  - 63,843 men and women including:

  - 25,836 CBP officers
  - 2,668 CBP Agriculture Specialists
  - 19,357 Border Patrol agents
  - 569 Air interdiction agents (pilots)
  - 364 Marine interdiction agents
  - 363 Aviation enforcement agents
  - 1,104 Trade personnel

- Deployed:
  - More than 700 canine teams and 101 horse patrols

45

At the end of FY 2020 (the last year for which staffing statistics are available), there were fewer than 17,000 Border Patrol agents stationed along the 1,954-mile Southwest border.

On paper, that equals out to roughly 8.64 agents per mile, but in reality, agents work shifts of approximately 50 hours per week. That means fewer than 30 percent of those agents are on the line at any given time, reducing staffing down to about 2.57 agents per mile.

Even that figure, however, does not adequately represent the actual number of agents who are "on the line"—that is, actively preventing the illicit entry of drug mules and human traffickers and smugglers—at the border at any given time.

Given what we have learned about the lengthy and detailed requirements for accurately vetting an individual from a national security perspective, as well as the expertise and time required to do so meaningfully[19], we are not convinced that anything much beyond a smile and a wave could be accomplished in such an amount of time, and we would not choose to gamble the safety of our fellow citizens on the results.

---

- Flew:
    - 224 hours enforcement missions over the United States
- Underway (float):
    - Underway 78 float hours of enforcement missions in the United States
- Conducted operations in:
    - 22 countries with 33 International Affairs employees working abroad
    - 328 ports of entry within 20 field offices
    - 129 Border Patrol stations within 22 sectors, with 35 permanent checkpoints
    - 75 Air and Marine Operations locations, including branches and units, National Air Security Operations Centers, and the Air and Marine Operations Center

[19] We have also extensively documented (in our Third and Fourth Presentments) the fact that HHS agencies like The Office of Refugee Resettlement consider "vetting" (even of persons attempting to obtain a child from them) to consist of telephone interviews, documents provided via WhatsApp, and *studious avoidance of DNA testing or thorough questions about prior criminal history and gang involvement*. If that standard prevails across DHS and other companion agencies, there can be zero confidence in the vetting process. We refer again to the announced kindred policies by DHS and the State Department regarding obsessive focus on "streamlining processes" and HHS Secretary Becerra's description of agency priorities: greater efficiency was demanded because "This is not the way you do an assembly line."

46

**CAR 133**

Nearly 100 Syrian and 50 Iranian nationals have been apprehended by the Border Patrol **since the beginning of October 2023**; several reporters and Senators recently also disclosed that explosive devices have been located among incoming population flows. These concerns resonate with examination of just four of many cases brought to light during our sessions. In one case,

> On April 17, 2022, Border Patrol apprehended a migrant and family members in Yuma, Arizona, and screened them for national security threats. Based on the information it had, *FBI's TSC determined the migrant was a possible Terrorist Watchlist match. Border Patrol released the migrant* on April 19, 2022. On April 21, 2022, at the Palm Springs International Airport, in Palm Springs, California, the *migrant and the migrant's family members checked in for a flight to Tampa, Florida.*
>
> *During pre-flight screening, the TSC obtained additional information from TSA and confirmed the migrant was a positive Terrorist Watchlist match.*

Border agents "were busy processing an increased flow of migrants" at the time, and "as a result, the Tactical Terrorism Response Team did not receive the NTC's request and *did not interview the alien*," instead releasing him to board a commercial flight from Palm Springs, California, to Tampa, Florida. Pre-check routines confirmed the watch list hit. "An increase in apprehensions, which created pressure to quickly process migrants and decreased the time available to review each file" so when the terrorist suspect was flagged a second time prior to boarding the flight to Tampa, the Transportation Security Administration at the Palm Springs airport *still let him on the plane*.

Once alerted, ICE asked for the "Alien File" from Border Patrol, but didn't get the file for eight days, because Border Patrol was unable to sort, box, and ship any more than a thousand files "once or twice a week" from its overwhelmed processing center and was tens of thousands behind.

Finally, when ICE did go to make an arrest, it was delayed because Border Patrol's *Alternatives to Detention* (electronic monitoring) office didn't open until 7 a.m. and did not share GPS tracking information with ICE.

https://www.oig.dhs.gov/sites/default/files/assets/2023-07/OIG-23-31-Jun23-Redacted.pdf

Florida is not alone in bearing the brunt of risks from this overburdened system:

47

**CAR 134**

On Oct. 3, U.S. Border Patrol encountered the noncitizen *[crossing illegally]* in the area of Monument Hill near Lukeville, Arizona. Officials processed him and served him a notice to appear as a noncitizen present without admission or parole. The noncitizen was released on his own recognizance and provided with documentation to report to ERO New York City.

On Oct. 10, Homeland Security Investigations agents attached to the FBI's Counter Terrorism Division notified ERO New York City that the noncitizen was wanted in Senegal for terroristic activities.

https://www.ice.gov/news/releases/ero-new-york-city-arrests-noncitizen-wanted-senegal-terroristic-activities

And

Enforcement and Removal Operations (ERO) Boston arrested an unlawfully present fugitive convicted of homicide in Venezuela who resided in state-provided housing on Joint Base Cape Cod in Bourne on Oct. 27.

The Venezuelan national, 38, *failed to disclose his previous homicide conviction* to U.S. Border Patrol officials *when they arrested him for unlawfully entering the United States* in Eagle Pass, Texas, on July 31. He was processed and given a notice to appear at ICE offices within 60 days, which he failed to do.

When authorities encountered him at his state-provided housing, the Venezuelan citizen admitted that he had been convicted of homicide and was wanted in Venezuela for violation of his sentencing conditions since 2006.

https://www.ice.gov/news/releases/ero-boston-arrests-fugitive-convicted-homicide-venezuela-joint-base-cape-cod

Perhaps most urgently, it also came to light that:

one of CBP's field offices found it necessary, in light of current events, to warn agents that individuals inspired by, or reacting to, the current Israel-Hamas-Hezbollah conflict may attempt travel... across the Southwest Border... Foreign fighters motivated by ideology or mercenary soldiers of fortune may attempt to obfuscate travel to or from the US to or from countries in the Middle East through Mexico.

48

**CAR 135**

Complicating this fact, though, was a contemporaneous revelation that *Palestinians (part of the very population about which CBP issued its warning*) are not classified as "Palestinian" when crossing the border; apparently, DHS software does not contain a menu classification for that nationality, meaning that when Palestinians are encountered, they *are often documented as "Israeli"* even if their passports are stamped by the Palestinian Authority.[20]

These are the policies:



---

[20] When questioned about this, a DHS spokesperson stated that this apparent anomaly was actually by design.

CAR 136

And these are their effects:



 **Chief Jason Owens**
@USBPChief

Over the weekend, USBP arrested 7 hardened criminals trying to enter the U.S.

1) w/ homicide conviction
2) w/ Assault Against Person & Hit & Run
3) Registered Sex Offender
4) El Sal Gang Member
5) Tren de Aragua Gang Member
6) Guatemalan w/ Warrant
7) Weapons Trafficker in Peru





**CAR 137**



**CAR 138**

## IV. CARTELS AND CO-OPTED SYSTEMS

The evidence we saw and the witnesses we heard from lead us to the conclusion that what occurs at or near the southern border often eventually makes its way to our state, whether by human movement and behavior, livestock or agriculture transport, or financial transactions. To that end we investigated the involvement of Transnational Criminal Organizations (TCOs) and their spheres of influence, as well as the negative implications their activity has for health, safety, security and law enforcement efforts in our state.

Many sections of Mexico have become *de facto* nation-states, governed not by elected leaders but by well-financed paramilitary groups possessing such equipment as armored vehicles, drone technology, sniper rifles, night vision capability, body armor, shoulder-fired RPGs and heavy machine guns. They have proven capable of taking down at least one Mexican military helicopter. We have seen and heard about armed incursions made by cartel members into American territory. One such group recently had to be physically and militarily evicted from sovereign U.S. soil on Fronton Island in Texas. "Sinaloa," "CJNG," "Gulf Cartel," and "Cartel del Noreste" are currently among the more predominant, though as one group wanes in influence another invariably ascends.

Because of these groups, the U.S. State Department lists the following advisories to anyone considering Mexico as a travel destination:

Country Summary: *Violent crime – such as homicide, kidnapping, carjacking, and robbery – is widespread and common in Mexico.* The U.S. government has limited ability to provide emergency services to U.S. citizens in many areas of Mexico, as travel by U.S. government employees to certain areas is prohibited or restricted. In many states, local emergency services are limited outside the state capital or major cities.

U.S. citizens are advised to adhere to restrictions on U.S. government employee travel. State-specific restrictions are included in the individual state advisories below. *U.S. government employees may not travel between cities after dark, may not hail taxis on the street, and must rely on dispatched vehicles*, including app-based services like Uber, and regulated taxi stands. U.S. government employees *should avoid traveling alone*, especially in remote areas. U.S. government employees *may not drive* from the U.S.-*Mexico border to or from the interior parts of Mexico, except daytime travel within Baja California and between Nogales and Hermosillo on Mexican*

**CAR 139**

*Federal Highway 15D, and between Nuevo Laredo and Monterrey on Highway 85D.*

Do Not Travel To:

Colima state due to crime and kidnapping.

Guerrero state due to crime.

Michoacan state due to crime and kidnapping.

Sinaloa state due to crime and kidnapping

Tamaulipas state due to crime and kidnapping.

Zacatecas state due to crime and kidnapping.

*Reconsider Travel To:*

Baja California state due to crime and kidnapping.

Chihuahua state due to crime and kidnapping.

Durango state due to crime.

Guanajuato state due to crime and kidnapping.

Jalisco state due to crime and kidnapping.

Morelos state due to crime.

Sonora state due to crime and kidnapping.

*Exercise Increased Caution When Traveling To:*

Aguascalientes state due to crime.

Baja California Sur state due to crime.

Chiapas state due to crime.

Coahuila state due to crime.

Hidalgo state due to crime.

Mexico City due to crime.

Mexico State due to crime.

Nayarit state due to crime.

53

**CAR 140**

Nuevo Leon state due to crime and kidnapping.

Oaxaca state due to crime.

Puebla state due to crime and kidnapping.

Queretaro state due to crime.

Quintana Roo state due to crime.

San Luis Potosi state due to crime and kidnapping.

Tabasco state due to crime.

Tlaxcala state due to crime.

Veracruz state due to crime.

Discussion at a 2021 hearing before the House Subcommittee on Oversight (for DHS) sketched out the reach of TCOs as follows:

> TCOs are typically either directly connected to the groups that smuggle migrants across borders or will allow the smugglers to pass through the territory they control for a fee, generating millions of dollars a year from the exploitation of those who seek a better life. For many who hope to escape violence by leaving their homes, the journey can prove just as perilous. It is estimated that *approximately 80 percent* of women and girls who migrate from the Northern Triangle face sexual violence along the way. Migrants are also highly susceptible to robbery and kidnapping. The same connections that allow TCOs to guarantee passage free from legal hassles, *also allow them to victimize migrants with impunity*…
>
> Successful TCOs exploit existing logistical chains and financial flows and diversify their portfolios to move multiple illicit items such as drugs, money, counterfeit goods, individuals, and weapons. TCOs conduct their operations without regard for human life and have proven to be highly capable, profitable, powerful, dangerous, elusive, and extremely resilient. In short, ***TCOs pose a significant threat to both National security and to public safety***. Human smugglers—many with ties to TCOs—engage in the crime of unlawfully bringing people into the United States, or unlawfully transporting and harboring people already in the United States, in deliberate evasion of immigration law. It is estimated that TCOs profit anywhere between $200 million and $2.3 billion alone for smuggling migrants from the Northern

**CAR 141**

Triangle to the Southwest Border. Desperate migrants often pay human smuggling groups thousands of dollars to aid them on their journey. These smugglers and TCOs profit by exploiting people who are seeking a better life…

Human smuggling poses a substantial threat to the homeland by creating conduits that allow contraband and persons seeking to harm the United States to clandestinely enter the country. Smugglers control where and how these illegal migrant border crossings take place, putting human lives at risk to create gaps in border security. While agents are diverted to process large groups or to conduct migrant rescues, TCOs are using these diversions to move illicit narcotics or other contraband elsewhere across the border. These same TCOs, through diversified criminal activities, are responsible for the movement of illicit drugs entering the United States….

Transnational gangs from this region represent another threat to our Nation's safety and security. La Mara Salvatrucha, also known as ''MS–13,'' is a gang operating throughout the United States and Northern Triangle countries. Members and associates of MS–13 are expected to protect the name, reputation, and status of the gang from rival gang members and other persons. MS–13 members require that all individuals show respect and deference to the gang and its membership. To accomplish this, MS–13 members and associates are expected to use any means necessary to force respect from those who show disrespect, including acts of intimidation and violence. HSI-led investigations have linked MS–13 gang members to a variety of organized criminal activity, including drug trafficking, extortion, and homicide. Another significant concern for our country, human smuggling, involves the provision of a service—typically transportation, navigation, or fraudulent documents—to facilitate an individual's unauthorized entry into the United States.

Harsh terrains and travel conditions, combined with the potential detection by law enforcement and the threat of violence posed by cartels controlling territory along smuggling routes across Central America and Mexico, make it difficult for migrants to travel from their home countries and reach our borders without the assistance of human smugglers. Criminal organizations play a major role in facilitating the smuggling of these noncitizens from their home countries and across our borders. *U.S.-bound human smuggling and related criminal activities are estimated by the Homeland Security Operational*

**CAR 142**

*Analysis Center to produce revenues of between $2 billion to $6 billion per year.*

The Executive Associate Director of HSI testified in June 2021 regarding the "new frontier" of human smuggling by the cartels:

Human smuggling involves the provision of a service—typically transportation, navigation, or fraudulent documents—to facilitate an individual's unauthorized entry into a foreign country. Over the last five years, nationals of El Salvador, Honduras, and Guatemala (referred to as the Northern Triangle countries), and Mexico, who migrate due to violence, poverty, limited economic opportunity, amongst other reasons, have comprised the majority of undocumented noncitizens encountered without authorization along the Southwest Border…

*Criminal organizations step in and to facilitate the illegal smuggling of these noncitizens across our borders.*

**U.S.-bound human smuggling** and related criminal activities are estimated by the Homeland Security Operational Analysis Center to produce revenues of *$2 billion to $6 billion per year*. Human smuggling organizations profit by charging fees for smuggling undocumented noncitizens into and throughout the United States and by collecting transit fees when smugglers and their clients travel through territory controlled by cartels or other TCOs. These groups are almost exclusively financially driven and see humans as just another commodity to be moved across borders.

Human smuggling enterprises and cartels often maintain a symbiotic relationship, both with cartels controlling the major U.S. and foreign drug markets, while smuggling networks control the smuggling flow, otherwise known as "illicit pathways." *Cartels or other TCOs have traditionally charged a "plaza" or tariff on migrants and human smuggling organizations to transit through their territory or operate in certain border towns. However, since mid-2019, some have taken a more active approach in human smuggling, increasing and diversifying sources of income with an activity they view as low risk.*

While human smuggling may constitute the initial crime facilitating the illicit movement of people, including UCs, to our borders, *the criminality does not stop there.* In some cases, migrants become victims of human or labor

56

**CAR 143**

trafficking – a crime of exploitation that does not require movement – when criminal networks introduce force, fraud, or coercion into smuggling schemes to induce victims into forced labor or commercial sex. If the victim is under age 18, sex trafficking occurs when the victim is induced to perform commercial sex – force, fraud, or coercion is not required. For example, in May, HSI identified and rescued a victim who was forced into labor after entering the United States. The victim entered the United States as a UC and was subsequently forced to work and live in substandard conditions, with minimal remuneration. HSI's investigations have also demonstrated that ***human smuggling often occurs alongside or can be a precursor to other transnational crimes such as gang activity, identity and benefit fraud, money laundering, bulk cash smuggling, narcotics smuggling, arms trafficking, and terrorism and other national security related crime***.

DEA's Washington D.C. Special Agent in Charge wrote in 2021 that:

We see trafficking of illegal drugs and human trafficking often happen together. Transnational drug traffickers and criminal organizations often look to increase profits and market control through diversification. This means using trafficking routes for drugs, labor, sex, and violence. Transporting people (usually women and children) for sex is just another egregious source of profits for these violent criminals.

***For traffickers, it doesn't matter which product is being sold*** -- both drugs and sex are lucrative industries – ***as long as money is made***. Drug cartels often use trafficked women and children to smuggle drugs across the border, doubling up on the money they can make from them.

***Violent criminals like this see no difference between abusing a woman's body by forcing her to swallow bags of drugs or by forcing her to have sex with hundreds of men.***

The link we see between human trafficking and opioids in this area, sadly goes both ways. Human traffickers often use drugs as "bait" to recruit people who have a substance use disorder. Or, conversely, traffickers use drugs as a means of control over their victims – to force compliance, harder work, longer hours, or to keep them "drugged out" so they do not attempt escape. Either way, we see these horrific criminals forcing women and even children into addiction by providing them strong and potent drugs as a means of exerting control.

**CAR 144**

The Assistant HSI Director followed this up in May 2023:

### Evolution of Transnational Criminal Organizations

Criminal organizations in the 21st century do not limit themselves to a single criminal enterprise. These criminal organizations have expanded beyond narcotics smuggling and have morphed into *poly-criminal TCOs involved in the associated crimes of weapons trafficking, human trafficking, human smuggling, money laundering, and other crimes*....

For example, the illicit collaboration between Chinese TCOs and Mexican cartels have created a complex criminal ecosystem that is fueling money laundering and narcotics trafficking, specifically illicit fentanyl, operations into and within the United States. Chinese money laundering organizations (MLOs) have developed sophisticated networks in the United States, Mexico, China, and throughout Asia to facilitate money laundering schemes. These organizations utilize their vast global infrastructure to clean illicit proceeds for various criminal organizations, including Mexican cartels. Moreover, as Mexican cartels have taken over fentanyl production and operate on an industrial scale, they are procuring precursor chemicals from China and synthesizing these chemicals in Mexico to produce fentanyl. Mexican cartels then smuggle the fentanyl into the United States in either powder or pill form for distribution....

Chinese criminal organizations also facilitate the trafficking and distribution of illicit fentanyl pills. The most common is fake oxycodone pills, which are made to look identical to prescription oxycodone but are laced with deadly fentanyl. These fake pills are responsible for thousands of overdose fatalities, as the user believes they are taking a real oxycodone pill and unknowingly receives a lethal dose of fentanyl. In order to manufacture these pills, Mexican cartels require industrial pill press equipment to turn powdered fentanyl into pill form. The Mexican cartels are purchasing these pill presses directly from Chinese manufacturers who are producing the equipment specifically for illicit activity.

Moreover, TCOs, particularly those along the Southern Border, have employed a multipronged illicit business model encompassing the importation of narcotics into the United States and *exportation of illicit firearms and ammunition to Mexico*. ...Firearms smuggled from the United States into Mexico allow the TCOs to continue their deadly operations against our

58

**CAR 145**

Mexican law enforcement partners and the local populace. In 2021, the Government of Mexico estimated at least 342,000 U.S.-sourced firearms are illegally smuggled into Mexico every year. Mexico's National Public Security System reported 34,515 intentional homicides with 70 percent involving firearms in 2020. During this period, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) performed traces on 19,762 firearms recovered in Mexico. ATF checks determined at least 67.7 percent were sourced from the United States with over half traced to a retail purchase.

As for specific cartels and their drug activities (conducted in tandem with portions of the People's Republic of China), the Administrator of DEA testified in May 2023 as follows:

### Mexican Cartels and Drug Trafficking

The Sinaloa and Jalisco Cartels pose the greatest criminal drug threat the United States has ever faced. These ruthless, violent, criminal organizations have associates, facilitators, and brokers in all 50 states in the United States, as well as in more than 100 countries around the world. The Sinaloa Cartel, the Jalisco Cartel, and their affiliates control the vast majority of the fentanyl global supply chain, from manufacture to distribution. The cartels are buying precursor chemicals in the PRC; transporting the precursor chemicals from the PRC to Mexico; using the precursor chemicals to mass produce fentanyl; using pill presses to process the fentanyl into fake prescription pills; and using cars, trucks, and other routes to transport the drugs from Mexico into the United States for distribution. It costs the cartels as little as 10 cents to produce a fentanyl-laced fake prescription pill that is sold in the United States for as much as $10 to $30 per pill. As a result, the cartels make billions of dollars from trafficking fentanyl into the United States.

The business model used by the Sinaloa and Jalisco Cartels is to grow at all costs, no matter how many people die in the process. The cartels are engaging in deliberate, calculated treachery to deceive Americans and drive addiction to achieve higher profits.

### The Sinaloa Cartel:

The Sinaloa Cartel, based in the Mexican State of Sinaloa, is one of the oldest drug trafficking organizations in Mexico. The Sinaloa Cartel controls drug trafficking activity in various regions in Mexico, particularly along the Pacific

**CAR 146**

Coast. Additionally, it maintains the most expansive international footprint of the Mexican cartels. The Sinaloa Cartel exports and distributes wholesale amounts of fentanyl, methamphetamine, heroin, and cocaine in the United States by maintaining distribution hubs in cities that include Phoenix, Los Angeles, Denver, and Chicago. Illicit drugs distributed by the Sinaloa Cartel are primarily smuggled into the United States through crossing points located along Mexico's border with California, Arizona, New Mexico, and Texas. The Sinaloa Cartel reportedly has a presence in 19 of the 32 Mexican states. It has been identified that there are currently more than 26,000 members, associates, facilitators, and brokers affiliated with the Cartel around the world.

**The Jalisco Cartel:**

The Jalisco Cartel is based in the city of Guadalajara in the Mexican state of Jalisco, and was originally formed as a spin off from the Milenio Cartel, a subordinate to the Sinaloa Cartel. It maintains illicit drug distribution hubs in Los Angeles, Seattle, Charlotte, Chicago, and Atlanta. Internationally, the Jalisco Cartel has a presence and influence through associates, facilitators, and brokers on every continent except Antarctica. The Jalisco Cartel smuggles illicit drugs such as fentanyl, methamphetamine, heroin, and cocaine into the United States by accessing various trafficking corridors along the southwest border including Tijuana, Mexicali, Ciudad Juarez, Matamoros, and Nuevo Laredo. The Jalisco Cartel's rapid expansion of its drug trafficking activities is characterized by the organization's willingness to engage in violent confrontations with Mexican Government security forces and rival cartels. The Jalisco Cartel reportedly has a presence in 21 of the 32 Mexican states. It has been identified that there are currently more than 18,800 members, associates, facilitators, and brokers affiliated with the Cartel around the world.

The PRC and Precursor Chemicals Chemical companies within the PRC produce and sell the majority of precursor chemicals that are used by the Sinaloa and Jalisco Cartels to manufacture fentanyl and methamphetamine. These precursor chemicals from companies within the PRC are the foundation of the fentanyl and methamphetamine that are manufactured and transported from Mexico into the United States, and that are causing tens of thousands of drug-related deaths in our country. Chemical companies within the PRC distribute and sell precursor chemicals that are used in fentanyl and methamphetamine production around the world. Some companies within the

**CAR 147**

PRC, for example, engage in false cargo labeling and ship chemicals to Mexico without tracking the customers purchasing the chemicals from the PRC and elsewhere. In recent weeks, DEA has had productive engagements with Chinese counterparts in Beijing and Washington, D.C. focused on increasing cooperation between our countries. DEA remains ready to work with the PRC and all willing partners to reduce the flow of precursor chemicals and the deadly synthetic drugs they produce.

**Chinese Money Laundering Operations and the Cartels:**

The Sinaloa and Jalisco Cartels utilize Chinese Money Laundering Organizations (CMLOs) in the United States and around the world to facilitate laundering drug proceeds. CMLOs use mirror transfers, trade-based money laundering and bulk cash movement to facilitate the exchange of foreign currency. The use of CMLOs by the cartels simplifies the money laundering process and streamlines the purchase of precursor chemicals utilized in manufacturing drugs. These money laundering schemes are designed to remedy two separate issues: (1) the desire of Mexican cartels to repatriate drug proceeds into the Mexican banking system, and (2) wealthy Chinese nationals who are restricted by the PRC's capital flight laws from transferring large sums of money held in Chinese bank accounts for use abroad. To address these issues, CMLOs acquire U.S. dollars held by Mexican cartels as a means to supply their customers in the PRC.

But as noted above, cartels do not confine themselves to mere drug activity. Cartel violence, and their ability to extend their tendrils throughout our country, has increased to the point that situations such as these are sadly routine:

- We heard from one individual who is awaiting a prison sentence for trafficking fentanyl provided to him by a cartel source. While he was willing to plead guilty and face decades in prison, he was afraid to identify his source to law enforcement, because as he flatly put it, they would torture and murder him and his family.
- Cartels have ambushed, shot, and killed American law enforcement and Border Patrol officers (we heard from some firsthand).
- They have fired at officers who were attempting to rescue people in the desert.
- On September 10, 2022, cartels shot seven people, among them American citizens, who drove across the border in nearby Ciudad Miguel Aleman.

**CAR 148**

- The Mayor of Tijuana lives on a military base and requires armed escorts just to get her hair styled, due to the threats against her because of her anti-cartel actions.
- We have been provided reports of complete road shutdowns by cartel members who forced children off school buses, and have observed infants and small children abandoned by the cartels in the desert as they flee to evade law enforcement.
- We have seen small children dropped from border walls and abandoned to fend for themselves in the Rio Grande courtesy of cartel smugglers.

In two other examples:

ABC news reported in August of 2023 that:

Prosecutors in the western state of Jalisco say they are investigating a video, and relatives of the missing group of young friends told local media that their clothing resembled that worn by the men in the video.

*The most horrifying thing is not just the pair of bound, inert bodies seen lying in the foreground. It is the fact that the youth seen bludgeoning and apparently decapitating another victim appears to be himself the fourth member of the kidnapped group of friends.*

The fifth member of the kidnapped group — young friends who had traveled to attend a festival in the city of Lagos de Moreno in Jalisco state — may be the body police found inside a burned-out car in the area. The young men went missing Friday in an area known for cartel violence, and authorities have mounted a massive search for them.

Luis Méndez Ruiz, the Jalisco state attorney general, said Tuesday that the men seen in the video "could be the five men who are being searched for. This video and the information that was made public on a social media platform is now part of the investigation," Méndez said. The clothing worn by the men in the video also resembles a photo of them alive, but bound, that was released earlier.

The likelihood that the video was authentic increased further Wednesday, when investigators raided a series of brick and concrete ranch buildings where the brutal scene was apparently taped. They found bloodstains on the floor and shoes scattered about. The video features a text written over the image

62

**CAR 149**

that says "Puro MZ," an apparent reference to El Mayo Zambada, the leader of a faction of the Sinaloa drug cartel.

CBS News reported in September of 2023 that:

> ***Eleven Mexican former police officers were found guilty on Thursday in the murders of 17 migrants who were shot and burned*** near the United States border, prosecutors said. After a trial that lasted more than three months, judge Patricio Lugo Jaramillo ruled there was enough evidence to convict the former police officers.
>
> The killings took place on Jan. 21, 2021 in the community of Santa Anita in Tamaulipas state, close to the border with the United States, where 16 migrants from Guatemala and one from Honduras were headed.
>
> The victims "lost their lives due to gunshot wounds and were subsequently incinerated," the prosecutor's statement read. The charred bodies were found in a truck in the municipality of Camargo, a major smuggling transit point for drugs and migrants. Organized crime groups covet control of stretches of the border because they make money off everything that crosses the border.
>
> Camargo is near the edge of territory historically controlled by the Gulf cartel and in recent years a remnant of the Zetas known at the Northeast cartel has tried to take over. A total of 19 bodies were discovered, including the remains of two Mexicans who, authorities said, were human traffickers who were going to take the migrants to the border.
>
> At least 853 migrants died trying to cross the U.S.-Mexico border unlawfully over a 12-month span in 2021-2022, making fiscal year 2022 the deadliest year for migrants recorded by the U.S. government.

We have seen other videos of cartel activity so graphic and disturbing that we will not describe them further here.

