**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| PACITO; ESTHER; JOSEPHINE; SARA; ALYAS; MARCOS; AHMED; RACHEL; ALI; HIAS, INC.; CHURCH WORLD SERVICE, INC.; LUTHERAN COMMUNITY SERVICES NORTHWEST, *Plaintiffs - Appellees*, v. DONALD J. TRUMP, in his official capacity as President of the United States; MARCO RUBIO, in his official capacity as Secretary of State; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; ROBERT F. KENNEDY JR., in his official capacity as Secretary of Health and Human Services, *Defendants - Appellants*. | Nos. 25-1313, 25-1939  D.C. No. 2:25-cv-00255-JNW  OPINION |

Appeal from the United States District Court
for the Western District of Washington
Jamal N. Whitehead, District Judge, Presiding

2                    PACITO V. TRUMP

Argued and Submitted September 3, 2025
Pasadena, California

Filed March 5, 2026

Before: Richard R. Clifton, Jay S. Bybee, and Kenneth K.
Lee, Circuit Judges.

Opinion by Judge Bybee;
Partial Dissent by Judge Lee

## SUMMARY[*]

### Immigration

The panel affirmed in part and reversed in part the
district court's preliminary injunctions prohibiting
enforcement or implementation of Executive Order No.
14163, "Realigning the United States Refugee Admissions
Program," 90 Fed. Reg. 8459 (Jan. 30, 2025), which
suspended the United States Refugee Admissions Programs
("USRAP"), as well as related suspensions of funding for
USRAP.

Applying the factors set out in *Winter v. Nat. Res. Def.
Council*, 555 U.S. 7 (2008), for evaluating a preliminary
injunction, the panel reviewed the district court's two broad
grounds for granting injunctive relief: (1) the executive order
was beyond the President's statutory authority; and (2) the

---

[*] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

State Department's suspension of USRAP violated the Administrative Procedure Act ("APA").

The panel concluded that Plaintiffs failed to make a strong showing that they are likely to succeed on the merits of their challenges to Executive Order No. 14163 as beyond the President's statutory authority under 8 U.S.C. § 1182(f) and the Refugee Act. As to the sections of the executive order that suspend the admission of approved refugees to the United States, the panel rejected the district court's concerns that the President impermissibly suspended USRAP in its entirety and indefinitely. As to the section of the executive order that suspends decisions on all applications for refugee status, nothing in the Refugee Act directs the President to continue to process applications while admissions have been suspended.

Turning to Plaintiffs' APA challenges to decisions to defund various services offered under USRAP, the panel addressed the Government's arguments that these claims were unreviewable. First, the Government argued that APA does not provide an avenue for review because the Court of Federal Claims has exclusive jurisdiction over the organizational Plaintiffs' claims under the Tucker Act. Rejecting that contention, the panel concluded that neither the source of the rights upon which Plaintiffs based their claims nor the relief sought sounded in contract.

Next, the Government argued that the actions of the President and the agencies were not reviewable because the "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Reasoning that the Refugee Act is quite specific in describing the programs for refugee resettlement, the panel concluded that the Government had not rebutted the strong presumption favoring judicial review.

4                           PACITO V. TRUMP

Finally, the Government argued that there is no "final agency action" to review." 5 U.S.C. § 704. The panel agreed that the executive order itself is not subject to APA review because the President is not an agency within the meaning of the APA. With respect to the agencies' decision to defund the refugee program, the panel rejected the argument that there was no final agency action because the State Department ultimately terminated funding.

Turning to the merits of Plaintiffs' APA challenges, the panel could not conclude that it was arbitrary and capricious or otherwise not in accordance with the Refugee Act for the State Department to defund overseas operations. The panel saw no reason why the State Department should be required to maintain an overseas structure capable of processing tens of thousands of applications when the executive order has limited entry to case-by-case consideration.

Next, the panel concluded that the district court did not abuse its discretion in concluding that the Government likely acted contrary to law by failing to provide statutorily mandated services to refugees already admitted to the United States. The panel also concluded that the termination of cooperative agreements with resettlement support centers was likely arbitrary and capricious because the Government failed to provide reasoned explanations, factual findings, or bases for the termination, and also terminated the cooperative agreements without first considering the reliance interests of individual refugees.

Turning to the remaining *Winter* factors with respect to Plaintiffs' APA challenge to the defunding of domestic resettlement services, the panel concluded that those factors also weighed in Plaintiffs' favor.

With respect to the scope of relief, the Government argued that the district court's injunctions are so overly broad as to constitute "universal injunctions" that run afoul of *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). Because *CASA* did not affect district courts' ability to issue class-wide injunctive relief and a class had been certified in this case, the panel concluded that the district court's injunctions complied with *CASA*.

Dissenting in part, Judge Lee disagreed on two points. First, Judge Lee did not think the court had jurisdiction over the organizational plaintiffs' claims because they are breach-of-contract claims seeking money from the federal government and thus must be heard by the Court of Federal Claims. Second, even assuming jurisdiction, the better reading of the statutory provisions is that the United States has discretion whether to fund these services.

Judge Lee also wrote separately to highlight that district courts cannot stand athwart, yelling "stop" just because they genuinely believe they are the last refuge against policies that they deem to be deeply unwise. Otherwise, the courts risk inching towards an imperial judiciary that lords over the President and Congress.

## COUNSEL

Linda B. Evarts (argued), Mevlüde A. Alp, Pedro Sepulveda
Jr., and Deepa Alagesan, International Refugee Assistance
Project, New York, New York; Melissa S. Keaney (argued),
International Refugee Assistance Project, Fair Oaks,
California; Laurie B. Cooper, International Refugee
Assistance Project, Washington, D.C.; Megan M. Hauptman
and Laurie B. Cooper, International Refugee Assistance
Project, Washington, D.C.; Harry H. Schneider Jr., Jonathan
P. Hawley, and Shireen Lankarani, Perkins Coie LLP,
Seattle, Washington; Joel W. Nomkin, Perkins Coie LLP,
Phoenix, Arizona; John M. Devaney, Perkins Coie LLP,
Washington, D.C.; Nicholas J. Surprise, Perkins Coie LLP,
Madison, Wisconsin; for Plaintiffs-Appellees.

Tiberius T. Davis (argued), August E. Flentje, Joseph
McCarter, Lindsay W. Zimliki, Jason K. Zubata, Ilana
Kramer, and Alexandra Yeatts, Trial Attorneys; Office of
Immigration Litigation, Civil Division; David Kim, Senior
Litigation Counsel; Drew C. Ensign, Deputy Assistant
Attorney General; Yaakov M. Roth, Principal Deputy
Assistant Attorney General; Ernesto H. Molina, Deputy
Director; Brett A. Shumate, Assistant Attorney General;
United States Department of Justice, Washington, D.C.; for
Defendant-Appellants.

Elizabeth B. Wydra, Brianne J. Gorod, Miriam Becker-
Cohen, and Nina G. Henry, Constitutional Accountability
Center, Washington, D.C., for Amicus Curiae Constitutional
Accountability Center.

Andrew L. Schlafly, Far Hills, New Jersey, for Amici Curiae
Immigration Reform Law Institute.

Fawn J. Rajbhandari-Korr, Lindsay Nako, and Lori Rifkin, Impact Fund, Berkeley, California, for Amici Curiae The Impact Fund, Justice in Aging, Refugee and Immigrant Center for Education, Centro Legal de la Raza, Contra Costa Senior Legal Services, Diverse Elders Coalition, La Raza Centro Legal, Oasis Legal Services, Self-Help for the Elderly, and Southeast Asia Resource Action Center.

Hannah C. Vail and Brett M. Gannon, Assistant Attorneys General; Elizabeth D. Matos, Chief, Civil Rights Division; Tasha J. Bahal, Deputy Solicitor General; Andrea J. Campbell, Commonwealth of Massachusetts Attorney General; Office of the Commonwealth of Massachusetts Attorney General, Boston, Massachusetts; Emma Grunberg, Kelly A. Paradis, and Cristina Sepe, Deputy Solicitors General; Nicholas W. Brown, Washington Attorney General; Office of the Washington Attorney General, Olympia, Washington; Kristin K. Mayes, Arizona Attorney General, Office of the Arizona Attorney General, Phoenix, Arizona; Rob Bonta, California Attorney General, Office of the California Attorney General, Sacramento, California; Philip J. Weiser, Colorado Attorney General, Office of the Colorado Attorney General, Denver, Colorado; William Tong, Connecticut Attorney General, Office of the Connecticut Attorney General, Hartford, Connecticut; Kathleen Jennings, Delaware Attorney General, Office of the Delaware Attorney General, Wilmington, Delaware; Anne E. Lopez, Hawaiʻi Attorney General, Office of the Hawaiʻi Attorney General, Honolulu, Hawaiʻi; Kwame Raoul, Illinois Attorney General, Office of the Illinois Attorney General, Chicago, Illinois; Aaron M. Frey, Maine Attorney General, Office of the Maine Attorney General, Augusta, Maine; Anthony G. Brown, Maryland Attorney General, Office of the Maryland Attorney General,

Baltimore, Maryland; Dana Nessel, Michigan Attorney General, Office of the Michigan Attorney General, Lansing, Michigan; Keith Ellison, Minnesota Attorney General, Office of the Minnesota Attorney General, St. Paul, Minnesota; Aaron D. Ford, Nevada Attorney General, Office of the Nevada Attorney General, Carson City, Nevada; Matthew J. Platkin, New Jersey Attorney General, Office of the New Jersey Attorney General, Trenton, New Jersey; Letitia James, New York Attorney General, Office of the New York Attorney General, New York, New York; Dan Rayfield, Oregon Attorney General, Office of the Oregon Attorney General, Salem, Oregon; Peter F. Neronha, Rhode Island Attorney General, Office of the Rhode Island Attorney General, Providence, Rhode Island; Joshua L. Kaul, Wisconsin Attorney General, Office of the Wisconsin Attorney General, Madison, Wisconsin; for Amici Curiae The State of Washington, Commonwealth of Massachusetts, and States of Arizona, California, Colorado, Connecticut, Delaware, Hawaiʻi, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New York, Oregon, Rhode Island, Vermont, and Wisconsin.

Matthew Z. Crotty, Riverside NW Law Group PLLC, Spokane, Washington, for Amici Curiae Refugees International.

Clara J. Shin, Covington & Burling LLP, San Francisco, California; Michael E. Cunniff and Aparna Sundaram, Covington & Burling LLP, New York, New York; Alexis N. Dyschkant and Evan K.W. Matsuda, Covington & Burling LLP, Washington, D.C.; for Amici Curiae Former U.S. Government Officials.

Linda Dakin-Grimm, Milbank LLP, Los Angeles, California; Atara Miller, Victor Hollenberg, and Alex

PACITO V. TRUMP                    9

Ruppert, Milbank LLP, New York, New York; for Amici Curiae Bet Tzedek Legal Services and Faith-Based Organizations.

Gregory L. Diskant, Jonah Wacholder, Ian D. Eppler, and Colleen Anderson, Patterson Belknap Webb & Tyler LLP, New York, New York, for Amici Curiae Ethiopian Community Development Council and Lutheran Services Carolinas.

Sarah M. Rich and Somil B. Trivedi, Democracy Forward Foundation, Washington, D.C.; Sunil R. Varghese, Refugee Council USA, Washington, D.C.; for Amicus Curiae Refugee Council USA.

10                        PACITO V. TRUMP

## OPINION

BYBEE, Circuit Judge:

On January 20, 2025, the President issued Executive Order No. 14163, "Realigning the United States Refugee Admissions Program." 90 Fed. Reg. 8459 (Jan. 20, 2025). Pursuant to 8 U.S.C. §§ 1182(f) and 1185(a), the President determined that "entry into the United States of refugees under the [United States Refugee Admissions Program (USRAP)] would be detrimental to the interests of the United States" and directed that "entry into the United States of refugees under the USRAP be suspended" pending further findings. Exec. Order. No. 14163, § 3(a). In response to the Executive Order, the Department of State suspended all funding of the USRAP program, purportedly pursuant to a different executive order entitled "Reevaluating and Realigning United States Foreign Aid." Exec. Order No. 14169, 90 Fed. Reg. 8619 (Jan. 20, 2025). Pending further review, this included the suspension of funding for (1) processing applications from persons outside the United States seeking refugee status here and (2) domestic resettlement services for refugees admitted to the United States.

Plaintiffs are refugees who have been recently admitted to the United States; refugees who have been approved for resettlement in the United States but remain outside the country; U.S.-based individuals seeking admission for their family members or sponsees; and three organizations that had cooperative agreements with the State Department to provide overseas processing and domestic resettlement services. Plaintiffs allege that Executive Order No. 14163's suspension of the refugee program violates the Refugee Act

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 11 of 90
ase 2:25-cv-00255-JNW   Document 198   Filed 03/04/26   Page 11 of 9

PACITO V. TRUMP                        11

of 1980, Pub. L. No. 96-212, 94 Stat. 102 (codified in various provisions of the Immigration and Nationality Act, 8 U.S.C. §§ 1101 et seq.), and that the defunding of USRAP violates various provisions of the Administrative Procedure Act, 5 U.S.C. § 551 et seq. The district court issued two preliminary injunctions prohibiting the enforcement or implementation of §§ 3(a), (b), (c), and 4 of Executive Order No. 14163 and the suspension of USRAP funding and reinstating the terminated cooperative agreements. The Government sought review.

Our task is to determine whether the President's actions were within the statutory authority granted him under the INA. Whether we agree with those actions is beside the point: "The wisdom of the policy choices made by [the President] is not a matter for our consideration." *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 165 (1993). "We do not sit as a committee of review . . . ." *TVA v. Hill*, 437 U.S. 153, 194–95 (1978). We conclude that, with one exception, Plaintiffs have not made the requisite showing that they are likely to succeed on the merits. We thus vacate the preliminary injunctions in large measure.

## I.  BACKGROUND

### A. *Constitutional and Statutory Background*

In this section, we first review the constitutional framework for the power of the political branches to regulate the admission of aliens to the United States. We then consider the statutory authorities and describe how USRAP works in practice. Because of the breadth of Plaintiffs' challenge and the complexity of USRAP, we set this forth in some detail.

12                          PACITO V. TRUMP

### 1.   Constitutional Framework

It has long been "an accepted maxim of international law, that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe." *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892). It is beyond dispute that "[t]he exclusion of aliens is a fundamental act of sovereignty." *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950); *see Landon v. Plasencia*, 459 U.S. 21, 32 (1982). The Constitution commits this "broad, undoubted power over the subject of immigration and the status of aliens" to Congress and the President. *Arizona v. United States*, 567 U.S. 387, 394 (2012); *see also Fiallo v. Bell*, 430 U.S. 787, 792 (1977).

Congress wields the bulk of this power. The Constitution vests in Congress the power "[t]o establish an uniform rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, to "regulate Commerce with foreign Nations," *id.* art. I, § 8, cl. 3, and to "declare War," *id.* art. I, § 8, cl. 11, facilitated by the more general power "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers," *id.* art. I, § 8, cl. 18. The Supreme Court has long read these provisions as granting Congress plenary power to establish the country's substantive immigration policy. *See Ekiu*, 142 U.S. at 659; *see also INS v. Chadha*, 462 U.S. 919, 940 (1983) ("The plenary authority of Congress over aliens under Art. I, § 8, cl. 4 is not open to question . . . ."); *Fiallo*, 430 U.S. at 792 ("'[O]ver no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens.") (quoting *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909)).

That said, the power to exclude aliens "stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." *Knauff*, 338 U.S. at 542. Although "the source of the President's power to act in foreign affairs does not enjoy any textual detail," *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003), it flows generally from the President's duty to "receive Ambassadors and other public Ministers," U.S. Const. art. II, § 3, and secondarily from the President's role as "Commander in Chief," *id.* art. II, § 2, cl. 1, the Vesting Clause, *id.* art. II, § 1, cl. 1, and the President's broad responsibility to "take Care that the Laws be faithfully executed," *id.* art. II, § 3; *see also Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 33–34 (2015). Indeed, "Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations.'" *Garamendi*, 539 U.S. at 414 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Frankfurter, J., concurring)). Whether or not the President has authority *independent* of Congress to authorize or forbid the admission of aliens, "the decision to admit or to exclude an alien may be lawfully placed with the President." *Knauff*, 338 U.S. at 543.

