THE HONORABLE JAMAL N. WHITEHEAD

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PLAINTIFF PACITO; PLAINTIFF ESTHER; PLAINTIFF JOSEPHINE; PLAINTIFF SARA; PLAINTIFF ALYAS; PLAINTIFF MARCOS; PLAINTIFF AHMED; PLAINTIFF RACHEL; PLAINTIFF ALI; PLAINTIFF YODIT; PLAINTIFF SENAI; PLAINTIFF MIRIAM; PLAINTIFF BABAK; PLAINTIFF JALAL; HIAS, INC.; CHURCH WORLD SERVICE, INC.; and LUTHERAN COMMUNITY SERVICES NORTHWEST,

*Plaintiffs*,

v.

MARCO RUBIO, in his official capacity as Secretary of State; MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; and ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services,

*Defendants*.

Case No. 2:25-cv-255-JNW

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      Fourteen refugees, their family members and sponsors, and three resettlement agencies challenge Defendants' intentional dismantling of Congress's carefully crafted system for resettling refugees in this country based on their iniquitous goal of ending refugee admissions to

FIRST AM. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
(No. 2:25-cv-255-JNW)

Perkins Coie LLP
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

the United States entirely. Defendants are federal agencies tasked with implementing the U.S. refugee admissions program ("USRAP"). For the past fourteen months, Defendants have implemented Executive Order 14163 (the "Refugee Ban EO" or "EO"), which suspends the entry of all refugees (except on a case-by-case basis) and decisions on refugee applications in an arbitrary, opaque, and discriminatory manner. Defendants have inexplicably chosen to deprive thousands of refugees of the chance of admission to the United States under the EO's case-by-case-exception provision and categorically excluded all refugees—except for white Afrikaners and a few non-Black minorities—from consideration. On top of that, Defendants have erroneously applied the Trump Administration's travel ban to refugees; implemented the Presidential Determination on Refugee Admissions for Fiscal Year 2026 (the "FY 2026 PD" or "PD") in a manner that precludes processing and admission of statutorily eligible categories of refugees and almost all non-white victims of discrimination; and denied refugees benefits upon arrival, devastating refugees already here and the organizations that seek to help them.

2.    Even before the Refugee Ban EO went into effect, Defendants made the chaotic and arbitrary decision to immediately cancel scheduled travel for fully vetted refugees and suspend *all* refugee processing, freezing work on pending applications. This decision was neither required nor authorized by the EO's express terms, and yet it makes it all but impossible for refugees to be considered for case-by-case exceptions. Meanwhile, less than three weeks after suspending refugee admissions, President Trump issued a new executive order seeking to promote the resettlement of a brand-new group of white Afrikaners from South Africa (the "Afrikaner EO"). Defendants swiftly initiated a new program to fast-track processing of refugee applications for white Afrikaners, thousands of whom have since been admitted as refugees through a categorical exception to the Refugee Ban EO. To date, Defendants have failed to resume refugee processing for any other refugees.

3.    Although the Refugee Ban EO has been in effect for more than a year, Defendants have yet to publish *any* information regarding the process or eligibility criteria for seeking an

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 2
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

exception. Defendants have nonetheless granted over 3,000 exceptions almost entirely to white Afrikaners without any justification for failing to consider other refugees, who have no means of determining their eligibility or how they might request an exception. This is not an aberration but design: Defendants have no intention of granting them an exception. Those refugees who have sought information about how they or their family members may be considered for an exception— like Plaintiff Miriam's nine-year-old son surviving alone in a refugee camp in Burundi—have simply been told that it is not for them.

4.     Defendants' efforts to block refugee admissions did not stop with their implementation of the Refugee Ban EO. On June 4, 2025, President Trump issued Proclamation 10949, suspending entry of immigrants and nonimmigrants from nineteen countries.[1] Upon issuing Proclamation 10949, President Trump announced that he was reviving the travel ban from his first term—which was never applied against refugees—based on purported concerns with targeted countries' security and vetting systems, visa overstay rates, and unwillingness to accept the return of removable nationals. Like the travel ban issued during President Trump's first term, Proclamation 10949 contains an explicit exception for refugees. But Defendants have ignored this exception and applied the travel ban to refugees, even though refugees are vetted under an entirely separate system, do not receive visas, and face danger and persecution in their home countries such that they have legal protections against removal to their countries of nationality.

5.     On October 31, 2025, President Trump published the FY 2026 PD, setting the refugee admissions goal at a historic low of 7,500 and determining that admissions would be "primarily" allocated among white Afrikaners and other victims of illegal or unjust discrimination in their homeland. The FY 2026 PD explicitly states that it is subject to the Refugee Ban EO.

---

[1] President Trump later expanded the travel ban to include immigrants and nonimmigrants from twenty additional countries and those applying to enter on Palestinian Authority travel documents.

FIRST AM. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF – 3
(No. 2:25-cv-255-JNW)

6.　　　In defiance of Congress and in stark departure from prior practice, Defendants have wielded the FY 2026 PD to erect yet another barrier to refugee admissions by implementing the PD in a manner that excludes congressionally designated refugees from admission and purports to replace the U.S. refugee resettlement system with a program for white Afrikaners and a few non-Black minorities in South Africa. In Defendants' plainest attempt to halt the admission of non-white refugees to the United States, they have predetermined that no other refugees will enter the United States in Fiscal Year 2026.

7.　　　Defendants' attacks have not been limited to refugees seeking to reach safety in the United States. Following the EO's issuance, Defendants immediately turned their attacks inward by attempting to cut off vital resettlement benefits for newly arrived refugees in the United States. Within days, Defendants suspended funding to the resettlement partners that provide necessary—and statutorily mandated—benefits to refugees and Afghan and Iraqi allies who have recently arrived, leaving refugees like Plaintiff Ali at risk of being turned onto the streets. Plaintiffs HIAS, Inc. ("HIAS") and Church World Service, Inc. ("CWS") partner with local organizations like Plaintiff Lutheran Community Services Northwest ("LCSNW," and collectively with HIAS and CWS, the "Organizational Plaintiffs") that form the backbone of this country's refugee resettlement system and have been devastated by Defendants' actions. As a result of Defendants' actions, all three Organizational Plaintiffs were immediately faced with significant staff layoffs and curtailment of vital services.[2]

8.　　　Defendants' attacks on refugees and the USRAP continue to leave vulnerable refugees in danger—like Plaintiff Alyas, whose travel for February 3, 2025, was canceled and who

---

[2] Defendants subsequently reinstated funding for domestic refugee resettlement services only after this Court issued a preliminary injunction requiring them to do so, which the Ninth Circuit declined to stay and ultimately affirmed as it relates to domestic resettlement services. *See Pacito v. Trump*, 169 F.4th 895, 940 (9th Cir. 2026). Defendants also suspended cooperative agreements with Plaintiffs HIAS and CWS for overseas refugee resettlement funding, but because those agreements were either renewed or have not been reinstated, Plaintiffs no longer challenge the overseas aspect of the funding suspension.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 4
(No. 2:25-cv-255-JNW)

lives under threat in Iraq with his wife and three-year-old child because of his association with the U.S. presence in that country and his membership in a persecuted ethnoreligious minority. U.S.-based family members of refugees are also left devastated—like Plaintiff Miriam, who is heartbroken by the unfair and needless separation from her nine-year-old son, who is being forced to grow up in a refugee camp without his parents and siblings; and Plaintiff Marcos, who stares hopelessly at an empty room, freshly painted and prepared to welcome his stepdaughter, who was supposed to travel to the United States in early February 2025 but instead remains in danger in El Salvador.

9.     These results cannot stand, as a matter of law or equity. Defendants' actions violate the Administrative Procedure Act ("APA"), the Refugee Act, the Refugee Crisis in Iraq Act ("RCIA"), and the Fifth Amendment to the U.S. Constitution. Plaintiffs seek an order enjoining, declaring unlawful, and setting aside Defendants' actions and ordering Defendants to comply with the APA and the Constitution, including by adopting a fair, transparent, and orderly process for granting case-by-case exceptions.

## PARTIES

10.     Plaintiff Pacito*[3] is a refugee from the Democratic Republic of the Congo who was approved for resettlement to the United States and scheduled to travel with his family on January 22, 2025, before their travel was abruptly canceled. Pacito and his family resided in Nairobi, Kenya.[4]

---

[3] Plaintiffs seek to proceed anonymously given the serious harms they and their families face should their participation in this lawsuit become public. On February 28, 2025, this Court granted the individual Plaintiffs' request to proceed under pseudonym. Dkt. 45 at 13 n.3. All Plaintiffs seeking to proceed anonymously are denoted here with an asterisk following their pseudonym.

[4] Since the filing of Plaintiffs' First Supplemental Complaint, Plaintiff Pacito was admitted to the United States on July 10, 2025. Pacito remains a Plaintiff and class representative in this case.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 5
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

11.    Plaintiff Esther* is a U.S. citizen living in Boise, Idaho, who filed an application to be reunited with her daughter who resided in South Africa.[5]

12.    Plaintiff Josephine* was the beneficiary on her mother Esther's application for family reunion. Josephine was born in the Democratic Republic of the Congo.

13.    Plaintiff Sara* is a refugee from Iraq who was conditionally approved for resettlement to the United States and awaiting travel confirmation before her case was suspended. She currently lives with her son, who is a derivative beneficiary on her refugee application, in Jordan.

14.    Plaintiff Alyas* is a refugee applicant from Iraq. He, his wife, and his three-year-old son were scheduled to travel to the United States on February 3, 2025, until their travel was canceled. The family currently lives in Iraq.

15.    Plaintiff Marcos* filed an application to be reunited with his stepdaughter, who was approved for resettlement, travel ready, and told she would travel the first or second week of February 2025. Marcos currently lives in Los Angeles, California.

16.    Plaintiff Ahmed* is a refugee from Afghanistan who was conditionally approved for resettlement to the United States and was awaiting travel confirmation before his case was suspended. He currently lives in Germany.

17.    Plaintiff Rachel* is a U.S. citizen who, along with four others, filed an application to sponsor an Afghan refugee family before their case was suspended. She lives in Bellevue, Washington.

18.    Plaintiff Ali* was admitted to the United States as a refugee from Iraq in January 2025. At the time Plaintiffs filed their initial complaint, Ali was statutorily entitled to receive

---

[5] Since the filing of Plaintiffs' First Supplemental Complaint, Plaintiff Josephine (Esther's daughter) was admitted to the United States on March 15, 2025. Esther and Josephine remain Plaintiffs and class representatives in this case.

FIRST AM. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF – 6
(No. 2:25-cv-255-JNW)

benefits as a recently resettled refugee—but was informed that those benefits were then unavailable. He lives in Dallas, Texas.[6]

19. Plaintiff Yodit* is a U.S. citizen living in Ohio, who filed an application to be reunited with her son, who remains in Egypt.

20. Plaintiff Senai* is the beneficiary on his mother Yodit's application for family reunion. He was born in Eritrea and currently lives in Cairo, Egypt.

21. Plaintiff Miriam* filed an application to be reunited with her nine-year-old son, who remains separated from his mother, father, and siblings in a refugee camp in Burundi.

22. Plaintiff Babak* is a U.S. citizen who came to the United States as a refugee and lives with his wife and daughter in California. Babak filed a petition for his wife and her parents to resettle in the United States; his wife's parents remain stranded in Iran.

23. Plaintiff Jalal* is a U.S. citizen who seeks to be reunited with his brother, Plaintiff Alyas. Jalal currently lives in Lincoln, Nebraska.

24. Plaintiff HIAS is a 501(c)(3) faith-based organization and the world's oldest refugee resettlement agency. HIAS, the American Jewish community's global refugee organization, works towards a world in which all refugees find welcome, safety, and freedom. Founded as the Hebrew Immigrants Aid Society in 1903 to assist Jews who had fled the pogroms of Russia and Eastern Europe (and later renamed the Hebrew Immigrant Aid Society), HIAS now serves refugees and persecuted people, regardless of their faith or ethnicity, around the globe. Since its founding, HIAS has helped more than 4.5 million refugees start new lives. HIAS has offices in Africa, Latin America and the Caribbean, Europe, and Israel. It is headquartered in Silver Spring, Maryland, and provides resettlement services in the United States through twenty-six remaining affiliates in seventeen states. HIAS has agreements with the U.S. Department of Health and Human Services ("HHS") to assist with the initial placement and resettlement of refugees in the United

---

[6] Since the filing of Plaintiffs' First Supplemental Complaint, Plaintiff Ali received his statutory benefits only following a preliminary injunction issued by this Court.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 7
(No. 2:25-cv-255-JNW)

States. Until January 2026, HIAS had agreements with the U.S. Department of State (the "State Department") to assist with overseas processing for the USRAP.

25.     Plaintiff CWS is a 501(c)(3) faith-based organization committed to serving the world's most vulnerable people through just and sustainable responses to hunger, poverty, displacement, and disaster. Since its founding in 1946 in the aftermath of the Second World War, CWS has provided assistance and resettlement services to those displaced by violence and discrimination. Within the United States, CWS works to build welcoming communities that support refugees on a path toward self-sufficiency, full integration, and a bright future for their families. To date, CWS has helped resettle more than 910,000 refugees, parolees, and other entrants across the United States. CWS has offices in fourteen countries worldwide, including its headquarters in New York City and other domestic offices in Elkhart, Indiana, and Washington, D.C. CWS provides domestic resettlement services at twenty-three remaining locations in sixteen states, either directly or through affiliates, across the United States. CWS has a cooperative agreement with the State Department to assist with processing refugees; prior to the Refugee Ban EO, CWS assisted with processing refugees in countries throughout sub-Saharan Africa. Under the Refugee Ban EO, this processing has been limited to cases for South Africans of Afrikaner ethnicity or other racial minorities. CWS also has agreements with HHS to assist with the initial placement and resettlement of refugees in the United States.

26.     Plaintiff LCSNW is a 501(c)(3) organization that is an affiliate of a national resettlement agency. Headquartered in Tacoma, Washington, LCSNW has more than 40 locations across Washington, Oregon, and Idaho, with more than 700 employees and dozens of programs providing services to more than 40,000 clients each year. It has provided a range of social and family services to low-income communities in the Northwest for decades and provided resettlement services to refugees resettled in its communities since the 1940s.

27.     Defendant Marco Rubio is the Secretary of State and is responsible for overseeing the State Department's management of the USRAP. He is also responsible for overseeing the

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 8
(No. 2:25-cv-255-JNW)

enforcement and implementation of executive orders by all State Department staff. He is sued in his official capacity.

28.    Defendant Markwayne Mullin is the Secretary of Homeland Security and is responsible for overseeing the Department of Homeland Security ("DHS") management of the USRAP. He is also responsible for overseeing enforcement and implementation of relevant executive orders by all DHS staff. He is sued in his official capacity.

29.    Defendant Robert F. Kennedy, Jr., is the Secretary of Health and Human Services and is responsible for overseeing the enforcement and implementation of executive orders by all HHS staff. The Office of Refugee Resettlement ("ORR") sits within HHS as part of the Administration for Children and Families. He is sued in his official capacity.

## JURISDICTION AND VENUE

30.    This Court has subject-matter jurisdiction over Plaintiffs' claims under the U.S. Constitution and federal statutes pursuant to 28 U.S.C. § 1331. The Court has additional remedial authority under 28 U.S.C. §§ 2201–2202.

31.    Venue is proper under 28 U.S.C. § 1391(e). Defendants are officers or employees of the United States acting in their official capacities. Plaintiff Rachel resides in this district and Plaintiff LCSNW is an Oregon corporation headquartered in Tacoma, Washington, and with offices in Seattle. No real property is involved in this action.

## FACTUAL ALLEGATIONS

**Congress's Comprehensive System for Meeting the United States' Commitments to People Fleeing Persecution**

*The Refugee Act*

32.    Under Article I of the U.S. Constitution, the power to make immigration laws "is entrusted exclusively to Congress." *Galvan v. Press*, 347 U.S. 522, 531 (1954); *see also* U.S. Const. art. I, § 8, cl. 4.

FIRST AM. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF – 9
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

33. Pursuant to this authority, Congress has enacted a comprehensive statutory scheme to regulate immigration—the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 et seq.—which empowers various federal agencies to enforce and administer immigration law.

34. Congress amended the INA in 1980 by enacting the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, which embodies the U.S. commitment to humanitarian assistance for those fleeing persecution.

35. In enacting the Refugee Act, Congress sought to "provide a permanent and systemic procedure for the admission … of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted." *Id.* § 101(b). It declares that "it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands," including through resettlement of such persons to this country. *Id.* § 101(a).

36. The Refugee Act sets out detailed policies and procedures that govern the admission and resettlement of refugees in the United States, which together create the USRAP. *See* 8 U.S.C. § 1157 et seq.

37. Under U.S. law, and consistent with U.S. treaty obligations, a "refugee" is a person fleeing his or her country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. *Id.* § 1101(a)(42).

### *The U.S. Refugee Admissions Program*

38. The USRAP embodies and effectuates the United States' commitment to offering a safe haven for people around the world fleeing persecution.

39. Individuals outside of the United States seeking admission as refugees are processed through the USRAP, which is managed by the State Department in cooperation with DHS and HHS.

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

40. The State Department, working with resettlement agencies and other cooperating agencies around the world, is responsible for facilitating the overall refugee application process, while DHS has responsibility for determining an applicant's eligibility for refugee status under U.S. law.

41. Under the Refugee Act, the Secretary of Homeland Security is authorized to admit to the United States "any refugee who is not firmly resettled in any foreign country, is determined to be of special humanitarian concern to the United States, and is admissible … as an immigrant." 8 U.S.C. § 1157(c)(1).

42. The Refugee Act provides that the total number of refugees who can be admitted to the United States in a given fiscal year is determined in advance by the President, based on what the President finds is justified by humanitarian concerns or is otherwise in the national interest.

43. The Refugee Act provides that, before the beginning of each fiscal year, the President must report to Congress regarding both the foreseeable number of refugees and the anticipated allocation of refugee admissions during the upcoming fiscal year.