We also received testimony regarding the cartels' ability to "hack" the CBP-One application by using a Virtual Private Network (VPN). At one point, the Mexican government would turn away people attempting to enter the country, unless they had a CBP One appointment. Cartels would penetrate the app and use a VPN to allow users anywhere to "schedule" their appointment, a/k/a their "transit visa through Mexico." They also exploit it by selling off appointments to aliens seeking

**CAR 150**

passage, proudly advertising their services on the internet and in migrant camps. As one expert termed it:

> [W]hat they did is the smugglers now use a VPN and they – and they tell the VPN that they're in Mexico even though they're in Tajikistan. And then, when they get the appointment, instead of the person flying and cooling his heels in Mexico, he stays in Tajikistan until he gets the appointment, then gets on the plane and heads to Mexico. I mean, in a sense the CBP One app is facilitating the work of smugglers in that sense.
>
> …. It hasn't stemmed the flow of illegal immigration; it's actually helped the cartels through their smuggling operations. They've actually made it easier. So before the cartels had to have a robust operation in the United States as well, and now all they've got to do is drop them off at our front door, at a port of entry, and we take over from there.

The goal, as always, is debt bondage; aliens may be forced as a cost of passage to ferry drugs or other people across the border, distracting law enforcement; in some cases, the distraction is necessary so incoming shipments of firearms, weapons, or bulk cash can be brought south into Mexico. Some end up working simply to pay off the cost of their passage upon threat of the death of their family in their home country or elsewhere; and they will be paying for an interminable period:

> So, quickly what the cartels did, they were able to overcome the app and they're able to get anybody anywhere to get online now and get their application to come to a port of entry in the United States. It's equivalent to their Willy Wonka Chocolate Factory ticket. If they have that, it's their transit through a hundred safe third countries. As long as they have that appointment, [Border Patrol is] just stepping aside and letting them come on in, and they're making their way.
>
> … It doesn't matter whether you're going through the Darien Gap. It doesn't matter whether you're traveling through all three Northern Triangle countries or transiting through a couple-of-thousand-mile trek through Mexico. It doesn't matter at the end whether you're going to enter illegally in between the ports of entry or use the CBP One app to come to a port of entry; you're still putting your life in the hands of the cartels. You're still being abused. You're still being exploited. And I promise you, you're having to pay for it every single day.

**CAR 151**

I mean, you really think the cartels and going to step aside and say, oh, OK, you have your appointment; go ahead, free of charge, go ahead and walk to a port of entry? That's stupid. That's not real life. That's not how that works. So the cartels every single day, it doesn't matter whether a migrant is illegally entering between the ports of entry or they're using the CBP One app, I promise you they're paying for it.

They are no longer merely "drug cartels," though that market is still quite active. Just this past fiscal year, Border Patrol seized 27,000 pounds of fentanyl and millions of fentanyl pills **(enough to kill every American 18 times)**, and in the second week of November 2023, seized a shipment of 304 pounds of fentanyl between ports of entry. Border Patrol estimates it only seizes around 10-15% of the fentanyl actually sent across the border, and the vast majority of what is intercepted is seized at a port of entry.

An even more lucrative market is now firmly under their control, *aided by the aforementioned policies which lure a steady stream of new victims* into the web: human smuggling and trafficking. As we learned from numerous witnesses, and as the House Homeland Security Committee pointed out, nearly all the illegal aliens that cross the southwest border are smuggled over by a Mexican cartel. This is because the cartels have complete operational control over the territory, including many of the points of origin, and can permit or deny passage as they see fit. Aliens are not able to pass from one "turf" to another without paying—some with money, some with debt bondage, some by agreeing to smuggle drugs or other people along with themselves, some with human commodities like their children, and some with their own lives. Most TCOs use a similar system to discriminate among those who have or have not paid the necessary bounty: colored wristbands. We have seen reporting that cartels will kill those who wear one group's band but, mistakenly or otherwise, pay off the wrong cartel for passage. Those aliens who do arrive in our country are sometimes committing criminal acts just to pay the debts incurred, so that TCOs will not harm them or those they left behind in their home countries.

TCOs thus profit from *both* ends of the process. Indeed, we have heard and seen evidence about how TCOs actually *weaponize* these alien flows, directing large numbers to cross between checkpoints in order to compel Border Patrol to pull resources from other areas to deal with them, leaving vast areas unpatrolled through which cartels bring other, more valuable (to them) commodities — high-paying illegal crossers such as terrorists, and large quantities of narcotics one direction,

**CAR 152**

counter-shipments of weapons, ammunition and money the other. "High-Value Passengers" of course command the highest prices, and there is little doubt about who they are: in just this past fiscal year, Border Patrol arrested **172 denizens of the Terror Watchlist**[21] **(double last year and more than the past six years combined), 598 gang members (178 from MS-13 alone), 998 persons with active warrants and 15,267 known convicted felons** (35% more than last year).

With smuggling rates for illegal aliens ranging from $3,000 to $60,000, Mexican cartels treat humans as profitable cargo (as we were repeatedly told by witnesses, while drugs can only be sold and consumed once, the same is not true for a person—particularly a child). One victim told the New York Times, "You have to pay with your body," and some are even forced to allow their children to be abused. Eight parents who brought single children over through the Fronton Island area reported $9,000 for the cartel to smuggle them up from Honduras. Two parents who brought one child said they paid the cartel $15,000 for the journey. We are also aware of a child smuggled from Honduras to the border who ultimately arrived in Florida and died here, the investigation of which remains ongoing.

DHS itself has reported to Congress that cartels often require:

> alternative forms of payment in exchange for passage, including migrants being required to participate in smuggling controlled substances or other illicit items across the border or to work off debts through criminal activity upon arrival in the United States.

These are sophisticated networks operating in many countries, including our own (as far north as Alaska). Experts, sheriffs, civilians, border law enforcement officers, and others have also described to us:

> They utilize a network ... of scouts, they're lookouts. They check on and off just like law enforcement. Anywhere from eight-hour shifts, 10-hour shifts,

---

[21]When all U.S. places of entry are added – by land, sea and air – another 564 people on the watchlist were caught, bringing the total to 736. By way of comparison, between fiscal 2017 and 2019, Border Patrol agents apprehended a total of 11 people on the terrorist watchlist. We also note with interest the recent admission, by the Director of the FBI in Congressional testimony, that the recent terrorist attack against Israel and subsequent reactions may "inspire" additional terrorist infiltrations and attacks within our country. Having so many confirmed terror suspects as well as so many SIA's and persons from countries affiliated with such terrorist threats already [legally or otherwise] within our borders is another result of the policies we described.

**CAR 153**

12-hour shifts. I've seen them in South Texas as far as 30 miles into the United States. I have seen them in Arizona as far as 70 miles. They leverage two-way handheld encrypted radios, sometimes encrypted apps, and they communicate back to what is known as 'central.'

So what happens is you have these lookouts everywhere. And when what they call the 'gate' is open, the gate meaning a bend in the river or bend at your border, when there is no law enforcement, they surge with whatever commodity it is that they want to push. So, when you're talking, based on the policies, [about] all of these migrants that have come from all over the world, what is happening is the cartel by design will push hundreds of people as you have seen on every news station over the last few years. And the media focuses on that. That causes the surge of local state and federal law enforcement to that location, and they do that by design because it opens up the other gates.

Now if they're going to move a commodity directly linked to a cartel boss, they'll shut down more gates to ensure that commodity makes it in.

And what they do is they contract directly with U.S.-based street gangs and what we call tier one gangs. Those are gangs which impact multiple regions in our country. They work directly with the cartels. Today it is very important to understand your U.S.-based street gangs are working side-by-side, contracting with the cartels. [...] So, when you wonder today why you are being overrun with drugs, it is because the tier one gangs, and U.S.-based street gangs are contracting and working directly with these cartels....

Historically your cartels, Mexican cartels, we call them drug cartels because that's what they were. Today, they are in over 54 countries around the world. This is not a U.S.-Mexico problem ladies and gentlemen. Cartel Jalisco New Generation, we know, is in 48. This will not stop. And now they've transitioned into the final version of human trafficking known as debt bondage, and I am holding it in my hands. This is how emboldened they've become. So, I can't stress to you [enough] that you have to take extreme action to go after these cartels and to truly create relationships with Mexico and the rest of the world in what we call a unified command and treat them as the dark networks that they are.

67

**CAR 154**

We have reviewed evidence and questioned experts, whistleblowers[22], and law enforcement personnel from the level of local deputy and state police officer to Sheriffs in three states and special agents, those with experience in the FBI, CIA, Treasury Department, Secret Service, FDLE, FHP, and even to the very pinnacle of leadership in ICE, Border Patrol, and the Department of Homeland Security regarding the potential hazards posed by individuals either outright smuggled in by these cartels or camouflaged among the flow of inadequately-vetted aliens. *From the perspective of national security*, the policies we described have created an environment of crisis; there is zero doubt that among the millions casually invited or illegally smuggled in are many individuals with bad intentions who have entered the country without the agencies designed to know, understand, and deal with the threats they represent having any idea who they are, where they are, what their history is, and how to adequately screen or monitor them. What is undeniable is that at least some of them are now in Florida. Even one is too many.

Several experts suggested that the *cartels be equated with, and designated as, foreign terrorist organizations* under 8 U.S.C. 1189, to unlock certain additional methods for lawfully combatting them. We realize our State cannot make such a designation, but we recommend that our federal representatives seriously entertain such a measure.

We also believe it would be appropriate for our State leaders to enhance the sentence for a person convicted of a criminal offense who is proven to be a member of a cartel or TCO, much as is the case already with enhanced sentencing for gang membership. *These are no longer simply thugs with small armies; they are essentially absurdly wealthy mini-countries in a perpetually belligerent posture.*

---

[22] We also heard from a Florida attorney, who works as an immigration lawyer and is involved in the immigrant community. He has publicly exposed the presence of some of these criminal actors (including gang members) in our state (which is terrorized by these groups). He also pointed out the fact that they have in some cases been brought to Florida courtesy of federal agencies. For his candor, he has received death threats and online attacks from the criminals and their sycophants. We commend his courage in coming forward.

**CAR 155**

### DOMESTIC SPILLOVER

When any group of human beings numbering in the millions is considered, there are bound to be those among them who are criminal actors.[23] Immigrants are not an exception. Criminal activity related to these issues is not confined to outside-- or even just inside-- our borders.

DHS' ERO conducts removals of individuals without a lawful basis to remain in the United States. For reference, in fiscal year 2022, ERO *arrested 46,396 noncitizens with criminal histories. This group had 198,498 associated charges and convictions, including 21,531 assault offenses; 8,164 sex and sexual assault offenses; 5,554 weapons offenses; 1,501 homicide-related offenses; and 1,114 kidnapping offenses.*

These numbers show a marked increase from relatively recent history, which was by no means unblemished in this regard. The Government Accountability Office (GAO) occasionally publishes data on *"Criminal Alien Statistics, Incarcerations, Arrests, Convictions, Costs, and Removals,"* having most recently done so in 2018. According to that report, which does not measure all alien crime but only a select few states and some federal crimes:

> Since there are no reliable data on criminal aliens incarcerated in all state prisons and local jails, we analyzed conviction data from the five state prison systems that had the largest number of State Criminal Alien Assistance Program (SCAAP) criminal alien incarcerations in fiscal year 2015.

The GAO found that from fiscal years 2011 through 2016,

- the criminal alien proportion of the total estimated federal inmate population was 21 percent, or about 39,500 inmates.

---

[23] We are aware of arguments attempting to compare the rates of criminal offenses between alien and citizen populations. These arguments appear to proceed from flawed premises to draw faulty conclusions. For starters, a great many alien criminal histories are unknowable, as their countries of origin either keep inaccurate data or do not share it with the United States at all; likewise, most states do not track such data, as we have explained within.

Second, every crime committed by illegally present immigrants with prior criminal histories was avoidable, since if their history was known they should have been removed or denied entry, whereas citizens cannot be blocked from American territory so as to be unavailable to commit crime. As one commentator put it, "The DHS detention and removal process cannot and will not ever prevent a single crime by an American citizen."

69

**CAR 156**

- the number of SCAAP criminal alien incarcerations in state prisons and local jails was about 169,300, or 40 percent.
- certain states—including California, which has the highest number of SCAAP criminal aliens—did not report or were unable to report data on the number of noncitizens.
- 62 percent of the SCAAP criminal aliens were arrested/transferred in one of three states—California, Texas, and Florida.
- the approximately 533,000 SCAAP criminal aliens in the state and local study population were arrested/transferred for a total of about 5.5 million offenses, averaging about 10 offenses per SCAAP criminal alien.
- also estimated that the total amount that state prison systems expended totaled about **$6.7 billion over the 6 years.**

As for immigration offenders, GAO found that:

- **Order of removal or previously removed**. About 55,700, or 77 percent, appeared to have a pending order of removal or were previously removed by ICE with no subsequent record of a legal reentry.
- **In removal proceedings**. About 5,000, or 7 percent, were in removal proceedings at the time of their incarceration, as indicated by ICE's review of records. In other words, they appeared to have a removal case in process in immigration court.
- **Subject to removal**. About 11,800, or 16 percent, may have been subject to removal at the time of their incarceration, as indicated by ICE's review of records.
- About 4,700 criminal aliens **did not have a record of admission or a record of other authorized presence** in the United States.

*Federally*, there were 196 terrorism convictions, 72 murders, 123 kidnappings, nearly 3,500 firearm convictions, and 591 sex offenses among the 200,000 federally-convicted alien criminals.

In the few *states* for which data was available,

- **Arizona**: Drug offenses accounted for 47 percent of the more than 6,300 primary offenses for which SCAAP criminal aliens were convicted.
- **California**: Homicide and sex offenses accounted for about 53 percent of the more than 18,600 primary offenses for which SCAAP criminal aliens were convicted.

70

**CAR 157**

- **Florida**: *Homicide and sex offenses accounted for 45 percent of the nearly 6,300 primary offenses for which SCAAP criminal aliens were convicted.*
- **New York**: Homicide and sex offenses accounted for 49 percent of the nearly 3,400 primary offenses for which SCAAP criminal aliens were convicted.
- **Texas**: Sex, drug, and assault offenses accounted for 52 percent of the nearly 9,600 primary offenses for which SCAAP criminal aliens were convicted.

Among states, only Texas routinely collects such data at the local level. The Texas Department of Public Safety receives data from local jails through a program that submits fingerprints to the FBI for criminal history and warrant checks, and to DHS, which returns immigration status. According to DHS status indicators, over 419,000 criminal aliens have been booked into local Texas jails between June 1, 2011 and October 31, 2023, of which *over 292,000 were classified as illegal aliens by DHS*. According to their data:

> *Between June 1, 2011, and October 31, 2023, these 292,000 illegal aliens were charged with more than 499,000 criminal offenses* which included arrests for 933 homicide charges; 62,624 assault charges; 9,050 burglary charges; 59,090 drug charges; 1,103 kidnapping charges; 24,722 theft charges; 38,989 obstructing police charges; 2,844 robbery charges; 6,320 sexual assault charges; 7,318 sexual offense charges; and 6,052 weapon charges. DPS criminal history records reflect those criminal charges have thus far resulted in over 183,000 convictions including 457 homicide convictions; 22,916 assault convictions; 4,580 burglary convictions; 24,803 drug convictions; 316 kidnapping convictions; 9,520 theft convictions; 15,496 obstructing police convictions; 1,607 robbery convictions; 2,998 sexual assault convictions; 3,364 sexual offense convictions; and 1,997 weapon convictions.
>
> These figures only count individuals who previously had an encounter with DHS that resulted in their fingerprints being entered into the DHS IDENT database. Foreign nationals who enter the country illegally and avoid detection by DHS but are later arrested by local or state law enforcement for a state offense will not have a DHS response in regard to their lawful status and do not appear in these counts.

71

**CAR 158**

[Additionally], the Department of Criminal Justice (TDCJ) [Texas prisons] has provided DPS with information on more than 31,000 individuals who were identified by DHS as in the country illegally while they were incarcerated at TDCJ. 10,747 of these individuals were not identified through the PEP program at the time of their arrest.

*We believe Florida should begin tracking this same type of data regarding the immigration status of arrestees, and mandate its reporting to FDLE for retention and publication. We recommend that our leaders adopt a law requiring the Department of Corrections, each County Sheriff, and the Chief of Police of any law enforcement agency in this state to provide such data to FDLE along with the other data they are already sending.*

*Moreover, given the large number of inmates reflected by SCAAP and the Texas DPS data who had been ordered removed but remained to commit more crimes, we recommend that our leaders look into adding a sentencing enhancement provision such as that below which would increase the exposure for those who have been previously deported and return to commit a felony offense in our state.*

921.0024(1)(a) Sentencing multipliers:

Prior Removal/Deportation: If the offender has been previously deported or removed from the United States pursuant to law, the subtotal sentence points are multiplied by 1.5.

CAR 159

## INHUMAN ACTS, HUMAN COSTS

Among the many facets of illegal immigration to which we have been exposed, the increasingly pervasive impacts of cartel-driven gang activity is the one which has, in ways both direct and indirect, left a mark at some level upon every citizen of this State. While the harms visited upon any community by illegal narcotics have been known for decades, the seemingly unchecked mass illegal entry into this country at our southern border has brought forth a criminal paradigm not witnessed to such an extent for multiple generations. That is, our nation has witnessed an invasion of criminal enterprises that are every bit as ruthless, dangerous, profitable, and powerful as those which operated for decades in the last century under the rubric of the Mafia.

Over the course of our sessions we heard extensive testimony conveying daily conditions along the border between the United States and Mexico. Several witnesses provided photographic and video presentations which illustrated their descriptions. The descriptions and images depicting crowds of migrants carried with them little in the way of shock value or even surprise. Regardless of one's philosophical bent towards the issue of immigration, it is an inescapable fact that the flow of immigrants into this country is and has been occurring at a staggering rate in recent years. This reality is confirmed by even a cursory review on a given day of most any broadcast news network or website. We further believe that these facts are not partisan.

It is when we delve into the real and potential impacts presented by a particular component of immigration—the purely criminal element—that the eyewitness accounts we heard from individuals who were on scene become most illuminating. These immersive perspectives—boots on the ground in the parlance—have conveyed to us a reality which was stated most grimly by a ranch owner from southern Texas. This man's dreams of a quiet retirement on his generational land along the border have been dashed by almost daily damage to his property and the continuous potential for violence directed to his family. His first-hand observation was simply this: ***if the lack of desire at the national level to enforce border security continues, this country will be lost***.

This was one of many individual plights we heard about, every one tragic in its own way, and all a direct consequence of the massive influx occurring at the United States border with Mexico. As will be further delineated later in this report, each such tale carries both a profound human component while also serving as a

**CAR 160**

cautionary tale about the new reality to be encountered when every community is a border community.

Although we were thorough about reviewing hard statistics, we certainly reviewed our share of direct testimony and evidence regarding the nature and costs of these crimes which do not come through from data alone. We spoke with some victim advocates who try to rescue particularly women and children who are forced into prostitution and what amounts to sexual slavery by TCOs. The anguish in their voices alone was enough to convey the depth of this scourge. The fact that current government policies abet such levels of depravity makes the cut even deeper. We commend the courage and compassion of their work, and thank them for sharing their experiences.

We also received evidence and testimony from citizen journalists, ranchers, state and federal law enforcement officers, and victims as far away as Arizona, California, Maryland, New Jersey, Texas, Utah, and Virginia. Many of them testified and presented video evidence, both heart-wrenching and revolting, regarding crimes committed in the recent past, even during the time we have been meeting. We appreciate our witnesses being willing to discuss these tragedies despite the obvious anguish this caused. These are but a few of the horrific cases and disturbing allegations we studied, watched happen, and were horrified by:

- In Maryland, an illegal alien gang member sodomized and murdered an autistic female in a trailer park.
- In Texas, a Guatemalan originally admitted as a UAC raped and strangled an 11-year-old girl in Pasadena. He then stuffed the child's body into a laundry basket and hid it under her bed.
- In San Antonio, an illegal alien who has been deported 15 times was arrested for prostituting and sexually assaulting a teenage girl who was being sheltered by her trafficker last year at a stash house used for human smuggling; he housed the girl and allowed men to have sex with her for $150, according to an affidavit supporting his arrest. He had been deported in the previous year, but was later arrested on a South Texas ranch after once again crossing illegally with a large group.
- Cartel members in armored vehicles containing military-grade weapons traveled on an Interstate highway in Arizona, fearlessly passing law enforcement vehicles on two occasions.

**CAR 161**

- Also in Texas, a Mexican previously deported four times murdered an entire family of Honduran migrants with an illegally-owned rifle.
- Here in Polk County, Florida, an illegal alien speeding to an illegal worksite smashed his pickup truck into a high school girl's car, killing some of his passengers and grievously injuring the girl.
- Also in Polk County, 35 illegal aliens were among hundreds arrested as part of a human trafficking and prostitution sting.
- In Pinellas County, Florida, an illegal alien illegally working on a road construction project ran over and killed a deputy sheriff with a piece of heavy construction equipment, then fled while his fellow illegal alien road crew members lied to police.
- On August 1, 2023, the FBI announced the results of a nationwide sting called Operation Cross Country XIII targeting those suspected of child sexual exploitation or human trafficking. In Bay County, Florida, 7 illegal aliens were among the arrestees.
- In Jacksonville, an illegal alien masquerading as an unaccompanied minor violently murdered his sponsor.
- In Fort Myers, an illegal alien murdered a police officer with the officer's own gun when being arrested for robbery.
- Also in Fort Myers, an illegal alien pretending to be a cab driver picked up a woman from a nightclub, drove her to a secluded location, raped her, punched her in the head and then strangled and threatened to kill her.
- In Daytona Beach, an illegal alien stabbed a bicycling couple to death during Bike Week.
- In Miami, less than a month ago, Border Patrol agents identified both a boat and a stash house used for human smuggling, making six arrests.
- Last year law enforcement officers disrupted a multi-layered narcotics organization in Orlando operating at the direction of one of the most notorious Mexican cartels and carrying out enforcement of their code by way of multiple assassins who fired into a vehicle in broad daylight while on a crowded six-lane thoroughfare.
- Near Tampa, FDLE agents were ambushed trying to effectuate an arrest of an illegal alien, and one was nearly killed during the exchange.

**CAR 162**

These are the policies:



U.S. Department of Homeland Security
Washington, DC 20528

**Homeland Security**

September 30, 2021

| | |
|---|---|
| MEMORANDUM TO: | Tae D. Johnson<br>Acting Director<br>U.S. Immigration and Customs Enforcement |
| CC: | Troy Miller<br>Acting Commissioner<br>U.S. Customs and Border Protection |
| | Ur Jaddou<br>Director<br>U.S. Citizenship and Immigration Services |
| | Robert Silvers<br>Under Secretary<br>Office of Strategy, Policy, and Plans |
| | Katherine Culliton-González<br>Officer for Civil Rights and Civil Liberties<br>Office for Civil Rights and Civil Liberties |
| | Lynn Parker Dupree<br>Chief Privacy Officer<br>Privacy Office |
| FROM: | Alejandro N. Mayorkas<br>Secretary |
| SUBJECT: | Guidelines for the Enforcement of Civil Immigration Law |

This memorandum provides guidance for the apprehension and removal of noncitizens.

| | FY22 | FY21 | FY19 | FY18 | Decline between FY22 and FY18 |
|---|---|---|---|---|---|
| Overall Civil ICE Arrests | 49,396[1] | 74,082 | 143,099 | 158,581 | (-69%) |
| Convicted Criminals | 36,322 | 36,300[2] | 92,108 | 105,140 | (-65%) |
| Homicide Related | 1,501 | 1,506 | 1,923 | 2,028 | (-26%) |
| Weapons Offenses | 5,554 | Not Reported | 10,278 | 11,766 | (-53%) |
| Sexual Offenses/Sex Assault | 8,164 | 3,415[3] | 11,711 | 12,238 | (-33%) |
| Assaults | 21,531 | 19,549 | 45,804 | 50,753 | (-58%) |
| Robbery | 2,348 | 2,717 | 4,736 | 5,562 | (-50%) |
| Kidnapping | 1,114 | 1,063 | 1,833 | 2,085 | (-47%) |
| Family Offense | 2,360 | Not Reported | 5,435 | 5,991 | (-61%) |
| Gang Members | Not Reported | Not reported | 5,497 | 5,872 | Unknown |

**CAR 163**

And these are their effects (victims):

  

  

 

**CAR 164**





78

**CAR 165**

## SMUGGLER BLUES

Specific crimes are also manifested in a burgeoning human smuggling industry. In Southern border communities, one Texas Sheriff's department arrested 169 human smugglers in 2021, but was on pace to arrest more than 900 this year. Arizona sheriffs reported similar problems— compounded by the fact that a section of that border is comprised of a Native reservation upon which they have no jurisdiction. Florida Highway Patrol continues to intercept smugglers on our highways, and FDLE works with Border Patrol interdicting such activity along our coastline and in our ports.

We have seen numerous horrifying accounts and photographic documentation of the "stash houses" in which dozens of human chattel spend their days as *de facto* hostages waiting for the cartel to release them or the next smuggler to arrive. Another sheriff said his county deals with 3-4 high-speed chases per day, involving groups of 20 people or more; Texas DPS data disclosed more than 150 such pursuits for the month of August alone. The cartels are recruiting American citizens and other aliens already in the country to drive for them, offering thousands of dollars via social media apps to pick up illegal alien passengers who have evaded border checkpoints and need transportation from their remote crossing point, including the recent arrest of a *school bus driver using his bus to smuggle aliens*. We have seen the "want ads," we have watched dozens of illegal entrants boil out of the bed of a single pickup truck fleeing from Border Patrol; and we have seen the video evidence of high-velocity pursuits ending in carnage, mayhem, and death to innocent civilians. We have received testimony and evidence regarding, among other things,

- ranchers who report massive waves of illegal traffic across their property, including cutting of fences, killing, escape, or theft of livestock, destruction of water tanks holding thousands of gallons needed in arid country (and taking weeks to replace), theft of heavy tractor equipment and wagons; cartel shootings and high-speed vehicle crashes; and even accosting of family members on their front porches by lone aliens or groups demanding water, food, or shelter;
- female ranchers feeling forced to venture onto their own property only while armed;
- innocent travelers now routinely maimed and killed in grisly fashion because a smuggler crashed his vehicle into theirs trying to elude capture; the week before we met to publish this report, a 17-year-old Honduran human smuggler fleeing from law enforcement smashed head-on into another car in Texas,

79

**CAR 166**

killing himself, his five illegally-present Honduran passengers, and (in the other car) a retired couple from Georgia;[24]

- cattle herds being infected with diseases traced to foreign origination, like particular strains of tuberculosis or anthrax, resulting in the forced destruction of herds up to ten thousand head;
- the loss of resale value and income from being able to rent land for hunting due to the human foot traffic and loss of high-priced game animals;
- small border towns in Texas and Arizona infiltrated by cartels—or at least their proxies—to the extent that law enforcement is able to detect which restaurants and other businesses are 'controlled' and by whom;
- the agonizing feelings that come with finding abandoned children, "rape trees" and corpses scattered about their property and essentially being held hostage to threat of near-daily incursions in remote country where the nearest law enforcement help may be fifty miles away[25];
- property owners along the border who feel compelled to warn campers, sightseers, or visitors of the hazards in manners such as this:



---

[24] In April 2019, the driver had crossed the border illegally and was given a notice to appear. In November, *a judge ordered him removed from the country*; this was not done. In April, 2023, he was caught as part of a failed human smuggling attempt in Texas. Once again, he was turned over to Border Patrol, which turned him over to **HHS. That agency ignored the court order**, sent him back to live with his mother in Houston, and now will not have to enforce the court order, since *he and seven other people are tragically dead.*

[25] We especially commend organizations such as the Texas Border Volunteers, a group of property owners who take it upon themselves to try to locate and assist those abandoned by cartels and smugglers, find and return bodies to countries of origin so families know the fate of their loved ones, and assist Border Patrol in tracking groups of illegal border crossers. Yet such a degree of self-help should not be necessary.

CAR 167

Unfortunately, we could add to this list enough tragic and specific cases to comprise another entire presentment, but we believe the point has been made. *Americans and Floridians suffer horrifying crimes which do not have to occur.*

Yet some claim to be ignorant of the multitude of evils perpetrated by these organizations, and others are deliberately complicit. We refer here to those who willingly accept payment to become smugglers themselves, and those like the school administrator in Rhode Island who:

- learned one of the students was working so hard that he was getting no sleep because he owed money to the group that had unlawfully smuggled him into the country and was threatening to butcher his family
- solicited funds on the school's email list to help *"pay the coyotes"*
- *rather than notify law enforcement*.