The precise steps for this constitutional choreography are not critical to our decision. In general, Congress, possessing plenary "power to set the procedures to be followed in determining whether an alien should be admitted," *DHS v. Thuraissigiam*, 591 U.S. 103, 139 (2020), determines who is admissible, under what terms they may be admitted, and under what conditions they may be excluded or removed. *See Mathews v. Diaz*, 426 U.S. 67, 82–83 (1976); *Galvan v. Press*, 347 U.S. 522, 531 (1954). The President, possessing the discretion to admit or exclude aliens when Congress has

14                          PACITO V. TRUMP

delegated him the power to do so, executes the policy.  *See Trump v. Hawaii*, 585 U.S. 667, 683–85 (2018).

### 2.  Statutory Background

#### a.  The Immigration and Nationality Act

*Admission of refugees.*   Congress enacted the Immigration and Nationality Act of 1952 (INA), codified at 8 U.S.C. § 1101 et seq., to establish "a comprehensive and complete code covering all aspects of admission of aliens to this country." *Elkins v. Moreno*, 435 U.S. 647, 664 (1978); *see also Immigration and Nationality Act*, U.S. Citizenship & Immigr. Servs. (last updated July 10, 2019), https://perma.cc/J6DK-B6LG (in enacting the INA, Congress "collected many provisions and reorganized the structure of immigration law"). Through the INA, Congress prescribed the terms on which aliens may be admitted to the United States, the conditions under which they may remain within its borders, and the requirements for aliens to become naturalized as U.S. citizens. *See* 8 U.S.C. § 1101 et seq.

The INA defines an "alien" as "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). "The terms 'admission' and 'admitted'" refer to "the *lawful entry* of [an] alien into the United States." *Id.* § 1101(a)(13)(A) (emphasis added). In general, to qualify for entry, an alien must apply for admission, be approved for an immigrant visa, and present specified travel or identification documents. *See* 8 U.S.C. § 1181(a).

Section 1182 of the INA details various conditions under which an alien may be ineligible for admission. *See id.*

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 15 of 90
ase 2:25-cv-00255-JNW    Document 198    Filed 03/04/26    Page 15 of 9

PACITO V. TRUMP                    15

§ 1182(a)(1)–(10) (defining "[c]lasses of aliens ineligible for visas or admission"). It further provides:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).

Congress has amended the INA several times over the years. Particularly relevant to this appeal, the Refugee Act of 1980 amended the INA "to revise the procedures for the admission of refugees" and to "establish a more uniform basis for the provision of assistance to refugees." Pub. L. No. 96-212, 94 Stat. 102 (1980). In the years leading up to the Refugee Act's passage, refugee admission policy had been "reactive and piecemeal as it grew in response to humanitarian crises and ethnic conflicts." *Policy Manual Chapter 1 - Purpose and Background*, U.S. Citizenship & Immigr. Servs. (last updated Dec. 12, 2025), https://perma.cc/XQ6K-3XKN. In an attempt to address these issues, Congress passed the Refugee Act to establish "a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for [their] effective resettlement." Pub. L. No. 96-212, § 101(b), 94 Stat. at 102.

16 PACITO V. TRUMP

To accomplish this end, the Refugee Act made a number of changes to the INA. First, it established a uniform definition for "refugee" as a person who (1) "is outside any country of such person's nationality" and (2) "is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country" (3) "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42).

Importantly, the Refugee Act exempted aliens who qualify as "refugees" from the standard visa requirement and admission procedures specified in the INA. 8 U.S.C. § 1181(c) ("The provisions of subsection (a) shall not apply to an alien whom the Attorney General admits to the United States under section 1157 of this title."). Instead, the Act created a separate, comprehensive framework for the processing, admission, and resettlement of refugees. *See generally* 8 U.S.C. §§ 1157, 1521–24.

Section 1157 of the INA lays out the process for admitting refugees to the United States. It provides procedures for determining an annual "[m]aximum number of admissions," for increasing that number in the case of unforeseen emergency refugee situations, and for allocating admissions among refugees. *See* 8 U.S.C. § 1157(a)–(c). Specifically, it provides that "the number of refugees who may be admitted" each year "shall be such number as the President determines, before the beginning of the fiscal year and after appropriate consultation" with Congress. *Id.* § 1157(a)(2).

For purposes of the Refugee Act, "appropriate consultation" requires in-person discussions between

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 17 of 90
ase 2:25-cv-00255-JNW    Document 198    Filed 03/04/26    Page 17 of 9

PACITO V. TRUMP                                17

"designated Cabinet-level representatives of the President with members of the Committees on the Judiciary of the Senate and of the House of Representatives." *Id.* § 1157(e). These parties must "discuss the reasons for believing that the [President's] proposed admission of refugees is justified," and the President's representatives must provide Congress with various sets of descriptions, analyses, and other information. *Id.* The "substance of such consultation" must be published, *id.* § 1157(d)(2), and a hearing must generally be held "to review the proposed" number of refugee admissions, *id.* § 1157(d)(3)(A).

After this consultation, individual refugee admissions are "allocated among refugees of special humanitarian concern to the United States." *Id.* § 1157(a)(3).[1] Subject to the "numerical limitations" determined by the President, the Attorney General is then authorized to, in his or her "discretion and pursuant to such regulations as the Attorney General may prescribe, admit any refugee who" is: (1) "not firmly resettled in any foreign country"; (2) "determined to be of special humanitarian concern to the United States"; and (3) is otherwise "admissible." *Id.* § 1157(c)(1).

Section 1157(c) also creates a special class of "follow-to-join" refugees. It provides that the spouse or child of a principal refugee shall "be entitled to the same admission status" as the principal refugee so long as the spouse or child is "accompanying, or following to join, such refugee" and the spouse or child is otherwise "admissible" under the INA. *Id.* § 1157(c)(2)(A). The admission of such a spouse or child "shall be charged against the numerical limitation

---

[1] The President may also increase the number of annual refugee admissions under certain emergency situations "after appropriate consultation." 8 U.S.C. § 1157(b).

established in accordance with the appropriate subsection under which the [principal] refugee's admission is charged." *Id.*

Finally, § 1157 expressly exempts refugees from being deemed inadmissible under certain § 1182 grounds. 8 U.S.C. § 1157(c)(3). Specifically, refugees may not be deemed inadmissible because they are "likely at any time to become a public charge" under § 1182(a)(4), are seeking to enter the United States "for the purpose of performing skilled or unskilled labor" under § 1182(a)(5), or do not possess a valid visa or other valid entry document under § 1182(a)(7)(A). 8 U.S.C. § 1157(c)(3). The Attorney General is further authorized to waive, with several narrow exceptions, "any other provision" of § 1182 "for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest." *Id.*

*Resettlement of refugees*. Once an alien has been admitted to the United States as a refugee, he or she acquires certain rights and responsibilities. For example, the sole cause for revoking refugee status is a determination that an alien was "not in fact a refugee . . . at the time of the alien's admission," 8 U.S.C. § 1157(c)(4), but an admitted refugee may contest removal proceedings by demonstrating his or her refugee status, *see* 8 U.SC. § 1252(e)(2)(c), (e)4(b). After a refugee has been physically present in the United States for at least one year, the refugee is generally entitled to have his or her status adjusted to lawful permanent residency. *See* 8 U.S.C. § 1159(a).

The Refugee Act also establishes procedures to provide various domestic resettlement services to recently admitted refugees. *See* 8 U.S.C. §§ 1521–24. Section 1521 establishes the Office of Refugee Resettlement (ORR)

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 19 of 90
ase 2:25-cv-00255-JNW    Document 198    Filed 03/04/26    Page 19 of 9

PACITO V. TRUMP                                    19

within the Department of Health and Human Services
(HHS).  8 U.S.C. § 1521(a).  ORR's "function" is "to fund
and  administer"  refugee  assistance  programs  under
Subchapter IV.  *Id.* § 1521(b).  Section 1522 outlines the
initial domestic resettlement services to be provided and
authorizes the Government to work with States and nonprofit
agencies to provide them.  The statute expressly identifies
Congress's "intent . . . in providing refugee assistance under
this section" is that (1) "employable refugees" be employed
"as soon as possible after their arrival; (2) "social service
funds"  be  focused  on  "employment-related  services,
English-as-a-second-language  training  . . ., and case-
management services"; and (3) local voluntary agencies
work in close cooperation with state and local governments.
8 U.S.C. § 1522(a)(1)(B).

The first provision of § 1522 directs that "[i]n providing
assistance under this section, the Director [of ORR] shall, to
the extent of available appropriations," follow four charges.
*Id.* § 1522(a)(1)(A).  First, the Director shall "make available
sufficient resources for employment training and placement
in order to achieve economic self-sufficiency among
refugees as quickly as possible."  *Id.*  Second, the Director
shall "provide refugees with the opportunity to acquire
sufficient English language training to enable them to
become effectively resettled as quickly as possible."  *Id.*
Third, the Director shall "insure that cash assistance is made
available to refugees in such a manner as not to discourage
their economic self-sufficiency."  *Id.*  And finally, the
Director  shall  "insure  that  women  have  the  same
opportunities  as  men  to  participate  in  training  and
instruction."  *Id.*

Section 1522(a) imposes several additional duties on the
Government.  For example, it provides that the Government

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 20 of 90
ase 2:25-cv-00255-JNW    Document 198    Filed 03/04/26    Page 20 of 9

20                         PACITO V. TRUMP

"shall develop and implement . . . policies and strategies for the placement and resettlement of refugees within the United States." *Id.* § 1522(a)(2)(B). Those policies and strategies must take into account various factors, including the "likelihood of refugees placed in the area becoming self-sufficient and free from long-term dependence on public assistance." *Id.* § 1522(a)(2)(C)(iii). The Government is also required to conduct "periodic assessment[s]" to evaluate the needs of admitted refugees, *id.* § 1522(a)(3), and it must "develop a system" to monitor and evaluate "the assistance provided under this section," *id.* § 1522(a)(7).

The remaining provisions of § 1522 are a mix of mandatory duties and permissive authorizations. Among other things, the Government "shall": "assure that an adequate number of trained staff are available at the location" where arriving refugees "enter the United States," *id.* § 1522(b)(4)(A); "attempt to arrange for the placement" of "unaccompanied refugee children," *id.* § 1522(d)(2)(B)(ii); "assume legal responsibility (including financial responsibility) for" any in-transit or admitted unaccompanied refugee children that have not yet been placed, *id.*; and "develop and implement alternative projects" to "provide[] interim support, medical services, support services, and case management" for refugees who have been in the United States for less than thirty-six months and who are not otherwise receiving cash or medical assistance, *id.* § 1522(e)(7)(A).

The Government is further "authorized" to "make grants to, and contracts with, public or private nonprofit agencies for initial resettlement (including initial reception and placement with sponsors) of refugees in the United States." *Id.* § 1522(b)(1)(A). Such grants or contracts must be made "consistent with the objectives" outlined in § 1522(a), and

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 21 of 90
ase 2:25-cv-00255-JNW   Document 198   Filed 03/04/26   Page 21 of 9

PACITO V. TRUMP                    21

any assistance provided via such contracts and agreements must "be provided in coordination with the Director's provision of other assistance under" Subchapter IV. *Id.*

The Government is required to track domestic resettlement services provided under § 1522, and § 1523 requires the Secretary of HHS to submit a detailed annual report to Congress on such activities. *See generally* 8 U.S.C. § 1523.

####     b.   Implementation of the INA

The Refugee Act's statutory framework is implemented through a variety of government agencies in coordination with United Nations partnership agencies and other nonprofit agencies located both domestically and abroad.  It is managed by the Department of State (DOS), through its sub-agency the Bureau of Population, Refugees, and Migration (PRM), and it is jointly administered by HHS, through its sub-agency ORR, and by the Department of Homeland Security (DHS), through its sub-agencies U.S. Citizenship and Immigration Services (USCIS) and U.S. Customs and Border Protection (CBP).  Collectively, this multi-agency implementation framework is referred to as the "United States Refugee Assistance Program" (USRAP). The executive has promulgated extensive regulations to govern the implementation of USRAP.  *See generally* 8 C.F.R. § 207 et seq. (admission of refugees); 45 C.F.R. § 400 et seq. (refugee resettlement programs).  In practice, the admission and resettlement of refugees under the Refugee Act occurs according to the following procedures.

*Admission of refugees*.   Each year, "after appropriate consultation" with Congress, the President determines the number of refugees that "may be admitted" to the United States in the following fiscal year.  8 U.S.C. § 1157.  This

finding is formalized in the annual "Presidential Determination on Refugee Admissions." *E.g.*, Presidential Determination No. 2024-13, 89 Fed. Reg. 83767 (Sept. 30, 2024) (determining that "[t]he admission of up to 125,000 refugees" during fiscal year 2025 "is justified by humanitarian concerns or is otherwise in the national interest"). These determinations often include flexible "allocation ranges" indicating how many refugees may be admitted from different regions. *See*, *e.g.*, *id.*

Once the Presidential Determination has been issued, USCIS begins processing applications for refugee status. *See* 8 C.F.R. § 207.1(a). To submit an application for refugee status, each applicant first "must receive a referral to the [USRAP] for consideration as a refugee." *Refugees*, U.S. Citizenship & Immigr. Servs. (last updated Sept. 17, 2025), https://perma.cc/K5ZP-29NK; 8 C.F.R. § 207.2(c) (all refugee applicants "must be sponsored by a responsible person or organization"). The United Nations High Commissioner for Refugees (UNHCR) is a common source of referrals. *The United States Refugee Admissions Program (USRAP) Consultation and Worldwide Processing Priorities*, U.S. Citizenship & Immigr. Servs. (last updated Sept. 17, 2025), https://perma.cc/4HBM-8LBY. Other referral sources include "U.S. embassies, certain senior U.S. government officials, certified non-governmental organizations (NGOs), and Welcome Corps private sponsors." *Refugee Admissions*, U.S. Dept. of State (last visited Dec. 14, 2025), https://perma.cc/MT7J-NZEL.

After an applicant receives a referral, a Resettlement Support Center (RSC) assists the alien with submitting a refugee application (Form I-590) and completing a pre-screening process. *Refugee Processing and Security Screening*, U.S. Citizenship & Immigr. Servs. (last updated

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 23 of 90
ase 2:25-cv-00255-JNW    Document 198    Filed 03/04/26    Page 23 of 9

PACITO V. TRUMP                    23

Mar. 14, 2024), https://perma.cc/VTS8-A9YH.  RSCs are international or non-governmental organizations with which DOS enters into "cooperative agreements" to prepare applicants for adjudication and to otherwise assist with USRAP implementation.  During the pre-screening process, RSCs conduct interviews, initiate security, biometric, and biographic checks for all applicants, and help applicants schedule USCIS eligibility interviews.  *Id.*

USCIS maintains waiting lists for all applications submitted for filing, and applicants are selected from these lists according to "processing priorities" adopted by the Secretary of HHS.  8 C.F.R. § 207.5.  The priorities may be based on "such considerations as reuniting families, close association with the United States, compelling humanitarian concerns, and public interest factors."  *Id.*  "Fulfilling a processing priority enables a refugee applicant the opportunity to interview with a USCIS officer, but does not guarantee acceptance."  *The United States Refugee Admissions Program (USRAP) Consultation and Worldwide Processing Priorities*, U.S. Citizenship & Immigr. Servs. (last updated Sept. 17, 2025), https://perma.cc/4HBM-8LBY.

After the pre-screening process is complete, applicants over fourteen years old that are selected for processing must conduct an in-person, under-oath interview with a USCIS officer overseas to determine whether the applicant is eligible for refugee status and resettlement in the United States.  8 C.F.R. § 207.2(a).  During the interview, a specially trained USCIS officer elicits information to confirm that the applicant meets the statutory requirements for refugee status and is otherwise eligible for admission to the United States.  *Refugee Processing and Security Screening*, U.S. Citizenship & Immigr. Servs. (last updated Mar. 14, 2024),

24                          PACITO V. TRUMP

https://perma.cc/VTS8-A9YH.         USCIS also considers
conditions in the applicant's country of origin and initiates
its own biometric and biographic checks.  *Id.*

Throughout this process, DOS and DHS conduct
extensive, individualized security vetting and background
checks.  Biographic data is provided to the intelligence
community and to law enforcement partners, and biometrics
are collected and submitted to the FBI, DOD, and other
agency partners.  *Id.*  According to the Presidential
Determination on Refugee Admissions for Fiscal Year 2026,
"refugees receive the most stringent identification
verification of any class of alien seeking admission or entry
into the United States."  Presidential Determination No.
2025-13, 90 Fed. Reg. 49005 (Sept. 30, 2025).