44. Historically, before the beginning of each fiscal year, the President issues a one-to-two page determination on refugee admissions that is published in the Federal Register.

45. The State Department prepares and submits a lengthy report to Congress jointly with DHS and HHS detailing, among other information, a description of the nature of the refugee situation, the number and allocation of refugees to be admitted, an analysis of conditions within the countries from which they came, and a description of the federal agencies' plans for their resettlement during the upcoming fiscal year.

46. In late 2024, President Joe Biden set the refugee admissions goal for Fiscal Year 2025 at 125,000 refugees, *see* Presidential Determination No. 2024-13, 89 Fed. Reg. 83,767 (Sept. 30, 2024), as he had done for the prior three fiscal years. Historically, the President has set the refugee admissions goal as high as 240,000 (in 1980, the year Congress passed the Refugee Act) and as low as 15,000 (at the end of the first Trump Administration). In late 2025, this was

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 11
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

surpassed by a new historic low when President Trump set the admissions goal for Fiscal Year 2026 at 7,500. *See* Presidential Determination No. 2025-13, 90 Fed. Reg. 49,005 (Sept. 30, 2025).

47.    According to data from the State Department, in the first four months of Fiscal Year 2025, 37,596 refugees had already been admitted to the United States when the Refugee Ban EO was issued on January 20, 2025.[7]

***Access to the USRAP Through Referrals or Congressional Programs***

48.    The U.N. High Commissioner for Refugees ("UNHCR") estimates that there are more than 120 million people around the world who have been forced to flee their homes, of whom more than 43 million are refugees.

49.    Only a tiny fraction of refugees worldwide will ever be considered for refugee resettlement in the United States.

50.    Refugees trying to reach safety in the United States must be processed through the USRAP, which is restricted to refugees considered to be "of special humanitarian concern to the United States." This has historically been determined by the USRAP "priority" system that the State Department sets out annually in its joint reports to Congress.

51.    Under this system, a refugee must either be referred to the program by an authorized entity or group (such as UNHCR) or belong to certain designated groups with common characteristics, defined either by statute or by the State Department in its joint reports to Congress. Through this priority system, the State Department has consistently provided USRAP access for individuals with immediate family members in the United States who were admitted as asylees, refugees, or Special Immigrant Visa ("SIV") holders for purposes of family reunification, in addition to other groups.

---

[7] *See Admissions & Arrivals*, Refugee Processing Ctr., https://www.wrapsnet.org/admissions-and-arrivals (Feb. 28, 2026) (click "Refugee Admissions Report as of March 31, 2026").

FIRST AM. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF – 12
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

52.     Through the Refugee Act and subsequent amendments, Congress has designated certain categories of individuals as refugees of special humanitarian concern and/or prioritized their admission by providing special protections to ease the requirements for accessing the USRAP. Unlike most other refugee applicants, who must wait to be referred to the USRAP by UNHCR or a State Department-designated referral entity, applicants to each of these statutory programs (and their family members) may apply directly to USRAP without waiting for a referral from UNHCR or another designated entity.

***Follow-to-Join Program for Spouses and Minor Children of Refugees in the United States***

53.     The Refugee Act created a pathway to access USRAP through the follow-to-join ("FTJ") program, through which certain family members of refugees already resettled in the United States can seek family reunification.

54.     The FTJ program allows a refugee already admitted to the United States to petition for his or her spouse and unmarried minor children, who remain abroad, to come to the United States. *See* 8 U.S.C. § 1157(c)(2)(A).

55.     Congress created an entitlement to refugee status for spouses and unmarried minor children of refugees in the United States, thereby designating FTJ beneficiaries as refugees without the need for them to prove that they meet the refugee definition.

56.     Under FTJ procedures, the refugee in the United States files a petition with U.S. Citizenship and Immigration Services ("USCIS") evidencing their refugee status and relationship with their spouse or minor child. If the criteria are met, the USCIS adjudicating officer is required to approve the petition. *See* 8 C.F.R. § 207.7.

57.     Beneficiaries of FTJ petitions are admitted as refugees and, upon their admission to the United States, their admission is counted against the number of refugees authorized to enter the United States pursuant to that fiscal year's presidential determination.

58.     Under the Refugee Act, FTJ beneficiaries are also entitled to the same services that other refugees receive upon resettlement, described below.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 13
(No. 2:25-cv-255-JNW)

59.    Under the Refugee Act, so long as an FTJ beneficiary is not inadmissible under the INA, the government has no discretion to deny their entry as refugees.[8]

*Iraqi Direct Access Program for U.S.-Affiliated Iraqis*

60.    In 2008, Congress passed the RCIA, which permits certain U.S.-affiliated Iraqi nationals and their close family members to access the USRAP through the Iraqi Direct Access Program ("Iraqi DAP refugees"). Through the RCIA, Congress designated such individuals as refugees of "special humanitarian concern" for whom USRAP access is required.

61.    Unlike most refugees who have left their country of nationality, Iraqi DAP refugees are statutorily entitled to in-country refugee processing. The RCIA requires the State Department and DHS to make in-country refugee processing available to Iraqi DAP refugees, either by establishing or using existing processing mechanisms in Iraq or, where appropriate in countries in the region, enabling Iraqi DAP refugees to apply and interview for admission to the United States as refugees.

62.    Since the enactment of the RCIA and until Fiscal Year 2026, the State Department has provided for the admission of Iraqi DAP refugees designated in the RCIA in its joint reports to Congress each year.

*Lautenberg Program for Persecuted Religious Minorities*

63.    Finally, through the Lautenberg Amendment, Congress has prioritized for resettlement categories of persecuted religious minorities and other vulnerable groups from certain specified countries. For those individuals, Congress has lowered the evidentiary burden of eligibility and mandated certain procedural protections. *See* Pub. L. 101-167, § 599D, 103 Stat. 1195, 1261–63. In 2004, Congress specifically added Iranian religious minorities to the Lautenberg Program through the Specter Amendment. Pub. L. No. 108-199, § 213, 118 Stat. 3, 253 (the

---

[8] The Ninth Circuit held that, in addition to being subject to relevant inadmissibility grounds, FTJ beneficiaries are also subject to entry restrictions under 8 U.S.C. § 1182(f). *See Pacito*, 169 F.4th at 923.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 14
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

"Iranian Lautenberg Program"). Congress has reauthorized the Lautenberg Amendment every year, including as recently as February 3, 2026.

64.    Following the enactment of the Lautenberg Amendment in 1996 and the Specter Amendment in 2004, until Fiscal Year 2026, the State Department had consistently provided for the allocation of refugee admissions to Lautenberg refugees in its joint reports to Congress.

65.    Refugee applications through the Lautenberg Program are initiated by a U.S.-based person with lawful status in the United States, usually a close family member, who submits an application on behalf of the refugee applicant through a local resettlement agency.

*U.S. Refugee Processing Overseas*

66.    Processing of refugee cases abroad through the USRAP is conducted by the State Department and DHS. The State Department has overall overseas management responsibility of the USRAP. Meanwhile, USCIS, a component of DHS, has responsibility for adjudicating applications for refugee status and reviewing case decisions.

67.    Prior to implementing the Refugee Ban EO, the State Department fulfilled its responsibilities by funding and managing nine regional Resettlement Support Centers ("RSCs") located in four continents around the world to assist with the resettlement of refugees from countries located in Africa, Latin America, South and East Asia, and the Middle East and North Africa. The RSCs were operated by third parties and assisted the government with certain aspects of refugee application processing. RSC support includes assisting applicants in preparing their refugee applications, conducting cultural orientations for approved applicants, and collecting information to assist in appropriate refugee placement in the United States. RSCs also directly assisted in application processing by, for example, scheduling medical exams and uploading the results to a government system.

68.    A refugee pursuing resettlement through the USRAP must complete a multistep process.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 15
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

69. At the threshold, they might be interviewed by a designated referral entity so that their case can be considered for referral to the program. Once a case is referred to the USRAP, an RSC collects biographic and other information from the applicant to prepare the cases for security screening, interview, and adjudication.

70. DHS, through its subagency USCIS, reviews the collected information and the results of security screening processes and conducts an in-person interview before deciding whether to conditionally approve the applicant for resettlement.

71. USCIS may prioritize processing for pending applications according to such considerations as reuniting families, close association with the United States, compelling humanitarian concerns, and public interest factors. *See* 8 C.F.R. § 207.5.

72. After DHS conditionally approves a refugee applicant for resettlement to the United States, the RSC guides the applicant through post-adjudication steps, including a health screening. The RSC also obtains a "sponsorship assurance" from one of seven remaining U.S.-based national resettlement agencies, of which Plaintiffs CWS and HIAS are two.

73. Once all the required steps are completed, the RSC refers the applicant's case to the International Organization for Migration ("IOM") to schedule the applicant's travel using State Department funds. Typically, IOM engages in block booking with commercial airlines to secure reasonable rates. Applicants are expected to pay back their flight cost through a low-interest loan program after their arrival in the United States and are generally required to sign a promissory note prior to travel.

74. Finally, the RSC provides the refugee with cultural orientation training and materials before the refugee travels to the United States.

### *Reduction of U.S. Refugee Processing to White Afrikaners and Non-Black South African Minorities*

75. Following the Refugee Ban EO, Defendants suspended—effective immediately—the cooperative agreements with resettlement partners that assist in processing refugee applications

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 16
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

abroad and subsequently terminated all but one of those agreements, shuttering RSCs worldwide and ending the ability for refugee processing to continue across the world.

76.    For example, RSC Turkey and the Middle East, which largely served refugees from Iran, Iraq, Afghanistan, Somalia, and Sudan, was forced to close completely following the State Department's termination of its cooperative agreement. As a result, refugees from these regions, including Iraqi DAP refugees and FTJ beneficiaries residing in these countries, have no means of having their refugee cases processed.

77.    Similarly, RSC East Asia, which was headquartered in Thailand and largely served ethnic minorities who fled persecution in Burma, has completely closed. As a result, refugee populations in these areas, including FTJ beneficiaries, no longer have a means to seek resettlement or have their applications processed.

78.    At the end of December 2025, the State Department terminated HIAS's cooperative agreement to operate RSC Austria. RSC Austria was largely dedicated to the processing of refugee applications for religious minorities in Iran through the Lautenberg Program, in addition to some refugees from Eritrea, Sudan, and South Sudan who are vulnerable in Israel and Afghan refugees in Austria. As a result of the State Department's funding termination, HIAS was forced to close RSC Austria, which HIAS had operated for twenty-five years. The closure of RSC Austria has left over 14,000 Iranian refugees who were in the USRAP pipeline stranded with no means for their cases to be processed.

79.    Many of these applicants and their U.S. based family members had signed contracts with HIAS, through which the U.S.-based family member pledges financial support for the refugee applicant. The U.S. based family members had also paid a deposit to HIAS to cover the cost of the refugee applicant's transit visa to Austria for further processing following their screening and vetting by the U.S. government. Since the closure of RSC Austria, HIAS is faced with the task of trying to locate U.S. ties and refund thousands of dollars in deposits paid by the family members of refugee applicants in the Lautenberg Program.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 17
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

80.    Other RSCs serving populations in the Middle East and North Africa, South Asia, and Latin America remain shuttered, preventing any processing of refugee applicants from these regions.

81.    Today, the only RSC that remains operational and continues to process refugee cases is RSC Africa, which the State Department continues to fund to allow for the processing of applications for white Afrikaners and a few non-Black minorities in South Africa, for whom the processing suspension was lifted within a matter of weeks. RSCs are not permitted to resume case processing for any other cases.

82.    Against the backdrop of the ongoing processing suspension for all other refugees, in September 2025, the State Department entered into an agreement with a new organization, Amerikaners, to serve as a designated USRAP referral partner for white Afrikaners.

83.    Amerikaners was founded in the wake of the Afrikaner EO to provide information on resettlement to white Afrikaners. Unlike other designated referral entities, which have extensive experience in the field of refugee resettlement, Amerikaners was formed in 2025 following the announcement of the Afrikaner EO.

84.    In a memorandum sent by Amerikaners to President Trump, purporting to formally accept his offer of refugee resettlement for white Afrikaners, Amerikaners described its values as being "Christian, conservative, and English-speaking."

85.    Prior to Defendants' creation of a program for white Afrikaners from South Africa, the application, interview, security screening, and adjudication process could take several months or years. Post-adjudication, conditionally approved refugees could spend months obtaining medical exams and other security clearances before being booked for travel to the United States.

86.    By contrast, the first Afrikaners approved for resettlement through this new program arrived in the United States in the first half of May 2025, just three months after the announcement of the program.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 18
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

*Refugee Travel and Admissions*

87.    Most noncitizens seeking to enter the United States enter with either an immigrant visa (whereupon entry the noncitizen becomes a lawful permanent resident ("LPR")) or a nonimmigrant visa, which allows for time-limited entry for a specified purpose.[9]

88.    Refugees do not apply for or receive visas to seek entry to the United States. Instead, once USCIS conditionally approves a refugee for resettlement to the United States and the refugee completes post-approval processing through an RSC, IOM prepares a travel letter and sealed travel packet for the refugee. This travel letter and packet allow the refugee to board a plane and travel to the United States to seek admission.

89.    For FTJ refugees, this process is generally handled by the local U.S. embassy or consulate, which issues a travel document known as a boarding foil that is affixed to the refugee's passport, as well as a sealed travel packet.

90.    Upon arrival in the United States, refugees who are deemed admissible and entitled to refugee status are admitted at a port of entry and become eligible for LPR status after residing in the United States for one year.

91.    For those entering on a nonimmigrant visa, U.S. Customs and Border Protection ("CBP") generates an I-94 Arrival/Departure Record with their visa category as the admission class. Although refugees are on a pathway to LPR status, CBP issues an I-94 Arrival/Departure Record under the class "RE" for refugee. In contrast, CBP generally does not issue an I-94 for individuals entering on immigrant visas, who instantly become LPRs.

*The Role of Resettlement Agencies in Post-Arrival Refugee Services*

92.    When a resettlement agency extends a sponsorship assurance to a conditionally approved refugee abroad, the resettlement agency assumes responsibility for placing the refugee

---

[9] Noncitizens who have already been admitted on immigrant visas are then treated as lawful LPRs and enter as LPRs for future entries. Refugees are eligible to apply to adjust their status to LPR one year after their admission to the United States as a refugee. *See* 8 U.S.C. § 1159(a)(1).

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 19
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

with one of its affiliates, which provides the refugee with initial services during their first ninety days in the United States. The local affiliate will provide basic necessities, including housing and food, and core services during the refugee's initial period of resettlement. Plaintiff LCSNW is one of these affiliates.

93.    Prior to the agency actions challenged here, resettlement agencies, including HIAS and CWS, received funding under cooperative agreements with the State Department to provide these services to the refugees assured to them. The agreements set out funding amounts based on the number of refugees the resettlement agency is anticipated to assure during the one-year agreement term. This funding is now provided to resettlement agencies through agreements with ORR, as discussed in more detail below.

94.    Resettlement agencies, directly and through affiliates, develop close relationships with the refugees and refugee families they resettle, as they provide critical support during this vulnerable and challenging time.

95.    For example, local resettlement offices provide many services that a refugee family is likely to require immediately upon arrival, including finding and furnishing housing, stocking the pantry, and making the family a welcome meal for their first night. When the refugees arrive, affiliate staff often greet them at the airport along with needed interpreters and caseworkers.

96.    After the refugees arrive, staff help them with transportation, socialization, and other steps necessary to transition to life in the United States, like taking an English placement test and getting social security cards.

97.    Resettlement agencies and their affiliates have invested decades in building up this resettlement infrastructure, including staff with relevant language skills, and the private partnerships—such as relationships with local employers, service providers, and landlords— required to ensure that the refugees they help resettle are afforded the best possible chance building new lives in the United States.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 20
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

*Federal Funding for Post-Arrival Refugee Benefits*

98.     Until January 2026, after refugees arrived in the United States, the State Department provided funding to support refugee integration and self-sufficiency through the Reception and Placement Program, which covered up to the first ninety days a refugee is in the United States.[10]

99.     The Reception and Placement Program was administered through cooperative agreements between the State Department and resettlement agencies. On September 30, 2025, President Trump issued a determination transferring responsibility for administering the program of initial resettlement grants and contracts from the State Department to ORR, a subagency of HHS.

100.    On January 1, 2026, the Reception and Placement Program was replaced with the Program of Initial Resettlement ("PIR"), which is administered through cooperative agreements between ORR and seven resettlement agencies, including Plaintiffs HIAS and CWS.

101.    Resettlement agencies use this funding to provide housing, essential furnishings, food, clothing, orientation, and assistance with access to other social, medical, educational, and employment services. As with cooperative agreements under the Reception and Placement Program, under these cooperative agreements, resettlement agencies are reimbursed per refugee they sponsor, some of which must be used in direct assistance to the refugee and some of which may offset the costs of the affiliate's services and overhead supporting the refugee. This support is intended as a supplement to private resources the resettlement agencies and their affiliates

---

[10] The Refugee Act permits the President to reassign the statutory authority of the Director of the ORR to administer the Reception and Placement Program to another office. *See* 8 U.S.C. § 1522(b)(1)(B). President Jimmy Carter determined that the State Department should exercise that authority; ever since, the State Department's Bureau of Populations, Refugees, and Migration has administered the Reception and Placement Program. Accordingly, this complaint refers to the State Department's responsibility to make grants or contracts with resettlement agencies "consistent with the objectives of [§ 1522]." 8 U.S.C. § 1522(b)(1)(A).

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 21
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

mobilize for the benefit of their refugee clients, relying on the relationships they have built up over decades.

102. In addition to refugees, Afghan and Iraqi SIV holders are entitled to initial resettlement benefits provided by one of the resettlement agencies. *See* Afghan Allies Protection Act, Pub. L. No. 111-8, § 602(b)(8), 123 Stat. 524, 809 (2009); Refugee Crisis in Iraq Act, Pub. L. No. 110-181, § 1244(g), 122 Stat. 3, 398 (2008).