We refer also to two soldiers from Louisiana, sent to Texas to ostensibly help secure the border, who were arrested in the act of smuggling illegal aliens across the border in their personal vehicles.

We refer also to the 19-year-old "TikTok Influencer" who was killed in 2021, in Zavala County, Texas (90 miles from the border) attempting to smuggle illegal alien passengers.

We refer also to people like two Dallas residents facing alien smuggling charges for, according to the Border Report, using their son's and granddaughter's birth certificates to bring two unauthorized Mexican nationals into the United States. In October, they attempted to drive from Mexico to the U.S., and handed a U.S. Customs and Border Protection officer two Texas birth certificates on behalf of children they claimed were their son and granddaughter. The officer turned to the "13-year-old" to ask routine questions in English, which he did not appear to understand. He then turned to the younger female child and got an answer that did not match the documents. The 13-year-old "child" admitted to the officer his name, that he was 21, and that he was born in Tejupilco, Mexico, that his brother paid 100,000 pesos ($5,476) to the Texas couple to smuggle him into the United States and would pay a similar amount later. The girl in the vehicle gave officers contact information for her mother, who confirmed to officers that the girl was a Mexican national.

**CAR 168**

Just *days before this report was written*, Texas DPS arrested two smugglers in the act:

Texas DPS Trooper disrupted a human smuggling attempt on RR 334 in Kinney County. The trooper arrested the driver, from Pasadena, after multiple illegal immigrants fled from the vehicle. The trooper attempted to detain one of the illegal immigrants who pushed & struggled against the trooper. A search of the vehicle revealed two unaccompanied children from Mexico, ages 7 & 9, in the cargo area.



The driver, a confirmed Tango Blast gang member, faces charges for human smuggling. The passenger, an illegal immigrant from Mexico, faces charges for evading & resisting arrest. The driver was transporting the illegal immigrants to Houston. The children were going to be smuggled to California.

The driver had multiple tattoos of the folk saint Santa Muerte. The Santa Muerte **is** common among those engaged in **criminal** activity & the Mexican drug cartels who worship & seek protection, healing, financial well-being, and assurance **of a** path to the afterlife.



Such people deserve the full measure of whatever penalty the law can impose. These are the realities, multiple times a day, every day.

82

**CAR 169**

Many aliens who reach the areas around our border are physically spent and in immediate danger of death. The terrain and weather are unforgiving; this is likewise true here in Florida, where coastal landings can be fraught with peril from rip currents, pounding surf, and predators such as sharks. As of September 15, 2023, CBP personnel had conducted 32,754 rescues in FY23; in FY22, CBP conducted 22,522 rescue operations. These range from helicopter or fan-boat deployments to jumping into fast-moving rivers to driving away cartel gunmen to liberating desperate human beings from dangerous reefs, locked semitrailers, filthy sewers and tunnels, and drug-infested stash houses. They are shot at, spit on, bitten, and regularly exposed to deadly drugs like fentanyl. They get little, if any, thanks or recognition and they do all this to rescue aliens who are committing criminal acts by entering far from appropriate ports of entry. We have seen lone Border Patrol agents struggling to patrol 20-mile sections of undefended beach, trying to catch one fence-jumper as five others use the diversion to run past, and speeding over rough desert terrain to pursue yet another truck full of smugglers and their cargo. Yet, to their credit, they continue to answer the call. In December 2022, Border Patrol agent Raul Gonzalez was killed while attempting to apprehend a group of illegal aliens near Mission, Texas. The House Committee on Homeland Security noted a significant increase in such violent incidents beginning within the last two or three years.

Now-Chief Jason Owens, then-chief patrol agent for the Del Rio Sector, told the House Committee in May 2023 that the nature of the job presents inherent risks to agents, and the Committee found:

> When [Border Patrol agents] go out on patrol, a lot of the time, their backup may not know exactly where they are, and if they do, they may be several minutes away. Whenever they go out on an encounter, a lot of times, they are vastly outnumbered. And people that they encounter are a mix of good people simply coming and looking for a better way of life or bad actors that would do them or the communities harm. And they have to exercise judgment and treat everybody accordingly in a split-second notice.

Border Patrol agents also literally put themselves in the line of fire when rescuing aliens. A CBP press release from May 19, 2023, recounted two separate incidents of gunfire that month in the vicinity of agents responding to crossings and rendering aid in the San Diego Sector. After agents in the San Diego Sector were fired upon while attempting to apprehend a group of illegal aliens in August 2023, Patricia McGurk-Daniel, chief patrol agent for the

83

**CAR 170**

sector, said, "Smuggling organizations are becoming desperate and escalating their level of violence because of the work being performed by U.S. Border Patrol agents."

On Aug. 18, 2023, Border Patrol Chief Owens tweeted, "USBP agents in El Paso Sector came under fire while arresting 3 subjects as 2 others fled back into Mexico. Fortunately, nobody was injured, but these are the very real dangers our agents face every day on the frontline. Unsurprisingly, Border Patrol morale has fallen so low that 17 CBP personnel committed suicide in 2022—the highest total in 13 years, including three within three weeks of each other in November 2022. And nearly 40 of them have been lost in the last two years.

We interviewed witnesses, including senior (current and former) members of the Border Patrol, ICE, and the Department of Homeland Security from the absolute top levels down to former line officers. Uniformly, we heard the same lament: dedicated individuals who signed on to enforce our nation's laws are instead prohibited from actually doing so and conscripted into duty as mere processors of "efficiency." They would prefer to be interdicting smugglers such as those described above; instead, they are required to simply nod and process. Even the elite "BORTAC" unit, which has participated in the apprehension of some of the nation's most dangerous and notorious criminals in recent memory, has been tasked with such "desk duty."

In May 2023, the DHS Office of the Inspector General (OIG) released a report documenting how the record surge of illegal aliens across the border has negatively impacted the health and morale of CBP and ICE officials:

Parents are missing 30% of the year, and [are] unable to participate in many family functions. This causes much stress on the parents and children, …We need more staff and better shifts that allow for more time off with families. Divorce rates and suicides are rampant in the agency. [The agency forces] a ridiculous 'anti-suicide' app onto our phones which cannot be deleted yet make us leave our homes and live in a hotel where we can't even eat healthily. This nightmare is forced upon us without a care of our mental or physical health.

The IG report also documented a major increase in the suicide rate.

**CAR 171**

It is unrealistic to expect this situation _**not**_ to have a deleterious effect on law enforcement and its operational capabilities. While Border Patrol, ICE, FDLE, FHP, and local Sheriffs are enduring, the fact that so much unnecessary stress is being placed upon them as a result of current policies should not escape notice.

As the House Homeland Security Committee found in its October 10, 2023 report,

> CBP and ICE personnel regularly reported that their agencies were not appropriately staffed to deal with the crisis, and that _**they were not being allowed to do the law enforcement jobs they signed to up to do**_: "Our interviews and survey comments showed staff frustration and lower morale related to changing policies, especially when the respondents felt the changes were inconsistent with their law enforcement duties. _**In the view of some law enforcement personnel these policies have made it difficult for them to enforce the laws and carry out their mission; one said they felt as if they were doing their job 'with one hand tied behind [their] back.'**_"

> In the [Inspector General] report, one agent _**vented frustration at being prevented**_ "_**from doing the other part of the duties/responsibilities we were hired for, which is deterring or apprehending individuals that have made an illegal entry**_ into the United States." When asked during a transcribed interview with the House Committee on Homeland Security if he had heard similar complaints voiced by his agents in the El Paso Sector, Chief Patrol Agent Good confirmed that he had, as did Joel Martinez, chief patrol agent for the Laredo Sector. Jason Owens, now chief of the Border Patrol, told Committee staff in May 2023 he had also heard agents use the "_**one hand tied behind their back**_" expression.

> The resulting stress on the men and women of CBP and ICE has spiraled out of control, with the OIG report concluding that approximately a quarter of the agents surveyed could be expected to leave the force unless changes were made. The reason? "…[S]truggles with carrying out their law enforcement duties as well as morale as issues influencing their decision to either leave or retire[.]"

Candidly, the policies being forced upon Border Patrol, ICE, ERO, and other law-enforcement agencies seem designed to intentionally discourage _**actual**_ law enforcement. This Potemkin veneer fools the unaware into thinking that laws are being enforced. But it overwhelms with sheer volume the innate disposition we

85

**CAR 172**

sensed among many of these witnesses to buckle down, work harder, and try to catch the bad guys. The frustration in their voices and carved into their expressions made their anguish palpable to us. Funding the hiring of more agents does little good if those agents are essentially handcuffed to their desks.

These policies seem the same in design and effect as those imposed by other bureaucrats running HHS and ORR which attempt to prevent law enforcement officers from investigating trafficked children and predatory sponsors in the UAC arena, as we documented in two of our earlier reports; perhaps this is what is meant by a "whole of government approach."

We can certainly see how anyone could get demoralized when they are accustomed to supporting their family by engaging in the noble profession of protecting public safety, only to be handcuffed by petulant bureaucrats. We express our gratitude to each of them, and to the civilian and law enforcement witnesses who shared their testimony with us, including our local Sheriff's deputies, FHP troopers, and FDLE agents. We wish we could offer more.

**CAR 173**

These are the policies:



*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

## Homeland Security

April 26, 2022

MEMORANDUM FOR:    Interested Parties

FROM:    Alejandro N. Mayorkas
Secretary of Homeland Security

SUBJECT:    **DHS Plan for Southwest Border Security and Preparedness**

### EXECUTIVE SUMMARY

Under the Biden-Harris Administration, the Department of Homeland Security (DHS) has been executing a comprehensive and deliberate strategy to secure our borders and build a safe,

And these are their effects.



CAR 174



**Chris Olivarez** ✓
@LtChrisOlivarez

A @TxDPS Trooper & a #Florida State Trooper find 2 juveniles being smuggled inside a trunk after a traffic stop on US-90 in Kinney Coun

During a roadside interview, Troopers discovered that the driver, an illegal immigrant from Mexico, was smuggling three illegal immigrant from Mexico.

Two of the illegal immigrants who are juveniles, a 14 & a 16-year-old, were located inside the trunk.

The driver, Edwin Giovanni Barrientos Linares, of Mexico was arreste and charged with 3 counts of smuggling of persons. Linares possess California driver license. The 3 were being smuggled to Dallas, Texas #USBP took custody of them. #OperationLoneStar



11:40 AM · Jul 6, 2023 · **52.6K** Views







88

CAR 175





**CAR 176**

## V. THREATS TO INFRASTRUCTURE

We received testimony and evidence regarding landings along Florida's coastal borders so numerous they required days to process, the complete shutdown of the Dry Tortugas National Park and the declaration of a State of Emergency throughout the Florida Keys; damage to reefs and marine life; motorized craft dumping groups of aliens to flee along Palm Beach; and the mobilization and overtime duty by a large portion of our State's Florida Department of Law Enforcement to assist local Sheriffs and federal authorities in interdicting small flotillas.

We received much evidence and testimony regarding activity by foreign nationals, primarily from countries holding special significance due to terrorism or espionage concerns (Iran, China, or Yemen, for example). We are aware that the Department of Homeland Security's "2024 Threat Assessment" included warnings about this type of potential attack:

> OVERVIEW Critical infrastructure provides the goods and services that are the backbone of our national and economic security and the well-being of all Americans. Within this section, we considered physical and cyber threats from domestic and foreign actors—including terrorists, adversarial nation-states, and non-state actors—to the resources, assets, and structures of our critical infrastructure sectors.

> Domestic and foreign adversaries likely will continue to threaten the integrity of US critical infrastructure—including the transportation sector—over the next year, in part because they perceive targeting these sectors would have cascading impacts on US industries and the American way of life.

> Complex economic threats from state and non-state actors, primarily the People's Republic of China and financially motivated cyber criminals, harm US producers and consumers and degrade the competitiveness of our companies and industries. Our adversaries will continue manipulating markets, employing economic espionage and coercive economic tools, and seeking to illicitly acquire our technologies and intellectual property.

In addition, the composition of those coming to the border has increased greatly in diversity, to the point that (per TRAC),

> What is even more remarkable than the recent overall increase in Border Patrol arrests is the ***number of arrests of migrants who were from beyond***

90

**CAR 177**

*Mexico or the Northern Triangle countries*. Fiscal year 2021 saw a dramatic increase in the number of these migrants, which grew from just 7,777 in FY 2011 to over a third of a million arrests (367,275) in FY 2021. These numbers increased again to 728,742 arrests in FY 2022, *marking the first year that non-Mexican and non-Northern Triangle nationalities outpaced the other two.*

CPB defines a Special Interest Alien (SIA) as a person who "potentially poses a national security risk to the United States or its interests. Often such individuals or groups are employing travel patterns known or evaluated to possibly have a nexus to terrorism." CPB encountered 25,627 SIAs in fiscal year 2022 (compared to 3,675 the fiscal year before) as well as 172 designated on the Terrorism Watchlist. We also reviewed FBI reports that just a month ago, the FBI had to scramble to locate a dozen Uzbekistanis allowed into the US after they sought asylum at the southern border with Mexico with the help of a smuggler with ties to ISIS.

Finally, 52,000 or so Chinese aliens appeared at our borders in recent months (a **1,300% increase**). The United States State Department imposed sanctions against several Chinese companies in April 2023 because they supply much of the flow of precursor chemicals used by cartels to manufacture fentanyl in Guatemala and Mexico. Moreover, as reported by the Wall Street Journal,

> Chinese nationals, sometimes posing as tourists, have accessed military bases and sensitive sites in the U.S. *as many as 100 times in recent years*... [as the WSJ reported] citing U.S. officials who described the incidents as potential espionage threats.

> The incidents, which U.S. officials describe as a form of espionage, appear designed to test security practices at U.S. military installations and other federal sites. Officials familiar with the practice say the individuals are typically Chinese nationals pressed into service and required to report back to the Chinese government.

> Concern over the base intrusions comes amid rising U.S.-China tensions, which spiked after a Chinese balloon overflew the U.S. earlier this year carrying what officials said was surveillance equipment. The incidents also cast a light on concerns that Beijing is using nontraditional means to gather intelligence on U.S. soil, whether through proximity to bases or through Chinese-produced commercial equipment that could be used to spy.

**CAR 178**

Officials at the White House and the Department of Homeland Security declined to comment, and the Pentagon only responded broadly to the issue. Government officials referred queries to the Federal Bureau of Investigation, which said: "*The Chinese government is engaged in a broad, diverse campaign of theft* and malign influence without regard to laws or international norms that the FBI will not tolerate."

Officials described incidents in which Chinese nationals say they have a reservation at an on-base hotel. In a recent case, a group of Chinese nationals claiming they were tourists, tried to push past guards at Fort Wainwright, Alaska, saying they had reservations at a commercial hotel on the base. The base is home to the Army's 11th Airborne Division, which is focused on Arctic warfare.

These cases at times occur in rural areas where officials indicate there is little tourism far from a commercial airport. The individuals use what appears to be scripted language when confronted by security guards, according to officials familiar with the tactics. When stopped, the Chinese nationals say they are tourists and have lost their way.

*The problem of low-level Chinese intelligence collection like this is well known in intelligence circles*, said Emily Harding, a senior fellow at the Center for Strategic and International Studies in Washington and a former deputy staff director at the Senate Select Committee on Intelligence. It is a numbers game, she said.

"The advantage the Chinese have is they are willing to throw people at collection in large numbers," she said. "If a few of them get caught, it will be very difficult for the U.S. government to prove anything beyond trespassing, and those who don't get caught are likely to collect something useful."

Harding said that *because most incidents in the U.S. can be pursued only as trespassing, the Chinese government gives a collective shrug for those who do get caught.* The base penetrations are considered a concerning and growing trend, U.S. military and other officials said.

In some cases, individuals did gain unauthorized access to a base, "often by speeding through security checkpoints," said Sue Gough, a Pentagon spokeswoman. "These individuals are often cited criminally, barred from future installation access and escorted off-base," she said.

92

**CAR 179**

There are repeated cases in which Chinese nationals have been found taking pictures at a U.S. Army range, according to people familiar with the matter. They often start off at nearby White Sands National Park, where visitors like to barrel down the sand dunes on rented slides, but then leave that area and cross into the adjacent missile site, the officials said.

In some cases, the individuals have used drones to bolster their surveillance efforts.

There have been *repeated incidents at an intelligence center based in Key West, Fla., starting some years ago, where Chinese nationals, saying they were tourists, were found swimming in the waters near the military facility and taking pictures*, according to officials familiar with the matter.

In at least one instance, an incursion there resulted in arrests and prosecutions that were made public. *In 2020, three Chinese citizens were sentenced to about a year in prison after pleading guilty to illegally entering the naval air station in Key West, and taking photos by either walking around the fence line and entering it from the beach, or driving in and ignoring orders to turn around.*

*In another incident, Chinese nationals appear to have been found scuba diving off Cape Canaveral, home to the Kennedy Space Center. The area is the launch site for spy satellites and other military missions.*

U.S. officials also describe incidents around the White House in which Chinese nationals posing as tourists leave the designated tour area to take pictures of the grounds, including communications gear and the positions of security guards, before being shooed away by the Secret Service.

*In many cases, those who have trespassed on bases, apparently deliberately, have simply been detained briefly and then escorted out* of the country, officials familiar with the incidents said.

Trespass to critical infrastructure sites is certainly not limited to one nationality. However, we received testimony and evidence from several witnesses, including FDLE, that the current law is insufficient to deter such behavior or enable it to be sufficiently investigated, because much of Florida's trespass laws make this conduct a misdemeanor which results in few arrests, low if any bond, and has zero deterrent value. We learned that the State of Texas has been forced to commence arresting illegal aliens who evade Border Patrol and manage to get some distance

93

**CAR 180**

into their State, particularly onto private land or sensitive infrastructure sites such as Starbase, home of Space X, and barely a mile from the Rio Grande. Texas has enacted very robust trespassing laws and is funding a unit of prosecutors specifically dedicated to handling these and other types of cases, such as smuggling. We appreciate their willingness to share their expertise, and we think Florida's legislature should consider enhancing our own state's trespassing laws.



We have been shown a copy of a proposed statute promulgated by the Florida Critical Infrastructure Working Group of law enforcement agencies, and we heartily endorse its adoption.

§810.09(TBD) "Trespass to Critical Infrastructure"

The offender commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084, if the property trespassed upon is a facility described herein that is legally posted and identified in substantially the following manner: "THIS AREA IS A DESIGNATED CRITICAL INFRASTRUCTURE FACILITY, AND ANYONE WHO TRESPASSES ON THIS PROPERTY COMMITS A FELONY."

94

**CAR 181**

For purposes of this section, the term "CRITICAL INFRASTRUCTURE FACILITY" means any portion of said facility and curtilage to which access by the public is prohibited by fences or appropriate signs and includes laboratories, launching pads, runways, taxiways, ramps, apron areas, parking and storage areas, fuel storage areas, maintenance areas, and any other area used or equipped to be used for:

(A) operation, landing, takeoff, or surface maneuvering of vehicles or aircraft;

(B) a chemical manufacturing facility or refinery;

(C) an electrical power generating facility, substation, switching station, electrical control center, or electrical transmission or distribution facility;

(D) a water intake structure, water treatment facility, wastewater treatment plant, or pump station;

(E) a natural gas transmission compressor station;

(F) a liquid natural gas terminal or storage facility;

(G)a cellular signal or relay tower or telecommunications central switching office;

(H) a port, airport, railroad switching yard, trucking terminal, or other freight transportation facility;

(I) a gas processing plant, including a plant used in the processing, treatment, or fractionation of natural gas;

(J) a transmission facility used by a federally licensed radio or television station; or

(K) a military base or military facility conducting research and development of military weapons systems, subsystems, components or parts.

**CAR 182**

## VI. FLORIDA'S LAWS AND ECONOMY

We applaud the efforts of our legislature and governor during last year's session to help secure Florida and address the ongoing influx of those unlawfully entering, being smuggled, or trafficked into our State. Many victims of such activity, including children (as documented by the New York Times and others) are forced into labor markets to pay off the costs of being smuggled, or because they or their loved ones are threatened by cartel traffickers.

We have read with interest claims in various media outlets that Florida's law ***might*** have adverse economic impacts by lessening the supply of illegal alien laborers or causing some to leave the state to avoid being caught breaking the law. Such claims are almost always purely anecdotal, and generally fail to disclose whether they emanate from those ***legally*** present or those who are not—a significant distinction. Florida is home to industries, particularly agriculture, construction, and hospitality, which employ comparatively high percentages of workers who are immigrants.

The facts are that, as the Chair of the Federal Reserve has reported (in December, 2022), on a national level:

> Despite the slowdown in growth, the labor market remains extremely tight, with the unemployment rate near a 50-year low, job vacancies still very high, and wage growth elevated. Job gains have been robust, with employment rising by an average of 272,000 jobs per month over the last three months. Although job vacancies have moved below their highs and the pace of job gains has slowed from earlier in the year, ***the labor market continues to be out of balance, with demand substantially exceeding the supply of available workers. The labor force participation rate is little changed since the beginning of the year***. FOMC participants expect supply and demand conditions in the labor market to come into better balance over time, easing upward pressures on wages and prices. The median projection in the SEP for the unemployment rate rises to 4.6 percent at the end of next year.

The U.S. Chamber of Commerce (large businesses) reported:

> Americans have been leaving the labor force since before the pandemic. In fact, we have ***1.5 million fewer Americans participating in the labor force*** today compared to February of 2020.

**CAR 183**

*Enhanced unemployment benefits, stimulus checks, and not being able to go out and spend money* during the COVID-19 pandemic all contributed to Americans collectively adding $4 trillion to their savings accounts since early 2020. The extra few hundred dollars a week from enhanced unemployment benefits (which ended in Sept. 2021), specifically, led to 68% of claimants earning more on unemployment than they did while working.

In the Chamber's Nov. 2022 survey, 23% of women cited others in the family making enough money that working full-time is not as critical as the reason they have not re-entered the workforce.

Small business group the National Federation of Independent Businesses reported that:

43% (seasonally adjusted) of all small business owners reported job openings they could not fill in the current period, up three points from August. Owners' plans to fill open positions remain elevated, with a seasonally adjusted net 18% planning to create new jobs in the next three months.

Of those hiring or trying to hire, 93% of owners reported few or no qualified applicants for the positions they were trying to fill. Thirty percent of owners reported few qualified applicants for their open positions, and 27% reported none.

Particular industries suffer across the board, as the Fox Business network reported:

The Bureau of Labor Statistics job openings report for June 2023 found that the construction industry had roughly 374,000 job openings while manufacturing had 582,000. While the number of job openings in the two sectors shrank by about 279,000 combined openings compared to a year ago, the total remained near one million job openings for those two sectors out of the roughly 8.5 million open jobs economy-wide.

"The problem that we're facing today is that a lot of the workforce that's been engaged in those roles is retiring and we're not replenishing the workforce with new recruits into these jobs because the Millennial and Gen Z generations – they kind of grew up with a different idea in mind of what was a well-paying and what was a very meaningful job," Aidan Madigan-Curtis, a partner at venture capital firm Eclipse, told FOX Business…. She added that there's currently a shortage of about 750,000 machinists and welders which is expected to climb to 2 million to 2.5 million in the next several years.

CAR 184

The Washington Post echoed:

> With more than 11 million job openings and only 6 million unemployed workers, employers have struggled for more than a year to hire enough people to fill their ranks. That mismatch has left employees frustrated and burnt out, and is fueling a new round of power struggles on the job....
>
> Too many industries are still struggling to find workers. The share of working-age Americans who have a job or are looking for one is at 62.4 percent, a full percentage point lower than it was in February 2020, according to Labor Department data.
>
> The reasons are complex and broad. Early retirements, a massive slowdown in immigration that began during the Trump administration, as well as ongoing child care and elder care challenges combined with covid-related illnesses and deaths have all cut into the number of available workers.
>
> "If you look at sectors like nursing homes, local schools, railroads — employment has fallen like a stone," said Lisa Lynch, an economics professor at Brandeis University and former Labor Department chief economist. "And with that, you see a marked increase in labor action and strike activity. People are tired and overworked."
>
> Although the U.S. economy has officially recouped the 20 million jobs it lost at the beginning of the pandemic, the gains have been uneven. Major shortfalls remain, particularly in low-wage industries that have lost workers to higher-paying opportunities in warehousing, construction, and professional and business services. The hospitality and leisure industry is still down 1.2 million jobs from February 2020. Public schools are missing nearly 360,000 workers and health care has yet to recover 37,000 positions. Rail transportation, meanwhile, is down 12,500 jobs.

And the Associated Builders and Contractors reported:

> The construction industry averaged more than 390,000 job openings per month in 2022, the highest level on record, and the industry unemployment rate of 4.6% in 2022 was the second lowest on record, higher than only the 4.5% unemployment rate observed in 2019. National payroll construction employment was 231,000 higher in December 2022 than in December 2021.

**CAR 185**

"Despite sharp increases in interest rates over the past year, the shortage of construction workers will not disappear in the near future," said ABC Chief Economist Anirban Basu. "First, while single-family home building activity has moderated, many contractors continue to experience substantial demand from a growing number of mega-projects associated with chip manufacturing plants, clean energy facilities and infrastructure. Second, too few younger workers are entering the skilled trades, meaning this is not only a construction labor shortage but also a skills shortage.

"With nearly 1 in 4 construction workers older than 55, retirements will continue to whittle away at the construction workforce," said Basu. "Many of these older construction workers are also the most productive, refining their skills over time. The number of construction laborers, the most entry-level occupational title, has accounted for nearly 4 out of every 10 new construction workers since 2012. Meanwhile, the number of skilled workers has grown at a much slower pace or, in the case of certain occupations like carpenter, declined….

In 2024, the industry will need to bring in more than 342,000 new workers on top of normal hiring to meet industry demand, and that's presuming that construction spending growth slows significantly next year.

Finally, the New York Times noted (in connection with a child-labor article referenced below) that,

A 2022 study led by a researcher at Washington State University found that many adult workers would be willing to take meatpacking jobs if they paid slightly better, around $2.85 more an hour.

We received evidence and met with representatives of various Florida industries (agriculture, hospitality, trucking/transportation, and construction) both large and small and asked these questions. What emerged was a consistent pattern of answers: (a) none of them ***want*** to employ anyone illegally; (b) "labor shortages" have been a concern for years, long before Florida's SB1718 was passed; and (c) there is nothing about the new statute which has had a long-term impact on the ability to hire ***legal*** employees; at most there were anecdotal accounts of individuals who

99

**CAR 186**

were leaving the state because they were illegal and now could not work, taking one or more legal family members with them.[26]

In short, they generally corroborated the national reporting consensus that market difficulties have been going on more broadly and far longer than Florida's law and are the result of a number of factors. ***Difficulties which have been present in the market remain, but those predate Florida's legislative efforts in this regard***.

We further note that the same sorts of "doomsday claims" were made some two decades ago when the federal government first passed its "e-verify" laws; the markets experienced short-term decreases in illegal employment, and adjusted. This fear-mongering about Florida's law appears to be devoid of factual support and indeed supposed hazards like "wholesale abandonment of construction sites" and "trucker boycotts" have failed to materialize.

We think Florida was correct to make it more difficult to illegally employ those who are not lawfully present here, because we have received much evidence that those workers are often targets of exploitation and artificially-low wages;[27] they are afraid to complain about such treatment, and some are working to pay cartels or as a consequence of human trafficking. If Florida is less attractive to illegally present persons, that is not a flaw of the legislation. ***Less exploitation of vulnerable people is an unqualified good.***

Florida Highway Patrol (FHP) has continued to focus on disrupting the human smuggling on our highways, including an arrest in August of an individual who along with several of his passengers was illegally present, had been previously deported, and had a small child in the vehicle being operated by an unlicensed driver. This is precisely the sort of case the law was intended to address-- as might be also the case for the persons "reticketed" in June to our state by the City of New York with the assistance of an NGO, if any of those individuals "entered the United States in violation of law and has not been inspected by the Federal Government since his

---

[26] A recent report from New York City disclosed that despite approximately 140,000 foreign nationals being brought to that city, ***only about 2% of them applied for work permits.***

[27] The Los Angeles District Attorney has announced a large-scale investigation of exactly this sort of behavior. "The investigation will meticulously examine the hiring practices of hotel employers in Santa Monica and Los Angeles, with a specific focus on the alleged employment of unhoused refugees... The mistreatment of vulnerable workers and their exploitation will not be tolerated. We will conduct an exhaustive investigation ... to ensure strict compliance with labor laws and protect the rights and dignity of all workers."

or her unlawful entry." The previously-deported driver is also a textbook case for the imposition of a sentence enhancement such as we suggested above.