The information collected on each refugee is synthesized
in an assessment that is provided to USCIS.  *Refugee
Processing and Security Screening*, U.S. Citizenship &
Immigr.  Servs.  (last  updated  Mar.  14,  2024),
https://perma.cc/VTS8-A9YH.        Before approving any
refugee application, USCIS confirms that all security checks
have been completed and that all collected information has
been reviewed and analyzed.  *Id.*  If an applicant has
completed and cleared all security checks, is found to qualify
for refugee status under the Act, is not otherwise
inadmissible, and has no unresolved national security
concerns, USCIS may adjudicate the applicant's Form I-590
and conditionally approve the applicant as a refugee.
*Refugee Admissions*, U.S. Dept. of State (last visited Dec.
14, 2025), https://perma.cc/MT7J-NZEL.  There is no appeal
if USCIS denies an application for refugee status.  8 C.F.R.
§ 207.4.

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 25 of 90
ase 2:25-cv-00255-JNW   Document 198   Filed 03/04/26   Page 25 of 9

PACITO V. TRUMP                    25

Once an applicant has been conditionally approved by USCIS for refugee status, the refugee is assigned to an RSC to assist with the final steps of admission. The RSC helps the refugee undergo mandatory medical screening examinations, 8 C.F.R. § 207.2(b), and it arranges pre-entry cultural orientation programs. The RSC also obtains a "sponsorship assurance" from an approved domestic Resettlement Agency (RA). The RA enters into a cooperative agreement with DOS, through which the RA commits to providing various initial resettlement services during the refugee's first ninety days post-admission to the United States. *See* 8 U.S.C. § 1522(b)(7) (listing resettlement agencies' statutory duties). Refugees are not permitted to travel to the United States until a sponsorship assurance has been obtained.

After a refugee has completed all pre-travel requirements, the RSC refers the refugee's case to the International Organization for Migration (IOM) to book travel to the United States. IOM is a nonprofit with which DOS contracts to coordinate travel for approved refugees and that serves as the RSC at certain overseas processing locations. *The United States Refugee Admissions Program (USRAP) Consultation and Worldwide Processing Priorities*, U.S. Citizenship & Immigr. Servs. (last updated Sept. 17, 2025), https://perma.cc/4HBM-8LBY. IOM books the refugee's travel with an interest-free loan that the refugee is expected to pay back after resettlement in the United States.

The refugee must then arrive at a port of entry of the United States "within four months of the date the refugee application was approved." 8 C.F.R. § 207.4. Even with an approved Form I-590, the refugee must still be inspected by CBP upon arrival at a port of entry, and CBP has ultimate

26                         PACITO V. TRUMP

authority whether to admit the refugee into the United States. *See id.*

   *Resettlement of refugees.*   After a refugee has been admitted, ORR and PRM fund resettlement services "to provide for the effective resettlement of refugees and to assist them to achieve economic self-sufficiency as quickly as possible."     45 C.F.R. § 400.1(b). To fund these resettlement services, the Government has historically entered into cooperative agreements with domestic nonprofit RAs.   *See* 8 U.S.C § 1522(b)(1)–(7) (authorizing such collaboration with "public or private nonprofit agencies for initial resettlement (including initial reception and placement with sponsors) of refugees in the United States").

   Domestic RAs must compete in an annual competitive funding process administered by PRM.  PRM then executes "Reception and Placement cooperative agreements" with the successful RAs, through which PRM grants federal funds to the RAs to provide initial reception services to newly admitted refugees, often for a period of thirty to ninety days.[2] Such services may include:  providing transportation from the airport upon arrival; developing an individualized service plan for the refugee; providing initial housing and basic furnishings, groceries, and clothing for at least thirty days; assisting the refugee with securing permanent housing; providing   cultural-orientation   and   English-language training; enrolling the refugee in school; helping the refugee apply for a Social Security card and other public benefits;

---

[2] Effective January 1, 2026, responsibility for administering initial resettlement services under USRAP transferred from DOS to HHS-ORR.  *See* Presidential Determination No. 2025-14, 90 Fed. Reg. 49007 (Oct. 31, 2025).

connecting the refugee with social services; and arranging medical appointments.

ORR also funds or administers various longer-term refugee resettlement projects. For instance, ORR funds refugee cash and medical assistance programs for up to thirty-six months after a refugee is admitted. ORR also provides funds for "employment services, on-the-job training, English language instruction, vocational training, case management, translation/interpreter services, social adjustment services, health-related services, home management, childcare, and transportation" for "up to five years after arrival."

Finally, after a refugee has been physically present in the United States for a year, the refugee is required to apply for lawful permanent residence status (a "Green Card"). *See* 8 C.F.R. § 209.1. Upon application, USCIS will once again determine whether the refugee is admissible under § 1182, subject to the exceptions and waiver provisions of § 1159. *Id.* § 209.1(e)–(f). If the refugee is found to be otherwise admissible, the refugee's status is adjusted to lawful permanent residence, and the refugee is considered to have been admitted as a lawful permanent resident as of the date of the refugee's initial arrival in the United States. *Id.* § 209.1(e); 8 U.S.C. § 1159(a)(2). Although there is no appeal of a denial, the refugee may renew the request for lawful permanent resident status during removal proceedings. 8 C.F.R. § 209.1(e).

B. *Factual and Procedural Background of This Case*

President Biden set the annual admissions ceiling for FY25 at 125,000 refugees. Presidential Determination No. 2024-13, 89 Fed. Reg. 83767 (Sept. 30, 2024). At the time President Trump took office, over 128,000 individuals were

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 28 of 90
ase 2:25-cv-00255-JNW    Document 198    Filed 03/04/26    Page 28 of 9

28                        PACITO V. TRUMP

conditionally approved for refugee status, and approximately 37,000 refugees had already been admitted to the United States pursuant to the FY25 allocation.

Hours after taking office on January 20, 2025, President Trump issued Executive Order No. 14163, which suspended the entry of all refugees into the United States under USRAP pending further findings. Exec. Order No. 14163 § 3(a). The executive order first states that "[o]ver the last 4 years, the United States has been inundated with record levels of migration," which has caused some jurisdictions to "declare[] states of emergency." *Id.* § 1. It further asserts that the United States "lacks the ability to absorb large numbers of . . . refugees, into its communities in a manner that does not compromise the availability of resources for Americans, that protects their safety and security, and that ensures the appropriate assimilation of refugees." *Id.*

Based on these assertions and the President's finding "that entry into the United States of refugees under the USRAP would be detrimental to the interests of the United States," the executive order suspends all entry of refugees under USRAP "until a finding is made in accordance with section 4 of th[e] order." *Id.* § 3(a). Section 3(b) of the order further suspends all "decisions on applications for refugee status" until such a finding is made. *Id.* § 3(b). Section 3(c) establishes a limited exception to the general suspension of admissions, under which the Secretary of State and the Secretary of Homeland Security "may jointly determine" to admit refugees "on a case-by-case basis" if they determine that such admission "is in the national interest and does not pose a threat to the security or welfare of the United States." *Id.* § 3(c).

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 29 of 90
ase 2:25-cv-00255-JNW   Document 198   Filed 03/04/26   Page 29 of 9

PACITO V. TRUMP                    29

Section 4 of the executive order sets out the mechanism and criteria for the resumption of USRAP.  It directs the Secretary of Homeland Security to submit a report to the President every ninety days regarding whether resumption of USRAP would be in the interests of the United States in "light of [four] polic[y]" considerations.  *Id.* § 4.  Those considerations are:  (1) "public safety and national security"; (2) the ability of refugees to "fully and appropriately assimilate into the United States"; (3) the preservation of "taxpayer resources for [U.S.] citizens"; and (4) the involvement of "State and local jurisdictions" in the resettlement process.  *Id.* § 2.  The order directs the Secretary to continue submitting such reports "until [the President] determine[s] that resumption of the USRAP is in the interests of the United States."[3]  *Id.* § 4.

Federal agencies immediately began implementing Executive Order No. 14163.  On January 21, 2025, DOS sent an email to its refugee resettlement partners stating that all refugee arrivals were suspended "until further notice," all previously booked travel was canceled, no new bookings were to be made, all refugee case processing and pre-departure activities must cease, refugees should not be moved to transit centers, and no new referrals should be made to USRAP.[4]

---

[3] President Trump has since issued a "Presidential Determination on Refugee Admissions for Fiscal Year 2026," setting the annual cap at 7,500 refugees to "primarily be allocated among Afrikaners from South Africa."  Presidential Determination No. 2025-13, 90 Fed. Reg. 49005 (Sept. 30, 2025).

[4] During the final week of the Biden Administration, senior PRM officials were informed that President Trump intended to issue an executive order suspending all refugee admissions immediately upon

On January 24, 2025, DOS issued written notices to resettlement agencies stating that all "award(s)" were "immediately suspended . . . pending a Department-wide review of foreign assistance programs," that recipients must "stop all work under the award(s)," "cancel as many outstanding obligations as possible," and incur no new costs. Recipients were also informed that they may "submit payment requests for legitimate expenses incurred prior to" or "associated with" the suspension.  The suspension notices purported to be issued pursuant to a different executive order, "Reevaluating and Realigning United States Foreign Aid," which directed federal agencies to "immediately pause new obligations and disbursements" of "foreign development assistance" funds.  Exec. Order No. 14169 § 3(a), 90 Fed. Reg. 8619 (Jan. 20, 2025).

On February 10, 2025, Plaintiffs filed a putative class action in the Western District of Washington against the President and the Secretaries of State, Homeland Security, and Health and Human Services.  Plaintiffs comprise nine individuals and three refugee-resettlement organizations. The individual Plaintiffs include three distinct groups: (1) refugees abroad, whose travel or processing was canceled; (2) U.S.-based individuals, seeking admission for their family members under the follow-to-join program or for their sponsees; and (3) recently arrived refugees, who allege loss of resettlement support.  The organizational

---

taking office.    In anticipation of the forthcoming order, DOS preemptively canceled all travel scheduled for after 12:00 p.m. on January 20, 2025.  This was apparently done to prevent refugees from being stranded at a U.S. port of entry or a layover location in a third country.

Plaintiffs include two of the ten national resettlement agencies and a local affiliate of a third.[5]

On February 11, 2025, Plaintiffs moved for a preliminary injunction to block the enforcement of Executive Order No. 14163 and the suspension of funding for resettlement services.  Specifically, Plaintiffs argued that Executive Order No. 14163 was *ultra vires* under the INA, that the executive order violated follow-to-join refugees' due process rights, that the agencies' cessation of refugee processing and admissions violated the Administrative Procedure Act (APA), and that the suspension of funding for resettlement services violated the APA.

During a hearing on February 25, 2025, the district court granted Plaintiffs' request and orally issued a preliminary injunction prohibiting the enforcement or implementation of §§ 3(a), 3(b), 3(c), and 4 of Executive Order No. 14163.  On February 28, the district court issued a written order to define the scope of its February 25 ruling, specifying that the preliminary injunction also prohibits the suspension of USRAP funding and the withholding of reimbursements for work already performed pursuant to the cooperative agreements.  *Pacito v. Trump*, 768 F. Supp. 3d 1199, 1239 (W.D. Wash. 2025).

On February 26, the day after the district court's oral ruling, the Government began emailing notices to terminate

---

[5] Plaintiffs Church World Services, Inc. (CWS) and HIAS, Inc. are resettlement agencies that entered into cooperative agreements with DOS to assist both with overseas USRAP processing and with domestic resettlement services.   Plaintiff Lutheran Community Services Northwest (LCSNW), an affiliate of a national resettlement agency, entered into cooperative agreements with DOS to provide domestic resettlement services in the Pacific Northwest.

its USRAP-related cooperative agreements.  By February 27, it had terminated every cooperative agreement to provide resettlement services for refugees in the United States and all but one of the cooperative agreements to provide USRAP processing support abroad.  The termination notices were identical, one-page letters that stated:

> The U.S. Department of State hereby notifies the recipient that this award is immediately terminated as of February 27, 2025.  This award no longer effectuates agency priorities and is terminated in accordance with the U.S. Department of State Standard Terms and Conditions, 2 CFR 200.340, and/or Award Provisions as applicable.

Like the suspension notices, the termination notices permitted recipients to submit reimbursement requests "for legitimate costs incurred prior to this" termination.

In light of the termination notices, the district court permitted Plaintiffs to amend their complaint and file a new motion for a preliminary injunction.  On March 24, 2025, the district court issued a second preliminary injunction and enjoined the Government, except for President Trump individually, from enforcing or implementing any portion of the termination of the cooperative agreements.  *Pacito v. Trump*, 722 F. Supp. 3d 1204, 1227–28 (W.D. Wash. 2025).  The second injunction also required the Government to reinstate all cooperative agreements terminated after the February 25 ruling.  *Id.*  The Government filed notices of appeal on February 28 and March 25, 2025.

On March 8, 2025, the Government sought a stay pending appeal of the February 28 injunction.  Citing *Trump*

*v. Hawaii*, 585 U.S. 667, 684 (2018), a motions panel of this court granted in part and denied in part the Government's stay request. *Pacito v. Trump*, 2025 WL 1325305, at \*1 (9th Cir. Mar. 25, 2025). Specifically, the motions panel declined to stay the district court's injunction to the extent it applied to "individuals who were conditionally approved for refugee status . . . before January 20, 2025." *Id.* Upon further motions, the panel issued two additional orders clarifying the scope of this "limited carveout from the stay."[6] *Pacito v. Trump*, 2025 WL 1325306 (9th Cir. Apr. 21, 2025). On July 14, 2025, the district court issued an order establishing a detailed framework for enforcing the carveout and appointing a magistrate judge to oversee its implementation. On July 18, 2025, we issued an administrative stay of that enforcement order.

On July 30, 2025, the district court granted Plaintiffs' motion for class certification and certified three subclasses under Federal Rule of Civil Procedure 23(b)(2). *Pacito v. Trump*, 796 F. Supp. 3d 692, 702–03 (W.D. Wash. 2025). First, "all persons who are being or will be processed for admission . . . as a refugee or who have applied or will apply for a family member to be processed." *Id.* Second, "all refugees and Afghan and Iraqi Special Immigration Visa holders resettled to the United States and within their first ninety days post-resettlement as of January 20, 2025, . . . or who currently are, or will be, resettled in the United States and within their first ninety days post-resettlement." *Id.* at 703. And third, "all persons in the United States who are currently petitioning or will petition for family members to

---

[6] According to the Government, 77 conditionally approved refugees, including two of the individual Plaintiffs, were admitted to the United States under the motions panel's carveout.

34                          PACITO V. TRUMP

be admitted to the United States under the follow-to-join ("FTJ") refugee program." *Id.*

Finally, on September 12, 2025, following oral argument, we issued a partial stay of the district court's injunctions pending final resolution of the appeal. Although we concluded that the Government was likely to prevail against most of Plaintiffs' claims, we declined to stay the injunctions to the extent they required the Government to "reinstate such cooperative agreements necessary to provide the reception and placement services described in § 1522 to refugees who have been admitted to the United States." *Pacito v. Trump*, 152 F.4th 1082, 1088 (9th Cir. 2025).

## II.  JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. § 1331.  We have jurisdiction under 28 U.S.C. § 1292(a)(1).

## III.  STANDARD AND SCOPE OF REVIEW

The decision to grant a preliminary injunction is within the discretion of the district court.  We thus review an order granting a preliminary injunction "for abuse of discretion, but review any underlying issues of law de novo." *Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019) (per curiam). A district court abuses its discretion when its ruling is based "on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Aargon Agency, Inc. v. O'Laughlin*, 70 F.4th 1224, 1230 (9th Cir. 2023) (quoting *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 838 (9th Cir. 2019)).

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008).  A plaintiff seeking

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 35 of 90
ase 2:25-cv-00255-JNW   Document 198   Filed 03/04/26   Page 35 of 9

PACITO V. TRUMP                    35

preliminary injunctive relief thus bears the burden of demonstrating that four elements are met:

> [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.

*Id.* at 20.  While a plaintiff must establish all four elements, our circuit uses a "sliding scale approach" under which "a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  "Likelihood of success on the merits is a threshold inquiry and is the most important factor." *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020).  But under our sliding scale approach, "if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Cottrell*, 632 F.3d at 1135).

We likewise review the *scope* of a preliminary injunction for abuse of discretion.  *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 823 (9th Cir. 2018).  "A trial court abuses its discretion 'by fashioning an injunction which is overly broad.'"  *Id.* (quoting *United States v. AMC Ent., Inc.*, 549 F.3d 760, 768 (9th Cir. 2008)).