103. Following the provision of initial resettlement services, ORR provides longer-term assistance to refugees through both the resettlement agencies and state governments. *See* 8 U.S.C. §§ 1521(a), 1522(b).

104. ORR is responsible for funding and administering federal cash and medical assistance programs for refugees beyond the initial resettlement period. *See id.* §§ 1521(b), 1522(e)(1).

105. Some of the money administered by ORR flows through the resettlement agencies for the provision of critical services to refugees and to Afghan and Iraqi SIV recipients assured to their agencies.

106. Some of the money administered by ORR flows through the states pursuant to a detailed statutory scheme under which each participating state must submit a plan describing how the state will coordinate cash and medical assistance and otherwise meet the requirements imposed by the Refugee Act. *See id.* § 1522(a)(6); 45 C.F.R. §§ 400.4(a), 400.5(b).

**History of the Trump Administration's Travel and Refugee Bans**

107. After demonizing refugees on the 2016 campaign trail—and pledging that, if elected, "they're going back"—President Trump attempted to deliver on that promise during his first term through an executive order issued on January 27, 2017, which suspended all refugee admissions for a period of 120 days and indefinitely blocked Syrian refugees from entering the United States. *See* Exec. Order No. 13769, Protecting the Nation from Foreign Terrorist Entry into the United States, 82 Fed. Reg. 8,977 (Jan. 27, 2017). The order included a discretionary case-by-

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 22
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

case exception only if the Secretaries of State and Homeland Security determined that "admission of such individuals as refugees is in the national interest … and it would not pose a threat to the security or welfare of the United States." The order also slashed, by more than half, the annual refugee admission allotment that was set prior to Fiscal Year 2017. A separate section of the order imposed a travel ban suspending immigrant and nonimmigrant entry for nationals of seven majority-Muslim countries for a period of ninety days.

108.    On February 3, 2017—less than a week after the executive order was issued—a court in this district issued a nationwide temporary restraining order enjoining it. *See Washington v. Trump*, No. C17-0141JLR, 2017 WL 462040, at *2 (W.D. Wash. Feb. 3) (construing temporary restraining order as preliminary injunction and denying government's motion for stay pending appeal), *stay pending appeal denied*, 847 F. 3d 1151 (9th Cir. 2017) (per curiam).

109.    Rather than pursue an appeal of that decision, President Trump signed a new executive order, which again suspended the USRAP for 120 days and included a discretionary case-by-case exception only if the Secretaries of State and Homeland Security determined that "the entry of such individuals as refugees is in the national interest and does not pose a threat to the security or welfare of the United States." Exec. Order No. 13780, Protecting the Nation from Foreign Terrorist Entry into the United States, 82 Fed. Reg. 13,209 (Mar. 6, 2017). Like the first executive order, this second order also attempted to lower the ceiling on admissions of refugees for fiscal year 2017 by more than half. It also imposed another ninety-day entry ban for immigrants and nonimmigrants from six of the seven countries designated in the first executive order.

110.    Before this executive order could take effect, the U.S. District Court for the District of Hawai'i issued a nationwide temporary restraining order, concluding that the second order likely violated the Establishment Clause. *See Hawai'i v. Trump*, 241 F.Supp.3d 1119, 1140 (D. Haw. 2017). About a week later, the district court converted the temporary restraining order into a preliminary injunction. *See Hawai'i v. Trump*, 245 F.Supp.3d 1227, 1239 (D. Haw.), *aff'd in part and vacated in part*, 859 F.3d 741 (9th Cir. 2017) (per curiam).

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 23
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

111. On appeal, the Ninth Circuit affirmed the district court's preliminary injunction, holding that the second executive order violated the INA and that the President exceeded his statutory authority in suspending refugee admissions. *See Hawai'i v. Trump*, 859 F.3d 741, 755–56 (9th Cir. 2017) (per curiam).[11]

112. President Trump then replaced the second executive order with a presidential proclamation that indefinitely suspended entry as immigrants and nonimmigrants of nationals from six Muslim-majority countries, including five of the countries targeted by the second executive order, plus Venezuela and North Korea. Procl. 9645, Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the United States by Terrorists or Other Public Safety Threats, 82 Fed. Reg. 45,161 (Sept. 24, 2017).

113. The proclamation provided for discretionary "case-by-case waivers" from the ban. Such a waiver would be granted if the individual demonstrated that three criteria were met: denial of entry would cause the individual "undue hardship"; their "entry would not pose a threat to the national security or public safety of the United States"; and their entry "would be in the national interest." In upholding Proclamation 9645 as lawful, the Supreme Court cited the Proclamation's waiver provision as an important reason for its legitimacy. *See Trump v. Hawai'i*, 585 U.S. 667, 709 (2018).

114. In implementing the proclamation's waiver provision, the State Department issued guidance on its website providing that waiver eligibility would be assessed at the time of an

---

[11] After consolidating the *Hawai'i* case with a challenge to the executive order in the Fourth Circuit, on June 26, 2017, the U.S. Supreme Court granted certiorari and partially stayed the injunction against the refugee ban pending appeal to the extent it applied to "foreign nationals abroad who have no connection to the United States at all." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 581 (2017) (per curiam). With Supreme Court review pending, President Trump replaced the executive order with a presidential proclamation that limited entry for visa applicants from certain countries; meanwhile, the refugee ban was later replaced by an agency memorandum further suspending refugee admissions as described below. Accordingly, the Supreme Court's subsequent decision in *Trump v. Hawai'i*, 583 U.S. 941 (2017), did not address the Ninth Circuit's ruling on the executive order's refugee ban, which remains controlling law.

FIRST AM. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF – 24
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

applicant's interview and citing the eligibility criteria listed in the proclamation, without further explaining the standards of eligibility. A district court subsequently ruled that the government's implementation of the waiver provision violated the APA because the government had "promulgated unduly narrow and restrictive limitations" for waiver criteria without any rational explanation and applications "were denied without the opportunity to apply under a properly-administered waiver process." Order Re Summary Judgment, *Emami v. Mayorkas*, No. 18-cv-1587-JD, 2022 WL 3031213, at *1 (N.D. Cal. Aug. 1, 2022).

115.    Unlike the first two executive orders, Proclamation 9645 did not include an entry suspension for refugees. The proclamation provided that it should not be "construed to limit the ability of an individual to seek [] refugee status," and it was never applied against refugees. Instead, at the conclusion of the 120-day USRAP suspension imposed by the second executive order, President Trump issued a new executive order, which purported to allow the USRAP to resume subject to determinations by the Secretary of Homeland Security in consultation with the Secretary of State of "whether any actions should be taken to address the risks to the security and welfare of the United States presented by permitting any category of refugees to enter this country, and, if so, what those actions should be." Exec. Order No. 13815, Resuming the United States Refugee Admissions Program with Enhanced Vetting Capabilities, 82 Fed. Reg. 50,055 (Oct. 24, 2017).

116.    That same day, the Secretaries of State and Homeland Security issued a memorandum to the President that continued the prior executive order suspensions of the USRAP in two ways: It (i) continued to suspend the USRAP for refugees from eleven countries and (ii) indefinitely suspended the FTJ process for refugees.

117.    A court in this district, examining a challenge brought by several refugee resettlement agencies as well as individuals directly affected by the memorandum's ban, quickly enjoined the first Trump Administration from enforcing it. *See Doe v. Trump*, 288 F.Supp.3d 1045, 1085–87 (W.D. Wash. 2017).

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 25
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

118.   Eventually, in February 2020, the parties in *Doe v. Trump* reached a settlement whereby the government agreed to prioritize processing of certain cases of individuals who were close to traveling to the United States before the ban went into effect. But nearly six years later, some of those cases still have not completed processing, and now their processing is once again suspended by President Trump's new Refugee Ban EO.

### President Trump's Current Executive Order Banning Refugees

119.   It took years to rebuild the resettlement infrastructure and significantly expand the number of refugees who could be resettled to the United States after the Trump Administration's repeated attacks on the USRAP. By Fiscal Year 2024, however, the resettlement infrastructure was able to support the resettlement of more than 100,000 refugees to the United States.

120.   But the effects of the attacks on the USRAP and resettlement infrastructure continued to linger when the Refugee Ban EO was issued eight years later. For example, some refugees who were on the verge of travel in 2017 and whose cases were suspended by the prior refugee bans had to wait for their cases to finally proceed to travel. They are waiting still.

121.   As President Trump campaigned in 2024, he promised to implement "brand new crackdowns" on refugees.[12] His campaign rhetoric also made clear his future intention to radically transform the U.S. immigration system by singling out disfavored non-white nationalities for bigoted and racist attacks, while expressly confirming his preference for immigrants from "nice countries" like majority-white European countries.[13] He also announced broad proposals for mass detention and deportation of disfavored non-citizens, whom he claimed were "poisoning the blood of our country."

---

[12] Kristina Cooke & Ted Hesson, *In a Small Wisconsin Church, Trump's Threat of Refugee Crackdown Looms*, Reuters (Oct. 29, 2024), https://www.reuters.com/world/us/small-wisconsin-church-trumps-threat-refugee-crackdown-looms-2024-10-29.

[13] Martin Pengelly, *Trump Bemoans Lack of Immigrants from Majority-White Countries to the U.S.*, Guardian (Apr. 8, 2024), https://www.theguardian.com/us-news/2024/apr/08/trump-immigration-north-europe

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTION RELIEF – 26
(No. 2:25-cv-255-JNW)

122.    Just hours into his second term, on January 20, 2025, President Trump signed a bevy of executive orders, including one titled "Realigning the United States Refugee Admissions Program"—the Refugee Ban EO.

123.    Under the purported authority of sections 212(f) and 215(a) of the INA, the Refugee Ban EO imposes an indefinite suspension of "entry into the United States of refugees under the USRAP" as well as a suspension on "decisions on applications for refugee status" until President Trump finds that decisions on refugee applications and admissions can resume.

124.    The process for making a finding to resume action on refugee applications and admissions is outlined in section 4 of the EO, which requires the Secretaries of Homeland Security and State to submit a report to the President within ninety days detailing "whether resumption of entry of refugees into the United States under the USRAP would be in the interests of the United States, in light of the policies outlined in section 2."

125.    Section 4 requires further reports every ninety days after the first report "until [President Trump] determine[s] that resumption of the USRAP is in the interests of the United States."

126.    The Refugee Ban EO does not provide any deadline by which the President will determine whether the USRAP can resume, if ever.

127.    Section 2 details President Trump's stated policies for refugee admissions, which the EO explains will be the basis of his finding of whether "resumption of USRAP is in the interest of the United States." It states that "[i]t is the policy of the United States to ensure that public safety and national security are paramount considerations in the administration of the USRAP, and to admit only those refugees who can fully and appropriately assimilate into the United States and to ensure that the United States preserves taxpayer resources for its citizens."

128.    The EO further states that "[i]t is the policy of the United States that, to the extent permitted by law and as practicable, State and local jurisdictions be granted a role in the process

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 27
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

of determining the placement or settlement in their jurisdictions of [individuals] eligible to be admitted to the United States as refugees."

129. In short, the Refugee Ban EO suspends all refugee admissions for an indefinite period until such time as President Trump determines that resuming the USRAP is in the "interests of the United States"—as President Trump, through the EO, has defined those interests.

130. The Refugee Ban EO suspends *all* refugee admissions regardless of the basis for a refugee's access to the USRAP. This includes statutorily created programs for USRAP access such as the FTJ and the Iraqi P2 Direct Access programs.

131. By its terms, the Refugee Ban EO's suspension of refugee admissions was to take effect at 12:01 a.m. ET on January 27, 2025. The EO's suspension of application decisions for refugee status, however, was effective immediately.

132. Aside from the suspension of decisions on refugee applications, the EO does not specify any actions to be taken related to other stages of refugee processing.

133. The EO provides under section 3(c) that exceptions to the suspensions may be made on a "case-by-case basis" pursuant to a joint determination by the Secretaries of State and Homeland Security after a finding that the "entry of such refugees is in the national interest and does not pose a threat to the security or welfare of the United States."

134. Section 3(d) further requires the Secretary of Homeland Security, in consultation with the Attorney General, to "examine existing law to determine the extent to which, consistent with applicable law, State and local jurisdictions may have greater involvement in the process of determining the placement or resettlement of refugees in their jurisdictions" and requires them to "devise a proposal to lawfully promote such involvement."

135. The EO does not make any findings that public safety and national security are not currently "paramount considerations in the administration of USRAP."

136. The EO does not make any findings that refugees who have been admitted through the USRAP are not "fully and appropriately assimilat[ing]."

FIRST AM. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF – 28
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

137.    The EO does not make any findings that State and local jurisdictions do not currently have a role in the placement or settlement of refugees or that the consultation requirements in 8 U.S.C. § 1522(a)(2) are not currently being carried out. Nor does it find that refugee resettlement has been conducted outside of the process outlined by statute, which disperses refugees across the country in accordance with local capacity to receive them and, as explained above, provides for federal funding to support arriving refugees.

138.    The EO seeks to justify its sweeping suspension of the USRAP by reference to "record levels of migration" and influxes of migrants causing New York and Massachusetts to declare states of emergency "because of increased migration."

139.    But the EO does not connect any of these supposed "migration influxes" to the admission of refugees under the USRAP. Indeed, New York's relevant state-of-emergency declaration related to Texas Governor Greg Abbott's bussing of 17,000 asylum seekers to New York City without warning.[14]

140.    Equally irrelevant is the Massachusetts declaration, which emphasized the need for the federal government to quickly grant work authorization to arriving asylum seekers.[15] In contrast, individuals admitted as refugees automatically receive work authorization upon admission.

141.    Upon information and belief, Defendants have decided that white Afrikaners and some other non-Black minorities in South Africa are the only refugees that satisfy their policy interests. They have determined to keep the Refugee Ban EO in place indefinitely while admitting

---

[14] *See Addressing the Asylum Seeker Crisis*, Governor Kathy Hochul, https://www.governor.ny.gov/programs/taking-action-address-asylum-seeker-crisis-new-york (last visited Apr. 7, 2026).

[15] *See Governor Healey Declares State of Emergency, Calls for Support for Newly Arriving Migrant Families*, Commonwealth of Mass. (Aug. 8, 2023), https://www.mass.gov/news/governor-healey-declares-state-of-emergency-calls-for-support-for-newly-arriving-migrant-families.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 29
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

their preferred population pursuant to a categorical exception, in circumvention of the scheme created by Congress.

142. On March 5, 2026, the Ninth Circuit issued a decision holding that the Refugee Ban EO does not exceed the President' authority under section 212(f) of the INA. The court reasoned that the President did not suspend USRAP in its entirety because the EO expressly provides for the admission of refugees on a case-by-case basis. *See Pacito*, 169 F. 4th at 921.

**The Agencies' Implementation of the Refugee Ban EO and Related Orders**

143. The agencies overseen by Defendants immediately began to implement the Refugee Ban EO.

144. The evening after President Trump signed the EO, on January 21, 2025, the State Department's Bureau of Population, Refugees, and Migration ("PRM") sent an email to refugee resettlement partners, including Plaintiffs CWS and HIAS, regarding the agency's implementation of the EO.

145. PRM's communication explained that all previously scheduled travel of refugees to the United States was canceled and that no new travel bookings will be made.

146. When questioned about whether the travel cancelations applied to cases where a refugee was scheduled to travel before the Refugee Ban EO's effective date for the refugee admissions suspension—which is to say, January 27 at 12:01 a.m. ET—PRM confirmed that it did.

147. In other words, the State Department opted to implement the suspension on refugee admissions almost one week earlier than required by the EO by canceling travel for refugees who were scheduled to travel to the United States *before* the effective date set out therein.

148. The agency's immediate implementation of the suspension of refugee admissions resulted in the canceled flights of Plaintiffs Pacito and Alyas, and their families, and prevented Plaintiff Josephine from booking her own flight to the United States.

FIRST AM. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF – 30
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

149.    PRM's communication also stated that all refugee case processing, including new referrals to the USRAP and processing of all active and previously submitted applications, is currently suspended.

150.    PRM's communication did not include any information about the process for requesting the case-by-case exception provided under the EO.

151.    To date, more than fourteen months later, neither the Organizational Plaintiffs nor individual refugee applicants have received any information regarding how an applicant may be considered for a case-by-case exception under the EO.

**Categorical Exception to the Refugee Ban EO for Afrikaners Being Admitted as Refugees**

152.    Less than three weeks after issuing the Refugee Ban EO, on February 7, 2025, President Trump issued the Afrikaner EO, which authorized the establishment of a program of refugee resettlement exclusively for Afrikaners from South Africa, a white ethnic group descended from European settlers.

153.    This new group was not designated as a category of special humanitarian concern to the United States in the presidential determination for Fiscal Year 2025, nor were Afrikaners described anywhere in the State Department's sixty-six-page joint report to Congress on refugee admissions for Fiscal Year 2025.

154.    While the cases of tens of thousands of refugees from Africa, Asia, Latin America, and the Middle East—including those with scheduled travel to the United States—remained suspended pursuant to the Refugee Ban EO, the new Afrikaner EO sought to fast-track the resettlement of a brand-new cohort of white Afrikaners as refugees.

155.    The State Department spared no time in creating a new initiative to facilitate USRAP referral and access for Afrikaners and other racial minorities in South Africa.

156.    In May 2025, within a mere three months of the issuance of the Afrikaner EO, Defendants had expedited processing and admitted the first group of approximately fifty-nine

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 31
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

white Afrikaners to the United States as refugees, compared with the years spent processing all other refugees hailing from majority non-white, non-European countries.

157.    Upon information and belief, in stark contrast to normal procedure, the administration approved a large expensive private charter flight costing approximately a half-million taxpayer dollars to transport the first group of Afrikaners to the United States. Unlike other refugees, the Afrikaners were not required to repay their travel costs.

158.    Upon information and belief, the State Department approved the charter flight, despite advice from legal counsel that the expense of the less-than-quarter-full plane could expose the State Department to liability for fraud, waste, and abuse.