We also note that the President of Mexico and one of his diplomats here in Florida apparently expressed that those, including us, who favored the adoption and enforcement of this law did so for unwholesome reasons. We note hundreds of thousands of Mexican citizens leave that country every year (57,000 of them via CBP-One alone in the past fiscal year), many of them bound for Florida. There is also the matter of the raging war between armed criminal cartels controlling entire sections of that country. Perhaps Mexico should prioritize order and safety within its borders over concern with Florida state statutes.

We do support expansion of available worker visa programs (H2A and H2B). Florida employers hired 50,973 H2A (agricultural) workers last year and could use more. However, thanks to a local Florida expert, we also learned that H2B (non-agricultural) visas in particular represent a steep cost to employers, as the rules affiliated with those federal programs not only cap the number of potential employees, but require that if one is hired, existing employees must all be paid at least as much as the skilled worker at the top of the prevailing wage scale—not only must the employer pay the visa worker more, he must also pay existing employees that same wage. Moreover, keeping up with the changes and requirements for worker pay, housing, and eligibility seem to us to almost mandate the hiring of someone to manage such a program on a full-time basis. The costs of such programs thus go far beyond the individual wages paid.

101

**CAR 188**

## VII. EMPLOYMENT, ID, INSURANCE, AND TAX FRAUD, INCLUDING CHILD LABOR CRIMES

There are, unfortunately, those who do unlawfully employ people from other countries, and even industry representatives we spoke with candidly acknowledged this. Most often, this fraud is conducted in tandem with other crimes—identity theft, forgery, and tax fraud among them. We applaud our legislature for acting to strengthen the verification requirements in the last session, and suggest they may want to do so again to address certain symptoms of illegal activity by illegal aliens and employers, including elimination of some loopholes we have noted.

The Social Security Act requires noncitizens to be lawfully present to receive benefit payments while in the United States [Social Security Act, §202(y); 42 U.S.C.§402(y)]. Illegal aliens are not eligible for these benefits. The Social Security Administration (SSA) sometimes finds employees whose W-2 wage and tax statements have names and Social Security numbers that do not match SSA records. Many times, this is because there was some fraudulent activity such as a worker using a fake Social Security number or a deceased person's Social Security number. When that happens, the earnings reports (not tax money itself) are funneled to the "Earnings Suspense File."

The total in the file has exceeded **$2 trillion** as of 2022. This figure represents a massive increase over the past decade (and twenty years ago, it was less than $200,000,000). In fact, in 2002, MSNBC reported that,

> With every paycheck, U.S. workers pay FICA taxes, destined for Social Security funds. But each year, millions of payments are made to the agency with mismatched names and numbers. The Social Security Administration has no idea who deserves credit for the taxes paid by those wage earnings -- so no one gets it.

> During 2002, the year with the most recent figures available, *9 million people* paid taxes with mismatched names and Social Security Numbers. ... [M]ost -- *between 50 and 80 percent* depending on whom you talk to -- *represent illegal immigrants using a stolen or manufactured Social Security number at the workplace...*

> MSNBC.com research and government reports suggest hundreds of thousands of American citizens are in the same spot -- unknowingly lending their identity to illegal immigrants so they can work. And while several government

102

**CAR 189**

agencies and private corporations sometimes know whose Social Security numbers are being ripped off, they won't notify the victims. That is, until they come after the victims for back taxes or unpaid loans owed by the imposter.

The problem is compounded by how often ripped-off numbers are used. James Lee, chief marketing officer for private data collection firm ChoicePoint, said *the average victim of immigrant-based identity theft sees their Social Security number shared about 30 times. "The numbers get passed around a family, and around neighborhoods,"* he said.

The pattern and amounts have accelerated in the years since. In a 2014 interview, Social Security Administration Chief Actuary Stephen Goss explained the use of the ESF to CNN:

[absent] undocumented immigrants paying into the system, Social Security would have entered persistent shortfall of tax revenue to cover payouts starting in 2009.

According to one estimate, the federal government collects about $22 billion annually in employment tax receipts from illegal aliens who obviously do not withdraw it later from Social Security. However, this "funding boost" comes at a significant cost to some: Federal agencies have found *well over 1 million cases of aliens using Social Security numbers belonging to someone else* – i.e. stolen or "shared" with a relative or acquaintance – or numbers that are fabricated.

This can be done by simply making up a number, using the numbers of children born in the U.S., or, as a Real Clear Investigations report pointed out,

Others steal them directly from individuals, purchase them from dealers for $80 to $200 along with a green card as can be done in Los Angeles, or via the dark web for as little as $4…

While some illegal immigrants work off the books, the Social Security Administration has previously said that *75% are using fake or stolen numbers*. By doing so, they gain access to broader employment opportunities. There is another powerful incentive for paying taxes as well. By dint of their generally low income levels, illegals can receive reimbursements through making use of deductions and exemptions, as well as rebates via refundable credits – leaving many with tax liabilities of zero or even as net recipients of government largesse. Immigration proponents contend that many do so in the

**CAR 190**

hope that paying their taxes through employer withholding will weigh in their favor in a future amnesty, reflecting good behavior.

In the meantime, though, ***real people suffer real consequences of this identity theft***; tax liens, ineligibility for home or business loans, loss of job opportunities, and other indignities. No one should be victimized because someone else wants to work illegally.

Other government agencies have found similar disturbing impacts. In 2018, the Department of Treasury inspector general found 1.3 million cases of employment-related identity theft in a five-year period ending in 2016; they also found ***1.2 million cases in which illegal aliens used someone else's Social Security numbers in 2017 alone***. In 2020, the GAO found more than 2.9 million Social Security numbers had "risk characteristics associated with SSN misuse."

The SSA used to at least notify employers of such discrepancies by letter; they could then notify law enforcement and have them possibly notify victims. But as the National Law Review documented:

> No-Match letters are notifications that an individual employee's W-2 form does not match SSA's records. … Receipt of a No-Match letter does not by itself mean the employee was working illegally or using a fraudulent Social Security card. Mismatches might be due to administrative errors, misspelled names, reversed numbers, or name changes (such as due to marriage). Nonetheless, employers, upon receipt of the EDCOR No-Match notification, were expected to take the appropriate actions – checking for errors in records and notifying the employee to resolve the issue with SSA. Employers were advised not to take adverse employment action against "noticed" employees solely due to a No-Match letter.

But in another policy move, the current administration has ordered the use of these letters discontinued.

***We think our elected officials should again consider strong legislative mandates regarding universal documentation requirements, and notification to potential employers and victims of these crimes***. A recently-concluded federal prosecution in the Southern District of Florida highlights other reasons why:

> The operators of several Key West, Florida, labor staffing companies, … were sentenced to prison today for tax and immigration-related crimes.

104

**CAR 191**

Defendants helped run a series of labor staffing companies that facilitated the employment of non-resident aliens in hotels, bars and restaurants in Key West and elsewhere who were not authorized to work in the United States. These labor staffing companies did not withhold federal income and Social Security and Medicare taxes from workers' wages and did not report said wages to the IRS.

These individuals were charged with having "entered into written contracts and verbal agreements with hotels, bars, and restaurants in Key West and elsewhere . . . *when in fact many of the customers knew or had reason to believe that the workers provided under these agreements were not authorized to work in the United States*… facilitated the employment of *more than 100 alien workers*," and for *conspiring to harbor aliens and induce them to remain in the United States* and filing a false federal tax return with the IRS.

Florida's licensing regime for General Licensed Contractors should also be addressed. Currently, our evidence suggests that significant loopholes are present whereby licensing requirements can be sidestepped. These include contractors who simply pass all liability for verification of employee eligibility to work to a third party, usually a subcontractor or labor staffing agency—there are "subs of subs of subs" on some projects. While we recognize a need for flexibility in industrial hiring, it does no good to have a licensing regime which can be so easily manipulated.

Accordingly, we recommend that our lawmakers assess the feasibility of either requiring general contractors to ultimately be fully and directly legally responsible for ensuring their subcontractors hire only legal workers, or requiring any employee staffing agency or any person or business which provides employees to work for another, to register with the state's Department of Labor and be bound by Florida's new e-verify requirements. We also suggest that the "25-employee exemption" to e-verify requirements be eliminated, as it provides too many incentives for the unscrupulous to "game the system."

As a state with many available jobs in the agriculture and construction industries, Florida is a particularly attractive destination for those from poorer nations seeking such work. We learned of the widespread use of persons with no U.S. status in insurance fraud schemes in Florida. The most common such scenario involves fraudsters who secure worker's compensation policies by either grossly underreporting the number of employees needing coverage, or mischaracterizing their job classification.

105

**CAR 192**

In these instances, parallel harms are occurring. First, the insurance company loses millions of dollars annually in lost premiums, a cost which ultimately is passed along to consumers. Additionally, the conductors of such fraud shamelessly exploit the non-status workers, secure in the knowledge they have a virtually non-existent financial bargaining position and are extremely unlikely to serve as prosecution witnesses in the event a criminal investigation yields arrests. Further, in an often overlooked but significant humanitarian consideration, these laborers are exposed to the physical dangers inherent in their workplaces without the guaranteed benefit of worker's compensation benefits.

Another disturbing facet of fraud in the immigration-employment context is referenced in our Third and Fourth Presentments, and highlighted recently by a series of articles in the New York Times (including "The Kids on the Night Shift"). *A worrisome number of those working illegally[28] are children, using fake or stolen identities,* who are sending funds to pay off smugglers and cartel members on behalf of themselves or their families. Many of these children are working in hazardous environments, without adequate protection, resulting in serious injury, disfigurement, chemical burns and poisoning, disease and inability to stay awake or attend school. We reviewed accounts of children working jobs that were supposedly "strictly off limits": construction, chemical cleaning, or labor in slaughterhouses.

In a typical example, these articles disclosed that:

> [His] parents decided he would go north and find a way to earn money. They borrowed against their land to pay a coyote — technically a human smuggler, but in this case, more like a travel agent — to help him reach the United States without being kidnapped or hurt. He made his way to an adult cousin .... Federal law bans minors from cleaning slaughterhouses because of the risk of injury. But with the help of a middle-school classmate who already worked at the plant, [the child] *bought fake documents that said he was a man with a different name in his 20s*. When he was hired, children made up as much as a third of the overnight cleaning crew[.]…

> [ORR provided] a list of requirements for sponsors. The first was to provide … food and shelter. Another was to send him to school. ***Nearly last on the list***

---

[28] The large majority of UAC in our state are between the ages of 15-17. We are concerned that proposed legislation such as HB49 in the current legislative session removes restrictions on the time, length, and hours children ages 16-17 are allowed to work. Specifically, we worry that this change might make it easier for those children, especially UAC, to be exploited.

106

CAR 193

*was a pledge that he wouldn't work. [The ORR-vetted sponsor—not the child's parent] agreed to them all, but she had no intention of keeping [the child] from working. She knew that was why he had come… [The child] borrowed $800 from [the sponsor] to buy fake papers from a man in a nearby trailer, and at 13 he was hired onto the overnight sanitation shift. Each morning, [the sponsor] picked him up from the plant at 6:30, and 20 minutes later, he was waiting…for the school bus.*

But as more children come to the United States to help their families, more are ending up … [with] brutal consequences. A Guatemalan eighth grader was killed on the cleaning shift at a Mar-Jac plant in Mississippi in July; a federal investigation had found migrant children working illegally at the company a few years earlier. A 14-year-old was hospitalized in Alabama after being overworked at a chicken operation there. A 17-year-old in Ohio had his leg torn off at the knee while cleaning a Case Farms plant. Another child lost a hand in a meat grinder at a Michigan operation….

His aunt had come from Guatemala a month earlier with her 15-year-old daughter… His aunt had planned to work while [the daughter] went to school, but they suffered a series of setbacks on their journey. ***Kidnappers held them hostage in Mexico*** and forced them to borrow from relatives to buy their freedom. They were turned back at the border and **decided to cross through the desert, but his aunt fell from the border wall, shattering her leg and running up $107,000 in debt to an El Paso hospital**. Now she was sleeping in the kitchen and using a walker, and instead of enrolling in ninth grade, [the child] was looking for a job.

The Times reported, and our investigations also showed, that the relevant agencies were well aware of these problems, but did little or nothing other than punish those who made the information public:

Even as veteran employees left, others kept sounding alarms. In January, shortly before the Times investigation was published, a group of workers sent another memo to their H.H.S. bosses saying the system had resulted in unsafe discharges. "We are pulling humanity out of 'Health and Human Services,'" they wrote.

Some of the most persistent warnings that children were being funneled into dangerous jobs came from outside the government. H.H.S. releases most children to sponsors without follow-up care, but it hires organizations to

107

**CAR 194**

provide thousands of the most high-risk children with several months of support services. ...[One wrote to H.H.S. that] "We have identified some troubling trends in the Chicago metro area," he wrote, including vans picking up children at odd hours, suggesting that they were being driven to factory jobs....

An H.H.S. staff member replied that more than 200 children, most of them Guatemalan, had recently been released to the neighborhood and confirmed that many of those cases had been marked as suspicious: Adults were sponsoring multiple children, and minors were working instead of attending school. "There are certainly plenty of other concerning trafficking red flags," the staff member wrote....

An H.H.S. spokeswoman said the department was aware that some migrant children worked long hours because they are under intense pressure to earn money, but the agency's legal responsibility for children ends once they are released. ...For now, most children released to sponsors have little support aside from an H.H.S. hotline. According to internal documents obtained by The Times, reports of trafficking to that hotline increased by about 1,300 percent over the past five years.

This included a 14 -year-old child from Florida who related that he

was working long shifts in a refrigerated warehouse, packing vegetables for distribution around the country, and had not seen his sponsor in months. . .He missed his grandmother and sometimes went days without talking to anyone. He wanted to go to school, but felt trapped because he needed to earn money to repay his debts[.]

The principal author of those articles indicated in an interview that:

So, like you say, I spent a year looking into migrant child labor in this country.

And we found kids working in all 50 states. These are sometimes 12-, 13-year-olds. ...And it turns out, there were people in the administration, some of them in senior roles, who were trying to raise this. So the administration was told about people out in the field who were coming across children who said that they were being forced to work. And then people at the highest levels of the administration, people in the White House were told about clusters of children working in meatpacking factories, working in car plants, all around the country. And they were also told that there were these staffers out in the

108

**CAR 195**

field or in the D.C. headquarters who were trying to send up a warning about this.

But, somehow, this still got missed. *So these warnings were maybe ignored.*

… And when I have gone back and asked the whistle-blowers at the agencies, well, why didn't they put them together, what these staffers say is, we think they just didn't want to know.

This crisis is the result of policy failures on multiple levels. And part of it has to do with labor enforcement. …

*And then, on the other side, this is a child welfare and immigration issue. And one thing that people point to in this country is, no single agency is really responsible for these children after they're released to sponsors.*

So they're released. And then most of them are really on their own. And that's part of how we have ended up in this situation.

109

**CAR 196**

==These are the policies.==

# OFFICE OF REFUGEE RESETTLEMENT
An Office of the Administration for Children & Families

## Children Entering the United States Unaccompanied: Section 2
Safe and Timely Release from ORR Care

Published January 30, 2015

Categories: Unaccompanied Children's Services

### 2.1 Summary of the Safe and Timely Release Process

The Office of Refugee Resettlement (ORR) has policies and procedures in place to ensure the care and safety of children who are apprehended in the United States without a parent or legal guardian available to provide care and custody and without immigration status. These policies require the timely release of children and youth to qualified parents, guardians, relatives or other adults, referred to as "sponsors." Safe and timely release must occur within a setting that promotes public safety and ensures that sponsors are able to provide for the physical and mental well-being of children.

ORR evaluates potential sponsors' ability to provide for the child's physical and mental well-being, as the law requires ORR to protect children from smugglers, traffickers, or others who might seek to victimize or otherwise engage the child in criminal, harmful or exploitative activity. The process for the safe and timely release of an unaccompanied alien child from ORR custody involves many steps, including: the identification of sponsors, the submission by a sponsor of the application and supporting documentation, the evaluation of the suitability of the sponsor, including verification of the sponsor's identity and relationship to the child, background checks, and in some cases home studies, and planning for post-release.

Posted 1/27/15

### 2.2 Application for the Safe and Timely Release of an Unaccompanied Alien Child from ORR Care

ORR begins the process of finding family members and others who may be qualified to care for an unaccompanied alien child as soon as the child enters ORR's care. Parents, other relatives, or close family friends can apply to have the child released to their care.

Posted 1/27/15

### 2.2.1 Identification of Qualified Sponsors

The care provider (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Care Provider) the ORR funded facility that cares for the child, interviews the child as well as parents (see the section below on how ORR confirms relationship with child), legal guardians, and/or family members to identify qualified custodians ("sponsors"). If a child is either too young or there are other factors that prohibit the care provider from obtaining potential sponsor information from the unaccompanied alien child, the care provider may seek assistance from the child's home country consulate in collaboration with the ORR Federal Field Specialist (ORR/FFS) (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#ORR/Federal Field Specialist) or from a reputable family tracing organization. Finding a sponsor for the child is an ongoing process that continues during the unaccompanied alien child's stay in ORR care and custody in the event that the primary potential sponsor or primary release plan is not approved.

ORR releases children to a sponsor in the following order of preference [1] parent, legal guardian, an adult relative (brother, sister, aunt, uncle, grandparent or first cousin), an adult individual or entity designated by the parent or legal guardian (through a signed declaration or other document that ORR determines is sufficient to establish the signatory's parental/guardian relationship), a licensed program willing to accept legal custody, or an adult individual or entity seeking custody when it appears that there is no other likely alternative to long term ORR care and custody. ORR has grouped these release options into the following categories [2]

- Category 1: Parent or legal guardian (This includes qualifying step-parents that have legal or joint custody of the child or teen)
- Category 2: An immediate relative—a brother, sister, aunt, uncle, grandparent or first cousin. (This includes biological relatives, relatives through legal marriage, and half-siblings)
- Category 3: Other sponsor, such as distant relatives and unrelated adult individuals
- Category 4: No sponsors identified

Although ORR gives preference to a parent or legal guardian when determining release plans, there are instances when ORR would not release an unaccompanied alien child to a parent or legal guardian. These include

https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.4    1/22





**CAR 197**

And these are their effects.







**CAR 198**

## VIII. WHO BENEFITS

This brings us to another subject: with the amount of TCO/cartel activity we have documented, and the amount of murder, mayhem, narcotics and human trafficking, debt bondage, and immigration crimes for which they are responsible, how do the proceeds of such activity return to the cartels? Bulk cash smuggling is one method, but another is more insidious: money laundering in the form of "remittances."

Every expert we consulted, when asked how a state such as Florida could assist in combatting organizations like TCOs, included the same recommendation:

> ***"They don't care about the people, about you, about life, or anything— except money. Go after the money."***

### A. MECHANICS

Remittances are, generally, noncommercial transactions whereby persons who are living in a country other than where they were born send money "home" to friends, family, or other individuals. According to the Consumer Financial Protection Bureau, they constitute "most electronic money transfers from people in the United States who send electronic transfers of more than $15 through a 'remittance transfer provider.'" This provider can be a bank, a credit union, a "money transfer" business such as Western Union, or smaller providers of such services. In Florida, they must be licensed as such.

A report produced for the 118th Congress by the Congressional Research Service provided this helpful information:

> The United States is the destination for the most international migrants and, according to the International Monetary Fund and World Bank, the largest global source of remittances, sending ***$72.7 billion in 2021***. As remittances have grown, banks, traditional money transfer companies, and entrepreneurs have responded to increased demand by increasing the remittance channels available to migrants; these now include mobile, internet, and card-based options.
>
> The United States has more immigrants than any other country in the world: immigrants account for 14.1% of the U.S. population and are the largest global source of remittances. Remittance transactions typically involve a sender from

112

**CAR 199**

one country, a recipient in another country, financial intermediaries in both countries, and a payment system used by the intermediaries. The financial institutions involved in the *$540 billion remittances market* can be banks or credit unions, but they are often money transmitters, such as MoneyGram, Western Union, or PayPal.

Formal channels[29] involve intermediaries that are officially licensed to operate money-transfer businesses. These formal channels consist of banks, nonbank financial institutions (including post offices), and money service businesses such as Western Union or MoneyGram. Increased use of technology in developing countries has also facilitated the use of mobile-phone-based and other electronic payment methods (such as PayPal), through both formal and informal mechanisms.

The U.S. foreign remittance market is dominated by MSBs, a category of nonbank financial institutions that generally own proprietary, so-called "closed-loop" payment systems, and operate largely outside of conventional banks. A reason remittance customers may use MSBs is that the customers are often "unbanked"; that is, they do not have an account with a depository financial institution. MSBs issue money orders and traveler's checks, transmit money, cash checks, exchange currency, and store value.

Although some prominent companies, such as Western Union, MoneyGram, and PayPal, belong to this group of financial institutions, thousands of money transmitters in the United States operate in the background of financial services. Traditional money transmitters like Western Union and MoneyGram are often located in a wide variety of other businesses, including supermarkets, check cashing agents, gas stations, liquor stores, convenience stores, and currency exchange offices. Alternatively, many peer-to-peer (P2P) platforms, such as PayPal and Venmo, operate through mobile apps and web

---

[29] Thanks to expert testimony we are familiar with alternative transfer systems, including "trade-based money laundering," bulk cash smuggling, and cryptocurrency; we focus on "formal" remittance systems. People can send remittances through informal or formal channels. The most well-known informal channel is hawala (hawala means "transfer" in Arabic), which originated in India and has been in use in South Asia and the Middle East for several hundred years ... these systems' lack of documentation and their anonymity and informality can make them attractive for money laundering, terrorist financing, or other illegal purposes. But they are not subject to ready inspection and are difficult to regulate.

CAR 200

browsers, and so are not ancillary to another business sharing a physical location.

According to the World Bank the United States is consistently the largest sending jurisdiction, accounting for 26% of all remittances sent in 2021. Mexico is by far the largest recipient of remittances from the United States, receiving over $50 Billion in 2021.

***Money transfer is accompanied by a processing fee.*** The World Bank also tracks the cost of sending remittances from the main remittance service providers, be they traditional MTOs (Money Transfer Operators, such as Western Union and Moneygram) and digital mobile operators and MTOs such as Transferwise (Wise), Remitly, WorldRemit, InstaReM and Xoom. In Q3 2022, the World Bank's International MTO Index recorded a decrease to ***5.93%*** from the previous value of 6.17% in Q2 2022. The cost of digital remittances, on the other hand, has increased in recent years. In Q3 2022, the World Bank's digital-only MTO Index was recorded at ***4.38%.***

## B. STRUCTURAL WARNING SIGNALS

In January 2023, FinCen reported that,

Migrants generally pay smugglers in one of three ways: 1) payment in advance, in which the migrant or the migrant's relatives provide full payment to the smuggler before traveling; 2) partial payment, in which a migrant pays some portion upon departure and the remaining balance is paid in full upon arrival, and 3) payment on arrival, in which the migrant's relatives pay the full fee to the smuggler after the migrant is successfully smuggled. … migrants who cannot afford full payment, are unable to pay any outstanding debt upon arrival in the United States or do not voluntarily enter into work agreements may be vulnerable to human trafficking, to include commercial sex trafficking, forced labor, fraud, kidnapping, and other forms of exploitation, once within the United States.

**Funnel Accounts**: Funnel accounts generally involve an individual or business account in one geographic area that receives multiple cash deposits, often in amounts below the cash reporting threshold, from which the funds are withdrawn in a different geographic area with little time elapsing between the deposits and withdrawals.

114

**CAR 201**

*Smuggling fees, often paid by the family members of migrants already settled in the United States and <u>disguised as remittances</u>,* are sent to funnel accounts at financial institutions with branches or locations along both sides of the SW border. Smuggling networks may seek to establish accounts with financial institutions with a large U.S. presence to allow for easy collection of payments from the families of those being smuggled and who may be located throughout the United States. In addition to payment via cash, human smugglers also use mobile payment applications and other forms of peer-to-peer (P2P) networks to transfer funds. For example, smugglers may use P2P networks to collect payments from migrants to cover the expenses necessary for their travel from the country of origin to their final destination.

**Financial Red Flag Indicators of Human Smuggling:**

FinCEN has identified the following financial red flag indicators to assist financial institutions in detecting, preventing, and reporting suspicious transactions associated with human smuggling.

- Transactions involving multiple wire transfers, cash deposits, or P2P payments from multiple originators from different geographic locations either across (1) the United States, or (2) Mexico and Central America, to one beneficiary located on or around the SW border, with no apparent business purpose.
- Deposits made by multiple individuals in multiple locations into a single account, not affiliated with the account holder's area of residence or work, with no apparent business purpose...
- Multiple customers sending wire transfers to the same beneficiary (who is not a relative, and may be located in the sender's home country), inconsistent with the customer's usual business activity and reported occupation.

As it relates to Mexico in particular, the Remittance Industry Observatory published a report in 2017 indicating that not only was the total remittance amount rising, but the average amount sent during each transaction had been steady over a four-year period at around $300. In Florida, it was $360. In 2017, RIO estimated that just under 250,000 such transfers occurred in Florida, and the total from the U.S. to Mexico was just under $30 billion. In the six years since, that number has nearly doubled.

115

**CAR 202**

The Dialogue: Leadership for the Americas compiled data on remittance transfers in 2022. They found:

- Total sent from the U.S. was $150 billion
    - At least 26 million senders and 40 million transactions
    - Annual 14 percent growth
    - 80% of the total remittance flow to Latin America came from the U.S., up from 75% the year before
    - Approximately 30% of the transfers were digital

And, most significantly for our purpose here, *the Gross Domestic Product of some nations* had a significant component from these very transfers:

| | |
|---|---|
| El Salvador | 26.7% |
| Guatemala | 20.0% |
| Haiti | 15.9% |
| Honduras | 28.8% |
| Jamaica | 25.6% |
| Nicaragua | 22.2% |
| Mexico | 4.6%* |

**\*Mexico's GDP is much larger than all the others combined.**

Given these figures and the amount of money they represent, it is no wonder some governments are assisting portions of their populations to undertake the horrific journey we have described; the return monies are *literally keeping their economies afloat* in many cases.

In the case of Mexico, the Mexico Institute and Mexico News Daily both reported that,

*Around 7.5% of the more than US $58 billion in remittances sent to Mexico last year could be linked to drug trafficking*, according to a Mexican think tank. Central bank data shows that *Mexicans living and working abroad, mainly in the United States, sent a record $58.5 billion* home last year.

The think tank Signos Vitales said in a report that there is evidence that *at least $4.4 billion of that amount* is ill-gotten gains that was sent electronically to Mexico as part of a money laundering process.

**CAR 203**

…Among the evidence cited by Signos Vitales is that *large amounts of money were sent to Mexico from U.S. states with small Mexican populations* and that *monthly remittances to over 200 municipalities exceeded the number of households located in them*.

The U.S. state from which the third highest amount in remittances emanated in 2022 — about 8% of the total — was Minnesota, which ranked behind only California and Texas despite having a Mexican population of just 200,000, or 0.5% of the total number of Mexican-origin residents in the United States. [It] also noted that the amount of money sent to Mexico from Minnesota increased 585% between 2018 and 2022.

"The most powerful reason to believe that it's not Mexicans sending remittances from Minnesota is that *the amount sent — some $4.7 billion — is equivalent to the gross annual income of all … Mexicans [in the state], making it financially impossible,*" the report said.

The combined increase in remittances in the same period from that state as well as Idaho, Maine, Montana, New Hampshire, North Dakota, Tennessee and Utah — all of which have relatively small Mexican populations — was just under 279%, Signos Vitales said.

The data-focused think tank also said that remittances originating from unknown locations increased 332.5% between 2018 and 2022.

In addition, it said that *227 municipalities received more remittances than households on a monthly basis last year. The number of monetary transfers received by 32 of those municipalities was at least two times higher than the number of households,* Signos Vitales said.

The $4.4 billion figure calculated by Signos Vitales is in fact based solely on "those municipalities … where 100% of the homes receive more than one [monetary] transfer per month," Signos Vitales said.

"… It's an introduction to the magnitude of the [money laundering] problem, which we believe is enormous," the think tank added.