36                           PACITO V. TRUMP

## IV.  LIKELIHOOD OF SUCCESS ON THE MERITS

The district court granted Plaintiffs' request for injunctive relief on two broad grounds:  First, Executive Order No. 14163, which suspends USRAP, is beyond the President's authority under 8 U.S.C. §§ 1182(f) and 1185(a). Second, the State Department's suspension of USRAP violated the Administrative Procedure Act.  We address the first issue in Part IV.A; the second, in Part IV.B.

### A.  *Executive Order No. 14163*

The district court held that Executive Order No. 14163 was *ultra vires* because it "overrides USRAP in its entirety" and "suspends USRAP indefinitely," thereby "effect[ing] a wholesale reversal of legislatively established policy" and "exceeding the President's statutory authority."  The district court explained that § 1182(f) authorizes only temporary suspensions of USRAP, and in its view, Executive Order No. 14163 "had no fixed end date and failed to tie the suspension to any resolvable, triggering event or condition."  The district court enjoined "[e]nforcing or implementing" §§ 3(a), 3(b), 3(c), and 4 of the executive order "in their entirety."

Because §§ 3(a), 3(c), and 4 address *admission* of approved refugees to the United States, while § 3(b) addresses *applications* for refugee status, we will address these issues separately.

### 1.  Sections 3(a), 3(c), and 4

Section 1182(f) provides:

> Whenever the President finds that the entry
> of any aliens or of any class of aliens into the
> United States would be detrimental to the

> interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

"By its plain language, § 1182(f) grants the President broad discretion to suspend the entry of aliens into the United States." *Trump v. Hawaii*, 585 U.S. 667, 683–84 (2018). Indeed, the Court continued,

> § 1182(f) exudes deference to the President in every clause.  It entrusts to the President the decision whether and when to suspend entry ("[w]henever [he] finds that the entry" of aliens "would be detrimental" to the national interest); whose entry to suspend ("all aliens or any class of aliens"); for how long ("for such period as he shall deem necessary"); and on what conditions ("any restrictions he may deem to be appropriate").  It is therefore unsurprising that we have previously observed that § 1182(f) vests the President with "ample power" to impose entry restrictions in addition to those elsewhere enumerated in the INA.

*Id.* at 684 (quoting *Sale*, 509 U.S. at 187).

The district court had two particular concerns:  that the executive order suspended USRAP "in its entirety" and "indefinitely."  We think the district court's concerns are not

38                          PACITO V. TRUMP

well taken.  As to the first point, § 1182(f) anticipates that it
may be in "the interests of the United States" to "suspend the
entry of *all* aliens."  8 U.S.C. § 1182(f) (emphasis added).
Nothing in § 1182 suggests that the President must maintain
some non-zero admissions under USRAP.  The President has
exercised authority consistent with the statute.

No provision of the Refugee Act prevents the President
from suspending all admissions, either.  The district court
concluded that the suspension of all refugees unlawfully
"effect[ed] a wholesale reversal of legislatively established
policy" because Congress, in passing the Refugee Act,
intended "to provide a permanent and systematic procedure
for [refugee] admission."  *Pacito*, 768 F. Supp. 3d at 1221–
22 (quoting § 101(b), 94 Stat. at 102).  But § 1157(a), titled
"*Maximum* number of admissions," provides that "the
number of refugees who *may* be admitted" in any year "shall
be such number as the President determines."  8 U.S.C.
§ 1157(a)(2) (emphasis added).  Put simply, § 1157 sets a
ceiling, not a floor—nothing in the statute requires the
admission of a non-zero number of refugees.  Nor does the
statute restrict the President's power to otherwise exclude
refugees under § 1182(f).  "Had Congress instead intended
[§ 1157] to constrain the President's power to determine who
may enter the country, it could easily have chosen language
directed to that end."[7]  *Hawaii*, 585 U.S. at 695.

---

[7] And in fact, later in § 1157, Congress *did* expressly exempt certain
refugees from specific § 1182 ineligibility provisions.  Namely,
§ 1157(c)(3) provides that "[t]he provisions of paragraphs (4), (5),
and (7)(A) of section 1182(a) of this title shall not be applicable to any
alien seeking admission to the United States under this subsection."  That
Congress specifically exempted refugees from these subsections of
§ 1182 but not § 1182(f) cuts strongly against the district court's
reasoning.

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 39 of 90
ase 2:25-cv-00255-JNW    Document 198    Filed 03/04/26    Page 39 of 9

PACITO V. TRUMP                    39

In any event, the fact that the President decided to suspend the entry of all aliens does not wholly suspend USRAP; the program is still in place.  Even though § 3(a) of the order suspends the entry of refugees, § 3(c) provides that "[n]otwithstanding the suspension of the USRAP . . . , the Secretary of State and the Secretary of Homeland Security may jointly determine to admit aliens to the United States as refugees on a case-by-case basis."  In other words, Executive Order No. 14163 does not suspend USRAP in its entirety, and the President's decision to suspend all admissions (except on a case-by-case basis) is expressly permitted by the statute.

As to the second point, even accepting the district court's premise that USRAP's suspension is indefinite, § 1182(f) authorizes the president to "suspend the entry of all aliens" for "such period as he shall deem necessary."  That is a complete answer to the district court's objection:  Not only can we not read into the statute a "temporal limitation" as the district court did, the statute is also explicit that a suspension is not subject to any particular "temporal limitation."  In *Trump v. Hawaii*, the Supreme Court considered this same argument.  The Court "agree[d] with plaintiffs that the word 'suspend' often connotes a 'defer[ral] till later . . . .  But that does not mean that the President is required to prescribe in advance a fixed end date for the entry restrictions."  585 U.S. at 687 (citation omitted).[8]

---

[8] Plaintiffs have pointed to language in *Doe #1 v. Trump*, 957 F.3d 1050 (9th Cir. 2020) (*Doe I*), suggesting that a presidential proclamation issued under § 1182 was "problematic" because there was a "lack of an explicit time limitation."  *Id.* at 1065.  That decision denied the government's motion to stay a preliminary injunction.  *Doe I* was superseded by a decision on the merits in which we reversed the grant of the preliminary injunction, ruling in favor of the government.  *Doe #1 v.*

40                    PACITO V. TRUMP

Further, even if we were inclined to read such a
limitation into the statute, § 4 of Executive Order No. 14163
contemplates only a temporary pause in refugee admissions.
The Secretary of Homeland Security, in consultation with
the Secretary of State, must submit a report to the President
every ninety days recommending whether to resume
USRAP.  The restrictions on admission will remain in effect
until "resumption of entry . . . under the USRAP would be in
the interests of the United States."  Exec. Order No. 14163
§ 4.  The order lists four policy considerations that would
inform resumption:    (1) "public safety and national
security,"  (2) the ability of refugees to "fully and
appropriately assimilate" into society, (3) the preservation of
"taxpayer resources for [U.S.] citizens," and (4) the capacity
for involving "State and local jurisdictions" in resettlement.
*Id.*  § 2.    These are all legitimate considerations in the
formulation of our national immigration policy and are
similar to the temporal limits imposed by the order at issue
in *Hawaii*.  *See* 585 U.S. at 687 ("[T]he Proclamation makes
clear that its 'conditional restrictions' will remain in force
only so long as necessary to 'address' the identified
'inadequacies and risks.'").      Whether the listed
considerations are ones we would adopt is irrelevant.  As we
noted at the beginning:  "The wisdom of the policy choices

---

*Trump*, 984 F.3d 848 (9th Cir. 2020) (*Doe II*); *see East Bay Sanctuary
Covenant v. Biden*, 993 F.3d 640, 662 (9th Cir. 2021) ("the motions panel
may be persuasive but [is] not binding").  We later vacated our merits
decision and remanded the matter to the district court with instructions
to dismiss the suit as moot.  *Doe #1 v. Trump*, 2 F.4th 1284 (9th Cir. 2021)
(*Doe III*).  When *Doe III* vacated our merits opinion in *Doe II*, it did not
revive our decision on the stay of the preliminary injunction *Doe I*.  We
are not bound by our decision in *Doe I*.

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 41 of 90
ase 2:25-cv-00255-JNW    Document 198    Filed 03/04/26    Page 41 of 9

PACITO V. TRUMP                    41

made by [the President] is not a matter for our consideration." *Sale*, 509 U.S. at 165.

Additionally, nothing in the executive order affects the obligation of the President's "designated Cabinet-level representatives" to consult annually with Senate and House Judiciary Committees. 8 U.S.C. § 1157(e). We view this as an important part of Congress's oversight responsibilities. As we described above in greater detail, the President provides Congress with information about "the refugee situation" as the basis for "discuss[ing] the reasons for believing the [President's] proposed admission of refugees is justified," *id.* § 1157(e)(1), and "regarding changes in the worldwide refugee situation, the progress of refugee admissions, and the possible need for adjustments in the allocation of admissions among refugees," *id.* § 1157(d). But nothing in the statute purports to bind the President to the Committees' views during the annual consultation, nor could such consultations countermand the authority granted to the President in § 1182. *See Chadha v. INS*, 462 U.S. 919, 954–55 (1983). Rather, if there is disagreement between members of Congress and the President, Congress remains free to amend the Refugee Act to provide greater direction to the President.

Finally, we will address here the district court's ruling that the executive order violates the Due Process Clause with respect to spouses and children of refugees. Under § 1157(c)(2)(A) "[a] spouse or child . . . of any refugee who qualifies for admission . . . shall . . . be entitled to the same admission status as such refugee" if they are accompanying the refugee or "following to join." According to the district court, § 1157(c)(2)(A) gives such spouses or children "a specific statutory entitlement" which "gives rise to procedural protections before that entitlement can be

suspended." *Pacito*, 768 F. Supp. 3d at 1234–35. We think this misreads the statute and the effect of Executive Order No. 14163. We do not read the order to affect the "admission status" of spouses or children referred to in this section. "The concepts of entry and admission . . . are used interchangeably in the INA." *Hawaii*, 585 U.S. at 695 n.4. "Admissibility" is not the same as "admission" or "entry."

Section 1157(c)(2)(A) does not guarantee entry to spouses and children of refugees who qualify for admission. They are entitled only to "the same admission *status*." 8 U.S.C. § 1157(c)(2)(A). Even if a refugee has been granted entry to the United States, his or her spouse and children may be admissible but not entitled to entry. They are still subject to other restrictions on entry, including determinations under § 1182(f). This is made clear by the qualification that the spouse or child shall be entitled to the same admission status only "if the spouse or child is admissible." *Id.* Moreover, the spouse's or child's admission might be barred if the annual admission cap has already been met: The final sentence of § 1157(c)(2)(A) provides that "[u]pon the spouse's or child's admission to the United States, such admission shall be charged against the numerical limitation established in accordance with the appropriate subsection under which the refugee's admission is charged."

Nothing in the executive order affects the admissibility status of refugees who have already qualified—it affects admission itself. *See Hawaii*, 585 U.S. at 694–97 (distinguishing between "the predicate question of a visa applicant's eligibility for admission and the subsequent question whether the holder of a visa may in fact enter the country"). We thus cannot agree with the district court that executive order violates the Due Process Clause of the Fifth Amendment.

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 43 of 90
ase 2:25-cv-00255-JNW   Document 198   Filed 03/04/26   Page 43 of 9

PACITO V. TRUMP                                    43

### 2.   Section 3(b)

Section 3(b) of Executive Order No. 14163 requires a slightly different analysis from §§ 3(a), (c), and 4.  Those sections address the *admission* of refugees whose applications for refugee status have been approved.  As we have explained above, the Refugee Act gives the President broad authority over the entry of refugees into the United States.  By contrast, § 3(b) of the executive order concerns the "decisions on *applications* for refugee status."  The Refugee Act does not contain separate instructions on the application or decision process.  Rather, the need for some kind of application and decision process is implicit in the decision to admit refugees.  That process has been addressed in detailed regulations, *see* 8 U.S.C. § 207 et seq., and directions from USCIS, *supra* Part I.A.2.b.

The President's decision to halt decisions on applications would follow logically from his determination to suspend all admissions.  We cannot see anything in the Refugee Act that directs the President to continue to process applications while admissions have been suspended.

* * *

In sum, Plaintiffs have failed to make a strong showing that they are likely to succeed on the merits of their challenges to Executive Order No. 14163 under the Refugee Act.

### B.   *Termination of Funding for the Cooperative Agreements*

Plaintiffs also bring an APA challenge to the decisions by the Department of State, Department of Homeland Security, and Department of Health and Human Services to defund various services offered under USRAP in light of Executive Order No. 14163 and Executive Order No. 14169.  Before

44                          PACITO V. TRUMP

we can consider Plaintiffs' APA claims, however, we must address two arguments by the Government that, if correct, would preclude our review.  First, the United States argues that the APA does not provide an avenue for our review because the Court of Federal Claims ("CFC") has exclusive jurisdiction over the organizational Plaintiffs' claims. Alternatively, the Government asserts that, even if the CFC does not have jurisdiction under the Tucker Act, the district court could not conduct review under the APA because the matter is committed to agency discretion by law or, alternatively, because there has been no final agency action.

We address these objections below in Part IV.B.1. Concluding that the Government is not likely to succeed on either of these objections, we consider the merits of Plaintiffs' challenge to the defunding decisions in Part IV.B.2.

    1.   Whether We Can Hear This Case Under the APA

        a.   Court of Federal Claims and Tucker Act jurisdiction

The Government challenges the district court's power to consider the organizational Plaintiffs' APA claims because, in the Government's view, the cooperative agreements at issue are contracts for which the United States has vested exclusive jurisdiction in the Court of Federal Claims under the Tucker Act.[9]  28 U.S.C. § 1491(a)(1) ("The United States Court of Federal Claims shall have jurisdiction to render

---

[9] The Government concedes that the Tucker Act does not bar the *individual* Plaintiffs' APA claims.  Instead, the Government claims for the first time in a footnote in its reply brief that the individual Plaintiffs lack standing to bring an APA claim.  Because we have concluded that the Tucker Act does not bar the organizational Plaintiffs' claim, we need not consider this argument at this juncture.

judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States . . . ."). The Government additionally characterizes the organizational Plaintiffs' claims as seeking specific performance and compensation for the cancellation of the cooperative agreements, which it argues are remedies that sound in contract and belong in the CFC. We disagree.

The APA "provide[s] a general authorization for review of agency action in the district courts." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). The APA, however, is a default provision: It provides a forum for review where "there is no other adequate remedy in a court." 5 U.S.C. § 704. Although the APA waives the sovereign immunity of the United States, it applies only where the party seeks "relief other than money damages," and only so long as no "other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Id.* § 702. The condition on the waiver of sovereign immunity in § 702 thus "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). We have summarized the restrictions on APA review as follows: "the APA waives sovereign immunity for [a plaintiff's] claims only if three conditions are met: (1) its claims are not for money damages, (2) an adequate remedy for its claims is not available elsewhere and (3) its claims do not seek relief expressly or impliedly forbidden by another statute." *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 645 (9th Cir. 1998). Because a claim falling under the Tucker Act may be brought in the CFC, a claim falling under the Tucker Act cannot be brought in a district court under the APA.

46                    PACITO V. TRUMP

    The Supreme Court has explained that the Tucker Act is
merely jurisdiction-granting.  *United States v. Testan*, 424
U.S. 392, 400 (1976).  For the CFC to have jurisdiction over
a claim, the claim must be based on either an "express or
implied contract with the United States" or a statute that "can
fairly be interpreted as mandating compensation by the
Federal Government for the damages sustained."  *Id.* at 397–
400 (citation omitted).  "[W]hen a breach of contract claim
is brought . . . , the plaintiff comes armed with the
presumption that money damages are available."  *Holmes v.
United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011).  But
when a party seeks other forms of relief, "we interpret the
Tucker Act to 'impliedly forbid' an APA action seeking
injunctive and declaratory relief only if that action is a
'disguised' breach-of-contract claim."  *United Aeronautical
Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023)
(citation omitted).

    To determine whether an action falls under the Tucker
Act because it is an action in contract—"disguised" or
otherwise—we have adopted a two-part test from the D.C.
Circuit's decision in *Megapulse, Inc. v. Lewis*, 672 F.2d 959
(D.C. Cir. 1982).  *See United Aeronautical*, 80 F.4th at 1026.
First, we look to "the source of the rights upon which the
plaintiff bases its claims."  *Id.* (citation omitted).  Second,
and relatedly, we look to "the type of relief sought."  *Id.*
(citation omitted).  If the "rights and remedies are *statutorily*
or *constitutionally* based, then district courts have
jurisdiction; if rights and remedies are *contractually* based
then only the Court of Federal Claims does, even if the
plaintiff formally seeks injunctive relief."  *Id.* (emphasis in
original); *see also Tucson Airport Auth.*, 136 F.3d at 646.