159.    The same month, the U.S. embassy in South Africa posted guidance on its website explaining how to apply to the Refugee Admissions Program for South Africans. The guidance stated that eligible applicants must be of "Afrikaner ethnicity" or "a member of a racial minority in South Africa."

160.    Upon information and belief, on July 9, 2025, in response to a question from U.S. embassy staff, the State Department's highest-ranking official stated that the new program for Afrikaners was intended for white people only.

161.    Around the same time, the Secretaries of State and Homeland Security submitted reports to the President regarding the resumption of the USRAP, as required under the Refugee Ban EO. These reports concluded that the resettlement of refugees (who largely hail from majority non-white Latino and Muslim countries) has created a "sharp increase in diversity" and that the administration should accept only refugees "who can fully and appropriately assimilate and are aligned with the president's objectives."[16]

---

[16] Zolan Kanno-Youngs & Hamed Aleaziz, *Trump Refugee Policy Focuses on White Applicants*, N.Y. Times (Oct. 15, 2025), https://www.nytimes.com/2025/10/15/us/politics/trump-refugee-white-people.html.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 32
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

162. Upon information and belief, the report further revealed that the administration was considering the possibility of prioritizing for refugee admission Europeans facing alleged discrimination in Europe based on their far-right political views.

163. In the first half of calendar year 2025, approximately 250 refugees were processed and admitted to the United States, 37% of whom were Afrikaners and the remainder of whom were admitted as a result of an injunction issued by this Court on February 25, 2025.

164. On July 19, 2025, the Ninth Circuit issued an administrative stay of this Court's injunction, allowing the ban on refugee processing and admissions to resume. *Pacito v Trump*, No. 25-1313 (9th Cir. Mar. 5, 2026), Dkt. 111.1. Thereafter, the processing and admission of non-Afrikaner cases halted completely.

165. In the ensuing months, the State Department continued to process and admit Afrikaners from South Africa as refugees, purportedly by invoking a case-by-case exception to the Refugee Ban EO, all the while continuing to block admission for the hundreds of thousands of refugees from other parts of the world already in the USRAP pipeline.

166. During the last two months of Fiscal Year 2025, following the Ninth Circuit's administrative stay, the State Department admitted 249 Afrikaners as refugees pursuant to an exception to the Refugee Ban EO.

167. Since the beginning of Fiscal Year 2026, the number of Afrikaners admitted as refugees has continued to grow: as of February 2026, 3,158 refugees from South Africa have been admitted.

168. Upon information and belief, over 95% of the 3,158 refugee admissions from South Africa this fiscal year have been white Afrikaners or another white minority.

169. According to recently disclosed reports, the number of exceptions that the State Department plans to grant to Afrikaners will only increase, with plans to process up to 4,500 Afrikaners per month.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 33
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

170.    Yet Defendants have published no information or guidance regarding a process or eligibility standards for consideration for an exception to the Refugee Ban EO and have failed to explain the basis for granting over 3,000 exceptions to white Afrikaners and other primarily white minorities on a categorical basis. Defendants have lifted the processing suspension for nationals of South Africa only, allowing their application for USRAP admission while continuing to freeze processing for all other applicants in the USRAP pipeline, foreclosing them from even seeking an exception.

171.    Defendants have predetermined that all Afrikaners accepted into the USRAP will be granted an exception—without any individualized case-by-case assessment as to whether they meet the Refugee Ban EO's criteria for an exception—while rendering all other refugees automatically ineligible.

172.    Upon information and belief, once a group of Afrikaners has been processed as refugees and is ready for travel, the Secretary of State or his delegee and the Secretary of Homeland Security sign a boilerplate memo listing the names of travel-ready Afrikaners and authorizing their entry pursuant to section 3(c) of the Refugee Ban EO. The memo does not contain any individualized analysis explaining the basis for granting an exception for each case and is issued after all processing steps have been completed.

173.    Conversely, when refugees in the USRAP pipeline (whose processing remains frozen) attempt to request consideration for an exception, they are told that only the government can initiate the process, without any further explanation as to the criteria for an exception and why they do not qualify.

174.    When counsel for Plaintiff Miriam asked government counsel how his client could request an exception to the Refugee Ban EO, he was told that only the government could initiate the exception process and that the process was not for Miriam's nine-year old son.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 34
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

175. Defendants' decision not to make case-by-case exceptions available to all refugees in the USRAP pipeline departs from the practice under the prior Trump Administration of making exceptions available to all applicants subject to entry bans.

176. Defendants' policy upends the serious reliance interests of countless refugees and their family members in the United States. Defendants' policy inexplicably excludes the over-12,000 conditionally approved refugees with travel booked prior to the Refugee Ban EO and refugees seeking admission under statutorily created programs, such as the FTJ, Iraqi Direct Access, and Lautenberg programs. Defendants' policy also excludes countless refugees who Defendants themselves had already approved for expedited processing due to urgent medical or protection reasons. Defendants have provided no explanation as to why they are refusing to consider admitting any of these refugees under a case-by-case exception to the EO.

177. All these refugees, and thousands of others, are barred from entering the United States—indefinitely—with no chance of seeking an exception to the ban.

**Defendants' Doubling Down on the Refugee Ban EO Through Implementation of the Fiscal Year 2026 Presidential Determination**

178. On October 31, 2025, President Trump issued a new presidential determination setting forth the cap for refugee admissions for Fiscal Year 2026 but expressly leaving in place the suspension of refugee admission ordered by the Refugee Ban EO. The FY 2026 PD directed that up to 7,500 refugees may be admitted and that these admission numbers "primarily be allocated among Afrikaners from South Africa, and other victims of illegal or unjust discrimination in their respective homelands."

179. The FY 2026 PD contained no determination of the number of allocations for the statutorily created Iraqi Direct Access and Lautenberg programs and provided no allocations for FTJ refugees.

180. On November 28, 2025, the State Department published on its website its Report to Congress on Refugee Admissions for FY 2026 ("FY 2026 Report"), a mere one-and-a-half-page

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 35
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

report (compared to the up-to-eighty-page long reports published in prior years, including during President Trump's first term).

181.    The FY 2026 Report recites the language from the FY 2026 PD, explaining that, during Fiscal Year 2026, refugees admitted by Defendants will "primarily be Afrikaners from South Africa … as well as other victims of illegal or unjust discrimination in their homelands," with no analysis as to why these groups are of special humanitarian concern to the United States. The Report does not mention or discuss the USRAP "priority" system that for decades Defendants have used to determine which individuals are of special humanitarian concern to the United States. It does not acknowledge, let alone discuss, why other populations that have been designated of special humanitarian concern or otherwise been provided a pathway to resettlement by statute are not allocated admissions.

182.    Specifically, and in a stark departure from prior reports, the FY 2026 Report contains no discussion of the congressionally created programs for Iraqi DAP refugees, FTJ refugees, or Lautenberg refugees. Nor does it explain or seek to justify the exclusion of these congressional programs. The FY 2026 Report departs from prior reports, including those issued during the first Trump Administration, in other ways. During the first Trump Administration, Defendants' predecessors consistently allocated admissions for refugees in the USRAP pipeline who were at the final stage of processing and in "ready for departure" status at the end of the prior fiscal year. By contrast, Defendants have chosen to exclude even those in the pipeline who had travel booked that was canceled due to the Refugee Ban EO.

183.    Through a series of emails to resettlement agencies, the State Department has since confirmed Defendants' policy is to not admit any refugees in the USRAP pipeline in Fiscal Year 2026 and to admit only white Afrikaners and other non-Black minorities from South Africa.

184.    On December 31, 2025, PRM sent an email to all resettlement agencies, including Plaintiffs CWS and HIAS, titled "Clean-up of cases without a path forward under the FY 2026 PD during the PIR transition."

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 36
(No. 2:25-cv-255-JNW)

Perkins Coie LLP
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

185. PRM's email explained that, as part of the transition of domestic resettlement responsibilities from PRM (in the State Department) to ORR (in HHS), refugee cases that the State Department determined not to meet criteria for processing under the FY 2026 PD would have their sponsorship assurances with resettlement agencies revoked or inactivated. Conversely, cases for white Afrikaners and other non-Black South African minorities would continue to be processed and would be transferred to ORR, responsible for administering the PIR program.

186. Following this initial communication, PRM sent emails to each resettlement agency containing lists of all refugee cases whose assurances were revoked or inactivated, despite the previous allocation and assurance histories of the cases, based on the State Department's decision to suspend their processing for at least the duration of Fiscal Year 2026. The only cases that retained their assurances and were excluded from the lists were cases for white Afrikaners and other non-Black minorities in South Africa.

187. Without a valid assurance from a resettlement agency, refugee cases cannot move forward with case processing and remain on indefinite hold.

188. The list of cases provided to resettlement agencies included cases of individuals facing discrimination in their homeland—including the case of Plaintiff Alyas, who is Yazidi, an ethnoreligious minority group facing discrimination in Iraq. The list also contained all the Lautenberg refugee cases assigned to the respective resettlement agencies, even though refugee applicants to the program are necessarily facing discrimination in their home countries. These include cases of Iranian religious minorities facing persecution in Iran, such as Plaintiff Babak's in-laws.

189. On January 12, 2026, PRM sent CWS an email containing an initial list of over 2,830 cases for which assurances with affiliates in the United States had been revoked. PRM's communication advised that these cases no longer had a path forward under Defendants' implementation of the FY 2026 PD. Almost two-thirds of the cases were from travel-ban-designated countries. The list included 461 cases that had travel canceled because of the Refugee

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 37
(No. 2:25-cv-255-JNW)

Ban EO and 99 FTJ cases. Over two-thirds of the FTJ cases were Somali nationals, a group that has been the subject of sustained and targeted animus from the Trump Administration, including statements from the President that Somali immigrants are "garbage" and that "we don't want them in our country."[17] The remaining FTJ cases were for nationals of five other travel-ban-designated countries—Afghanistan, Burma, Burundi, Eritrea, and Sudan—and nationals of the following nine countries: Bhutan, Colombia, Cuba, the Democratic Republic of the Congo, Ethiopia, Ghana, Iraq, Kenya, and Uganda. The list also contained 219 Iraqi DAP cases.

190.    HIAS received a similar email from PRM the same day, containing a list of over 1,600 cases for which assurances had been revoked because they did not have a path forward under Defendants' implementation of the FY 2026 PD. Over half of the cases listed were from travel-ban-designated countries. The list included over 250 cases that had travel canceled after January 20, 2025 because of the Refugee Ban EO; 25 FTJ cases, two-thirds of which were for nationals of travel-ban-designated countries; and 9 Iraqi DAP cases.

191.    On February 12, 2026, PRM sent CWS and HIAS additional lists of all family reunification cases, including Lautenberg cases, whose assurances had been inactivated based on Defendants' determination that the cases did not have a path forward under the FY 2026 PD and as such would not be processed or admitted in Fiscal Year 2026.[18] The list sent to CWS contained 120 cases for applicants seeking family reunification with a family member in the United States, including 48 Lautenberg cases. The list sent to HIAS contained 100 Lautenberg cases, in addition to several other family reunification cases.

---

[17] Zolan Kanno-Youngs & Shawn McCreesh, *Trump Calls Somalis 'Garbage' He Doesn't Want in the Country*, N.Y. Times (Dec. 2, 2025), https://www.nytimes.com/2025/12/02/us/politics/trump-somalia.html.

[18] Family reunification cases are required to be filed through a local resettlement agency and are automatically assured to the resettlement agency that submitted the application. These assurances were inactivated rather than revoked given resettlement agencies' unique ownership over family reunification cases, as compared with FTJ petitions and other refugee applications, which may be assured to any resettlement agency.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 38
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

192.    Following the State Department's action, the only refugee cases that remain actively assured to resettlement agencies are cases for white Afrikaners and non-Black minorities in South Africa. The State Department's policy is that the overwhelming majority of refugees that will be admitted this fiscal year will be white, as illustrated by the fact that approximately 98% of the cases that remain assured to CWS are for white Afrikaners or other white minorities.

193.    Defendants made the preordained decision to place FTJ refugee cases on an indefinite hold for the duration of Fiscal Year 2026, notwithstanding that admissible FTJ refugees are statutorily entitled to admission without requiring any additional special humanitarian concern designation or refugee determination. Defendants' decision to exclude FTJ refugees as ineligible for admission almost exclusively impacts refugees who are non-white and of non-European origin.

194.    Defendants' decision to exclude FTJ refugees as per se ineligible for admission is a departure from the agencies' prior practice, under which Defendants have admitted FTJ refugees regardless of whether a specific designation is made in the presidential determination and do not count FTJ admissions against the numerical cap in the presidential determination prior to their admission.

195.    Defendants determined not to admit any Iraqi DAP refugees for Fiscal Year 2026, despite Congress's designation of them as refugees of special humanitarian concern.

196.    For all other refugee cases, Defendants failed to consider whether they were eligible for admission based on having faced illegal and unjust discrimination in their homeland, as provided for under the FY 2026 PD, prior to placing the cases on an indefinite hold.

197.    Defendants made the arbitrary and discriminatory decision to place Lautenberg cases on indefinite hold without considering their eligibility for an exception, even though such refugees (the vast majority of whom are Iranian) are by definition ethnic or religious minorities facing discrimination in their homeland and qualify for admission under the FY 2026 PD on that basis.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 39
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

198. Upon information and belief, Defendants failed to make any determination as to whether any of the cases excluded under the FY 2026 PD qualify for a case-by-case exception to the Refugee Ban EO.

199. As a result of Defendants' policies, refugees like Plaintiffs Sara, Alyas, Ahmed, and Senai face a double hurdle to admission. They are barred by Defendants' arbitrary and discriminatory implementation of the FY 2026 PD and deprived of any chance of an exception to the Refugee Ban EO. For nationals of travel-ban-designated countries, like Ahmed and Senai, Defendants' arbitrary application of the travel ban, discussed below, poses a third barrier to admission.

## Defendants' Unprecedented Attack on Newly Resettled Refugees

### *Defunding of Initial Resettlement Services*

200. Defendants' attacks on refugees have not been limited to those seeking entry to the United States. Just days after President Trump issued his executive order blocking refugee admissions, the State Department and HHS turned their attack on newly resettled refugees seeking to establish their lives within the United States.

201. On the evening on Friday, January 24, 2025, the State Department immediately and without notice suspended previously committed funding of resettlement partners for their refugee resettlement work, including funding for reception, placement, and other integrative services for newly arrived refugees and SIV holders.

202. Defendants advised resettlement partners, including Plaintiffs HIAS and CWS, of this unprecedented action by sending notices of suspension (the "Suspension Notices").

203. The Suspension Notices informed the partners that their existing cooperative agreements—referenced in a list at the top of each notice—are "immediately suspended as of January 24, 2025." The Suspension Notices ordered the partners to "stop all work" under their cooperative agreements and "not incur any new costs" after January 24, 2025. The Suspension Notices also directed that the partners "must cancel as many outstanding obligations as possible."

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 40
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

204.    Defendants' lone explanation for their extreme and unprecedented action is that the cooperating agreements "*may* no longer effectuate agency priorities" as expressed in President Trump's "Reevaluating and Realigning United States Foreign Aid" executive order (the "Foreign Aid EO"). (Emphasis added). According to the Suspension Notices, the State Department will be undertaking "a Department-wide review of foreign assistance programs" to determine "*whether* to continue, modify, or terminate" the cooperative agreements. Exec. Order No. 14169, 90 Fed. Reg. 8,619 (Jan. 20, 2025) (emphasis added).

205.    But the Foreign Aid EO—the stated basis for the funding suspension—has nothing to do with refugee resettlement. It makes no mention of refugees, the USRAP, or anything related to processing of individuals for admission into the United States and support for individuals after their arrival in the United States.

206.    Rather, the Foreign Aid EO requires a "90-day pause" of U.S. "foreign development assistance" pending a review by "all department and agency heads with responsibility for United States foreign development assistance programs" to ensure that U.S. foreign assistance is not "disbursed in a manner that is not fully aligned with the foreign policy" of President Trump.

207.    The State Department has provided no explanation as to why USRAP processing and support for refugees and Afghan and Iraqi allies in the United States constitute "foreign development assistance."

208.    The State Department and HHS also implemented a sub silentio suspension of funding for support for recently arrived refugees and SIV holders, as detailed below (the "Sub Silentio Suspension," and together with the Suspension Notices, the "Refugee Funding Suspension"). Until ordered by this Court, the Organizational Plaintiffs did not receive reimbursements for millions of dollars they were owed from the State Department for work performed in November and December 2024, well before the Suspension Notices and the Foreign Aid EO were issued.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 41
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

209. Upon information and belief, HHS also took aim at newly arrived refugees and the refugee resettlement infrastructure by, without notice or explanation, withholding reimbursements it had committed pursuant to cooperative agreements to resettlement agency work supporting the integration of recently arrived refugees and SIV holders.

210. The Organizational Plaintiffs do not have significant cash reserves and are dependent on expeditious processing of reimbursements in order to maintain the funds necessary to provide services to recently arrived refugees and SIV holders.

211. On February 25, 2025, this Court held a hearing on Plaintiffs' motion for a preliminary injunction and enjoined Defendants from enforcing the Refugee Ban EO in an oral ruling.

212. Just one day later, Defendants began terminating the USRAP-related cooperative agreements of resettlement partners, including HIAS and CWS.

213. Beginning on February 26 and continuing on February 27, the State Department sent documents terminating all resettlement agencies' USRAP-related cooperative agreements for reception, placement, and other integrative services for newly arrived refugees and SIV holders.

214. The State Department sent the resettlement partners documents (the "Termination Notices") with the heading "NOTICE OF TERMINATION," stating, "The U.S. Department of State hereby notifies the recipient that this [USRAP-related] award is immediately terminated[.]" The sole explanation the documents provide for the terminations: The awards "no longer effectuate[] agency priorities."

215. The Termination Notices do not explain why continuing to fund resettlement partners' work critical to the USRAP no longer serves agency priorities or the national interest.