In its report, Signos Vitales also noted that the total monetary amount of remittances sent to Mexico has increased sharply in recent years. "There has to be an explanation for the astounding increase in the past few years. It's impressive that *it's gone from around $21 billion [a decade ago] to nearly*

117

**CAR 204**

*$60 billion,*" said the think tank's president Enrique Cárdenas, an economics professor.

The report also built on research from 2021 which found:

Organized crime groups in Mexico have shown a remarkable ability to adapt amid the global health crisis, and *the record number of remittances sent back to the country from the United States presents a clear money laundering opportunity.*

To be sure, *Mexican criminal groups have long co-opted remittances sent through US banks* for their own interests. In 2017, for example, the US Justice Department announced that Banamex USA's (BUSA) anti-money laundering monitoring system "issued more than 18,000 alerts involving more than $142 million in potentially suspicious remittance transactions" sent between 2007 and 2012.

Organized crime groups often use such transfers to launder money and hide its illicit origins. Yet BUSA "conducted fewer than 10 investigations and filed only nine" Suspicious Activity Reports (SARs) during that time, and didn't file a single report on suspicious remittance transactions between 2010 and 2012, according to US prosecutors. … Remittances will remain a key money laundering tool for Mexican crime groups so long as US banks struggle to step up controls.

Finally, we received evidence regarding a remarkable study conducted at the Universidad de la Salle Bajio Campus Salamanca Correo in Mexico. It found:

In 2021, remittances reached a record level of more than 52.7 billion USD, 25% more than a year before but 215% in comparison with 2014. That means, that remittances doubled in seven years which is a remarkable accomplishment.…

In the face of this conundrum, *we want to inquire whether there is enough evidence to correlate the boom in Mexico's remittances with Mexican TCO and the outbreak of the drug overdose death crisis in the United States* up 2015.

Most of illegal fentanyl consumed in the US is produced in clandestine labs in Mexico. Fentanyl is 50 times more potent than heroin, rather cheap, easy to get and is classified as a synthetic drug because it is made of chemicals.

118

**CAR 205**

Figure 1 plots *the trajectory of murders related to organized crime in Mexico, remittances, and drug overdose deaths in the USA*. We can notice that *the three variables seem to move harmoniously* taking off very quickly up 2015. …. Drug overdose deaths and remittances behave similarly, whereas violent murders in Mexico have also augmented but more irregularly and with an important backlash in 2021; they have stabilized at around 35,000 murders a year on average.

Table 3 displays the top seven Mexican states in violent murders and their share in remittances from 2003 to 2020. The high level of violence in terms of murders by the seven states have a strong presence of Cartel Jalisco Nueva Generación (CJNG) and harbor clandestine labs to produce synthetic drugs.

*The fact that these states accounted for 41.46% of violent murders between 2003 and 2020 and at the same time they also received 48.28% of remittances in the same period, awake the suspicion that this foreign currency could be camouflaging revenues from drug trafficking*.

We took quarterly data published by Data Center for Disease Control (Centers for Disease Control and Prevention, 2022) from QI-2015 to QIII-2021 and found significant correlations between drug overdose deaths vs remittances. … As can be seen from table 4, *the seven Mexican States receiving 2/5 of remittances show a positive significant correlation with drug overdose deaths* in borderlands,

*Thus, we can sustain the hypothesis that Mexico's spike in remittances is not correlated with historical low rates of unemployment and this boom in remittances coincides with higher prices of synthetic drugs and larger numbers of drug overdose deaths.* The same pattern with slight differences can be observed by Texas (figure 5) and New Mexico (figure 6) respectively.

This could either be the result of more migrants working in the USA or of higher revenues obtained by Mexican TCO at higher prices of their drugs derived from the lockdowns and freezing of economic activity during the Covid-19 pandemic. This conclusion represents only an approach to a complex and dynamic phenomenon, and it is based on public data.

**CAR 206**

## C. TCOs AND THEIR CUTS

We have already established that Florida is home to a large immigrant population, including a large illegal population. And just as some of our citizens are criminals who work with or in fear of gangs and TCOs, so too are some aliens. Regardless of status, though, a great many incur substantial debt to TCOs in the process of reaching our state. That debt does not disappear just because they arrive. Cartels and their gang affiliates also make large sums of money in this country through various activities; they look for ways to get it back to their "home turf."

One method becoming more popular, it seems, is via co-opting of the remittance process. We have previously referenced an FDLE investigation of financial information we subpoenaed from a number of Florida institutions documenting financial transactions from within Florida to specific locations in countries through which migration is occurring. That investigation has turned up disturbing evidence of multiple cases of *each* of the FinCen "Red Flags" described above.

### (1)

Most disgustingly, ***TCO control of remittances is exercised upon the most vulnerable population: Unaccompanied Alien Children***. This is done by simple extortion: parents borrow money from these criminals to send their children to the United States where, instead of being placed with a vetted sponsor who makes sure they are safe and sound, they are abandoned thousands of dollars in debt to groups who can have their parents harmed or killed, or seize their home. Their "sponsor" lets them work under false identification, in hazardous jobs with great risk of harm, and unscrupulous MTOs allow them to cash their paychecks (often issued under someone else's name) and send cash to their parents, who immediately turn that money over to the TCO—***all courtesy of ORR*** and other federal agencies' lax policies.

The New York Times' "Night Shift" story described the situation thusly:

The store is more than just a place to wire money. [T]he woman at the cash register, ... had helped the ninth grader's brother apply to be her sponsor. Now she noticed that the girl had the white payroll debit card used by the sanitation companies. The companies deposited a week's pay each Friday, and workers usually withdrew it all in cash the following day. The girl [said] with pride that she had gotten a job.

120

**CAR 207**

[The woman] sympathized with children who worked nights *but thought their sponsors were akin to traffickers.*[30] …Another girl came in with a white payroll card. She finished [her] shift a few hours earlier and still had a headache from the night's chemicals. [The woman] counted out $500 for her and gave her a discount on a bag of ice pops. "Take care of yourself," she said…

Technically, *minors are not supposed to send wire transfers*, and [the woman] was supposed to check their IDs. But when she tried to enforce the rule, customers complained. *"They just have fake papers anyway,"* she said. The store got more crowded in the afternoon. A boy with the beginnings of a mustache withdrew his $500 and bought a bottle of nonalcoholic wine. A teenager who had recently dropped out of 10th grade so he could switch to the day shift sent $150 to his mother.

Another child came in, a slight 15-year-old who had played on the soccer team … but dropped out after spring break to work during the day. He was too short to rest his elbows on the counter. "Is your uncle not letting you go to school?" she asked as he ran his payroll card.

"They don't let me," he said... Sometimes, she wanted to interrogate the children who came in with payroll cards, but she also knew **that would be bad for business**. There was another store with a card reader a few miles up the highway. *She handed the boy $500 and then helped him send money to his mother.*

What we propose may at least throw some sand in the gears of this practice—and if anything can be done to avoid even one child being permitted to perpetuate this cycle of exploitation and self-harm, we believe it should.

(2)

A case from the nearby State of Georgia sets out another facet of the enterprise:

> **Multiple guilty pleas expose ability of drug cartels to launder drug proceeds through money remitters.**

Drug Cartels are constantly looking for conduits like money service businesses to launder their illicit drug proceeds back to Mexico. We work to

---

[30] We do not disagree, though we also would not describe *her* complicity as anything but criminal.

121

**CAR 208**

dismantle drug organizations by cutting off the money flow back to Mexico, this makes it harder for the drug cartels to operate," said James Dorsey, Acting Special Agent in Charge, Atlanta Field Office. ...

In 2014, federal law enforcement agents began investigating individuals in the metro-Atlanta area that were suspected of laundering drug proceeds to Mexico. Federal agents utilized cooperating sources to infiltrate these individuals' networks and determined that the money launderers were frequently using small businesses to send drug proceeds to Mexico. These small businesses offered "money remittance services," which allow customers to wire funds to individuals in other countries without using traditional bank accounts.

Investigators determined that managers and employees of a number of metro-Atlanta remitters were knowingly helping the money launderers send drug proceeds to Mexico. During the course of this investigation, cooperating sources and an undercover law enforcement officer brought drug proceeds or money that was represented as coming from drug sales to different remitters. In exchange for a kickback, managers and employees of nine different remitters agreed to launder the funds to Mexico by breaking the transactions into smaller amounts and by listing fake sender names, addresses, and telephone numbers. The investigation revealed that *nine metro-Atlanta remitters transmitted more than $40 million over a roughly four-year timeframe*. The resulting guilty pleas in this case made clear that the bulk of this money came from the sale of illegal narcotics.

*Several of the defendants who pleaded guilty actually served as the Bank Secrecy Act/Anti-Money Laundering ("BSA/AML") compliance officers* for their respective stores and were responsible for detecting and reporting these types of illicit financial transactions. Instead, these defendants used their anti-money laundering training to help the drug proceeds flow to Mexico undetected.

*The recorded undercover transactions that took place during the operation exposed how willing many remitters were to help their customers secretly send drug proceeds to Mexico*. One defendant, who served as a store manager and BSA/AML compliance officer, even *gave an undercover officer tips on where to sell drugs* in Atlanta. Another defendant, who also served as a store manager and BSA/AML compliance officer, *offered to provide a cooperating*

122

**CAR 209**

*source help on obtaining fake identifications so that drug proceeds could be transmitted to Mexico undetected.*

Reuters described the same phenomenon during our investigation:

A Mexican mother walked into a bank in her home city of Culiacán in the Mexican state of Sinaloa, where an $8,000 remittance from the United States was waiting. She withdrew the funds in local currency, then strolled across town and deposited nearly all of it into accounts at two different banks.

Money sent home by migrant workers is a lifeline for millions of Mexicans. But the woman had never met the person who wired her the funds, nor the owners of the accounts where she took the cash. What she did know: ***The deal had been carefully arranged by the Sinaloa Cartel, one of the world's largest drug trafficking groups, to repatriate profits from U.S. drug sales back to Mexico disguised as a routine remittance.*** Her cut: $230 worth of Mexican pesos.

It was the start of easy money for the woman, who said she previously had struggled to make ends meet cleaning houses. Recalling that day in April 2014 for Reuters, ***she estimated she had earned some $17,000 over the years recruiting others into the scheme and cashing remittances totaling hundreds of thousands of dollars*** – but never too much or too often, so as to avoid scrutiny by banking authorities. She said a neighbor got her into the game, and that she had never met her bosses in person. "Everything was by phone," she said, "and the phone numbers changed every time."

The woman showed Reuters ***WhatsApp messages*** on her phone that she said were from traffickers coordinating her remittance pickups and drop-offs. One from early 2022 said: "They are waiting for you outside. They know who you are. Give them the money."

The Culiacán mother is part of ***an army of civilians recruited by the Sinaloa Cartel and other drug syndicates across Mexico to help move illicit drug profits earned in the United States south of the border. The criminal scheme essentially piggybacks on the vast legal network of money-transfer firms that help migrant laborers send money home to their families.***

…As legitimate remittances have ballooned, it has become ever easier for cartels to disguise their ill-gotten gains in small transfers sent to average

123

**CAR 210**

people across Mexico who have no obvious links to organized crime, according to four U.S. and Mexican security officials.

*...Several features of the remittance sector make it an attractive vehicle through which criminal funds can enter the financial system*, according to four industry executives and the Mexican and U.S. law enforcement officials. Chief among them is the worldwide reach of this network and the modest-sized cash transactions that drive it. Identification requirements for such transfers are more relaxed than those needed to set up a formal bank account or to wire significant sums of money.

Cases of crime groups using popular money-transfer services to conduct illegal activities have been documented before. *Reuters interviewed two dozen Mexico residents who said they had been paid by the Sinaloa Cartel to act as conduits for remittances, turning the money over to cartel operatives after receiving it.* Records from eight U.S. federal court cases and interviews with a dozen industry insiders, analysts and law enforcement agents on both sides of the border paint a detailed picture of how the criminal venture works.

The use of remittances to move drug money was *supercharged by the COVID-19 pandemic after long-established travel routes were upended by closures and lockdowns*, according to four security officials from the United States and Mexico. Between March 2020 and November 2021, the U.S.-Mexico border was closed to all but "essential" travel. That made the traditional method of repatriating drug profits – bulk smuggling of cash hidden in southbound cars, trucks and cargo trailers – much harder. Traffickers turned to other means, the security sources said, resulting in a heavier reliance on remittances. *It's an approach that has endured even as the public health emergency has receded, they said, because the networks the narcos established are effective*. The Sinaloa Cartel and Jalisco New Generation Cartel are believed to be among the drug syndicates using remittances to repatriate drug proceeds, the person said.

There is a clear pattern for how money is laundered via remittances, according to the U.S. official who works on illicit finance, people who have participated in the scheme in Mexico, and federal court documents reviewed by Reuters from U.S. money laundering prosecutions.

**CAR 211**

In the United States, much of the remittance trade is conducted through corner stores, chain retailers and currency exchanges. These businesses sign on as agents with one or more of the money-transfer companies, for example Western Union, and display the familiar logos of these firms in their shops to entice customers. The retailers receive training from the money-transfer companies on how to use their technology platforms, spot fishy transactions and comply with U.S. anti-money laundering laws. Agents are paid a commission for each transaction they process. Customers can bring cash to these storefronts and send it abroad. *Neither senders nor receivers are required to have a bank account.*

This fragmented network is key to the functioning of the scheme, according to the people and documents. Although money-transfer companies have internal systems designed to spot and curtail illegal activity, controls largely rely on checks done face-to-face with customers at the shop level. Thus, *protections are only as robust as the honesty and diligence of these mom-and-pop agents, some of whom are purportedly in league with drug traffickers,* according to law enforcement sources and the eight federal court cases reviewed by Reuters that involved alleged laundering of drug money via money transfers.

The process of dividing large amounts of money into smaller transactions to avoid reporting requirements is commonly known as "smurfing" or "structuring." Mobilizing large numbers of people or "smurfs" to send and receive those modest sums is referred to as "many to many" by U.S. law enforcement agents.

*U.S.-based accomplices sending money south can earn kickbacks from the cartels as high as 10% of the value of individual transfers that rarely exceed $1,000,* according to the U.S. official and a 2019 federal indictment of alleged criminals running an Ohio money laundering ring.

*The average size remittance sent to Mexico in 2022 was $390*, according to data from the country's central bank. Those funds often are sent to Mexican merchants including convenience stores, supermarkets, pharmacies and department stores.

Two dozen Mexico-based smurfs who said they work for the Sinaloa Cartel told Reuters they prefer dealing with retailers because those businesses tend to ask fewer questions than banks do. They said they typically are required to

125

**CAR 212**

show their official voter ID card; provide the name of the sender and their relationship to that person; and present a transaction tracking number that senders share only with recipients – *details provided to them in advance by the cartel via texts or Whatsapp messages*.

*Receivers in Mexico typically keep 1% of the proceeds as compensation*, the people said, with new recruits pocketing a larger share on their first transaction to entice them into the racket. Security officials said Mexican smurfs are paid less than their U.S. counterparts because the risk of arrest is lower. A Reuters search of Mexican court records dating back to 2012 turned up no cases involving money laundering through remittances.

In the United States, at least seven drug trafficking cases that involved the use of remittances to send profits to Mexico have been successfully prosecuted since 2017 in federal courts in Colorado, Georgia, Ohio, Oklahoma, Texas, Virginia and Washington state. Collectively, those cases involved the *laundering of more than $100 million* between 2013 and 2020, according to court documents filed by prosecutors. At least *81 individuals* charged in those cases have pleaded guilty to crimes including conspiracy to commit money laundering and to distribute narcotics, and illegal possession of firearms.

…Sigue, for example, examined 375 transactions performed by Express Cellular from March to August of 2017 and found multiple indicators of "wire transfers related to narcotics trafficking," the affidavit said. Among the warning signs noted in the document: *Nearly two-thirds of the transactions were sent to the "high risk" Mexican state of Nayarit, a place renowned as a center of opium poppy cultivation.* And many of the transactions were for amounts between $800 and $999, a range Sigue flagged as indicative of "narcotics proceeds."

Barely 28,000 people live in the Sinaloan town of Costa Rica, located about 35 kilometers south of Culiacán, the state capital. It is an area of low migration to the United States, according to Mexican government data. Yet Costa Rica boasts a thriving financial cluster: Six branches of the country's main banks are located there, as well as convenience stores, pharmacies and other retailers where residents can pick up remittances.

In a visit to the town last year, Reuters saw at least five people on motorcycles, *wearing fanny packs and accompanied by bodyguards, collecting cash from people exiting branches* of Banco Azteca, Banorte and BanCoppel located on

126

**CAR 213**

the poorly paved main drag. Six locals told Reuters these couriers worked for the Sinaloa Cartel picking up drug money sent as remittances, without elaborating further.

Across Sinaloa, *49 people familiar with this activity – many of whom have participated themselves – told Reuters it's a common side hustle for residents*. A mother from El Tepuche, a small rural town about 18 kilometers outside Culiacán, said she had been cashing remittances for the Sinaloa Cartel for four years. *"I've done it, most of my family has done it,"* she said. The woman said some of her relatives retrieve remittances for the cartel using a smartphone app from Albo, a Mexican fintech company.

…Mexico last year received the second highest amount of remittances globally, behind only India and surpassing China, according to the World Bank. Remittances last year accounted for 4.3% of Mexican GDP, nearly double the percentage from 2015, government data show. Almost 2 million Mexican households received remittances last year, according to Mexico's central bank.

…In the first nine months of last year, *227 Mexican municipalities received so many money transfers that every single household in those places could have received at least one remittance per month*. "Statistically speaking, such phenomena are unlikely," Signos Vitales said. *Collectively, those places received $10.5 billion, or nearly 25% of all remittances sent to Mexico in the first three quarters of 2022.* Oquitoa is a hamlet of around 500 people located in a region of Sonora state dominated by the Caborca Cartel. As recently as 2017, Oquitoa registered no remittances. Last year it received $2.5 million.

In Culiacán, the former house cleaner who began cashing remittances for the Sinaloa Cartel in 2014 said she had initially been nervous about getting involved with narcos, but did so "out of necessity." She had recently returned with her daughter to Mexico from the United States and was struggling to live on her $150 monthly earnings when a neighbor suggested a way to make some easy money. Her initial cut of $230 went towards paying that month's rent. Soon, she was retrieving remittances regularly, but no more than three times a month, a limit imposed by the cartel. Sometimes, her handlers messaged that she must "take a break" for a few months, she said. The woman said she received about 1% of each remittance she cashed. But a good chunk of her

127

**CAR 214**

total earnings – around $8,000 – came from bringing others into the ring. *She said she was paid $40 a head for people she recruited herself, $20 for each person her enlistees brought in, followed by a final payout of $10 per person from the next layer of the pyramid.* She said the work hasn't made her rich, but it has made life a little more comfortable. "We used the money to improve the house," she said.

One of her direct recruits was a Sinaloan truck driver in his 50s, who told Reuters he eventually brought his daughter in on the action. He said she and other younger recruits used Albo, a Mexican fintech, or mobile payments company, to receive money for the cartel. The daughter's activities cast light on how new banking technology offers traffickers fresh ways of laundering money, a trend confirmed by security experts and 13 smurfs who said they cash remittances for the Sinaloa Cartel. Some fintechs offer app-based services that wire money internationally in seconds, and provide users with a debit or credit card to make purchases with those funds…. The truck driver said *his daughter cashed remittances for the Sinaloa Cartel for three years. Then, in June 2019, two unidentified men shot her dead.*

"They shot my daughter, here in front of my house," he said. Reuters viewed a copy of her death certificate. It said she died of gunshot wounds. *The man said he still cashes remittances for the Sinaloa Cartel.* He's afraid they'll harm him if he stops.

(3)

The sort of activities our witnesses described to us are also corroborated in a lengthy article by VICE World News from April, 2021, abridged and reordered below. By the time we read it, it was no longer news to us, but it contains what we consider an excellent distillation of another problem we have studied and now confront: **kidnapping, ransom, and extortion via remittance.**

Don … was trying to get back to his wife and two daughters in San Jose, California, where he'd lived for more than a decade before being deported back to Mexico.

With no legal way to reunite with his family, Don had agreed to pay the smugglers $12,000 to sneak him across the border and up to Los Angeles. But as the two men drove him through Tijuana, he overheard them talking and realized they had other plans.

128

**CAR 215**

"Did you bring the gun?"

"Yeah, in case they want to run."

They passed a Mexican police patrol, but Don didn't bother to scream—he assumed the cops were friendly with his captors, or perhaps even in on the kidnapping. As the SUV pulled up to a house, the men forced a hood over his head and tied up his feet and arms. He thought to himself, "This is it; I am never going to see my family again."

In California, Don's wife got a phone call. A man whose voice she didn't recognize demanded she pay $10,000 through wire transfers for her husband's release. She insisted on talking to Don. The kidnappers held the phone to his mouth.

"Get the money, please, get it," he told her. "Ask my brothers. Find someone who will loan it to you. Help me."

Don was kidnapped on January 13, 2014. In the years since, tens of thousands of other migrants have endured similar nightmares. ...At the heart of it are *wire transfers through American companies, which are still by far the most common way for kidnappers to extort ransom payments and for coyotes to collect fees*.

The kidnapper gave detailed instructions to Don's wife, Maria. If she wanted to see her husband alive, she had to make four deposits of $2,500 each to four people in Tijuana. Maria scraped together all she and Don had, then turned to relatives for the rest. She drove to Tropicana Foods in San Jose, a market that sells everything from groceries to jewelry and clothes. At the checkout counter, customers can also send cash abroad using a number of money transfer companies. Maria chose Ria, a California-based company with nearly half a million locations in 159 countries, because it offered the best exchange rate.

Maria's in-laws each deposited $2,500. *Ria charged $25 per transfer. The payments were "structured" or broken up into smaller amounts in an effort to avoid triggering laws* that require companies like Ria to keep detailed records of any transaction over $3,000 and monitor for suspicious behavior.

Even so, when Maria tried to send her portion, Ria's system blocked it. Undeterred, she simply went to another Ria outlet a few miles away. This

**CAR 216**

time, the transfer went through. For the $10,000 ransom payment, Ria earned $100 in fees....

Most family members of kidnap victims pay $2,000-$4,000 to free the loved one, according to receipts we reviewed and interviews with nearly a dozen victims. With few exceptions, the kidnappings are carried out by cartels or affiliated criminal groups. Like Maria, the victims usually enlist friends and relatives to help send the money to avoid being blocked. The initial extortion is often just the beginning. If kidnappers sense victims aren't bled dry, they demand more money. Such was the case with Maria and Don.

Hours after Maria sent the payments, the kidnappers called back and angrily reported that one of the $2,500 transactions was blocked on their end. Maria was able to retrieve that money, but the man told her she needed to come up with another $8,000 to make up for the loss or she'd never see Don again.

Don's mother had recently sold a house and split the money among her children. Those funds would now be used to pay off the kidnappers.

The kidnappers gave Maria a new list of four names and again instructed her to send the money in parts. She returned to Tropicana Foods and attempted to make the transfer, but this time the teller said the amount was too large.

In Tijuana, Don's nightmare was just beginning. He recalled being held alone, blindfolded and bound. He received only water, no food. The first guard kicked him, he said, and another took down Don's pants and touched his genitals.

"He would touch my parts and tell me that he was going to help me, that I needed to do what he said, because if I didn't, they were going to kill me," Don said. "I was practically like an animal," he added, wiping tears from his face. "It was like they were going to sacrifice me."

Don, ... had been deported previously trying to enter the U.S., and his 2013 removal came after a traffic stop led to police finding a weapon—a collector's item Japanese throwing star, or shuriken.

On the third day of his kidnapping, the man who liked to touch Don came into the room and announced: "*Te vas a tomar dos Tonayans.*" He carried two bottles of Tonayan, a bottom-shelf brand of tequila that comes in a plastic jug. Don would be released, but first he had to drink.

130

**CAR 217**

With no other choice, Don began to down the tequila. He blacked out and woke up next to a highway. He was beaten and bloodied, his clothes dirty and stained. He begged for help, but passers-by kept their distance.

Don managed to get to a church in Tijuana. A man outside agreed to call Don's home, and Maria picked up. Over the previous three days, she had paid the kidnappers $14,500 for Don's release: $7,500 in money transfers, plus the additional $7,000 in cash, which her in-laws fearfully handed off at a park in East Los Angeles.

Maria arranged for a cousin to pick up Don. … They found yet another coyote to smuggle him across near Calexico, California.

Two months after Don's kidnapping, Maria went to the police. … She knew after delivering the second ransom payment that the criminals had connections in California, and she feared retaliation. She also knew of other people—family members of church friends—who'd been kidnapped while crossing the border.

"I was terrified," she said. "But my friends at the church said to me, 'You have to speak up so other people will also overcome their fear and denounce what's happening. Because if people don't say what happened, it remains a secret and nothing ever changes.'" …

Two FBI agents arrived at Maria's house a few weeks later. She retold the story, again providing copies of all the records. Maria said she never heard from them again.

As soon as Don crossed into Arizona with his second coyote, immigration agents began pursuing the group, and eventually detained them. The federal authorities wanted to prosecute the smuggler, and Don agreed to cooperate as a witness in the case.

He also told them about the kidnapping, and after a year in detention, a judge ordered him released, ruling he had a "credible fear" of returning to Mexico. He and Maria are currently pursuing U-visas for undocumented immigrants who are victims of crime and cooperate with law enforcement. …

Nothing ever came of the FBI investigation. In 2017, Don's attorney contacted the FBI agent who visited Maria. The agent said in an email that the case was

**CAR 218**

closed because Don could not be reached for an interview while he was in ICE custody.

These days, Maria works in a Mexican restaurant, and Don has returned to the construction industry, laying tile in bathrooms and kitchens for $28 an hour, but the pandemic has made jobs scarce. They still owe money to their relatives who helped pay the $14,500 ransom.

Don and Maria still hold out hope the kidnappers will be caught and prosecuted, but they know the reality of that happening gets dimmer with every passing day. "That money will never be returned to me," Don said. "But if there were justice in my case, so other families didn't go through the same, that would be enough."

There are no reliable statistics on migrant kidnappings. The Mexican government's most recent report, from 2011, documented more than *11,000 in just six months*. If that pace continued, it would work out to over 200,000 kidnappings in a decade. Assuming the kidnappers received around $2,000-$4,000 per victim, the going rate in the receipts we reviewed, that works out to *$40 million–$80 million annually paid out in ransoms*. The true total is impossible to pin down, since most kidnappings go unreported and only the most horrifying cases ever make headlines.

In hopes of avoiding a similar fate, migrants pay smugglers upwards of $14,000 to ferry them from Guatemala or Honduras to a given city in the U.S., usually taking out loans at exorbitant interest rates and putting up their family's land for collateral to pay the fee. The trip is marketed as all-inclusive, including not only food but also the fee paid to cartels to pass through territory they control.

*The vast majority paid a smuggler at some point in their journey. Most of that money traveled through U.S. financial institutions. Migrants rarely carry cash because it's too dangerous,* and wire transfers offer a degree of protection against theft.

The low-budget option is to make the trek north without a smuggler and just pay for the border crossing into the U.S., which runs from a couple hundred to a couple thousand dollars. Payment is non-negotiable.

"*The cartel has its rules,*" said one smuggler in Juarez who asked to go by the name Spider. "*Those who don't pay are disappeared.*"

132

**CAR 219**

At 43, Spider has been in the smuggling business for 20 years. Back when he was 13, he could cross freely into El Paso. Now he charges $1,500-$1,800 for the same trip. *A third of the fee goes to the cartel* that controls his portion of the Rio Grande. To reach Dallas, the price goes up to $5,500. He said he'd crossed 12 people the day before. His preferred wire service is MoneyGram, but he also collects using Elektra, BanCoppel, and others.

*Spider's money is picked up by a rotating cast of family, friends, and acquaintances whom he has trained on what to say if questioned.* If the teller asks who sent the money, for example, they should say a relative—but a distant one, like a stepfather or brother-in-law—or even a lover. His people can usually collect up to four payments with one company before they are frozen out, he said, but after a few months they're back in business.

"It's a sweet deal for everyone," Spider said. "Even the people picking up the money make $25 for every deposit." … The smuggling doesn't end at the U.S. border. Once migrants cross the Rio Grande, they are typically handed off to another member of the organization, who drives them to a safe house where they wait for payment to be collected before they are freed or continue north.