    *Source of the rights*.  We begin with the first part of the
*Megapulse* test.  The source of the rights claimed by the

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 47 of 90
ase 2:25-cv-00255-JNW   Document 198   Filed 03/04/26   Page 47 of 9

PACITO V. TRUMP                                    47

organizational Plaintiffs in this case is their "cooperative
agreements" with the State Department, which the
Government has characterized as contracts subject to the
Tucker Act.  We think the Government's characterization is,
at best, incomplete.  The organizational Plaintiffs provide
resettlement services to refugees admitted to the United
States under USRAP.  The resettlement program is created
by 8 U.S.C. § 1522, which authorizes the Secretary of State
"to make grants to, and contracts with, public or private
nonprofit agencies for initial resettlement . . . of refugees in
the United States."   *Id.* § 1522(b)(1); *see also id.*
§ 1522(b)(5), (b)(7), (c)(1)(A), (d)(2)(A), (e) (describing
various services to be provided to refugees through grants
and contracts).  Although it has the discretion to provide
these services by contract, the State Department elected to
proceed by cooperative agreement, which is a form of a
grant.

The terms "grant" and "cooperative agreement" have
been defined by Congress in the Federal Grant and
Cooperative Agreement Act of 1977 (FGCAA), 31 U.S.C.
§§ 6301–08.  The FGCAA was adopted to "promote a better
understanding of United States Government expenditures
and help eliminate unnecessary administrative requirements
on recipients of Government awards . . . ."  *Id.* § 6301(1).
The FGCAA carefully defines three terms:  "procurement
contracts," "grant agreements," and "cooperative
agreements." *Id.* §§ 6303–05.  Procurement contracts are the
"legal instrument reflecting a relationship between the
United States Government and [a recipient] when[] the
principal purpose of the instrument is to acquire . . . property
or services for the direct benefit or use of the United States

Government."   *Id.* § 6303(1).[10]   By contrast, grants and cooperative agreements are the appropriate legal instruments when the "purpose of the relationship is to transfer a thing of value to [the recipient] to carry out a public purpose of support or stimulation authorized by a law of the United States."[11]   *Id.* §§ 6304(1), 6305(1).   In a nutshell, the difference between a procurement contract and a grant or cooperative agreement is whether the United States Government receives a direct benefit from the arrangement: If it does, then the arrangement is a procurement contract; if not, it is a cooperative agreement or a grant.   *See Patridge v. Reich*, 141 F.3d 920, 924 (9th Cir. 1998).   An agency's choice of legal instrument has important consequences across a variety of contexts, including the "general rules regarding drafting and ambiguities."[12]   *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985) (because "grant agreements . . . cannot be viewed in the same manner as a bilateral contract governing a discrete transaction,"

---

[10] Congress has given agencies some further flexibility, permitting them in "specific instance[s]," to label an agreement a "procurement contract" even if it does not satisfy the definition provided in § 6303(1).   *See* 31 U.S.C. § 6303(2).

[11] The difference between a grant and a cooperative agreement is whether "substantial involvement" is expected between the executive agency and the recipient.   *Compare* 31 U.S.C. § 6304(2) (substantial involvement not expected with a grant) *with* 31 U.S.C. § 6305(2) (substantial involvement expected with a cooperative agreement).

[12] In addition, "agreements that are not procurement contracts . . . are not subject to the general statutes, regulations, and requirements governing procurement contracts, *e.g.*, the Competition in Contracting Act, 41 U.S.C. §§ 251 et seq.; the Contract Disputes Act, 41 U.S.C. §§ [7101] et seq.; and the Federal Acquisition Regulations, 48 C.F.R. Chap. 1."   *Trauma Serv. Grp. v. United States*, 33 Fed. Cl. 426, 429 (1995).

ambiguities will not "invariably be resolved against the Federal Government").

A number of courts have looked to the definitions in the FGCAA to help determine whether specific agreements were contracts for purposes of the Tucker Act. *See, e.g.*, *Am. Ctr. for Int'l Lab. Solidarity v. Chavez-DeRemer*, 789 F. Supp. 3d 66, 86 n.5 (D.D.C. 2025); *United States v. President & Fellows of Harvard Coll.*, 323 F. Supp. 2d 151, 164 (D. Mass. 2004); *St. Bernard Par. Gov't v. United States*, 134 Fed. Cl. 730, 735 (2017), *aff'd on different grounds*, 916 F.3d 987 (Fed. Cir. 2019); *Anchorage v. United States*, 119 Fed. Cl. 709, 713 (2015); *Thermalon Indus., Ltd. v. United States*, 34 Fed. Cl. 411, 417 (1995). In such cases, the agency's choice of instrument has been persuasive but not conclusive for Tucker Act purposes. *Compare Anchorage*, 119 Fed. Cl. at 713 (holding that the "reciprocal nature of [an] Agreement . . . [made it] an express contract and not a cooperative agreement"), *with Am. Ctr. for Int'l Lab. Solidarity*, 789 F. Supp. 3d at 91 (cooperative agreement was not a contract for purposes of the Tucker Act), *and St. Bernard Parish*, 134 Fed. Cl. at 735 (same). The CFC has also stated that cooperative agreements, unlike procurement contracts, are not presumed to provide money damages. *St. Bernard Parish*, 134 Fed. Cl. at 734; *see also Am. Ctr. for Int'l Lab. Solidarity*, 789 F. Supp. 3d at 87 ("how the government agency classifies or denominates an agreement has probative value in assessing" whether the agreement "qualif[ies] as a contract for purposes of the Tucker Act").**[13]**

---

[13] We emphasize here that the FGCAA merely provides a framework for classifying various agreements as procurement contracts, grants, or cooperative agreements. That classification is not determinative of whether an instrument is a contract for purposes of the Tucker Act. *See*

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 50 of 90
ase 2:25-cv-00255-JNW    Document 198    Filed 03/04/26    Page 50 of 9

50                          PACITO V. TRUMP

The Government failed to cite the FGCAA or to acknowledge the existence of this authority.  In fact, the Government's argument appears to be inconsistent with its own prior expressed view.  In its brief to the Federal Circuit in *St. Bernard Parish*, the Government took the exact opposite position that it takes now and cited the FGCAA to argue that a cooperative agreement was *not* a Tucker Act contract because it "did not provide a direct benefit to the Government, and . . . was therefore not an enforceable contract within the jurisdiction of the [CFC]."  Brief for Defendant-Appellee at 3, *St. Bernard Par. Gov.*, 916 F.3d 987 (9th Cir. 2019) (No. 18-1204), 2018 WL 1438313 [hereinafter *St. Bernard* Brief].  In the lower court, the CFC agreed with the Government that because the cooperative agreement at issue provided "no direct benefit" to the Government—as compared to a "mere incidental benefit"— the agreement lacked "the consideration necessary to form an enforceable contract."  *St. Bernard Par.*, 134 Fed. Cl. at 735–36 (citation omitted).  On appeal to the Federal Circuit, the Government argued that "[t]his holding appropriately respect[ed] the distinctions between contracts, grants, and cooperative agreements."  *St. Bernard* Brief at 20.  The Government cannot have its cake and eat it too by insisting that cooperative agreements *are not* Tucker Act contracts when it does not want to litigate in the CFC but that they *are*

---

*Trauma Serv. Grp.*, 104 F.3d at 1326.  Rather, federal courts have long held that the FGCAA supplies a *presumption* that grants and cooperative agreements are not contracts under which a claim for money damages may be brought in the CFC.  *See*, *e.g.*, *Rick's Mushroom Serv. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008).  We are thus puzzled by the dissent's argument that our holding would require claims based on grants to be brought in the CFC.  *See* Dissenting Op. at 84.

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 51 of 90
Case 2:25-cv-00255-JNW   Document 198   Filed 03/04/26   Page 51 of 9

PACITO V. TRUMP                    51

Tucker Act contracts when—as in this case—it would rather be there.

Here, the State Department made a deliberate choice to proceed by cooperative agreement and not by contract. This is evident from the "Federal Assistance Award" the State Department entered into with the organizational Plaintiffs, which expressly identifies the instrument as a "cooperative agreement," and makes the parties subject to the State Department's "Standard Terms and Conditions for Federal Awards" (Standard Terms and Conditions). The Standard Terms and Conditions refers repeatedly and exclusively to "grants or cooperative agreements." Furthermore, consistent with the FGCAA's definition of "cooperative agreement," the Federal Assistance Award specifies that "[t]he Department of State will be *substantially involved* in carrying out [certain] aspects of this cooperative agreement." *See* 31 U.S.C. § 6305(2) ("An executive agency shall use a cooperative agreement . . . when . . . *substantial involvement* is expected between the executive agency and the . . . recipient." (emphasis added)). The sources of the rights claimed by the organizational Plaintiffs are § 1522, which creates the resettlement program and permits the State Department to proceed by cooperative agreement rather than by contract; the cooperative agreements themselves; and the Standard Terms and Conditions, which applies to all such agreements. Nothing in the statute or the documents indicates that the parties were entering into a contract, much less a "procurement contract," which would have triggered a host of additional rights and duties on the parties. *See supra* at 48 & nn. 11–12.

*The type of relief sought.* The second part of the *Megapulse* test considers "the type of relief sought." 672 F.2d at 968. In general, if a party seeks "money damages"

stemming from an agreement with the United States, its claim is a "contract-based action [that] falls within the scope of the Tucker Act." *United Aeronautical*, 80 F.4th at 1026. By contrast, where "claims arise under a federal grant program and turn on the interpretation of statutes and regulations rather than on the interpretation of an agreement negotiated by the parties," the plaintiff's claims are generally "not contract claims for Tucker Act purposes." *Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985).

In this case, the organizational Plaintiffs do not seek damages from the State Department. Nor has the Government pointed us to any statutory provision or provision within the cooperative agreements that contemplates the payment of damages for breach of the agreement.[14] *See Testan*, 424 U.S. at 400. The Standard Terms and Conditions also provides a single remedy: termination "in whole or in part" at the option of the recipient or the State Department. The State Department's list of justifications for termination includes failure to comply with "the terms and conditions of award" and "if the award no longer effectuates the program goals or agency priorities." Nothing in the Standard Terms and Conditions suggests that

---

[14] Federal courts and the Government have previously considered this fact to be determinative of the Tucker Act analysis. *See Summit Power Grp., LLC v. United States*, 139 Fed. Cl. 369, 374 (2018) (collecting cases and noting that both the CFC "and the Federal Circuit have held that particular cooperative agreements [that] did not contemplate payment of money as a remedy for breach of the agreement" fell outside the CFC's jurisdiction); *St. Bernard* Brief at 10 ("The agreement between the Parish and NRCS is clearly a cooperative agreement and, as such, is not presumed to contemplate money damages. Moreover, the agreement in fact does not contemplate money damages, and therefore does not fall within the jurisdiction of the Court of Federal Claims.").

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 53 of 90
ase 2:25-cv-00255-JNW    Document 198    Filed 03/04/26    Page 53 of 9

PACITO V. TRUMP                               53

either party has any right to seek damages in compensation for early termination of the resettlement program. *See Bennett*, 470 U.S. at 669 ("Although we agree with the State that Title I grant agreements had a contractual aspect, the program cannot be viewed in the same manner as a bilateral contract governing a discrete transaction." (citation omitted)). We cannot see how, under either part of the *Megapulse* test, the cooperative agreements qualify as contracts for purposes of the Tucker Act.

Our reading is fully consistent with the Supreme Court's decision in *Bowen v. Massachusetts* and the Court's recent decisions in *Department of Education v. California*, 604 U.S. 650 (2025) (per curiam), and *National Institutes of Health v. American Public Health Association*, 606 U.S. ---- (2025) (per curiam). In *Bowen*, the state sued under the APA for declaratory and injunctive relief after the Secretary of Health and Human Services prospectively disallowed certain Medicaid reimbursements. 487 U.S. at 887. The Government in turn raised a "novel proposition that the Claims Court," the CFC's predecessor, "is the exclusive forum for judicial review of this type of agency action" because it purportedly involved "money damages." *Id*. at 883, 891. The Court disagreed, distinguishing the State's "equitable action for specific relief" from "an action at law for damages." *Id*. at 893. It explained that an action for "money damages" is one "intended to provide a victim with monetary compensation for an injury to his person, property, or reputation." *Id*. And it described an "equitable action," which would permit APA review, as one "seeking to enforce [a] statutory mandate," which could also "happen[] to be one for the payment of money." *Id*. at 900. Because Massachusetts was not seeking "money in *compensation* for the damage sustained by the failure of the Federal

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 54 of 90
Case 2:25-cv-00255-JNW    Document 198    Filed 03/04/26    Page 54 of 9

54                          PACITO V. TRUMP

Government to pay as mandated" but was instead seeking review of a law that entailed monetary implications, its APA claim was not foreclosed by the Tucker Act. *Id*. at 900 (emphasis in original).

In *Department of Education*, the states were recipients of various education-related grants, which the Department of Education terminated. The district court issued injunctive relief against the termination of those grants, but it "also require[d] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue." 604 U.S. at 650. In a brief order, the Court granted a stay pending appeal. It noted that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here." *Id*. at 651 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)).

The Court issued a similar stay in the *National Institutes of Health*. NIH had terminated research-related grants, for which the American Public Health Association sought "relief designed to enforce any 'obligation to pay money' pursuant to those grants." 606 U.S. at ---- (citation omitted). Although the Court did not say as much, its language strongly suggested that the CFC had jurisdiction over the claims, thus depriving the district court of review under § 704 of the APA. *See id.* at ---- (Barrett, J., concurring) ("[T]he District Court likely lacked jurisdiction to hear challenges to the grant terminations, which belong in the Court of Federal Claims.").

In our case, the organizational Plaintiffs are parties to cooperative agreements—not procurement contracts—with the State Department. Those legal instruments have been

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 55 of 90
Case 2:25-cv-00255-JNW    Document 198    Filed 03/04/26    Page 55 of 9

PACITO V. TRUMP                    55

denominated "cooperative agreements" consistent with the FGCAA definitions and § 1522, which creates the resettlement program. And despite the Government's characterization, these Plaintiffs do not pursue specific performance or compensation for the cancellation of their cooperative agreements in a manner that sounds in contract.[15] As in *Bowen*, they pursue review of a final agency action and are thus "seeking to enforce [a] statutory mandate," which "happens to be one" that *might* result in "the payment of money." 487 U.S. at 900. Unlike the grantees in *Department of Education* and *NIH*, Plaintiffs do not seek backpay of funds or a guarantee of continued funding.[16] *Dep't of Educ.*, 604 U.S. at 650; *NIH*, 606 U.S. at ----. Under the *Megapulse* test, Plaintiffs' APA claim was properly brought in the district court.

  b.  Reviewability under the APA

The Government argues that the district court, and consequently this court, cannot review the President's or the

---

[15] Although we conclude that Plaintiffs' APA challenge is properly before the district court, if Plaintiffs were seeking compensation for past services provided under the cooperative agreements, that would raise a different set of issues concerning CFC jurisdiction over that claim. *See NIH*, 606 U.S. at ---- (Barrett, J., concurring) (suggesting that a case bringing both a programmatic challenge and a claim for past-due monies would result in "[t]wo-track litigation"). Plaintiffs are not seeking reimbursement here; the termination notices expressly permitted recipients to make reimbursement requests for previously incurred costs.

[16] The organizational Plaintiffs surely have a self-interest in being able to continue their cooperative agreements. But the heart of their claims, when considered together with the individual Plaintiffs' interests, is to see the refugee resettlement program continue, whether or not these specific organizations continue to be funded. That brings this case squarely within *Bowen*.

56                    PACITO V. TRUMP

agencies' actions under § 706 of the APA because the "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Alternatively, the Government argues that there is no "final agency action" to review. *Id*. § 704. We will address each claim.

*Committed to agency discretion*. The Supreme Court has "'long applied a strong presumption favoring judicial review of administrative action.'" *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (quoting *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 489 (2015)). Because § 706(2)(A) authorizes courts to set aside agency action that is, among other things, "an abuse of discretion," not all matters of discretion are unreviewable. In fact, we are to "read the exception in § 701(a)(2) quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Weyerhaeuser*, 585 U.S. at 23 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)).