216. On February 28 and March 24, 2025, this Court entered preliminary injunctions enjoining Defendants from suspending or terminating USRAP-related funding to refugee and resettlement partners and requiring Defendants to reinstate cooperative agreements to provide reception and placement services.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 42
(No. 2:25-cv-255-JNW)

217.    On March 5, 2026, the Ninth Circuit "affirm[ed] the district court's preliminary injunctions to the extent they require the Government to reinstate such cooperative agreements necessary to provide the resettlement services described in § 1522 to refugees who have been admitted to the United States." *Pacito*, 169 F.4th at 940.

### Defendants' Attacks on Refugees Within the United States

218.    Defendants' termination of funding for newly arrived refugees was a harbinger of further attacks to come upon refugees within the United States. Over the course of the past year, Defendants have sought to remake the demographics of this country by blocking non-white refugees from entering the United States and making life within the United States as unbearable as possible for the overwhelmingly non-white, non-European refugees and their family members who live here.

219.    Beginning with their decision to cut off congressionally mandated benefits for newly arrived refugees, Defendants have engaged in steadily intensifying attacks to terrorize refugees within the United States. President Trump and members of his administration have used racial smears to stigmatize refugee and immigrant communities and make them feel unsafe and unwelcome. For example, in November 2025, the President took aim at Somali refugees, posting on social media that "hundreds of thousands of refugees from Somalia are completely taking over the once great State of Minnesota."[19] The next month, Stephen Miller, the U.S. Homeland Security Advisor, smeared Somali immigrants, calling them "pirates" who the United States had "import[ed]".[20]

220.    On November 21, 2025, USCIS issued a memorandum directing a hold on all pending refugee applications for LPR status and directing the review and re-interview of all refugees whose admission to the United States occurred under the Biden Administration. The

---

[19] Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 27, 2025, at 11:27 ET), https://truthsocial.com/@realDonaldTrump/posts/115625429081411360.

[20] Fox News, *'GO HOME': Stephen Miller Decries 'Pirate' Somalis Amid Alleged Fraud Scandal* (YouTube, Dec. 20, 2025), https://www.youtube.com/watch?v=Eqs42DviZ3Q.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 43
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

memorandum stated that "USCIS's top priority is to ensure that all principal refugees admitted to the United States warranted a favorable exercise of discretion." The memorandum exempted from its review those admitted as refugees after February 2025, notably white Afrikaners.

221.    On December 2, 2025, and January 1, 2026, USCIS issued memoranda pausing all USCIS benefit applications, including applications to adjust status by refugees, for individuals from travel-ban-designated countries, with the goal of depriving them of stable legal status.

222.    On January 9, 2026, DHS launched Operation Post-Admission Refugee Reverification and Integrity Strengthening (Operation PARRIS), which targeted 5,600 lawfully admitted refugees in Minnesota for arrest and detention, subjecting them to often violent warrantless arrest and dehumanizing tactics followed by coercive re-interviews of their refugee claims in detention. DHS justified its actions by claiming that the Refugee Act mandated the detention of refugees on their one-year anniversaries in the United States to inspect and examine them for adjustment to LPR status. A district court resoundingly rejected DHS's actions as unlawful and enjoined the arrest or detention of refugees in Minnesota. *See U.H.A. v Bondi*, No. 26-417 (JRT/DLM), 2026 WL 222226, at *1 (D. Minn. Jan. 28, 2026).

223.    On February 18, 2026, DHS issued a memorandum purporting to mandate the indefinite detention of all unadjusted refugees present in the United States for more than one year. The goal: to detain refugees en masse to review their refugee status and seek opportunities to terminate that status, thereby rendering refugees vulnerable to removal. A district court in Massachusetts swiftly stayed the policy. *See Jean A. v. Noem*, No. 26-30031, 2026 WL 805207, at *1 (D. Mass. Mar. 23, 2026).

224.    Through these actions, Defendants have made clear that non-white refugees and their family members are not welcome in the United States.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 44
(No. 2:25-cv-255-JNW)

**The Administration's Issuance of New Travel Bans and Agency Implementation Against Refugees from Designated Countries**

225.    On June 4, 2025, President Trump issued a new proclamation titled "Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats" that invokes the purported authority of INA sections 212(f) and 215(a) to suspend the entry into the United States of foreign nationals from designated countries seeking entry on immigrant and nonimmigrant visas. Procl. No. 10949, 90 Fed. Reg. 24,497 (June 10, 2025) (the "Travel Ban").

226.    The Travel Ban fully suspends the entry of nationals seeking to enter the United States on immigrant and nonimmigrant visas from twelve countries (Afghanistan, Burma, Chad, Republic of the Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Libya, Somalia, Sudan, and Yemen). The proclamation also suspends the entry of nationals from seven other countries (Burundi, Cuba, Laos, Sierra Leone, Togo, Turkmenistan, and Venezuela) who seek to enter the United States as immigrants or on certain nonimmigrant visas. The Travel Ban went into effect on June 9, 2025.

227.    President Trump justified the suspension of entry of immigrants and nonimmigrants from these countries based on assertions by the Secretary of State that the countries have inadequate information sharing, vetting and screening mechanisms. Further, President Trump stated that "many of these countries have also taken advantage of the United States in their exploitation of our visa system and their historic failure to accept back their removable nationals." *Id.*

228.    The Travel Ban does not make any findings of detriment specific to refugees, who are fleeing their countries of nationality, do not travel on visas, and are subject to significantly more extensive vetting than any visa applicants.

229.    The Travel Ban purports to apply only to foreign nationals who, on June 9, 2025, "are outside the United States" and "do not have a valid visa."

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 45
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

230. The Travel Ban states that it applies to individuals seeking entry as both immigrants and nonimmigrants. On its face, the ban does not apply to refugees, who do not receive visas to travel to the United States.

231. In the section on enforcement, the Travel Ban also states that it does not apply to admitted refugees and that "nothing in this proclamation shall be construed to limit the ability of an individual to seek [] refugee status."

232. Section 6(d) of the Travel Ban is identical to language included in Proclamation 9645, a prior travel ban issued during the first Trump Administration. Proclamation 9645 was not applied to bar the entry of refugees.[21] The Travel Ban contains a case-by-case waiver provision, under which the Secretary of State has discretion to find an otherwise-barred individual to be excepted from the entry ban where "the travel by the individual would serve a United States national interest."

233. According to a State Department cable released in separate litigation, the agency instructs that waivers are to be used rarely for "exceptional" travel that serves the national interest from an "America First perspective."

234. Although government counsel in this case have represented that a national interest exception from the Travel Ban might apply to some refugees, Defendants have failed to provide any guidance on how a refugee might seek a waiver.

235. The Travel Ban contains an exception for immigrant visas for ethnic and religious minorities facing persecution in Iran. Yet Lautenberg refugees, who by definition are ethnic and religious minorities facing persecution in Iran, do not travel on immigrant visas and so do not qualify for this exception.

---

[21] At an emergency hearing to address Defendants' lack of compliance with this Court's preliminary injunction, including application of the Travel Ban to refugees, Defendants' counsel conceded that this provision was the reason why Proclamation 9645 did not apply to refugees.

FIRST AM. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF – 46
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

236. After the issuance of the Travel Ban, counsel for Plaintiffs contacted counsel for Defendants to confirm that the Travel Ban does not suspend the entry of refugees. On June 23, 2025—more than two weeks after the Travel Ban went into effect—counsel for Defendants informed counsel for Plaintiffs that the agencies have implemented the Travel Ban to suspend the entry of refugees who are nationals of designated countries.

237. Upon information and belief, Defendants have stopped processing the cases of, and will not admit, any refugees who are nationals of countries designated by the Travel Ban.

**Administration's Animus Against Non-White Refugees and Immigrants and Issuance of Expanded Travel Ban**

238. Since issuing the Travel Ban, the Trump Administration has intensified its discriminatory rhetoric targeting immigrants and refugees. On December 1, 2025, former Secretary of Homeland Security Kristi Noem posted on social media that she had met with the President and was recommending "a full travel ban on every damn country that's been flooding our nation," describing immigrants as "killers," "leeches," and "foreign invaders," and stating, "WE DON'T WANT THEM. NOT ONE."[22]

239. On December 2, 2025, the President declared at a cabinet meeting, "We're going to go the wrong way if we keep taking in garbage into our country," specifically referring to individuals from Somalia. He continued, "I don't want them in our country. I'll be honest with you…. Their country stinks. And we don't want them in our country. I could say that about other countries too."[23] And on December 9, 2025, at a rally in Pennsylvania, President Trump praised his administration's forthcoming decision to expand the travel ban to bar nationals of over thirty countries—all majority non-white and non-European—from entering the United States, stating, "I've also announced a permanent pause on third world migration, including from hellholes like

---

[22] Kristi Noem (@EnvoyNoem), X (Dec. 1, 2025, at 6:52 ET), https://x.com/Sec_Noem/status/1995642101779124476.

[23] Associated Press, *Trump Says He Doesn't Want Somali Migrants in the U.S., Calls People 'Garbage'*, PBS News (Dec. 2, 2025), https://www.pbs.org/newshour/politics/watch-trump-says-he-doesnt-want-somali-migrants-in-the-u-s-calls-people-garbage.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 47
(No. 2:25-cv-255-JNW)

Afghanistan, Haiti, and Somalia and many other countries."[24] He then questioned why the United States didn't take in more people from Scandinavian countries—that is, countries that are majority white.

240.  Days later, on December 16, 2025, President Trump issued a second proclamation titled "Restricting and Limiting the Entry of Foreign Nationals to Protect the Security of the United States," which continued and modified the restrictions imposed on nineteen countries by the first Travel Ban and expanding restrictions to immigrants and nonimmigrants from an additional twenty countries and individuals applying to enter on Palestinian Authority travel documents. *See* Procl. No. 10998, 90 Fed. Reg. 59,717 (Dec. 19, 2025) (the "Expanded Travel Ban," and together with the Travel Ban, the "Travel Bans").

241.  The Expanded Travel Ban prohibits the entry into the United States of all immigrants and nonimmigrants who are nationals of nineteen countries (Afghanistan, Burkina Faso, Burma, Chad, Republic of the Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Laos, Libya, Mali, Niger, Sierra Leone, Somalia, South Sudan, Sudan, Syria, and Yemen) and individuals seeking to enter on travel documents issued or endorsed by the Palestinian Authority. The Expanded Travel Ban also suspends the entry of immigrant visa holders and, with the exception of Turkmenistan, a subset of nonimmigrant visa holders who are nationals of twenty other countries (Angola, Antigua and Barbuda, Benin, Burundi, Cote d'Ivoire, Cuba, Dominica, Gabon, The Gambia, Malawi, Mauritania, Nigeria, Senegal, Tanzania, Togo, Tonga, Turkmenistan, Venezuela, Zambia, and Zimbabwe) seeking to enter the United States as immigrants or nonimmigrants. In total, the Travel Bans restrict entry of nationals of thirty-nine countries across Africa, Asia, Latin America, and the Middle East.

---

[24] Alexandra Marquez, *Trump Revives Slur While Discussing Immigrants from Somalia and Other 'Disgusting' Nations*, NBC News (Dec. 10, 2025), https://www.nbcnews.com/politics/donald-trump/trump-immigrants-somalia-slur- rcna248395.

FIRST AM. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF – 48
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

242. Like the Travel Ban and the travel bans imposed during the first Trump Administration, the Expanded Travel Ban contains an express provision that it does not apply to admitted refugees and that "nothing in this proclamation shall be construed to limit the ability of an individual to seek [] refugee status."

243. Nevertheless, upon information and belief, the administration continues to apply the Travel Bans to all refugees who are nationals of one of the countries designated in either of the proclamations.

244. Defendant's decision to apply the Travel Bans to refugees has significant repercussions for refugees in the USRAP pipeline. Based on refugee admissions in recent years, more than half are from travel-ban-designated countries. In Fiscal Year 2025, two-thirds of refugee admissions were from travel-ban-designated countries; in Fiscal Year 2024, over 57% of admitted refugees hailed from travel ban-designated countries.

**Irreparable Harm Imposed on Plaintiffs by Defendants' Actions**

245. All of these actions—the suspension of refugee admissions and processing, the refugee funding suspension, the application of the Travel Bans to refugees, and the implementation of the FY 2026 PD—have harmed not just refugees waiting to come to the United States but also refugees already here and the organizations that seek to help them.

*Individual Plaintiffs*

*Plaintiff Pacito*

246. Plaintiff Pacito is a refugee from the Democratic Republic of the Congo who, along with his wife and baby son, was scheduled to travel to the Unites States on January 22, 2025, days before the suspension of refugee admissions was to take effect per the Refugee Ban EO.

247. As they were expecting to imminently travel, Pacito's family sold all of their belongings but for the items that could fit in their checked luggage—including the music production equipment that he had used to earn a living—and they gave up the lease on their home.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 49
(No. 2:25-cv-255-JNW)

Perkins Coie LLP
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

248. But just days before they were scheduled to travel, Pacito received a phone call from IOM informing him that his family's travel had been canceled. Initially he thought there must be some mistake, so the family traveled to the IOM transit center (where they were supposed to go on the day of travel for transport to the airport) and asked for clarification. There, he learned that their travel had been canceled because of the EO. IOM staff referred him to the White House website for more information.

249. When Pacito read that the admissions suspension was not to take effect until January 27, 2025, he asked IOM staff why the EO was affecting his family. IOM staff could not explain and simply said that a representative from Washington, D.C., instructed them to cancel the family's flights.

250. That night, the family slept in the parking lot of the IOM transit center, vainly hoping and praying that there was some mistake and that they would be taken to the airport to board their flight the next day as planned.

251. Pacito and his family were devastated by the travel cancelation. They struggled to find stable housing and employment, particularly since he no longer had the equipment required to continue his work as a music producer.

252. Pacito was eventually able to travel to the United States on July 10, 2025, as a result of this Court's preliminary injunction.

*Plaintiff Esther*

253. Plaintiff Esther and her family fled their home in the Democratic Republic of the Congo because of war. At the time, her daughter Plaintiff Josephine was very young. The family arrived at a refugee camp in Tanzania, where life was unsafe for Josephine because young Christian women like her were in danger of being kidnapped and assaulted and were prevented from attending school. The family made the difficult decision to send Josephine to South Africa so she could be safe and have more options.

FIRST AM. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF – 50
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

254. When Esther came as a refugee to the United States in 2016 with other members of her family, she learned that she could apply for family reunification with Josephine through the FTJ process. The case moved forward very slowly during the first Trump Administration's suspension of FTJ processing. Finally, with the assistance of attorneys, Esther filed a mandamus lawsuit in federal court asking the court to order the agencies to make a decision on the years-long pending application.

255. The case began to move more quickly, and in January 2025, Josephine was on the verge of travel. Her boarding foil—the documentary proof she would need to board a flight and enter the United States—was issued. She was awaiting travel booking confirmation when the Refugee Ban EO went into effect.

256. When Esther learned that Josephine's case was indefinitely on pause, she was heartbroken. It was especially hard for Esther because one of her children died unexpectedly and she wished Josephine was with her to provide support.

257. Esther was eventually reunited with her daughter after her daughter traveled to the United States on March 15, 2025, as a result of this Court's preliminary injunction.

*Plaintiff Josephine*

258. Josephine became separated from her mother and the rest of her family after they fled the war in the Democratic Republic of the Congo and found their way to a refugee camp in Tanzania. Josephine's family decided she could not stay in the camp because it was too dangerous for a young, unmarried, Christian woman. Josephine fled to South Africa.

259. Processing began to move more quickly after Josephine's mother, Plaintiff Esther, filed a mandamus lawsuit in federal court to speed up her years-long delayed family reunification case. While Josephine waited for IOM to book her flight, Josephine's lawyer helped her organize her own travel so that she could try to travel before the Refugee Ban EO took effect on January 27, 2025. Before her flight, Josephine went to the U.S. embassy in Johannesburg to pick up her boarding foil. Because she believed she would not be returning to her living quarters, Josephine

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 51
(No. 2:25-cv-255-JNW)

Perkins Coie LLP
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

packed her bags, gave away many of her belongings, and terminated her rental agreement with her landlord.

260. Unfortunately, the embassy refused to release Josephine's boarding foil. Josephine stayed overnight in Johannesburg and tried again the following day to obtain the boarding foil that would have allowed her to self-travel to the United States before January 27, 2025. But she was not able to obtain the document.

261. Josephine was brokenhearted that she was unable to support her mother as she grieved the loss of her son, Josephine's brother, and she longed to be reunited with her siblings, whom she has not seen in so many years.

262. On March 15, 2025, following the issuance of this Court's preliminary injunction, Josephine was able to travel to and be admitted to the United States as a refugee.

*Plaintiff Sara*

263. Plaintiff Sara and her youngest son are Iraqi nationals who currently live in Amman, Jordan. Sara fled Iraq with her eldest son in or around 2003 after their lives were threatened by militias. They were subsequently referred to the USRAP for resettlement to the United States as refugees. Sara's eldest son was admitted to the United States as a refugee in or around 2012 while her own application remained pending. While in Jordan, Sara became remarried, gave birth to her second son, and then divorced. Her youngest son is a derivative beneficiary on her pending refugee application.

264. Sara's refugee application was conditionally approved in January 2024 and she completed her medical exam and cultural orientation—two of the last steps in refugee processing before travel arrangements are made—in January 2025. IOM told her to be prepared to leave quickly because once travel was scheduled, she would have very little time.

265. Sara made preparations to leave and eagerly awaited a phone call saying that she and her son were booked to travel to the United States, where they would finally be reunited with her eldest son, who lives in Idaho. Instead, on January 25, 2025, IOM informed her that the refugee

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 52
(No. 2:25-cv-255-JNW)

program was suspended—and, along with it, her application for resettlement. Sara could hardly bear the news that, after so many years of waiting to reunite with her eldest son and restart their lives in safety, her dreams were now put on indefinite hold.

266.    When Sara closes her eyes, she still imagines herself at the airport and the joy she would feel in seeing her oldest son waiting for her. He is now a U.S. citizen and is expecting his first child. Sara is crushed that she might miss the birth of her first grandchild and that her separation from her oldest son is now indefinitely prolonged. She also feels afraid for her and her youngest son's safety in Jordan, where they face discrimination as Iraqis; her son has been targeted by a local gang and beaten and robbed.