Ramón, a smuggler in Arizona, is a U.S. citizen who makes around $1,200 per trip transporting up to six people at a time from the border to Phoenix or Tucson. *He compared the service to a travel agency, with the coyotes as "agents" who refer clients, and him as the "chauffeur" driving the last leg of the journey.*

*"It's a real ego stroke, to be honest,"* Ramón said. "If you get them across, they're like, 'Thank you, thank you so much.'"

The line between smuggling and kidnapping can be blurry, with people held for days or weeks at stash houses until they pay what's owed—and sometimes more. Ramón recalled witnessing a stash house worker threaten someone by firing gunshots into the air: "He was like, 'You have to hurry, get all these account numbers otherwise I'm going to have to call this guy's mom and tell her why her son is tied up.'"

Evidence of extortion payments connected to stash houses in the U.S. shows up in receipts we reviewed. One family in New Jersey used the money transfer service Walmart2Walmart to send two payments totaling $1,000 to free family members held in Texas.

**CAR 220**

Ramón said…"The way they send transfers of money hasn't changed in probably 30 years," he said. "I have some buddies that can do some crazy things with bitcoin, but I'm not that cool. It's old-school."

Other kidnapping victims also shared money transfer receipts. Using the recipient names, we located some of the individuals responsible for collecting the ransoms in a matter of minutes, just by searching on Facebook. One man who ignored our messages lives in the Mexican border city of Nuevo Laredo. He lists his occupation as "Boss of Los Zetas," a notoriously violent cartel, though he looks to be 20 at most. He picked up a $1,500 money transfer from Mastercard subsidiary Transfast, one of four payments sent in the kidnapping of an Ecuadorian family trying to reach the U.S.

[We] reviewed 40 ransom payments made through money transfers in eight different kidnapping cases from 2014 through January of this year. Virtually all of the money flowed through U.S. companies, mostly through Western Union and MoneyGram but also Walmart and lesser-known companies like Ria. *By our rough estimate, criminal organizations in Mexico have made around $800 million on migrant kidnappings alone over the past decade,* and money-transfer companies received a cut on nearly every transaction through fees and exchange rates. ...

*Ransom payments are a drop in the bucket compared to the fees people willingly fork over to be smuggled into the U.S. American companies profit from these deals too, through relatives wiring money to the coyotes.* The cost of crossing illegally ranges from $150 to $15,000, depending on the stretch of the border, the destination in the U.S, and where the journey began. *The total paid to smugglers, mostly through wire transfers, is in the range of $2 billion annually,* according to law enforcement and think tank estimates....

Money transfer companies and U.S. authorities have tools to track the millions of dollars being sent to human smugglers and kidnappers. But most of the information gets lost in a web of bureaucracy.

When companies spot something shady, such as a large transaction or structuring, they are obligated to file a "Suspicious Activity Report," or SAR, with the U.S. Treasury Department. The system is an information black hole. Last year, companies filed 2.5 million SARs, so many that the database of reports is unwieldy almost to the point of uselessness, especially for kidnappings that involve relatively small dollar amounts.

134

**CAR 221**

"Their mandate was to be a filing cabinet, to be a data repository," said Jimenez, the anti–money laundering expert. "Very few law enforcement use SARs as a starting point for an investigation. They use it as a supplement."…

Money transfer companies have seen their fortunes rise in the years since Don's kidnapping. Remittances to Latin America are a $100 billion-per-year industry. "Financial institutions along the spectrum, they're making a killing," said Richard Lee Johnson, a doctoral researcher at the University of Arizona who studies the relationship between debt and migration in Guatemala. "It's a whole economy."

Even DHS's "United States-Mexico Binational Criminal Proceeds Study" found that:

CEs also hire individuals to move criminal proceeds through wire transfer companies like Western Union. For example, in February 2010, the Attorneys General of Arizona, California, New Mexico, and Texas announced a $94 million settlement agreement with Western Union. The company had been accused of allowing people who were working on behalf of Mexican CEs and human traffickers to wire funds from the United States to Mexico.

### D.  PAYING IT FORWARD INSTEAD OF OVERSEAS

The trend of the evidence we reviewed and set forth is this: TCOs, particularly those based in Mexico, are using the aliens under their control to commit crimes like human smuggling and kidnapping, as well as to launder the proceeds of criminal activity, and they are doing so increasingly through the use of remittances. We understand that this can occur at either end of the transaction, or both: cartels can have several aliens send transfers to a funnel account, which then makes a larger transfer to the cartel. Cartels can also compel aliens to send funds to small villages or large cities all along migration routes, where cartel agents retrieve them, possibly giving the alien's family members some portion. In short, there are many opportunities to take a cut of these transfers, and TCOs avail themselves of every one.

We investigated this phenomenon ourselves. We subpoenaed financial transaction information from a number of Florida financial institutions and discovered, with FDLE's assistance, a similar pattern of suspicious activities to certain locales south of the border. The conclusion is inescapable: just as the articles

135

**CAR 222**

above described, there are some living among us who are facilitating this criminal activity, whether out of fear, greed, or simply from desire to bring others here without obeying the laws while doing so.

There are approximately 90 banks in Florida, and several hundred Money Transfer Organizations. We sent subpoenas to three banks and three MTOs, and asked them to provide data on the (a) number and (b) aggregate dollar value of transactions which met the following criteria:

- done within a specific *one-year period*
- originated from within Florida
- terminated outside the nation's borders
- represented *non-commercial* activity

The results were shocking.

Not counting children, most estimates indicate that there is a total of roughly 4 million people from other countries living in Florida (regardless of status). Yet,

> *In a single one-year period, these six institutions alone recorded nearly 17 million such transactions. These transactions had an aggregate value of 5.2 billion dollars.*

This means an average of more than four transactions for every single alien in the state, with an average transaction value of $305. As we documented above, we also subpoenaed records which show a suspicious pattern of transfers into remote or odd areas; for example, Venezuelan people in Florida sending money in equal installments over four weeks to a remote area of Mexico. It strains all forms of credulity to think all these represent legitimate transfers.

The State of Oklahoma has also attempted to address this phenomenon. Years ago, the people of Oklahoma imposed a fee on wire transfers such as these that leave their state borders. **We propose that our leaders should impose a similar statutory fee on all such transactions from Florida which leave the country**. On the above set of transactions alone, a 1.5% fee would yield *$7.8 million*. Assuming these six financial institutions represent an overly-cautious estimate of 20% of the total transfers, the expected yield would be nearly *$40 million*.

Even discounting the opportunity to identify criminal activity and cut into cartel profits this represents, there are ample reasons to support such a fee. To begin with, this is a staggering amount of money which is leaving not just the economy of

136

**CAR 223**

our state, but that of our entire country. It will never be taxed, spent, or invested into our state and its people. It is gone. Florida should recoup at least some portion of it, especially because these types of transfers are "ripe for criminal exploitation." These funds may be from legitimate income, but may also be either earned illegally or the product of criminal activity.

In addition, the fees collected would support a number of other recommendations we have made, such as:

- increased funds for DCF and family courts to manage our UAC and SIJ proposals;
- for FDLE, law enforcement, and criminal justice agencies to investigate, interdict, and prosecute smugglers, cartels and their affiliates;
- assistance to the public education system to help serve new students; and
- to subsidize some of the possible costs to small businesses associated with beefed-up e-verify laws.

Oklahoma parcels their fee out to a listed set of agencies. Florida could do the same.

We understand that this proposal will not capture all such transactions, and will not necessarily stop illicit activity. We do not believe it to be a perfect solution. But to the extent it might make crime less convenient while helping the residents of our state and protecting at least some UAC, the perfect should not be the enemy of the good.

Oklahoma sets a modest fee of 1.5% on all outgoing wire transfers from the state to any destination, even domestically. The fee (raised from its original 1%) is a withholding against the state income tax; any person who wishes may claim it as a deduction when filing their state taxes. *96% **do not***, indicating that a massive portion of the transactions are likely made by those who are not paying state income tax—i.e., ***not legal***. The report of the Oklahoma State Tax Commission, for the year 2018-2019, shows wire transfer fee receipts of $13,147,000. Oklahoma has a tiny fraction of the population of illegal aliens found in Florida.

Our proposal would impose a fee only on those transactions which originate inside Florida and leave the country. Florida has no state income tax. But we think essentially the same result as Oklahoma's tax credit could be accomplished by including a provision whereby legal individuals might achieve a similar outcome: allow for a refund with certain conditions.

137

**CAR 224**

Upon filing a sworn request *for each transaction* sought to be refunded with the Office of Financial Regulation, containing the receipt for the transaction including wire transfer number, either a valid social security number or a valid taxpayer identification number, and valid state-issued photographic identification, the customer shall be entitled to a refund equal to the amount of the fee paid by the customer for the transaction.

We envision such a law might look something like this (patterned on the Oklahoma law):

Money and wire transmission fee - Quarterly remittance - Enforcement

A. Any licensee of a money transmission, transmitter or wire transmitter business pursuant to Florida Statutes shall collect a fee of Five Dollars ($5.00) for each transaction not in excess of Five Hundred Dollars ($500.00) and in addition to such fee an amount equal to one percent (1%) of the amount in excess of Five Hundred Dollars ($500.00) which originates within the State of Florida and terminates outside the United States or its sovereign territories, consulates, or military installations.

B. The fee prescribed by subsection A of this section shall be remitted quarterly to the Florida Department of Revenue in such manner as the Department may prescribe for such purpose. All required forms and remittances shall be filed with the Department not later than the fifteenth day of the month following the close of each calendar quarter.

C. The Department of Revenue shall apportion all revenues derived from the fee to [such agencies and funds as may be designated].

D. Every licensee and their delegates shall post a notice on a form prescribed by the Department of Revenue that notifies customers that upon filing a sworn request for each transaction sought to be refunded with the Office of Financial Regulation, containing a receipt for the transaction including wire transfer number, either a valid social security number or a valid taxpayer identification number, and valid state-issued photographic identification, the customer shall be entitled to a refund equal to the amount of the fee paid by the customer for the transaction.

E. The Department of Law Enforcement shall be afforded all provisions currently under law to enforce the provisions of subsection B of this section. If a licensee fails to file reports or fails to remit the fee authorized by subsection B of this section, the Office of Financial Regulation shall have the authority pursuant to

138

**CAR 225**

Florida Statutes to suspend the license of the licensee and its delegates. A notification of the suspension shall also be sent to the Office of Attorney General. The licensee and its delegates may not reapply for a license until all required reports have been filed and all required fee amounts have been remitted.

F. Upon request from the Office of the Attorney General, the Office of Financial Regulation may make a claim against the surety bond of the licensee on behalf of the State.

## CONCLUSIONS

This overview illustrates the current realities posing physical and financial dangers to the residents of Florida. If there is an over-arching theme that we have discovered that is endemic to the tributaries of illegal immigration to which we have been exposed during our past year of intensive work it is this: when every community is a border community, the perils presented to us will inevitably follow. "As long as it stays in Mexico" is an illusion of well-being in this country which has been shattered.

We believe that for too long, it has been left to the people of a few communities and states to suffer a disproportionate share of the effects of the policies we have described. For too long, somnolence has been the reaction by those who benefit from the illusion of geographic separation and remain numb to events occurring first outside, then at, then around our nation's borders. We ourselves were not as cognizant as we wish we had been of how decisions made in the District of Columbia are profoundly, and apparently intentionally, producing what is nothing short of a humanitarian disaster.

There are, however, things that Florida can do about it, starting with the list on page 142.

139

**CAR 226**

Whether one believes the purposes behind current federal policies are appropriate or abominable, and whether their execution is masterly or maladroit, it is beyond real dispute that the current state of affairs is a predictable consequence of those policies.

*These are the current policies, and these are their observed effects.*

Thomas Gray was famous for positing that "if ignorance is bliss, 'tis folly to be wise." When it comes to the subjects we were mandated to investigate, we found that there are many who do not recognize the scope and severity because they perceive it not to be affecting their day-to-day existence.

This is not bliss.

In previous Presentments, we have cited Florida's Standard Jury Instruction about Willful Blindness:

**Florida law recognizes a concept known as willful blindness, which is sometimes referred to as "deliberate avoidance of positive knowledge." Willful blindness occurs when a person has his or her suspicion aroused about a particular fact, realized its probability, but deliberately refrained from obtaining confirmation because he or she wanted to remain in ignorance. A person who engages in willful blindness is deemed to have knowledge of that fact.**

This concept should apply with equal force in this situation. Lack of awareness of the policies, the problems – the *atrocities*—we have described, is no longer an option.

We choose wisdom and knowledge, even though it is certainly not blissful. Pretending there are not policies in existence, that they have no effect on our state because they are exercised on the other side of a map line, is folly—not bliss.

THIS is no longer acceptable.

140

**CAR 227**

Because THIS



Darien Gap                NGO Camp                US Border

is also unacceptable.

Florida is not helpless, and should wait no longer to protect its interests, its residents, and its immigrant population from the problems we have described. We urge our fellow citizens to become aware and educated about these issues, and our leaders to take swift and direct action.

We have done our best to be thorough in our investigation. We have worked hard to obtain multiple sources of information and perspectives on issues. We have chosen our words with care, after significant deliberation. While we understand that there may be some who seek a reason to discredit our work, we are comfortable that it represents a sound set of conclusions, logically derived from facts, testimony, and evidence.

We believe our findings are accurate, and our rationales legitimate. We would like any audience to know that we are a large and diverse group, who showed up at the courthouse more than a year ago and have labored independently ever since to answer the questions posed in our mandate. We believe we have made great progress in that mission.

**CAR 228**

RECOMMENDATIONS (DIGEST)

1. *We recommend that our leaders consider the formation of another Statewide Grand Jury solely to investigate the questionable activities of Non-Government Organizations doing immigration business in or with our state, especially the misuse of grant funds, avoidance of transparency in use of public funds, and contravention of state laws.*

2. We reiterate here our recommendation from our Third and Fourth Presentments: *require any UAC "sponsor" who is not a biological parent or court-ordered legal guardian to submit themselves and the UAC to the family court for such a formal legal determination.*

3. Further, we ask our leaders to *immediately close the SIJ visa loophole by requiring petitions under Chapter 39.01 to either (a) be filed by the Department of Children and Families or (b) require that any minor being deemed dependent be formally placed in custody of the Department.*

4. *We believe Florida should begin tracking data regarding the immigration status of arrestees, and mandate its reporting to FDLE for retention and publication. We recommend that our leaders adopt a law requiring the Department of Corrections, each County Sheriff, and the Chief of Police of any law enforcement agency in this state to provide such data to FDLE along with the other data they are already sending.*

5. *Moreover, given the large number of inmates reflected by SCAAP and the Texas DPS data who had been ordered removed but remained to commit more crimes, we recommend that our leaders look into adding a sentencing enhancement provision such as that below which would increase the exposure for those who have been previously deported and return to commit a felony offense in our state.*

   921.0024(1)(a) Sentencing multipliers:

   Prior Removal/Deportation: If the offender has been previously deported or removed from the United States pursuant to law, the subtotal sentence points are multiplied by 1.5.

142

**CAR 229**

*We also believe it would be appropriate for our State leaders to enhance the sentence for a person convicted of a criminal offense who is proven to be a member of a cartel or TCO, much as is the case already with enhanced sentencing for gang membership.*

6. *We think our elected officials should again consider strong legislative mandates regarding universal documentation requirements, and notification to potential employers and victims of these crimes.*

7. *We propose that our leaders should impose a modest statutory fee on all wire transactions from Florida which leave the country.*

Money and wire transmission fee - Quarterly remittance - Enforcement.

A. Any licensee of a money transmission, transmitter or wire transmitter business pursuant to Florida Statutes shall collect a fee of Five Dollars ($5.00) for each transaction not in excess of Five Hundred Dollars ($500.00) and in addition to such fee an amount equal to one percent (1%) of the amount in excess of Five Hundred Dollars ($500.00) which originates within the State of Florida and terminates outside the United States or its sovereign territories, consulates, or military installations.

B. The fee prescribed by subsection A of this section shall be remitted quarterly to the Florida Department of Revenue in such manner as the Department may prescribe for such purpose. All required forms and remittances shall be filed with the Department not later than the fifteenth day of the month following the close of each calendar quarter.

C. The Department of Revenue shall apportion all revenues derived from the fee to the [agency or fund as the legislature may deem appropriate].

D. Every licensee and their delegates shall post a notice on a form prescribed by the Department of Revenue that notifies customers that upon filing a notarized request for each transaction sought to be refunded with the Office of Financial Regulation, containing a receipt for the transaction including wire transfer number, either a valid social security number or a valid taxpayer identification number, and valid state-issued photographic identification, the customer shall be entitled to a refund equal to the amount of the fee paid by the customer for the transaction.

E. The Department of Law Enforcement shall be afforded all provisions currently under law to enforce the provisions of subsection B of this section. If a licensee fails to file reports or fails to remit the fee authorized by subsection B of this section, the

143

**CAR 230**

Office of Financial Regulation shall have the authority pursuant to Florida statutes to suspend the license of the licensee and its delegates. A notification of the suspension shall also be sent to the Office of Attorney General. The licensee and its delegates may not reapply for a license until all required reports have been filed and all required fee amounts have been remitted.

F. Upon request from the Office of the Attorney General, the Office of Financial Regulation may make a claim against the surety bond of the licensee on behalf of the State.

8. We recommend that our lawmakers assess the feasibility of either requiring general contractors to ultimately be fully and directly legally responsible for ensuring their subcontractors hire only legal workers, or requiring any employee staffing agency or any person or business which provides employees to work for another, to register with the state's Department of Labor and be bound by Florida's new e-verify requirements. We also suggest that the "25-employee exemption" to e-verify requirements be eliminated.

9. We strongly urge the legislature to *delete Florida Statute § 908.104(8) in its entirety and Florida Statute § 908.104(5) must be limited* to crimes occurring in the United States and time barred to five years prior to an alien's claim of relief under the statute. *Additionally*, the Florida Legislature must bar an alien with pending criminal charges for any crime or attempt to commit any crime of violence, felony drug offense involving the sale, manufacturing, distribution, or trafficking in a controlled substance, or felony sexual offense from being eligible for relief.

10. *TCOs / cartels should be equated with, and designated as, foreign terrorist organizations* under 8 U.S.C. 1189, to unlock certain additional methods for lawfully combatting them. We realize our State cannot make such a designation, but we recommend that our federal representatives seriously entertain such a measure.

144

**CAR 231**

Respectfully submitted to the Honorable Ellen S. Masters, Presiding Judge of the Twenty-First Statewide Grand Jury, this 17th day of November, 2023.

Foreperson Juror #18
Twenty-First Statewide Grand Jury

THE FOREGOING Fifth Presentment was returned to me in open court this this 17th day of November, 2023.

HON. ELLEN S. MASTERS,
Presiding Judge
Twenty-First Statewide Grand Jury

I, Nicholas B. Cox, Statewide Prosecutor and Legal Advisor, Twenty-First Statewide Grand Jury of Florida, hereby certify that I, as authorized and required by law, have advised the Grand Jury which returned this Report on this 17th day of November, 2023.

NICHOLAS B. COX
Statewide Prosecutor
Florida Bar #767610
Twenty-First Statewide Grand Jury

I, Richard Mantei, Senior Assistant Statewide Prosecutor and Assistant Legal Advisor, Twenty-First Statewide Grand Jury of Florida, hereby certify that I, as authorized and required by law, have advised the Grand Jury which returned this Report on this 17th day of November, 2023.

RICHARD MANTEI
Special Counsel
Senior Assistant Statewide Prosecutor
Florida Bar #119296
Twenty-First Statewide Grand Jury

**CAR 232**

I, Robert Finkbeiner, Chief Assistant Statewide Prosecutor and Assistant Legal Advisor, Twenty-First Statewide Grand Jury of Florida, hereby certify that I, as authorized and required by law, have advised the Grand Jury which returned this Report on this17th day of November, 2023.

ROBERT FINKBEINER
Chief Assistant Statewide Prosecutor
Florida Bar #938904
Twenty-First Statewide Grand Jury

I, Guillermo Vallejo, Assistant Statewide Prosecutor and Assistant Legal Advisor, Twenty-First Statewide Grand Jury of Florida, hereby certify that I, as authorized and required by law, have advised the Grand Jury which returned this Report on this17th day of November, 2023.

GUILLERMO VALLEJO
Assistant Statewide Prosecutor
Florida Bar #120304
Twenty-First Statewide Grand Jury

FILED
JOHN A. TOMASINO

NOV 17 2023

CLERK, SUPREME COURT
BY

146

**CAR 233**

#189

FLORIDA SUPREME COURT

03/06/2024

RECEIVED

# IN THE SUPREME COURT OF FLORIDA

CASE NO.: SC22-796

## SIXTH PRESENTMENT OF THE TWENTY-FIRST STATEWIDE GRAND JURY REGARDING NON-GOVERNMENT ORGANIZATIONS (NGOs)

### I. CONTINUING COSTS

Since the publication of our last Presentment, we have continued meeting and investigating. We are pleased to note that several of our recommendations are being discussed by our legislature; we are saddened to see that illegal border crossings, crime, and the endangering of citizens and children continue to escalate. We are aware that more than 300,000 aliens crossed our border in December 2023 (two-thirds of them unlawfully), and while January 2024 saw a lower number, it was still the largest ever for the month of January; more than 800,000 have crossed since October 1, 2023, as have some 120,000 "gotaways."

We are also aware of continued high-profile tragedies such as the murder of a college student in our neighboring state of Georgia; the murder of a two-year-old in Maryland; and the rape at knifepoint of a teen girl in Louisiana, all purportedly by illegal aliens who had been previously arrested but not deported; the shooting of three police officers in our nation's capital by a previously-deported illegal re-entrant; and the total of non-detained aliens with either criminal convictions or pending criminal charges now being reported at 617,607.

1

**CAR 234**

In January 2024, 9 more individuals whose names appear on the terrorist watchlist were stopped trying to cross the U.S.-Mexico border between ports of entry. Since FY21, 340 of these individuals have attempted to cross our southwest border illegally.

So far in FY24, 18,755 Chinese nationals have been encountered at the southwest border, and CBP has arrested 11,958 aliens with criminal convictions nationwide, including 157 known gang members, 24 of those being MS-13 members. In January, CBP seized 1,799 pounds of fentanyl coming across the southwest border, bringing the total for the fiscal year to 6,778 pounds—enough to kill over a billion people.

In short, what we reported was likely to happen, has continued to happen.

We also commend our legislature for at least attempting to ascertain some unaccounted costs affiliated with this issue by passing, among other laws, **Chapter 395.3027, Florida Statutes, "Patient immigration status data collection."**

**(1) Each hospital that accepts Medicaid must include a provision on its patient admission or registration forms for the patient or the patient's representative to state or indicate whether the patient is a United States citizen or lawfully present in the United States or is not lawfully present in the United States. The inquiry must be followed by a statement that the response will not affect patient care or result in a report of the patient's immigration status to immigration authorities. (2) Each hospital must submit a quarterly report to the agency within 30 days after the end of each calendar quarter which reports the number of hospital admissions or emergency department visits within the previous quarter**

2

**CAR 235**

**which were made by a patient who indicated that he or she was a citizen of the United States or lawfully present in the United States, was not lawfully present in the United States, or declined to answer.**

The average Emergency Room visit in our state costs $3,102, if the patient is not admitted to the hospital. We reviewed evidence that, in the first quarter in which this statute was in effect (**October-December, 2023**), hospitals in Florida (ONLY the 201 receiving Medicaid) reported the following:

Number of Patients Visiting ER who admitted being illegal aliens: 16,073
Number of Patients Visiting ER who declined to answer: 159,914
Number of ADMITTED Patients who admitted being illegal aliens: 6,126
Number of ADMITTED Patients who declined to answer: 57,458

We are aware that NGOs and other activist organizations very publicly *advise* illegal aliens not to answer this question.[1] Parsing the data above, however, yields the following:

In three months, Florida hospitals treated at least 22,000 patients who admitted being here illegally, and over 200,000 who refused to answer the question. At that rate, and using the average non-admit cost (not counting any additional costs incurred by the 6,000 people admitted to the hospital), just those admitting illegal presence would have received $68,861,298 of care services.

---

[1] https://floridaphoenix.com/2023/10/12/advocacy-groups-promote-decline-to-answer-regarding-immigration-question-in-hospitals/.

3

**CAR 236**

*Over a one-year period, that means 88,500 patients who acknowledge being illegally present, and the cost amount increases to $275,445,192.*

If just *one-half* of those declining to answer were also illegally present, that adds 108,686 individuals and results in $326,058,000 in additional treatment costs *each quarter*.

Added together, the totals approach $*1.3 billion dollars every year*.

These numbers can be compared to what was reported voluntarily to the Florida Agency for Health Care Administration in *the entire FY 2020-2021* (111,475 illegal alien encounters and 23,358 illegal alien hospital admissions; of course, there are no statistics on the number who declined to answer for that year). That agency likewise reported that:

> Total costs attributed to [self-reported] illegal aliens were $312.92M. Facilities were paid $103.49M. There is a $209.43M difference between facility costs and how much facilities were paid, meaning *facilities were paid for 33% of costs attributed to illegal aliens*.

If only one-third of the costs are actually paid, Florida's Medicaid hospitals seem certain to lose well over $150,000,000 and might collectively be short approximately one billion dollars, this fiscal year alone. We note that the hospital with by far the most such patients (nearly *25,000 in three months*) was located in Miami.

We find this sort of data enlightening and encourage our leaders to consider similar efforts with regard to ascertaining some of the "hidden costs" affiliated with the subjects we have discussed. For example, similar statutes aimed at discovering burdens placed upon our public educational system, agencies which care for

4

**CAR 237**

dependent families and children, and the courts and criminal justice system (such as data accumulated federally by the SCAAP program mentioned in our Fifth Presentment) would no doubt help guide future efforts to direct state resources where they are most needed.

## II. BOOMING BUSINESS

In this Presentment, we will discuss a facet of this industry which receives comparatively little attention: the role of Non-Government Organizations (NGOs) in encouraging, facilitating, and profiting from the conditions we have previously reported.

In the course of our investigation, we met with dozens of current and former employees, executives, and clients of different types of NGOs; some operate only in foreign countries, some only within our borders, some in both arenas; some focus only on rescue operations, while others house, feed, or place individuals; some only serve refugees, some serve aliens legal and illegal regardless of status. Some are small, others are massive; and some take only private donations, while others (usually the ones which have demonstrated the most problems) are funded almost exclusively by government grants. NGOs might be non-profit organizations or for-profit corporations; they may be religious or secular.

Not only do many of these NGOs receive hundreds of millions of dollars in grant funding from the federal government, but they also receive substantial

5

**CAR 238**

subsidies channeled through international donor agencies like the United Nations International Organization for Migration (UN-IOM), which use funds originating in the U.S. Treasury to provide money, transportation, and housing to those traveling to our border.

In the United States, federal agencies like the Department of Homeland Security (DHS), the Department of Health and Human Services (HHS), and the Department of State (DoS), including sub-agencies like the Federal Emergency Management Agency's (FEMA) Emergency Food and Shelter Program (EFSP), and the Office of Refugee Resettlement (ORR) hand over hundreds of millions in funding each year to aid NGOs.

We have learned that in too many instances, these large and government-dependent NGOs abuse their tax-exempt status and the trust of U.S. taxpayers, encouraging migratory travel to the southern border for reasons such as economic mobility (which is not a legal basis for any claim of asylum or refugee status), using resources from federal funds. We recognize that some organizations rationalize this activity by claiming that the migration will occur anyway, and that making the process smoother and more efficient has inherent humanitarian value. However, our prior Presentments have amply documented the crime, chaos, and harm migrants experience in spite of NGO efforts. The evidence demonstrates to us that such efforts actually encourage more people to venture into harm's way.

6

**CAR 239**

A former DHS advisor in the Obama administration, Charles Marino, stated in June 2023 that "The problem here is that the NGOs have taken over as the official travel agency of the Department of Homeland Security. So now they've turned it over to the NGOs, not just to coordinate the shelter and the food, but also the travel, ultimately, we're going to see billions of dollars of taxpayer money go to waste through fraud and abuse because there's no oversight through FEMA."