The Government rests its claim on the Court's decision in *Lincoln*, in which it held that a lump-sum appropriation to the Indian Health Service "for the benefit, care, and assistance of the Indians," 25 U.S.C. § 13, provided no meaningful standard for judicial review because "the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192. Unlike the program in *Lincoln*, the Refugee Act is quite specific in describing the programs for refugee resettlement in the United States. Far from conferring discretion on the agency to establish or not establish such a program, the Act establishes the Office of Refugee Resettlement and

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 57 of 90
ase 2:25-cv-00255-JNW   Document 198   Filed 03/04/26   Page 57 of 9

PACITO V. TRUMP                    57

describes, in some detail, the services it is to provide to refugees resettled in the United States.  *See* 8 U.S.C. §§ 1521–22.  This case is not even close to the lump-sum appropriation for Indian health generally at issue in *Lincoln*. As we recently wrote, "[t]he rule announced in *Lincoln* has no application where, as here, the agency fails to carry out a program that is *required* by statute."  *Community Legal Servs., v. U.S. Dep't of HHS*, 137 F.4th 932, 940 (9th Cir. 2025) (emphasis in original).  To be sure, an agency almost always will have some discretion in the design and administration of a program, but that measure of discretion does not insulate it from judicial review.  The Government has not rebutted the "strong presumption favoring judicial review of administrative action."  *Mach Mining,* 575 U.S. at 489.

*Final agency action*.  Section 704 of the APA provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."  The APA thus prevents piecemeal or premature review of agency action and preserves the right to challenge any aspect of the agency's action once the agency has reached a final decision. *See* 5 U.S.C. § 704 ("A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action.").  Accordingly, the Court has explained that "final agency action" will be the "consummation of the agency's decisionmaking process"—not of a "merely tentative or interlocutory nature"—and "one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up).

58                        PACITO V. TRUMP

The Government argues that Executive Order No. 14163 was not a final order because it calls for only temporary suspension of entry and that the funding termination was a 90-day pause subject to reassessment. The Government also points out that the executive order is not subject to APA review because the President is not an "agency" within the meaning of the APA.

These arguments call for separate treatment of the executive order and the defunding decision. We can quickly address the APA challenge to the President's decision to suspend entry. The APA's definition of "agency" does not include the President, *see* 5 U.S.C. § 701(b)(1), and "[o]ut of respect for the separation of powers and the unique constitutional position of the President," the Court has determined that the President is not subject to the judicial review provisions of the APA, *Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992). Because "the final action complained of is that of the President, and the President is not an agency within the meaning of the Act . . . there is no final agency action that may be reviewed under the APA standards." *Id.* at 796.

Plaintiffs' challenge to the agencies' decision to defund the refugee program stands on different footing. Executive Order No. 14163 did not itself terminate the funding of the resettlement programs. Instead, those effects flowed from the termination letters issued by the State Department. The Government acknowledges that the termination qualified as agency action but contends that the action is not final because the State Department only suspended those awards in response to the executive order, which provides that USRAP's suspension can be revisited every ninety days. Although the State Department initially suspended the awards on January 24, 2025, in response to Executive Order

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 59 of 90
Case 2:25-cv-00255-JNW    Document 198    Filed 03/04/26    Page 59 of 9

PACITO V. TRUMP                                    59

No. 14163, it terminated the awards on February 26, 2025, because they "no longer effectuate[d] agency priorities." *See* 2 C.F.R. § 200.340. The termination, as opposed to the suspension, is final agency action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (cleaned up).[17]

                                    * * *

We conclude that Plaintiffs have not made a sufficient showing that they are likely to succeed on their claim that the executive order itself is subject to APA review. Otherwise, Plaintiffs have made such a showing, and we may proceed to consider the merits of their APA challenge to the termination of funding for refugee resettlement.

### 2. APA Challenge to the Defunding of the Cooperative Agreements

The Government claims that the district court erred in enjoining the termination of the organizational Plaintiffs' cooperative agreements. Under § 706 of the APA, we may "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). As before, we will first consider separately the defunding of

---

[17] The Government also argues, briefly, that Plaintiffs are seeking "*wholesale* improvement of [a] program by court decree," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (emphasis in original), a task that would "inject[] the judge into day-to-day agency management," *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 67 (2004). We can see nothing in Plaintiffs' challenges to the termination of funding of the resettlement program that would lead to the "[t]he prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with . . . congressional directives." *Id.*

60                         PACITO V. TRUMP

services to applicants for refugee status who are outside the
United States and then turn to the defunding of cooperative
agreements providing resettlement services to refugees
admitted to the United States under USRAP.

> a.  Defunding services to applicants outside the
>     United States

The Refugee Act provides a framework for determining
who are refugees and how many refugees many be admitted
to the United States in any given year.  But the Act does not
specify how the State Department is to process those who
wish to apply for admission to the United States as refugees.
Instead, it is the State Department's regulations that provide
for the filing of applications for admission, 8 U.S.C. § 207.1,
and the processing of those applications, *id.* § 207.2.  Further
details can be found on various websites maintained by the
USCIS.  General information may be found at *Refugees*,
U.S. Citizenship & Immigr. Servs. (last updated Sept. 17,
2025), https://perma.cc/K5ZP-29NK.  That website, in turn,
will refer applicants to other websites.  An applicant for
refugee status must be sponsored and then register with the
UNHCR.  *See The United States Refugee Admissions
Program (USRAP) Consultation and Worldwide Processing
Priorities*, U.S. Citizenship & Immigr. Servs. (last updated
Sept. 17, 2025), https://perma.cc/4HBM-8LBY.  Once an
applicant has been referred, the applicant may seek the
assistance of an RSC, which will further help the applicant
navigate the process.  *See Refugee Processing and Security
Screening*, U.S. Citizenship & Immigr. Servs., (last updated
Mar. 14, 2024), https://perma.cc/VTS8-A9YH.  The RSCs
entered into cooperative agreements with the State
Department to conduct background interviews, start security
checks, and schedule USCIS interviews for conditional
approval.  If USCIS conditionally approves an applicant,

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 61 of 90
ase 2:25-cv-00255-JNW   Document 198   Filed 03/04/26   Page 61 of 9

PACITO V. TRUMP                              61

then an RSC helps the applicant with medical screening examinations, cultural orientation programs, and travel arrangements.

We cannot conclude that it was arbitrary and capricious or otherwise not in accordance with the Refugee Act for the State Department to defund the overseas operations of the RSCs. Once the President determined to suspend the entry of refugees, it was not irrational for the State Department to terminate the cooperative agreements with RSCs for the processing of applications overseas. As we noted above, although the Refugee Act surely contemplates an admission process, it does not mandate any particular process. Executive Order No. 14163 does anticipate that some refugees will be admitted on a case-by-case basis, but these applications can be handled by the State Department itself or through future agreements to provide more limited services. We see no reason why the State Department should be required to maintain an overseas structure capable of processing tens of thousands of applications when the executive order has limited entry to case-by-case consideration.

> b. Defunding services to refugees admitted to the United States

The district court concluded that it was likely both contrary to law and arbitrary and capricious for the Government to terminate the cooperative agreements. To the extent that doing so deprived newly admitted refugees of the domestic resettlement benefits to which they were statutorily entitled, we agree.

*Contrary to law.* Congress established a comprehensive statutory framework for providing resettlement services to newly admitted refugees. *See generally* 8 U.S.C. §§ 1521–

62                           PACITO V. TRUMP

1524.  In so doing, Congress directed that the Government "*shall*, to the extent of available appropriations":

> (i) make available sufficient resources for employment training and placement in order to achieve economic self-sufficiency among refugees as quickly as possible, (ii) provide refugees with the opportunity to acquire sufficient English language training to enable them to become effectively resettled as quickly as possible, (iii) insure that cash assistance is made available to refugees in such a manner as not to discourage their economic self-sufficiency, in accordance with subsection (e)(2), and (iv) insure that women have the same opportunities as men to participate in training and instruction.

8 U.S.C. § 1522(a)(1)(A) (emphasis added).  In addition to these four mandates, the statute commands that the Government "shall" provide various other services and benefits.  *See*, *e.g.*, *id.* § 1522(d)(2)(B) (financial and legal responsibility for unaccompanied minor refugees "[d]uring any interim period while such a child is in the United States or in transit to the United States but before the child is so placed"); *id.* § 1522(e)(7)(A) (cash and medical assistance for the first thirty-six months).  We conclude that by failing to provide these statutorily mandated services, the Government acted contrary to law.

The district court determined that by terminating the cooperative agreements, the Government rendered the domestic refugee resettlement infrastructure functionally inoperative, and recently admitted refugees have been

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 63 of 90
ase 2:25-cv-00255-JNW    Document 198    Filed 03/04/26    Page 63 of 9

PACITO V. TRUMP                                          63

unable to access resettlement benefits as a result.    The
Government itself represented that the funding termination
has caused "significant deterioration of functions throughout
the USRAP."   Despite acknowledging this months ago, the
Government has made no indication that it has since
developed an alternative mechanism for providing the
§ 1522 services.    In other words, by terminating the
cooperative agreements, the Government knowingly
scrapped its only means of meeting its statutory duties
without any sort of contingency in place.

As a result of the Government's actions, there are
thousands of refugees potentially entitled to those services
who have not received—and will not receive—them.  For
example, there were 37,000 refugees admitted to the United
States during FY25 alone.  The Government would also have
to supply resettlement services to the 77 refugees already
admitted under the motion panel's carveout and to any
refugees admitted pursuant to the case-by-case exception in
§ 3(c) of Executive Order No. 14163.  And pursuant to the
President's FY26 determination, up to 7,500 new refugees
may be admitted this year.  *See* Presidential Determination
No. 2025-13, 90 Fed. Reg. 49005 (Sept. 30, 2025).  Each of
these groups of refugees is entitled to receive § 1522 services
following entry.

The Government argues it was not contrary to § 1522 to
terminate the cooperative agreements because "nothing in
the plain text of the statute requires the Secretary to fund
initial resettlement services at all."  We disagree.  The word
"*shall* is mandatory."  Antonin Scalia & Bryan A. Garner,
*Reading Law: The Interpretation of Legal Text* 112 (2012);
*see also Alabama v. Bozeman*, 533 U.S. 146, 153
(2001) ("[T]he word 'shall' is ordinarily 'the language of
command.'" (citation omitted)).  Moreover, the terms "shall"

and "may" are used throughout § 1522; "shall" appears 49 times, while "may" appears 17 times. "And when the same Rule uses both 'may' and 'shall,' the normal inference is that each is used in its usual sense—the one act being permissive, the other mandatory." *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947); *see also Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 346 (2005); *Lopez v. Davis*, 531 U.S. 230, 240–41 (2001).[18]

Our reading is fortified by two indisputable facts. First, as we have pointed out repeatedly, Congress described the services the United States will provide to refugees in some detail. *See*, *e.g.*, 8 U.S.C. § 1522(a)(1)(B) (employment); (d) (assistance for children); (e) (cash and medical assistance). Second, Congress has committed substantial appropriations to fund refugee resettlement.[19] Where Congress has provided detailed instructions for creating a refugee program and then funded those programs, the Government must spend those appropriations to provide the mandated services to refugees, whether the refugees number in the hundreds or the tens of thousands. *See Cmty. Legal Servs.*, 137 F.4th at 941.

---

[18] Indeed, if there is ambiguity to be had here, it is over the word "may," which "is often treated as imposing a duty, rather than conferring a discretion." *United States ex rel. Siegel v. Thoman*, 156 U.S. 353, 359 (1895). When the words "shall" and "may" appear together, however, they "indicat[e] command in the one and permission in the other." *Id.* at 360.

[19] Congress appropriated $3.178 billion for migration and refugee assistance for FY25, *see* Pub. L. No. 119-4, § 1101(a)(11) (adopting funding appropriated in division F of Pub. L. No. 118-147), which was subsequently reduced by $800 million in the Rescissions Act of 2025, Pub. L. No. 119-28, § 2(b)(6).

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 65 of 90
ase 2:25-cv-00255-JNW    Document 198    Filed 03/04/26    Page 65 of 9

PACITO V. TRUMP                    65

The Government's position that § 1522(a)(1)(A) requires the Government "to prioritize certain goals" only *if*, at its option, it decides to provide resettlement services in the first place is unconvincing. The Refugee Act provides that the United States shall provide resettlement services to newly arrived refugees. The Act further instructs the State Department what services, consistent with the monies appropriated, will be offered under the resettlement program. And the Act requires the Government to submit a detailed annual report to Congress on the resettlement program, including a description of all resettlement services provided and "the Director's plans for improvement of refugee resettlement." 8 U.S.C. § 1523(b)(4). As with most federal programs, there is play in the joints and the State Department will have discretion in *how* the program is run. But the Government does not have discretion *whether* to provide resettlement services at all. So long as the United States is admitting refugees, the Government has a duty to provide them with resettlement services.

Adopting the Government's position, the dissent focuses on the prefatory language "[i]n providing assistance under this section," arguing that "in," as it is used here, really means "if." *See* Dissenting Op. at 88–89 (quoting § 1522(a)(1)(A)). Although that may not be a grammatically impossible reading of the statute, we do not believe it is the best one. First, it does not comport with a common-sense understanding of the language used. Consider, for example, a scenario where a judge gives her law clerk the following instructions: "In drafting this opinion, you shall address arguments X, Y, and Z." Should the clerk interpret those instructions as a command to draft an opinion that includes a discussion of X, Y, and Z arguments? Or should the clerk construe them—as the dissent contends—to mean that he has

the option whether to draft the opinion at all, but that if he does decide to draft it, he should make sure to address X, Y, and Z?  In this example, "in" is obviously not conditional; the clerk is not making a decision about whether to draft the opinion or not.

Congress has used similar "in providing" language in other statutes that impose a mandatory duty on the Government.  Take 15 U.S.C. § 4724, for instance, the structure of which closely resembles that of § 1522. Section 4724(a) mandates that "the Secretary of Commerce *shall* provide assistance for trade shows in the United States," while § 4724(b) clarifies that such "[a]ssistance under subsection (a) *may* be provided to" various identified entities.  Section 4724(c)—like § 1522(a)(1)(A)—identifies the objectives of the mandatory program:  "In providing assistance under this section, the Secretary of Commerce shall . . . make special efforts to facilitate participation by small businesses and companies new to export."  Similarly, 12 U.S.C. § 4113, which mandates that the Government "shall" provide funds to certain displaced low-income families "[t]o the extent sufficient funds are made available under appropriations Acts," contains the qualification that "[i]n providing assistance under this section, the Secretary shall allocate the assistance on a regional basis."  The duty to provide assistance in these examples is mandatory, not discretionary, and the prefatory language does not alter that duty.

Although we recognize that "legislative history is not the law," *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018), the Court continues to use legislative history in limited circumstances.  *See*, *e.g.*, *Zivotofsky*, 576 U.S. at 31.  Here, "[t]hose who deem legislative history a useful interpretive tool will find that the congressional history of [the Refugee

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 67 of 90
ase 2:25-cv-00255-JNW    Document 198    Filed 03/04/26    Page 67 of 9

PACITO V. TRUMP                              67

Act] supports [our] analysis." *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 234 (2020). Nothing in the legislative history of the Refugee Act, which created the current refugee resettlement program, suggests that Congress intended the program to be discretionary. To the contrary, the Senate Report on the Refugee Act declares that the Act's purpose is to establish "a permanent and systematic procedure" to provide "comprehensive and uniform provisions for assistance to those refugees who are admitted," thereby "plac[ing] into law what we do for refugees now by custom." S. Rep. No. 96-256, at 1, 4 (1979). One of the bill's "basic objectives" was to "provide[] for federal support of the refugee resettlement process . . . and extend[] coverage to all refugees entering the United States for two years for cash and medical benefits, and longer for other programs that help the refugees normalize their lives in their adopted communities." *Id.* at 1–2. The Report unambiguously states that "the federal government clearly has a responsibility to assist states and local communities in resettling the refugees" and explains that § 1522 "provides this assistance." *Id.* at 10. The related House Conference Report further provides that "the President is required to provide for a study of which agency is best able to administer the resettlement grant program," while reserving for the President discretion "to designate the appropriate agency and/or official to carry out such *responsibility*." H.R. Conf. Rep. No. 96-781, at 22 (1980) (emphasis added).