267.    Her youngest son also suffers from a neurological birth defect that affects his nerves and vision. She herself suffers from several medical conditions, including diabetes and uterine fibroids. Sara and her son struggle to access appropriate medical care in Jordan.

268.    Since the Refugee Ban EO went into effect, processing on Sara's refugee application has been suspended and her medical exam has expired.

269.    Sara has been provided with no information or guidance regarding an exception to the Refugee Ban EO and has no means of requesting that her case be considered for an exception.

*Plaintiff Alyas*

270.    Plaintiff Alyas is an Iraqi national who currently lives in Sinjar City, Iraq, with his wife and three-year-old son. Alyas applied for refugee resettlement to the United States through the Iraqi P-2 DAP program, which is a statutorily created program that allows Iraqi nationals who worked for or on behalf of the U.S. government in Iraq, as well as certain family members of such individuals, to directly apply to the USRAP. *See* 8 U.S.C. § 1242(a).

271.    In December 2024, Alyas was conditionally approved for refugee resettlement to the United States, and he and his family were booked to travel on February 3, 2025.

272.    His case was assured to an affiliate office of Plaintiff CWS based in Lincoln, Nebraska, where his brother resides, and where the family were planning to live together. On

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 53
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

January 21, 2025, IOM informed Alyas that his travel was canceled and his case was suspended because of the Refugee Ban EO.

273. Alyas and his wife suffer from anxiety and hopelessness, wondering if they will ever complete the process and be resettled in the United States where they long to live free from fear. He and his family have received death threats and face persecution because of their association with the United States through Alyas's brother, Plaintiff Jalal, who worked for the U.S. military during the Iraq war. He and his family are also in danger in Iraq because they are Yazidi, an ethnoreligious minority that is the target of violence and discrimination. Alyas was forced to abandon his college degree and is unable to find steady employment because of discrimination that he faces in Iraq for being Yazidi.

274. After this Court entered a preliminary injunction on February 25, 2025, requiring the government to lift the suspension of processing and admission of refugees, Alyas was no longer eligible to travel, despite having had travel booked for February 3, 2025, because his medical exams had expired and needed to be redone. Although the injunction remained in place for almost five months, Defendants delayed processing Alyas's case and he had not been scheduled for a new medical exam by the time the Ninth Circuit stayed this Court's injunction in July 2025.

275. Alyas has been provided with no information or guidance regarding an exception to the Refugee Ban EO and has no means of requesting that his case be considered for an exception.

276. On January 12, 2026, PRM emailed Plaintiff CWS a list of cases that would have their assurances revoked and be placed on indefinite hold because Defendants had decided that there was no path forward for the case in Fiscal Year 2026. Alyas's case was included on that list. Without any sponsorship assurance, Alyas's case cannot move forward with any further case processing. Even if the President decides to lift the Refugee Ban EO, Defendants have decided that Alyas is ineligible for admission under the FY 2026 PD despite Congress's determination that, as an Iraqi DAP refugee, he is a refugee of special humanitarian concern.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 54
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

277.    Alyas's heart breaks at the thought that his long-awaited reunion with his parents and two brothers, who live in Nebraska, is now on indefinite hold.

*Plaintiff Marcos*

278.    Plaintiff Marcos lives in Los Angeles, California, with his wife. In or around November 2016, he sponsored his stepdaughter, who lives in El Salvador, to be reunited with her mother and him in the United States through the Central American Minors ("CAM") program.

279.    The CAM program allows parents who are nationals of some Central American countries and have certain legal statuses in the United States to request access to the USRAP for their minor, unmarried children who are living in those countries. If ultimately approved, the child enters the United States as a refugee.[25]

280.    Marcos's stepdaughter received conditional approval for refugee resettlement in or around August 2024, and IOM told Marcos in early January 2025 that his stepdaughter would be traveling to the United States in the first or second week of February.

281.    When Marcos learned about the suspension of refugee admissions, he was devastated and heartbroken to share the news with his stepdaughter, who cried on the phone with him when she learned that her long-awaited reunion with her mother—whom she has not seen since she was a small child—was no longer on the horizon. Marcos fears that his stepdaughter will never be able to travel to the United States to live with her mother and him. This continued separation—after his stepdaughter was on the verge of travel after many years of refugee processing—causes him deep sadness and frustration.

282.    Neither Marcos nor his stepdaughter has been provided with information or guidance regarding an exception to the Refugee Ban EO and the family have no means of requesting that her case be considered for an exception.

283.    Marcos knows that the government has started admitting white Afrikaners as refugees while excluding his stepdaughter and people that look like him. This treatment makes

---

[25] CAM has an additional humanitarian parole track that is not at issue in this case.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 55
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

him feel like the government is stereotyping people of his nationality and treating him and his stepdaughter as if they will be a public burden just because of their country of origin.

*Plaintiff Ahmed*

284.    Plaintiff Ahmed is a refugee from Afghanistan who was actively involved in peace and human rights activism and participated in political activities sponsored by or affiliated with the U.S. government. In the fall of 2021, when the United States withdrew and the Taliban took over Afghanistan, the U.S. government evacuated Ahmed from Afghanistan to Germany due to the serious threats to his life.

285.    After being evacuated, Ahmed was referred for resettlement to the United States as a refugee. His case was conditionally approved in January 2025, and he was scheduled to complete his medical exam when the Refugee Ban EO was announced.

286.    Having learned that his refugee application is on indefinite hold as a result of the suspension, Ahmed is disconsolate that his dream to pursue his graduate studies in the United States and reunite with his sister, who lives in Maryland, is now delayed for an uncertain period.

287.    Following the issuance of the Travel Bans, and because of Defendants' implementation of the Travel Bans against refugees, Plaintiff Ahmed is further barred from pursuing refugee admission because he is a national of Afghanistan.

288.    Ahmed has not been provided with information or guidance regarding an exception to the Refugee Ban EO and he has no means of requesting that his case be considered for an exception.

289.    Ahmed cannot safely return to Afghanistan, nor can he live in Germany long-term. He does not know the German language, which prevents him from working in Germany to support himself and his family members who remain in Afghanistan. Ahmed is devastated that he may never be reunited with his sister and his nieces and nephews in the United States.

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

*Plaintiff Rachel*

290.    Plaintiff Rachel is U.S. citizen living in Bellevue, Washington. Driven by her Jewish faith, she organized her friends, synagogue community members, and book club members in support of sponsoring an Afghan family. She, along with four others and her synagogue, filed an application to sponsor a family through Welcome Corps.

291.    Welcome Corps is a program started by the State Department in January 2023 that permits a group of eligible private individuals to sponsor refugees in the USRAP. In submitting an application to sponsor, Welcome Corps group agrees to provide the individuals or families with all of the post-resettlement support that would normally be provided by a resettlement agency. As of August 2024, Americans in all fifty states; Washington, D.C.; and Puerto Rico have applied to sponsor refugees of more than forty-five nationalities through Welcome Corps.[26]

292.    The family that Rachel's group agreed to sponsor was already known to her because her daughter befriended a young Afghan woman who was granted asylum in the United States but whose family remains in danger abroad.

293.    Rachel spent more than forty hours actively working on the process to sponsor the family. She found four other people to sponsor with her and they fundraised about $16,000, completed background checks, and signed guarantees that they would be responsible for the family for the first three to six months. Rachel prepared a detailed application for the family, explaining why each member feared return to Afghanistan, and began preparing for their possible arrival. She spent countless hours thinking about the family and her hopes for them to come to the United States.

294.    The family completed their medical exams and interviews in the summer of 2024.

[26] *See Proposed Refugee Admissions for Fiscal Year 2025*, U.S. Dep't of State, https://www.state.gov/wp-content/uploads/2024/10/Report-Proposed-Refugee-Admissions-for-FY25.pdf (last visited Feb. 10, 2025).

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 57
(No. 2:25-cv-255-JNW)

295.    When Rachel learned about the Refugee Ban EO, she felt immense pain for herself and the family she hoped to welcome. Rachel's heart broke when she told the young Afghan woman about the suspension. Two days later, the Afghan woman's father, who would have been one of the sponsored refugees, died.

296.    As a result of Defendants' implementation of the Travel Bans against refugees, the family Rachel sponsored is further barred from pursuing refugee admission because they are nationals of Afghanistan.

*Plaintiff Ali*

297.    Plaintiff Ali is a refugee from Iraq who was admitted to the United States through the USRAP in early January 2025. He now lives in Dallas, Texas, alone, with no familial support.

298.    As a gay man in Iraq, he faced extreme persecution and discrimination: Same-sex relationships are criminalized in Iraq, and the Iraqi government and society are hostile towards members of the LGBTQ+ community.

299.    Over the years, Ali was subjected to repeated sexual assault by several men and physical and emotional abuse at the hands of his family members, teachers, peers, and coworkers. Ali was unable to seek protection from the police, who instead arrested him, beat him, and tried to coerce him into a sexual act. Ali was referred for resettlement in the United States on the basis of this persecution.

300.    With only $120 in his pocket, Ali entered the United States as a refugee in January 2025. He was assured to a local resettlement agency, which helped arrange an apartment and some initial cash for basic necessities—critical support for Ali, who has no family or support in the United States. They also referred him to apply for the Refugee Cash Assistance Program, which he understood would provide about $726 every month for six months and, after six months, a reduced amount based on income.

301.    Ali was already worried about making the $726 per month stretch enough to cover rent, groceries, furniture, clothing, and all his necessities. Then, on February 5, 2025, he received

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 58
(No. 2:25-cv-255-JNW)

Perkins Coie LLP
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

an email from the Texas Office for Refugees that indicated "there is an indefinite delay in Refugee Cash Assistance benefit payments." Ali learned from his case manager at the resettlement agency that this is the result of the federal government's suspension of funding for programs that assist recently arrived refugees like him.

302.    When Ali's benefits were suspended, he began to experience trouble sleeping and worried he would have to decide between living on the street or moving back to Iraq, where his life would be in constant danger. While Ali loves his new community in Dallas and cherishes the freedom to wear what he wants and be who he is, he suffered from the lack of full benefits to assist him in establishing a new life in the United States.

303.    As a result of this Court's preliminary injunction, Ali has been provided with resettlement benefits that he is statutorily entitled to receive.

*Plaintiff Yodit*

304.    Plaintiff Yodit fled Eritrea in 2008 and was eventually resettled to the United States as a refugee in 2018. She is now a U.S. citizen. Because the journey to escape Eritrea was very dangerous, she made the difficult decision to leave her five-year-old firstborn son, Plaintiff Senai, with his grandmother. Life in Eritrea was very difficult for Senai because of the ongoing war. When he was older, the family made the heavy decision to send him to Egypt to avoid his being forcibly conscripted into the Eritrean army.

305.    When Yodit arrived in the United States as a refugee in 2018, she filed an application for Senai to come to the United States through the FTJ process. The case moved very slowly during the first Trump Administration's suspension of FTJ processing, but Yodit and her son completed all steps required of them and the case was transferred for overseas processing. They underwent DNA testing to prove their relationship and submitted all required documents to the U.S. embassy in Egypt.

306.    Then, the Refugee Ban EO went into effect. Yodit was devastated. She has seen her son only once since he was five years old. Now he is twenty-seven. Several months later, President

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 59
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Trump announced the ban on entry for Eritrean nationals. Yodit is worried that now it will be even harder for her son to ever reach the United States.

307.    When the Refugee Ban EO went into effect, Yodit's son was waiting to receive a travel document to enable him to travel to the United States. Yodit has not been able to find peace knowing that Senai is struggling to survive in Egypt. She calls him every day and cries from the pain of their separation.

308.    Yodit has not been provided with information or guidance regarding an exception to the Refugee Ban EO and the family have no means of requesting that their case be considered for an exception.

309.    When Yodit learned that the government was admitting white Afrikaners from South Africa as refugees, she felt that she was being treated unfairly and discriminated against because of her race and the fact that she is from Eritrea.

*Plaintiff Senai*

310.    Plaintiff Senai is Plaintiff Yodit's son. He currently lives in Cairo, Egypt, where he faces discrimination because he is an Eritrean refugee.

311.    Senai is scared to leave the house or go to school because the situation for Eritrean and Sudanese refugees in Egypt is especially dangerous and the authorities target him based on his skin color.

312.    Senai has not been able to live with his mother for over two decades. After his mother petitioned for him through the FTJ program in 2018, he hoped that they would be reunited. In 2021, he provided a DNA sample and in 2024 his case was transferred to the U.S. embassy in Cairo. All that remained was for him to get a travel document to enable him to travel to the United States.

313.    In 2025, Senai learned from his mother that his application would not proceed because of the Refugee Ban EO.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 60
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

314. Senai has not been provided with information or guidance regarding an exception to the Refugee Ban EO and he has no means of requesting that his case be considered for an exception.

315. Now that Senai is a young man, he wants to be able to live with his mother and support her. He is heartbroken when she cries from the pain of their separation during their daily calls.

*Plaintiff Miriam*

316. Plaintiff Miriam and her family fled the Democratic Republic of Congo after being persecuted by paramilitary groups. Miriam arrived at a refugee camp in Burundi with her husband and children and they lived in the refugee camp for the next fifteen years. During this time, Miriam and her family were accepted to the USRAP and spent about five years undergoing vetting, background checks, and interviews as part of their refugee processing. While Miriam and her family were in the refugee camp waiting to be resettled to the United States, she gave birth to her youngest son. Miriam was erroneously advised by UNHCR staff that adding another family member would delay the resettlement process.

317. When Miriam and her family were eventually ready to travel to the United States in 2021, she was forced to leave her five-year-old son behind after he was prevented from boarding the plane because his name was not listed on the flight manifest.

318. After arriving in the United States, Miriam quickly filed an application for her son through the FTJ process, expecting that they would soon be reunited.

319. Miriam's case moved very slowly due to delays in FTJ processing after the first Trump Administration and, more than four years later, she remains separated from her now nine-year-old son, who has been surviving alone in a refugee camp without his family ever since.

320. Miriam has worked exhaustively to try and move the application process along, even filing a mandamus lawsuit—but then the Refugee Ban EO was issued and all processing on her case stalled.

FIRST AM. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF – 61
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

321. The separation from her son causes Miriam and her entire family immense anguish. When Miriam learned about the Refugee Ban EO, she began shaking and became sick and scared that her son would no longer be allowed to come to the United States.

322. Miriam's nine-year-old son cannot share a simple meal with his parents and siblings. When her other children ask about their brother, she is unable to provide an answer or predict when the family will be reunited.

323. Miriam speaks to her son every day, often multiple times, so that he knows that she is thinking of him and feels emotionally supported. But the separation has caused Miriam and her son unbearable frustration and emotional pain. These years of needless separation cannot be recovered.

324. In May 2025, counsel for Miriam asked government counsel how his client could request a case-by-case exception to the Refugee Ban EO. In response, government counsel informed Miriam's attorney that only the government could initiate the exception process and that the process was not for Miriam's nine-year-old son.

325. Defendants did not explain why Miriam's son was excluded from being considered for a case-by-case exception. Nor did they explain how the entry of Miriam's nine-year-old son would be contrary to the national interest or pose a threat to the security or welfare of the United States.

326. While the U.S. government provides an exception to the Refugee Ban EO for white Afrikaners, Miriam and other refugees like her are prevented from reuniting with their family members. Miriam cannot understand why white Afrikaners are allowed to come in as refugees while Black refugees like her son are not allowed to come as well.

327. Miriam believes the U.S. government is purposely neglecting her and her family because they do not want her to be here and do not value her family in the same way that they value white Afrikaners, just because of her race.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 62
(No. 2:25-cv-255-JNW)

*Plaintiff Babak*

328.    Plaintiff Babak came to the United States as a refugee from Iran. He is now a U.S. citizen and lives with his wife and daughter in California. In 2015, Babak submitted a refugee application for his wife and her parents through the Lautenberg program. He was eventually able to reunite with his wife through a different pathway, but his wife's parents remain in Iran.

329.    Babak, his wife, and her parents are Zoroastrian. In Iran, Zoroastrians face discrimination across all facets of society. Since arriving in the United States, Babak and his family have been able to freely practice their religion and observe their religious traditions.

330.    In 2017, Babak's father- and mother-in-law were scheduled to travel to Austria on a transit-visa for further processing of their refugee applications at RSC Austria. As a result of the first Trump Administration's refugee ban, their appointment was canceled at the last minute.

331.    Babak and his wife never wavered in their desire to be reunited with the rest of their family. In 2021, they bought a bigger house with more room for their family to live in once they arrive.

332.    In 2024, Babak's in-laws were scheduled for an appointment for their Austria transit-visa once again. They excitedly prepared to travel to Austria for the final stages of their refugee processing, including selling their belongings in Iran. The family was devastated when the Refugee Ban EO was announced and their case stalled once again.

333.    The ongoing separation affects Babak and his family each day. With the ongoing war in Iran, Babak and his wife worry for the safety of their daughter's grandparents, whom Babak cares for like his own parents and who have met their granddaughter only once.

334.    Babak and his family have received no information or guidance regarding an exception to the Refugee Ban EO and have no means of requesting that their case be considered for an exception.

335.    Babak has been unable to receive any information about his in-laws' refugee application since the closure of RSC Austria and the Lautenberg program. He refused to accept a

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 63
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

refund for the thousands of dollars he paid as a deposit to HIAS in the hope that it might keep his family's case open.

336.    Babak recently learned about the government's policy to allow only white minorities facing discrimination in South Africa to come to the United States. He feels directly harmed by this unfair policy and believes no one should be discriminated against based on race, religion, or nationality.

*Plaintiff Jalal*

337.    Plaintiff Jalal is Plaintiff Alyas's brother. He came to the United States in 2015 through the SIV program because of his work supporting the U.S. mission in Iraq. He is now a U.S. citizen.

338.    Jalal is very close to his brother and worries about the safety of his brother Alyas and his family in Iraq, knowing that they face persecution because of their ethnoreligious identity as Yazidis and because of Jalal's service to the U.S. military.