As described in a series of letters from U.S. Congress members to federal agencies and NGOs during preceding months:

> NGOs have been consistently uncooperative with investigations. Instead, they continue to lobby for more funds for migrant-related issues and oppose any efforts to secure the southern border.
>
> It appears these religious mega-charities and other NGOs have a vested interest in mass migration to the United States, which has only been more rewarding due to a weak border and weak administration. This alone calls for a serious investigation into current practices. The most pressing issue that demands congressional attention is the misuse of taxpayer funds by the federal government and NGOs to facilitate illegal immigration.
>
> One of the most notorious examples of this practice dates to 2021 when I visited the border and uncovered nonprofits (such as Catholic Charities of San Diego and Jewish Family Services) operating as resettlement agencies to secretly transport and lodge undocumented migrants. This includes bussing and flying illegal aliens to a destination of their choice and housing them in hotels under the guise of COVID-19 until travel can be determined and scheduled. In addition, these NGOs provide guidance to illegal immigrants on how to bypass TSA security screening, navigate our legal system, and assimilate into their desired community. In my investigation into this operation, my office obtained a packet given to migrants that included flight information, copies of the Notice to Appear from Customs and Border

7

**CAR 240**

Protection (CBP), a list of pro bono legal service providers, and information and legal assistance in Spanish.

These organized and premeditated services are not limited to migrants already in the United States. Before migrants even reach the southern border, they are provided debit cards loaded with hundreds of dollars that are refilled each month. These gift cards are distributed by the United Nations agency, the International Organization for Migration (IOM), which receives federal funding for a variety of services provided from South America to our southern border. One example of an area requiring much-needed oversight is the so-called "Refugee Travel Loan" program from the U.S. Department of State. The IOM provides these loans to refugees that are subsequently collected by non-profits. It has been reported that from 1952 to 2002, the IOM issued $1,020,803,910 in "transportation" loans and recovered only $584,219,453. These nonprofits are often tasked with collecting these loans and are permitted to keep 25% of the loans they recoup, once again giving these organizations a vested financial interest in the number of refugees brought into the United States….

It is clear these acts directly encourage migrant caravans to cross the border and incentivize them to stay. … Instead of working to address this issue together, non-profits have refused to cooperate with Congressional requests for information and other documents. Heads of religious organizations attacked me, my colleagues, and our conservative constituents as those who only "call themselves Christians" and fail to remember that "the gospel compels us" to aid migrants. Catholic Charities USA called my allegations "incredibly disturbing" and "fallacious and factually inaccurate." Even preliminary calls for an investigation were met with fervent responses from non-profits, who called it a "vile threat" and an "intimidation". These responses against a just call for investigation are not just disappointing but further highlight how unwilling the NGO sector is to solve the border crisis.

*The financial partnership between these non-profits and the federal government is real. The facilitation of mass migration through taxpayer dollars is real. … By facilitating the mass inflow of illegal immigrants, NGOs risk our national security and expose migrants to exploitation through abusive labor practices, human trafficking, and smuggling.* … I call upon

8

**CAR 241**

you to join me in ending this open threat to our society by demanding transparency of taxpayer-funded NGOs.

These concerns are similar to those we have previously expressed in our Third, Fourth, and Fifth Presentments.

Just last month, the State of Texas filed suit against one NGO for "facilitating unlawful entry into the U.S., harboring illegal aliens, human smuggling, and operating a stash house."[2] Facilitating, encouraging, or inducing aliens by suggesting unlawful means for acquiring citizenship, crossing unlawfully, or remaining unlawfully, especially when doing so for reasons of financial benefit, is in fact a federal crime.

As we noted in our Fifth Presentment,

### *The river of accountability-free money has absolutely polluted the entire process.*

Given the breadth of our mandate, we focused on transnational criminal organizations and illegal immigration (detailed further at other sections of this report); we discovered, however, that there are also "legal" organizations who appear to be misusing federal contract monies and their "nonprofit" status *in order to abet the process, and likely the actors, responsible for the illegal activity we are describing.* …

These NGOs do not truly or exclusively operate as humanitarians. They do not spend federal grant money to convince alien populations not to risk a life-threatening odyssey. Rather, they magnify the magnetic illusion of economic prosperity at the end of a migratory trek. They provide cash cards, cell phones, and transport vehicles and what amount to safari-style guide maps through

---

[2] https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-sues-end-ngos-operations-texas-after-discovering-potential-efforts

**CAR 242**

portions of jungle and across deadly terrain, increasing the number of individuals who thus elect to make the journey and enabling Transnational Criminal Organizations[.]

The United States treasury gave U.N. agencies $18 billion in 2022, which comprised nearly one-third of their total budget. The United Nations-led "Regional Refugee and Migrant Response Plan (RMRP)" is a written plan to have more than 200 NGOs assist in handing out some $1.6 billion in cash debit cards, food, clothing, medical treatment, shelter, and transportation to U.S.-bound people in 2024. The U.S. State Department has given the UN's IOM $1.4 billion in just the last 12 months to encourage people to leave their home countries and undertake the exceedingly dangerous trek to this one.



These U.N. agencies have announced plans to use $372 million in "Cash and Voucher Assistance (CVA)" and "Multipurpose Cash Assistance (MCA)" to assist approximately 624,000 aliens' travel to the United States border, providing

**CAR 243**

transportation, food, shelter, and advice on how to answer questions from immigration officials—along with pre-paid, rechargeable debit cards, cash, and bank and mobile fund transfers. Once at the border, FEMA's Emergency Food and Shelter Program spent at least $425 million last year to do the same for aliens crossing into the country (we discuss later the problems identified within this program by a recent Inspector General audit).[3]



---

[3] https://www.r4v.info/en/rmrp2024update

CAR 244





**CAR 245**







The constant and repeated giveaways to those who are 90% likely to make invalid claims of asylum upon being caught illegally crossing or presentation *sans* identification at our borders stands in odd contrast to, for example, the hurdles placed in front of those becoming naturalized citizens or previously vetted as refugees:

13

**CAR 246**

For decades, the State Department has funded interest-free travel loans to refugees who … cannot afford the cost of relocating here. Six months after their arrival, borrowers are expected to start repaying the loans to one of nine private nonprofits, known as resettlement agencies, which are involved in helping refugees start their new lives here. When refugees make their travel plans, they are assigned one of these resettlement agencies through the International Organization for Migration, which administers the travel loans.[4]

NGOs come in many sizes and forms and often make positive contributions to society. However, in the immigration context, the evidence leads us to conclude that there are several such organizations which exacerbate the problems we have exposed within the migration industry.

And an industry it certainly has become; in recent years, as outlined above, our federal government has *directly* given out untold billions in grant funding alone to NGOs via multiple federal agencies. Were this level of funds instead deployed to address the costs to our hospitals described above, or to our education system and law enforcement as referenced in prior Presentments, we believe this might be a wiser allocation.

---

[4] https://www.nytimes.com/2019/03/15/nyregion/refugees-travel-loans.html

14

**CAR 247**



# REFUGEE & ENTRANT ASSISTANCE DISCRETIONARY GRANTS RECIPIENTS
## 2013-2023

| NAME | SUM OF AMOUNT |
|---|---|
| INTERNATIONAL RESCUE COMMITTEE, INC. | $180,899,489 |
| U.S. COMMITTEE FOR REFUGEES AND IMMIGRANTS, INC. | $136,506,464 |
| UNITED STATES CONFERENCE OF CATHOLIC BISHOPS | $134,050,656 |
| LUTHERAN IMMIGRATION AND REFUGEE SERVICE INC. | $130,480,740 |
| CHURCH WORLD SERVICE, INC. | $125,207,192 |

✓ LEARN MORE AT OPENTHEBOOKS.COM

# "PREFERRED COMMUNITIES"
## RECIPIENTS & FUNDING
### FY2023

| NAME | SUM OF AMOUNT |
|---|---|
| UNITED STATES CONFERENCE OF CATHOLIC BISHOPS | $66,468,721 |
| INTERNATIONAL RESCUE COMMITTEE, INC. | $66,458,012 |
| LUTHERAN IMMIGRATION AND REFUGEE SERVICE INC | $66,252,208 |
| CHURCH WORLD SERVICE, INC. | $64,864,261 |
| U.S. COMMITTEE FOR REFUGEES AND IMMIGRANTS, INC. | $64,579,367 |
| HIAS, INC. | $56,411,240 |
| ETHIOPIAN COMMUNITY DEVELOPMENT COUNCIL, INC. | $51,590,800 |
| **GRAND TOTAL** | **$436,247,482** |

✓ LEARN MORE AT OPENTHEBOOKS.COM

15

**CAR 248**

It should not escape the public's notice that the current Secretary of the Department of Homeland Security is a former board member of HIAS, Inc., and the current Director of ORR is a former employee of International Rescue Committee, Inc., and Church World Service, Inc. (all NGOs listed above).

Church World Service, as recently as 2021, published "Abolish Ice" as a hashtag on its Twitter account.   And in a "Pastoral Letter Concerning Migration," (reaffirmed just last year), the Catholic Bishops of Mexico and the United States are quoted as follows:

> While recognizing *the right of the sovereign state to control its borders*, *Exsul Familia* also establishes that *this right is not absolute*, stating that the needs of immigrants must be measured against the needs of the receiving countries…
>
> [We] reiterate the rights of migrants and their families and the respect for human dignity "*even in cases of non-legal immigration*."
>
> Both of our episcopal conferences have echoed the rich tradition of church teachings with regard to migration. … *all the goods of the earth belong to all people.* When persons cannot find employment in their country of origin to support themselves and their families, they have a right to find work elsewhere in order to survive. *Sovereign nations should provide ways to accommodate this right.…the presumption is that persons must migrate in order to support and protect themselves and that nations who are able to receive them should do so whenever possible*.
>
>  A broad legalization program of the undocumented would benefit not only the migrants but also both nations. …Legalization also would maintain the flow of remittances to Mexico… Legalization represents sound public policy and should be featured in any migration agreement between the United States and Mexico. In order to ensure fairness for all nationalities, the U.S. *Congress should enact a legalization program for immigrants regardless of their*

16

**CAR 249**

*country of origin….Migrants without documentation should not be treated as criminals.*[5]

Recently, a U.S. Senate proposal would have provided $2.334 billion to HHS to distribute to NGOs for "refugee and entrant[6] assistance programs," and $350 million more to HHS to award grants and contracts to NGOs or state and local government agencies for additional "Refugee and Entrant Assistance" services to unaccompanied minors.  It also would have provided $1.4 billion from the budget for Customs and Border Protection (CBP) to be transferred to the FEMA Shelter and Services Program, to be awarded to NGOs for providing shelter and other services to illegal migrants.

As we have previously reported, this particular FEMA disbursement program has a deplorable record when it comes to appropriate use of taxpayer funds. In 2023, DHS's Inspector General published an audit (we previously referenced this in our Fifth Presentment) finding that for a sample of $12.9 million awarded to 18 grant recipients, numerous grant recipients violated the terms of the program including

---

[5]https://www.usccb.org/issues-and-action/human-life-and-dignity/immigration/strangers-no-longer-together-on-the-journey-of-hope

[6] This conflation of "Refugee and Entrant" has become an increasingly common dodge, as though the two populations shared characteristics other than being from outside the United States. Refugees and "entrants" (legal and illegal border crossers and asylum claimants) are distinct populations when it comes to their vetting process, legal standing, and virtually every other characteristic.

17

**CAR 250**

failure to provide receipts for reimbursements, failing to maintain logs of individuals served, and even providing services to individuals who had no DHS record reflecting lawful status. Overall, the Inspector General found the program was unable to properly account for $7.4 million, or *58% of the sample.*

An even more recent report shows that the situation within the Department of Health and Human Services is likewise suspect:[7]

> 16,790 children in ORR care were released to sponsors in March and April 2021. [HHSOIG used] a final sample size of 342 children.
>
> Case files for 16 percent of unaccompanied children who were released to sponsors in *March and April 2021* did not contain any documentation that indicated one or more required safety checks for sponsors were conducted.
>
> For 19 percent of children whose sponsors required an FBI fingerprint check or a child abuse and neglect registry check, we found documentation in children's case files indicating that a check was initiated, but the results were pending at the time of the children's release. ORR policy allows for children to be released to sponsors when the results of these checks are pending, under certain conditions[.] This practice can reduce children's length of stay in care because these checks can take weeks or more to be processed. However, this policy may also limit case managers' ability to address concerns regarding sponsor suitability before children are released to sponsors.
>
> Our review of children's case files identified legibility *concerns with sponsor submitted IDs* (e.g., images or scans of photo IDs, birth certificates, or legal documents) in *35 percent of children's case files*. Facility staff are required to ensure that copies of sponsor-submitted IDs include a legible photo and information. However, we identified legibility issues in the scanned images of sponsor IDs including images that were overly dark, light, blurry, or grainy[.]

---

[7] https://oig.hhs.gov/oei/reports/OEI-07-21-00250.pdf

18

**CAR 251**

These issues could limit a case manager's ability to fully evaluate the photo or read the text on a sponsor's ID. … In addition to sponsor IDs with legibility concerns, we identified images of IDs that were incomplete (e.g., missing the back or second page of the ID) and in which ID details (e.g., holograms or watermarks) were not visible in black and white images.

Information regarding child welfare outcomes or sponsorship history was inaccurate or missing from sponsor records within ORR's case management system, the UC Portal, for 5 percent of sponsors.

[O]ne sponsor reported to a post-release services provider that the 15- year-old child released to the sponsor's care went missing in the middle of the night without any belongings or known contacts in the United States. The sponsor reported the case to the police department and the post-release service provider reported the child as missing to the National Center for Missing and Exploited Children. However, no notes or flags about this outcome were added to this sponsor's record, and he went on to sponsor two additional children following the incident. During the followup call for another case, a staff member discovered that the whereabouts of a 3-year-old child who had been released to an unrelated sponsor were unknown.

Overall, staff identified *more than 10 children who were no longer residing with their sponsors* shortly after children were released from ORR care. Only five of these children's sponsor records noted this concerning outcome and contained related flags indicating concern about the suitability of the sponsor.

Our review of children's case files identified 20 sponsor records in the UC Portal that did not reflect the number of children a sponsor had previously sponsored or attempted to sponsor.

*In 22 percent of cases, ORR did not conduct timely Safety and Well-Being Follow Up Calls*, and in 18 percent of cases, the followup calls were not documented in children's case files.

This is but one of many reports finding similar fault with the way NGOs are "supervised" by federal agencies like DHS/HHS/ORR, and we have discussed many of them in our previous Presentments.

19

**CAR 252**

A study performed in 2022 substantiated the notion that Florida is being affected. The study:

analyzed movement patterns of anonymized mobile devices that were detected on the premises of over 30 NGO facilities at or near the border. These locations were selected either based on public knowledge of these facilities being used to process illegal aliens or on reliable human source information. All physical locations were verified and physical location boundaries were defined to include building and parking areas to minimize false positives.…

The investigation [also] involved the geofencing of 20 NGO facilities. These locations were chosen based on human source information, as well as open-source intelligence, that they may be involved in helping illegal aliens travel from the border to various parts of the interior. During the month of January 2022, more than 22,000 unique mobile devices were detected at these NGO facilities. **The devices were later traced to 431 separate U.S. congressional districts out of a total 435 congressional districts.…**

The investigation [also] involved geofencing 13 NGO locations located in close physical proximity to the border. These locations were selected based on human source intelligence that the facilities may be involved in the processing and transportation of illegal aliens into the interior of the United States. Over 5,000 unique mobile devices were identified as being on-premises at the targeted location. **Devices were later traced nationwide to 434 congressional districts out of a total of 435 congressional districts.…**

The investigation [also] focused on geofencing Catholic Charities of the Rio Grande Valley, located in San Juan, Texas. **Nearly 3,400 unique mobile devices were identified as being on-premises. These devices were later tracked to 433 congressional districts.**

20

**CAR 253**





21

**CAR 254**



https://www.heritage.org/press/oversight-project-investigation

The data seem consistent with information regarding immigration court dockets and ICE statistics referenced in our Fifth Presentment:

> Those numbers are not decreasing. As previously referenced, more than 2,400 aliens (not including UAC) have been shipped by the federal government to just two sections of Florida in the past week, at that rate, more than 120,000 will have joined our population this calendar year. …DHS provided information in discovery estimating that about 160,000 of the aliens released into the country between January 2021 and July 2022 provided a Florida address or are on the Miami ERO docket, which covers Florida[.]

Florida NGOs also appear to studiously avoid asking questions that might expose problem areas in such arrangements. As one exchange with an NGO manager showed:

> GRAND JUROR 13: You said you catered to two-year-olds. Tell me a little bit more about that. How would that come about, you getting a two-year-old baby? Have you ever had a two-year-old?
>
> THE WITNESS: We have.

22

**CAR 255**

GRAND JUROR 13: Okay.

THE WITNESS: Sometimes they come with siblings that are maybe eight, ten-year-olds or different older age.

Q: As unaccompanied minors?

THE WITNESS: As unaccompanied minors... Usually when they're tender age, it's a parent that receives the minors here. So they would have all of these proof of the relationship.

GRAND JUROR 13: I like that term you said, "tender age."

Q: Let me ask you just to piggyback on that, a parent who is living here gets a two-year-old as an unaccompanied minor. How does that work?

THE WITNESS: A few times -- a few times -- sometimes it's happened that the parent comes maybe, you know, a little bit before the minor to kind of get stable in the U.S. before they bring the baby -- before they bring their children.

**Q: How does a two-year-old arrive unaccompanied at the border and their parent is here?**

**THE WITNESS: I'm not sure.**

**Q:** Okay. I know it's probably outside your scope, but that is remarkable that you would be in that situation where **there's a parent already in the country getting a two-year-old who somehow showed up at the border without a parent; right?**

THE WITNESS: (No response.)

The NGO nonetheless turns over such "tender-age" children, who seem to have miraculously appeared *unaccompanied* at our border thousands of miles from their home country, to the parents who left them behind.

We also were presented with evidence that NGOs actively intercede to facilitate the airborne movement of aliens who have no identification. We have reviewed the "Rapid Response" document, prepared by one of these NGOs for an

23

**CAR 256**

alien to present when boarding an airplane. The letter, on NGO stationery, is a typed form letter stating as follows:

> TSA Employee: The individual(s) standing in front of you have recently been discharged from a U.S. Immigration detention facility and must cross the country to present themselves for an ICE check in approximately two weeks from now.[8]

> They are currently showing you all of their identification in their possession, which should be adequate for them to be able to be searched in Secure Flight.[9] Please find them in Secure Flight and then allow entry if cleared.

> There may be an American citizen accompanying this person (or persons) that would like to take them to the gate, as this may be their first time in an airport. If this is possible, please allow it. Thank you.

"All of their identification" was a DHS Notice to Appear, a series of maps and NGO hotline numbers to call for legal advice, a "Folio Provisional" Mexican travel visa (the alien claimed to be from Honduras) and a handwritten address of an ICE field office. None of these documents contained a photo, fingerprint, or any other method of identification. The "Subject ID" section of the Notice to Appear contained a number, but no name or photo. *Essentially, the "ID packet" enabled*

---

[8] *This was a false statement.* The Notice to Appear document indicated that the appearance was "on a date to be set, at a time to be set."

[9] "Secure Flight performs watch list matching on carrier-provided traveler information to the No Fly and Selectee portions of the Terrorist Screening Database (TSDB) maintained by the Terrorist Screening Center (TSC), as well as other watch lists to identify individuals who may need additional screening or are prevented from travel."
https://www.dhs.gov/publication/dhstsapia-018-tsa-secure-flight#:~:text=This%20screening%20is%20designed%20to,and%20to%20ensure%20that%20other

24

**CAR 257**

*TSA to search no-fly lists for persons matching the name the individual provided when encountered by Border Patrol.*

Many NGOs in Florida and elsewhere operate facilities catering to aliens both legal and otherwise. These NGO facilities are not always staffed in a manner sufficient to comply with federal rules for doing so:[10]



Moreover, NGO employees have often described to us that they outsource their background checks to private companies. As described in our Fourth Presentment, ORR actually has proposed a rule ***penalizing*** NGO employees who contact law enforcement, as ORR clearly does not welcome scrutiny of its operations. This aversion to sunlight means these NGOs use the least reliable of all forms of checks to determine who receives UAC:

---

[10] https://oig.hhs.gov/oas/reports/region6/62107003.pdf

**CAR 258**

Based on our analysis, *private-sector background checks* are laden with false-positive and false-negative errors: 60 percent and 50 percent of participants had at least one false-positive error on their regulated and unregulated background checks, and <mark>*nearly all (90 percent and 92 percent of participants, respectively) had at least one false-negative error*</mark>.[11]

HHS/ORR has demonstrated, time and again (as we referenced in our Third and Fourth Presentments) that as an agency it remains unequal to its statutory task. Why NGOs and their employees, in this state and others, would nonetheless continue adherence to ORR policies, *despite being aware of the multitude of risks ORR has created*, is almost beyond comprehension.

We say *almost* because, as it turns out many NGOs, including several (but not all) here in Florida, depend on agencies like ORR and HHS for 90% or more of their annual budget. In this context, the reasons these NGOs might continue to place aliens (adults and, especially, children) into risky situations, become illuminated.

---

[11] *"The problem with criminal records: Discrepancies between state reports and private-sector background checks."* Sarah Lageson, Robert Stewart. First published: 09 February 2024 https://doi.org/10.1111/1745-9125.12359

26

**CAR 259**

### III. THE NEED FOR ADDITIONAL INVESTIGATION

In <u>United States v. Hansen</u>, 599 U.S. 762 (2023), the U.S. Supreme Court

upheld a criminal statute:

> Helaman Hansen operated a program that ***<u>purported to help unlawfully</u>***
> ***<u>present aliens become U.S. citizens, even though federal law does not</u>***
> ***<u>provide</u>*** a pathway to U.S. citizenship through [Hansen's method]. Hansen's
> fraudulent scheme and ***false representations allegedly caused some aliens to***
> ***enter the United States unlawfully and caused others to overstay their***
> ***periods of authorized stay*** in the United States. Along with convictions for
> mail fraud and wire fraud, a federal jury convicted Hansen of two counts of
> encouraging or inducing illegal immigration for purposes of financial gain in
> violation of 8 U.S.C. § 1324(a)(1)(A)(iv) and (B)(i).
>
> The question before the Supreme Court was "[w]hether the federal criminal
> ***<u>prohibition against encouraging or inducing unlawful immigration for</u>***
> ***<u>commercial advantage or private financial gain</u>***, in violation of 8 U.S.C. §
> 1324(a)(1)(A)(iv) and (B)(i), is facially unconstitutional on First Amendment
> overbreadth grounds." In a 7-2 decision, the Court held that Subsection (iv) is
> not unconstitutionally overbroad on its face under the First Amendment
> because the provision forbids only the purposeful solicitation and facilitation
> of specific acts that violate federal law. In the majority opinion … The
> majority explained that "the defendant generally must intend to facilitate the
> commission of the crime.... Since 'encourages or induces' in clause (iv) draws
> on the same common-law principles, it too incorporates them implicitly." …
> Examining activity that may fall within the provision's purview, the Court
> pointed out that "***<u>a great deal of nonexpressive conduct" (i.e., conduct that</u>***
> ***<u>does not qualify as speech) falls within the provision's scope, such as</u>***
> ***<u>"smuggling noncitizens into the country</u>***, providing counterfeit immigration
> documents, and issuing fraudulent Social Security numbers to noncitizens."
>
> As demonstrated in Hansen, Subsection (iv) may apply in a variety of contexts
> … for instance, prosecutors have used the provision to punish those who
> engage in fraudulent schemes that encourage unlawfully present aliens to
> remain in the United States under false pretenses. … The Hansen court
> defined solicitation as "the intentional encouragement of an unlawful act" and

27

**CAR 260**

facilitation (i.e., aiding and abetting) as "the provision of assistance to a wrongdoer with the intent to further an offense's commission." ***The Court added that "lending physical aid" is not required and that "words may be enough*.**"

https://crsreports.congress.gov/product/pdf/LSB/LSB11003

As we have stated before,

The intentional avoidance of knowledge regarding the flaws in the process and their foreseeable outcomes does not absolve them of culpability. We find it helpful, in view of the details set forth above, to further remind our readers—including "placement agencies," their employees, and donors, of Florida Standard Jury Instruction 3.3(h):

### "Willful Blindness"

**In some cases, the issue to be determined is whether the defendant had knowledge of a certain fact. Florida law recognizes a concept known as willful blindness, which is sometimes referred to as "deliberate avoidance of positive knowledge." Willful blindness occurs when a person has his or her suspicion aroused about a particular fact, realized its probability, but deliberately refrained from obtaining confirmation because he or she wanted to remain in ignorance. A person who engages in willful blindness is deemed to have knowledge of that fact.**

We believe that we have only been able to expose the tip of this iceberg, and therefore reiterate our prior recommendation that a separate Statewide Grand Jury, with sufficient time[12] and broader mandate, be charged with investigating these

---

[12] We have previously discussed the refusal of ORR and its grantees to comply with subpoenas for information. The New York Times actually sued the agency in federal court for similar information, a process often requiring more than a year to receive any data. https://www.nytimes.com/interactive/2023/12/28/us/migrants-children-data.html?unlocked_article_code=1.Jk0.xUv9.GJ_Yfahr5URj&hpgrp=ar-abar&smid=url-share

28

**CAR 261**

organizations. We further point out that Chapter 895 of the Florida Statutes sets forth that:

"Racketeering activity" means to commit, to attempt to commit, to conspire to commit, or to solicit another person to commit:

(a)   Any crime that is chargeable by petition, indictment, or information under the following provisions of the Florida Statutes:

24.   Section 777.03, relating to commission of crimes by accessories after the fact.

27.   Chapter 787, relating to kidnapping, human smuggling, or human trafficking.

35.   Chapter 817, relating to fraudulent practices, false pretenses, fraud generally,

37.   Section 827.071, relating to commercial sexual exploitation of children.

44.   Chapter 843, relating to obstruction of justice.

OR

(b)   Any conduct defined as "racketeering activity" under 18 U.S.C. s. 1961(1), which includes:

section 1425 (relating to the procurement of citizenship or nationalization unlawfully)

section 1426 (relating to the reproduction of naturalization or citizenship papers),

section 1427 (relating to the sale of naturalization or citizenship papers),

section 1503 (relating to obstruction of justice),

section 1510 (relating to obstruction of criminal investigations),

section 1511 (relating to the obstruction of State or local law enforcement),

section 1512 (relating to tampering with a witness, victim, or an informant),

section 1513 (relating to retaliating against a witness, victim, or an informant

29

**CAR 262**

section 1546 (relating to fraud and misuse of visas, permits, and other documents), and

sections 1581–1592 (relating to trafficking in persons)

OR

(F) any act which is indictable under the Immigration and Nationality Act, including

section 274 (relating to bringing in and harboring certain aliens),

section 277 (relating to aiding or assisting certain aliens to enter the United States), or

section 278 (relating to importation of alien for immoral purpose)

if the act indictable under such section of such Act was committed for the purpose of financial gain[.]

We found unimpressive the repeated attempts by some witnesses to appeal to nostalgia. One CEO repeatedly invoked his group's origins in activities related to refugee migration decades ago. Working with refugees following an armed revolution is a decidedly different proposition than what these NGOs are now doing with regard to illegal aliens; the public should not be misled by NGOs' desire to conflate the two in an attempt to confuse perceptions of their behavior.

What is more, this argument serves to underscore one of the central complaints against NGOs. As more than one executive confessed, without federal funds, the programs they currently run would not be possible to implement, a marked departure from the history in which they would prefer to wrap themselves. They also admitted that when these nonprofit organizations historically participated in acts of

30

**CAR 263**

charity to help refugees fleeing persecution, they did not need billions of dollars in federal government subsidies to do so:

Q: I'm sorry. You just said you don't do it for money, right?

THE WITNESS: Correct.

Q: Your organization made something like $6 million [just] from ORR last year; right? Yeah?

THE WITNESS: Yeah, somewhere in there.

Q: Would you be doing -- would you be doing this if you didn't get $6 million from ORR, or would you close your doors and not accept any children?

THE WITNESS: You need funds to operate.

Q: I understand you need funds to operate. You talked to me about all this fundraising you do. I know that according to your financials the organization is sitting on something like $37 million in assets; okay? You talked about fundraising already. That, we get. So my question to you is: Why then take ORR's money when you know that the strings attached to that money result in proceedings like this where you redact e-mails, where you refuse to answer questions because you're told ORR says you can't? Why take their money? Why not tell them where to stick their money and proceed with your mission instead? Why not?

THE WITNESS: Our mission is, we know these children when they cross the border are in danger of human trafficking, and we have to trust in our government when they get into the care of ORR and they are sent to us. We then are taking care of traumatized children, and it's -- we do a good job.