The Government argues that it acted within its lawful discretion in terminating the cooperative agreements because § 1522(b)(1)(A) merely "authorize[s]," rather than mandates, the Government to enter into cooperative agreements with resettlement agencies to provide certain

services.[20]  To be sure, the Government does not necessarily have to provide the § 1522 resettlement services through *these* specific resettlement agencies or through the use of cooperative agreements at all—the Government retains discretion as to the method through which it provides the services.  But that discretion does not extend to rendering all resettlement services effectively inoperative as the Government appears to have done here.   That the Government may ultimately enjoy wide discretion as to *how* and *with whom* it meets its statutory obligations does not mean it may choose to shirk those obligations in the first instance.  Section 1522(a) imposes a mandatory duty on the Government; § 1522(b) merely authorizes one potential procedure through which the Government may discharge that duty.

In short, we conclude that the word "shall" means just that.  And here, Congress has directed that the Government "shall" provide certain services so long as there are funds appropriated for that purpose.  8 U.S.C. § 1522(a)(1)(A).  By simultaneously terminating all cooperative agreements to provide domestic resettlement services, the Government left

---

[20] The dissent also points to the title of § 1522, "Authorization for programs for domestic resettlement of and assistance to refugees," as evidence that the statute is merely permissive.  Dissenting Op. at 87.  We do not think the term "authorization" can bear that weight.  The term "authorization" grants an agency the power to do something, but of itself, the term does not tell us whether that authority is mandatory or discretionary.  A direction to do something is surely authorization to do it.  And while a title may serve as "a useful clue" to understanding an unclear statutory provision, "[a] title [may] not supplant the actual text of the provision."  *Dubin v. United States*, 599 U.S. 110, 121–24 (2023).  In this case, reading § 1522 as a whole persuades us that the authorization to provide resettlement services is mandatory, and the title does not dissuade us from that reading.

itself without a viable alternative means of providing those statutorily mandated services.  The district court therefore did not abuse its discretion in concluding that the Government likely acted contrary to law in so doing.[21]

*Arbitrary and Capricious.*   We also agree with the district court's conclusion that the termination of the cooperative agreements was likely arbitrary and capricious. First, the Government acted arbitrarily and capriciously in suspending and terminating the cooperative agreements without providing a reasoned explanation, factual findings, or bases for the terminations.  To survive review under the arbitrary and capricious standard, an agency's action must have been the result of "reasoned decisionmaking."  *See Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d 1061, 1080 (9th Cir. 2019) (quoting *Motor Vehicle Mfr. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983)).  To have engaged in reasoned decisionmaking, the agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Id.* (quoting *State Farm*, 463 U.S. at 43).

---

[21] We note that the effect of our holding is not that the Government is permanently prevented from terminating the cooperative agreements. The district court's injunctions merely restore the status quo before the improper terminations and require the Government to establish an alternative mechanism to provide the § 1522 services before it may lawfully terminate the agreements.  *See*, *e.g.*, *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 681 (9th Cir. 2007) (requiring an agency that violated the APA by transferring functions to new contractor "to fund the [original contractor], at least for a period of time in which [the agency] can reconsider its action in accordance with [the court's] opinion").

Agencies cannot defend rules from APA review with post hoc rationalizations.  *See State Farm*, 463 U.S. at 50.

The initial funding suspension on January 24 was done purportedly pursuant to Executive Order No. 14169, titled "Reevaluating and Realigning United States Foreign Aid." But an executive order that merely calls for a pause in "*foreign* development assistance" cannot serve as reasonable justification for the cessation of statutorily mandated *domestic* services.  *See* 8 U.S.C. § 1522(a)(3) (expressly characterizing the services provided under § 1522 as "domestic assistance").  Moreover, neither of the executive orders at issue here even refers to—much less directs the agencies to cease or defund—domestic resettlement services.

In the February 26 termination notices, the only explanation the Government provided for the terminations was that they represented a "policy determination vested in the Secretary of State" and a finding that the awards "no longer effectuate[] agency priorities."  But as we have held, although the Government may be entitled to change its mind as to what agency priorities are, it "must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored."  *Nw. Envtl. Def. Ctr.*, 477 F.3d at 687.  The Government supplied no such analysis in the termination letters.  The Government also cites 2 C.F.R. § 200.340 as authority for the terminations, but that regulation allows agencies to terminate cooperative agreements only "to the extent authorized by law," and we have already concluded that it was contrary to law to terminate the cooperative agreements in such a manner that prevented the Government from fulfilling its statutory obligations.

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 71 of 90
ase 2:25-cv-00255-JNW    Document 198    Filed 03/04/26    Page 71 of 9

PACITO V. TRUMP                    71

The Government also likely acted arbitrarily and capriciously in terminating the cooperative agreements without first considering the reliance interests of individual refugees depending on the essential resettlement services provided thereunder.  The Supreme Court has explained that an agency acts arbitrarily and capriciously if it changes course without first considering legitimate reliance interests in longstanding policies.  *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30–33 (2020).    To lawfully terminate the cooperative agreements, therefore, the Government was "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns."  *Id.* at 33. But there is no indication that the Government ever considered the individual Plaintiffs' reliance interests in receiving resettlement services under the cooperative agreements before issuing its termination notices.  We thus conclude that Plaintiffs' APA challenge is likely to succeed on this alternative ground.

## V.  REMAINING *WINTER* FACTORS

Because Plaintiffs have failed to show that there are even serious questions as to the merits of their challenges to the executive order, to the suspension of refugee processing and admissions, and to the defunding of overseas refugee services, we need not address the remaining *Winter* factors as to those claims.  *See Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) ("the court need not consider the other factors" if no likelihood of success is shown).    But having determined that Plaintiffs have demonstrated a strong likelihood of success on their APA challenge to the defunding of domestic resettlement services, we briefly address the remaining equitable factors with respect to that claim only.  We conclude that those factors

also weigh in favor of granting that portion of Plaintiffs' requested relief.

## A. *Irreparable Harm*

At minimum, the individual Plaintiffs who have recently been admitted as refugees to the United States have demonstrated that they would likely be irreparably harmed absent injunctive relief. We have noted that "[i]rreparable harm should be determined by reference to the purposes of the statute being enforced." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 818 (9th Cir. 2018). The express purpose of § 1522 is fourfold: to "(i) make available sufficient resources for employment training and placement in order to achieve economic self-sufficiency among refugees as quickly as possible, (ii) provide refugees with the opportunity to acquire sufficient English language training to enable them to become effectively resettled as quickly as possible, (iii) insure that cash assistance is made available to refugees in such a manner as not to discourage their economic self-sufficiency, . . . and (iv) insure that women have the same opportunities as men to participate in training and instruction." 8 U.S.C. § 1522(a)(1)(A).

For newly resettled refugees, the Government's termination of the cooperative agreements has ended access to various statutorily mandated initial resettlement-support services aimed at accomplishing these purposes. As the district court found, these recent arrivals "have been cut off from critical resettlement benefits and support services needed to establish their new lives in America." The loss of access to these forms of support during the crucial period after a refugee first enters the United States constitutes irreparable harm. *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) (harm is irreparable

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 73 of 90
ase 2:25-cv-00255-JNW   Document 198   Filed 03/04/26   Page 73 of 9

PACITO V. TRUMP                    73

"where parties cannot typically recover monetary damages flowing from their injury—as is often the case in APA cases"); *Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.,* 630 F.3d 1153, 1165 (9th Cir. 2011) ("loss of opportunity to pursue [Plaintiffs'] chosen profession[s]" constitutes irreparable harm).

Accordingly, the district court did not abuse its discretion in concluding that the individual Plaintiffs would face irreparable harm absent a preliminary injunction.

B. *Balance of Equities & Public Interest*

Because Plaintiffs have established a likelihood that the Government's termination of the cooperative agreements violated the Refugee Act and the APA, we conclude that both the public interest and the balance of equities tip sharply in favor of injunctive relief. "[I]t is clear that it would not be equitable or in the public's interest to allow the [Government] . . . to violate the requirements of federal law, especially when there are no adequate remedies available." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (citation omitted); *see also East Bay Sanctuary Covenant*, 993 F.3d at 679 ("[T]he public has an interest in ensuring that the 'statutes enacted by [their] representatives are not imperiled by executive fiat.'" (citation omitted)); *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) ("The public interest is served by compliance with the APA."). The public interest would be served here by requiring the Government to comply with the requirements imposed on it by Congress through the Refugee Act and the APA.

On the other hand, the Government will suffer no harm from being required to meet its statutory obligations. Indeed, the Government has presented no evidence that it

would be harmed by such a limited-in-scope injunction pending the district court's final judgment on the merits. The Government's primary argument is that the district court's second injunction "forces the Government to expend taxpayer funds in ways the Government has determined contravene the interests of the country." That argument is not compelling where, as here, Congress appropriated funds and commanded the Government to spend them on projects it has expressly determined *are* in the public interest. *See* 8 U.S.C. § 1522(a). Moreover, because the district court's injunctions do not necessarily require the disbursement of any funds to any specific entity, we are not convinced by the Government's argument that it will be irreparably harmed by being forced to pay out funds that it cannot recover. *Cf. NIH*, 606 U.S. at ----; *Dep't of Educ.*, 604 U.S. at 651–52.

In sum, we conclude that Plaintiffs have made the requisite showing as to all four *Winter* factors, and the district court did not abuse its discretion in granting injunctive relief to ensure the Government continues to provide the domestic resettlement services mandated by statute.

## VI.  SCOPE OF RELIEF

Recently, the Supreme Court determined that "universal injunctions"—injunctions prohibiting enforcement of a law or policy against anyone, anywhere—"likely exceed the equitable authority that Congress has granted to federal courts" under the Judiciary Act of 1789. *Trump v. CASA, Inc.*, 606 U.S. 831, 837 (2025). The Government argues that the district court's injunctions are so overly broad as to constitute "universal injunctions" that run afoul of *CASA*. We disagree.

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 75 of 90
ase 2:25-cv-00255-JNW   Document 198   Filed 03/04/26   Page 75 of 9

PACITO V. TRUMP                                        75

*CASA* did not affect district courts' ability to issue class-wide injunctive relief.  *See CASA*, 606 U.S. at 868 (Alito, J., concurring) ("Putting the kibosh on universal injunctions does nothing to disrupt Rule 23's requirements.")  And here, the district court has certified three Rule 23 subclasses.  That class certification order is not on appeal.  Because a class has been certified, the district court's injunctions comply with *CASA*, and we need not address whether they would constitute impermissible universal injunctions absent the existence of a class.  *See CASA*, 606 U.S. at 849–50.

## VII.  CONCLUSION

We recognize the enormous practical implications of this decision.  There are over one hundred thousand vetted and conditionally approved refugees, many of whom may have spent years completing the USRAP process in a third country only to be turned away on the tarmac.  But such a result is one potential consequence of Congress's sweeping grant of power to the President to "suspend the entry of all aliens or any class of aliens."  8 U.S.C. § 1182(f).  Whether that consequence reflects prudent policy is not a question for this court.   To hold otherwise would be to substitute our judgment for Congress's, and the President's authority under § 1182(f) precludes much of Plaintiffs' request for relief here.

Because Plaintiffs have not shown that they are likely to succeed on the merits of their challenges to Executive Order No. 14163, the cessation of refugee processing and admissions, and the funding of refugee resettlement services abroad, we reverse those portions of the preliminary injunctions as an abuse of discretion.  *See Winter,* 555 U.S. at 32.  But because Plaintiffs are likely to succeed on their APA challenge to the termination of cooperative agreements

to provide domestic resettlement services, we affirm the district court's preliminary injunctions to the extent they require the Government to reinstate such cooperative agreements necessary to provide the resettlement services described in § 1522 to refugees who have been admitted to the United States.  Each party shall bear its own costs on appeal.

## AFFIRMED IN PART; REVERSED IN PART.

LEE, Circuit Judge, dissenting in part:

I agree with Judge Bybee's magisterial analysis in Section IV.A. explaining why 8 U.S.C. § 1182(f) authorizes the President to suspend the admissions of refugees.  I, however, dissent on two points, both of which are close calls.  First, I do not think we have jurisdiction over the organizational plaintiffs' claims because they effectively seek reinstatement of funding for refugee resettlement services.  Such breach-of-contract claims seeking money from the federal government must be heard by the Court of Federal Claims.  Second, even if we do have jurisdiction, I believe the better reading of the statutory provisions is that the United States has discretion whether to fund these services.

I also write separately to highlight what happened in the district court because it reflects a recent trend that I fear will erode the credibility of the judiciary.  To be clear, courts can and should intervene if the President oversteps legal bounds.  We, however, must not be seduced by the temptation of judicial resistance:  District courts cannot stand athwart, yelling "stop" just because they genuinely

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 77 of 90
ase 2:25-cv-00255-JNW   Document 198   Filed 03/04/26   Page 77 of 9

PACITO V. TRUMP                              77

believe they are the last refuge against policies that they deem to be deeply unwise.  Otherwise, we risk inching towards an imperial judiciary that lords over the President and Congress.  *Cf. Trump v. CASA, Inc.*, 606 U.S. 831, 858 (2025) (warning against "embracing an imperial judiciary").

\* \* \* \*

When President Trump entered office on January 20, 2025, he suspended the admission of refugees, citing the record number of migrants who had to come to our shores during the last administration.  *See* Executive Order 14163, 90 Fed. Reg. 8459 (Jan. 20, 2025), "Realigning the United States Refugee Admissions Program."  Congress expressly empowered the President to do so in clear and broad statutory language: He can "suspend the entry of all aliens or any class of aliens" whose entry he "finds" would be "detrimental to the interests of the United States."  8 U.S.C. § 1182(f).  Only a few years ago, the Supreme Court upheld President Trump's so-called "Muslim ban," stating that this statutory provision "exudes deference to the President" and that he could ban the entry of aliens from certain Muslim countries with inadequate national security vetting.  *Trump v. Hawaii*, 585 U.S. 667, 683-84 (2018) ("By its plain language, § 1182(f) grants the President broad discretion to suspend the entry of aliens into the United States.").

Yet the district court preliminarily enjoined the President's executive order suspending refugee admissions. As the majority opinion explains, the district court's order cannot be squared with the statutory text or the Supreme Court's decision in *Trump v. Hawaii*.

Not surprisingly, an emergency motions panel of the Ninth Circuit—consisting of Judges Silverman, Bade, and de Alba—mostly stayed the district court's preliminary

injunction, except that it temporarily allowed in those refugees who had been conditionally approved for refugee status before January 20.  The plaintiffs insisted though that the Ninth Circuit's narrow carveout from the stay would allow the admission of well over 100,000 refugees—a number so high that an exasperated Ninth Circuit panel remarked that its carveout "was not intended to compel the government to admit more refugees than authorized for the entire Fiscal Year 2025" and that the "Plaintiffs clearly grasp that" the panel's order was not intended to be that broad.

The Ninth Circuit panel explained that its stay order included only a narrow exception for people like "Plaintiff Pacito, who sold all of his belongings in anticipation of flying to safety in the United States and was forced to shelter with his wife and baby in the parking lot of the U.S. embassy in Nairobi after their travel was abruptly cancelled."  The panel emphasized that those who have "strong reliance interest arising prior to January 20, 2025" means people "comparable to Plaintiff Pacito."  The U.S. government then started admitting people with reliance interests similar to Pacito's.

Despite this stay imposed by the Ninth Circuit, the district court issued a "Compliance Framework Order" that expanded the categories of refugees who could be admitted. It held that refugees "whose travel was canceled *before* January 20 [*i.e.*, before the EO went into effect] are not necessarily excluded from the injunctive relief"—even though the Ninth Circuit expressly held that an individual must have had "confirmable travel plans to the United States" as of January 20, 2025, to be admitted.  So even those who had their travel plans cancelled in December 2024 during the Biden administration might have been eligible for admission if their plans would have been rescheduled but for

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 79 of 90
ase 2:25-cv-00255-JNW Document 198 Filed 03/04/26 Page 79 of 9

PACITO V. TRUMP                                    79

the EO.  The district court also presumed Afghan refugees at Camp As Sayliyah could be admitted, despite the Ninth Circuit's stay order including no such exception.  The district court's "Compliance Framework Order" was in deep tension with the Ninth Circuit emergency motion panel's stay orders.

The district court then allowed the plaintiffs' lawyers (at a non-governmental organization (NGO) and Perkins Coie) to initially review the court-ordered survey responses from potentially thousands of refugees to flag who might have significant reliance interests to qualify for admission.  The government then had seven days to decide whether it disagreed.  If it did so, the plaintiffs would submit a six-page brief to the magistrate judge (with no time limit for submitting it); the government, however, would have only four days to file its opposition brief.  Then a magistrate judge would submit its recommendation, and finally the district court would make the ultimate decision.  This would happen for every potential person that the plaintiffs identified as having a strong reliance interest.