339.    Jalal was shocked when Alyas's travel was cancelled. In preparation for Alyas's arrival, Jalal had bought and remodeled a bigger house so that their two families could live together, as well as everything they would need to settle into society, including a car for his brother to drive and books for him to study to become an electrician. Jalal is pursuing a nursing degree and had excitedly planned for his brother to visit his class after he arrived. He had to explain to his friends and teachers that Alyas is no longer allowed to come to the United States. Jalal's prolonged separation from his brother causes him pain and mental anguish.

340.    Jalal suffers with the knowledge that white Afrikaners designated as refugees are being permitted to enter the United States in a matter of months, while he remains painfully separated from his brother. He believes the U.S. government is subjecting him to collective punishment and telling him that he is a threat and not welcome in U.S. society, just because of where he comes from.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 64
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

*Impact of the Refugee Funding Suspension on Individual Plaintiffs*

341.   In addition to Plaintiff Ali, who was directly impacted by the Refugee Funding Suspension because it prevented him from obtaining cash assistance and other benefits to which he is entitled under the Refugee Act and its implementing regulations, each of the individual Plaintiffs is also at risk of being impacted by the funding suspension.

342.   Without the protection of this Court's preliminary injunction, if any of the other individual Plaintiffs who are currently overseas manage to surpass all the hurdles erected by Defendants and travel to the United States, they would be at risk of being prevented from accessing critical support and services during their first days in the United States—just like Plaintiff Ali.

*Organizational Plaintiffs*

343.   The Organizational Plaintiffs are 501(c)(3) nonprofit organizations dedicated to serving refugees by assisting with refugee processing abroad and providing essential services to refugees recently resettled in the United States. Two of the Organizational Plaintiffs—HIAS and CWS—are among the ten[27] national resettlement agencies which, at the time of filing the initial complaint, had cooperative agreements with the State Department to assist in the resettlement of refugees through the Reception and Placement Program (now the PIR program). The third, LCSNW, is a local affiliate of a national resettlement agency that provides services to refugees and others in three Northwestern states. CWS has a cooperative agreement with the State Department to operate RSC Africa. HIAS and CWS, and the resettlement agency for whom LCSNW is a local affiliate, each have agreements with ORR to resettle refugees through the PIR.

344.   Refugee resettlement lies at the heart of the Organizational Plaintiffs' work in the United States. The Organizational Plaintiffs share a mission to support and advocate on behalf of refugees and other persecuted people and engage their respective faith communities in welcoming

---

[27] Following the transition of funding responsibilities from the State Department to ORR, there are now seven national resettlement agencies with cooperative agreements to provide initial resettlement benefits.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 65
(No. 2:25-cv-255-JNW)

refugees and newcomers. Their missions and work are the product of sincerely held beliefs, both religious and moral.

345.   The Organizational Plaintiffs collectively have resettled millions of refugees over decades of work.

346.   HIAS currently provides refugee resettlement support through its twenty-six affiliate offices in seventeen states: California, Colorado, Connecticut, Florida, Illinois, Maine, Massachusetts, Michigan, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Rhode Island, Texas, Washington, and Wisconsin. HIAS closed four offices after the State Department terminated its cooperative agreements.

347.   Through one of the cooperative agreements with PRM, HIAS also operated the RSC in Austria, with suboffices in Croatia and Israel, for over twenty-five years. The State Department ended its cooperative agreement with HIAS in January 2026. Until the Refugee Ban EO, these offices coordinated refugee applications and processing for the USRAP in these countries. The offices in Austria and Croatia relied on special arrangements between the governments of those countries and the State Department. Under those arrangements, Austria and Croatia issued a limited number of visas at the request of HIAS, vetted by the U.S. government, for Iranian followers of the Jewish, Christian, Baha'i, Zoroastrian, and Mandaean faiths. There are currently over 14,000 religious minority members who registered with HIAS for the program and are waiting for visas in Iran. The program allowed them to escape from living as persecuted religious minorities in Iran and travel to Europe for adjudication of their claims by DHS officials. In January 2026, the State Department ended that program. In Tel Aviv, the RSC operated by HIAS prepared resettlement applications and coordinates refugee processing for refugees from Eritrea, Sudan, and South Sudan who are vulnerable in Israel.

348.   Through another cooperative agreement with the State Department, HIAS administered and led the Equitable Resettlement Access Consortium ("ERAC") as a means to facilitate referrals from nongovernmental service providers who identify highly vulnerable

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 66
(No. 2:25-cv-255-JNW)

refugees in need of resettlement due to protection concerns in their country of first asylum. Since ERAC's launch in 2023, thirteen NGOs have been approved by PRM as ERAC partners, and hundreds of NGO staff globally have been trained in refugee protection and resettlement. The ERAC network has set up operations in Lebanon, Jordan, Egypt, Nigeria, Kenya, Greece, Romania, Poland, Aruba, Guyana, Peru, Panama, and Colombia, which in turn identify individuals with resettlement needs and submit applications to the USRAP for individuals from countries including Syria, Iraq, Afghanistan, the Democratic Republic of the Congo, Somalia, Ethiopia, Central African Republic, Venezuela, and Ecuador. The State Department terminated that cooperative agreement too.

349.    Either directly or through its affiliates, CWS currently supports refugees resettled in twenty-three locations in sixteen states: California, Florida, Illinois, Indiana, Iowa, Massachusetts, Nebraska, New Hampshire, New Jersey, New York, North Dakota, Oklahoma, Oregon, Texas, Virginia, and Utah. Prior to the State Department's suspension of its cooperative agreements and the forced closure of multiple offices, CWS operated in forty-four locations across twenty-four states.

350.    CWS also operates an overseas refugee resettlement support center (RSC Africa) in Nairobi, Kenya, which until February 2025 covered refugee processing across sub-Saharan Africa. Through a cooperative agreement with PRM, CWS assisted in the processing of refugee applicants from all of sub-Saharan Africa for admission to the United States. Since February 2025, processing of refugees outside of white minorities from South Africa has been frozen. RSC Africa staff now conduct remote pre-screen interviews with applicants in South Africa and prepare cases for adjudication by USCIS staff. Through the RSC, CWS assists these applicants in completing documentary requirements and schedules USCIS refugee eligibility interviews. USCIS then conducts security vetting checks on applicants. If an applicant is conditionally approved for resettlement by USCIS, RSC staff guide the refugee through post-adjudication steps, including completing medical screening exams and attending cultural orientation programs. The RSC

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 67
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

obtains domestic sponsorship assurances and, once all required steps are completed, the RSC arranges for transportation to the United States.

351. LCSNW is a multiservice social welfare agency with more than forty locations in Washington, Oregon, and Idaho. As an affiliate of a national resettlement agency, LCSNW provides refugee resettlement services as part of its core work, assisting resettled refugees to secure housing, enroll in school, learn English, and adjust to their new communities.

352. The success of HIAS and CWS depends on their broad network of affiliates and offices around the country, such as the partnership LCSNW has with its national resettlement agency. In order to carry out their work effectively, HIAS, CWS, and their affiliates invest considerably in a network of local community individuals and entities whose cooperation is essential to successfully resettle refugees, including landlords, medical providers, employees, government agencies, congregations, civil organizations, and foster care providers.

353. The Organizational Plaintiffs also rely heavily on the work of their volunteers, often drawing upon faith communities that believe that refugee resettlement is a fulfillment of the religious calling to welcome the stranger. In turn, the Organizational Plaintiffs serve as a conduit, providing these faith communities with an opportunity to express this sense of calling.

354. The impact of Defendants' implementation of the Refugee Ban EO on the Organizational Plaintiffs has been immediate and severe, and has been further cemented by Defendants' subsequent implementation of the Travel Bans and the FY 2026 PD. Tens of thousands of refugees whom the Organizational Plaintiffs have as clients have had their plans to resettle or reunify with family blocked indefinitely. Among hundreds of vetted individuals and families who were considered "travel-ready," many saw travel scheduled for January and February 2025 (and some in later months) abruptly canceled. Funds available for essential services for thousands of recently resettled refugees in their first ninety days in the United States were suddenly canceled, leaving the Organizational Plaintiffs scrambling for ways to provide financial and

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

emotional support. Defendants' actions have thwarted the Organizational Plaintiffs' missions and shut down core components of their work.

355. Financially, the impact of the Refugee Ban EO and its implementation has been catastrophic, directly impeding the Organizational Plaintiffs' ability to carry out their mission-driven work.

356. With no advance warning, on January 24, 2025, the Organizational Plaintiffs were instructed to stop all work on current and active funding agreements they had with federal agencies. They were unable to access the funding portals on the State Department website even for access reimbursement for work performed in the months of calendar year 2024, prior to the Suspension Notices.

357. The Suspension Notices, Sub Silentio Suspension, and other obstacles to obtaining funding to conduct refugee resettlement work resulted in thousands of layoffs and furloughs at HIAS and CWS and twenty-three layoffs at LCSNW.

358. HIAS began laying off employees at its national offices on January 31, 2025, as resettlement operations were forced to end. In the early part of 2025, HIAS laid off forty-two of fifty employees at the RSCs it administers in Austria, Croatia, and Israel. On December 31, 2025, the State Department terminated HIAS's contract to administer RSC Austria, resulting in the closure of all RSC offices operated by HIAS and the layoff of remaining staff. HIAS has had to end all subawards under the ERAC project to vetted, approved, and trained resettlement referral partners, preventing partners from maintaining resettlement staff and continuing operations. Resettlement case workers who have undergone extensive training were laid off with no notice, resulting in challenges to communication with clients in various stages of the resettlement process.

359. In the early part of 2025, CWS furloughed 860 individuals in its offices in the United States and issued notices under the Worker Adjustment and Retraining Notification Act to some furloughed employees that they may be laid off after 60 days. CWS further initiated layoffs of over 600 staff in Africa, with CWS paying severance and benefits for each employee. CWS has

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 69
(No. 2:25-cv-255-JNW)

lost 1,269 employees globally, primarily due to layoffs in early 2025 following the refugee ban and termination of government funding.

360.    After LCSNW was informed of the Suspension Notice on its refugee resettlement work, it found itself without the grants to provide rent, food, and other assistance for the recently resettled refugees who are entitled to such payments in the ninety days after arrival. Unwilling to leave these refugees at risk of housing loss or hunger, LCSNW has continued to serve these clients without a guarantee of funding by drawing on other available funding, a short-term solution that will not allow these services to continue for the long-term. LCSNW has laid off twenty-three staff and reassigned twelve staff members, primarily due to the refugee ban and loss of funding.

361.    CWS has already been forced to close local resettlement offices, ending its operations in two countries and eight states within the United States and closing offices in twenty-one locations. HIAS has been forced to close four affiliate offices in the United States and offices in three countries.

362.    Each day the Refugee Ban EO and the Refugee Funding Suspension remain in effect causes lasting damage that cannot be repaired. Once staff with expertise, extensive networks and relationships, and goodwill are separated from employment, full rehiring and rebuilding the goodwill they cultivated is nearly impossible.

363.    Additionally, Defendants' application of the Travel Bans to refugees impacts the Organizational Plaintiffs in unique ways.

364.    The Organizational Plaintiffs must allocate resources and time to serve identified populations in the refugee pipeline, which requires maintaining staff with particular language capacities or creating targeted resources to support specific populations.

365.    Prior to the agency actions challenged here, a significant proportion of the refugees that Organizational Plaintiffs served were nationals of countries designated by the Travel Bans. Approximately half of the refugee clients welcomed by CWS in the last quarter of 2024 were from travel-ban-designated countries. For HIAS and LCSNW, approximately three-quarters of the

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 70
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

refugees served by their organizations in the years preceding the Refugee Ban EO were from travel-ban-designated countries.

366.     The application of the Travel Bans threatens to significantly reduce the number of refugees resettled by the Organizational Plaintiffs and fundamentally alter the composition of the refugees they resettle. The only refugees that the Organizational Plaintiffs have been permitted to resettle are white Afrikaners and non-Black minorities from South Africa; all others from Africa, as well as from Asia and Latin America, have had their applications frozen in place or their access to the USRAP program blocked indefinitely.

## CLASS ALLEGATIONS

367.     Plaintiffs Pacito, Esther, Josephine, Sara, Alyas, Marcos, Ahmed, Ali, Yodit, Senai, Miriam, Babak and Jalal bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1) and (b)(2) on behalf of themselves and all other similarly situated persons for whom Defendants' implementation of the Refugee Ban EO, FY 2026 PD, Travel Bans, and Refugee Funding Suspension interferes with their (i) ability to be resettled, (ii) reunification with family members in the United States, and/or (iii) ability to receive post-resettlement services to which they are entitled by law (the "Class").

368.     On July 30, 2025, the Court appointed Plaintiffs Pacito, Esther, Josephine, Sara, Alyas, Marcos, Ahmed, and Ali as class representatives and approved and certified three subclasses.

369.     The Court appointed Plaintiffs Pacito, Sara, Alyas, Marcos, Josephine, and Ahmed as representatives of the Refugee and Family Member Subclass, defined as "all persons who are being or will be processed for admission to the United States as a refugee or who have applied or will apply for a family member to be processed for admission as a refugee."

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 71
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

370.    The Court appointed Plaintiff Ali as a representative of the Reception and Placement Subclass,[28] defined as "all refugees and Afghan and Iraqi Special Immigrant Visa holders resettled to the United States and within their first ninety days post-resettlement as of January 20, 2025, the issuance date of the Refugee Ban Executive Order, or who currently are, or will be, resettled in the United States and within their first ninety days post-resettlement."

371.    The Court appointed Plaintiff Esther as a representative of the FTJ Petitioner Subclass, defined as "all persons in the United States who are currently petitioning or will petition for family members to be admitted to the United States under the follow-to-join ("FTJ") refugee program."

372.    Plaintiffs intend to seek certification of additional subclasses, including:

a.    All persons who are being or will be processed for admission to the United States as a refugee or who have applied or will apply for a family member to be processed for admission as a refugee who are nationals of a country designated by the Travel Bans (the "Travel Ban Subclass");

b.    All persons who are being or will be processed for admission to the United States as a refugee who are eligible to access the USRAP via the Iraqi Direct Access Program (the "Iraqi DAP Subclass"); and

c.    All persons in the United States who have a close family member who is being processed or will be processed for admission to the United States as a refugee (the "U.S. Family Member Subclass," and together with the Travel Ban Subclass and the Iraqi DAP Subclass, the "Subclasses").

373.    Separate subclasses might be appropriate for the Class defined in paragraph 367.

374.    The Class, including the Subclasses, is so numerous that joinder is impracticable. Approximately 20,287 refugees and SIVs were approved for resettlement and ready for travel as

---

[28] Although the Reception and Placement Program was replaced with PIR in January 2026, class members and their claims are identical and the approved class definition remains appropriate.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 72
(No. 2:25-cv-255-JNW)

Perkins Coie LLP
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

of January 2025. Many thousands more are in the USRAP pipeline in earlier stages of refugee processing. Several thousand refugees already resettled in the United States have applied for family reunification through the FTJ program and are awaiting a final decision on their applications. As of January 2025, approximately 42,000 individuals (comprising of approximately 32,000 refugees and 10,000 SIV holders) resettled in jurisdictions throughout the United States and were within their first 90 days post-resettlement and entitled to Reception and Placement services. Over 10,000 Iraqi refugees who accessed the USRAP through the Iraqi Direct Access Program have completed their USCIS interview, and tens of thousands more are in the USRAP pipeline at earlier stages of processing.

375.    There are tens of thousands of refugees in the USRAP pipeline who are nationals of travel-ban-designated countries. In Fiscal Year 2024, 57,433 refugees were admitted from travel-ban-designated countries. In Fiscal Year 2025, 25,086 refugees admitted (67.7% of all refugee admissions that fiscal year) were nationals of travel-ban-designated countries.

376.    Likewise, there are tens of thousands of individuals in the United States who have close family members who are in the USRAP pipeline. The Lautenberg Program alone has approximately 14,000 pending refugee applicants, each of whom has a U.S.-based family member who initiated their refugee application.

377.    The claims of the Class and Subclass members share common issues of law, including but not limited to whether Defendants' implementation of the Refugee Ban EO, FY 2026 PD, and Refugee Funding Suspension and application of the Travel Bans to refugees violate the APA and the Fifth Amendment.

378.    The claims of the Class and Subclass members share common issues of fact, including but not limited to (i) whether Defendants' implementation of the Refugee Ban EO and FY 2026 PD and application of the Travel Bans to refugees prevents them or their family members from entering the United States from abroad and (ii) whether the Refugee Funding Suspension is

FIRST AM. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF – 73
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

or will be enforced to prevent the provision of essential post-resettlement services to which the Reception and Placement Subclass members are entitled as a matter of law.

379.    The claims and defenses of the named Plaintiffs are typical of the claims or defenses of the Class and Subclasses.

380.    The named Plaintiffs will fairly and adequately protect the interests of the Class and Subclasses. The named Plaintiffs have no interest that is now or might be potentially antagonistic to the interests of the Class and Subclasses. The attorneys representing the named Plaintiffs include experienced attorneys who are considered able practitioners in federal civil litigation, including civil rights litigation. These attorneys should be appointed as class counsel.

381.    Defendants have acted, have threatened to act, and will act on grounds generally applicable to the Class and Subclasses, thereby making final injunctive and declaratory relief appropriate to the Class as a whole. The Class and Subclasses may therefore be properly certified under Federal Rule of Civil Procedure 23(b)(2).

382.    Prosecution of separate actions by individual members of the Class and Subclasses would create the risk of inconsistent or varying adjudications and would establish incompatible standards of conduct for individual members of the Class. The Class and Subclasses may therefore be properly certified under Federal Rule of Civil Procedure 23(b)(1).

## CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act**
**(Implementation of Refugee Ban EO)**
**(On Behalf of All Plaintiffs, including the Class, Against All Defendants)**

383.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

384.    Defendants' actions taken to implement the Refugee Ban EO are arbitrary and capricious; an abuse of discretion or otherwise not in accordance with law; contrary to a

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

constitutional right, power, privilege, or immunity; and in excess of statutory jurisdiction, authority, or limitation or short of statutory right.