Q: You can do that without taking the money that prohibits you from answering questions. You can do that. You just told us you started out doing that; right? That's how you began. Why then continue -- I'm going to say it again -- being complicit with ORR's policy of not answering questions, not disclosing things, not being up front, public, transparent, about anything? Why do that when you have the option not to?

THE WITNESS: We don't have the option not to. We would not be able to fund the program.

31

**CAR 264**

Q: You wouldn't be able to fund the program at all, or you wouldn't be able to fund it as large as it is currently? In other words, is this not a policy choice by the corporation of which you are the CEO? You could operate. You have, in fact, in the past operated, maybe not at that scale, but you have done it and can do it.

THE WITNESS: We would not be able to.

Q: You wouldn't be able to take care of one child?

THE WITNESS: We would -- the program as it is where it's licensed for the children that come in, we need funding in order to be able to do that.

Q: So the idea is, then, that you will, because you want to maintain the program as it is, accept whatever conditions are placed on that money? How many -- what conditions would you not accept? What could ORR possibly put as a string on that money to finally get you to walk away from it?

. . .

THE WITNESS: Well, as I said, we've been doing this for 65 years and we never --

Q: You were doing it before ORR existed.

THE WITNESS: We never came -- you know, we never had to get to this point.

Q: I'm going to take -- I'm going to take that as this. You could, in fact, do something different, and have in the past done something different. For whatever reason, I'm going to quit asking you to explain your reasons, because I don't think you intend to. For whatever reason, the corporation has decided to accept the conditions placed on that money and continue operating like this. Knowing the conditions placed on that money, knowing that you have to submit answers like that, you now know and you're continuing to do it.

THE WITNESS: Knowing that we take good care.

Q: I didn't say you didn't. Nobody has said you don't take good care of the kids when you have them. That's not the point. The point is, what is the cost of being able to take care of them so well for 45 days? What are the costs? And the costs are high. The costs are costs of things like nobody knows where those children are after 30 days. The costs are 400 of them ended up in DCF

32

**CAR 265**

care. The costs are some of them get placed with criminals, and on and on and on and on.

So just the final question. If -- could there be a condition -- can you think of any condition ORR could place upon that grant money to finally cause [your NGO] to walk away from it, say that we can't accept that condition anymore? What would that look like?

THE WITNESS: It would be something that we felt was not in the best interest of the children.

Q: You are accepting the money from ORR. I'm going to therefore, based on your answer, interpret that as saying you think that that is in the best interest of the children, because if it wasn't you would walk away, and you're not walking away.

THE WITNESS: That's correct. We make a place with us, that's correct.

. . .

GRAND JUROR 4: So you've qualified your answers a couple times saying "when they're with us." And if [the NGO] only housed and took care of people then that would be a reasonable qualification, but that's not all that [the NGO] does. They place children with other people. And the policies of ORR in that placement are primarily where the neglect and abuse occurs. And, so, I think that the question of ORR's policy with regard to placement of children with sponsors and ensuring that those sponsors are being responsible with those children and taking care of them in the appropriate and proper way are where ORR's policy are woefully inadequate. And that placement that you guys do for them, therefore, has no accountability nor security for those children. And I don't understand how you can say that is in their best interest.

That some organizations have effectively chosen to become corporations dependent on taxpayer subsidies emphasizes the perversion of noble purpose, not a continuation thereof. They are so tethered to government funding that their original declared purpose is no longer served and they now operate essentially as a no-

33

**CAR 266**

questions-asked pass-through for federal grant funds to various other individuals and organizations.

## IV. SPECIFIC EXAMPLES

During the course of our investigation, we interviewed dozens of current or former NGO employees, ranging from entry-level caseworkers to managers to Chief Legal Counsel to rescue operatives to CEOs and board chairmen. Some appeared willingly; others not only required a subpoena but showed up with multiple attorneys. Some were quite candid; some were understandably reluctant; and in the case of NGO1 (described herein), repeated some variation of "I don't know" more than ninety-three times in one sitting. Our Third Presentment detailed some of this behavior:

> In testimony before us, one CEO admitted only visiting the UAC facility run by that organization one day per month. Officers professed to be unable to discuss the details of their acknowledged transfer of minor children, on the theory that subpoenas and direct questions from the Supreme Court of Florida and this grand jury were subservient to the language of the contract they chose to sign with ORR in exchange for massive amounts of federal taxpayer dollars. Indeed, part of one response asserted that it was "beyond the authority of the Statewide Grand Jury" to even so much as ask for "the total number of sponsors who have received more than one UAC for placement."
>
> Some executives were cooperative to an extent, but nonetheless displayed an alarming lack of awareness that there were any serious problems in the current process. Extreme naivete can be as dangerous as malice in this situation Others behaved far more suspiciously. On ninety-three separate occasions during examination of one group, the answer was some variant of "I don't know"; they don't know who makes placement decisions, they don't know who redacted entire emails including signature lines, they don't know what a

34

**CAR 267**

follow-up to placement is, they don't know anything about ORR's success or lack thereof in safe placement, they don't know why they don't report crimes they observe, they don't know what happens to children after leaving their facility, the CEO doesn't know the answer but says another officer does but that officer has no idea why the CEO would say that, and on and on ad nauseum…

Uniformly, these individuals professed allegiance to ORR. They were unable to name any condition which ORR might put upon a grant which would lead them not to accept the money. We confronted them with a number of the findings about ORR referenced in this report; we pointed out that they could easily choose to provide care to UAC without becoming involved in ORR's placement business; yet the answers did not change. These organizations would (as one CEO brazenly stated) rather operate an unlicensed placement facility and display contempt of Florida's laws, than risk losing ORR's funding.'

We emphasize that we interviewed and examined representatives and evidence from more than the NGOs specifically discussed below. Some of them, including two here in Florida, were content to run carefully-managed (and usually smaller-scale) placement programs and stated they exceeded federal agency recommendations in the care they took. Not all seem so conscientious. We will discuss three organizations in more detail. Concurrently with this Sixth Presentment, we will publish a separate Seventh Presentment identifying these NGOs.

35

**CAR 268**

<u>Florida NGO 1:</u>

NGO1 received 1,243 UAC in the two-year time period we studied. Only 197 were placed in Florida.[13] We examined NGO1's Form 990 for FY 2022. This organization received just over $29 million in "Government Grants" and less than $1.5 million from "all other contributions." Ninety-six percent of NGO1's income appears to have been derived from government grants of some type.

NGO1 spent around $4.5 million dollars in "Grants and other assistance to foreign organizations, foreign governments, and foreign individuals." The CEO, CFO, and CAO of NGO1 each make more than $160,000 per year. It spent $845,000 on executive salaries and $14 million on "other salaries and wages" with an additional million going toward "other employee benefits" and approximately $2 million being paid for "Health Benefits and Pensions."

Florida NGO1 operates a large child placement facility in Florida; that is, it takes federal money to place Unaccompanied Alien Children (legal and illegal entrants) with sponsors. It does so without a required state license. When confronted by the Department of Children and Families, NGO1 took legal action against the Department to prevent being sanctioned for its unlicensed activity.

---

[13] This illustrates another facet of the problem, warranting further investigation: most UAC and other aliens are in fact placed into Florida by agencies who do not operate here in any other capacity.

**CAR 269**

A top executive at NGO1 admitted that nearly 20% of NGO1's operating budget came from a *__single__* federal agency.  He also testified as follows:

Q: If you were denied a license to place children by the Department of Children & Families such that you are not allowed under the licensing law of the state of Florida to do it, what would [your organization] do?

THE WITNESS: We have to follow the guidelines of ORR.

Q: So I'm going to interpret your answer. You tell me if I'm right or wrong. You would continue to operate, license or no from DCF, under the terms of your grant with ORR.

THE WITNESS: We have to follow the guidelines of ORR.

Q: You have to follow them because you entered a contract; right? You accepted a grant. That's a contract; right? That's the reason you have the -- so the penalty if you don't follow ORR's rules is they take that money; right? That's what happens when you breach a contract. If you don't follow ORR's rules they take their money back; right?

THE WITNESS: I mean, it's -- I don't think it's happened to us.

Q: But that's how a -- that's how a grant would work. They can take their money back. That's the only real penalty ORR can impose, right, take the money away. They say, "You're not following our rules, we're taking our money back" right?

THE WITNESS: I guess, yeah.

. . .

GRAND JUROR 4: So the reason that I ask is, because it feels as you've outsourced your policy-making ability to ORR by accepting the contracts from them. We have received lots of testimony and read reams of documentation showing policies from ORR and practices from ORR that are highly neglectful of the best interest of children. Policy such as firing employees who express concerns over possible dangerous placement of children. Policy such as placing children with known criminals. And, to me, that does not reflect the value of doing what is best for children. So it seems incongruous to me that holding that value or claiming to hold that value as an

37

**CAR 270**

organization you would allow such an agency to impose so much influence over your own agency.

... There's a choice that an organization makes when they are in the context of a flawed system, whether to be complicit with that system or whether to say, you know, this is what -- the way that you are, that is you ORR, are treating children is not in their best interest. Your corporate organizational values are manifestly not aligned with the best interest of the children, and we're not going to be complicit with the abuse and neglect you perpetuate upon UCs. The choice that it appeared that you-all have made is to be complicit with ORR's neglectful and abusive policy towards UCs.

THE WITNESS: I would respectfully disagree with that. Our job is, we take these unaccompanied minors who have been traumatized, and they come into our facility, and as long as they are in our facility they are well taken care of, they are safe and -- but the system, is the system flawed? Probably so.

And yet, as one "Lead Case Manager" for NGO1 stated, the organization routinely follows policies without those in charge having any idea as to why they do so:

Q: Okay. Presenting a fake document in an attempt to get a child, that's a crime. Who do you report that crime to?

THE WITNESS: Well, we submit an SIR and we make our field specialist aware of it.

Q: SIR, the Significant Incident Report -- sent to ORR? So you tell ORR?

THE WITNESS: Yes.

Q: Are they law enforcement that you know of?

THE WITNESS: Not that I'm aware of.

Q: Why don't you tell law enforcement, the FBI, or the local police or the sheriff? Why doesn't that happen? Somebody just tried to get a child from you under completely false pretenses. Why wouldn't we involve law enforcement at that point? Is that a policy?

THE WITNESS: I wouldn't be able to tell you.

38

**CAR 271**

Q: When you see a crime happen outside of your job, I assume you would report it, right? You see somebody breaking into your neighbor's car, you're going to call the police?

THE WITNESS: Yes.

Q: Why don't you do that here?

THE WITNESS: I don't know.

An NGO1 UAC Program executive made similarly disturbing statements:

Q: ORR has an agreement with [NGO1]?

THE WITNESS: Yes.

Q: In other words, they have said, "We don't care if you're licensed by the State of Florida or not, you can continue working with us."

THE WITNESS: That's what I understand.

Q: Okay. So they have traditionally, over all the other years you've worked, ORR has required you to be licensed by the State for placement; right? That's been the case since you've been working before; right?

THE WITNESS: That's correct.

Q: Now, they are waiving that requirement; right?

THE WITNESS: That's what I understood.

Q: That doesn't mean -- because Florida law still requires you, in order to place children, regardless of what ORR says, Florida law still says you have to have a license; right? If you don't have a license and Florida law says you have to have one, what's going to happen?

THE WITNESS: I don't know.

…

Q: What if I told you that ORR dropped eight children into a human trafficking ring where they were discovered at an egg farm in Ohio that resulted in a bunch of people trafficking in children?

THE WITNESS: Wow.

**CAR 272**

Q: I'm going to go back to the series of questions I asked you earlier. How confident of you -- are you that ORR knows what the heck they are doing?

THE WITNESS: (No response.)

Q: When is the last time you looked into whether they know what they were doing?

THE WITNESS: (Nodding head.)

Q: You have a responsibility to these children in your position; right? You have agreed to accept that responsibility?

THE WITNESS: (Nodding head.)

Q: Do you believe that responsibility is being faithfully and properly executed when you take ORR's word for everything?

THE WITNESS: (Nodding head.)

Q: Yes? No?

THE WITNESS: No.

Q: I'm sorry?

THE WITNESS: I'm not sure how to answer your concern.

…

Q: So these children are legally custodialless, legally homeless, legally in limbo hanging out there. Everybody that has a Category 2 and Category 3 sponsor is in that boat. Do you understand that?

THE WITNESS: Mm-hmm.

Q: Does that create a concern for the well-being of those children when nobody can be held responsible for bad things happening to them? Do you understand that?

THE WITNESS: I understand.

Q: Why would you then authorize or help or assist placement with Category 2 and 3 sponsors when you're basically saying here's a child that can live with you but the child has no protections? Why would you do that?

40

**CAR 273**

THE WITNESS: I understand what you're saying, but, yes, that's what we're instructed to do.

Q: I understand that might be what you're instructed. Why would you -- if you realize that is a problem, why would you do it? That's my question. Can you answer that one?

THE WITNESS: No.

...

GRAND JUROR 28: Do you receive any type of pressures or, I guess, a push to go ahead and expedite the process?

THE WITNESS: Yes. There are times when we have other documentation then, yes, we feel the pressure that we need to be sending immediately.

GRAND JUROR 28: Who pressures you?

THE WITNESS: ORR.

GRAND JUROR 28: ORR?

THE WITNESS: Mm-hmm.

Florida NGO1's board chair was interviewed regarding the problems identified in our Third Presentment. He professed concern and told us he would be raising those issues with his CEO and his Board of Directors:

GRAND JUROR 4: In your understanding of the policies that are followed at [NGO1], would you expect that staff who become aware of criminality would report that to law enforcement?

THE WITNESS: Yes.

GRAND JUROR 4: In cases like sponsors committing fraud, that that would be reported to law enforcement?

THE WITNESS: Yes.

41

**CAR 274**

GRAND JUROR 4: What would you advise -- how would you advise your CEO if he told you that ORR discouraged reporting of such criminality to law enforcement?

THE WITNESS: Well, obviously it's something that we would not -- I don't think it's something that we like to hear. But to what control do we have?

GRAND JUROR 4: So at the end of the day you would say this is a bad policy but we will follow it?

THE WITNESS: Yeah. Aware that there are things that -- beyond our scope of, you know, what we do. We can't do any more.

...

GRAND JUROR 7: So just to be clear. It's not in the [NGO]'s best interest to report crime when you become aware of it?

THE WITNESS: Oh, it is in our interest.

GRAND JUROR 7: Is there a reason why you aren't doing it?

THE WITNESS: Who says we are not doing it?

GRAND JUROR 7: From testimony that we've heard.

Q: Let me be very blunt with you, ... From your employees. Your employees say you're not doing it and they're intentionally not doing it because they have been strongly advised not to.

THE WITNESS: Well, that I'm not aware of.

Q: Now that you are, what do plan to do about it?

THE WITNESS: Well, after those, talk to my CEO about it.

GRAND JUROR 7: Thank you.

...

Q: I'm gonna guess you realize that you-all have these kids for about 30 days and take care of them while they are -- while ORR and [NGO1] are locating sponsors. Are you familiar with that?

THE WITNESS: Yes.

42

**CAR 275**

Q: Beyond the 30 days we've learned, and I just want to find out if you're aware of this too, [NGO1], or more importantly your case managers or whomever, are essentially prohibited by ORR rules, practices, procedures, whatever it may be, from having further contact with those children. Are you familiar with that after they're placed with a sponsor?

**_THE WITNESS: I know now because of the report._**

Q: Okay.

**_THE WITNESS: I did not know before._**

Q: Is that one of the things that concerned you?

THE WITNESS: Yes.

. . .

Q: Correct. And, you know, the idea that there is zero involvement after and a decision is made within 30 days where this child is essentially going, for all we know for the rest of their childhood, with this sponsor is being made that quickly. Is that something that you would share a concern about after you learned about that from the report?

THE WITNESS: Yes.

Q: Do you believe that that is something that you are going to want to discuss with the rest of the board?

**_THE WITNESS: It's not something I want to. It's something I'm going to._**

. . .

Q: If ORR refused to hear your concern or to react in what I would believe to be a positive manner and say, yeah, [NGO1], you can be involved with these kids or maintain contact, make sure that they're safe beyond the 30 days and ORR said, no, we're not going to do it, we're -- that's it, we're not going to allow that to happen, you're still at 30 days, you're done because they have a sponsor, do you think your board would push back with ORR I guess is what I'm thinking?

THE WITNESS: I would say -- think so, yes.

. . .

43

**CAR 276**

Q: You referenced earlier in the discussion there are a number of ways that [NGO1] can help or aid children in general. Right?

THE WITNESS: Yes.

Q: I mean you do it all the time. You have foster care, substance abuse care, adoptive care, all of that. Right?

THE WITNESS: Um-hum.

Q: And you have been doing that since before the Office of Refugee Resettlement was ever even created.

THE WITNESS: Yes.

Q: Okay. So [NGO1] does not need, in order to fulfill its mission to reach out to children, does not need the Office of Refugee Resettlement. Right? You can and have been for decades, centuries even, doing that kind of outreach and counseling and working and assisting?

THE WITNESS: Yes.

Q: Okay. The problems that were written about in that report you read are created largely and almost solely as a function of the fact that [NGO1] has a contract, meaning you accept grant money, apply for and accept grant money from the Office of Refugee Resettlement and, therefore, agree to abide by their rules in conducting your business with these children. If you cannot by virtue of the fact that you have agreed to accept that money do the things that you want to do or think need to happen for the welfare of these children, does [NGO1] have a decision to make about whether they want to continue to be in the ORR business when they can and are able to and have been and have proven to be very good at serving children without having to follow ORR's rules? Do you understand my question?

THE WITNESS: Yes. I think that there are several elements there that would come into play. I think one, one we have to change our funding, you know, where we do that.

We took the witness at his word. We subpoenaed him again after approximately six months. *We learned that nothing had been done or changed, and there were no plans to do so.*

44

**CAR 277**

Q: Number 1, is it still the idea that even if there is criminality observed that as long there's an ORR policy in place the calling of police or reporting to law enforcement should be discouraged, that that is still the rules that are being followed by your case managers as far as you know? Is that still going on?

THE WITNESS: As far as I know. ***I've not been able to really speak about this as I swore***.

...

Q: Are you -- am I to understand that as of today you have not had those discussions with the board at all?

THE WITNESS: Correct.

Q: Okay. When did you say you plan to do that?

THE WITNESS: I need to plan on doing it with our board.

Q: Which is when?

THE WITNESS: To be honest, I don't remember. I'm thinking about it. I'm thinking about something else that I -- ***I don't know when***.

In other words, NGO1's chief administrators and senior employees all recognize, or claim to recognize, many of the problems we have not only publicly reported but impressed upon them personally. Nonetheless, they continue business as usual.

Florida NGO 2

Florida NGO2 is larger than NGO1, and more diversified in terms of the services it performs. It has numerous contracts throughout the state performing functions as varied as mental health and substance abuse counseling for local court systems and service to homeless and aging populations. We note at the outset that

45

**CAR 278**

our discussion is not related to the performances of these other functions, which we have not investigated and have no reason to question.

NGO2 declared total revenues of just over $300 million in FY2021, with nearly $295 million of that coming from "Government Grants." It spent more than $2 million on executive salaries, nearly $60 million on "other salaries and wages," and more than $8 million on "other employee benefits" such as "pension plan accruals." No fewer than nine executives are paid more than $140,000 per year, three more make in excess of $200,000, and the CEO salary is listed at more than $350,000 annually.

Over a three-year period, NGO2 received more than 800 UAC for placement. Like NGO1, it currently operates a placement facility without a state license to do so, and took legal action against the Department of Children and Families over potential liability for such activity.

A top executive of NGO2 admitted that, much like NGO1, his organization was completely dependent upon grant funding for this facet of its program:

> GRAND JUROR 9: If [NGO2] did not receive the funding from ORR, would you guys still be able to handle as many children and continue placing children to the same capacity, or would you have to lower the capacity? Basically, like, do you require that lump money, you know, the 6 million, $7 million compared to the, what, 200, $250 million that you guys normally have, right, in order to complete this service?
>
> THE WITNESS: Complete which service?

**CAR 279**

GRAND JUROR 9: The application of the UC children.

THE WITNESS: Of the UC children? Well, we wouldn't have any of the UC children if we didn't have the [program location]. That's the only program that we have that actually serves UC children. So, yeah, if we weren't able to operate the [program location] we wouldn't be placing anybody anywhere 'cause we wouldn't -- we wouldn't have kids.

The same executive claimed to be unaware that there were any problems in ORR's framework, and when confronted with several specific examples from our Third Presentment, (including labor trafficking of UAC, murders and other crimes committed by UAC or sponsors, and reckless placement of children with criminals) he indicated as follows:

THE WITNESS: That's horrifying. That's terrible.

...

Q: While we're on that subject, you seemed concerned --

THE WITNESS: I am concerned.

Q: -- and understandably so about Florida, but most of the children your organization and most organizations list, you place most of your children with people outside of Florida.

THE WITNESS: Mm-hmm.

Q: And a lot of people outside Florida place children here. ...

THE WITNESS: I think I would have heard if that happened in Florida, for example.[14] No, that's -- that -- you know, those are horror stories, and I agree with you. Those are extremely concerning. ... I think it's horrible. Whoever is responsible for that, they should fix it. And ORR has some -- has responsibility for that. You're telling me things I haven't heard before. I'd be outraged if I heard that the State of Florida did that with kids, too. I'm outraged if ORR is

---

[14] He had *not* heard, which is why we informed him.

47

**CAR 280**

actually not following up more than that. And I will definitely go back and try to dig a little bit on my own to figure out exactly what happened, you know, as best I can find out. So thanks for sharing.

Naturally, we followed up with this witness approximately six months later. While we were pleased to learn that, unlike NGO1, this witness had in fact made inquiries regarding some of the deficiencies we pointed out, we were ultimately quite disappointed to learn that absolutely nothing had changed:

Q: All right. And you had had the opportunity, as I referenced, to testify before us about five or six months ago. During the course of that testimony I think you even were presented with some evidence on this side of things about certain matters that you had been previously unaware of. And some of those findings and matters were summarized and described in some detail in the previous report that this grand jury had issued and is now a matter of public record. We invited you back here -- they invited you back here today as more in the form of a follow-up bit of testimony here for you to describe to us if you would that, based on the discussions that were had in the previous testimony, your previous appearance before us in some of those matters that I have referenced, what either changes or at least discussions you have had on your end of things with some of the stakeholders that you have with [NGO2]. Have you either brought about or at least discussed some of the matters that you became aware of during your prior testimony here in front of us?

THE WITNESS: Yes. Obviously I heard things from you-all that I hadn't heard before that raised some concern on my part. I made a trip to Washington, D.C., after we met. I met with the officials with the Office of Refugee Resettlement. We had a nice talk.

...

It was collegial. You know, the first meeting there was a whole lot of sort of bringing people up to speed about what I was talking about. The second meeting, the principal deputy had already been briefed on my earlier meeting, so it was very collegial.

...

48

**CAR 281**

They listened to what I said. I mean, I felt heard.

Q: Did they counterrespond with any suggestions or offers as to how they, themselves, might do their jobs better, or matters that they felt perhaps as an agency potentially deficient in?

THE WITNESS: Not really.

…

Q: So back to my -- I'm trying to figure out exactly what response you got from these individuals. What were the words that were exchanged? What did you get back from them in terms of what did they say?

THE WITNESS: They said we hear you, I guess.

…

I felt like I got what I needed from them. I needed for them to hear that I'm concerned that they're being sloppy with post placements. I'm concerned about that. And I want them to know our agency doesn't want to take part in anything that's sloppy like that. And we're going to do the things that we need to do to make sure this is a good process, so, I mean, I got what I needed.

Obviously, ***nothing has actually changed***; ORR still restricts providers from doing anything more than 30 days after placement, providers have only that window to "check" anything, employees are still discouraged from reporting incidents directly to law enforcement, and no amount of doublespeak regarding "we hear you" alters that fact (indeed, as we documented extensively in our Fourth Presentment, ORR has instead proposed a rule which would make these issues ***worse***, not better). Nor does it appear that NGO2 has reconsidered being involved with this particular industry, on the same terms.

49

**CAR 282**

## Florida NGO 3

Like NGO2, NGO3 operates in multiple arenas, including foster care, domestic violence counseling, residential health treatment, and others. Just as with NGO2, we did not investigate any of those areas and none of the commentary herein should be construed to apply in those contexts.

We examined NGO3's Form 990 for FY 2021. This organization received just over $33 million in "Government Grants" and reported just over $42 million in total revenue. It spent nearly $500,000 on executive salaries and $20 million on "other salaries and wages" with an additional $2 million going toward "other employee benefits."

Florida NGO3, like the others mentioned, operates a child placement facility in Florida; that is, it takes federal money to place Unaccompanied Alien Children (legal and illegal entrants) with sponsors. It does so without a Florida license.



50

**CAR 283**



CAR 284



---

[15] https://www.acf.hhs.gov/media/press/2018/hhs-executing-its-mission-care

CAR 285



53

**CAR 286**



**CAR 287**



**CAR 288**

████████████████████████████████████████████

We recognize that the policies and conditions imposed by DHS, HHS, and ORR upon financial grantees are laden with potential to cause tragedy, as has been outlined before. ***It has always been not a matter of if, but when***.

We also assert that organizations and individuals who accept those conditions and take the money cannot automatically absolve themselves by simply saying they were "following the rules of the program." Individuals are responsible for their own actions ***and inactions***.

Our concern and mandate is not to consider whether, in this instance, there might be individual or organizational civil tort liability. It is, as the Supreme Court charged us, to determine potential ***criminal*** liability. Given the evidence as we understand it, we do not believe individual criminal liability is warranted in this specific instance. We decline to find that one or two individuals should bear the brunt of responsibility for federal agency policies in light of these particular facts and circumstances.

**CAR 289**

## V. CONCLUDING REMARKS

The members of the Twenty-First Statewide Grand Jury appreciate the diligence and faith our Supreme Court and Presiding Judge Masters put into the process of our empanelment and deliberations. We conclude our term of service knowing a great deal more than when we began, and hoping that we have provided information useful to our fellow Floridians. We wish to express our thanks to the Tenth Circuit Court staff, Polk County Sheriff's Office, Capitol Police and FDLE agents who made it possible to carry out our mandate in a secure and well-equipped environment; and to our court clerk and court reporter for months of excellent and productive labor on our behalf.

Respectfully submitted to the Honorable Ellen S. Masters, Presiding Judge of the Twenty-First Statewide Grand Jury, this 6th day of March, 2024.

Foreperson Juror #18
Twenty-First Statewide Grand Jury

THE FOREGOING Sixth Presentment was returned to me in open court this this 6th day of March, 2024.

HON. ELLEN S. MASTERS,
Presiding Judge
Twenty-First Statewide Grand Jury

57

**CAR 290**

I, Nicholas B. Cox, Statewide Prosecutor and Legal Advisor, Twenty-First Statewide Grand Jury of Florida, hereby certify that I, as authorized and required by law, have advised the Grand Jury which returned this Report on this 6th day of March, 2024.

_____
NICHOLAS B. COX
Statewide Prosecutor
Twenty-First Statewide Grand Jury

I, Guillermo Vallejo, Assistant Statewide Prosecutor and Assistant Legal Advisor, Twenty-First Statewide Grand Jury of Florida, hereby certify that I, as authorized and required by law, have advised the Grand Jury which returned this Report on this 6th day of March, 2024.

_____
GUILLERMO VALLEJO
Assistant Statewide Prosecutor
Twenty-First Statewide Grand Jury

I, Richard Mantei, Assistant Statewide Prosecutor and Assistant Legal Advisor, Twenty-First Statewide Grand Jury of Florida, hereby certify that I, as authorized and required by law, have advised the Grand Jury which returned this Report on this 6th day of March, 2024.

_____
RICHARD MANTEI
Assistant Statewide Prosecutor
Florida Bar #119296
Twenty-First Statewide Grand Jury

I, Robert Finkbeiner, Assistant Statewide Prosecutor and Assistant Legal Advisor, Twenty-First Statewide Grand Jury of Florida, ~~hereby~~ certify that I, as authorized and required by law, have advised the Grand Jury which returned this Report on this 6th day of March, 2024.

_____
ROBERT FINKBEINER
Assistant Statewide Prosecutor
Twenty-First Statewide Grand Jury

FILED
JOHN A. TOMASINO
MAR 0 6 2024
CLERK, SUPREME COURT
BY_____

58

**CAR 291**