The district court at one point even ordered the United States to "submit weekly reports to the Court detailing actions taken since the last report to comply with the Court's injunctions"—in effect, a weekly homework assignment for the President.

Our constitutional structure will topple if a single district court sits atop the President, Congress, the Supreme Court, and the federal appellate court.  As Alexander Hamilton noted in The Federalist No. 78, the judiciary is the "weakest" branch because it has "neither FORCE nor WILL" but "merely judgment."  We do not have the legitimacy of Congress because we are unelected and unaccountable to the

people.  And we lack the power to enforce our own decisions and depend on the executive branch to enforce them.  We thus rely solely on our credibility as neutral arbiters of the law, the most precious asset we have as judges.  That means we must scrupulously stay in our legal lane and abide by the separation of powers system established by the Framers.  Not only that, we inferior court judges must pay heed to the Supreme Court.  As Justice Gorsuch admonished, "[l]ower court judges may sometimes disagree with [the Supreme] Court's decisions, but they are never free to defy them." *Nat'l Insts. of Health v. Am. Pub. Health Ass'n (NIH)*, 145 S. Ct. 2658, 2663 (2025) (Gorsuch, J., concurring in part and dissenting in part).

None of this means that judges are automatons without personal views, even strong ones.  As an immigrant, I am forever grateful to the United States for welcoming our family and feel blessed to enjoy the liberties and opportunities provided by our great country.  This experience shapes my own personal views on various policy issues. But whatever personal opinions I may have, they cannot and must not have any bearing on the legal issues before us.  Our allegiance is always to the law and the Constitution.  *See* William H. Pryor, Jr. "The Judicial Oath and the Judgment of History," Public Discourse (Dec. 29, 2025), available at https://www.thepublicdiscourse.com/2025/12/99817/ ("Judges swear before God to uphold the Constitution and laws of the United States wherever it leads. We do not swear to follow a prediction or speculation about what future generations will favor.").

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 81 of 90
ase 2:25-cv-00255-JNW   Document 198   Filed 03/04/26   Page 81 of 9

PACITO V. TRUMP                    81

* * * *

## I.  We lack jurisdiction to consider the plaintiffs' claims seeking funding.

The Supreme Court recently reiterated in its interim docket orders that the Tucker Act requires cases against the federal government sounding in contract law to be brought before the Court of Federal Claims.  28 U.S.C. § 1491(a)(1); *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025); *see also NIH*, 145 S.Ct. at 2660 (plurality opinion).  The majority, however, contends that this jurisdictional restriction does not apply here because plaintiffs do not seek "to enforce a contractual obligation to pay money."  *Great-West Life & Annuity Ins. Co v. Knudson*, 534 U.S. 204, 212 (2002).  I disagree.

As the majority opinion notes, our court has adopted the D.C. Circuit's *Megapulse* test to determine whether a claim against the federal government belongs in a district court or the Court of Federal Claims.  *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (adopting the two-part test from *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)).  Under *Megapulse*, we look to (1) "the source of rights" undergirding the claims and (2) the "type of relief sought (or appropriate)."  672 F.2d at 968.  If a party's "rights and remedies are *contractually* based," then "only the Court of Federal Claims" has jurisdiction over the claim.  *United Aeronautical Corp.*, 80 F.4th  at 1026 (emphasis in original).  And a "contract-based action falls within the scope of the Tucker Act" if the plaintiff "seeks *money damages* for the breach of a government contract" (rather than injunctive relief based on a statutory or constitutional claim).  *Id.* (emphasis in original).  In other words, a claim belongs in the Court of Federal Claims if a

82                        PACITO V. TRUMP

party essentially seeks monetary relief based on a contract. I address each prong of the *Megapulse* test below.

### A. The organizational plaintiffs' "source of rights" arises from a contract.

The majority opinion correctly points out that the organizational plaintiffs' alleged rights arise out of their "cooperative agreements" with the federal government. The majority, however, thinks cooperative agreements are not sufficiently contractual.  To reach that end, the majority opinion tries to distinguish a cooperative agreement from a typical government contract.  But if we examine the nature of these agreements, the organizational plaintiffs are effectively seeking money damages based on their contract.

The majority opinion seeks refuge in the Federal Grant and Cooperative Agreement Act of 1977 (FGCAA) which defines grants, cooperative agreements, and procurement contracts.  *See* 31 U.S.C. §§ 6301–08.  Procurement contracts under the FGCAA necessarily involve the federal government directly as a party to the bargain.  31 U.S.C. § 6303.  Grants involve the federal government the least, as all they require are disbursement and occasional supervision. 31 U.S.C. § 6304.  Cooperative agreements are in between. *See* 31 U.S.C. § 6305.  These agreements benefit individuals or entities who also expect the federal government's "substantial involvement."  *Id.*  In other words, on a sliding scale analysis, grants are least like contracts; cooperative agreements are in the middle; and contracts are contracts. *See* 31 U.S.C. §§ 6303–05.

Using this framework, the majority opinion claims that the State Department's "substantial involvement" in providing services to third parties separates these arrangements from contractual relationships.    But

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 83 of 90
ase 2:25-cv-00255-JNW   Document 198   Filed 03/04/26   Page 83 of 9

PACITO V. TRUMP                                83

contracts—such as service contracts or those agreements with good-faith effort provisions—can often require substantial involvement of parties. So "substantial involvement" alone cannot be the dispositive factor. The majority also claims that a cooperative agreement is unlike a contract because the government itself does not directly benefit from it. But third-party beneficiary contracts—in which one of the parties does not directly benefit from the agreement—are common. *See* CONTRACT, Black's Law Dictionary (12th ed. 2024) (defining third-party-beneficiary contracts). A contract does not stop being a contract just because a third party is the intended beneficiary.

Most importantly, the Supreme Court in recent orders on the interim docket has hinted at a more functional framework for Tucker Act questions: It looks at whether a claim seeks "to enforce a contractual obligation to pay money." *Dep't of Educ.*, 604 U.S. at 651 (quoting *Great-West Life & Annuity Ins. Co.*, 534 U.S. at 212). If so, then it belongs in the Court of Federal Claims. *See id.* ("[T]he Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'") (quoting 28 U.S.C. § 1491(a)(1)); *cf. Megapulse*, 672 F.2d at 968 (second factor looking at "the type of relief sought (or appropriate)"). In *Department of Education*, the Court applied this principle in issuing a stay in a grant funding dispute and ruling that it likely must be brought in the Court of Federal Claims. 604 U.S. at 651–652. Likewise, in *NIH*, the Court held that a claim based on the government's "termination of various research-related grants" seeks to enforce an "obligation to pay money pursuant to those grants" and thus likely cannot be raised as an APA claim in district court. 145 S. Ct. 2658 at 2660. In short, the Supreme

Court has strongly suggested that even suits based on federal grants belong in the Court of Federal Claims.[1]

The majority opinion thus potentially leads to odd ends. It envisions a world where claims based on procurement contracts (the most contract-like) and grants (the least contract-like) may go to the Court of Federal Claims, but claims arising from cooperative agreements (more like contracts than grants) may be at home in district court. This is a confusing result.

Here, the organizational plaintiffs demand the federal government to reinstate funding. As they put it in their complaint, they want the court to "direct[]" the government to "restore funding pursuant to the terms of all cooperative agreements."    Put another way, they want the court to enforce an "obligation to pay money pursuant to those" cooperative agreements. *NIH*, 145 S. Ct. 2658 at 2660. Such a claim belongs in the Court of Federal Claims.[2]

---

[1] To be sure, the majority cites several cases that suggest a difference between procurement contracts and cooperative agreements. But all those cases except one predate the Supreme Court's 2025 Tucker Act orders, which appear to adopt a more pragmatic analysis (*i.e.*, whether the plaintiff is seeking money from the federal government arising out of a contract). The one half-exception is a D.C. district court case in which "[n]o count claim[ed] that plaintiffs are entitled to relief because of any term or condition of their cooperative agreements . . . or any alleged breach of those agreements." *Am. Ctr. For Int'l Solidarity v. Chavez-Deremer*, 789 F. Supp. 3d 66, 84 (D.D.C. 2025). In contrast here, the organizational plaintiffs seek funding reinstatement based on the cooperative agreements.

[2] It is less clear whether the individual plaintiffs—who are not express parties to these cooperative agreements—are seeking monetary relief based on a contract (though perhaps they may be characterized as third-party beneficiaries of the cooperative agreements). In any event, as

PACITO V. TRUMP                    85

### B.  The "type of relief sought" here is money based on a contract.

We next turn to "the type of relief sought" under the *Megapulse* two-part analysis. *Megapulse*, 672 F.2d at 968. "If rights and remedies are *statutorily* or *constitutionally* based, then districts courts have jurisdiction; if rights and remedies are *contractually* based then only the Court of Federal Claims does, even if the plaintiff formally seeks injunctive relief." *United Aeronautical Corp.*, 80 F.4th at 1026 (emphases in original).

Organizational and individual plaintiffs in their complaint make clear that they want funding in the cooperative agreements restored.  The majority opinion, however, distinguishes this ask from those in the *NIH* and *Department of Education* cases by claiming those were contractual because the plaintiffs there sought past-due payment under the grants.  In contrast here, the majority says, the plaintiffs seek "to enforce a statutory mandate" which only incidentally results in the payment of money.

But we must be wary of "an APA action seeking injunctive and declaratory relief" when in reality it is a "'disguised' breach-of-contract claim." *United Aeronautical*, 80 F.4th at 1026.  A plaintiff cannot point to a statute to avoid the Court of Federal Claims when it is seeking money based on a contract.  And centrally here, the organizational plaintiffs want the federal government to turn on the funding spigot again—and receive the flow of money under the cooperative agreements.  Indeed, the plaintiffs, the district court, and the majority opinion highlight the critical

---

explained later, their claims are unavailing because funding under § 1522 is not mandatory and thus grants no statutory rights to sue.

role of cooperative agreements in the program's operation. The district court framed the termination's impact in terms of funding cuts that led to layoffs, furloughs, and service reduction. The plaintiffs' prayer for relief also focuses on the funding through these cooperative agreements. And their motion for preliminary injunction refers to the "USRAP *Funding* Termination," "*contract*-termination clauses," and the "termination of USRAP-related *funding*."[3] Money is the core of the claim. This lawsuit belongs to the Court of Federal Claims.

## II. Section 1522 does not mandate the funding of resettlement services.

Even if we have jurisdiction over these claims, I believe they fail because Section 1522 gives the federal government discretion whether to fund the resettlement services.

My colleagues interpret 8 U.S.C. § 1522 as requiring the government to provide certain services to refugees, pointing to the word "shall" in subsection (a)(1)(A). It is a close call, but I believe the statute merely authorizes—and does not mandate—funding.

This is apparent when the statute is viewed as a whole. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012) ("Perhaps no interpretive fault is more common than the failure to follow the whole-text cannon, which calls on the judicial interpreter

---

[3] The majority argues that the organizational plaintiffs really seek the refugee resettlement program's restoration no matter their own funding status. The pleadings and the district court's analysis counter this claim. The organizational plaintiffs paint the impact of the termination in financial terms and they seek restoration of the agreements which grant them federal funds.

to consider the entire text, in view of its structure and of the physical and logical relation of its many parts.").

We start with the title:  Section 1522's is titled "*Authorization* for programs for domestic resettlement of and assistance to refugees."  (emphasis added). Authorization is permissive, not mandatory. AUTHORIZATION, Black's Law Dictionary (12th ed. 2024) (defining it as "permission to do something" or the "official document granting such permission").

While titles are not the operative text, the Supreme Court has held that they provide helpful context in determining a statute's meaning.  *See Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) ("'the title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute." (quoting *Trainmen v. Balt. & Ohio R. Co.*, 331 U.S. 519, 528–29 (1947)); *King v. Burwell*, 576 U.S. 473, 492 (2015) ("'A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme ... because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.'" (quoting *United Sav. Assn. of Tex. v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 371 (1988)).

The statutory language in the operative funding provision in § 1522 underscores that funding is discretionary.  The four specific statutory provisions that provide funding for different refugee services—*e.g.*, "Program of initial resettlement," "Cash assistance and medical assistance to refugees"—all state in their text that the "Director is *authorized*" to provide assistance. 8 U.S.C. § 1522(b)-(e) (emphasis added).  This text explicitly grants the executive branch discretion over funding.  *Confederated*

88                          PACITO V. TRUMP

*Salish & Kootenai Tribes v. United States*, 343 F.3d 1193,
1196 (9th Cir. 2003) (noting that the term "authorize" has
"the connotation of being permissive, rather than
mandatory" (cleaned up)).

In arguing that Section 1522 imposes mandatory
funding, my colleagues look to § 1522(a)—illustratively
titled "Conditions and considerations"—and focus on the
word "shall":

> (a)    Conditions and considerations
>
> (1)(A) In providing assistance under this
> section, the Director shall, to the extent of
> available appropriations, (i) make available
> sufficient resources for employment
> training and placement in order to achieve
> economic self-sufficiency among refugees
> as quickly as possible, (ii) provide refugees
> with the opportunity to acquire sufficient
> English language training to enable them to
> become effectively resettled as quickly as
> possible, (iii) insure that cash assistance is
> made available to refugees in such a
> manner as not to discourage their economic
> self-sufficiency, in accordance with
> subsection (e)(2), and (iv) insure that
> women have the same opportunities as men
> to participate in training and instruction.

But the "shall" language is qualified by the immediately
preceding phrase: "In providing assistance under this
section [*i.e.*, the discretionary funding provisions under
§ 1522(b)-(e)]. . ."    In other words, § 1522(a) imposes
certain mandatory "conditions and considerations" *if*

Case: 25-1313, 03/05/2026, DktEntry: 167.1, Page 89 of 90
ase 2:25-cv-00255-JNW   Document 198   Filed 03/04/26   Page 89 of 9

PACITO V. TRUMP                    89

the government chooses to fund refugee programs. For example, under subsection (a)(1)(A)(i), the Director "shall. . . make available sufficient resources for employment training and placement [under § 1522(c)'s discretionary funding for "Project grants and contracts for services for refugees"] in order to achieve economic self-sufficiency among refugees as quickly as possible." Stated differently, *if* the government chooses to fund employment training, it *shall* consider "economic self-sufficiency . . . as quickly as possible" as a "consideration" that must be taken into account (*e.g.*, employment training should focus on training to be, say, an electrician, not a poetry teacher).[4]

The rest of the statutory provision imposes similar conditions and considerations to discretionary funding. Subsection (a)(1)(A)(ii) emphasizes that a key "consideration" for funding is that refugees should learn "sufficient English." Subsection (iii) imposes a condition on "cash assistance" such that it is "made available . . . in such a manner as not to discourage their economic self-sufficiency." And subsection (iv) ensures that women have the same opportunities as men when the government chooses to provide training and instruction.

To bolster their claim of mandatory spending, my colleagues cite portions of subsection (a) as well as subsections (d)(2)(B) and (e)(7)(A) which arguably impose

---

[4] The majority disagrees with this statutory analysis and offers the example of a judge telling a law clerk, "In drafting this opinion, you shall address arguments X, Y, and Z" to contend that the judge's direction is mandatory. I think a more apt analogy would be a judge telling a law clerk, "You are authorized to grant time extensions. In granting an extension, you shall consider X, Y, and Z." The law clerk can grant an extension, but if he or she decides to do so, then the clerk must consider factors X, Y, and Z.

some obligations on the Director. None, however, persuasively counters the overall operation of § 1522. The provisions in subsection (a) merely give direction to the government in developing "policies and strategies" and to conduct "periodic assessment" of the program. These are housekeeping good governance measures for when the program operates—hardly a mandate for the program's continuation.

Subsection (d)(2)(B) requires that the program's Director take legal and financial responsibility for unaccompanied refugee children only if such responsibility is "necessary." Even while using the word "shall," the subsection drips with deference to the executive branch and invokes no firm mandate. It also is not clear from the record if there are any unaccompanied refugee children at issue to whom plaintiffs could claim this section's alleged mandate would apply. Similarly, subsection (e)(7)(A) states the "Secretary shall develop and implement" projects for cash and medical support for refugees "as needed." The Director decides what is needed. The metes and bounds of the programs are up to executive discretion: No congressional mandate in sight.

When examined in its entirety, the statutory text supports this conclusion repeatedly: Section 1522 authorizes the executive branch to craft programs under its discretion so long as appropriations flow. It does not require that those programs operate.

We and the district court lack jurisdiction. Even if we had it, the program's operation is not mandatory. I thus respectfully dissent in part and would reverse the district court's injunctions in their entirety.