385.   Defendants' actions taken to implement the Refugee Ban EO were arbitrary and capricious because they failed to follow their own policies, procedures, and regulations.

386.   Defendants' actions taken to implement the Refugee Ban EO constitute a legislative rule issued without observance of the notice and comment procedure required by 5 U.S.C. § 553.

387.   Defendants' implementation of the Refugee Ban EO must therefore be set aside pursuant to the APA. *See* 5 U.S.C. § 706(2).

**SECOND CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act and Immigration and Nationality Act**
**(Defunding of USRAP)**
**(On Behalf of All Plaintiffs, including the Class, Against All Defendants)**

388.   The foregoing allegations are repeated and incorporated as though fully set forth herein.

389.   Defendants' defunding of the USRAP, specifically provision of post-arrival resettlement benefits, is arbitrary and capricious; an abuse of discretion or otherwise not in accordance with law; contrary to a constitutional right, power, privilege, or immunity; and in excess of a statutory jurisdiction, authority, or limitation or short of statutory right.

390.   The defunding of the USRAP, including the Termination Notices, the Suspension Notices, and the Sub Silentio Suspension, is arbitrary and capricious because Defendants failed to consider the relevant factors; articulate a rational connection between the facts found and the choices made; show there are good reasons for the change in policy; consider important aspects of the problem, including serious reliance interests; and consider reasonable alternatives within the ambit of the existing policy. The Sub Silentio Suspension is arbitrary and capricious for the additional reason that it is a sub silentio policy change.

391.   The defunding of the USRAP is also contrary to law because it is contrary to Congress's statutory scheme governing refugee processing and admissions, refugee resettlement,

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 75
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

and SIV resettlement, and Defendants have also failed to follow their own policies, procedures, and regulations.

392. The defunding of the USRAP constitutes a legislative rule issued without observance of the notice and comment procedure required by 5 U.S.C. § 553.

393. The defunding of the USRAP must therefore be set aside pursuant to the APA. *See* 5 U.S.C. § 706(2).

**THIRD CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act**
**(Implementation of Refugee Ban EO Case-by-Case Exceptions)**
**(On Behalf of Plaintiffs Sara, Alyas, Marcos, Ahmed, Yodit, Senai, Miriam, Babak, Jalal, and the Class Against All Defendants)**

394. The foregoing allegations are repeated and incorporated as though fully set forth herein.

395. The Refugee Ban EO authorizes the Secretaries of State and Homeland Security to admit individuals on a "case-by-case basis" under an exception to the EO so long as they determine that entry is "in the national interest and does not pose a threat to the security or welfare of the United States."

396. Under the APA, it is incumbent upon Defendants when administering benefits to develop eligibility standards, adopt procedures for determining eligibility, and promulgate guidance and make the guidance public. *See Morton v. Ruiz,* 415 U.S. 199, 231 (1974).

397. Defendants have implemented the Refugee Ban EO's provision for case-by-case exceptions to grant over 3,000 exceptions to permit the entry of almost exclusively white Afrikaners while categorically withholding case-by-case exceptions from other refugee applicants, without considering their eligibility for an exception.

398. Defendants have failed to adopt or publicize eligibility standards for adjudicating case-by-case exceptions and have failed to adopt or promulgate procedures or guidance regarding eligibility for a case-by-case exception.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 76
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

399.    Defendants' implementation of the Refugee Ban EO's case-by-case exceptions, including the actions set forth above, is arbitrary, capricious and an abuse of discretion, including for failure to take into consideration all relevant factors, failure to consider serious reliance interests, failure to provide a rational explanation, and departing from prior practice; contrary to constitutional right; and ultra vires and in excess of any authority granted by the EO or the Refugee Act.

400.    Defendants' actions taken to implement the Refugee Ban EO's case-by-case exceptions violate Plaintiffs' substantive rights and constitute a legislative rule issued without observance of procedure required by law, including the notice and comment procedure required by 5 U.S.C. § 553.

401.    Defendants' implementation of the Refugee Ban EO's case-by-case exceptions must therefore be set aside pursuant to the APA. *See* 5 U.S.C. § 706(2).

**FOURTH CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act**
**(Agency Implementation of FY 2026 PD)**
**(On Behalf of Plaintiffs Sara, Alyas, Marcos, Ahmed, Yodit, Senai, Miriam, Babak, Jalal, and the Class Against All Defendants)**

402.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

403.    The FY 2026 PD and accompanying report to Congress provide for the admission of refugees who are "victims of illegal or unjust discrimination in their homelands."

404.    Defendants' decision to implement the FY 2026 PD in a manner that makes all refugees except white Afrikaners and other non-Black minorities in South Africa per se ineligible for admission is arbitrary and capricious, an abuse of discretion, and contrary to law, including for failure to consider existing refugee applicants' eligibility for admission under the FY 2026 PD as "victims of illegal or unjust discrimination in their respective homelands"; failure to provide a

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 77
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

rational explanation; departing from prior practice; and failure to take into consideration all relevant factors, including serious reliance interests.

405. Defendants' implementation of the FY 2026 PD must therefore be set aside pursuant to the APA. *See* 5 U.S.C. § 706(2).

**FIFTH CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act, Refugee Crisis in Iraq Act, and Refugee Act**
**(Agency Implementation of FY 2026 PD Against Iraqi DAP Refugees)**
**(On Behalf of Plaintiff Alyas and the Iraqi DAP Subclass Against All Defendants)**

406. The foregoing allegations are repeated and incorporated as though fully set forth herein.

407. Through the RCIA, Congress designated certain U.S.-affiliated Iraqis to be refugees of "special humanitarian concern" to the United States and mandated their access to the USRAP.

408. The Refugee Act requires that refugee admissions "be allocated among refugees of special humanitarian concern to the United States." 8 U.S.C. § 1157(a)(3).

409. Defendants' decision to implement the FY 2026 PD to indefinitely suspend the processing and admission of Iraqi DAP refugees is final agency action subject to judicial review. *See* 5 U.S.C. § 704.

410. There is no authority for Defendants to disregard Congress's determination that individuals eligible under the Iraqi DAP Program are refugees of special humanitarian concern. There is no authority for Defendants to indefinitely halt processing and admission for such individuals. Defendants' decision is therefore not in accordance with law and contrary to a constitutional right, power, privilege, or immunity and in excess of statutory jurisdiction, authority, or limitation or short of statutory right.

411. Defendants' decision to implement the FY 2026 PD to indefinitely suspend the processing and admission of Iraqi DAP refugees is arbitrary and capricious and an abuse of discretion, including for failure to consider whether Iraqi DAP refugees are eligible for admission

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 78
(No. 2:25-cv-255-JNW)

under the FY 2026 PD as "victims of illegal or unjust discrimination in their respective homelands" and failure to consider the serious reliance interests of Iraqi DAP refugees and their U.S.-based family members.

412.    Defendants' implementation of the FY 2026 PD to indefinitely halt processing and consideration for admission of Iraqi DAP refugees of special humanitarian concern must therefore be set aside pursuant to the APA. *See* 5 U.S.C. § 706(2).

**SIXTH CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act and Refugee Act**
**(Agency Implementation of FY 2026 PD Against FTJ Beneficiaries)**
**(On Behalf of Plaintiffs Esther, Josephine, Yodit, Senai, Miriam, and the FTJ Petitioner Subclass Against All Defendants)**

413.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

414.    Under the Refugee Act, federal agencies have a non-discretionary duty to admit FTJ beneficiaries who are otherwise eligible and admissible. There is no authority for Defendants to indefinitely suspend a nondiscretionary statutory duty.

415.    Defendants' implementation of the FY 2026 PD to suspend FTJ refugee processing and admission is arbitrary and capricious, including for failure to consider the serious reliance interests of FTJ petitioners and beneficiaries; an abuse of discretion or otherwise not in accordance with law; contrary to a constitutional right, power, privilege, or immunity; and in excess of statutory jurisdiction, authority, or limitation or short of statutory right.

416.    Defendants' implementation of the FY 2026 PD to suspend FTJ refugee processing and admission must therefore be set aside pursuant to the APA. *See* 5 U.S.C. § 706(2).

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 79
(No. 2:25-cv-255-JNW)

## SEVENTH CLAIM FOR RELIEF
### Violation of the *Accardi* Doctrine and Administrative Procedure Act
### (Agency Implementation of FY 2026 PD Against FTJ Beneficiaries)
### (On Behalf of Plaintiffs Esther, Josephine, Yodit, Senai, Miriam, and the FTJ Petitioner Subclass Against All Defendants)

417. The foregoing allegations are repeated and incorporated as though fully set forth herein.

418. Defendants' implementation of the FY 2026 PD to suspend FTJ refugee processing and admission violates agency procedures, including those at 8 C.F.R. § 207.7. Defendants' implementation of the FY 2026 PD to suspend FTJ refugee processing and admission should therefore be set aside under the principles articulated in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

419. The failure to comply with applicable regulations renders the Defendants' implementation of the FY 2026 PD arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2).

## EIGHTH CLAIM FOR RELIEF
### Violation of the Fifth Amendment
### (On Behalf of Plaintiffs Yodit, Miriam, Babak, Jalal, the FTJ Petitioner Subclass, and the U.S. Family Member Subclass Against All Defendants)

420. The foregoing allegations are repeated and incorporated as though fully set forth herein.

421. The Fifth Amendment's Due Process Clause incorporates an equal-protection guarantee. *United States v. Navarro*, 800 F.3d 1104, 1112 n.6 (9th Cir. 2015) (citing *Bolling v. Sharpe*, 347 U.S. 497, 498–99 (1954)). Government action motivated by animus based on race, ethnicity, national origin, or religion is unconstitutional. *Romer v. Evans*, 517 U.S. 20, 32 (1996).

422. Defendants' policies to (i) implement the FY 2026 PD in a manner that makes all refugees except white Afrikaners and other non-Black minorities in South Africa per se ineligible for admission and (ii) implement the Refugee Ban EO's case-by-case exceptions to exclude from consideration all refugees except white Afrikaners and some non-Black minorities are improperly

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 80
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

motivated by discriminatory intent; animus against non-white, non-European origin refugees; and a desire to effect such discrimination. Defendants' discriminatory intent without any lawful justification is evidenced by a number of factors, including the disparate impact on non-white, non-European-origin refugees; the allocation of over 95% of case-by-case exceptions to white Afrikaners and other white minorities in South Africa; the departure from prior practice and disregard of statutory requirements; the lack of any explanation or rationale for the discriminatory policies; the long history of racial slurs and discriminatory treatment by the Trump Administration towards non-white, non-European-origin immigrants and refugees; and Defendants' unprecedented actions targeting lawfully admitted, non-white refugees within the United States while simultaneously facilitating the entry of white Afrikaners as refugees.

423.   Defendants have thus violated the equal-protection guarantee of the Fifth Amendment by engaging in intentional discrimination based on race, ethnicity, and national origin without any legitimate justification, lawful purpose, rational basis, or nondiscriminatory explanation.

**NINTH CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act**
**(Implementation of Travel Bans)**
**(On Behalf of Plaintiff Ahmed, Yodit, Senai and the Travel Ban Subclass Against Defendants Rubio and Mullin)**

424.   The foregoing allegations are repeated and incorporated as though fully set forth herein.

425.   Defendants' decision to implement the Travel Bans as to refugees is arbitrary and capricious because Defendants failed to consider the relevant factors; articulate a rational connection between the facts found and the choices made; show there are good reasons for the change in policy and departure from prior practice; consider important aspects of the problem, including serious reliance interests; and consider reasonable alternatives.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 81
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

426.   Defendants' actions taken to implement the Travel Bans as to refugees are not in accordance with law; contrary to a constitutional right; and in excess of statutory jurisdiction, authority, or limitation or short of statutory right because they violate the INA.

427.   Defendants' actions taken to implement the Travel Bans as to refugees constitute a legislative rule issued without observance of the notice and comment procedure required by 5 U.S.C. § 553.

428.   Defendants' implementation of the Travel Bans as to refugees must therefore be set aside pursuant to the APA. *See* 5 U.S.C. § 706(2).

## TENTH CLAIM FOR RELIEF
### Violation of the *Accardi* Doctrine and Administrative Procedure Act
### (Implementation of Travel Bans)
### (On Behalf of Plaintiffs Ahmed, Yodit, Senai and the Travel Ban Subclass Against Defendants Rubio and Mullin)

429.   The foregoing allegations are repeated and incorporated as though fully set forth herein.

430.   Defendants' actions taken to implement the Travel Bans as to refugees violate agency policy and regulation, including those at 8 C.F.R. § 207.1 et seq. The application of the Travel Bans to refugees should therefore be set aside under the principles articulated in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

431.   The failure to comply with applicable regulations renders the Travel Bans arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

A.   Enjoin Defendants, including their officials, agents, employees, assigns, and all persons acting in concert or participating with them, from enforcing any portion of Defendants' suspension of refugee processing, decisions, and admissions;

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 82
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

B. Declare unlawful and set aside Defendants' suspension of refugee processing decisions, and admissions;

C. Enjoin Defendants, including their officials, agents, employees, assigns, and all persons acting in concert or participating with them, from implementing or enforcing the defunding of domestic resettlement services and direct them to restore funding pursuant to the terms of all cooperative agreements as necessary to provide resettlement services consistent with the terms of such agreements and any relevant statutes and regulations;

D. Declare unlawful and set aside the defunding of domestic resettlement services, including the Termination Notices, the Suspension Notices, and the Sub Silentio Suspension;

E. Enjoin Defendants, including their officials, agents, employees, assigns, and all persons acting in concert or participating with them, from enforcing Defendants' suspension of refugee processing, decisions, and admissions based on their implementation of the FY 2026 PD;

F. Enjoin Defendants, including their officials, agents, employees, assigns, and all persons acting in concert or participating with them, from implementing the FY 2026 PD, or any subsequent presidential determinations, in a manner that categorically excludes Iraqi DAP refugees and FTJ beneficiaries;

G. Declare unlawful and set aside Defendants' suspension of refugee processing, decisions, and admissions based on their implementation of the FY 2026 PD;

H. Declare unlawful and set aside Defendants' implementation of the FY 2026 PD in a manner that categorically excludes Iraqi DAP refugees and FTJ beneficiaries;

I. Enjoin Defendants, including their officials, agents, employees, assigns, and all persons acting in concert or participating with them, from implementing or enforcing the Travel Bans as to refugees;

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 83
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

J.    Declare unlawful and set aside Defendants' implementation of the Travel Bans as to refugees;

K.    Order Defendants to fulfill their duties under the APA by adopting and publicizing clear and consistent guidance for determining whether an applicant is entitled to a case-by-case exception under section 3(c) of the Refugee Ban EO, including eligibility standards for applicants to meet; examples of information needed to meet those standards; and an orderly, uniform process for determining applicants' eligibility for an exception;

L.    Declare unlawful and set aside Defendants' policy of categorically withholding case-by-case exceptions from all refugees except white Afrikaners and non-Black minorities in South Africa as violative of the APA and the Due Process Clause of the Fifth Amendment to the U.S. Constitution;

M.    Enjoin Defendants, including their officials, agents, employees, assigns, and all persons acting in concert or participating with them, from enforcing any portion of Defendants' policy of categorically withholding case-by-case exceptions from all refugees except white Afrikaners and non-Black minorities in South Africa;

N.    Determine that Plaintiffs' claims may properly be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1) and (b)(2);

O.    Award Plaintiffs costs of suit and reasonable attorneys' fees and expenses pursuant to any applicable law; and

P.    Issue such other and further relief as the Court deems equitable, just, and proper.

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 84
(No. 2:25-cv-255-JNW)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Dated: June 16, 2026

Mevlüde Akay Alp*
Hussein Elbakri*
Kimberly Grano*
Ghita Schwarz*
Pedro Sepulveda*
**INTERNATIONAL REFUGEE
ASSISTANCE PROJECT**
One Battery Park Plaza, 33rd Floor
New York, New York 10004
Telephone: (646) 939-9169
Facsimile: (516) 324-2267
makayalp@refugeerights.org
helbakri@refugeerights.org
kgrano@refugeerights.org
gschwarz@refugeerights.org
psepulveda@refugeerights.org

Laurie Ball Cooper*
Megan McLaughlin Hauptman*
**INTERNATIONAL REFUGEE
ASSISTANCE PROJECT**
650 Massachusetts Avenue NW, Suite 600
Washington, D.C. 20001
Telephone: (516) 732-7116
Facsimile: (516) 324-2267
lballcooper@refugeerights.org
mhauptman@refugeerights.org

By: *s/ Harry H. Schneider, Jr.*
Harry H. Schneider, Jr., WSBA No. 9404
By: *s/ Jonathan P. Hawley*
Jonathan P. Hawley, WSBA No. 56297
By: *s/ Christine E. Gibbs*
Christine E. Gibbs, WSBA No. 62949
**PERKINS COIE LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Telephone: (206) 359-8000
Facsimile: (206) 359-9000
HSchneider@perkinscoie.com
JHawley@perkinscoie.com
ChristineGibbs@perkinscoie.com

John M. Devaney*
**PERKINS COIE LLP**
700 Thirteenth Street NW, Suite 800
Washington, D.C. 20005
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
JDevaney@perkinscoie.com

Joel W. Nomkin*
**PERKINS COIE LLP**
2525 East Camelback Road, Suite 500
Phoenix, Arizona 85016
Telephone: (602) 351-8000
Facsimile: (602) 648-7000
JNomkin@perkinscoie.com

By: *s/ Esmé L. Aston*
Esmé L. Aston, WSBA No. 62545
**PERKINS COIE LLP**
505 Howard Street, Suite 1000
San Francisco, California 94105
Telephone: (415) 344-7000
Facsimile: (415) 344-7050
EAston@perkinscoie.com

*Counsel for Plaintiffs*

* *Admitted pro hac vice*

FIRST AM. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 85
(No. 2:25-cv-255-JNW)